# EXHIBIT A

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

INVESTMENT ADVISERS ACT OF 1940
Release No. 5000 / September 6, 2018

INVESTMENT COMPANY ACT OF 1940
Release No. 33218 / September 6, 2018

ADMINISTRATIVE PROCEEDING
File No. 3-18724

| | |
|---|---|
| **In the Matter of**<br><br>    **MARK R. GRAHAM, BLUE CAPITAL MANAGEMENT, INC., and BLUE ALTERNATIVE ASSET MANAGEMENT, L.L.C.,**<br><br>**Respondents.** | **ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 203(e), 203(f) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, AND SECTION 9(b) OF THE INVESTMENT COMPANY ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), and Section 9(b) of the Investment Company Act of 1940 ("Investment Company Act") against Mark R. Graham, Blue Capital Management, Inc., and Blue Alternative Asset Management, L.L.C. (collectively "Respondents").

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of

the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940, and Section 9(b) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

### III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

### Summary

1. These proceedings arise from investment advisers Blue Alternative Asset Management, L.L.C. ("BAAM") and Blue Capital Management, Inc. ("BCM") (collectively, the "Blue Advisers"), and their 100% owner and President Mark Graham's ("Graham") scheme to defraud in connection with their management of various client assets. Specifically, from at least September 2015 through at least December 2017, the Blue Advisers and Graham engaged in a complex scheme to conceal declining asset values in various client accounts. This scheme included, among other things, making false statements and improperly redeeming investments from private funds the Respondents controlled. The Blue Advisers' and Graham's active concealment contributed to large losses by one trust client, bringing the insurance company beneficiary of the trust to the brink of collapse. Additionally, BCM and Graham failed to disclose numerous conflicts of interest associated with their management of client assets, and failed to implement reasonably designed compliance policies and procedures.

### Respondents

2. **Blue Alternative Asset Management, L.L.C. ("BAAM")**, located in New York City, registered with the Commission as an investment adviser in 2010 and managed several different funds, including the Blue Elite Fund, Ltd. ("BEF"), a pooled investment vehicle. BAAM withdrew its registration with the Commission in March 2015, although it continued to provide various services to Blue Capital Management, Inc. BAAM also functioned as the collateral manager for certain series of the Cygnet 001 Master Trust ("Cygnet Trust"), a trust used for investments made by the reinsurance trusts that the Blue Advisers managed, through 2014. It also managed the assets in the reinsurance trusts through the end of 2017. Graham owns BAAM.

---

[1] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

3. **Blue Capital Management, Inc. ("BCM")**, located in San Juan, Puerto Rico, registered with the Commission in 2014 as an investment adviser and replaced BAAM in 2014 as the manager of various pooled investment vehicles (including BEF) and as the collateral manager for the Cygnet Trust. BCM also managed two other funds, the Stuyvesant Fund and the Blue II Ltd Fund (the "Blue II Fund"). Graham owns BCM. BCM also managed reinsurance trust assets starting in 2014. BCM withdrew its registration as an investment adviser in 2018.

4. **Mark Graham ("Graham")**, age 60, lives in New York City and serves as the President and 100% owner of BAAM and BCM. He controls all investment decisions and activity on behalf of those firms. He is also the majority equity owner of Alpha Re Limited, a Cayman Islands-based reinsurance company.

## Other Relevant Entities

5. **Alpha Re Limited ("Alpha Re")** is a Cayman Islands- based reinsurance company formed in 2011. Alpha Re is primarily engaged in the reinsurance of individual and group coverage in the life and health reinsurance markets. Graham and others formed Alpha Re. Graham owns 51% of the common equity and 9.8% of the voting power of Alpha Re. On January 15, 2018, the Cayman Islands Monetary Authority issued a cease-and-desist order against Alpha Re preventing it from writing any further business. On January 16, 2018, Alpha Re went into voluntary liquidation.

6. **Cygnet 001 Master Trust ("Cygnet Trust")** is a United States trust with different series, including Series 2011-C and Series 2013-A. The Cygnet Trust issued share certificates and notes and made various investments. Additionally, certain of the Cygnet Trust Series entered into repurchase agreements with certain of the reinsurance trusts. The Blue Advisers were the collateral managers for the Cygnet Trust.

7. **Insurance Company A** sells life insurance to fund pre-arranged funeral plans. Insurance Company A entered into a $153 million reinsurance contract with Alpha Re in 2012. Insurance Company A was privately held until January 2018 when it was forced to sell the entire company to another insurance company to raise capital to fund its reserves. Insurance Company A received an initial arbitration award in late 2017 requiring Alpha Re to provide over $100 million in assets to the Insurance Company A Reinsurance Trust.

