**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :

GREAT WESTERN INSURANCE COMPANY  :

                                 :

             Plaintiff,    :

                                 :

                                 :

    vs.                         :

                                 :

MARK GRAHAM, DONALD SOLOW, BLUE  :
CAPITAL MANAGEMENT, INC., BLUE  :
ALTERNATIVE ASSET MANAGEMENT LLC, :
WILMINGTON SAVINGS FUND SOCIETY,  :
FSB, CHRISTIANA TRUST, REGATTA  :
HOLDINGS LLC, CYGNET 001 MASTER  :
TRUST, CYGNET 001 MASTER TRUST SERIES :
2011-A, CYGNET 001 MASTER TRUST SERIES :
2011-C, CYGNET 001 MASTER TRUST SERIES :
2013-A, ALPHA RE LIMITED, ALPHA RE  :
HOLDINGS (CAYMAN) LIMITED, ATLANTIC :
SPECIALTY FINANCE, BLUE ELITE FUND  :
LTD., BLUE ELITE FUND LP, BLUE II LTD.,  :
SANCUS CAPITAL BLUE CREDIT  :
OPPORTUNITIES FUND LTD., ABILITY  :
INSURANCE COMPANY, JOHN DRAKE,  :
EDWARD BRENDAN LYNCH, AND GREGORY :
TOLARAM.                        :

                                 :

             Defendants.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Civil Action No. 18-cv-06249-VSB

Hon. Vernon S. Broderick

**FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY**

      Plaintiff Great Western Insurance Company ("Great Western"), by and through its

counsel, hereby alleges as follows for its Complaint against Defendants:

<u>**NATURE OF THE ACTION**</u>

      1.     This is an action for damages stemming from systematic breaches of fiduciary

duty, fraud, and other misconduct resulting in losses to Great Western that are in excess of $135

million.

2.      Great Western is a Utah-domiciled insurer writing life insurance and annuities that fund pre-arranged funeral plans.  In 2009, Great Western entered into a Coinsurance Agreement ("Coinsurance Agreement"), a copy of which is attached as Exhibit A hereto, with Ability Reinsurance (Bermuda) Limited ("Ability Re") to reinsure certain policies issued by Great Western.  In 2012, Great Western, Ability Re, and Defendant Alpha Re Limited ("Alpha") entered into a Novation Agreement ("Novation Agreement"), a copy of which is attached as Exhibit B hereto, whereby Alpha replaced Ability Re as the reinsurer of Great Western.  In connection with the Novation Agreement, Great Western, Alpha, and WSFS (as defined in paragraph 13 below) entered into an Amended & Restated Trust Agreement ("Trust Agreement") effective July 11, 2012, a copy of which is attached as Exhibit C hereto, whereby Great Western deposited approximately $152 million into the Trust Account (as defined in paragraph 59 below).

3.      Under the Trust Agreement, Defendant Blue Alternative Asset Management ("BAAM"), controlled by Defendant Mark Graham ("Graham"), served as the collateral manager for the assets held in the Trust Account.  In September 2012—two months after receiving control of the then $153 million in the Trust Account—Graham and BAAM invested $148 million of the $153 million in a Repurchase Agreement (as defined in paragraphs 61-71, below, and attached as Exhibit D hereto).

4.      Unbeknownst to Great Western at the time, the counter-party to the Repurchase Agreement was Defendant Cygnet 001 Master Trust Series 2011-C ("Series 2011-C"), which is owned by Defendant Regatta Holdings LLC ("Regatta") and Defendant Donald Solow ("Solow").  The investment manager for Series 2011-C is Defendant Blue Capital Management ("BCM"), which is owned and operated by Graham.  WSFS served as the trustee for Series

2011-C.  This was self-dealing.  It was not an arrangement negotiated at arms-length, and it was to the detriment of Great Western.

5.      From 2012 through 2017, as described below, Graham, Solow, BCM, BAAM, WSFS, Regatta, Series 2011-C, Alpha, and other Defendants named herein obfuscated and hid that they were depleting the funds in the Trust Account, during which time WSFS sent Great Western monthly statements for the Trust Account representing to Great Western that the Market Value (the commonly used and understood term chosen and employed by WSFS in all of its monthly statements referenced herein) of the Trust Account was always in excess of $130 million.

6.      Series 2011-C became a slush fund for Graham, Solow, and the many entities that they controlled or with which they did business.  Graham and Solow comingled Great Western's funds in Series 2011-C with other entities' funds, including funds from Defendant Ability Insurance Company ("Ability").  In October 2016, Ability improperly and unlawfully withdrew approximately $109 million from Series 2011-C, including funds that belonged to Great Western, which withdrawal was not stopped by WSFS, Graham, Solow, BCM, BAAM, or any other Defendant, and, indeed, the withdrawal appears to have been aided by Graham.

7.      As of the date of filing of this Complaint, Great Western does not know the whereabouts of the over $135 million that should be in the Trust Account.  Due to Defendants' misconduct, breaches of fiduciary duty, and fraudulent activity, Great Western has sustained significant economic losses as alleged in greater detail below.  Great Western is entitled to compensatory damages, trebled damages, as well as special and punitive damages.

## PARTIES

8.      Plaintiff Great Western is an insurance company domiciled in Utah with its principal place of business in Ogden, Utah.

9.      Defendant Graham is a resident of New York, New York.

10.      Upon information and belief, Defendant Solow is a resident of Madison, New Jersey.

11.      Defendant BCM is a corporation registered in Puerto Rico with its principal place of business in Puerto Rico.

12.      Defendant BAAM is a limited liability company registered in Delaware with its principal place of business in New York.

13.      Defendant Christiana Trust ("Christiana") is a division of Defendant Wilmington Savings Fund Society, FSB ("Wilmington Savings"), which is a corporation registered in Delaware with its principal place of business in Wilmington, Delaware.  Wilmington Savings and Christiana are collectively referred to herein as "WSFS."

14.      Defendant Regatta is a limited liability company registered in Delaware with its principal place of business in New Jersey.

15.      Defendant Cygnet 001 Master Trust ("Cygnet") is statutory trust registered in Delaware.

16.      Defendant Cygnet 001 Master Trust Series 2011-A ("Series 2011-A") is a series of Cygnet.

17.      Defendant Series 2011-C is a series of Cygnet.

18.      Defendant Cygnet 001 Master Trust Series 2013-A ("Series 2013-A") is a series of Cygnet.

19.    Defendant Alpha is a Cayman limited liability company registered in the Cayman Islands with its principal place of business in the Cayman Islands.

20.    Defendant Alpha Re Holdings (Cayman) Limited ("Alpha Holdings") is a limited liability company registered in the Cayman Islands with its principal place of business in the Cayman Islands.

21.    Defendant Atlantic Specialty Finance ("Atlantic") is a limited liability company registered in the Cayman Islands with its principal place of business in the Cayman Islands.

22.    Defendant Blue Elite Fund Ltd. is a limited liability company registered in the Cayman Islands with its principal place of business in the Cayman Islands.

23.    Defendant Blue Elite Fund LP is a limited partnership registered in Delaware with its principal place of business in New York.

24.    Defendant Blue II Ltd. is a limited liability company registered in the Cayman Islands with its principal place of business in New York.

25.    Defendant Sancus Capital Blue Credit Opportunities Fund Ltd. ("Sancus") is a limited liability company registered in the Cayman Islands with its principal place of business in New York.

26.    Defendant Ability is a corporation registered in Nebraska with its principal place of business in Omaha, Nebraska.

27.    Upon information and belief, Defendant John Drake ("Drake") is a resident of Ontario, Canada.

28.    Upon information and belief, Defendant Edward Brendan Lynch ("Lynch") is a resident of Nassau, New Providence, Bahamas.

29.     Upon information and belief, Defendant Gregory Tolaram ("Tolaram") is a resident of Bermuda.

## JURISDICTION AND VENUE

30.     This Complaint is filed, and this Court has subject matter jurisdiction of the matters complained of, pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 18 U.S.C. § 1961, *et seq.*  This Court has federal question jurisdiction under 28 U.S.C. § 1331, because Great Western's action against certain Defendants arises under 18 U.S.C. § 1961.  This Court has diversity jurisdiction under 28 U.S.C. § 1332, because (a) Great Western and Defendants are citizens of different states, with Great Western being incorporated and its principal place of business being located in Utah, while no Defendant is incorporated in or is a citizen of Utah, and (b) the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

31.     This Court has supplemental jurisdiction over Great Western's state law and common law claims pursuant to 28 U.S.C. § 1367, because the claims against Defendants are related to the claims upon which subject matter jurisdiction is based.

32.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events, actions, or omissions giving rise to the dispute occurred in this District.

33.     The Court has personal jurisdiction over Graham.  Graham is a resident of New York and maintains an office in New York through which he has transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein.

34.     The Court has personal jurisdiction over Solow.  Solow transacted business, maintained substantial contacts, and/or committed overt acts in New York in furtherance of the

acts that are the basis of the claims herein.  Solow attended multiple meetings with Great Western in New York, including, but not limited to, meetings on or about December 7, 2016 and on or about November 16, 2017.

35.     The Court has personal jurisdiction over BCM.  BCM maintains an office in New York through which it has transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein.

