UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x
GREAT WESTERN INSURANCE COMPANY        :
                                       :
                   Plaintiff,          :   Civil Action No. 18-cv-06249-VSB
                                       :
        vs.                            :
                                       :
MARK GRAHAM, DONALD SOLOW, BLUE        :   Hon. Vernon S. Broderick
CAPITAL MANAGEMENT, INC., BLUE         :
ALTERNATIVE ASSET MANAGEMENT LLC,      :
WILMINGTON SAVINGS FUND SOCIETY,       :
FSB, CHRISTIANA TRUST, REGATTA         :
HOLDINGS LLC, CYGNET 001 MASTER        :
TRUST, CYGNET 001 MASTER TRUST SERIES  :
2011-A, CYGNET 001 MASTER TRUST SERIES :
2011-C, CYGNET 001 MASTER TRUST SERIES :
2013-A, ALPHA RE LIMITED, ALPHA RE     :
HOLDINGS (CAYMAN) LIMITED, ATLANTIC    :
SPECIALTY FINANCE, BLUE ELITE FUND     :
LTD., BLUE ELITE FUND LP, BLUE II LTD.,:
SANCUS CAPITAL BLUE CREDIT             :
OPPORTUNITIES FUND LTD., ABILITY       :
INSURANCE COMPANY, JOHN DRAKE,         :
EDWARD BRENDAN LYNCH, AND GREGORY      :
TOLARAM.                               :
                                       :
                                       :
                                       :
                   Defendants.         :
------------------------------------- X

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO ABILITY INSURANCE COMPANY'S MOTION TO DISMISS

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................... 2

LEGAL STANDARD................................................................................................................... 7

ARGUMENT ................................................................................................................................ 7

   I.   Great Western Properly Pled Its Claim For Unjust Enrichment. ........................................ 8

      A.   Ability and Great Western have a sufficient relationship for an unjust
       enrichment claim.................................................................................................................... 8

      B.   Great Western's pleadings satisfy New York's "equity and good conscience"
       requirement for an unjust enrichment claim. .................................................................. 11

   II.   Great Western Has Properly Pled Conversion. ................................................................ 12

CONCLUSION........................................................................................................................... 15

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Brass v. Am. Film Tech., Inc.*,
 987 F.2d 142 (2d Cir. 1993)..................................................................................................5

*Calcutti v. SBU, Inc.*,
 224 F. Supp. 2d 691 (S.D.N.Y. 2002)....................................................................................5

*Chen v. New Trend Apparel, Inc.*,
 8 F. Supp. 3d 406 (S.D.N.Y. 2014) ..................................................................................9, 10

*Childers v. New York & Presbyterian Hosp.*,
 36 F. Supp. 3d 292 (S.D.N.Y. 2014)....................................................................................12

*Cohen v. BMW Investments L.P.*,
 144 F. Supp. 3d 492 (S.D.N.Y. 2015)....................................................................................9

*Cortec Indus., Inc. v. Sum Holding L.P.*,
 949 F.2d 42 (2d Cir. 1991)....................................................................................................5

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*,
 375 F.3d 168 (2d Cir. 2004)..................................................................................................7

*Galasso, Langione, & Botter, LLP v Galasso*,
 53 Misc. 3d 1202(A) (Sup. Ct. 2016) .................................................................................14

*Grund v. Del. Charter Guarantee & Tr. Co.*,
 788 F. Supp. 2d 226 (S.D.N.Y. 2011)....................................................................................8

*Kolodin v. Valenti*,
 147 A.D.3d 459 (1st Dept. 2017).........................................................................................14

*Krasner v. Rahfco Funds LP*,
 No. 11 CV 4092(VB), 2012 WL 4069294 (S.D.N.Y. Aug. 9, 2012) ..............................14, 15

*Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*,
 87 F.3d 44 (2d Cir. 1996)....................................................................................................15

*Mendelson v. Boettger*,
 257 A.D. 167, *aff'd,* 23 N.E.2d 554 (1939) .......................................................................15

*Meyer v. Jinkosolar Holdings Co.*,
 761 F.3d 245 (2d Cir. 2014)..................................................................................................7