8. **Insurance Company B** sells long-term care policies. Insurance Company B entered into a $103 million reinsurance contract with Alpha Re in 2013. Insurance Company B entered arbitration with Alpha Re in late 2016. In March 2017, Insurance Company B and Alpha Re reached a settlement. In connection with the settlement, Insurance Company B received $64 million from the Cygnet Trust and BAAM obtained a litigation release from Insurance Company B.

**Facts**

*Background: The Reinsurance Trust Clients*

9. Between 2011 and 2013, Alpha Re entered into reinsurance contracts with several U.S.-based insurance companies, including a $153 million contract in 2012 with Insurance Company A and a $103 million contract in 2013 with Insurance Company B. In each case, Alpha Re assumed a portion of each company's insurance liabilities in exchange for an insurance premium, and was responsible for making payments to the insurance companies on a monthly basis to pay for insurance claims.

10. Each reinsurance contract and applicable state insurance law required Alpha Re to establish one or more U.S.-based reinsurance trusts. Pursuant to the applicable trust contracts, Insurance Company A and Insurance Company B were the beneficiaries of the trusts (the "Insurance Company A Reinsurance Trust" and the "Insurance Company B Reinsurance Trust"). The reinsurance trust contracts required each trust to hold assets sufficient to cover the actuarially determined liability of the future obligations assumed under the reinsurance contracts (*i.e.*, to pay insurance claims). The Insurance Company A Reinsurance Trust was required to hold assets having a fair value of 106% of the actuarially determined amount of liabilities assumed by Alpha Re, and the Insurance Company B Reinsurance Trust was required to hold assets having a fair value of 102% of the actuarially determined amount of liabilities assumed by Alpha Re. If the assets fell below these required thresholds when evaluated on a monthly basis, there was a shortfall ("Asset Shortfall") and Alpha Re was obligated to contribute assets sufficient to meet or exceed the thresholds.

11. Alpha Re, through the reinsurance trusts, could make investments with the premiums it received as part of the reinsurance trust agreements. BAAM was the investment manager under the reinsurance contracts, and had the responsibility to (among other things) select investments for the reinsurance trusts and monitor investments on an ongoing basis. BCM also played a role in managing the reinsurance trusts starting in 2014.

12. Under the reinsurance trust contracts, Alpha Re's ability to profit or lose money was tied in part to the reinsurance trusts' investment returns. In the event that the assets in the reinsurance trusts were less than the required threshold at the end of a month, Alpha Re was required to contribute additional assets to such reinsurance trusts after a cure period and subject to dispute resolution provisions. By contrast, in the event that the assets in the reinsurance trusts were greater than the required threshold, Alpha Re could withdraw assets having a fair market value greater than the threshold from the reinsurance trusts.

13. As the majority common equity owner of Alpha Re, Graham was directly impacted by whether Alpha Re made or lost money on investments made by the reinsurance trusts. The Blue Advisers and Graham (through his ownership of BAAM and BCM) also received management fees as a result of investing the reinsurance trust assets into other funds and investments that they advised and controlled, including BEF and the Stuyvesant Fund.

**Reinsurance Trust Investments**

14. To facilitate the transfer of assets from the reinsurance trusts to other investments the Blue Advisers and Graham managed, Alpha Re set up another U.S.-based trust, the Cygnet Trust, as a securitization vehicle for the assets of the reinsurance trusts. The Blue Advisers (first BAAM, and then BCM) served as the "collateral manager" for the various series of the Cygnet Trust. As such, Graham performed similar functions to his role as "investment manager" for the reinsurance trusts, including determining what investments to make and monitoring assets on an ongoing basis. The Blue Advisers did not receive compensation directly for managing the Cygnet Trust. Rather, the Blue Advisers (and Graham as the 100% owner of BCM and BAAM) received fees for managing the investments made by the Cygnet Trust.

15. In September 2012, BAAM, acting as the investment adviser to both Insurance Company A Reinsurance Trust and the Cygnet Trust, caused both clients to enter into a repurchase agreement ("Insurance Company A Repos") whereby Insurance Company A Reinsurance Trust transferred $148 million to Series 2011-C of the Cygnet Trust ("Series 2011-C"). The Insurance Company A Repos had a term of 364 days. Graham caused these clients to enter into new 364 day repurchase agreements every September from 2013 through 2016.