36.     The Court has personal jurisdiction over BAAM.  BAAM maintains an office in New York through which it has transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein.

37.     The Court has personal jurisdiction over WSFS.  WSFS availed itself of the privilege of conducting activities in New York through its involvement with Graham, BCM, and BAAM, who sent withdrawal and deposit instructions from New York to WSFS.  The nexus of the transacted business and overt acts that are the basis of the claims herein occurred in New York.  Such exercise of jurisdiction is both reasonable and fosters judicial economy.

38.     The Court has personal jurisdiction over Regatta.  Solow is the sole owner of Regatta, which owns Cygnet and all series trusts thereunder, through which Regatta has transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein in New York.

39.     The Court has personal jurisdiction over Cygnet.  Regatta created and operated Cygnet, through which it has transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein in New York.

40.     The Court has personal jurisdiction over Series 2011-A.  Regatta created and operated Series 2011-A, through which it has transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein in New York.

41.     The Court has personal jurisdiction over Series 2011-C.  Regatta created and operated Series 2011-C, through which it has transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein in New York.

42.     The Court has personal jurisdiction over Series 2013-A.  Regatta created and operated Series 2013-A, through which it has transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein in New York.

43.     This Court has personal jurisdiction over Alpha under Article XI of the Coinsurance Agreement, as applied to Alpha through the Novation Agreement, which states that Alpha submits to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction.  In addition, Alpha transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein in New York.

44.     This Court has personal jurisdiction over Alpha Holdings as the ultimate beneficial owner of Alpha.  The directors and owners of Alpha Holdings—Tolaram, Drake, Lynch, Graham, and Solow—transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein in New York, all of which benefited Alpha Holdings.  Tolaram, representing Alpha, Alpha Holdings, and Atlantic met with Great Western in New York on or about November 16, 2017.

45.     This Court has personal jurisdiction over Atlantic as the ultimate beneficial owner of Alpha Holdings (and, therefore, ultimately of Alpha).  The directors and owners of Atlantic—

Tolaram, Drake, and Lynch—transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein in New York; all of which benefited Atlantic.  Tolaram, representing Alpha, Alpha Holdings, and Atlantic met with Great Western in New York on or about November 16, 2017.

46.     The Court has personal jurisdiction over Blue Elite Fund Ltd.  Blue Elite Fund Ltd. was created and operated by Graham from New York-based offices, through which it has transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein.

47.     The Court has personal jurisdiction over Blue Elite Fund LP.  Blue Elite Fund LP was created and operated by Graham from New York-based offices, through which it has transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein.

48.     The Court has personal jurisdiction over Blue II Ltd.  Blue II Ltd. was created and operated by Graham from New York-based offices, through which it has transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein.

49.     The Court has personal jurisdiction over Sancus.  Sancus was created and operated by Graham from New York-based offices, through which it has transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein.

50.     This Court has personal jurisdiction over Ability.  Under information and belief, Ability's reinsurance agreement with Alpha is governed by New York law.  Ability also delivered funds to New York to be placed under the control of Graham and/or entities Graham

controls as part of its reinsurance agreement with Alpha.  In addition, Ability availed itself of the privilege of conducting activities in New York by causing the transfer of approximately $109 million of assets from the Series 2011-C account at WSFS to an Ability account at BNY Mellon located in New York in furtherance of the acts that are the basis of the claims herein.  Such exercise of jurisdiction is both reasonable and fosters judicial economy.

51.     The Court has personal jurisdiction over Drake because—as Director of Alpha—Drake directed overt acts to be committed in New York in furtherance of the acts that are the basis of the claims herein.  This includes, but is not limited to, directing Graham, Solow, Tolaram, and other Alpha representatives to meet with Great Western in New York on or about November 16, 2017 in furtherance of the acts that are the basis of the claims herein.  In addition, through Drake's ownership of Alpha, the Court has personal jurisdiction over Alpha under Article XI of the Coinsurance Agreement, as applied to Alpha through the Novation Agreement, which states that Alpha will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction.

52.     The Court has personal jurisdiction over Lynch because—as Director of Alpha—Lynch directed overt acts to be committed in New York in furtherance of the acts that are the basis of the claims herein.  This includes, but is not limited to, directing Graham, Solow, Tolaram, and other Alpha representatives to meet with Great Western in New York on or about November 16, 2017 in furtherance of the acts that are the basis of the claims herein.  In addition, through Lynch's ownership of Alpha, the Court has personal jurisdiction over Alpha under Article XI of the Coinsurance Agreement, as applied to Alpha through the Novation Agreement, which states that Alpha will submit to the jurisdiction of any court of competent jurisdiction

within the United States and will comply with all requirements necessary to give such court jurisdiction.

53.     The Court has personal jurisdiction over Tolaram because he transacted business and committed overt acts that are the basis of the claims herein in New York.  Tolaram attended multiple meetings with Great Western in New York, including, but not limited to, meetings on or about November 16, 2017.  In addition, through Tolaram's ownership of Alpha, the Court has personal jurisdiction over Alpha under Article XI of the Coinsurance Agreement, as applied to Alpha through the Novation Agreement, which states that Alpha will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction.  At Tolaram's direction, Alpha transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein in New York.

## FACTUAL BACKGROUND

**The Coinsurance Agreement**

54.     In 2009, Great Western entered into a Coinsurance Agreement with Ability Re.  Under the Coinsurance Agreement, Ability Re assumed a 75% quota share participation on all policies issued by Great Western in calendar years 2006, 2007, and 2008, and which were in force as of January 1, 2009.

55.     Article XII of the Coinsurance Agreement requires the reinsurer to establish a trust account for the benefit of Great Western to secure the reinsurer's payment obligations.  The stated intent and express purpose of the Trust Account is to enable Great Western "to obtain statutory statement credit, as a deduction from reserve liabilities, for the business ceded under this Agreement to the Reinsurer."  Ex. A at § 12.02.  In order to obtain "statutory statement

credit," the reinsurer agreed to deposit and to maintain in the Trust Account qualifying assets under Utah's Insurance Code with a market value of no less than 102% of the reinsurer's share of the reserve liabilities under the Coinsurance Agreement.  *Id.* at § 12.03(b). In order for the assets to be "qualifying assets" under Utah's Insurance Code, the assets generally needed to be cash or low-risk investments, such as United States Treasury securities.

56.     Pursuant to the Coinsurance Agreement, Great Western transferred to Ability Re over $135 million in cash, which Ability Re used to establish the trust account required under Article XII with BNY Mellon.  Ability Re, Great Western, and BNY Mellon entered into a Trust Agreement setting forth the respective rights and obligations of the grantor (Ability Re), the beneficiary (Great Western), and the trustee (BNY Mellon) with regard to the trust account.  As part of the Coinsurance Agreement, Ability Re transferred approximately $18 million into the Trust Account in order to bring Ability Re's share of the reserve liabilities to the required 102%; bringing the total to $153 million.

57.     On June 28, 2012, Great Western, Ability Re, and Alpha entered into a Novation Agreement, whereby Alpha replaced Ability Re as the reinsurer of Great Western under the Coinsurance Agreement.  Ex. B.  The Novation Agreement modified certain parts of the Coinsurance Agreement.  In pertinent part, it called for liquidation of the assets in the BNY Mellon trust account, followed by deposit of the proceeds into the Trust Account here at issue, established by Alpha for the benefit of Great Western, in order to meet Alpha's security obligations under Article XII.  Pursuant to these provisions, Alpha received over $153 million in cash following liquidation of the BNY Mellon trust account in 2012.

58.     Unbeknownst to Great Western at the time, Alpha Holdings and Atlantic—owned by Drake, Lynch, and Tolaram—together with Solow and Graham, founded Alpha.  Alpha

Holdings and Atlantic owned 100% of the preferred shares with 80.2% of the vote. Graham owns roughly 60% and Solow owns roughly 40% of the common stock of Alpha Holdings, which includes a 19.8% voting interest and an 85% economic interest in Alpha.

59.    The Novation Agreement required Alpha to fund the Trust Account for the benefit of Great Western in the amount of 102% of Alpha's reserve obligations under the Coinsurance Agreement. Ex. B at ¶ 15, amending § 12.02 of the Coinsurance Agreement. In this Complaint, Great Western refers to this account as the "Trust Account." The Novation Agreement obligates Alpha to fund the Trust Account with "admitted assets under the Utah Insurance Code." *Id.* The Novation Agreement also requires Alpha to establish and maintain a separate trust account (the "Supplementary Trust Account") for the benefit of Great Western, with an additional amount of 4% of Alpha's share of the reserve liabilities. *Id.* at ¶ 18, creating new § 12.09 under the Coinsurance Agreement.

60.    Alpha established the Trust Account and the Supplementary Trust Account with WSFS, which served as trustee. Alpha, Great Western, and WSFS entered into an Amended & Restated Trust Agreement (hereinafter the "Trust Agreement") effective July 11, 2012, setting forth the respective rights and obligations of the grantor (Alpha), the beneficiary (Great Western), and the trustee (WSFS) as to the Trust Account. *See* Ex. C.[1] Section 4(b) of the Trust Agreement identifies BAAM as the "investment manager" for the assets held in the Trust Account. Graham co-founded BAAM in 2003, has owned all interest and LLC stock in BAAM since 2009, and signed the Trust Agreement's Incumbency Certificate in his capacity as "President" of BAAM. Ex. C at Ex. D.