*Moscato v. Tie Techs, Inc.*,
   No. 04 Civ. 2487(GBD), 2005 WL 146806 (S.D.N.Y. Jan. 21, 2005) ................................... 14

*Myun-Uk Choi v. Tower Research Capital LLC*,
   890 F.3d 60 (2d Cir. 2018) .................................................................................................. 8

*Newbro v Freed*,
   409 F Supp. 2d 386 (S.D.N.Y. 2006), *aff'd.*, No. 06-1722-CV, 2007 WL
   642941 (2d Cir. Feb. 27, 2007) ........................................................................................ 13

*Nielsen v. Rabin*,
   746 F.3d 58 (2d Cir. 2014) .................................................................................................. 7

*Overton v. Art Fin. Partners LLC*,
   166 F. Supp. 3d 388 (S.D.N.Y. 2016) .............................................................................. 8, 10

*Oxon Italia, S.p.A. v. Farmland Indus., Inc.*,
   546 F. Supp. 681 (S.D.N.Y. 1982) .................................................................................... 14

*Petrone v Davidoff Hutcher & Citron, LLP*,
   150 A.D.3d 776 (2d Dept 2017) ....................................................................................... 14

*Scheuer v. Rhodes*,
   416 U.S. 232 (1974) ........................................................................................................... 7

*Simpson & Simpson PPLC v. Lippes Mathias Wexler Friedman LLP*,
   130 A.D.3d 1543 (4th Dept. 2015) ................................................................................... 13

*Sweet v. Sheahan*,
   235 F.3d 80 (2d Cir. 2000) ................................................................................................. 7

*Valentini v. Citigroup, Inc.*,
   837 F. Supp. 2d 304 (S.D.N.Y. 2011) ............................................................................... 14

*Villager Pond, Inc. v. Town of Darien*,
   56 F.3d 375 (2d Cir. 1995) ................................................................................................. 7

## Other Authorities

Fed. R. Evid. 201(b)(2) ................................................................................................................ 5

Rule 12(b) .................................................................................................................................... 7

UTAH ADMIN. CODE R590-173-10(A)(4) .................................................................................. 12

Plaintiff Great Western Insurance Company ("Great Western") submits this Memorandum of Law in Opposition to the Motion to Dismiss ("Motion") filed by Defendant Ability Insurance Company ("Ability").

## INTRODUCTION

Great Western has been the victim of a massive fraud. Great Western filed this action because over $135 million that was entrusted to defendants to be available to meet coinsurance obligations on Great Western insurance policies is unaccounted for. Every single one of the defendants to this action had some combination of legal, fiduciary and/or contractual obligations related to the missing funds. Every single one of the defendants to this action played a role in the disappearance of those funds. Not a single one of the defendants to this action has even tried to explain, either before or after Great Western filed this action, what happened to those funds. And yet, every single one of the defendants to this action has denied, either in this action or the reinsurance arbitration that preceded it, any responsibility for the disappearance of those funds. Although Great Western believes it has sufficiently pled facts to maintain all of its claims in its First Amended Complaint (Doc. 39, cited herein as "FAC"), Great Western has recently learned of additional facts that further demonstrate the legal, fiduciary and/or contractual obligations relating to the missing funds. With an eye towards judicial economy and efficiency, Great Western submits this Objection to Ability's Motion in conjunction with a Letter Motion seeking leave to File a Second Amended Complaint ("SAC"), which is cross-referenced herein.

As for Ability in particular, its central thesis, that Great Western's claims against it are "tack-on claims," could not be further from the truth. (Ability's Memorandum of Law in Support of its Motion to Dismiss (Doc. 76, cited herein as "Memorandum") at 1). In fact,

Ability and its principals have longstanding ties to the other defendants and were instrumental in positioning the other defendants so that they could gain control over Great Western's funds – plus, of course, *Ability now has possession of a substantial portion of those funds.*

The allegations in the FAC clearly meet the legal standard for pleading unjust enrichment (Count Eleven) and Conversion (Count Twelve) against Ability. Thus, Ability's Motion should be denied. However, Great Western has recently learned of additional facts tying Ability and its principals, Dan Cathcart ("Cathcart")[1] and Ken King ("King"),[2] to defendants Mark Graham ("Graham") and Don Solow ("Solow") (and the entities that they control), who were the lynchpins of the $135 million fraud perpetrated against Great Western. Those facts are set forth in the SAC and further demonstrate the untenable nature of Ability's attempt to distance itself (and the Great Western funds in its possession) from this action.