16. In September 2014, the Blue Advisers, acting as the investment advisers to both Insurance Company B Reinsurance Trust and the Cygnet Trust, caused both clients to enter into a complex transaction in which Insurance Company B Reinsurance Trust obtained a $49 million asset that was supported by $50 million in U.S. Treasuries being held by Series 2011-C.

17. Throughout the Relevant Period, as reflected in the diagram below, the Blue Advisers and Graham made numerous investments in securities on behalf of Series 2011-C, including investments in a leveraged swap that tracked a basket of hedge funds, a share certificate issued by Cygnet Trust Series 2013-A ("Series 2013-A"), and several private funds (BEF, the Stuyvesant Fund, and the Blue II Fund).



**The Decline of Cygnet Trust Asset Values and Resulting Asset Shortfalls**

18. By at least September 2015, Series 2011-C's assets had declined substantially in value. This decline in asset values continued through 2016 and into 2017. The decline in Series 2011-C's assets led to a corresponding Asset Shortfall in the Insurance Company A Reinsurance Trust and the Insurance Company B Reinsurance Trust because Series 2011-C's assets were being used to support the Insurance Company A Repos and the Insurance Company B complex investment. The chart below reflects the reinsurance trust assets, Series 2011-C's assets, and the related Asset Shortfalls:

| Date | Insurance Company A Repos | Insurance Company B Complex Investment | Total Insurance Company A and Insurance Company B Investments | Total Series 2011-C Assets | Asset Shortage in 2011-C, Resulting in Asset Shortfall in Insurance Company A and Insurance Company B Reinsurance Trusts |
|---|---|---|---|---|---|
| September 2015 | $142,898,940 | $49,312,276 | $192,211,216 | $119,847,264 | ($72,363,952) |
| September 2016 | $143,613,434 | $49,312,276 | $192,925,710 | $82,771,839 | ($110,153,871) |
| March 2017 | $143,613,434 | $0 | $143,613,434 | $31,340,303 | ($112,273,131) |

19. The Blue Advisers and Graham were aware of the 2011-C asset value declines and the resulting Asset Shortfalls. As the investment adviser for the Cygnet Trust and for certain of the funds in which the Cygnet Trust invested, Respondents made investment decisions for Series 2011-C, knew what investments Series 2011-C made, and knew the value of each of these investments. In addition, an outside valuation agent performed an analysis of Series 2011-C, the results of which were shared with Graham before September 2015, showing that the value of the net assets in Series 2011-C was significantly less than the face amounts of the Insurance Company A Repos and the Insurance Company B complex investment.

***The Blue Advisers and Graham Engaged in a Fraudulent Scheme to Conceal the Asset Shortfalls***

20. By at least September 2015, rather than disclose the Asset Shortfalls to the reinsurance trusts (which would have required that Alpha Re contribute additional assets to make up for the Asset Shortfalls and could have caused the insurance companies to withdraw assets from their respective reinsurance trust), the Respondents engaged in a scheme to defraud Insurance Company A Reinsurance Trust and Insurance Company B Reinsurance Trust in order to conceal the Asset Shortfalls. In particular, the Respondents (i) made false statements to the trustee of the Insurance Company A Reinsurance Trust as to the value of the securities that supported the 2015 and 2016 repurchase agreements, (ii) failed to disclose a reduction in the value of the reinsurance

6

trust assets, (iii) improperly redeemed investments from private funds the Respondents controlled to provide liquidity to Series 2011-C, and (iv) engaged in other deceptive conduct.

*False Statements in Repurchase Agreements*

21. In September 2015, Respondents, acting as investment advisers to both Insurance Company A Reinsurance Trust and Series 2011-C, caused these two clients to enter into new 364 day repurchase agreements.  In connection with entering into these new repurchase agreements, the Respondents sent confirmations, which Graham signed, to the trustee for the Insurance Company A Reinsurance Trust that assigned a $143 million value to the purchased securities supporting the repurchase agreement.

22. Contrary to these representations, Series 2011-C had, at most, only $120 million in assets as of the confirmation date, and $50 million of Series 2011-C's assets (*i.e.*, the U.S. Treasuries) were also being used as collateral for an investment by Insurance Company B Reinsurance Trust. Thus, there was an Asset Shortfall of at least $72 million.

23. In September 2016, Respondents, acting as investment advisers to both the Insurance Company A Reinsurance Trust and the Cygnet Trust, again caused these clients to enter into new 364 day repurchase agreements knowing that the value of the assets in Series 2011-C had declined.  In particular, in connection with the entering into of these new repurchase agreements, the Respondents sent confirmations to the trustee for the Insurance Company A Reinsurance Trust identifying the value of the purchased securities that supported the repurchase agreement as $144 million.