---

[1] WSFS subsequently resigned as trustee, leading to appointment of a new trustee and execution in July 2017 of a Second Amended & Restated Trust Agreement between Alpha (as grantor), Great Western (as beneficiary), and Wilmington Trust, NA (as trustee).

**Repurchase Agreement**

61.     The Trust Agreement requires that the assets only be invested in qualified and permitted assets under the Utah Insurance Code to permit Great Western to receive full reinsurance credit from its regulator.  Ex. C at Section 1(c).  Without reinsurance credit, Great Western would be subject to both having its license revoked and being liquidated by the Utah Insurance Department.  In order for the assets to be qualifying assets and provide Great Western with the required statement credit under Utah's Insurance Code, the assets generally needed to be cash or low-risk investments, such as U.S. Treasury securities.

62.     In September 2012—two months after receiving control of the $153 million in the Great Western Trust Account—Graham and BAAM invested $148 million of the $153 million in a Repurchase Agreement with Series 2011-C.  *See* Ex. D.  Regatta owns Series 2011-C, and Solow is the sole owner of Regatta—all of which were unknown to Great Western.

63.     A Repurchase Agreement is an agreement on behalf of one party (here, Series 2011-C) to sell assets to another entity (here, the Trust Account securing Great Western) and then to re-purchase them in the future at a set price plus interest, and a corresponding agreement on behalf of the other party (the Trust Account securing Great Western) to buy those assets and then sell them back to the first party (Series 2011-C) in the future.

64.     This chart illustrates the Repurchase Agreement transaction:

**DAY 1**



| Cygnet 001 Master Trust Series 2011-C<br><br>(Seller/Borrower) | CASH<br>$148mm in Cash ⟵<br><br>$148mm of ⟶<br>COLLATERAL | Reinsurance Trust Account securing Great Western<br><br>(Buyer/Lender) |

**REPURCHASE DATE**

CASH AND INTEREST

| | | |
|---|---|---|
| Cygnet 001 Master Trust Series 2011-C | $148mm plus interest → <br><br> ← | Reinsurance Trust Account securing Great Western |

$148mm of COLLATERAL

65.     The Repurchase Confirmation—setting forth, in part, the terms and conditions of the Repurchase Agreement—provided to Great Western along with the Repurchase Agreement identified the "Purchased Securities" (*i.e.*, the collateral) as "$148,000,000 (USD) cash, all or part of which may be used to purchase United States Treasury securities." This 2012 Repurchase Confirmation was signed by WSFS as trustee for Series 2011-C, while at the same time WSFS was trustee for the Great Western Trust; thus, WSFS was on both sides of the transaction.

66.     Prior and subsequent to the execution of the Trust Agreement, Solow and Graham repeatedly affirmed that the collateral backing the Repurchase Agreement were only cash and United States Treasury securities which met the requirements of the Utah Insurance Code. These affirmations were made in a series of conversations and electronic communications that included Nathan Felix, Chief Financial Officer of Great Western.

67.     The Repurchase Agreement was for one day less than one year. This meant that, one day before its one-year anniversary (the "Repurchase Date"), Series 2011-C was to provide cash and interest back to the Great Western Trust Account, and the Great Western Trust Account was to provide the collateral back to Series 2011-C.

68.     However, every subsequent year in September, Series 2011-C and WSFS (as trustee of Great Western's Trust Account) re-entered into the Repurchase Agreement for another year. This occurred in September 2013, September 2014, September 2015, and September 2016.

69.     In December 2013, Regatta and BCM entered into a Collateral Management Agreement, whereby BCM became the Collateral Manager of Series 2011-C.  Graham was the President of BCM, and has owned 100% of BCM since its inception.

70.     Consequently, for the Repurchase Agreements signed in September 2014 – 2016, Graham was on both sides of the purported "negotiation":  as President of BAAM (investment manager of the Trust Account for Great Western) and as President of BCM (collateral manager of Series 2011-C).

71.     At no time from 2012 to 2016 did any party advise Great Western of: (a) the significant interests that Graham simultaneously held in Alpha and BCM, or his role at Series 2011-C (the counter-party to the Repurchase Agreement); (b) the significant interests that Solow and Graham jointly had in Alpha; (c) the significant interests that Solow had in Series 2011-C; or (d) that WSFS (and specifically, Donna Lockerman) served as the Trustee for Series 2011-C. Instead, Defendants Graham, Solow, BCM, BAAM, WSFS, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram kept all of these connections and other conflicts of interest secret from Great Western.

**Assets Backing the Repurchase Agreement**

72.     From 2012 to 2016, all representations by Defendants Alpha, Graham, BAAM, Solow, Tolaram, and WSFS to Great Western were that the collateral backing the Repurchase Agreements were properly valued and appropriate; specifically, cash and United States Treasury securities.

73.     Great Western received monthly account statements from WSFS making representations as to the value of the Trust Account.  From 2012 to 2017, every account

statement received by Great Western from WSFS stated the value of the Trust Account was between $140 – 150 million.  Except for a few very small assets, every account statement received by Great Western showed that the vast majority of the Trust Account's value came from a single Repurchase Agreement with Series 2011-C.  The Trust Account Statements always identified the Market Value of this Repurchase Agreement to be more than $130 million.

74.    The Trustee for Great Western's Trust Account—WSFS and specifically its trust officer, Donna Lockerman—also served as the Trustee for Series 2011-C, the counterparty to the Repurchase Agreement.

75.    Yet, WSFS never told Great Western: (a) that the assets in Series 2011-C were not cash and United States Treasury securities (as Great Western had been told); or (b) that beginning in at least 2014, the value of the Series 2011-C account was significantly below $130 million (meaning, the Repurchase Agreement was not worth anywhere close to $130 million).

76.    For instance, in 2014, Nathan Felix of Great Western asked Donna Lockerman of WSFS if the assets backing the Repurchase Agreement remained cash and United States Treasury securities.  Lockerman said the Repurchase Agreement is tied to "another Alpha account" managed by WSFS, but she refused to share the details of that account.  At that time, Donna Lockerman and WSFS knew that Series 2011-C contained many assets other than cash and United States Treasury securities, yet they failed to alert Great Western.

77.    On many occasions, Nathan Felix, Chief Financial Officer of Great Western, asked Solow about the assets backing the Repurchase Agreement.  In response, Solow gave vague, but reassuring, answers that he did not know precisely what Graham was doing, but the trust was fully funded.  This was false, as Solow, who owned Series 2011-C, well knew.

78.     On many occasions, Great Western asked Graham about the assets backing the Repurchase Agreement.  In response, Graham said there was no issue and that the Great Western Trust Account statements showed the true value of the Repurchase Agreement and that the Trust Account was fully funded.  This was false, as Graham, who, *inter alia*, was the Collateral Manager for Series 2011-C, knew its actual value was far below what was being represented to Great Western.

79.     Contrary to the misrepresentations made by Alpha, Graham, BAAM, Solow, Tolaram, and WSFS to Great Western, sometime after the initial investment in cash and United States Treasury securities, Graham and Solow began to direct the funds backing the Repurchase Agreement in Series 2011-C into risky investments, including numerous hedge funds and swap agreements.  WSFS had immediate knowledge of these activities but never alerted Great Western.

80.     Cygnet, Series 2011-A, Series 2013-A, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., and Sancus are seven such investment vehicles to which Graham and Solow transferred money, both directly and indirectly, from Series 2011-C.  Graham and/or Solow have an ownership interest in all seven of these investment vehicles or entities.

81.     As explained below, Great Western first learned vague details about these investments in November 2016.  However, even at that time, Defendants Alpha, Graham, BAAM, Solow, Tolaram, and WSFS failed to give Great Western specifics, despite repeated promises by Graham, Solow and the entities they represented or controlled to do so.  Great Western did not learn any details about any of these investments, and the fact that they included hedge funds, swaps, and other risky investments until June 2018 (except for a purported $100 million note, as described below, about which Great Western first learned in late 2017).

**September 2015 Repurchase Confirmation**

82.     On June 29, 2015, Alpha received a valuation of Series 2011-C from its accountants.  As of December 31, 2014, the "Fair Value" of Series 2011-C was negative $18.5 million.  This negative valuation accounted for the assets and liabilities of Series 2011-C. Graham, Solow, Regatta, all Cygnet-related entities, BCM, BAAM, Alpha, Drake, Lynch, and Tolaram all knew of this valuation and did not alert Great Western to this fact.

83.     In September 2015, Graham, as President of BCM and Collateral Manager of Series 2011-C, signed several Repurchase Confirmations to re-enter into the Repurchase Agreement with Great Western's Trust Account for several amounts ($134,700,000 and $7,385,895) for a total of $142,085,095.  The "Purchased Securities" (or collateral) identified in the $134,700,000 Repurchase Confirmation included: "$134,700,000 cash, bank certificates of deposit (or interest in the same), United States Treasury obligations or other securities reasonably acceptable to Buyer [Great Western's Trust Account]."  The other Repurchase Confirmation identified the same "Purchased Securities," only in a different dollar amount.