## STATEMENT OF FACTS

**Ability's Role**

In 2009, Great Western entered into a Coinsurance Agreement with Ability Reinsurance (Bermuda) Limited ("Ability Re"). Cathcart, Ability Re's Chief Financial Officer, negotiated the Coinsurance Agreement on behalf of Ability Re.

In early 2012, Ability Re informed Great Western that it was exiting the reinsurance business and recommended that Great Western move its reinsurance to Defendant Alpha Re Limited (Cayman) ("Alpha"). In early 2012, Cathcart and King, Ability Re's Chief Executive Officer, introduced Great Western to Alpha, Graham, and Solow. Cathcart vouched for Graham

---

[1] Dan Cathcart was not a defendant in the FAC but is included as a defendant in the SAC.
[2] Ken King was not a defendant in the FAC but is included as a defendant in the SAC. Cathcart and King were and are the principals of both Ability and Ability Re and served as Ability Re's main contacts with Great Western throughout the parties' relationship

2

and said that many of the members of Ability Re's Board of Directors invested with Graham and earned terrific returns on their investments. At the same time, Great Western requested to buy back its ceded book of business from Ability Re, but Cathcart refused the offer, asserting that Alpha had offered Ability Re more money to buy the business than Great Western could afford to pay. Shortly thereafter, Great Western signed the Novation Agreement with Alpha. (FAC ¶¶ 2, 57, Ex. B.)

Unbeknownst to Great Western at the time, defendants Graham, Solow and Alpha were assisting Advantage Capital Holding, LLC ("ACH")[3] in acquiring Ability at the same time Ability Re and Cathcart were pressuring Great Western into a reinsurance relationship with Alpha. As a condition to the acquisition of Ability by ACH, ACH was required to infuse Ability's surplus by $5,750,000. Alpha assisted ACH with its acquisition of Ability by (1) providing Ability with $2,250,000 of the $5,750,000 surplus infusion in the form of a surplus note, (2) entering into a new Coinsurance Agreement, effective 12/31/2012, reinsuring 20% of the LTC Medico policies, and (3) paying Ability Re a commission for the novation of the Great Western business, which money was then used to fund a $20 million trust with Ability as the beneficiary. (SAC ¶ 68.)

Ability's characterization of itself and Ability Re as "indisputably distinct entities" (Memorandum at 3, fn. 2.) is misleading, to say the least. In fact, Ability and Ability Re were owned by the same entity, Ability Reinsurance Holding Limited, from 2007 until February 25, 2013, and were controlled by the same person, Cathcart. On February 25, 2013, Advantage Capital Holding, LLC (owned by King) purchased Ability. Therefore, Ability was already

---

[3] ACH was not a defendant in the FAC but is included as a defendant in the SAC.

positioned to benefit from Great Western's relationship with Alpha Re, and the incestuous relationship between Ability and many of the other defendants was already well established.

By 2016, the financial scheme concocted to bilk Great Western was crumbling. (*See* FAC ¶ 6.) In late 2016, Ability, using the inside information received by Cathcart and King, withdrew $109 million from defendant Cygnet 001 Master Trust Series 2011-C ("Series 2011-C") (FAC ¶¶ 6, 101), which was controlled and operated by Solow and Graham and was supposed to be safeguarding funds for Great Western. (FAC ¶¶ 4, 105.)

The events that followed, the critical aspects of which were unknown to Great Western until recently, are set forth in detail in the SAC (*see* SAC ¶¶ 113-129) and conclusively rebut Ability's cynical protestations of innocence:

- In early September 2016, Great Western contacted Cathcart to see if Ability knew about the SEC's investigation into Alpha, Graham, Solow, and others. Cathcart told Great Western he did not know about the investigation and that Ability's reinsurance relationship with Alpha was "going smoothly."

- Soon thereafter, King reached out to Great Western and told them he would "get to the bottom" of the SEC investigation. Great Western told King that Graham and Alpha refused to show Great Western any details about the underlying investments supporting the repurchase agreements in Great Western's Trust Account.