24. Contrary to these representations, Series 2011-C had, at most, only $83 million in assets as of the confirmation date, and over half of that amount was also being used as collateral for the $49 million investment by Investment Company B Reinsurance Trust.  Thus, there was an Asset Shortfall of at least $110 million.

*Failure to Disclose the Reduction in Value of the Reinsurance Trust Assets*

25. The Insurance Company A Reinsurance Trust and the Insurance Company B Reinsurance Trust generally held few liquid assets that could be used to cover Alpha Re's monthly insurance obligations.  As a result, BCM frequently liquidated assets in Series 2011-C for Alpha Re to use to cover its monthly insurance obligations.  These liquidations decreased Series 2011-C's assets, which resulted in a corresponding decrease in the values of the Insurance Company A Repos and the Insurance Company B complex investment being supported by Series 2011-C's assets. Respondents, however, did not disclose these decreases in the values of the reinsurance trust assets.  If Respondents had properly disclosed this decrease in value of reinsurance trust assets, Alpha Re would have been required to add additional assets to the reinsurance trusts to meet the contractual requirement to hold 106% of the actuarially determined amount of liabilities for the Insurance Company A Reinsurance Trust, and 102% for the Insurance Company B Reinsurance Trust.

*Improper Redemptions*

26. To provide liquidity for Series 2011-C to pay Alpha Re's insurance obligations, from September 2015 through April 2017, BCM and Graham made $26 million in preferential redemptions from BEF (a private fund they managed) to benefit Series 2011-C. In particular, Graham and BCM waived the notice provisions in the BEF Offering Memorandum for their affiliated entities. As a result, there were delays in satisfying $41 million in redemption requests to 55 BEF investors. While the BEF Offering Memorandum disclosed that "the Directors, following consultation with the Investment Manager, may waive the notice provisions and otherwise modify the conditions relating to redemption with regard to any shareholder," it did not disclose that Graham and BCM could leapfrog certain outstanding redemption requests to honor redemption requests by entities Graham controlled.

*Other Deceptive Conduct*

27. The Blue Advisers and Graham also engaged in other deceptive conduct to avoid detection of the Asset Shortfalls. First, faced with dwindling asset values and a need for liquidity, Graham and BCM, acting as the investment advisers to Blue II and the Cygnet Trust, acted inconsistently with the Blue II Offering Memorandum to withdraw more money than allowed. Specifically, the Blue II Offering Memorandum provided that only 90% of the estimated value of an investor's shares could be redeemed before the preparation of the audited financial statements (Blue II was never audited). Despite this requirement, Graham and BCM caused Series 2011-C to redeem more than 100% of its interest in Blue II, withdrawing $21 million from the Blue II Fund at a time when Series 2011-C's interest was, at most, worth $18 million.

28. Second, starting by at least September 2016, when Insurance Company A had raised concerns to Graham about the value of the collateral supporting the assets held in its reinsurance trust, Graham knowingly and repeatedly misrepresented to representatives of Insurance Company A that sufficient collateral for the repurchase agreements existed and that they were fully collateralized.

29. Third, in March 2017, Graham and the Blue Advisers engaged in a conflicted transaction with multiple advisory clients to hide Asset Shortfalls. At this time, Series 2011-C had, at most, approximately $95 million in assets. Respondents, under threat of litigation, transferred $64 million of Series 2011-C's assets to the Insurance Company B Reinsurance Trust, leaving approximately $31 million in Series 2011-C. Series 2011-C's assets, however, also collateralized the Insurance Company A Repos (whose value Graham represented as $144 million as of only a few months prior). In exchange for making this payment, several parties, including BAAM, received full litigation releases from Insurance Company B. This transaction, which resulted in a $112 million Asset Shortfall, harmed one client, Insurance Company A Reinsurance Trust, to the benefit of both Graham and Insurance Company B Reinsurance Trust.

8

30. Finally, throughout the Relevant Period, Graham made numerous misrepresentations to BCM's Chief Compliance Officer ("CCO").  On multiple occasions, the CCO asked Graham to describe the assets BCM and Graham managed and to disclose all of Graham's outside business activities.  In these discussions, Graham failed to disclose numerous critical facts, including his majority equity ownership of Alpha Re, his management of the reinsurance trusts, and his management of Blue II and the Stuyvesant Fund.  Graham also failed to disclose delayed and preferential redemptions in BEF, and investor complaints relating to the delayed redemption payments.  In addition, these misrepresentations resulted in the failure of BCM's Forms ADV (filed from 2014-2016) to disclose the conflicts of interest associated with these issues.