84.     Yet, as of December 2015, an independent third-party chosen by Alpha, Graham, and Solow valued Series 2011-C to be worth approximately negative $50.9 million.  The assets of 2011-C were valued at $148.5 million, while the liabilities were valued at $199.4 million.

85.     The December 2015 WSFS account statement for Great Western's Trust Account showed a Market Value of $134,700,000 and $7,385,895 for the Repurchase Agreement, even though—as trustee of Series 2011-C and the Great Western Trust—WSFS knew that valuation was incorrect.

**September 2016 Repurchase Confirmation**

86.     In September 2016, Graham, as President of BCM and Collateral Manager of Series 2011-C, signed several Repurchase Confirmations to re-enter into the Repurchase Agreement with Great Western's Trust Account for several amounts ($134,700,000 and $7,385,895) for a total of $142,085,095.  The "Purchased Securities" (or collateral) identified in the $134,700,000 Repurchase Confirmation included: "$134,700,000 cash, bank certificates of deposit (or interest in the same), United States Treasury obligations or other securities reasonably acceptable to Buyer [Great Western's Trust Account]."  The other Repurchase Confirmation identified the same "Purchased Securities," only in a different dollar amount.

87.     Yet, the September 2016 WSFS Account Statement for Series 2011-C showed a Market Value of $83,968,197.92.  This valuation only accounted for assets, not liabilities, so the real value was likely even lower.  Even without reflecting liabilities, the September 2016 WSFS Account Statement for Series 2011-C showed significantly less value than the $135 million of assets necessary to meet the obligations of the Repurchase Agreement.

88.     The September 2016 WSFS account statement for Great Western's Trust Account still showed a Market Value of $134.7 million for the Repurchase Agreement, even though—as trustee of Series 2011-C—WSFS knew that such valuation was incorrect.

89.     Every statement Great Western received from WSFS from October 2016 to June 2017 showed a Market Value of $135.4 million for the Repurchase Agreement.  All of these statements were false.  WSFS resigned as trustee of Great Western's Trust Account in June 2017.

90.     On April 29, 2016, Alpha received a valuation of Series 2011-C from its accountants.  As of December 31, 2015, the "Fair Value" of Series 2011-C was negative $50.86

million.  This negative valuation accounted for the assets and liabilities of Series 2011-C.

Graham, Solow, Regatta, all Cygnet-related entities, BCM, BAAM, Alpha, Drake, Lynch, and

Tolaram all knew of this valuation and did not alert Great Western to this fact.

**Payments Received for Purported Services**

91.     Defendants Graham, Solow, BCM, BAAM, WSFS, Regatta, Cygnet, Series 2011-

A, Series 2011-C, Series 2013-A, Alpha, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue

Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram have received many

payments—both directly and indirectly—from assets originally held in Great Western's Trust

Account.

92.     For instance, from September 2012 – March 2017, "Alpha Re Reinsurance

Trusts," which included Series 2011-C, provided cash disbursements to:

      a.   BAAM and BCM (combined) for at least $15.9 million;

      b.   Regatta Holdings for at least $6.3 million;

      c.   Solow for at least $340,000;

      d.   WSFS for at least $545,911; and

      e.   Alpha Holdings for at least $75,000.

93.     BAAM received an "incentive fee" for $2.44 million for the year 2013 from Blue

Elite Fund, Ltd.  A significant amount of money from Series 2011-C was invested in Blue Elite

Fund, Ltd.  That $2.44 million payment was made with funds to which the Trust Account for

Great Western had a superior claim and should never have been made.

**Graham's Self-Dealing Through the Blue Parties**

94.     Graham served in a primary role of responsibility (such as the President, Founder, or similar position) for BAAM, BCM, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., and Sancus Capital Blue Credit Opportunities Fund Ltd.

95.     Lynch and Tolaram served as authorized signatories for Blue II, Ltd.

96.     From 2013 to 2017, Graham directed the movement of moneys linked to Great Western's Trust Account between these four entities.  Graham did this through BAAM and BCM.

97.     To move money between entities Graham controlled, he would sell certificates, notes, shares, or the like in the various entities in exchange for money.  For example, on January 4, 2016, Graham signed a Resolution on behalf of Blue II, Ltd. to redeem $875,039 from Blue Elite Fund.  This means that Blue Elite Fund—under Graham's direction—had previously invested $875,039 in Blue II Ltd.—also under Graham's direction—in exchange for a certificate.  Then, on January 4, 2016, Graham "redeemed" that note for $875,039.  This is one way in which Graham obfuscated his money movements.

98.     On March 28, 2016, Cipperman Compliance Services LLC, the Chief Compliance Officer for BCM chosen by Graham, issued a report reviewing BCM's compliance policies and procedures from January 1, 2015 through December 31, 2015.  The report detailed, among other things, that BCM "is not in compliance with the requirements of the Advisers Act" and that "Graham [] has not been fully transparent with respect to compliance request and inquiries."

99.     After this negative report, BCM continued to serve as the investment manager for Series 2011-C.  Great Western was never told about this report or its findings; all the while,

Solow and Regatta kept Graham and BCM as the investment manager for Series 2011-C and in-charge of Great Western's assets subject to the Repurchase Agreement.

100.    On February 20, 2018, Graham (on behalf of himself and for BCM and BAAM), signed a sworn response to an information subpoena wherein Graham identified all securities or assets related in any way to Alpha and/or Great Western.  The identified securities and assets included, among other things:

        a.  Cygnet 2011-A Certificates;

        b.  Cygnet 2013-A Certificates;

        c.  Sancus Capital Blue Shares;

        d.  Blue Elite Fund Shares; and

        e.  Blue II Shares.

**Ability Withdrawal from Cygnet 001 Master Trust Series 2011-C**

101.    In November 2016, Ability caused the transfer of approximately $109 million of assets from the Series 2011-C account at WSFS to an Ability account at BNY Mellon.  Graham knew that Ability had no right to cause that transfer to be made, because Series 2011-C contained Great Western's assets and moneys, but he took no steps to prevent or to reverse it.  Indeed, Graham testified under oath in July 2018 that he assisted Ability in liquidating the assets it withdrew.

102.    The assets transferred included many of the assets belonging to Great Western, because they were the assets backing the Repurchase Agreement deposited in the Trust Account.

103.    WSFS, as the Trustee for both Great Western's Trust Account and Series 2011-C, knew that the assets in Series 2011-C belonged to Great Western's Trust Account as part of the

Repurchase Agreement.  Yet, WSFS approved and allowed the transfer to Ability's account at BNY Mellon.

104.    Instead of alerting Great Western about this decrease in funds backing the Repurchase Agreement, WSFS sent Great Western a December 2016 account statement stating that the Market Value of the Repurchase Agreements were approximately $135.37 million and $7.4 million.  WSFS knew this was false.

105.    Graham (as Collateral Manager of Series 2011-C), Solow (as owner of Regatta), and Regatta/Cygnet 001 Master Trust (as owners of Series 2011-C) all knew that the assets in Cygnet 001 Master Trust were significantly deficient to back the Repurchase Agreement.  Yet, Graham and Solow—on multiple occasions via in-person meetings, telephone calls, and emails—falsely represented to Great Western that the assets backing the Repurchase Agreement were of sufficient value to meet all of the obligations to Great Western under the Coinsurance Agreement, the Novation Agreement, and the Repurchase Agreement.

106.    Drake, Lynch, and Tolaram—as owners and directors of Alpha—knew that Alpha's cedent (Ability) had caused the transfer of $109 million out of Series 2011-C.  As a result, they knew that the assets in Cygnet were significantly deficient to back the Repurchase Agreement and that Alpha was in breach of its obligations under the Coinsurance Agreement.  Yet, for over a year, they knowingly participated in Alpha's obfuscation to hide these facts from Great Western.

107.    In March 2017, the $109 million at from Ability's BNY Mellon account was transferred to an Ability account at Wells Fargo opened during that month.

**SEC Investigation**

108.    In September 2016, the U.S. Securities and Exchange Commission ("SEC")

contacted Great Western and informed it that the SEC was investigating BAAM and various

entities associated with it, including but not limited to Regatta Holdings, WSFS, Atlantic, Alpha

Holdings, BCM, Alpha, Blue Elite Fund, Blue II Fund, Solow, and Graham.

109.    From that point forward, Great Western made multiple requests and demands to

WSFS, Alpha, Graham, and Solow for information about the assets backing the Repurchase

Agreement.  In an email to Alpha's counsel sent September 29, 2016, Great Western requested

that Alpha identify the collateral backing the trust and assurance that the Trust Account value is

equal to 102% of the reserve liabilities.

110.    On a conference call on October 24, 2016, Great Western requested an

identification of all assets backing the Trust Account.  The Alpha and BAAM representatives,

including Graham, were unable to identify any such assets during the call, but said that a full

picture of the collateral would be provided by October 28, 2016.  That did not happen.

111.    On December 8, 2016, Great Western representatives met with Alpha and BAAM

representatives at the offices of Alpha's counsel in New York.  At that meeting, Graham and

BAAM agreed to provide a full statement of the collateral backing the Trust Account within 5

days.  That never happened.