- Within a few weeks, Cathcart informed Great Western that Graham had given King a "view of the investments" and reassured Great Western that Ability "was not concerned" about any of its reinsurance investments with Alpha.

- In December 2016, an entity named Alpha Re (US)—the US-version of defendant Alpha that was owned and operated by Don Solow—changed its name to Vista Life & Casualty Reinsurance Company ("Vista Re"). Solow specifically said the reason for this change was to insulate the U.S. entity from any reputation damage that might be incurred in the event the Cayman regulatory authorities pursued action against Alpha.

- On December 31, 2016, one month after Ability withdrew $109 million from Series 2011-C, Ability signed a new coinsurance agreement with Vista Re (owned by Solow). Under Ability's coinsurance agreement with Alpha (owned, in part, by

Solow)—which remained in-force even after the $109 million withdrawal—Ability ceded 20% of its business to Alpha under a quota share.[4] Now, under the new coinsurance agreement, Ability agreed to cede an additional 40% of its business to Vista Re; *tripling* the amount of its business it ceded to entities owned or controlled by Solow.

- On March 24, 2017, Cathcart (former CFO of Ability Re, current director of Ability), King (Director, CEO and President of Ability), and Ian Kilpatrick (owner and director of Ability), who directed and negotiated the withdrawal of $109 million from Series 2011-C with Solow and Graham (and entities they both own and control), joined the board of directors for defendant Blue Elite Fund LP (which is owned and operated by Graham).

- On March 30, 2017, Atlantic Coast Life Insurance Company (owned by ACH and King and run by Cathcart) along with SQN Fund IV purchased the surplus note from Alpha for $2.25 million.

Ability claims that it has "no financial interests in any other defendants." (Memorandum at 3.) **This is false.** At all times relevant to Great Western's claims, Ability owed Alpha Re $2.25 million plus interest from the surplus note. Further, according to Ability's Form-Y Annual Statement for the Year Ended December 31, 2017, filed with the Nebraska Department of Insurance, Ability is a wholly-owned subsidiary of Advantage Capital Holdings, LLC ("A-Cap Holdings"), which owns 80% of defendant Sancus Blue Credit Opportunities Fund Ltd. ("Sancus").[5] *See* Ex. A. Sancus is one of the investment vehicles into which Mark Graham and Don Solow (through the entities they controlled) invested Great Western's $135+ million. This

---

[4] A quota share coinsurance agreement means the reinsurer pays a percentage of every dollar the cedent pays in claims. For instance, a 20% quota share means the reinsurer is obligated to pay $0.20 of every dollar, and the cedent pays $0.80.

[5] In deciding Ability's Motion, this Court may cite "to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Tech., Inc.,* 987 F.2d 142, 150 (2d Cir. 1993); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir. 1991); *Calcutti v. SBU, Inc.,* 224 F. Supp. 2d 691, 696 (S.D.N.Y. 2002). Rule 201 of the Federal Rules of Evidence generally permits a court to take judicial notice of any facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

means that Ability or its directors and officers (through A-Cap Holdings) controlled part of, and profited from, Great Western's $135+ million. Lest there be any doubt as to the intimate connection between these entities, King is the Chairman & CEO of A-Cap Holdings, and Cathcart is "Head of M&A/CEO of Atlantic Coast Life." As of December 31, 2017, King was the President and CEO of Ability, and both Cathcart and King were listed as "Directors/Trustees" of Ability.

**Claims Against Ability**

Great Western brought this lawsuit to recover its stolen money and assets, including those that Ability improperly seized as part of its $109 million withdrawal from the Series 2011-C account *while misleading Great Western about the situation at Alpha*. In 2012, Mark Graham as the Investment Manager of the Great Western Trust Account entered into multiple Repurchase Agreements, whereby $153 million was transferred from the Great Western Trust Account to defendant Cygnet 001 Master Trust Series 2011-C (herein referred to as "Great Western's Money").[6] In exchange, the Great Western Trust Account (for which, Great Western was the sole beneficiary) was supposed to receive ownership of collateral in the Series 2011-C trust account. (FAC ¶¶ 61-71.)