*Compliance Failures*

31. BCM did not implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder in connection with identification and disclosure of conflicts of interest.  For example, the BCM compliance manual stated that employees were required to "avoid establishing financial interests or outside affiliations that may create a conflict or appear to create a conflict" between the employee and the interest of BCM's clients.  If a conflict potentially existed, the compliance manual required Graham to disclose it to the CCO and recuse himself from the decision making process.  Neither of these things occurred.  Moreover, Graham failed to forward numerous required complaints to the CCO as required by the compliance manual.

## Violations

32. As a result of the conduct described above, Respondents willfully violated Sections 206(1) and 206(2) of the Advisers Act, which make it unlawful for any investment adviser, directly or indirectly, to "employ any device, scheme, or artifice to defraud any client or prospective client" and to "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

33. As a result of the conduct described above, Respondents willfully violated Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder, which, in pertinent part, prohibit any investment adviser to a pooled investment vehicle from making an untrue statement of a material fact or omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in a pooled investment vehicle and engaging in any act, practice, or course of business that is fraudulent or deceptive with respect to any investor or prospective investor in the pooled investment vehicle.

34. As a result of the conduct described above, BCM willfully violated, and Graham willfully aided and abetted and caused BCM's violations of, Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder, which require registered investment advisers to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and its rules.

35. As a result of the conduct described above, BCM and Graham willfully violated Section 207 of the Advisers Act, which makes it unlawful for any person to make any untrue statement of a material fact in any registration application or report filed with the Commission, or to omit to state in any such application or report any material fact which is required to be stated therein.

### IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Sections 203(e), 203(f) and 203(k) of the Advisers Act, and Section 9(b) of the Investment Company Act, it is hereby ORDERED that:

A. BCM and Graham cease and desist from committing or causing any violations and any future violations of Section 206(1), 206 (2), 206(4) and 207 of the Advisers Act and Rules 206(4)-7 and 206(4)-8 thereunder.

B. BAAM cease and desist from committing or causing any violations and any future violations of Section 206(1), 206 (2), and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

C. Respondent Graham shall be, and hereby is,

   (1) barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization; and

   (2) prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter;

   with the right to apply for reentry after three (3) years to the appropriate self-regulatory organization, or if there is none, to the Commission.

Any reapplication for association by the Respondent Graham will be subject to the applicable laws and regulations governing the reentry process, and reentry may be conditioned upon a number of factors, including, but not limited to, the satisfaction of any or all of the following: (a) any disgorgement ordered against Graham, whether or not the Commission has fully or partially waived payment of such disgorgement; (b) any arbitration award related to the conduct that served as the basis for the Commission order; (c) any self-regulatory organization arbitration award to a customer, whether or not related to the conduct that served as the basis for the Commission order; and (d) any restitution

order by a self-regulatory organization, whether or not related to the conduct that served as the basis for the Commission order.

   D.   Respondents BAAM and BCM are censured.

   E.   Respondents, jointly and severally, shall pay disgorgement of $1,853,988, prejudgment interest of $73,559, and a civil penalty of $600,000 to the Securities and Exchange Commission within 30 days from the date of entry of this Order.  If any payment is not made by the date the payment is required by this Order, the entire outstanding balance of $2,527,547, plus any additional interest accrued pursuant to SEC Rule of Practice 600 and/or pursuant to 31 U.S.C. 3717, shall be due and payable immediately, without further application.

      Payment must be made in one of the following ways:

      (1)   Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

      (2)   Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

      (3)   Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

      Payments by check or money order must be accompanied by a cover letter identifying Graham, BCM, and BAAM as respondents in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Jason Burt, Assistant Regional Director, Asset Management Unit, Division of Enforcement, Denver Regional Office, U.S. Securities and Exchange Commission, Bryon G. Rogers Federal Building, 1961 Stout Street, Suite 1700, Denver, CO 80294.

   F.  Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended, a Fair Fund is created for the disgorgement, prejudgment interest, and penalty referenced in paragraph E above.  The amount ordered to be paid as a civil money penalty pursuant to this Order shall be treated as penalty paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award

of compensatory damages by the amount of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors and/or clients based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

G.  It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Graham, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Graham under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Graham of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Brent J. Fields
Secretary