112.    In May 2017, the Utah Department of Insurance directed inquiries to Alpha's

counsel and BAAM respecting the Trust Account and the assets backing that account.  Those

inquiries have gone completely unanswered.

113.    Despite these requests and notwithstanding its repeated and recycled promises to

provide the information "shortly," Alpha, its owners (Tolaram, Lynch, Drake, Graham, and

Solow), BCM, BAAM, Regatta, and Series 2011-C have utterly failed to identify the nine-figure sum of assets backing the Trust Account.

**Alpha's Failure To Pay Monthly Account Statements**

114.    From 2012 to February 2017, Alpha—through Graham and his entities as its Investment Manager, and WSFS as the Trustee for Great Western's Trust Account—paid most of its monthly account bills to Great Western in a timely fashion.

115.    On or about February 17, 2017, Great Western sent Alpha and WSFS the monthly account for amounts due under the Coinsurance Agreement, for the month of January 2017 ("the January 2017 Settlement Statement").  Alpha owed $1,418,045 for this monthly account.  Alpha failed to pay the bill within the 45 business day deadline under the Coinsurance Agreement.  On April 6, 2017, Great Western sent Alpha a formal notice of intent to terminate the Coinsurance Agreement for non-payment, starting the 20 business day cure period under §8.05 of the Coinsurance Agreement.  A few days later, Alpha—through Graham and/or his entities as its Investment Manager and WSFS as the trustee for the Great Western Trust Account—paid the overdue balance.

116.    This same course of events—Alpha's failure to pay, followed by Great Western sending a notice of intent to terminate letter, and Alpha subsequently paying the overdue account during the cure period—repeated for the February 2017 and March 2017 Settlement Statements.

117.    However, beginning with the April 2017 Settlement Statement, Alpha failed to pay the monthly account and failed to cure the default after receiving notice of Great Western's notice of intent to terminate.  The outstanding balance as of December 2017 totaled $8,575,911, including interest owed under §7.05 of the Coinsurance Agreement.

**Utah Threatened Takeover And Forced Sale Of The Company**

118.     Under Article XII of the Coinsurance Agreement, Great Western is to obtain statutory statement credit for the reinsurance provided by Alpha, which is required to ensure that the assets in the Trust Account qualify as admitted assets under Utah insurance laws and regulations.  Ex. A at § 12.02; Ex. B at ¶ 15 (amending third and fourth sentences of § 12.02).

119.     In April and May of 2017, the Utah Insurance Department sent Alpha and BAAM requests for information on the collateral backing the various Repurchase Agreements held by the Great Western Trust. Both Alpha and BAAM ignored the Department's request.

120.     In or about September 2017, the Utah Insurance Department informed Great Western that it planned to disallow any credit on Great Western's financial statement for the reinsurance from Alpha because of Alpha's failure to identify assets in the Trust Account that qualified for reinsurance credit under Utah law and regulations.

121.     The resulting negative adjustment to Great Western's surplus would reduce it from positive $86,153,259 to negative $41,083,393.  The resulting Risk-Based Capital action level would change from none to "Mandatory Control Level."

122.     On or about October 5, 2017, following a meeting with Great Western, the Utah Department of Insurance issued a Technical Memo reiterating its determination that the assets in the Trust Accounts do not comply with Utah Insurance Code, and, therefore "the credit for reinsurance is disallowed."  The Utah Department of Insurance set a deadline for December 31, 2017 for Great Western to provide evidence of a positive surplus, or else the Department would take control of the Company.

123.     On the brink of extinction and facing the possibility that over 300,000 policy holders would lose coverage, Great Western was sold to American Enterprise Group ("AEG") for pennies on the dollar, with the closing taking place in early 2018.

**The $100 Million Promissory Note**

124.     Unbeknownst to Great Western, in July 2017, Alpha Holdings deposited assets allegedly worth $100 million into the Series 2011-C account at WSFS.  The alleged $100 million asset was in the form of a promissory note by a Seychelles entity called Giga Global backed by a supposed guarantee from a Hong Kong based entity called China Ruifeng Galaxy Renewable Energy Holdings Ltd.  The $100 million promissory note was a contribution of capital by Giga Global to Alpha Holdings in exchange for 100,000,000 preferred shares of Alpha Holdings.  Then, in turn, Alpha Holdings deposited the note into Alpha, which then assigned it to Series 2011-C.  The supposed guarantee from China Ruifeng Galaxy Renewable Energy Holdings Ltd., was not assigned along with the note.

125.     WSFS, as the trustee for Series 2011-C, accepted the deposit of the $100 million promissory note and reflected its Market Value as $100 million on the Series 2011-C account statements going forward.  Series 2011-C provided no consideration to any other entity coincident with the deposit of the $100 million promissory note.  Upon information and belief, the promissory note is not worth $100 million, and it may, in fact, be worthless.

126.     At this same time (and before), Alpha, Graham, Solow, and Tolaram all repeatedly assured Great Western that the Series 2011-C account was fully funded with respect to the approximately $135 million and $7 million Repurchase Agreement.  This was not true.

127.     From September through November 2017, Alpha, Graham, Solow, and Tolaram all represented on multiple occasions to Great Western that this $100 million promissory note

provided sufficient backing of the Repurchase Agreement because the note was genuine and would fully fund the Great Western Trust Account, as the counter-party to the Repurchase Agreement.  Upon information and belief, this was not true.

128.   At the November 2017 arbitration hearing for Great Western's Motion for Interim Security, after Umpire Tom Tobin asked Alpha's counsel about the background of a supposed $100 million promissory note, Alpha's counsel represented that Alpha was not in a position to discuss the bona fides of the note or the guarantee.  Alpha's counsel repeatedly referred to the note as Graham's efforts to fund the amounts missing from the Great Western Trust Account.

129.   In June 2018, Graham, contradicting Alpha and its counsel, testified under oath that he was not the main negotiator of the note.  Graham testified that Tolaram was responsible for the note and negotiations related thereto.  Graham testified that he did not know whether any cash or other consideration was ever exchanged for the note or whether any interest has been paid (as required by the note).

**Arbitration and $132 Million Award In Favor Of Great Western.**

130.   On June 6, 2017, Great Western sent a letter to counsel for Alpha, demanding compliance with the Coinsurance Agreement and an identification of all assets in the Trust Account, including any and all collateral backing any Repurchase Agreements.  This letter stated that if the information was not provided by June 20, 2017, Great Western would pursue formal dispute resolution.

131.   On June 20, 2017, Alpha's counsel sent a letter, providing no information on the assets backing the Trust Account, but instead proposing that Great Western hold off on formal dispute resolution in exchange for a vague suggestion that perhaps there might be productive

discussions among the parties in the future.  Identifying what assets back the Trust Account should have been a clerical exercise taking about a half hour.

132.     On June 21, 2017, Great Western demanded Arbitration, seeking, among other things, that Alpha post security in the form of liquid assets.  On August 4, 2017, Great Western amended and supplemented its demand for Arbitration by including Alpha's failure to pay its April settlement under section 7.02 and its failure to cure the same, after proper notice was given, under section 8.05 of the Coinsurance Agreement.

133.     On November 29, 2017, the Arbitration Panel held a hearing on Great Western's demand that Alpha post pre-hearing security for more than $130 million.  At the hearing, Alpha and its counsel repeatedly pointed directly at Graham, BCM, and BAAM as the parties who know there whereabouts of Great Western's money; Alpha's counsel stated that Alpha has "questions and significant concerns about the Blue Third Parties [*i.e.,* Graham, BAAM, and BCM], what they've done, [and] what happened to the assets."

134.     Later the same day, the Panel issued its Interim Award requiring Alpha to deposit into the Trust Account (see Ex. B at ¶ 15, amending § 12.02 of the Coinsurance Agreement) securing Great Western under the Coinsurance Agreement, cash and/or United States Treasury securities in the amount of $126,994,559.61 and to establish an irrevocable letter of credit subject to the Panel's control in the amount of $4,699,887.77, to cover its liability for unpaid monthly accounts through October 9, 2017.

135.     On December 21, 2017, the United States District Court for the Southern District of New York confirmed the Panel's Interim Award and entered Judgment thereon against Alpha.

136.     On April 17, 2018, the Panel issued its Final Award requiring, among other things, that Alpha pay Great Western all unpaid accounts under the Coinsurance Agreement

(plus interest) and the net accounting and settlement payment due for recapture and termination, totaling $131,432,712.

137.    On July 9, 2018, the United States District Court for the Southern District of New York confirmed the Panel's Final Award and entered Judgment thereon against Alpha.

138.    Alpha has failed to comply with the Panel's Interim Award, failed to satisfy the subsequent federal court judgment, failed to comply with the Panel's Final Award, and failed to satisfy the July 9, 2018 federal court judgment, paying no part of the $131.4 million ordered by the Panel and the subject of two judgments.

139.    The collateral held by Series 2011-C is supposed to secure the Great Western Trust Account.  This collateral is what the Great Western Trust Account supposedly purchased from Series 2011-C pursuant to the Repurchase Agreements and which Series 2011-C is required to repurchase on the Repurchase Date pursuant to the Repurchase Agreements.

140.    To date, Great Western has never received an identification of the specific assets backing the Great Western Trust Account, nor of the assets that are supposedly the subject of the Repurchase Agreement between Series 2011-C and WSFS.  No "repurchase" benefiting the Trust Account securing Great Western has ever taken place.