Alpha, Graham, and Solow (among others) comingled Great Western's Money with assets allegedly belonging to Ability in Series 2011-C. Instead of only withdrawing its money and assets from Series 2011-C as to which it might have a claim (as yet unproven), Ability withdrew *both* the money and assets it was claiming it had a right to withdraw as well as what was indisputably Great Western's Money. Based on these facts, Great Western has brought

---

[6] These assets are collectively referred to herein as "Great Western's Money." Defendants' protestations regarding this characterization are as specious as they are disingenuous.

Count Eleven (unjust enrichment) and Count Twelve (conversion) against Ability.  For the reasons stated herein, those claims are well founded, and Ability's Motion should be denied.

## **LEGAL STANDARD**

A motion to dismiss pursuant to Rule 12(b)(6) must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). When deciding a motion to dismiss under Rule 12(b), this Court must "accept[ ] all factual allegations [in the complaint] as true and draw[ ] all reasonable inferences in favor of the plaintiff."  *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014) (alterations in original); *accord Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer,* 416 U.S. at 236). In other words, "'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.,* 375 F.3d 168, 176 (2d Cir. 2004) (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir. 1980)). Dismissal is only appropriate when "it appears beyond doubt that the [claimant] can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir. 2000); *accord Eternity Glob. Master Fund Ltd.,* 375 F.3d at 176-77.

As discussed herein, Ability has not met and cannot meet its burden under Rule 12(b)(6), and its Motion should be denied.

**ARGUMENT**

I. **GREAT WESTERN PROPERLY PLED ITS CLAIM FOR UNJUST ENRICHMENT.**

In Count Eleven of the FAC and SAC, Great Western alleges that Ability has been unjustly enriched in connection with its withdrawal of approximately $109 million from Series 2011-C, which included Great Western's Money. FAC ¶¶ 223-27.

To maintain a claim for unjust enrichment under New York law, a plaintiff must simply plead that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover. *See Overton v. Art Fin. Partners LLC*, 166 F. Supp. 3d 388, 403 (S.D.N.Y. 2016). Ability does not dispute that Great Western has properly pled the first two elements. Instead, Ability argues that Great Western's claim for unjust enrichment fails because (a) Ability and Great Western "had no relationship of any kind" (Memorandum at 9), and (b) the third element is not met, because "Ability's exercise of contractual rights preclude a finding of conduct offending equity and good conscience." (Memorandum at 12.) These arguments are meritless.

A. **Ability and Great Western Have a Sufficient Relationship for an Unjust Enrichment Claim.**

Under New York law, "[g]iven that unjust enrichment is a claim in quasi-contract, it requires some relationship between plaintiff and defendant." *Overton*, 166 F. Supp. 3d at 403. However, this is a "modest" requirement that only requires "a claim will not be supported if the connection between the parties is too attenuated." *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (citation omitted) (reversing the district court's dismissal of plaintiff's unjust enrichment claim because plaintiff did not need to show the parties' had a "direct relationship"); *Grund v. Del. Charter Guarantee & Tr. Co.*, 788 F. Supp. 2d 226, 251

8

(S.D.N.Y. 2011) ("Unjust enrichment does not require a direct relationship between the parties."). "The [New York] Court of Appeals has observed that the nexus between parties is too attenuated if the parties 'simply had no dealings with each other'. . ." *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 464 (S.D.N.Y. 2014) (quoting *Georgia Malone & Co., Inc. v. Rieder,* 19 N.Y.3d 511, 517–18 (2012)).

As alleged in the SAC, Great Western and Ability had significant dealings with each other, ***especially*** at the time when Ability withdrew the $109 million from Series 2011-C that included Great Western's Money. (SAC ¶¶ 113-15.) Specifically, Cathcart and King (principals of Ability) had multiple conversations with Great Western in late 2016 about the financial condition of Alpha and the strength of Graham's investments in its reinsurance trust. At the same time that Cathcart and King were reassuring Great Western about Alpha and Graham's investments, Cathcart and King (on behalf of Ability) were negotiating the withdrawal of $109 million from Series 2011-C with Graham and Solow. To make matters worse, once Ability withdrew the $109 million – instead of ending its relationship with Graham and Solow – Ability kept its coinsurance agreement with Alpha in-force and (literally) ***tripled-down*** by signing a new coinsurance agreement with Vista Re (formerly Alpha Re (US)) and Don Solow.