**Alpha Declared Insolvent.**

141.    On January 16, 2018, Alpha placed itself into voluntary liquidation in the Cayman Islands.

142.    On March 9, 2018, the Grand Court in the Cayman Islands placed Alpha under court-supervised insolvency and rejected the request of two professionals from Grant Thornton Specialists Services (Cayman) Limited (Alpha's choice as joint voluntary liquidators) to be

appointed joint official liquidators, instead appointing two professionals from Kalo (Cayman)

Limited (who were proposed by Great Western) as Alpha's joint official liquidators.

## COUNT ONE

### (Breach of Fiduciary Duty Against Alpha, WSFS, BAAM, and Graham)

143.    Great Western incorporates each and every allegation contained in paragraphs 1

through 142, as though they were fully set forth herein.

144.    Alpha, as reinsurer, owed fiduciary duties to Great Western.

145.    WSFS, as trustee, owed fiduciary duties to Great Western.

146.    BAAM and Graham, as the investment manager for Great Western's Trust

Account, owed fiduciary duties to Great Western.

147.    Based on assurances by Solow and Graham that Alpha would invest Trust assets

prudently and in the best interest of policyholders and Great Western, and other representations

including the ownership structure of Alpha, Great Western reposed trust and confidence in

Alpha, Solow, and Graham.

148.    Alpha, WSFS, BAAM, and Graham owed Great Western a duty of candor and a

duty of loyalty.

149.    Alpha, WSFS, BAAM, and Graham knowingly breached those fiduciary duties by

the acts set forth above, including, without limitation:  (a) failing to advise Great Western of the

true ownership structure of Alpha and deliberately concealing such information in order to

induce Great Western to enter into the Trust Agreement so they could misuse and pilfer assets in

the Trusts to further their fraudulent scheme; (b) over a course of almost five years, deliberately

concealing Alpha, Solow, and Graham's many connections with Regatta, the Cygnet entities, and

the Blue entities; (c) continually using Trust assets to benefit themselves through the Cygnet

entities and Blue entities as part of the fraudulent scheme, and deliberately misleading Great Western as to the true nature of Alpha, Solow, and Graham's relationship to the Cygnet entities and Blue entities; (d) deliberately applying false and erroneous valuations to assets of the Great Western Trust Account and the Repurchase Agreement tied to Series 2011-C, including in monthly reports, to create the erroneous impression that the Great Western Trust Account was fully funded when in fact it was not; (e) using false and erroneous valuations of the Repurchase Agreement to remove more than $150 million from the Trust Accounts; (f) engaging in numerous other investments to benefit Solow, BCM, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus,  Drake, Lynch, and Toloram—and not Great Western; and (g) continually providing Great Western with assurances that Trust assets were properly invested when in fact they were not.

150.    As a result of Alpha, WSFS, BAAM, and Graham's conduct, Great Western has suffered damages of at least $135 million and together with punitive damages in an amount to be determined at trial.

## COUNT TWO

**(Aiding and Abetting a Breach of Fiduciary Duty Against Solow, BCM, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus,  Drake, Lynch, and Toloram)**

151.    Great Western incorporates each and every allegation contained in paragraphs 1 through 142, as though they were fully set forth herein.

152.    Solow, BCM, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Toloram were aware of Alpha, WSFS, BAAM, and/or Graham's breaches of fiduciary duties and knowingly participated in them and induced them.

153.    Solow, BCM, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram all assisted in diverting moneys belonging to Great Western and its Trust Account into investments that benefited themselves and not Great Western.

154.    Solow, BCM, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram knew Alpha, Graham, BAAM, and WSFS continually provided Great Western with assurances that Trust assets were properly invested when in fact they were not.

155.    Solow, BCM, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram knew such false statements about the Great Western Trust Account would induce Great Western to not terminate the Coinsurance Agreement earlier, and therefore, keep Great Western's moneys under Alpha, Graham, BAAM, and WSFS's control.

156.    As a result of Solow, BCM, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus,  Drake, Lynch, and Tolaram conduct, Great Western has suffered damages of at least $135 million and together with punitive damages in an amount to be determined at trial.

## COUNT THREE

**(Fraud Against Alpha, BCM, BAAM, Graham, Regatta, Solow, and Tolaram)**

157.    Great Western incorporates each and every allegation contained in paragraphs 1 through 142, as though they were fully set forth herein.

158.     Alpha, BCM, BAAM, Graham, Regatta, Solow, and Tolaram knowingly made numerous false representations of material fact to Great Western, knowing such statements were false when making them, as detailed above, concerning the ownership of Series 2011-C, Alpha and its owner's ties to Series 2011-C, and the value of the Repurchase Agreement and assets in Great Western's Trust Account, among others, with the intent of inducing Great Western into not terminating the Coinsurance Agreement after it was entered into and withdrawing its assets out of the Great Western Trust Account.

159.     Alpha, BCM, BAAM, Graham, Regatta, Solow, and Tolaram continually concealed their fraud, by repeatedly misrepresenting: (a) the true purpose of the Master Repurchase Agreement, which was to further their fraud scheme; (b) who actually ran Cygnet 001 Master Trust and Series 2011-C, which was Solow and Graham (and various entities they owned and/or controlled); (c) why Alpha was investing in Series 2011-C, which was to benefit Alpha, Solow, Graham, and various other entities linked to them (including, but not limited to, BCM, BAAM, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., and Sancus); and (d) the valuation of the Great Western Trust assets by providing false and erroneous monthly and annual statements, which contained inflated valuations designed to lull Great Western into believing that the Great Western Trust Accounts were properly funded and that Series 2011-C was fully collateralized, all of which is false.

160.     As a result of Alpha, BCM, BAAM, Graham, Regatta, Solow, and Tolaram's conduct, Great Western has suffered damages of at least $135 million and together with punitive damages in an amount to be determined at trial.

## COUNT FOUR

**(Aiding and Abetting a Fraud Against Alpha, BCM, BAAM, Graham, Regatta, Solow, and Tolaram)**

161.    Great Western incorporates each and every allegation contained in paragraphs 1 through 142, as though they were fully set forth herein.

162.    Alpha, BCM, BAAM, Graham, Regatta, Solow, and Tolaram knowingly made numerous false representations of material fact to Great Western, knowing such statements were false when making them, as detailed above, with the intent of inducing Great Western to not terminate the Coinsurance Agreement earlier.

163.    Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Sancus, WSFS, Drake, and Lynch were aware of the fraud being perpetrated on Great Westerns—and provided substantial assistance to the fraud's commission—by Alpha, BCM, BAAM, Graham, Regatta, Solow, and Tolaram.

164.    Great Western justifiably relied upon Alpha, BCM, BAAM, Graham, Regatta, Solow, and Tolaram's misrepresentations to their detriment by not terminating the Coinsurance Agreement earlier.

165.    As a result of Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Sancus, WSFS, Drake, and Lynch's conduct, Great Western has suffered damages of at least $135 million and together with punitive damages in an amount to be determined at trial.

## COUNT FIVE

**(Violation of RICO – 18 U.S.C. § 1962(c) Against Graham, Solow, BCM, BAAM, Regatta, Alpha, Alpha Holdings, Atlantic, Drake, Lynch, and Tolaram)**

166.    Great Western incorporates each and every allegation contained in paragraphs 1 through 142, as though they were fully set forth herein.

167.    Great Western is a "person" as defined by 18 U.S.C. § 1961(3).

168.    Graham, Solow, BCM, BAAM, Regatta, Alpha, Alpha Holdings, Atlantic, Drake, Lynch, and Tolaram are "persons," as that term is defined in 18 U.S.C. § 1961(3).

## The Enterprise

169.    In addition to Alpha, BCM, BAAM, and Regatta being "enterprises" for purposes of RICO, at all relevant times, there was an association-in-fact between and among Alpha, BCM, BAAM, and Regatta employees and entities.  The association-in-fact's purpose was to fraudulently secure reinsurance arrangements with insurance companies, take control of reinsurance trust funds, use those assets to conceal and perpetuate its ongoing fraud scheme, and ultimately enrich the scheme's founders.

170.    Each of these enterprises, including the association-in-fact, had an ascertainable structure and organization and existed apart from its predicate acts.

171.    That association-in-fact was an enterprise for purposes of RICO can be inferred from their shared business relationships and from their common participation in the fraudulent scheme.  Specifically:

172.    Alpha Holdings and Atlantic—owned by Drake, Lynch, and Tolaram—along with Solow and Graham, founded Alpha.  Solow and Graham own 100% of the common shares of Alpha.  Alpha was significantly capitalized by $153 million from a series of trusts funded by Great Western.

173.    Alpha appointed BAAM and its president Graham to be the Investment Manager of Great Western's Trust Account.

174.    Graham and BAAM invested essentially all of the money in a Repurchase Agreement shortly after the Great Western Trust Account fund's arrival.

175.    The counter-party to the Repurchase Agreement—Series 2011-C—was created by Regatta (which is owned solely by Solow).  Solow appointed BCM and its president Graham as the Collateral Manager of Series 2011-C.  Thus, Solow and Graham were on both sides of the transaction.