These facts clearly distinguish this case from the main case in Ability's Memorandum: *Cohen v. BMW Investments L.P.*, 144 F. Supp. 3d 492 (S.D.N.Y. 2015). There, not only were there no allegations of a "relationship between Cohen and BMW of any kind prior to this litigation," there were no allegations "indicating that BMW and Cohen even knew of each other's existence prior to this litigation." *Id.* at 501. Nor were there any allegations that "BMW even knew of [the fraudster's] other fraudulent transactions, with Cohen or otherwise." *Id.* at

9

502. Based on that, the court found that the relationship between the two parties was "too attenuated" to maintain a claim for unjust enrichment.

As alleged in the SAC, all of the facts that were missing from the *BMW Investments* case have been alleged here. Based on the parties' reinsurance relationship in 2009-2012 and the multiple conversations they had in late 2016, the two parties certainly had a relationship prior to this litigation. Furthermore, Ability *knew* not only of Great Western's existence, it knew that Great Western was a victim of Alpha, Graham, and Solow's scheme – ***that is why Ability seized the $109 million***.

Importantly, New York courts have held that "a defendant's awareness of the plaintiff and of the potential negative impact of its own conduct on the plaintiff" can demonstrate the required closeness between parties to maintain a claim for unjust enrichment. *Chen*, 8 F. Supp. 3d at 465. In *Chen*, a multi-party dispute, the Chen plaintiffs alleged that the Chang defendants were unjustly enriched at the Chen plaintiffs' expense when certain inventory was transferred. Similar to Ability's arguments here, the Chang defendants disputed this claim "on the grounds that they were good-faith purchasers for value and had no relations with the Chen parties." *Id.* at 464. The district court ruled in favor of the Chen plaintiffs and held that, "despite the lack of any direct dealings between the Chen plaintiffs and the Chang defendants, there was sufficient connection between them to potentially support an unjust enrichment claim." *Id.* at 465. "A trier of fact could, therefore, conclude that the Chang defendants were aware of the potential negative impact that their business dealings with New Trend might impose on the Chen plaintiffs." *Id.*; *see also Overton*, 166 F. Supp. 3d at 414 (denying defendant's motion for summary judgment for plaintiff's unjust enrichment claim because a factual dispute existed "which may be probative of defendants' awareness of how their conduct would affect [plaintiff]").

As alleged in the FAC and in greater detail in the SAC, Ability knew that (a) Alpha, Graham, and Solow (among others) controlled approximately $135 million from Great Western's trust account via one or more repurchase agreements; (b) the SEC was investigating Alpha, Graham, and Solow (among others) for securities fraud; and (c) Great Western had significant concerns that its trust account was underfunded. With this knowledge, Ability withdrew almost all of the money and assets in Series 2011-C (totaling $109 million), which included Great Western's Money. Thus, Ability indisputably had an "awareness" of the "potential negative impact of its own conduct" on Great Western – indeed, the only reasonable inference to be drawn is that Ability took action *knowing* that it was harming Great Western.

### B. Great Western's Pleadings Satisfy New York's "Equity and Good Conscience" Requirement for an Unjust Enrichment Claim.

Ability's actions prior to, in connection with, and after, its withdrawal of the $109 million show that it would be "against equity and good conscience" to permit Ability to retain that money.

As described above at pages 7-8, prior to the withdrawal, Ability informed Great Western that Graham had given King a "view of the investments," and King reassured Great Western that Ability "was not concerned" about any of its reinsurance investments with Alpha. Then, immediately after the withdrawal, rather than inform Great Western of its actions or move its business elsewhere, since it knew the reinsurance trusts were underfunded, Ability entered into a new coinsurance agreement worth *double the amount of money* with Vista Re, formerly known as Alpha Re (US) and owned and operated by Solow. As explained above at page 8, Ability went from ceding 20% of its business to Alpha to 60% of its business to Alpha and Vista. Three months later, beginning in March 2017, Cathcart and King joined the board of directors for Blue Elite Fund LP, which is owned and operated by Graham. Ability was also able to convince, over

11

the course of 2017, Graham and Alpha to help liquidate the assets that Ability withdrew, such as redemption coupons for Blue Elite Fund LP. The SEC determined these, among others, were "***improper redemptions***." *See* Ex. A ¶ 26. Having intentionally misled Great Western so that it could seize the assets in question, Ability's argument that its Motion should somehow be granted because Great Western "took no steps to recover or protect any assets in which it allegedly held an interest" (Memorandum at 13) is a classic example of chutzpah and a premature argument at the motion to dismiss stage.