176.    Each of the enterprises set forth above constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

177.    At all relevant times, each of these Enterprises engaged in, and its activities affected, interstate commerce.

178.    Graham, Solow, Drake, Lynch, Tolaram, Alpha Holdings, and Atlantic are associated with each of the four Enterprises identified above and participated, directly or indirectly, in the management or direction of the Enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  Graham, Solow, Drake, Lynch, Tolaram, Alpha Holdings, and Atlantic were "employed by or associated with" the Enterprise within the meaning of 18 U.S.C. § 1962(c).

**Predicate Acts**

179.    In the course of conducting and participating in the scheme to defraud investors and perpetuate the fraud scheme, Graham, Solow, BCM, BAAM, Regatta, Alpha, Alpha Holdings, Atlantic, Drake, Lynch, and Tolaram perpetrated numerous predicate acts of racketeering activity, which are indictable under provisions of the U.S. criminal code enumerated in 18 U.S.C. § 1961(1), as more specifically alleged below.

180.    Specifically, from 2012 to 2018, Graham, Solow, BCM, BAAM, Regatta, Alpha, Alpha Holdings, Atlantic, Drake, Lynch, and Tolaram engaged in repeated instances of wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

181.    In furtherance of the scheme described above, and with intent to defraud Great Western and other institutional investors, Graham, Solow, BCM, BAAM, Regatta, Alpha, Alpha Holdings, Atlantic, Drake, Lynch, and Tolaram participated in or induced the following conduct that actually used – or foreseeably would have used – wires:

a.    In 2012, Alpha portrayed itself as a trustworthy reinsurer.  As a result, Great Western signed the Novation Agreement (modifying the Coinsurance Agreement) with Alpha, obligating Alpha to invest $153 million in Trust Account assets in accordance with certain investment guidelines prescribed by the Coinsurance Agreement and the insurance laws of Utah.

b.    On approximately July 18, 2012, Great Western transferred $153 million via wires to a Trust Account at WSFS.

c.    Immediately thereafter, Alpha, BAAM, and Graham (a) invested $148 million of the $153 million via wires directly in a Repurchase Agreement—the counter-party to which was Series 2011-C, a series trust wholly owned by Regatta and Solow, and wholly controlled by BCM and Graham, in violation of the Coinsurance Agreement, and (b) hid this self-dealing and violation of the Coinsurance Agreement so that Great Western would not withdraw its funds from the Trust Account.

d.    Between 2012 and 2017, Graham and Solow, through BCM, BAAM, Regatta, and Alpha, directed the investment of Great Western's funds in numerous entities owned and controlled by Graham and Solow, including Series 2011-A, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite

Fund LP, Blue II Ltd., and Sancus.  All of the money and assets transfers occurred via wires.

e.   On approximately September 26, 2015, Graham signed the Repurchase Agreement Confirmation to reinvest $134.7 million from Great Western's Trust Account in "Purchased Securities" from Regatta and Series 2011-C.  At this time, Graham, Regatta, Solow, BCM, and BAAM knew the value of the assets in Series 2011-C was significantly less than $134.7 million.  Yet, they still caused the Repurchase Agreement Confirmation to be sent via wires to WSFS for deposit into Great Western's Trust Account.

f.   On approximately September 25, 2016, Graham signed the Repurchase Agreement Confirmation to reinvest $135.37 million from Great Western's Trust Account in "Purchased Securities" from Regatta and Series 2011-C.  At this time, Graham, Regatta, Solow, BCM, and BAAM knew the value of the assets in Series 2011-C was significantly less than $135.37 million.  Yet, they still caused the Repurchase Agreement Confirmation to be sent via wires to WSFS for deposit into Great Western's Trust Account.

g.   Between 2016 and 2017, after Great Western demanded an accounting of the collateral backing the Repurchase Agreements and information on the relationship between the various parties—such as Regatta, Series 2011-C, Alpha, BAAM, Graham, Solow, and BCM—Defendants Alpha, Tolaram, and Solow represented that the investments were the work of Graham, and outside of their control.  Graham did not provide any information.

h.   Defendants Graham, Solow, BCM, BAAM, Regatta, Alpha, Alpha Holdings, Atlantic, Drake, Lynch, and Tolaram continually engaged in self-dealing and fraud by investing Trust Account assets with entities they controlled in order to enrich the scheme participants and/or protect the scheme by paying demands from other entities (*i.e.*, use Great Western's money to repay old debts).

182.   In each of these instances, Graham, Solow, BCM, BAAM, Regatta, Alpha, Alpha Holdings, Atlantic, Drake, Lynch, and Tolaram acted willfully and with actual knowledge that the conduct was fraudulent.

## **Pattern of Racketeering Activity**

183.   The above acts of wire fraud are part of a pattern of racketeering activity.

184.   The racketeering acts are related to each other in that they have the same purpose, results, participants, victims, and methods of commission.

185.   The racketeering acts are related to each of the Enterprises in that the misrepresentations enabled the Enterprises to obtain institutional investors, direct their funds to certain investment vehicles (such as Series 2011-A, Series 2011-C, Series 2013-A, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., and Sancus), and conceal Graham and Solow's involvement, thus protecting the fraudulent scheme.  Alpha, BCM, BAAM, Regatta, Graham, and Solow were enabled to commit the predicate offenses solely by virtue of their positions in and control over both the Great Western Trust Accounts and Cygnet 001 Master Trust and its various series, including Series 2011-C.  Specifically:

a. Great Western relied on Alpha, Graham, and Solow's aura of legitimacy in their decision to cede Alpha control of assets in the Great Western Trust Accounts.

b. Graham's control over Great Western Trust Account investments made it possible to direct Trust funds to Series 2011-C.

c. Each Enterprise also relied on Tolaram, Drake, and Lynch to act as fronts in persuading Great Western that Alpha was a legitimate reinsurer; hiding the true role of Graham and Solow.

186. The racketeering acts affected thousands of Great Western policyholders throughout the United States whose policies are tied to the assets in the Trust, as the Trust is used to pay policyholder claims.

187. In addition, the Utah Insurance Department determined that Alpha's use of Trust assets was improper, as investments of Trust assets in repurchase agreements with uncertain assets backing the repurchase agreements was non-compliant with the Utah Insurance Code.

**RICO Injury**

188. Graham, Solow, BCM, BAAM, Regatta, Alpha, Alpha Holdings, Atlantic, Drake, Lynch, and Tolaram's conduct and participation in the conduct of each of the Enterprises identified above through a pattern of racketeering activity has directly and proximately caused Great Western to be injured in their business and property, including the loss of the value of Trust assets, reputation to their business, and ultimate forced-sale of their business.

189. By virtue of Graham, Solow, BCM, BAAM, Regatta, Alpha, Alpha Holdings, Atlantic, Drake, Lynch, and Tolaram's violation of 18 U.S.C. § 1962(c), Great Western is entitled to recover from them three times the damages sustained by reason of the claims

submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT SIX

**(Violation of RICO – 18 U.S.C. § 1962(a) Against Graham, Solow, BCM, BAAM, Regatta, Alpha, Alpha Holdings, Atlantic, Drake, Lynch, and Tolaram)**

190.    Great Western incorporates each and every allegation contained in paragraphs 1 through 142, as though they were fully set forth herein.

191.    Graham, Solow, BCM, BAAM, Regatta, Alpha, Alpha Holdings, Atlantic, Drake, Lynch, and Tolaram have received income derived, directly or indirectly, from the pattern of racketeering set forth above and used or invested, directly or indirectly, that income or the proceeds of that income in the acquisition of an interest in, or the establishment of the operation of, each of the Enterprises identified above, in violation of 18 U.S.C. § 1962(a).

192.    Graham, Solow, BCM, BAAM, Regatta, Alpha, Alpha Holdings, Atlantic, Drake, Lynch, and Tolaram's violation of 18 U.S.C. § 1962(a) has directly and proximately injured Great Western in their business and property by, among other things, reducing value of the assets in the Great Western Trust Accounts through investments that are speculative, risky, or simply sham transactions, all of which were made to benefit Alpha, Regatta, BAAM, BCM, Graham, and Solow.

193.    By virtue of the Graham, Solow, BCM, BAAM, Regatta, Alpha, Alpha Holdings, Atlantic, Drake, Lynch, and Tolaram's violations of 18 U.S.C. § 1962(a), Great Western is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT SEVEN**</u>

**(RICO Conspiracy 18 U.S.C. § 1962(d) Against Alpha, Graham, Solow, BCM, BAAM, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram)**

194.    Great Western incorporates each and every allegation contained in paragraphs 1 through 142, as though they were fully set forth herein.

195.    In violation of 18 U.S.C. § 1962(d), Alpha, Graham, Solow, BCM, BAAM, and Regatta have conspired with each other, as well as Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram, to violate 18 U.S.C. §§ 1962(a) and (c).

196.    The objects of the conspiracy included, without limitation, the misappropriation of funds from Great Western and others by means of a scheme to defraud.  By these misappropriations, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram gained personal benefits and supported Alpha, Graham, Solow, BCM, BAAM, and Regatta's fraudulent scheme.

197.    Alpha, Graham, Solow, BCM, BAAM, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram agreed to engage in a pattern of racketeering activity.  Upon information and belief, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram, through their words and actions, each agreed to commit two or more predicate acts of wire fraud, as alleged above, in furtherance of their scheme to protect the fraud scheme perpetrated by Alpha, Graham, Solow, BCM, BAAM, and Regatta to enrich themselves.

Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme described above.

198.    Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram agreement can reasonably be inferred from their close professional ties and from their mutually dependent, coordinated efforts in achieving the objectives of each Enterprise.  Alpha, Graham, Solow, BCM, BAAM, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram dutifully concealed Alpha's role as a front for the racketeering activity to invest Great Western's moneys for their own benefit.

199.    The predicate acts of wire fraud, described above, constitute overt acts of the foregoing conspiracy, in violation of 18 U.S.C. § 1962(d), by reason of which Great Western has suffered a loss as set forth herein.

200.    Great Western is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## **COUNT EIGHT**

**(Civil Conspiracy to Commit Fraud Against Graham, Solow, BCM, BAAM, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram)**

201.    Great Western incorporates each and every allegation contained in paragraphs 1 through 142, as though they were fully set forth herein.

202.     Graham, Solow, BCM, BAAM, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram, together and with others, conspired with each other for the unlawful objective of defrauding Great Western.

203.     The civil conspirators reached an agreement or understanding to commit the fraud described herein, including the objective of the fraud and the manner in which it would be carried out.

204.     Graham, Solow, BCM, BAAM, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram, together and with others, committed numerous overt acts in furtherance of the conspiracy, as detailed herein.

205.     Great Western suffered damages as a result of the overt acts, in an amount of at least $135 million.

## COUNT NINE

### (In the Alternative, Negligent Misrepresentation Against Alpha and WSFS)

206.     Great Western incorporates each and every allegation contained in paragraphs 1 through 142, as though they were fully set forth herein.

207.     As set forth herein, Great Western alleges that Graham, Solow, BCM, BAAM, WSFS, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram conspired together to defraud and harm Great Western, by knowingly and intentionally participating in a fraudulent scheme to induce Great Western to turn over approximately $150 million to be managed by Graham and BAAM for the benefit of Graham, Solow, BCM, BAAM,

WSFS, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram and its principals.

208.    Alternatively, in the event it is determined that Graham, Solow, BCM, BAAM, WSFS, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram were unaware of the others' fraudulent scheme and did not conspire with others to defraud Great Western in the manner set forth herein, Great Western asserts the following alternative claim for relief.

209.    Due to the Coinsurance Agreement and privity-like relationship between Great Western and Alpha, Alpha was under a duty to impart correct and truthful information to Great Western concerning, among other things, why Alpha was investing in Series 2011-C, Alpha's connection to Series 2011-C, Graham's connection with the investments made in the Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., and Sancus, the actual value of the assets in the Great Western Trust Accounts, and the difficulties in actually unwinding those assets.

210.    Due to the Trust Agreement, and privity-like relationship between Defendant WSFS and Great Western, Defendant WSFS was under a duty to impart correct and truthful information to Great Western concerning, among other things, the actual value of the assets in the Trust Accounts and the relationship of the parties named in the Repurchase Agreement (*i.e.*, BCM, Graham, and Solow on the one hand, and BAAM, Graham, and Solow on the other hand).

211.    As Trustee for Series 2011-C, WSFS knew the actual value of the Series 2011-C account and that the statements WSFS sent to Great Western identifying the "Market Value" of the Great Western Trust Account were false.

212.    Even after inquiry from Great Western, Alpha and WSFS did not provide Great Western with correct and truthful information but instead continually misled Great Western concerning the foregoing items.

213.    Investment decisions by Graham were easily visible to Alpha and WSFS, but they acted with willful disregard for the truth out of their own self-interest.

214.    Great Western reasonably relied upon the incorrect and untruthful information provided by Alpha and WSFS by not terminating the Coinsurance Agreement and Trust Agreement for over five years.

215.    Great Western has been damaged by Alpha and WSFS in an amount of at least $135 million.

## <u>COUNT TEN</u>

### (In the Alternative, Negligence Against Alpha and WSFS)

216.    Great Western incorporates each and every allegation contained in paragraphs 1 through 142, as though they were fully set forth herein.

217.    As set forth herein, Great Western alleges that Graham, Solow, BCM, BAAM, WSFS, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram conspired together to defraud and harm Great Western, by knowingly and intentionally participating in a fraudulent scheme to induce Great Western to turn over approximately $153 million to be managed by Graham and BAAM for the benefit of Defendants Graham, Solow, BCM, BAAM, WSFS, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram, and its principals.

218.    Alternatively, in the event it is determined that Defendants Graham, Solow, BCM, BAAM, WSFS, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha, Alpha Holdings, Atlantic, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram were unaware of the others' fraudulent scheme and did not conspire with others to defraud Great Western in the manner set forth herein, Great Western asserts the following alternative claim for relief.

219.    Defendants Alpha and WSFS owed Great Western a duty to act with reasonable care in connection with directing the Trusts' assets.

220.    Defendants Alpha and WSFS breached that duty of care by, among other things, making imprudent investments to benefit themselves, failing to advise Great Western of the reason for such investments, and improperly valuing or identifying such assets.

221.    The inappropriateness of BAAM and Graham's investments with Trust assets was easily visible to Defendants Alpha and WSFS, but they acted with willful blindness out of their own self-interest.

222.    Such negligence has actually caused and proximately caused damages to Great Western in an amount in excess of $135 million.

## COUNT ELEVEN

**(Unjust Enrichment Against Graham, Solow, BCM, BAAM, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha, Alpha Holdings, Atlantic, Ability, WSFS Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram)**

223.    Great Western incorporates each and every allegation contained in paragraphs 1 through 142, as though they were fully set forth herein.

224.    Graham, Solow, BCM, BAAM, Regatta, Cygnet, Series 2011-A, Series 2011-C, Series 2013-A, Alpha, Alpha Holdings, Atlantic, Ability, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., Sancus, Drake, Lynch, and Tolaram were unjustly enriched, at Great Western's

expense, when they received portions of the assets removed from the Great Western Trust Account, because but for their improper conduct, those amounts would never have been paid to Alpha, and then to them, and equity and good conscious militate against permitting them from retaining those amounts, and other amounts they have personally received as a result of the Coinsurance Agreement or Trust Agreement.

225.    WSFS was unjustly enriched, at Great Western's expense, when it received compensation as a result of serving as Trustee for Great Western's Trust Account and Cygnet, Series 2011-A, Series 2011-C, and Series 2013-A, because but for their improper conduct, those amounts would never have been paid to Alpha, and then to them, and equity and good conscious militate against permitting WSFS from retaining those amounts, and other amounts they have personally received as a result of the Trust Agreement or other trust agreements between WSFS and Regatta and/or Cygnet (or related entities).

226.    Ability was unjustly enriched, at Great Western's expense, Ability withdrew approximately $109 million from Series 2011-C. Defendants Graham, Solow, BAAM, BCM, and Series 2011-C (along with various entities that they controlled) comingled assets supporting the Repurchase Agreement with assets claimed by Ability in Series 2011-C. But for Ability's improper conduct in withdrawing assets owed to Great Western as part of the Repurchase Agreement in Series 2011-C, those amounts would never have been paid to Ability, and equity and good conscious militate against permitting Ability from retaining those amounts, and other amounts it has received belonging to Great Western or to which Great Western has a superior claim.

227.    Great Western is entitled to damages in an amount to be proven at trial.

## COUNT TWELVE

### (Conversion Against Ability)

228.    Great Western incorporates each and every allegation contained in paragraphs 1 through 142, as though they are fully set forth herein.

229.    Ability asserted unauthorized control over Great Western's property when Ability withdrew approximately $109 million from Series 2011-C.

230.    Alpha, Graham, Solow, BCM, BAAM, Regatta, Cygnet, and Series 2011-C comingled Great Western's money and assets (via the Repurchase Agreement) and Ability's money and assets in Series 2011-C.

231.    In October 2016, Ability withdrew approximately $109 million from Series 2011-C without accounting for the fact that much of that money and/or the assets belong to Great Western.

232.    Great Western has been damaged by Ability's conduct in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, as a result of the foregoing, Great Western demands judgment in the amount of actual damages proven at trial, treble damages pursuant to 18 U.S.C. § 1964 (RICO), punitive damages under New York state or other applicable law, plus interest, attorneys' fees, costs of suit, and such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Great Western demands a trial by jury on all issues so triable.

Dated: New York, New York         SIDLEY AUSTIN LLP
        October 4, 2018

By: */s/ Michael P. Morrissey*
    Michael P. Morrissey
    mmorrissey@sidley.com
    Steven M. Bierman
    sbierman@sidley.com

    787 Seventh Avenue
    New York, New York 10019
    (212) 839-5300

    Nicholas K. Lagemann
    nlagemann@mdmc-law.com

    McElroy, Deutsch, Mulvaney & Carpenter, LLP
    225 Liberty Street
    36th Floor
    New York NY 10281
    (973) 425-0161

    Gerard D. Kelly
    gkelly@sidley.com
    Stephen W. McInerney
    smcinerney@sidley.com

    One South Dearborn Street
    Chicago, Illinois 60603
    (312) 853-7000

*Attorneys for Plaintiff Great Western Insurance Company.*