Ability claims that "the exercise of a statutory or contractual right does not violate, as a matter of law, equity and good conscience," **but cites no cases that hold this "as a matter of law."** (Memorandum at 12.) The fact that Nebraska insurance law required Alpha to hold money accessible to Ability is no different from the Utah insurance law that required Alpha to hold money accessible to Great Western. *See* UTAH ADMIN. CODE R590-173-10(A)(4). Alpha, Graham, and Solow certainly broke both state's insurance laws by comingling Ability and Great Western's trust accounts. However, that does not give Ability a superior right to money or assets that belonged to Great Western in the first instance.

Thus, the FAC and SAC certainly satisfy the "equity and good conscience" requirement for Great Western to maintain a claim for unjust enrichment. *See Childers v. New York & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 305 (S.D.N.Y. 2014) (denying defendant's motion to dismiss because "equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover"). The Motion should be denied.

II.   **GREAT WESTERN HAS PROPERLY PLED CONVERSION.**

With respect to Conversion, Ability's argument appears to be that, since Ability may have had a right to withdraw some money from Series 2011-C pursuant to Ability's coinsurance

agreement with Alpha, Great Western's conversion claim must fail.  (Memorandum at 13-15.)  However, Great Western's claim is not reliant on proving that Ability inappropriately withdrew money from Series 2011-C (though that appears to be the case).  Rather, the gravamen of Great Western's claim is that Ability withdrew "money and/or [] assets [that] belong to Great Western."  FAC ¶ 231.

New York law is clear that comingled money in an account may serve as the subject of a conversion claim.  *See Newbro v Freed*, 409 F Supp. 2d 386 (S.D.N.Y. 2006), *aff'd.*, No. 06-1722-CV, 2007 WL 642941 (2d Cir. Feb. 27, 2007).  In *Newbro*, plaintiff's accountant transferred $1.12 million from plaintiff's account into another client's account (defendant) to cover a "shortfall," and plaintiff sued defendant on a theory of conversion to "merely [] undo the improper transfer."  *Id.* at 396.  The court granted plaintiff's motion for summary judgment for conversion because, "[g]iven that plaintiff owned the money invested in his account and lost possession without his consent, defendant[] had an obligation to return such funds to plaintiff."  *Id.* at 397.  Even if the "crooked broker . . . may have owed defendants $1 million before the transfer, [] 'one who receives money from a thief in satisfaction of pre-existing debt does not have a defense against the person from whom the money was stolen.'"  *Id.* at 396-97 (quoting *Eisenberg v. Grand Bank for Sav. FSB*, 207 F. Supp. 2d 553, 561 (S.D. Miss. 2002), *aff'd*, 70 Fed. Appx. 765 (5th Cir. 2003)).

The *Newbro* case is not alone.  There are numerous other cases applying New York law where courts have held that a party may maintain a claim for conversion based on allegations that one party withdrew the other party's money from an account; including, specifically where the allegations are that the funds were inappropriately comingled.  *See, e.g.*, *Simpson & Simpson PPLC v. Lippes Mathias Wexler Friedman LLP*, 130 A.D.3d 1543, 1544-45 (4th Dept. 2015)

13

(reversing the lower court because "the court erred in determining that the comingling of the embezzled funds in the employee's joint checking account precluded a cause of action for conversion . . . [since] the embezzled funds are sufficiently identifiable and traceable to sustain a cause of action for conversion."); *Petrone v Davidoff Hutcher & Citron, LLP*, 150 A.D.3d 776, 778 (2d Dept 2017) ("Contrary to the defendant's contention, the fact that the children's funds were commingled with other money in the escrow account does not preclude a cause of action for conversion."); *Galasso, Langione, & Botter, LLP v Galasso*, 53 Misc. 3d 1202(A) (Sup. Ct. 2016).

The case law cited by Ability (Memorandum at 13-15) is inapposite here. The *Oxon* case from 1982 involved a contractual dispute whereby plaintiff's agent, the middle-party in the transactions, was empowered by plaintiff to enter into a contract with defendant which excused defendant's non-payment (hence, defendant was not unjustly enriched). *Oxon Italia, S.p.A. v. Farmland Indus., Inc.*, 546 F. Supp. 681 (S.D.N.Y. 1982). This has nothing to do with a claim for conversion based on the transfer of Great Western's Money to Ability to cover Alpha's shortfall. And, in any event, the *Oxon* case involved a final judgment after a trial, not a ruling on a motion to dismiss.

The other cases cited by Ability are similarly off-point. *See Kolodin v. Valenti*, 147 A.D.3d 459, 459-60 (1st Dept. 2017) (ruling on summary judgment, based on deposition testimony, that plaintiff willingly transferred her interests in a joint investment account into an account held solely in the defendant's name); *Moscato v. Tie Techs, Inc.*, No. 04 Civ. 2487(GBD), 2005 WL 146806 (S.D.N.Y. Jan. 21, 2005) (plaintiff failed to allege that defendant possessed the items plaintiff accused defendant of converting); *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 330-31 (S.D.N.Y. 2011) (same); *Krasner v. Rahfco Funds LP*, No. 11 CV

4092(VB), 2012 WL 4069294 (S.D.N.Y. Aug. 9, 2012) (plaintiff failed to make a pre-litigation demand, which was necessary because the defendant lawfully possessed the funds).

Lastly, Great Western did not need to make a pre-litigation demand to maintain a claim for conversion, because its allegations are that Ability unlawfully took Great Western's Money. (FAC ¶¶ 6, 101.) "New York law does not, however, always require that a demand be made and be met by a refusal to make out a claim of conversion. Instead, a demand is necessary only where the property is held lawfully by the defendant." *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 49 (2d Cir. 1996). "'Unlawfulness' need not amount to theft or misappropriation. Rather, "[i]t is sufficient if there be interference with the owner's dominion over his property to the exclusion of his rights." *Mendelson v. Boettger,* 257 A.D. 167, 169–70, (2d Dep't), *aff'd,* 23 N.E.2d 554 (1939). A pre-litigation demand is only necessary if defendant's initial possession of the property was lawful. *See Krasner*, 2012 WL 4069294, at*7 (requiring plaintiff to make a pre-litigation demand because plaintiff alleged defendant initially maintained plaintiff's investment funds lawfully, but then converted those funds for defendant's own purpose). Thus, since Great Western's allegations are that at no point did Ability lawfully possess Great Western's Money, no pre-litigation demand was necessary.

## CONCLUSION

For the foregoing reasons, Great Western respectfully requests that the Court deny Ability's Motion; however, if the Court dismisses any claims in the FAC against Ability, Great Western requests that such dismissal be without prejudice, so Great Western may replead to cure such deficiencies.

| | |
|---|---|
| Dated: Chicago, Illinois<br>December 12, 2018 | SIDLEY AUSTIN LLP<br><br>By: */s/ Gerard D. Kelly*<br>   Gerard D. Kelly<br>   (admitted *pro hac vice*)<br>   gkelly@sidley.com<br>   Stephen W. McInerney<br>   (admitted *pro hac vice*)<br>   smcinerney@sidley.com<br><br>   One South Dearborn Street<br>   Chicago, Illinois 60603<br>   (312) 853-7000<br><br>   Steven M. Bierman<br>   sbierman@sidley.com<br>   Michael P. Morrissey<br>   mmorrissey@sidley.com<br><br>   787 Seventh Avenue<br>   New York, New York 10019<br>   (212) 839-5300<br><br>   Nicholas K. Lagemann<br>   nlagemann@mdmc-law.com<br>   McElroy, Deutsch, Mulvaney & Carpenter, LLP<br>   225 Liberty Street<br>   36th Floor<br>   New York NY 10281<br>   (973) 425-0161<br><br>   *Attorneys for Plaintiff Great Western Insurance Company.* |