# EXHIBIT C

## AMENDED & RESTATED
## TRUST AGREEMENT

**THIS AMENDED & RESTATED TRUST AGREEMENT,** effective as of July 11th, 2012 (the "Agreement"), is among Alpha Re Limited (the "Grantor"), Great Western Insurance Company, including, without limitation, any liquidator, rehabilitator, receiver, conservator, or other successor by operation of law (collectively, the "Beneficiary"), and Wilmington Savings Fund Society, FSB,a qualified United States financial institution within the meaning of the Utah Administrative Code(Utah Administrative Code, R590-173-3(H)) (the "Trustee"). The Grantor, the Beneficiary and the Trustee are hereinafter each sometimes referred to individually as a "Party" and collectively as the "Parties."

## WITNESSETH:

**WHEREAS,** the Grantor, Beneficiary and Ability Reinsurance (Bermuda) Limited ("Ability") have entered into the Novation Agreement annexed hereto as Exhibit A.1 with an effective date of January 1, 2012 by which the Grantor will be substituted in Ability's name, place and stead as the assuming reinsurer under the Coinsurance Agreement (the "Reinsurance Contract"), dated February 18, 2009, annexed hereto as Exhibit A.2 between the Beneficiary and Ability (the Coinsurance Agreement together with the Novation Agreement collectively are referred to hereinafter as the "Reinsurance Agreement"); and

**WHEREAS,** the Parties wish to amend, restate and replace in its entirety as of July 11, 2012 the previous Trust Agreement (the "Prior Trust Agreement"), dated as of February 18, 2009, by and among the Beneficiary, Ability and The Bank of New York Mellon (the "Prior Trustee"), a New York banking corporation; and

**WHEREAS,** by instrument dated July 11, 2012, the Prior Trustee resigned as trustee under the Prior Trust Agreement and has no rights or obligations under this Agreement; and

**WHEREAS,** the Prior Trustee has the rights specified in Section 6 of the Prior Trust Agreement; and

**WHEREAS,** the Trustee has no rights or obligations under the Prior Trust Agreement and is to be appointed as the successor Trustee subject only to the terms of this Agreement; and

**WHEREAS,** the Parties wish to amend and restate the Prior Trust Agreement as this Agreement to take into account, among other things, the appointment of the Trustee as successor trustee;

**WHEREAS,** the Beneficiary desires the Grantor to secure payment of all amounts at any time and from time to time owing by the Grantor to the Beneficiary under or in connection with the Reinsurance Agreement; and

**WHEREAS,** the Grantor and the Beneficiary desire to enter into this Agreement pursuant to the regulations of the Utah Insurance Department (Utah Administrative Code, R590-

173-9) promulgated by the Utah Insurance Commissionerin order to create a trust account ("Trust Account") under that regulation; and

**WHEREAS,** the Grantor desires to transfer to the Trustee for deposit to the Trust Account assets in order to secure payments under or in connection with the Reinsurance Agreement; and

**WHEREAS,** this Agreement is made for the sole use and benefit of the Beneficiary and for the purpose of setting forth the duties and powers of the Trustee with respect to the Trust Account; and

**WHEREAS,** the Trustee has agreed to act as Trustee hereunder, and to hold such assets in trust in the Trust Account for the sole use and benefit of the Beneficiary.

**NOW, THEREFORE,** in consideration of the premises and mutual promises set forth herein, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

## Section 1.Deposit Into Trust Account

(a)   The Grantor shall establish the Trust Account and the Trustee shall administer the Trust Account in its name as Trustee for the Beneficiary. The Trust Account shall be subject to withdrawal by the Beneficiary solely as provided herein.

(b)   Upon execution of the Agreement, the Prior Trustee, at the direction of the Grantor, shall transfer to the Trustee, for deposit to the Trust Account, cash in the amount of One Hundred Fifty-Three Million, Sixty-Four Thousand and Thirty-Seven Dollars ($153,064,037.00) ("Initial Deposit"), which is the liquidated amount of the assets held in Trust under the Prior Trust Agreement. As stipulated in the Reinsurance Agreement, Grantor shall deposit additional Assets, as that term is defined below, as may be required from time to time. The Initial Deposit along with any additional deposited Assets shall constitute the corpus of the Trust Account (the "Corpus").

(c)   Grantor shall provide Beneficiary with Investment Guidelines as set forth in Exhibit Bhereto. Grantor agrees to use commercially reasonable efforts to ensure that the Assets in the Trust Account conform to such guidelines. "Assets" shall be those assets rated investment grade by at least one Nationally Recognized Statistical Rating Organization ("NRSRO")[1], cash (United States legal tender), securities listed by the National

---

[1]   For purposes of this Agreement, NRSRO's shall include all those organizations currently designated as NRSRO's by the U.S. Securities and Exchange Commission, including Standard & Poor's, Moody's Investor Services, Fitch Ratings, Kroll Bond Rating System, A.M. Best Company, Dominion Bond Rating Service, Ltd., Japan Credit Rating Agency. Ltd., Egon-Jones Rating Company, and Morningstar, Inc.

2

Association of Insurance Commissioner's Securities Valuation Office and qualifying as admitted assets under the Utah Insurance Code, and Eligible Securities. "Eligible Securities" shall mean and include certificates of deposit issued by a United States bank and payable in United States legal tender, and investments of the types specified in Section 31A-18-105 of the Utah Insurance Code.Except as expressly provided for in this Agreement, the Trustee shall have no obligation or liability with respect to the nature of the Assets held in the Trust Account or the ability or failure of such Assets to meet the definitions as set forth above.

(d)     Grantor hereby represents and warrants that any Assets it transfers to the Trust Account will be in such form that the Beneficiary may, and the Trustee upon direction by the Beneficiary will, negotiate any such Assets without consent or signature from the Grantor or any person or entity in accordance with the terms of this Agreement.

(e)     All Assets shall be held in a safe place by the Trustee at the Trustee's office in the United States.

## Section 2.  Withdrawal of Assets from Trust Account

(a)     Without notice to the Grantor, the Beneficiary shall have the right, at any time and from time to time, to withdraw from the Trust Account, upon written notice to the Trustee in the form annexed as Exhibit C (the "Withdrawal Notice"), such Assets as are specified in the Withdrawal Notice.   The Withdrawal Notice may designate a third party (the "Designee") to whom Assets specified therein shall be delivered.  The Beneficiary need present no statement or document in addition to a Withdrawal Notice in order to withdraw any Assets.

(b)     Upon receipt of a Withdrawal Notice, the Trustee shall immediately transfer absolutely and unequivocally all right, title and interest in the Assets specified in such Withdrawal Notice, and shall deliver such Assets to or for the account of the Beneficiary or Designee as specified in such Withdrawal Notice.

(c)     Subject to paragraph (a) of this Section 2 and to Section 4 of this Agreement, in the absence of a Withdrawal Notice, the Trustee shall allow no substitution or withdrawal of any Asset from the Trust Account.

## Section 3.Application of Assets

(a)     The Beneficiary hereby covenants to the Grantor that it shall use and apply any withdrawn Assets, without diminution because of the insolvency of the Beneficiary or the Grantor, for the following purposes only:

(i)          to pay the Beneficiary for any of Grantor's Obligations under the Reinsurance Agreement;

(ii)         where the Beneficiary has received a termination notice pursuant to Section 8 of this Agreement, or a resignation or removal notice pursuant to Section 7 of this Agreement and where all of the Grantor's Obligations

3

have been liquidated or discharged ten (10) days prior to the termination date, to make payment to the Grantor of any amounts held in the Trust Account;

(iii)     where the Beneficiary has received a termination notice pursuant to Section 8 of this Agreement, or a resignation or removal notice pursuant to Section 7 of this Agreement and a successor Trustee has not been appointed within twenty (20) days of the date of such notice, and where any of the Grantor's Obligations remain un-liquidated and un-discharged ten (10) days prior to the termination date, to withdraw amounts equal to such Obligations and deposit such amounts in a separate account, apart from its other assets, in the name of the Beneficiary, in any bank or trust company organized in the United States which is not a parent, subsidiary or affiliate of the Beneficiary, in trust for the uses and purposes specified in subparagraphs (i) and (iii) of this paragraph (a); or

(iv)     where the Beneficiary has elected, pursuant to the amended Section 8.03 of the Reinsurance Contract to recapture the Reinsured Contracts, subject to the accounting provisions of Section 8.03 and for the purposes specified in subparagraphs (1) and (ii) and of this paragraph (a).

(b)     The Trustee shall have no responsibility whatsoever to determine that any Assets withdrawn from the Trust Account pursuant to Section 2 of this Agreement will be used and applied in the manner contemplated by paragraph (a) of this Section 3.

## Section 4. Redemption, Investment and Substitution of Assets

(a)     The Trustee shall surrender for payment all maturing Assets and all Assets called for redemption and deposit the proceeds of any such payment in the Trust Account.

(b)     Grantor and Beneficiary agree that Blue Alternative Asset Management, LLC, or such other entity as is selected by the Grantor and approved in writing by the Beneficiary, will be the investment manager ("Investment Manager") for all Assets which may be held in the Trust Account, provided, however, that to the extent the Investment Manager desires to delegate duties or issue directions to another entity concerning management of the Assets, the Investment Manager shall identify such entity and obtain Beneficiary's written approval, which approval shall not be unreasonably withheld. The Investment Manager is the agent of, and is acting on behalf of, the Grantor. The Grantor shall be solely responsible for all fees charged by and all other obligations to the Investment Manager in connection with the Trust Account.

(c)     From time to time, following the Initial Deposit, and upon the written order and direction of the Grantor or the Investment Manager, the Trustee shall invest Assets as specified by the Grantor or the Investment Manager, in a manner consistent with the Investment Guidelines. Any such instruction or order concerning the sale or purchase of Assets shall be referred to herein as an "Investment Order." If conflicting Investment Orders are received, the Trustee shall not execute either Investment Order, but shall contact the

4

Grantor and the Investment Manager to request further instruction. The Trustee shall carry out Investment Orders and settle securities transactions involving Assets by itself or by means of an agent or broker. The Trustee shall not be responsible for any act or omission, or for the solvency, of any such agent or broker, or the Grantor or the Investment Manager.

(d)  Subject to the provisions of Section 1(c) of this Agreement, the Grantor and the Investment Manager are hereby authorized to issue Investment Orders and direct the Trustee to invest the Assets in the Trust Account without obtaining the consent of the Beneficiary prior to each investment.

(e)  From time to time, subject to the prior written approval of the Beneficiary, the Grantor or Investment Manager may provide a written order and direction (a "Substitution Order") to the Trustee to substitute, for Assets then in the Trust Account, Assets with an equal Fair Value (as defined in Section 4(j) below). The Trustee shall have no obligation to determine the value of such substituted Assets.

(f)  In no event shall investments in or issued by an entity controlling, controlled by, or under common control with either the Grantor or the Beneficiary exceed five percent (5%) of the Fair Value of Assets in the Trust Account.

(g)  The Grantor hereby covenants that all investments and substitutions of Assets requested by it or by the Investment Manager in accordance with this Section 4 shall be in compliance with the relevant provisions set forth in this Section 4 and the definition of "Assets" in Section 1(c) of this Agreement. The Trustee shall have no liability or obligation to verify compliance with the Investment Guidelines, Section 4(g) or the other provisions of this Section 4, and shall be entitled to conclusively rely upon any Investment Order or Substitution Order received pursuant hereto.

(h)  When the Trustee is directed to deliver Assets against payment, delivery will be made in accordance with generally accepted market practice.

(i)  Any loss incurred from any investment pursuant to the terms of this Section 4 shall be borne exclusively by the Trust Account other than a loss due to the Trustee's own negligence, willful misconduct or lack of good faith.

(j)  For purposes of determining the fair market value of any Assets in the Trust Account pursuant to this Agreement, the Parties hereby agree (without any liability being incurred on the part of the Trustee for any incorrect fair valuation of Assets, howsoever caused) to use prices published by a nationally recognized pricing service for Assets for which such prices are available and for Assets for which such prices are not available, to obtain at the expense of the Grantor and pursuant to its written recommendation, a qualified independent securities valuation firm to appraise the value of such Assets, which may use methodologies consistent with those which the Grantor uses for determining the fair market value of assets held in the Grantor's general account (other than the Assets) in the ordinary course of business (the "Fair Value"). If the Beneficiary shall dispute the Fair Value of any Asset, and the Parties are unable to resolve such dispute within fourteen

5

(14) days, the value of such Asset shall be determined by an independent appraisal firm which is mutually acceptable to the Grantor and the Beneficiary, and the Parties shall be bound by such valuation. The Trustee shall not be a party to any dispute between the Grantor and the Beneficiary relating to the valuation of Assets.

(k) All payments of dividends, interest and other income in respect to Assets in the Trust Account shall be posted and credited by the Trustee, subject to deduction of the Trustee's compensation, indemnities and expenses as provided in Section 6 of this Agreement, in the separate income column of the custody ledger (the "Income Account") within the Trust Account established and maintained by the Grantor at an office of the Trustee. Any interest, dividend or other income automatically posted and credited on the payment date to the Income Account which is not subsequently received by the Trustee shall be reimbursed by the Grantor to the Trustee and the Trustee may debit the Income Account for this purpose. The interest, dividends and other income shall be paid to the Grantor or credited to any account of the Grantor in accordance with written instructions provided from time to time by the Grantor to the Trustee.

## Section 5.Rights and Duties of Trustee

(a) The Trustee shall forward to the Grantor all annual and interim stockholder reports and all proxies and proxy materials relating to the Assets in the Trust Account that are received by the Trustee. The Grantor shall have the full and unqualified right to vote any Assets in the Trust Account.

(b) The Trustee shall notify the Grantor and the Beneficiary in writing within ten (10) days following each deposit to, or withdrawal from, the Trust Account.

(c) The Trustee shall determine that any Assets for deposit to the Trust Account are in such form that the Beneficiary, or the Trustee upon direction by the Beneficiary may, whenever necessary, negotiate any such Assets, without consent or signature from the Grantor or any other person or entity.

(d) The Trustee shall have no responsibility whatsoever to determine that any Assets in the Trust Account are or continue to be Assets.

(e) The Trustee shall furnish to the Grantor and the Beneficiary a statement of all Assets in the Trust Account upon the inception of the Trust Account and on a monthly basis thereafter.

(f) Upon the request of the Grantor or the Beneficiary, the Trustee shall promptly permit Grantor or the Beneficiary, their respective agents, employees, or independent auditors to examine, audit, excerpt, transcribe and copy, during the Trustee's normal business hours, any books, documents, papers and records relating to the Trust Account or the Assets.

(g) Unless otherwise provided in this Agreement, the Trustee is authorized to follow and rely upon all instructions given by officers named in incumbency certificates furnished to the Trustee from time to time by the Grantor, Investment Manager and the Beneficiary, respectively, including, without limitation, instructions given by letter, telephone

6

(subsequently confirmed in writing), facsimile transmission, telegram, teletype, cablegram or electronic media, if the Trustee believes such instruction to be genuine and to have been signed, sent or presented by the proper Party or Parties. These incumbency certificates shall contain the names, titles and signatures of the Persons duly authorized by the Grantor, Investment Manager and the Beneficiary, including any agent of their designated investment advisor, to act on their behalf under this Agreement. Current incumbency certificates for the Grantor, Investment Manager and the Beneficiary are annexed in Exhibit D hereto. The Trustee shall not incur any liability to anyone resulting from actions taken by the Trustee in reliance in good faith on such instructions, or Trustee's inaction due to the failure of such proper Party or Parties to instruct the Trustee.

(h)     The duties and obligations of the Trustee shall only be such as are specifically set forth in this Agreement, as it may from time to time be amended, and no implied duties (including fiduciary duties, except to the extent expressly set forth herein) or obligations shall be read into this Agreement against the Trustee.

(i)     The Trustee shall not be personally liable to any Person under any circumstances in connection with any of the transactions contemplated by this Agreement, except that such limitation shall not relieve the Trustee of any personal liability it may have for the Trustee's own bad faith, willful misconduct or negligence in the performance of its express duties under this Agreement. In particular, but not by way of limitation of the foregoing:

(i)     The Trustee shall not be personally liable for any error of judgment made non-negligently and in good faith by any of its officers or employees;

(ii)     No provision of this Agreement shall require the Trustee to expend or risk its personal funds or otherwise incur any financial liability in the exercise of its rights or powers hereunder;

(iii)     The Trustee shall not be personally liable for or in respect of the validity or sufficiency of this Agreement or for the due execution hereof by any Person other than the Trustee or for the value of the Assets;

(iv)     Except as expressly provided in this Agreement, the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, instruction, Investment Order, Withdrawal Notice, entitlement order, approval or other paper or document; and

(v)     The Trustee shall not be personally liable for (x) special, consequential or punitive damages, however styled, including, without limitation, lost profits, (y) the acts or omissions of any nominee, correspondent, clearing agency or securities depository through which it holds the Trust's Assets or (z) any losses due to forces beyond the reasonable control of the Trustee, including, without limitation, strikes, work stoppages, acts of war or terrorism, insurrection, revolution, nuclear or natural catastrophes or acts of God and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.

7

(j)     The Trustee shall provide a notice in the form attached hereto as Exhibit E to the Utah
        Insurance Department within three (3) business days after all the Assets in the Trust
        Account are withdrawn. At the Trustee's request, the Beneficiary shall provide to the
        Trustee the address of the Utah Insurance Department.

(k)     In the exercise or administration of the trust hereunder, the Trustee (i) may act directly or,
        at the expense of the Grantor, through agents or attorneys, and the Trustee shall not be
        liable for the default or misconduct of such agents or attorneys selected by it in good
        faith, and (ii) may, at the expense of the Grantor, consult with counsel, accountants and
        other experts, and the Trustee shall not be liable for anything done, suffered or omitted in
        good faith by it in accordance with the advice or opinion of any such counsel,
        accountants, or other experts selected by it in good faith, except  to the extent that the
        Trustee is negligent in following such advice or opinion.

(l)     The Trustee shall not have any duty or obligation to manage, make any payment in
        respect of, register, record, sell, dispose of or otherwise deal with the Assets, or to
        otherwise take or refrain from taking any action under, or in connection with, any
        document contemplated hereby to which the Trustee is a party, except as expressly
        provided by the terms of this Agreement. The Trustee shall have no responsibility to
        record this Agreement, to prepare or file any financing or continuation statement in any
        public office at any time or otherwise to perfect or maintain the perfection of any
        ownership or security interest or lien or to prepare or file any tax, qualification to do
        business or any securities or insurance law filing or report.

(m)     To the extent that, at law or in equity, a Covered Person (as defined in Section 6(d)
        hereof) has duties (including fiduciary duties) and liabilities relating to the trust created
        hereunder, the Beneficiary or any other Person, such Covered Person acting under this
        Agreement shall not be liable to the Beneficiary or to such other Persons for its good faith
        reliance on the provisions of this Agreement. To the extent that provisions of this
        Agreement restrict or eliminate the duties (including fiduciary duties) and liabilities of a
        Covered Person otherwise existing at law or in equity, such provisions are agreed by the
        Parties hereto to replace such other duties and liabilities of such Covered Person.

## Section 6.  Trustee's Compensation, Expenses, Indemnification, etc.

(a)     For its services as Trustee pursuant to this Agreement, the Trustee shall receive such
        compensation as may be agreed upon from time to time in writing by the Grantor and the
        Trustee. A copy of the  current compensation arrangement agreed to by the Grantor and
        the Trustee is annexed as Exhibit F. Any changes to this compensation arrangement shall
        be made only upon thirty (30) days' prior written notice from the Trustee to the Grantor
        and the Beneficiary.   The Trustee shall issue an invoice to the Grantor for such
        compensation, which shall be payable quarterly in advance.

(b)     The Grantor shall pay or reimburse the Trustee for all of the Trustee's expenses and
        disbursements that are reasonably incurred by the Trustee in connection with its duties
        under this Agreement (including attorneys' fees and expenses), except any such expense

or disbursement as may arise from the Trustee's negligence, willful misconduct or lack of good faith.

(c)     From time to time, the Trustee shall be entitled to deduct its compensation and expenses from the Income Account established pursuant to Section 4(j) above. The Trustee shall provide written notice to the Grantor of any such deduction and payment within five (5) business days following the transaction. In no event, however, shall the Corpus be utilized for paying compensation, or reimbursing expenses of the Trustee. If the Income Account does not hold funds sufficient to pay the Trustee's quarterly invoice, the Grantor shall pay the chargeable items included in the Trustee's invoice within thirty (30) business days of receiving the invoice.

(d)     The Grantor shall (i) indemnify, defend and hold harmless the Trustee (in both its individual and trustee capacities) and the officers, directors, employees and agents of the Trustee (collectively, including the Trustee in its individual capacity, the "Covered Persons") from and against any and all losses, damages, liabilities, claims, actions, suits, costs, expenses, disbursements (including the reasonable fees and expenses of counsel), taxes and penalties of any kind and nature whatsoever, to the extent that the foregoing arise out of or are imposed upon or asserted at any time against one or more Covered Persons with respect to the performance of this Agreement, the creation, operation or termination of the Trust or the transactions contemplated hereby, including, without limitation, any breach by the Grantor of any representation or warranty made by the Grantor herein (all of the foregoing as provided in clauses (i) and (ii) above are herein referred to collectively as "Expenses"), provided, however, that the Grantor shall not be required to indemnify a Covered Person for Expenses as a direct result of such Covered Person's willful misconduct, bad faith or negligence as determined by a final, non-appealable judgment of a court of competent jurisdiction, and (ii) advance to each Covered Person Expenses (including reasonable legal fees and expenses) incurred by such Covered Person in defending any claim, demand, action, suit or proceeding, prior to the final disposition of such claim, demand, action, suit or proceeding, upon receipt by the Grantor of a written request therefor and of an undertaking by or on behalf of the Covered Person to repay such amount if it shall ultimately be determined that the Covered Person is not entitled to be indemnified therefor under this Section. The rights of the Covered Persons and the obligations of Grantor under this Section 6 shall survive the termination of this Agreement and the resignation or removal of the Trustee.

## Section 7.Resignation or Removal of Trustee

(a)     The Trustee may resign at any time by giving not less than ninety (90) days' prior written notice thereof to the Beneficiary and to the Grantor. The Trustee may be removed by delivery of not less than ninety (90) days' prior written notice of removal to the Trustee executed by both Grantor and Beneficiary. Such resignation or removal shall become effective only upon the acceptance of appointment by a successor Trustee, the entry into a trust agreement by the successor Trustee, Grantor and Beneficiary that complies with the requirements of Utah Administrative Code, R590-173-9, and the transfer to such successor Trustee of all Assets in the Trust Account in accordance with paragraph (b) of this Section 7.

9

(b)     Upon receipt by the proper Parties of the Trustee's notice of resignation or the Grantor's notice of removal, the Grantor and the Beneficiary shall appoint a successor Trustee within twenty (20) days of the date of such notice. Any successor Trustee shall be a bank that is a qualified United States financial institution within the meaning of the Utah Administrative Code(Utah Administrative Code, R590-173-3(H)), and shall not be a parent, a subsidiary or an affiliate of the Grantor or the Beneficiary. Upon acceptance of the appointment as Trustee hereunder by a successor Trustee of all Assets in the Trust Account, such successor Trustee shall succeed to and become vested with all rights, powers, privileges and duties of the resigning or removed Trustee. If the Grantor and the Beneficiary fail to appoint a successor Trustee or the nominee shall fail to accept the appointment as successor Trustee within twenty (20) days of the date of any resignation or removal notice, the Beneficiary shall immediately withdraw from the Trust Account all Assets in accordance with Section 3(a) for the purposes specified therein, provided that, if the Beneficiary shall fail to withdraw all Assets within such timeframe, the Trustee may, at the expense of the Beneficiary, petition a court of competent jurisdiction for the appointment of a successor Trustee. The resignation or removal of the Trustee shall become effective upon either of these events, and the resigning or removed Trustee shall then be discharged from any future duties and obligations under this Agreement, but shall continue, after such resignation or removal, to be entitled to the benefits of the indemnities provided herein for the Trustee.

## Section 8.Termination of Trust Account

(a)     The Trust Account and this Agreement, except for the indemnities provided herein, may be terminated only after (i) the Grantor and Beneficiary mutually give the Trustee written notice of their intention to terminate the Trust Account ("Notice of Intention"), (ii) the Trustee has given the Grantor and the Beneficiary the written notice specified in paragraph (b) of this Section 8, and (iii) all amounts due the Trustee have been paid.

(b)     Within three (3) days following receipt by the Trustee of the Notice of Intention, the Trustee shall give written notification to the Beneficiary and the Grantor of the date on which the Trust Account shall terminate. The termination date shall be at least thirty (30) days but no more than forty-five (45) days subsequent to the date such notice was given.

(c)     On the termination date, upon receipt of written approval of the Beneficiary, the Trustee shall transfer to the Grantor any Assets remaining in the Trust Account, at which time all obligation and liability of the Trustee hereunder shall cease and this Agreement and the trust created hereby shall terminate.

10

**Section 9.Governing Law**

All matters concerning the construction and interpretation of this Agreement and performance under this Agreement shall be interpreted and construed according to the laws of the State of Delaware without regard to said state's conflict of laws rules.

**Section 10.Successors and Assigns**

Except as expressly permitted by Section 7 of this Agreement, no Party may assign this Agreement or any of its rights or obligations hereunder, whether by merger, consolidation, sale of all or substantially all of its assets, liquidation, dissolution or otherwise without the prior written consent of the other Parties, provided that any Person into which the Trustee may be merged or with which it may be consolidated, or any Person resulting from any merger or consolidation to which the Trustee shall be a party, or any Person which succeeds to all or substantially all of the corporate trust business of the Trustee, shall be the successor Trustee under this Agreement without the consent of any other Party or the execution, delivery or filing of any paper or instrument or any further act to be done on the part of the Parties hereto, notwithstanding anything to the contrary herein; provided further however, that such successor Trustee shall comply with the requirements of applicable law and of this Agreement.

**Section 11.Severability**

The invalidity or unenforceability of any particular term or condition of this Agreement shall not affect the other terms and provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable term or provision has been omitted.

**Section 12.Waiver of Terms**

Failure by the Trustee, the Grantor or the Beneficiary to insist upon compliance with any of the terms and conditions of this Agreement at any given time or under any given set of circumstances shall not operate to waive or modify such terms or conditions or in any manner render them unenforceable as to any other time or as to any other occurrence, whether the circumstances are or are not the same, and no waiver of any of the terms or conditions of this Agreement shall be valid or of any force or effect unless contained in a written memorandum specifically expressing such waiver and signed by an officer of each Party duly authorized to sign such waiver.

**Section 13.Entire Agreement**

This Agreement constitutes the entire and sole contract among the Parties concerning the Trust Account, and there are no understandings, or agreements, conditions or qualifications relative to this Agreement which are not fully expressed in this Agreement.

11

**Section 14.Amendments**

This Agreement may be modified or otherwise amended, and the observance of any term of this Agreement may be waived, if such modification, amendment or waiver is in writing and signed by all Parties.

**Section 15.Notices**

(a) All notices under this Agreement and other communications shall be in writing and shall be deemed to have been duly given or made (i) when delivered personally, (ii) when made or given by prepaid telex, telegraph, telecopier or e-mail (with confirmation of delivery), or (iii) in the case of mail delivery, upon the expiration of three (3) days after any such notice shall have been deposited in the United States mail for transmission by first class mail, postage prepaid, or upon receipt thereof, whichever shall first occur and when addressed as follows:

| To Grantor: | Alpha Re Limited |
| | c/o Aon Insurance Managers (Cayman) Ltd. |
| | P.O. Box 69 |
| | 94 Solaris Avenue |
| | Second Floor |
| | Camana Bay |
| | Grand Cayman, Cayman Islands |
| | Attn: Colleen Artuch RN, ACII, ACI |
| | Senior Account Manager |
| | Facsimile No.: 345-945-2889 |
| | Telephone No.: 345-945-1266 |

| To Beneficiary: | Great Western Insurance Company |
| | 3434 Washington Blvd. - Suite 300 |
| | Ogden, Utah 84401 |
| | Attn: Nathan Felix |
| | Facsimile No.: (801) 689-1390 |
| | Telephone No.: (866) 689-1415 |

| To Trustee: | Wilmington Savings Fund Society, FSB |
| | 500 Delaware Avenue, 11th Floor |
| | Wilmington, Delaware 19801 |
| | Attn: Corporate Trust Administration |
| | Facsimile No.: 302-421-9137 |
| | Telephone No.: 302-888-7437 |

(b) Each Party may from time to time designate a different address for notice and other communications by giving written notice of such change to the other Parties. All notices and other communications relating to the Beneficiary's approval of the Grantor's authorization to substitute Trust Assets in the Trust Account and to the termination of the

12

Trust Account shall be in writing and may not be made or given by prepaid telex, telegraph or telecopier.

**Section 16.Headings**

The headings of the Sections have been inserted for reference only and shall not be deemed to constitute a part of this Agreement.

**Section 17.Counterparts**

This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall constitute an original, but such counterparts together shall constitute but one and the same Agreement.

*[Remainder of this page intentionally left blank]*

13

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers thereunto duly authorized as of the date first above written.

Signed this 1 3 day of July, 2012
In HAMILTON, BERMUDA

For Alpha Re Limited, as Grantor

Attest:

Signature: _____

By: GREGORY TOLARAM

Title: COO

Signed this ___ day of July,2012
In Ogden, Utah

For Great Western Insurance Company, as Beneficiary

Attest:

Signature: _____

By: _____

Title: _____

Signed this ___ day of July,2012
In Wilmington, Delaware

For Wilmington Savings Fund Society, FSB, as Trustee

Attest:

Signature: _____

By: _____

Title: _____

14

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers thereunto duly authorized as of the date first above written.

Signed this ____ day of July, 2012
In __ ___ _____ ___

For Alpha Re Limited, as Grantor

Attest:

Signature: _____

By: _____

Title: _____

Signed this ____ day of July, 2012
In Ogden, Utah

For Great Western Insurance Company, as Beneficiary

Attest:

*Todd W. Rich*

Signature: *Nathan Felix*

By: Nathan Felix

Title: CFO

Signed this ____ day of July, 2012
In Wilmington, Delaware

For Wilmington Savings Fund Society, FSB, as Trustee

Attest:

Signature: _____

By: _____

Title: _____

14

A

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers thereunto duly authorized as of the date first above written.

Signed this ____ day of July, 2012
In _____

For Alpha Re Limited, as Grantor

Attest:

Signature: _____

By: _____

Title: _____

Signed this ____ day of July, 2012
In Ogden, Utah

For Great Western Insurance Company, as Beneficiary

Attest:

Signature: _____

By: _____

Title: _____

Signed this $\cancel{\beta}^{th}$ day of July, 2012
In Wilmington, Delaware

For Wilmington Savings Fund Society, FSB, as Trustee

Attest:

Signature: _Donna Lockerman_

By: _DONNA LOCKERMAN_

Title: _TRUST OFFICER_

14

**EXHIBIT A**

**A.1    NOVATION AGREEMENT**

**A.2    COINSURANCE AGREEMENT**

## NOVATION AGREEMENT

**THIS NOVATION AGREEMENT IS MADE THIS** 19th day of June 2012, between and among Great Western Insurance Company, a Utah domiciled insurer, with its principal place of business located at 3434 Washington Blvd. - Suite 300, Ogden, Utah 84401 (the "Company"), Ability Reinsurance (Bermuda) Limited, a Bermuda domiciled reinsurer, with its principal place of business located at Windsor Place – 2nd Floor, 22 Queen Street, Hamilton HM 11, Bermuda (the "Reinsurer"), and Alpha Re Limited, a Cayman Islands reinsurer, with its principal place of business located at Buckingham Square, 720 West Bay Road– 2nd Floor, Grand Cayman, KY1-1102, Cayman Islands ("Alpha Re").

## W I T N E S S E T H:

**WHEREAS,** the Reinsurer reinsures the Company under the Coinsurance Agreement, dated as of February 18, 2009, annexed hereto as Exhibit A (the "Reinsurance Contract"); and

**WHEREAS,** the Company, Reinsurer and Alpha Re desire to substitute Alpha Re in Reinsurer's name, place and stead as the assuming reinsurer under the Reinsurance Contract effective January 1, 2012 (the "Effective Date"); and

**WHEREAS,** the Company and Alpha Re, as of **28th June 2012** (the "Closing Date"), desire to amend Sections 1.01, 8.03, 8.07, 11.01, 12.01, 12.02, 12.03, 12.05, 14.01, and 15.02 of the Reinsurance Contract and add a new Section 12.08 and a new Section 12.09 to the Reinsurance Contract.

**NOW, THEREFORE,** in consideration of the mutual covenants and promises set forth below, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      As of the Effective Date, Alpha Re is substituted as the assuming reinsurer under the Reinsurance Contract in the name, place and stead of Reinsurer. Alpha Re agrees, as of the Effective Date, to assume and perform all of the Reinsurer's obligations and liabilities contained in the Reinsurance Contract and be bound by all the terms of the Reinsurance Contract in every way as if an original party thereto, and Reinsurer shall be released of any and all obligations, liabilities, damages, claims, losses, costs or expenses of any kind or nature (contingent or otherwise, whether known or unknown and whether existing now or arising hereafter with respect to periods on, before or after the Effective Date) arising out of or in connection with the Reinsurance Contract. Alpha Re hereby agrees to indemnify Reinsurer from and against, and agrees to hold Reinsurer harmless from, any and all liabilities arising out of or in connection with the Reinsurance Contract incurred or suffered by Reinsurer from and after the Effective Date.

2.      As of the Effective Date, Reinsurer hereby assigns to Alpha Re all rights, privileges and benefits under the Reinsurance Contract, including, but not limited to, the right to receive all sums due or to become due under the Reinsurance Contract (e.g., any recoveries, additional premium or refunds of premium taxes or regulatory assessments).

3.      As of the Closing Date, Reinsurer hereby (i) agrees to reasonably cooperate with Alpha Re in seeking a novation of any retrocession agreement(s) covering any of the liability

under the Reinsurance Contract in order to substitute Alpha Re for Reinsurer as the retrocedent under any such retrocession agreement(s) (it being understood and agreed that Reinsurer shall in no event be obligated to compensate any person or entity, commence or participate in litigation or offer or grant any accommodation (financial or otherwise) to any person or entity as part of such cooperation); and, (ii) agrees to direct the Prior Trustee under the Trust Agreement (both as defined hereinbelow) to transfer the Assets in the Trust Account established under the Trust Agreement to the Trust Account established under the Amended & Restated Trust Agreement ,(as defined hereinbelow), the Company and the Reinsurer shall direct the Prior Trustee to liquidate the Assets in the Trust Account established under the Trust Agreement and deposit the cash proceeds from such liquidation into the Trust Account established under the Amended & Restated Trust Agreement (as defined hereinbelow).

4.      Within ten (10) Business Days (as defined in Section 1.01 of the Reinsurance Contract) following the deposit by the Prior Trustee of the cash proceeds from the liquidation of the Assets in the Trust Account established under the Trust Agreement into the Trust Account established under the Amended & Restated Trust Agreement, Alpha Re shall (a) provide the Company with a Letter of Credit, and/or (b) deposit additional Assets into the Trust Account established under the Amended & Restated Trust Agreement, where the sum of the amount of such Letter of Credit plus the amount of such deposit shall total $14,944,977. Upon receipt of the Letter of Credit or upon deposit of such additional Assets into the Trust Account established under the Amended & Restated Trust Agreement, the Company shall then prepare and provide to Alpha Re a special statement of the amount of the Reserves under the Reinsurance Contract for the sole purpose of adjusting the amount of security provided pursuant to Article XII, as amended by this Novation Agreement. If the special statement shows that Alpha Re's pro rata share of the Reserve liabilities under the Reinsurance Contract is less than the value of the security as of the special statement date, the Company shall, within three (3) days after providing Alpha Re with the special statement, facilitate the release to Alpha Re of such excess security by agreeing to the withdrawal of trusteed assets as provided for in Section 12.05 of the Reinsurance Contract so that the value of the Trust Account is equal to no less than 102% of Alpha Re's pro rata share of the Reserve liabilities. Within three (3) days after receiving the excess security from the Trust Account, Alpha Re shall then transfer the amount of such excess security to the Reinsurer. Within three (3) days after the receipt by the Reinsurer of such security, the Reinsurer shall transfer to the Company an aggregate amount in cash equal to $2,000,000.

5.      The Company hereby releases and discharges Reinsurer from any and all liabilities, obligations, damages, claims, losses, costs or expenses of any kind or nature (contingent or otherwise, whether known or unknown, and whether existing now or arising hereafter with respect to periods on, before or after the Effective Date) arising out of or in connection with the Reinsurance Contract. The Company waives any right of setoff or recoupment it may have had prior to this Novation Agreement as to any amount(s) due from Reinsurer under any other agreement, and agrees to look solely to Alpha Re in place of Reinsurer for the performance of all obligations under the Reinsurance Contract, for which Reinsurer is forever discharged.

6.      The Reinsurer hereby releases and discharges the Company from any and all liabilities, obligations, damages, claims, losses, costs or expenses of any kind or nature (contingent or otherwise, whether known or unknown, and whether existing now or arising

2

hereafter with respect to periods on, before or after the Effective Date) arising out of or in connection with the Reinsurance Contract.   The Reinsurer waives any right of setoff or recoupment it may have had prior to this Novation Agreement as to any amount(s) due from the Company under any other agreement.

7.     The Company agrees that it shall continue to be bound by the terms and conditions of the Reinsurance Contract, as amended by this Novation Agreement, in every way as if Alpha Re had originally been a party to the Reinsurance Contract in place of Reinsurer.

8.     The Company further agrees that it shall cooperate with the Reinsurer and Alpha Re in substituting Alpha Re in Reinsurer's name, place and stead as the Grantor under an Amended & Restated Trust Agreement (the "Amended & Restated Trust Agreement") to be entered into among the Company, Alpha Re, and Wilmington Savings Fund Society, FSB ("WSFS"). The Company shall also cooperate with the Reinsurer and Alpha Re in replacing and removing The Bank of New York Mellon (the "Prior Trustee") as trustee under the Trust Agreement (the "Trust Agreement"), dated as of February 18, 2009, among the Company, Reinsurer and Prior Trustee, and entering into the Instrument of Removal and Replacement annexed hereto as Exhibit A with the Reinsurer and the Prior Trustee.

9.     As of the Closing Date, the definition of "Accounting Period" in Section 1.01 of the Reinsurance Contract, for all accounting periods after the initial accounting period is amended to mean a calendar month, and all other provisions of the Reinsurance Contract relating to such accounting periods, including any reporting forms, are amended and conformed to the calendar month accounting period.

10.    As of the Closing Date, the definition of "Qualified Financial Institution" in Section 1.01 of the Reinsurance Contract shall be deleted and replaced by the following:

       "Qualified Financial Institution" shall have the meaning specified in Utah Administrative Code, R590-173-3(H)."

11.    As of the Closing Date, Section 8.03 of the Reinsurance Contract shall be deleted and replaced by the following:

       "8.03 Recapture. Recapture shall be permitted as follows:

(a)    Upon mutual agreement of the Company and the Reinsurer as to the terms and conditions applicable thereto.

(b)    In the event the Reinsurer shall default in maintaining the required amount of assets in the Trust Account established pursuant to Article XII of this Agreement, and shall fail to cure such default upon twenty (20) Business Days' written notice from the Company, the Company shall have the right in its sole discretion to recapture all, but not less than all, the Reinsured Contracts and to withdraw all the assets in the Trust Account, subject to the accounting required pursuant to Section 8.07 below.

(c)    In the event the Reinsurer has become insolvent or has been placed into liquidation or receivership (whether voluntary or involuntary), or there has been instituted

3

against it proceedings for the appointment of a receiver, liquidator, rehabilitator, conservator, or trustee in bankruptcy, or other agent known by whatever name, to take possession of its assets or control its operations, the Company shall have the right in its sole discretion to recapture all, but not less than all, the Reinsured Contracts and to withdraw all the assets in the Trust Account, subject to the accounting required pursuant to Section 8.07 below.

(d)   If the Company, due to a breach of this Agreement by the Reinsurer which breach cannot be cured, is not entitled to all relevant statement credit for the cession of reinsurance to a Reinsurer in its Annual Statement as filed in its domiciliary state."

12.   As of the Closing Date, the first paragraph of Section 8.07 of the Reinsurance Contract shall be deleted and replaced by the following:

8.07   Payments on Termination or Recapture.   In the event that this Agreement is terminated or recapture effected pursuant to this Article VIII, a net accounting and settlement as to any balance due under this Agreement shall be undertaken by the parties to this Agreement (the "Recapture Accounting and Settlement" or "Terminal Accounting and Settlement," respectively). The balance due shall equal 100% of the Reserves under the Reinsured Contracts; provided, however, in the event this Agreement is terminated or recaptured pursuant to subsections (b), (c), or (d) of Section 8.03 above, the Company shall have the right to use, in determining the balance due, the interest rate prescribed by Utah for the valuation of policies substantially similar to the Reinsured Contracts issued in the year of such recapture or termination.

13.   As of the Closing Date, the address to which service of process may be made upon in Section 11.01 of the Reinsurance Contract shall be deleted and replaced by the following:

"Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022
Attention: Marc M. Tract, Esq."

14.   As of the Closing Date, Section 12.01 of the Reinsurance Contract shall be deleted and replaced by the following:

"12.01   Establishment of Trust.   The Reinsurer shall enter into an Amended & Restated Trust Agreement (the "Trust Agreement") and establish a trust account for the benefit of the Company on or before the Closing Date in the Novation Agreement, with Wilmington Savings Fund Society, FSB (the "Trustee"), which is a Qualified United States Financial Institution. A copy of the Trust Agreement is attached hereto as Exhibit B to the Novation Agreement. Upon execution of the Trust Agreement, The Bank of New York Mellon, the Prior Trustee, at the direction of the Reinsurer, shall transfer for deposit to the Trust Account established under the Trust Agreement, the Assets listed in Exhibit B of the Trust Agreement. As stipulated in Article XII of this Agreement, Grantor shall deposit additional Assets into the Trust Account as may be required from time to time."

4

15.    As of the Closing Date, the third and fourth sentences in Section 12.02 of the Reinsurance Contract shall be deleted and replaced by the following:

"Such assets shall initially be in an amount that is equal to 102% of the Quota Share Percentage of the Reserves as of 28th June 2012 and shall be increased or decreased, as appropriate, for each Accounting Period in accordance with the terms of this Agreement and the terms of the Trust Agreement. Assets deposited in the Trust Account shall be valued as set forth in the next following sentence and shall consist only of assets rated investment grade by at least one Nationally Recognized Statistical Rating Organization, cash (United States legal tender), securities listed by the National Association of Insurance Commissioner's Securities Valuation Office and qualifying as admitted assets under the Utah Insurance Code, and Eligible Securities. "Eligible Securities" shall mean and include certificates of deposit issued by a United States bank and payable in United States legal tender, and investments of the types specified in Section 31A-18-105 of the Utah Insurance Code. For purposes of determining the fair market value of any Assets in the Trust Account, the parties hereby agree (without any liability being incurred on the part of the Trustee for any incorrect fair valuation of Assets, howsoever caused) to use prices published by a nationally recognized pricing service for Assets for which such prices are available and for Assets for which such prices are not available, to obtain at the expense of the Reinsurer and pursuant to its written recommendation, a qualified independent securities valuation firm to appraise the value of such Assets, which may use methodologies consistent with those which the Reinsurer uses for determining the fair market value of assets held in the Reinsurer's general account (other than the Assets) in the ordinary course of business (the "Fair Value"). If the Company shall dispute the Fair Value of any Asset, and the parties are unable to resolve such dispute within fourteen (14) days, the value of such Asset shall be determined by an independent appraisal firm which is mutually acceptable to the Reinsurer and the Company, and the parties shall be bound by such valuation. The Trustee shall not be a party to any dispute between the Reinsurer and the Company relating to the valuation of Assets."

16.    As of the Closing Date, Section 12.03(a) of the Reinsurance Contract shall be deleted and replaced by the following:

"(a)    If the statement shows that the Reinsurer's pro rata share of the Reserve liabilities exceeds the value of the security as of the statement date, the Reinsurer shall, within twenty (20) Business Days after receipt of notice of such excess, deposit additional assets with the Trustee so that the value of the Trust Account is equal to 102% of the Reinsurer's pro rata share of the Reserve liabilities."

17.    As of the Closing Date, Article XII of the Reinsurance Contract shall be amended by the addition of a new Section 12.08 which shall read as follows:

"12.08 Letters of Credit. Notwithstanding the foregoing, the Reinsurer shall have the option of providing one or more letters of credit ("Letters of Credit") to the Company in place of, or in addition to, the Trust Account established under the Trust Agreement to allow the Company to obtain statutory statement credit, as a deduction from reserve

5

liabilities, for the business ceded under this Agreement to the Reinsurer. Any Letter of Credit provided to the Company by the Reinsurer pursuant to this Section 12.08 shall in all respects comply with the requirements of Utah Administrative Code, R590-114, shall be clean, irrevocable, and unconditional, shall be issued for a period of not less than one year, and shall be automatically extended for one year from its date of expiration or any future expiration date unless thirty (30) days prior to any expiration date the issuing bank shall notify the Company by certified or registered mail that the issuing bank elects not to consider the Letter of Credit extended for any additional period. The Reinsurer and the Company agree that any Letter of Credit provided by the Reinsurer pursuant to the provisions of this Agreement may be drawn upon at any time, notwithstanding any other provision of this Agreement, and may be utilized by the Company, or any successor, by operation of law, of the Company including, without limitation, any liquidator, rehabilitator, receiver or conservator of the Company for the any of the purposes contemplated under this Article XII."

18.    As of the Closing Date, Article XII of the Reinsurance Contract shall be amended by the addition of a new Section 12.09 which shall read as follows:

"12.09 Supplementary Trust Account. As additional security for the Reinsurer's obligations under this Agreement in an amount which exceeds the requirements imposed by Utah law upon Utah domiciled insurers seeking to take credit for reinsurance cessions to unauthorized reinsurers, the Reinsurer shall enter into a supplementary trust agreement (the "Supplementary Trust Agreement") and establish a separate trust account (the "Supplementary Trust Account") for the benefit of the Company with Wilmington Savings Fund Society, FSB (the "Supplementary Trustee"), which is a Qualified United States Financial Institution. A copy of the Supplementary Trust Agreement is attached hereto as Schedule E. The Supplementary Trust Account shall be funded by the Reinsurer with an additional amount of assets equal to 4% of the Reinsurer's pro rata share of the Reserve liabilities. Assets deposited in the Supplementary Trust Account shall consist only of assets rated investment grade by at least one Nationally Recognized Statistical Rating Organization, cash (United States legal tender), securities listed by the National Association of Insurance Commissioner's Securities Valuation Office and qualifying as admitted assets under the Utah Insurance Code, and Eligible Securities. "Eligible Securities" shall mean and include certificates of deposit issued by a United States bank and payable in United States legal tender, and investments of the types specified in Section 31A-18-105 of the Utah Insurance Code. The Reinsurer will have the authority to withdraw assets from the Supplementary Trust Account at any time, provided that no withdrawal shall result in the balance of the Supplementary Trust Account falling below 4% of the Reinsurer's pro rata share of the Reserve liabilities, and further provided that the Reinsurer may not withdraw assets from the Supplementary Trust Account if the balance of the Trust Account created by the Amended and Restated Trust Agreement is below 102% of the Reinsurer's pro rata share of the Reserve liabilities. In the event the Company becomes subject to any regulatory action, order, proceeding, or planned or threatened regulatory intervention or oversight by the Utah Insurance Department in connection with its financial condition, including, but not limited to, any notice of impairment, corrective order, risk based capital deficiency or event, or other similar threatened regulatory action, the Reinsurer shall have the authority

to immediately withdraw all assets from the Supplementary Trust Account upon making a written request to the Supplementary Trustee. In the event any amount is due under this Agreement which has not been paid by the Reinsurer, the Company shall first obtain payment from the Trust Account established under the Trust Agreement or the Letters of Credit; provided, however, that withdrawals from the Trust Account do not cause the balance of the Trust Account to fall below 102% of the Reinsurer's pro rata share of the Reserve liabilities."

19.     As of the Closing Date, Section 14.01 of the Reinsurance Contract shall be deleted and replaced by the following:

"14.01  Organization, Standing and Authority of the Reinsurer. The Reinsurer is an insurance company duly organized, validly existing and in good standing under the laws of the Cayman Islands and has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on the operations of its business as they are now being conducted."

20.     As of the Closing Date, the address and contact information for the Reinsurer in Section 15.02 of the Reinsurance Contract shall be deleted and replaced by the following:

> "Alpha Re Limited
> c/o Aon Insurance Managers (Cayman) Ltd.
> P.O. Box 69
> Buckingham Square
> 720 West Bay Road – 2nd Floor
> Grand Cayman, Cayman Islands
> Attn: Colleen Artuch RN, ACII, ACI
> Senior Account Manager
> Facsimile No.: 345-945-2889"

21.     All other terms and conditions of the Reinsurance Contract remain unchanged.

*[Remainder of this page intentionally left blank]*

8

**IN WITNESS WHEREOF,** the parties hereto have caused this instrument to be duly executed by their respective corporate officers as of the date first mentioned above.

**GREAT WESTERN INSURANCE COMPANY**

By: _____ CFO
    Name
    Title

**ABILITY REINSURANCE (BERMUDA) LIMITED**

By: _____
    Name MICHAEL CROW
    Title PRESIDENT

**ALPHA RE LIMITED**

By: _____
    Name GREGORY TOLARAM
    Title COO

9

EXHIBIT A

**COINSURANCE  AGREEMENT**
**DATED FEBRUARY 18, 2009**
**BETWEEN**
**GREAT WESTERN INSURANCE COMPANY**
**AND**
**ABILITY REINSURANCE (BERMUDA) LIMITED**

COINSURANCE AGREEMENT

by and between

GREAT WESTERN INSURANCE COMPANY

Ogden, Utah

Referred to as the "Company"

and

ABILITY REINSURANCE (BERMUDA) LIMITED

Hamilton, Bermuda

Referred to as the "Reinsurer"

## TABLE OF CONTENTS

Page

ARTICLE I       DEFINITIONS ........................................................................... 1
    1.01    Definitions ............................................................................... 1
ARTICLE II      REINSURANCE COVERAGE .................................................... 3
    2.01    Coverage ................................................................................. 3
    2.02    Conditions ............................................................................... 4
    2.03    Exclusions ............................................................................... 4
    2.04    Plan of Reinsurance ................................................................ 5
    2.05    Retrocession ........................................................................... 5
    2.06    Policy Growth .......................................................................... 5
ARTICLE III     GENERAL PROVISIONS ........................................................... 7
    3.01    Administration ......................................................................... 7
    3.02    Contract Changes .................................................................... 8
    3.03    Inspection ................................................................................ 8
    3.04    Misunderstandings and Oversights ......................................... 9
    3.05    Indemnification ...................................................................... 10
    3.06    Other Reinsurance ................................................................. 10
    3.07    Setoff and Recoupment ......................................................... 10
ARTICLE IV      REINSURANCE PREMIUM ..................................................... 11
    4.01    Reinsurance Premium ............................................................ 11
ARTICLE V       EXPENSE ALLOWANCE ......................................................... 11
    5.01    Commission and Expense Allowance ..................................... 11
ARTICLE VI      BENEFIT PAYMENTS .............................................................. 12
    6.01    Benefit Payments ................................................................... 12
ARTICLE VII     REPORTING, ACCOUNTING AND SETTLEMENT ................. 12
    7.01    Reporting ................................................................................ 12
    7.02    Settlements ............................................................................ 13
    7.03    Best Efforts to Supply Actual Data ........................................ 13
    7.04    Full Disclosure ....................................................................... 14
    7.05    Interest on Delayed Payments ............................................... 14
    7.06    Statutory Reports ................................................................... 14

## TABLE OF CONTENTS
(continued)

Page

ARTICLE VIII    DURATION, RECAPTURE AND TERMINATION ..................................... 14

    8.01    Duration ............................................................................................ 14

    8.02    Reinsurer's Liability............................................................................ 14

    8.03    Recapture .......................................................................................... 15

    8.04    Automatic Termination....................................................................... 15

    8.05    Termination Due to Nonpayment ....................................................... 15

    8.06    Termination by Mutual Agreement..................................................... 15

    8.07    Payments on Termination ................................................................... 15

    8.08    Termination Report............................................................................ 16

ARTICLE IX      INSOLVENCY ........................................................................................ 16

    9.01    Insolvency ......................................................................................... 16

    9.02    No Waiver of Defenses....................................................................... 17

ARTICLE X       ARBITRATION...................................................................................... 17

    10.01   Appointment of Arbitrators................................................................ 17

    10.02   Proceedings ....................................................................................... 18

    10.03   Decision ............................................................................................ 18

    10.04   Expenses of Arbitration ..................................................................... 19

ARTICLE XI      SERVICE OF SUIT ................................................................................ 19

    11.01   Service of Suit.................................................................................... 19

ARTICLE XII     SECURITY ............................................................................................ 20

    12.01   Establishment of Trust ....................................................................... 20

    12.02   Purpose of Trust................................................................................. 20

    12.03   Adjustment of Security ...................................................................... 21

    12.04   Return of Assets................................................................................. 21

    12.05   Withdrawals by the Reinsurer............................................................ 22

    12.06   Expenses ........................................................................................... 22

    12.07   Company's Right to Receive Confirmation of Trust Assets................. 22

ARTICLE XIII    REPRESENTATIONS, WARRANTIES AND COVENANTS OF
                 THE COMPANY........................................................................... 22

    13.01   Organization, Standing and Authority of the Company........................ 22

**TABLE OF CONTENTS**

(continued)

Page

| | | | |
|---|---|---|---|
| 13.02 | Authorization | | 22 |
| 13.03 | No Conflict or Violation | | 23 |
| 13.04 | Investigations | | 23 |
| 13.05 | Maintain Business in Force | | 23 |
| 13.06 | No Contingencies or Liabilities | | 23 |
| 13.07 | Documents True and Complete | | 24 |
| ARTICLE XIV | REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE REINSURER | | 24 |
| 14.01 | Organization, Standing and Authority of the Reinsurer | | 24 |
| 14.02 | Authorization | | 24 |
| 14.03 | No Conflict or Violation | | 25 |
| 14.04 | Investigations | | 25 |
| 14.05 | No Contingencies or Liabilities | | 25 |
| 14.06 | Documents True and Complete | | 25 |
| ARTICLE XV | MISCELLANEOUS PROVISIONS | | 26 |
| 15.01 | Headings and Schedules | | 26 |
| 15.02 | Notices | | 26 |
| 15.03 | Severability and Governing Law | | 26 |
| 15.04 | Successors and Assigns | | 27 |
| 15.05 | Execution in Counterparts | | 27 |
| 15.06 | Currency | | 27 |
| 15.07 | Entire Agreement | | 27 |
| 15.08 | Amendment or Waiver | | 27 |
| 15.09 | Interpretation | | 28 |
| 15.10 | Survival of Representations, Warranties and Agreements | | 28 |

## SCHEDULES

SCHEDULE A – REINSURED CONTRACTS

SCHEDULE B – COMMISSIONS AND EXPENSE ALLOWANCE

SCHEDULE C – QUARTERLY SETTLEMENT REPORT

SCHEDULE D – TRUST AGREEMENT

iv

## COINSURANCE AGREEMENT

THIS COINSURANCE AGREEMENT (this "Agreement"), dated as of February 18, 2009 is made and entered into by and between GREAT WESTERN INSURANCE COMPANY, an insurance company organized under the laws of Utah (the "Company"), and ABILITY REINSURANCE (BERMUDA) LIMITED, an insurance company organized under the laws of Bermuda (the "Reinsurer").

## ARTICLE I

## DEFINITIONS

1.01    Definitions.    As used in this Agreement, the following terms shall have the following meanings (definitions are applicable to both the singular and the plural forms of each term defined in this Article):

"Accounting Period" means a calendar quarter, except that the initial Accounting Period shall be the period commencing with the Effective Date and ending with the last day of the then current calendar quarter, and the final Accounting Period shall be the period commencing with the first day of the calendar quarter that includes the Termination Date and ending on the Termination Date.

"Benefit Payments" shall have the meaning specified in Section 6.01.

"Business Day" means any day that is not a Saturday or a Sunday or a day on which banks in the State of New York are authorized or required by law to close.

"Closing Date" shall mean the date upon which the parties exchange executed counterpart signature pages of this Agreement and the Reinsurance Premium is paid.

"Effective Date" shall have the meaning specified in Section 2.01.

"Extracontractual Liabilities" means all liabilities of the Company for consequential, exemplary, punitive or similar damages which relate to or arise in connection with any alleged or actual act, error or omission by the Company, or its directors, officers, employees, agents or any of its affiliates, whether intentional or otherwise, in connection with the handling of any claim under any of the Reinsured Contracts or in connection with the cancellation or administration of any of the Reinsured Contracts.

"Index" shall mean the average coupon on the Barclays US Credit Index, or such replacement index upon which the parties may mutually agree from time to time, provided that such replacement index is incorporated into this Agreement pursuant to Section 15.08 hereof.

"NAIC" means the National Association of Insurance Commissioners.

"Net Benefit" in respect of an individual Reinsured Contract is the benefit amount payable under the terms and conditions of the Reinsured Contract, less the sum of offsets provided for under the terms and conditions of the Reinsured Contract, if any.

"Qualified Financial Institution" shall have the meaning specified in 11 NYCRR 79.1(e).

"Quota Share Percentage" shall mean 75%.

"Reinsurance Premium" shall have the meaning specified in Section 4.01.

"Reinsured Contracts" means all policies issued by the Company in calendar years 2006, 2007 and 2008 and still in force as of January 1, 2009, as more particularly listed on Schedule A.

"Reserves" means the gross statutory reserves established by the Company with respect to the liabilities arising under the Reinsured Contracts, including, but not limited to, claim reserves and other statutory liabilities required to be reported by the Company on its NAIC

Annual Statement Blank filed with the State of Utah. The Company certifies to the Reinsurer the actuarial accuracy of the Reserves based upon the appropriate mortality table, interest assumptions, and method of calculation relating to each of the Reinsured Contracts, and the accuracy of the outstanding balances of the policy loans, dividend deposits and coupon deposits, if any, applicable to each of the Reinsured Contracts; provided, however, that in the event of a breach of these certificates or the discovery by the Company or Reinsurer of an error in calculation, any such breach or error may be cured by the Company or Reinsurer making a cash payment to the other, as the case may be, of the amount of any such error in calculation or actuarial inaccuracy.

"Termination Date" means the date on which any complete termination of this Agreement, as provided in Article VIII, is effective, either as a result of an event described in Article VIII, or as designated by the terminating party or parties.

"Trust" or "Trust Account" means the Trust or Trust Account established pursuant to Article XII.

"Trust Agreement" shall have the meaning specified in Section 12.01.

## ARTICLE II

## REINSURANCE COVERAGE

2.01 Coverage.

(a)    Upon the terms and subject to the conditions and other provisions of this Agreement, and any required governmental and regulatory consents and approvals, effective as of 12:01 a.m., Eastern Time, on January 1, 2009 (the "Effective Date"), the Company hereby cedes to the Reinsurer, and the Reinsurer hereby assumes, on a coinsurance basis, the Quota Share

3

Percentage, from first dollar, of the Net Benefit liabilities and obligations of the Company arising under the Reinsured Contracts, subject to the exclusions set forth in 2.03.

(b)     The liability of the Reinsurer with respect to any Reinsured Contract shall begin on the Effective Date and not on the date the Reinsured Contract was issued by the Company.

(c)     If a Reinsured Contract that was or is reduced, terminated, or lapsed, and subsequently reinstated, the reinsurance for such contract under this Agreement will be reinstated automatically to the amount that would be in force if the contract had not been reduced, terminated, or lapsed. The Company will pay to the Reinsurer the Reinsurer's proportionate share of all amounts collected from, or charged to the insured.

(d)     This Agreement is an indemnity reinsurance agreement solely between the Company and the Reinsurer, and the performance of the obligations of each party under this Agreement shall be rendered solely to the other party. In no instance, except as set forth in Article IX of this Agreement, shall anyone other than the Company or the Reinsurer have any rights under this Agreement, and the Company shall be and shall remain the only party hereunder that is liable to any cedent, insured, contract owner, or beneficiary under any contract reinsured hereunder.

2.02    Conditions. The reinsurance hereunder is subject to the same limitations, terms and conditions as the Reinsured Contracts, except as otherwise provided in this Agreement.

2.03    Exclusions. This Agreement does not apply to and specifically excludes from coverage hereunder:

(a)     any liabilities and obligations arising under insurance or annuity contracts issued or reinsured by the Company other than the Reinsured Contracts;

4

4846-6613-0139 15

(b)      any benefits other than the Net Benefits which may be provided by the Company;

(c)      any liabilities other than those expressly provided for herein;

(d)      any and all liabilities, causes of action, including regulatory action, lawsuits, penalties, claims and demands that arise out of or result from the fact that any Reinsured Contract was issued and delivered in violation of applicable law or regulation.

(e)      any liabilities for any Extracontractual Liability whatsoever other than those that may arise out of litigated claims approved by the Reinsurer pursuant to Section 6.01(c) and only to the extent that such liabilities do not result from the Company's negligent, reckless or intentional wrongs, fraud, oppression, bad faith or strict liability and only to the extent permitted by law.

2.04      Plan of Reinsurance.  This reinsurance shall be on a quota share coinsurance basis.

2.05      Retrocession.  Reinsurer retains the right to retrocede all or any portion of the risk on any Reinsured Contract without the consent of the Company.

2.06      Policy Growth.

(a)      From time to time, Company sets simple and compound growth rates (discretionary increases in death benefits) for its contracts.  In so doing, Company will treat the Reinsured Contracts in the same manner as other contracts of the Company.

(b)      The Company and Reinsurer agree that the Company, in its normal course of business, will continue to grant discretionary increases in death benefits on the Reinsured Contracts based on both simple and compound growth rates.  While this agreement is in force, the Company, in deciding the rate of discretionary increases from time to time, shall not

5

discriminate between the Reinsured Contracts and any other business, shall maintain its current practices in determining the rate of discretionary increases, and, as to the determination of simple growth rates only, shall allow the Reinsurer full access to Company management discussions in the determination of such rates.    The Company shall, in good faith, consider the recommendations of the Reinsurer in setting such simple growth rates.

        (c)     On any Policies for which the Company grants discretionary increases in death benefits based on the simple growth rate, the Reinsurer shall be liable for its share of such additional death benefits based on the Quota Share Percentage, subject to the following adjustments:

        (i)     The Increase Upper Limit shall be defined from time to time as the then current Index, minus 350 basis points.

        (ii)     The Maximum Increase shall be defined from time to time as the then current Index, minus 300 basis points.

        (iii)     The Increase Lower Limit shall be defined from time to time as the then current Index, minus 450 basis points.

        (iv)     The Minimum Increase shall be defined from time to time as the then current Index, minus 500 basis points.

        (v)     If, at any time, the Company grants discretionary increases at a rate in excess of the Increase Upper Limit but less than the Maximum Increase, the Reinsurer's liability shall be its Quota Share Percentage of any claims paid less 50% of the cost of any discretionary increase paid in excess of the Increase Upper Limit.

        (vi)     If, at any time, the Company grants discretionary increases at a rate in excess of the Maximum Increase, the Reinsurer's liability shall be its Quota Share

6

Percentage of any claims paid less 50% of the cost of any discretionary increase paid in excess of the Increase Upper Limit. less a further 50% of the cost of any discretionary increase paid in excess of the Maximum Increase.

(vii)   If, at any time, the Company grants discretionary increases at a rate less than the Increase Lower Limit but in excess of the Minimum Increase, the Reinsurer's liability shall be its Quota Share Percentage of any claims paid plus 50% of the additional amounts that the Company would have paid out as claims if the discretionary increase had been equal to the Increase Lower Limit.

(viii)   If, at any time, the Company grants discretionary increases at a rate less than the Minimum Increase. the Reinsurer's liability shall be its Quota Share Percentage of any claims paid plus 50% of the additional amounts that the Company would have paid out as claims if the discretionary increase had been equal to the Increase Lower Limit, plus a further 50% of the additional amounts that the Company would have paid out as claims if the discretionary increase had been equal to the Minimum Increase.

(d)   In the event that the cumulative amount of the compound growth is greater than the cumulative amount of the simple growth from December 31, 2008 to the time of death of the life insured. the Company will bear the entire excess cost. Any reserves held in connection with compound growth in excess of simple growth will be the Company's full responsibility.

## ARTICLE III

### GENERAL PROVISIONS

3.01   Administration.  The Reinsured Contracts shall continue to be administered by the Company, which shall perform all accounting and other administrative functions in a competent and professional manner in accordance with (i) the terms of this Agreement. (ii) applicable law.

7

4846-6613-9139.15

(iii) the terms of the Reinsured Contracts and (iv) claims practices that are the same as those currently utilized by the Company with respect to similar policies issued by the Company and not subject to this Agreement. The Company agrees not to change its current claims practices without first receiving written approval from the Reinsurer.

3.02    Contract Changes.  The Reinsurer shall not participate in any change, from the Effective Date, in the terms and conditions of any Reinsured Contracts unless such change(s) is required by law or regulation or is agreed to in writing by the Reinsurer.

3.03    Inspection.

(a)    Subject to reasonable advance notice to the Company, the Reinsurer or its designated representative may inspect, at the offices of the Company or its designated representative or wherever such records are located, any and all books, documents or records of the Company reasonably relating to the Reinsured Contracts during normal business hours for such period as this Agreement is in effect or for as long thereafter as the Company seeks performance by the Reinsurer pursuant to the terms of this Agreement. While performing any such inspection, the Reinsurer or its designated representative shall use its best efforts to minimize any disruption to the Company's normal business operations. Upon the Reinsurer's reasonable request, copies of such records shall be furnished to the Reinsurer, at the expense of the Reinsurer. The information obtained by the Reinsurer shall be treated as confidential material and proprietary to the Company and shall be used by the Reinsurer or its designated representative only for purposes relating to reinsurance of the Reinsured Contracts under this Agreement. The Reinsurer's rights under this Section shall survive termination of this Agreement.

8

4846-6613-9139.15

(b)     Subject to reasonable notice to the Reinsurer, the Company or its designated representative may inspect, at the offices of the Reinsurer or its designated representative or wherever such records are located, any and all books, documents, or records of the Reinsurer reasonably relating to the Reinsured Contracts during normal business hours for such period as this Agreement is in effect or for as long thereafter as Reinsurer seeks performance by the Company pursuant to the terms of this Agreement. While performing any such inspection, the Company or its designated representative shall use its best efforts to minimize any disruption to the Reinsurer's normal business operations. Upon the Company's reasonable request, copies of such records shall be furnished to the Company, at the expense of the Company. The information obtained by the Company or its designated representative shall be treated as confidential material and proprietary to the Reinsurer and shall be used by the Company only for purposes relating to reinsurance of the Reinsured Contracts under this Agreement.     The Company's rights under this Section shall survive termination of this Agreement.

3.04    Misunderstandings and Oversights.   If any delay, omission, error or failure to pay amounts due or to perform any other act required by this Agreement is unintentional and caused by misunderstanding or oversight, the Company and the Reinsurer will adjust the situation to what it would have been had the misunderstanding or oversight not occurred and the reinsurance provided hereunder shall not be invalidated. The party first discovering such misunderstanding or oversight, or act resulting from the misunderstanding or oversight, will notify the other party in writing promptly upon discovery thereof, and the parties shall act to correct such misunderstanding or oversight within twenty (20) Business Days of receipt of such notice.

9

However, this Section shall not be construed as a waiver by either party of its right to enforce strictly the terms of this Agreement.

3.05    Indemnification.    The Company agrees to indemnify, defend, and hold the Reinsurer harmless from any and all liabilities, causes of action, including regulatory action, lawsuits, penalties, claims, or demands (including the costs, expenses, reasonable attorney's fees and punitive damages on account thereof) that arise out of, or result from the Company's or its agents' negligence, willful misconduct, or failure to perform pursuant to the terms of this Agreement.

3.06    Other Reinsurance.   During the term of this Agreement, the Company hereby shall retain net for its own account that portion of the liability relating to the Reinsured Contracts which is not reinsured under this Agreement and shall not, without the prior written consent of the Reinsurer, enter into any reinsurance agreement of any type, other than this Agreement, with respect to the Reinsured Contracts.

3.07    Setoff and Recoupment.   Any debts or credits, matured or unmatured, liquidated or unliquidated, regardless of when they arose or were incurred, in favor of or against either the Company or the Reinsurer with respect to this Agreement are deemed mutual debts or credits, as the case may be, and shall be setoff from any amounts due to the Company or the Reinsurer hereunder, as the case may be, and only the net balance shall be allowed or paid. This setoff provision shall not, except to the extent required by law, be modified or reconstrued due to the insolvency, liquidation, rehabilitation, conservatorship, or receivership of either party.

## ARTICLE IV

### REINSURANCE PREMIUM

4.01    Reinsurance Premium.  As consideration for the reinsurance by the Reinsurer of the liabilities under this Agreement:

(a)    Initial Premium.  On the Closing Date the Company agrees to pay the Reinsurer $135,633,665.

(b)    Pro Rata Share of Premiums.  The Company shall pay the Reinsurer an amount equal to the Quota Share Percentage of the gross premium charged and received by the Company in connection with the Reinsured Contracts.  The premium paid to the Reinsurer by the Company will be paid as part of the quarterly settlements hereunder, as the premiums are collected by the Company.

(c)    Payment of Reinsurance Premium.  The amounts provided for in (a) and (b) constitute the Reinsurance Premium.  The Reinsurance Premium shall be payable by wire transfer of cash (United States legal tender) pursuant to written wiring instructions provided by the Reinsurer.    Payment of the Reinsurance Premium shall be a condition precedent of reinsurance coverage hereunder.

## ARTICLE V

### EXPENSE ALLOWANCE

5.01    Commission and Expense Allowance.  The Reinsurer shall pay the Company a commission and expense allowance in the amount determined in accordance with Schedule B. The Reinsurer shall also be credited with its quota share of commission chargebacks for lapses in the first 12 policy months and deaths in the first 9 policy months

11

## ARTICLE VI

## BENEFIT PAYMENTS

6.01    Benefit Payments.

(a)    Notice.   The Company will, upon written request, notify the Reinsurer promptly after receipt of any information on a claim on a Reinsured Contract.   The claim form and any copies of notifications, claim papers and proofs will be furnished to the Reinsurer as soon as possible.

(b)    Liability and Payment.   Subject to the terms and conditions of this Agreement, the Reinsurer will accept the good faith decision of the Company on payment of a claim or surrender on a Reinsured Contract.   The Reinsurer will pay its proportionate share of each claim based upon the form of claim settlement determined.   In no instance shall anyone other than the Company or the Reinsurer have any rights under this Agreement, and the Company shall be and remain solely liable to any insured, policyowner, or beneficiary under any Reinsured Contract.

(c)    Litigated Claims.   The Company will not litigate a claim involving a Reinsured Contract without the prior approval of the Reinsurer.   The Reinsurer will pay to the Company the Reinsurer's proportionate share of any litigation and investigative expenses incurred on litigated claims.

## ARTICLE VII

## REPORTING, ACCOUNTING AND SETTLEMENT

7.01    Reporting.   Company agrees to send to the Reinsurer accounting reports as set out in Schedule C not later than 25 business days after the end of each Accounting Period.   Such reports shall contain information for the preceding Accounting Period.

12

7.02    Settlements.

(a)    Within 45 business days after the end of each Accounting Period, the Company will pay the Reinsurer the sum of: (i) the pro-rata premiums for the preceding Accounting Period, determined in accordance with Subsection 4.01(b), plus (ii) the policy loan repayments and policy loan interest paid in the preceding Accounting Period., plus (iii) if allowed by the Reinsurer under Section 3.06, any amounts received from other reinsurance companies.

(b)    Simultaneously, the Reinsurer will pay the Company the sum of the Reinsurer's pro rata share of: (i) the amount of Benefit Payments by the Company during the preceding Accounting Period, plus (ii) the commission and expense allowance determined in accordance with Schedule B, plus (iii) new policy loans on Reinsured Contracts paid by the Company in the Accounting Period, plus (iv) if allowed by the Reinsurer under Section 3.06, any amounts paid to other reinsurance companies.

(c)    Except as otherwise specifically provided in this Agreement, including without limitation the provisions of Section 3.07 governing setoff and recoupment, all amounts due to be paid to either the Company or the Reinsurer shall be determined on a net basis and only that amount paid.

7.03    Best Efforts to Supply Actual Data.    In preparing all reports required in this Agreement, the Company and the Reinsurer shall make their best efforts to supply the actual data.    If the actual data cannot be supplied with the appropriate report, the Company shall produce best estimates, and shall provide amended reports based on actual data no more than twenty (20) Business Days after such report was originally due.

13

7.04    Full Disclosure. The Company certifies that it has provided and agrees it shall continue to provide full disclosure of all material facts regarding the Reinsured Contracts covered by this Agreement.

7.05    Interest on Delayed Payments. Should any payment due to either the Reinsurer or the Company be delayed, such delayed payment (including any amount constituting a difference between an estimated and actual amount, as described in Section 7.02), shall accrue interest for the period that payment is overdue at an interest rate equal to .5% (one half of one percent) per month, for the period that the amount is overdue. A payment shall be considered delayed 30 days after the date such payment is due.

7.06    Statutory Reports.    Annual reports shall be submitted to the Reinsurer by the Company and to the Company by the Reinsurer, not later than 25 business days after the end of each calendar year. Such reports shall include information necessary for completion of the NAIC Convention Blank and Bermuda Statutory Financial Return based on the Reinsured Contracts. Quarterly accounting reports shall be submitted by the parties not later than 25 business days after the end of each calendar quarter and shall include information for completion of the NAIC Quarterly Blank.

## ARTICLE VIII

## DURATION, RECAPTURE AND TERMINATION

8.01    Duration. Except as otherwise provided herein, this Agreement shall be unlimited in duration.

8.02    Reinsurer's Liability.    The Reinsurer's liability with respect to Reinsured Contracts will terminate on the earliest of: (i) the date the Company's liability on any such

14

Reinsured Contract is terminated pursuant to the terms of the Reinsured Contract or (ii) the date this Agreement is terminated.

8.03     Recapture. Upon and only upon mutual agreement of the Company and Reinsurer as to the terms and conditions applicable thereto, Company may recapture any, some or all of the Reinsured Contracts.

8.04     Automatic Termination. If, at the end of an Accounting Period, none of the Reinsured Contracts are in force, this Agreement shall automatically terminate.

8.05     Termination Due to Nonpayment. Either party may terminate this Agreement if the other party fails to pay, when due, any amounts due under this Agreement, provided that the non-delinquent party has given at least twenty (20) Business Days prior written notice of its intent to terminate for that reason. The delinquent party may avoid termination pursuant to this Section 8.05 by paying all amounts that are delinquent and then due, including any interest owing thereon pursuant to Section 7.05, on or before the Termination Date specified in the written notice.

8.06     Termination by Mutual Agreement. The parties may mutually agree to terminate this Agreement at any time. Neither party has the unilateral right to terminate this Agreement except as set forth in Section 8.05.

8.07     Payments on Termination. In the event that this Agreement is terminated pursuant to this Article VIII, a net accounting and settlement as to any balance due under this Agreement shall be undertaken by the parties to this Agreement (the "Recapture Accounting and Settlement" or "Terminal Accounting and Settlement", respectively).

15

Any net payment under the Terminal Accounting and Settlement shall consist of cash or Cash Equivalents, however, the Reinsurer may elect to transfer assets in the Trust Account in lieu of cash or Cash Equivalents, subject to the provisions of the Trust Agreement.

8.08    Termination Report.   Within ten (10) Business Days after the Termination Date, the Company shall supply the Reinsurer with a report that shall show the Terminal Accounting and Settlement (the "Termination Report"). Any net amount owed to the Reinsurer or the Company by reason of such supplemental accounting, plus any interest due pursuant to Section 7.05, shall be paid within ten (10) Business Days after the completion of such Termination Report or supplementary accounting, as appropriate.

## ARTICLE IX

## INSOLVENCY

9.01    Insolvency.   In the event of insolvency of the Company, all reinsurance shall be payable directly to the liquidator, receiver, or statutory successor of the Company on the basis of the liability of the Company under the contracts reinsured hereunder, without diminution because of the insolvency of the Company.

In the event of insolvency of the Company, the liquidator, receiver, or statutory successor shall give the Reinsurer written notice of the pendency of a claim against the Company on a contract reinsured within a reasonable time after such claim is filed in the insolvency proceeding. During the pendency of any such claim the Reinsurer may investigate such claim and interpose, in the name of the Company (or of its liquidator, receiver, or statutory successor), but at its own expense in the proceeding where such claim is to be adjudicated, any defense or defenses which the Reinsurer may deem available to the Company or its liquidator, receiver, or statutory successor.

16

The expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

9.02    No Waiver of Defenses.   Nothing in this Article IX shall preclude the Reinsurer from asserting any excuse or defense to payment of this reinsurance other than the excuses or defenses of the insolvency of the Company and the failure of the Company's conservator, receiver, liquidator or statutory successor to pay all or a portion of any claim.

## ARTICLE X

## ARBITRATION

10.01   Appointment of Arbitrators.   In the event of any disputes or differences arising hereafter between the contracting parties with reference to any transaction under or relating in any way to this Agreement as to which agreement between the parties hereto cannot be reached, the same shall be decided by arbitration. Three arbitrators will decide any dispute or difference. The arbitrators must be disinterested officers or retired officers of life insurance or reinsurance companies, however any such persons should not be employees, former employees or current or past consultants to either party to this Agreement. Each of the contracting parties agrees to appoint one of the arbitrators with the third, the "Umpire," to be chosen by the two appointed arbitrators. In the event that either party should fail to choose an arbitrator within twenty (20) Business Days following a written request by the other party to do so, the requesting party may choose the second arbitrator before entering upon arbitration. In the event that the two arbitrators shall not be able to agree on the choice of the Umpire within twenty (20) Business Days following their appointment, each arbitrator shall nominate five candidates within five (5)

17

Business Days thereafter. Each arbitrator shall decline four of the candidates nominated by the other arbitrator. The Umpire shall be chosen from the two remaining candidates by drawing lots. Should the chosen Umpire decline to serve, the candidate whose lot was not drawn shall be appointed. This process shall continue until a candidate has agreed to serve. The arbitration shall be held in New York, New York.

10.02  Proceedings. The parties will cooperate in good faith in the voluntary, prompt and informal exchange of non-privileged information relevant to the arbitration. The parties will make every effort to conclude the information exchange process within thirty (30) days after notice that the Umpire has been selected. Within fourteen (14) days after the Umpire is selected, the parties will provide to each other copies of all documents in their possession or control on which they will or may rely in support of their position. On the request of either party, the arbitrators will conduct a conference for the purpose of determining additional information to be exchanged. If the arbitrators determine that the requesting party has a reasonable need for the information and that the request is not overly burdensome to the opposing party, the arbitrators may order the exchange of the additional information.

10.03  Decision. Within sixty (60) days following the appointment of the Umpire, each party must present its case to the arbitrators. The arbitrators are relieved from following judicial formalities and shall consider customary and standard practices in the reinsurance business and not be bound by the strict rules of law. Within sixty (60) days after the arbitration hearing, a decision shall be reached by a majority vote of the arbitrators. There shall be no appeal from their written decision, which shall be final and binding upon the parties. Judgment may be entered on the decision of the arbitrators by any court having jurisdiction.

18

10.04 Expenses of Arbitration. Each party shall bear the expense of its own arbitrator (whether selected by that party, or by the other party pursuant to the procedures set out in Section 10.01) and related outside attorneys' fees, and shall jointly and equally bear with the other party the expenses of the third arbitrator.

## ARTICLE XI

## SERVICE OF SUIT

11.01 Service of Suit. It is agreed that in the event the Reinsurer fails to perform its obligations under the terms of this Agreement, the Reinsurer will, at the request of the Company, submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction. Nothing in this Article constitutes or should be understood to constitute a waiver of the Reinsurer's rights to commence an action in a court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon

> Edwards Angell Palmer & Dodge, LLP
> 750 Lexington Avenue
> New York, NY 10022
> Attention: Nick Pearson, Esq.

and that in any suit instituted, the Reinsurer will abide by the final decision of such court or of any appellate court in the event of an appeal.

The above-named are appointed as the Reinsurer's true and lawful attorney and are authorized and directed to accept service of process on behalf of the Reinsurer in any such suit.

19

It is not the intent of this Article XI to override or alter the obligation of the parties to submit all disputes to binding arbitration pursuant to Article X, but rather to aid in its enforcement.

## ARTICLE XII

## SECURITY

12.01 Establishment of Trust. The Reinsurer shall enter into a trust agreement (the "Trust Agreement") and establish a trust account for the benefit of the Company on or before the Closing Date, with The Bank of New York, which is a Qualified United States Financial Institution. A copy of the Trust Agreement is attached hereto as Schedule D.

12.02 Purpose of Trust. It is the intent of the Reinsurer and the Company that the Company shall be able to obtain statutory statement credit, as a deduction from reserve liabilities, for the business ceded under this Agreement to the Reinsurer. Therefore, the Reinsurer agrees to deposit, upon receipt from the Company, and maintain in said Trust Account assets to be held in trust by the Trustee for the benefit of the Company as security for the payment of the Reinsurer's obligations to the Company under this Agreement. Such assets shall initially be in an amount that is equal to the Quota Share Percentage of the Reserves on the Effective Date and shall be increased or decreased, as appropriate, for each Accounting Period in accordance with the terms of this Agreement and the terms of the Trust Agreement. Assets deposited in the trust Account shall be valued according to their current fair market value and shall consist only of assets defined as Eligible Securities in the Trust Agreement, provided investments in or issued by an entity controlling, controlled by or under common control with either the Reinsurer or the Company will not exceed 5% of total investments.

12.03 Adjustment of Security. Promptly after the end of each Accounting Period the Company shall prepare a specific statement of the amount of the Reserves, for the sole purpose of adjusting the amount of security provided pursuant to this Article XII, in the following manner:

(a)    If the statement shows that the Reinsurer's pro rata share of the Reserve liabilities exceed the value of the security as of the statement date, the Reinsurer shall, within twenty (20) days after receipt of notice of such excess, deposit additional assets with the Trustee so that the value of the Trust Account is equal to the Reinsurer's pro rata share of the Reserve liabilities.

(b)    If the statement shows that the Reinsurer's pro rata share of the Reserve liabilities are less than the value of the security as of the statement date, the Company shall, within twenty (20) days after receipt of a written request from the Reinsurer, facilitate the release of such excess security by agreeing to the withdrawal of trusteed assets as provided for in Section 12.05 of this Agreement so that the value of the Trust Account is equal to no less than 102% of the Reinsurer's pro rata share of the Reserve liabilities.

12.04 Return of Assets. In the event that the Company withdraws assets from the Trust Account in excess of actual amounts required to meet the Reinsurer's obligations to the Company, the Company shall return such excess to the Reinsurer, plus interest at the prime rate of interest. In the event of a dispute arising under this Article XII, the arbitration panel established pursuant to Article X of this Agreement shall have the right to award interest at a rate that it determines to be equitable, and may award attorney's fees, arbitration costs and other reasonable expenses.

21

4846-6613-9139.15

12.05 Withdrawals by the Reinsurer. The Reinsurer shall have the right to seek the Company's approval to withdraw all or any part of the assets from the Trust Account and transfer such assets to the Reinsurer, provided that:

(a)     the Reinsurer shall, at the time of withdrawal, replace the withdrawn assets with other assets of a type permitted hereunder having a market value equal to the market value of the assets withdrawn, so as to maintain the Trust Account in the required amount; or

(b)     after such withdrawal and transfer, the market value of the Trust Account is no less than 102% of the required amount.

In the event that the Reinsurer seeks the Company's approval hereunder, the Company shall not unreasonably or arbitrarily withhold its approval.

12.06 Expenses. All expenses of establishing and maintaining the Trust Account shall be paid by the Reinsurer.

12.07 Company's Right to Receive Confirmation of Trust Assets. The Company shall have the right at any time to request and receive from the Trustee confirmation of the assets held in the Trust Account.

## ARTICLE XIII

## REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE COMPANY

13.01 Organization, Standing and Authority of the Company. The Company is a life insurance company duly organized, validly existing and in good standing under the laws of the State of Utah and has all requisite corporate power and authority to carry on the operations of its business as they are now being conducted.

13.02 Authorization. The Company has all requisite corporate power and authority to enter into this Agreement and to perform its obligations hereunder. The execution and delivery

22

by the Company of this Agreement, and the performance by the Company of its obligations under this Agreement, have been duly authorized by all necessary corporate action. This Agreement, when duly executed and delivered by the Company, subject to the due execution and delivery by the Reinsurer, will be a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

13.03  No Conflict or Violation.   The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby in accordance with the respective terms and conditions hereof will not (a) violate any provision of the Articles of Incorporation or Bylaws of the Company, or (b) violate any order, judgment, injunction, award or decree of any court, arbitrator or governmental or regulatory body against, or binding upon, or any agreement with, or condition imposed by, any governmental or regulatory body, foreign or domestic, binding upon the Company, except when any such violation would not have a material adverse effect.

13.04  Investigations.   The Company will notify the Reinsurer immediately, in writing, of any and all investigations of the Company or its directors, principal officers or shareholders conducted by any Federal, state or local governmental or regulatory agency other than routine state insurance department examinations.

13.05  Maintain Business in Force.   The Company represents and warrants that it will take all reasonable efforts to keep the reinsured business in force.

13.06  No Contingencies or Liabilities.   The Company warrants that except to the extent specifically reflected in its audited annual report for the year ended December 31, 2007 (or in the notes relating thereto), there were no contingencies or liabilities against, relating to, or affecting the Company as of December 31, 2007, and from that time to the Closing Date, that individually

23

4846-6613-9139.15

or in the aggregate have or may reasonably be expected to have a material adverse effect on the financial condition of the Company and/or its ability to fulfill its obligations and responsibilities under this Agreement.

13.07  Documents True and Complete.  The Company warrants that the documents and statements presented to the Reinsurer prior to the Closing Date, reflecting the financial condition of the Company and its affiliated companies, are true and complete in all material respects, and fairly present the financial condition of the Company and its affiliated companies as of the respective dates thereof and were prepared in accordance with the accounting methodologies described therein.

## ARTICLE XIV

## REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE REINSURER

14.01  Organization, Standing and Authority of the Reinsurer.  The Reinsurer is a life insurance company duly organized, validly existing and in good standing under the laws of the Bermuda  and has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on the operations of its business as they are now being conducted.

14.02  Authorization.  The Reinsurer has all requisite corporate power and authority to enter into this Agreement and to perform its obligations hereunder.  The execution and delivery by the Reinsurer of this Agreement, and the performance by the Reinsurer of its obligations under this Agreement, have been duly authorized by all necessary corporate action.  This Agreement, when duly executed and delivered by the Reinsurer, subject to the due execution and delivery by the Company, will be a valid and binding obligation of the Reinsurer, enforceable against the Reinsurer in accordance with its terms.

24

14.03  No Conflict or Violation.   The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not (a) violate any provision of the Articles of Incorporation, Bylaws or other charter or organizational document of the Reinsurer, or (b) violate any order, judgment, injunction, award or decree of any court, arbitrator or governmental or regulatory body against, or binding upon, or any agreement with, or condition imposed by, any governmental or regulatory body, foreign or domestic, binding upon the Reinsurer, except when any such violation would not have a material adverse effect.

14.04  Investigations.  The Reinsurer will notify the Company immediately, in writing, of any and all investigations of the Reinsurer or its directors, principal officers or shareholders conducted by any Federal, state or local governmental or regulatory agency other than routine state insurance department examinations.

14.05  No Contingencies or Liabilities.  The Reinsurer warrants that except to the extent specifically reflected in its audited annual report and its annual report for the year ended December 31, 2007 (or in the notes relating thereto), there were no contingencies or liabilities against, relating to, or affecting the Reinsurer as of December 31, 2007, and from that time to the Closing Date, that individually or in the aggregate have or may reasonably be expected to have a material adverse effect on the financial condition of the Reinsurer and/or its ability to fulfill its obligations and responsibilities under this Agreement.

14.06  Documents True and Complete.  The Reinsurer warrants that the documents and statements presented to the Company prior to the Closing Date, reflecting the financial condition of the Reinsurer and its affiliated companies, are true and complete in all material respects, and fairly present the financial condition of the Reinsurer and its affiliated companies as of the

respective dates thereof and were prepared in accordance with the accounting methodologies described therein.

## ARTICLE XV

## MISCELLANEOUS PROVISIONS

15.01 Headings and Schedules. Headings used herein are not a part of this Agreement and shall not affect the terms hereof. The attached Schedules are a part of this Agreement.

15.02 Notices. All notices and communications hereunder shall be in writing and shall be deemed given if received three (3) Business Days after mailing, or if by telefax or by hand, when received, and if by overnight mail, on the next Business Day. Any written notice shall be by either certified or registered mail, return receipt requested, or overnight delivery service (providing for delivery receipt) or delivered by hand. All notices or communications with the Reinsurer under this Agreement shall be addressed as follows:

> Michael Crow
> Ability Reinsurance (Bermuda) Limited
> 2nd Floor, Windsor Place
> 18 Queen Street
> Hamilton HM 11
> Bermuda
> Fax: (441) 295 9513

All notices and communications with the Company under this Agreement shall be directed to:

> Fred Meese
> Great Western Insurance Company
> 3434 Washington Blvd #300
> Ogden UT 84409
> Fax 1-801-689-1390

15.03 Severability and Governing Law. If any term or provision of this Agreement shall be held void, illegal, or unenforceable, the validity of the remaining portions or provisions shall

26

not be affected thereby. This Agreement shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of law thereof, except with respect to credit granted for reinsurance, in which case the laws of the state of the Company's domicile shall govern, and further except in the case of conflict between this Agreement and the laws of the state of the Company's domicile, in which case the laws of such state shall govern.

15.04 Successors and Assigns. This Agreement may not be assigned by either party without the prior written consent of the other. No right to any payments under this Agreement may be assigned without the written consent of the Company and may only be accomplished by the entry of the name of any new payee on the books of the Company. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns as permitted herein.

15.05 Execution in Counterparts. This Agreement may be executed by the parties hereto in any number of counterparts, and by each of the parties hereto in separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

15.06 Currency. All payments and accounts shall be made in U.S. dollars and all fractional amounts shall be rounded to the nearest whole unit of that currency.

15.07 Entire Agreement. This Agreement supersedes all prior discussions and written and oral agreements and constitutes the sole and entire agreement between the parties and there are no understandings between the parties other than as expressed herein with respect to the subject matter hereof.

15.08 Amendment or Waiver. No amendment or waiver of any provision of this Agreement shall be effective unless set forth in writing, signed by duly authorized officers of the

27

parties hereto. A waiver shall constitute a waiver only with respect to the particular circumstance for which it is given and not a waiver of any future circumstance.

15.09   Interpretation.   For purposes of this Agreement, the words "hereof," "herein," "hereby," and other words of similar import refer to this Agreement as a whole unless otherwise indicated. Whenever the words "include," "includes," or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." Whenever the singular is used herein, the same shall include the plural, and whenever the plural is used herein, the same shall include the singular, where appropriate.

15.10   Survival of Representations, Warranties and Agreements.   The Reinsurer or the Company, as the case may be, has the right to rely fully upon the representations, warranties, covenants and agreements of the Company or the Reinsurer, as the case may be, contained in this Agreement. All representations and warranties made by the Company or the Reinsurer in this Agreement shall survive the execution and delivery hereof. The provisions of Section 3.03 and Article X shall survive the termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written by their duly authorized representatives.

GREAT WESTERN INSURANCE COMPANY

By _____

Name: _____

Title: _____

28

parties hereto. A waiver shall constitute a waiver only with respect to the particular circumstance for which it is given and not a waiver of any future circumstance.

15.09 Interpretation. For purposes of this Agreement, the words "hereof," "herein," "hereby," and other words of similar import refer to this Agreement as a whole unless otherwise indicated. Whenever the words "include," "includes," or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." Whenever the singular is used herein, the same shall include the plural, and whenever the plural is used herein, the same shall include the singular, where appropriate.

15.10 Survival of Representations, Warranties and Agreements. The Reinsurer or the Company, as the case may be, has the right to rely fully upon the representations, warranties, covenants and agreements of the Company or the Reinsurer, as the case may be, contained in this Agreement. All representations and warranties made by the Company or the Reinsurer in this Agreement shall survive the execution and delivery hereof. The provisions of Section 3.03 and Article X shall survive the termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written by their duly authorized representatives.

| GREAT WESTERN INSURANCE COMPANY | ABILITY REINSURANCE (BERMUDA) LIMITED |
|---|---|
| By | By |
| Name: John E Lindquist | Name: |
| Title:   President | Title: |

28

ABILITY REINSURANCE (BERMUDA)
LIMITED

By

Name:     MICHAEL CROW

Title:     PRESIDENT

## SCHEDULE A
## REINSURED CONTRACTS

1.   Reinsured Contracts

A listing of the Reinsured Contracts and their respective Reserves as of the Effective Date was supplied to Reinsurer by Company via attachment to an e-mail sent on February 13, 2009 from Stacey E. Haws of Company to Michael Crow of Reinsurer at 1:40 p.m. Mountain Standard Time, the contents of which e-mail and attachment are hereby incorporated by reference and made a part of this Agreement.

## SCHEDULE B
## COMMISSIONS AND EXPENSE ALLOWANCE

1.     Monthly Commission and Expense Allowance.

As part of the quarterly settlements under this Agreement a commission and expense allowance of $1.61 multiplied by the Quota Share Percentage per policy per month will be paid in addition to all other agent commissions (including renewals) and chargebacks for premiums collected. This expense allowance will inflate at 3% interest each calendar year after 2009.

2.     Premium Taxes, including all other Licenses and Fees based on Premium, and FET.

A premium tax and fees allowance equal to the Quota Share Percentage of actual premium taxes and fees paid during a reporting period will be paid in addition to all other allowances. This is inclusive of the allowance for premium taxes paid in connection with the Reinsured Contracts. In addition the Reinsurer will pay the Company a Federal Excise Tax (FET) allowance for the amount of FET the Company actually pays.

4846-6613-9139.15

**SCHEDULE C**
**QUARTERLY SETTLEMENT REPORT**

Reporting Quarter: _____/ _____/ _____
Date Report Completed: _____/ _____/ _____

1) Direct Premiums                                                  _____
   Less Reinsurance Premiums Paid                                   _____
   Net Premiums                                                     _____

2) Policy Loans                                                     _____
   Policy Loans Repaid                                              _____
   Policy Loan Interest Paid in Cash                                _____
   Total                                                            _____

3) Benefits
   Surrenders                        _____
   Deaths                            _____
   Other                             _____
   Less Reinsurance Recoveries       _____
   Total                                                            _____

4) Commissions and Expense Allowance (Schedule B)                   _____
   Less Allowances on Reinsured Ceded                               _____
   Net Commission and Expense Allowance                             _____

5) New Policy Loans Paid Out in Cash                                _____

   Net due Equals (1) + (2) – (3) – (4) – (5) =                     _____

Supplemental Information

Direct

|  | # of Policies | Policy Reserves | Face Amount |
|---|---|---|---|
| Beg. of Period |  |  |  |
| +Additions |  |  |  |
| -Terminations |  |  |  |
| End of Period |  |  |  |

Reinsurance Ceded

|  | # of Policies | Policy Reserves | Face Amount |
|---|---|---|---|
| Beg. of Period |  |  |  |
| +Additions |  |  |  |
| -Terminations |  |  |  |
| End of Period |  |  |  |

| Direct | Gross | Net |
|---|---|---|
| Deferred Premiums: |  |  |
| Due Premiums: |  |  |
| Advance Premiums: |  |  |

Reinsurance Ceded
Deferred premiums:
Due Premiums:
Advance Premiums:

Coinsurance Allowances on Reinsurance Ceded
Deferred Premium
Due Premium
Advance Premium
Policy Loan Interest Due:
Policy Loan Interest Accrued:
Policy Loan Interest Unearned:
Policy Loan Beginning of Period:
+ New Loans Paid in Cash:
+ New Loans to Cover Interest:
+ New Loans to Pay Premiums:
- Loans Paid Off:
Policy Loans End of Period:
Policy Loans Interest Paid in Cash:
Policy Loans Interest Added to Loan:

Total Policy Loan Interest:

SCHEDULE D
TRUST AGREEMENT

4846-0613-9139.15

## TRUST AGREEMENT

This TRUST AGREEMENT, dated as of February 18, 2009 (this "Trust Agreement"), is among ABILITY REINSURANCE (BERMUDA) LIMITED, a Bermuda limited company (the "Grantor"), GREAT WESTERN INSURANCE COMPANY, a Utah insurance company (the "Beneficiary"), and The Bank of New York Mellon, a New York banking corporation (the "Trustee") (the Grantor, the Beneficiary and the Trustee are hereinafter each sometimes referred to individually as a "Party" and collectively as the "Parties"). All terms not defined herein shall have the same meanings as set forth in the Reinsurance Agreement (as hereinafter defined).

### WITNESSETH:

**WHEREAS,** the Beneficiary and the Grantor are parties to a reinsurance agreement of even date herewith (the "Reinsurance Agreement"); and

**WHEREAS,** the Grantor desires to transfer to the Trustee for deposit to a trust account (the "Trust Account") certain assets as security for the payment and performance by the Grantor of its obligations under the Reinsurance Agreement; and

**WHEREAS,** the Trustee has agreed to act as Trustee hereunder, and to safely hold such assets in trust in the Trust Account for the sole use and benefit of the Beneficiary for such purposes in accordance with the terms and conditions of this Trust Agreement; and

**WHEREAS,** this Trust Agreement is made for the sole use and benefit of the Beneficiary and for the purpose of setting forth the duties and powers of the Trustee with respect to the Trust Account;

**NOW, THEREFORE,** for and in consideration of the premises and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree as follows:

Section 1. Deposit of Assets to the Trust Account.

(a)     The Grantor hereby establishes the Trust Account with the Trustee for the sole use and benefit of the Beneficiary, under the terms set forth herein. The Trustee shall administer the Trust Account in its name as Trustee for the sole benefit of the Beneficiary. The Trust Account shall be subject to withdrawal by the Beneficiary solely as provided herein. The Trustee hereby accepts the Trust Account upon the terms set forth in this Trust Agreement.

(b)     The Grantor shall transfer to the Trustee, for deposit to the Trust Account, such assets as may be required from time to time pursuant to the Reinsurance Agreement (all such assets are herein referred to individually as an "Asset" and collectively as the "Assets"). The Trustee is authorized and shall have power to receive the Assets from the Grantor and to hold, invest, reinvest and dispose of the same for the uses and purposes of and according to the provisions herein set forth. All Assets shall be maintained by the Trustee in the Trust Account separate and distinct from all other assets on the books of the Trustee and in accordance with the

terms of this Trust Agreement. The Assets shall consist only of Eligible Securities (as hereinafter defined). In the event of any payment default as to any Asset in the Trust Account or in the event that any Asset no longer is an Eligible Security, the Grantor shall, within five (5) business days after receiving notice from the Trustee pursuant to Section 6(m) or the Grantor having knowledge of such default or ineligibility, substitute other Assets which meet the requirements of an Eligible Security and having a statutory book value equal to the statutory book value of such Asset, which has a payment default or no longer meets the requirements for an Eligible Security, on the last statement provided by the Trustee.

(c) The Grantor hereby represents and warrants (i) that any Assets transferred by the Grantor to the Trustee for deposit to the Trust Account will be in such form that the Beneficiary whenever necessary may, and the Trustee upon direction by the Beneficiary will, negotiate any such Assets without consent or signature from the Grantor or any other person or entity in accordance with the terms of this Trust Agreement, (ii) that all Assets transferred by the Grantor to the Trustee for deposit into the Trust Account consist only of Eligible Securities, and (iii) that Grantor has at the time of transfer into this Trust Account good and marketable title to the Assets to be so transferred and each such Asset shall be at the time of transfer free and clear of all claims, liens, interests and encumbrances (other than those arising under this Trust Agreement).

(d) Prior to depositing the Assets into the Trust Account, and from time to time thereafter as required, the Grantor shall execute assignments, endorsement in blank, or transfer legal title to the Trustee of all shares, obligations or other Assets requiring assignments, so that the Beneficiary whenever necessary may, and the Trustee upon the direction by the Beneficiary will, negotiate any such Assets without the consent or signature from the Grantor or any other person or entity. The Grantor shall give all notices and take all actions as the Trustee deems appropriate in order to cause payments due or that become due on any Asset within the Trust Account to be paid to the Trustee. The Grantor shall not make or consent to any waiver, amendment or restriction on transfer with respect to any Asset in the Trust Account, in each case without the Beneficiary's prior written consent. In connection with the deposit of Assets into the Trust Account, the Grantor shall furnish to the Trustee all original documentation evidencing the Grantor's ownership thereto. Upon request from the Beneficiary, the Trustee will promptly confirm in writing the receipt from the Grantor of all required, properly executed assignments, endorsements in blank or other evidence of transfer of legal title to the Trustee.

(e) All payments of interest, dividends and other income in respect to Assets in the Trust Account shall be posted and credited by the Trustee, subject to deduction of the Trustee's compensation and expenses as provided in Section 8 of this Agreement, in the separate income column of the custody ledger (the "Income Account") within the Trust Account established and maintained by the Grantor at an office of the Trustee in New York City. Any interest, dividend or other income automatically posted and credited on the payment date to the Income Account which is not subsequently received by the Trustee shall be reimbursed by the Grantor to the Trustee and the Trustee may debit the Income Account for this purpose. The interest, dividends and other income shall be paid to the Grantor or credited to an account of the Grantor in accordance with written instructions provided from time to time by the Grantor to the Trustee.

Section 2. Withdrawal of Assets from the Trust Account.

(a)     Without notice to the Grantor, the Beneficiary shall have the right, at any time and from time to time, to withdraw from the Trust Account, upon written notice to the Trustee in the form of a certificate substantially in the form of Exhibit A-1 attached hereto (the "Beneficiary Certificate"), signed by a duly authorized officer of the Beneficiary, accompanied by a request for withdrawal substantially in the form of Exhibit A-2 hereto (the "Beneficiary Request for Withdrawal"), signed by a duly authorized officer of the Beneficiary, such Assets as are specified in such Beneficiary Request for Withdrawal. The Beneficiary Request for Withdrawal may designate a third party (the "Beneficiary Designee"), including the Grantor, to whom Assets specified therein shall be delivered. The Beneficiary shall not be required to present any other statement or document in addition to a Beneficiary Certificate and a Beneficiary Request for Withdrawal in order to withdraw any Assets, except that the Beneficiary shall acknowledge receipt of any such Assets withdrawn upon request by the Trustee.

(b)     Upon receipt of a Beneficiary Certificate and a Beneficiary Request for Withdrawal, the Trustee and the Grantor shall immediately take any and all steps necessary to transfer absolutely and unequivocally all right, title and interest in the Assets specified in such Beneficiary Request for Withdrawal and shall deliver physical custody (or such other form as is necessary to complete the transfer) of such Assets to or for the account of the Beneficiary or such Beneficiary Designee, as specified in such Beneficiary Request for Withdrawal. The Trustee shall notify the Grantor and Beneficiary within three (3) business days following each withdrawal from the Trust Account.

(c)     Subject to Section 4, in the absence of a Beneficiary Certificate and a Beneficiary Request for Withdrawal, the Trustee shall allow no substitution or withdrawal of any Asset from the Trust Account.

(d)     The Trustee shall notify the insurance regulator in the state where the Beneficiary is domiciled within three (3) business days after all the assets in the Trust Account are withdrawn. At the Trustee's request, the Beneficiary shall provide to the Trustee the address of the insurance regulator in the state where the Beneficiary is domiciled

Section 3. Application of Assets. The Beneficiary shall be permitted to withdraw Assets from the Trust Account, without diminution because of the insolvency of the Beneficiary or Grantor, only for the following purposes:

(a)     to pay or reimburse the Beneficiary for:

(i)     the Grantor's share under the Reinsurance Agreement of premiums returned, but not yet recovered from the Grantor, to the owners of policies reinsured under the Reinsurance Agreement on account of cancellations of the policies; and

(ii)     the Grantor's share under the Reinsurance Agreement of surrenders and benefits or losses paid by the Beneficiary, but not yet recovered from the Grantor, under the terms and provisions of the policies reinsured under the Reinsurance Agreement;

(b)     to pay the Grantor amounts held in the Trust Account in excess of the amount necessary to secure the credit or reductions from liability for reinsurance taken by the Beneficiary; or

(c)     where the Beneficiary has received notification of termination of the trust and where the Grantor's entire obligations under the Reinsurance Agreement remain unliquidated and undischarged 10 days prior to the termination date, to withdraw amounts equal to the Grantor's share of liabilities, to the extent that the liabilities have not yet been funded by the Grantor, and deposit those amounts in a separate account, in the name of the Beneficiary in any Qualified United States Financial Institution apart from its general assets, in trust for such uses and purposes specified in Subsections R590-173-9.A.(12)(a) and (b) of Utah Administrative Code R590-173 as may remain executory after withdrawal and for any period after the termination date.

Section 4. Redemption, Investment and Substitution of Assets.

(a)     From time to time, upon notice to the Beneficiary, the Trustee may withdraw any Asset in the Trust Account upon the call or maturity of such Asset provided that the proceeds from such call or maturity are deposited into the Trust Account.

(b)     The Grantor, subject to the prior written approval of the Beneficiary, may retain (and pay the service fees of ) a professional asset manager (the "Asset Manager") to manage and make investment decisions with regard to the Assets held by the Trustee in the Trust Account. From time to time, at the written order and direction of the Grantor or the Asset Manager, the Trustee shall invest Assets in the Trust Account in Eligible Securities.

(c)     From time to time, subject to the prior written approval of the Beneficiary, the Grantor or the Asset Manager may direct the Trustee to substitute Assets of equal statutory book value for other Assets presently held in the Trust Account. The Trustee shall have no responsibility whatsoever to determine the value of such substituted Assets or that such substituted Assets constitute Eligible Securities.

(d)     All investments and substitutions of securities referred to in Sections 4(b) and 4(c) above shall be in compliance with the definition of "Eligible Securities" in Section 11 of this Trust Agreement. Any instruction or order concerning such investments or substitutions of securities shall be referred to herein as an "Investment Order". The Trustee shall execute Investment Orders and settle securities transactions by itself or by means of an agent or broker. The Trustee shall not be responsible for any act or omission, or for the solvency, of any such agent or broker, except as set forth in Section 6.

(e)     When the Trustee is directed to deliver Assets against payment, delivery will be made in accordance with generally accepted market practice.

(f)     Any loss incurred from any investment pursuant to the terms of this Section 4 shall be borne exclusively by the Trust Account.

Section 5. Right to Vote Assets.   The Trustee shall forward all annual and interim stockholder reports and all proxies and proxy materials relating to the Assets in the Trust

Account to the Grantor within a reasonable period of time following the Trustee's receipt thereof. The Grantor shall have the full and unqualified right to vote any Asset in the Trust Account.

Section 6. Additional Rights and Duties of the Trustee.

(a) Before accepting any Asset for deposit to the Trust Account, the Trustee shall determine that such Asset is in such form that the Beneficiary whenever necessary may, or the Trustee upon direction by the Beneficiary will, negotiate such Asset without consent or signature from the Grantor or any person or entity other than the Trustee in accordance with the terms of this Trust Agreement.

(b) The Trustee shall be under no obligation to determine whether or not any instructions given by the Grantor and Beneficiary are contrary to any provision of law. It is understood and agreed that the Trustee's duties are solely those set forth herein and that the Trustee shall have no duty to take any other action unless specifically agreed to by the Trustee in writing. Without limiting the generality of the foregoing, the Trustee shall not have any duty to advise, manage, supervise or make recommendations with respect to the purchase, retention or sale of Assets with respect to any Assets in the Trust Account as to which a default in the payment of principal or interest has occurred or to be responsible for the consequences of insolvency or the legal inability of any broker, dealer, bank or other agent employed by the Grantor or Trustee with respect to the Assets except to the extent that the Trustee was negligent, engaged in misconduct or acted in bad faith in the selection of any such person or entity.

(c) The Trustee shall accept, open and forward as needed all mail directed to the Grantor or the Beneficiary in care of the Trustee.

(d) The Trustee shall have no responsibility whatsoever to determine that any Assets in the Trust Account are or continue to be Eligible Securities.

(e) All assets of the Trust Account shall be held by the trustee at an office of the trustee in New York City except that the Trustee may deposit any Assets in the Trust Account in a book entry account maintained at the Federal Reserve Bank of New York or in depositories such as the Depository Trust Company. Assets may be held in the name of a nominee maintained by the Trustee or by any such depository.

(f) The Trustee shall furnish to the Grantor and the Beneficiary a statement of all Assets in the Trust Account upon the inception of the Trust Account and at the end of each calendar month thereafter. The statement shall include a description of the Assets in the Trust Account and shall be delivered within ten (10) business days following the end of such calendar month. The Trustee shall notify the Grantor and Beneficiary within ten (10) days of any deposit to the Trust Account.

(g) The Trustee shall keep full and complete records of the administration of the Trust Account in accordance with all applicable law. Upon the request of the Grantor or the Beneficiary, the Trustee shall promptly permit the Grantor or the Beneficiary, their respective agents, employees, independent auditors and regulatory authorities to examine, audit, excerpt,

5

transcribe and copy, during the Trustee's normal business hours, any books, documents, papers and records relating to the Trust Account or the Assets.

(h)     Unless otherwise provided in this Trust Agreement, the Trustee is authorized to follow and rely upon all instructions given by officers of the Grantor or the Beneficiary and by attorneys-in-fact acting under written authority furnished to the Trustee by the Grantor or the Beneficiary, including, without limitation, instructions given by letter, facsimile transmission or electronic media, if the Trustee believes such instructions to be genuine and to have been signed, sent or presented by the proper party or parties. In the absence of negligence, the Trustee shall not incur any liability to anyone resulting from actions taken by the Trustee in reliance in good faith on such instructions. The Trustee shall not incur any liability in executing instructions (i) from any attorney-in-fact prior to receipt by it of notice of the revocation of the written authority of the attorney-in-fact or (ii) from any officer of the Grantor or the Beneficiary named in an incumbency certificate delivered hereunder prior to receipt by it of a more current certificate.

(i)     The duties and obligations of the Trustee shall only be such as are specifically set forth in this Trust Agreement, as it may from time to time be amended, and no implied duties or obligations shall be read into this Trust Agreement against the Trustee. The Trustee shall not be liable except for its own negligence, willful misconduct or lack of good faith.

(j)     No provision of this Trust Agreement shall require the Trustee to take any action which, in the Trustee's reasonable judgment, would result in any violation of this Trust Agreement or any provision of law.

(k)     Anything in this Agreement to the contrary notwithstanding, in no event shall the Trustee be liable under or in connection with this Agreement for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever, including but not limited to lost profits, whether or not foreseeable, even if the Trustee has been advised of the possibility thereof and regardless of the form of action in which such damages are sought.

(l)     The Trustee may confer with counsel of its own choice in relation to matters arising under this Trust Agreement and shall have full and complete authorization from the other Parties for any action taken or suffered by it under this Trust Agreement or in respect of any transaction contemplated hereby in good faith and in accordance with the opinion of such counsel. The Trustee shall promptly notify the Parties of any action so taken or suffered to be taken.

(m)     The Trustee shall notify the Grantor and Beneficiary in writing of any payment default occurring as to any Asset within three (3) business days after Trustee receives notice of such default. In the event of a delinquency of a timely payment in regard to any of the Assets, the Trustee shall inform the Grantor and the Beneficiary immediately upon Trustee's receipt of notice of such delinquency.

(n)     The Trustee shall not be responsible for the existence, genuineness or value of any of the Assets, for the validity, perfection, priority or enforceability of the liens in or with respect to any of the Assets, for the validity of title to the Assets, for insuring the Assets, for the payment of taxes, charges, assessments or liens upon or with respect to the Assets, for any obligations

6

under any agreements or other documents evidencing or related to any of the Assets (other than this Trust Agreement), or for the compliance of the Assets with any laws, including any Environmental Law (as hereinafter defined). The Trustee shall have no responsibility for the recording, filing or registration (or for the rerecording, refiling or reregistration) of any instrument or notice, including any financing or continuation statement or any tax or securities form, at any time in any public office or elsewhere for the purpose of perfecting, maintaining the perfection of or otherwise making effective any lien upon or with respect to any of the Assets.

(o)     The Trustee shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of Trustee (including but not limited to any act or provision or any present or future law or regulation or governmental authority, any act of God or war, or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility).

Section 7. Representations, Warranties and Covenants of the Trustee.     The Trustee represents, warrants and covenants to the Grantor and Beneficiary that:

(a)     The Trustee is a Qualified United States Financial Institution;

(b)     In the ordinary course of its business, the Trustee maintains securities accounts for others and is acting in that capacity in this Trust Agreement;

(c)     The Trust Account is and at all times shall be maintained at an office of the Trustee in the United States of America;

(d)     The Trustee is not an Affiliate of the Grantor or the Beneficiary.

Section 8. The Trustee's Compensation; Expenses.

(a)     The Grantor shall pay the Trustee, as compensation for its services under this Trust Agreement, a fee computed at rates determined by the Trustee from time to time and communicated in writing to the Grantor. The Grantor shall pay or reimburse the Trustee for all of the Trustee's expenses and disbursements in connection with its duties under this Trust Agreement (including reasonable attorney's fees and expenses), except any such expense or disbursement as may arise from the Trustee's negligence, willful misconduct, lack of good faith or failure to administer the Trust Account in accordance with the terms of this Trust Agreement. The Trustee shall be entitled to deduct its compensation and expenses from payments of dividends, interest and other income in respect of the Assets held in the Trust Account prior to the deposit thereof to the Trust Account as provided in Section 1(f) of this Agreement. The Grantor also hereby indemnifies the Trustee for, and holds it harmless against, any loss, liability, costs or expenses (including reasonable attorney's fees and expenses) incurred or made without negligence, willful misconduct or lack of good faith on the part of the Trustee, arising out of or in connection with the performance of its obligations in accordance with the provisions of this Trust Agreement (which shall be the sole obligation of the Trustee), including any loss, liability, costs or expenses arising out of or in connection with the status of the Trustee and its nominee as the holder of record of the Assets.   The Grantor hereby acknowledges that the foregoing indemnities shall survive the resignation of the Trustee or the termination of this Trust Agreement and hereby grants the Trustee a lien, right of set-off and security interest in the

Income Account for the payment of any claim for compensation, reimbursement or indemnity hereunder.

(b)     No Assets shall be withdrawn from the Trust Account or used in any manner for paying compensation to, or reimbursement or indemnification of, the Trustee.

Section 9.  Resignation or Removal of the Trustee.

(a)     The Trustee may resign at any time upon delivery of a written notice thereof to the Beneficiary and to the Grantor effective not less than ninety (90) days after receipt by the Beneficiary and the Grantor of such notice.  The Trustee may be removed by prior written notice executed by Grantor and Beneficiary.  No such resignation or removal shall become effective until a successor Trustee has been appointed and approved by the Beneficiary and the Grantor and all Assets in the Trust Account have been duly transferred to the successor Trustee in accordance with paragraph (b) of this Section 9.

(b)     Upon receipt by the proper Parties of the Trustee's notice of resignation or the Grantor's and Beneficiary's notice of removal, the Grantor and the Beneficiary shall appoint a successor Trustee.  Any successor Trustee shall be a bank that is a member of the Federal Reserve System and a Qualified United States Financial Institution, and shall not be an Affiliate of the Grantor or the Beneficiary.  Upon the acceptance of the appointment as Trustee hereunder by a successor Trustee and the transfer to such successor Trustee of all Assets in the Trust Account, the resignation or removal of the Trustee shall become effective.  Thereupon, such successor Trustee shall succeed to and become vested with all the rights, powers, privileges and duties of the resigning or removed Trustee, and the resigning or removed Trustee shall be discharged from any future duties and obligations under this Trust Agreement, but the resigning or removed Trustee shall continue after such resignation or removal to be entitled to the benefits of the indemnities provided herein for the Trustee.

Section 10.  Termination of the Trust Account.

(a)     The Trust Account and this Trust Agreement, except for the indemnities provided herein, may be terminated only after the Grantor and Beneficiary mutually give the Trustee written notice of their intention to terminate the Trust Account (the "Notice of Intention").  The Notice of Intention shall specify the date on which the Parties intend the Trust Account to terminate (the "Proposed Date").

(b)     Within three days following receipt by the Trustee of the Notice of Intention, the Trustee shall given written notification (the "Termination Notice") to the Beneficiary and the Grantor of the date (the "Termination Date") on which the Trust Account shall terminate.  The Termination Date shall be (a) the Proposed Date if the Proposed Date is at least 30 days but no more than 45 days subsequent to the date the Termination Notice is given; (b) 30 days subsequent to the date the Termination Notice is given, if the Proposed Date is fewer than 30 days subsequent to the date the Termination Notice is given; or (c) 45 days subsequent to the date the Termination Notice is given, if the Proposed Date is more than 45 days subsequent to the date the Termination Notice is given.

(c)     On the Termination Date, upon receipt of written approval of the Beneficiary, the Trustee shall transfer to the Grantor any Assets remaining in the Trust Account, at which time all liability of the Trustee with respect to such Assets shall cease.

Section 11. Definitions.  Except as the context shall otherwise require, the following terms shall have the following meanings for purposes of this Trust Agreement (the definitions to be applicable to both the singular and the plural forms of each term defined if both forms of such term are used in this Trust Agreement):

The term "Beneficiary" shall include any successor of the Beneficiary by operation of law including, without limitation, any liquidator, rehabilitator, receiver or conservator.

The term "Eligible Securities" shall mean assets of the types specified on Exhibit B attached hereto.

The term "person" shall mean and include an individual, a corporation, a partnership, an association, a trust, an unincorporated organization or a government or political subdivision thereof.

The term "Qualified United States Financial Institution" means an institution that is eligible to act as a fiduciary of a trust that:

(a)     is organized, or, in the case of a United States branch or agency office of a foreign banking organization, licensed, under the laws of the United States or any state of the United States and has been granted authority to operate with fiduciary powers; and

(b)     is regulated, supervised and examined by federal or state authorities having regulatory authority over banks and trust companies.

Section 12. Governing Law.  This Trust Agreement shall be subject to and governed by the laws of the State of New York without regard to its conflict of laws provision and the Trust Account created hereunder shall be administered in accordance with the laws of said state.

Section 13. WAIVER OF JURY TRIAL.     EACH PARTY HERETO HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER.    THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS AGREEMENT.

Section 14. Successors and Assigns.  This Trust Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, permitted assigns and legal representatives.  Neither this Trust Agreement, nor any right or obligation hereunder, may be assigned by any Party without the prior written consent of the other Parties hereto.   Any assignment in violation of this Section 14 shall be void and shall have no force and effect.

Section 15. Severability.  If any provision of this Trust Agreement is held to be void or unenforceable, in whole or in part, (i) such holding shall not affect the validity and enforceability

of the remainder of this Trust Agreement, including any other provision, paragraph or subparagraph, and (ii) the Parties agree to attempt in good faith to reform such void or unenforceable provision to the extent necessary to render such provision enforceable and to carry out its original intent.

Section 16. Entire Agreement. This Trust Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof, and there are no understandings or agreements, conditions or qualifications relative to this Trust Agreement which are not fully expressed in this Trust Agreement.

Section 17. Amendments. This Trust Agreement may be modified or otherwise amended, and the observance of any term of this Trust Agreement may be waived, only if such modification, amendment or waiver is in writing and signed by the Parties.

Section 18. Notices. All notices, requests, demands and other communications under this Trust Agreement must be in writing and will be deemed to have been duly given or made as follows: (a) if sent by registered or certified mail in the United States return receipt requested, upon receipt; (b) if sent by reputable overnight air courier, two (2) business days after mailing; (c) if sent by facsimile transmission or electronic media, with a copy mailed on the same day in the manner provided in (a) or (b) above, when transmitted and receipt is confirmed by telephone; or (d) if otherwise actually personally delivered, when delivered, and shall be delivered as follows:

If to the Grantor :

> ABILITY REINSURANCE (BERMUDA) LIMITED
> 2nd Floor, Windsor Place
> 18 Queen Street
> Hamilton HM 11
> Bermuda
> Attn: Michael Crow
> Telecopier: (441) 295 9513

If to the Beneficiary:

> GREAT WESTERN INSURANCE COMPANY
> 3434 Washington Blvd #300
> Ogden UT 84409
> Attn: Fred Meese
> Fax 1-801-689-1390

If to the Trustee:

> The Bank of New York Mellon, as Trustee
>
> 101 Barclay 8W
>
> New York, New York 10286
>
> Attn: Angelita L. Pena, AVP
>
> Telecopier: 1-212-815-5875

or to such other address or to such other Person as a Party may have last designated by notice to the other Parties.

Section 19. Headings. The headings of the Sections have been inserted for convenience of reference only and shall not be deemed to constitute a part of this Trust Agreement.

Section 20. Counterparts. This Trust Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall constitute an original, but such counterparts together shall constitute but one and the same Trust Agreement.

Section 21. USA Patriot Act. The Grantor and Beneficiary hereby acknowledges that the Trustee is subject to federal laws, including the Customer Identification Program ("CIP") requirements under the USA PATRIOT Act and its implementing regulations, pursuant to which the Trustee must obtain, verify and record information that allows the Trustee to identify the Grantor and Beneficiary. Accordingly, prior to opening the Trust Account hereunder, the Trustee will ask the Grantor and Beneficiary to provide certain information including, but not limited to, the Grantor's and Beneficiary's name, physical address, tax identification number and other information that will help the Trustee to identify and verify the Grantor's and Beneficiary's identity such as organizational documents, certificate of good standing, license to do business, or other pertinent identifying information. Each of the Grantor and Beneficiary agrees that the Trustee cannot open the Trust Account hereunder unless and until the Trustee verifies the Grantor's and Beneficiary's identity in accordance with the Trustee's CIP.

Section 22. Required Disclosure. The Trustee is authorized to supply any information regarding the Trust Account and related Assets that is required by any law, regulation or rule now or hereafter in effect. Each of the Grantor and the Beneficiary agrees to supply the Trustee with any required information if it is not otherwise reasonably available to the Trustee.

Section 23. Representations. Each Party represents and warrants to the others that it has full authority to enter into this Agreement upon the terms and conditions hereof and that the individual executing this Agreement on its behalf has the requisite authority to bind such Party to this Agreement, and that the Agreement constitutes a binding obligation of such party enforceable in accordance with its terms.

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

ABILITY REINSURANCE (BERMUDA)
LIMITED, as Grantor

By: _____
      Name: MICHAEL CROW
      Title: PRESIDENT

GREAT WESTERN INSURANCE
COMPANY, as Beneficiary

By: _____
      Name:
      Title:

The Bank of New York Mellon, as Trustee

By: _____
      Name:
      Title:

ABILITY REINSURANCE (BERMUDA)
LIMITED, as Grantor

By: _____
    Name:
    Title:

GREAT WESTERN INSURANCE
COMPANY, as Beneficiary

By: _____
    Name:    John E. Lindquist
    Title:     President

The Bank of New York Mellon, as Trustee

By: _____
    Name:
    Title:

ABILITY REINSURANCE (BERMUDA)
LIMITED, as Grantor

By: _____
    Name:
    Title:

GREAT WESTERN INSURANCE
COMPANY, as Beneficiary

By: _____
    Name:
    Title:

The Bank of New York Mellon, as Trustee

By: _____
    Name:
    Title:    ANGELITA L. PENA
                    Assistant Vice President

4827-0425-3443.9

12

Exhibit A-1

## CERTIFICATE

The undersigned, the [insert position] and a duly authorized officer of Great Western Insurance Company, does hereby certify that, pursuant to Section 2 of the Trust Agreement dated as of [            ], 2009 entered into by and among Great Western Insurance Company, Ability Reinsurance (Bermuda) Limited and The Bank of New York Mellon (the "Trust Agreement") Great Western Insurance Company is entitled to withdraw from the Trust Account established by Ability Reinsurance (Bermuda) Limited for the benefit of Great Western Insurance Company pursuant to the Trust Agreement, assets with a current statutory book value equal to $[            ] for the purpose[s] specified in paragraph[s] [   ] and [   ] of Section 3 of the Trust Agreement.

This Certificate is a "Beneficiary Certificate" within the meaning of Section 2(a) of the Trust Agreement.

Dated: _____

_____
Name:
Title:

Exhibit A-2

## REQUEST FOR WITHDRAWAL

Great Western Insurance Company ("Great Western") hereby requests that [          ] immediately transfer to Great Western [/or [          ]] all right, title and interest in those assets set forth on Schedule A attached hereto (which assets have a statutory book value equal to $[_____]) from the Trust Account established by Ability Reinsurance (Bermuda) Limited ("Ability") for the benefit of Great Western pursuant to the Trust Agreement dated as of [          ], 2009 entered into by and among Great Western, Ability and [          ] (the "Trust Agreement"). [Insert transfer instructions.]

This Request for Withdrawal is a "Beneficiary Request for Withdrawal" within the meaning of Section 2(a) of the Trust Agreement, and is made in conjunction with the attached Beneficiary Certificate.

GREAT WESTERN INSURANCE
COMPANY

Dated: _____

By: _____
   Name:
   Title:

**Exhibit B**

## ELIGIBLE SECURITIES

Assets of the types for which a Utah-domiciled life insurance company could obtain full statutory reserve credit under statutory accounting practices prescribed or permitted by the Commissioner as more particularly described under Utah Administrative Code R590-173-8, as may be amended from time to time.

**EXHIBIT B**

**INVESTMENT GUIDELINES**

# Alpha Re Ltd.

## *Sample Portfolio Allocation for Reinsurance Trust*

**By Asset Type**

| | | | |
|---|---|---|---|
| **Cash and Short Term Investments** | | 1% Min – 100% Max | |
| | Cash | 100% | Max |
| | Repurchase Agreements | 100% | Max |
| **Investment Grade Securities** | | 100% | Max |
| | Governments | 100% | Max |
| | Corporate Bonds | 100% | Max |
| | Asset Backed & Mortgage Backed Securities | 100% | Max |
| **Non-Investment Grade Securities** | | 25% | Max |
| | Corporate (High Yield) | 50% | Max |
| | ABS & MBS (Mezzanine & Equity) | 50% | Max |
| **Equity Investments** | | 15% | Max |
| | Common Stock | 33% | Max |
| | Convertible Bonds & Securities | 100% | Max |

**Derivatives (hedging only and subject to Other Permitted Asset limit)**

| | | | |
|---|---|---|---|
| | Cumulative Notional Face Value | 25% | Max |

**By Credit Rating**

| | | |
|---|---|---|
| AA – or greater rating | 100% | Max |
| A – rating | 100% | Max |
| BBB – rating | 75% | Max |
| Investment Grade or Higher | 75% | Min |
| Minimum quality | BB- | |

**Other Permitted Utah Assets**                                        25%   Maximum

## EXHIBIT C

## WITHDRAWAL NOTICE

## [ON GREAT WESTERN INSURANCE COMPANY LETTERHEAD]

## WITHDRAWAL NOTICE

## VIA CERTIFIED MAIL

Wilmington Savings Fund Society, FSB
500 Delaware Avenue, 11th Floor
Wilmington, Delaware 19801

Attention: _____

### Re: Great Western Insurance Company Trust Agreement

Reference is made to the Amended & Restated Trust Agreement (the "Trust Agreement"), dated [insert date], by and among Alpha Re Limited ("Grantor"), Great Western Insurance Company ("Beneficiary"), and Wilmington Savings Fund Society, FSB ("Trustee").

This Withdrawal Notice is hereby executed and delivered pursuant to Section 2(a) of the Trust Agreement.

All capitalized terms used in this certificate that are not otherwise defined herein shall have the meanings given to them in the Trust Agreement.

1.    The Beneficiary hereby directs the Trustee to transfer cash in the amount of $[insert dollar amount] from the Trust Account to the Beneficiary.

2.    All cash being transferred to the Beneficiary from the Trust Account will be used solely for the purposes set forth in the Coinsurance Agreement, dated February 18, 2009, as amended by the Novation Agreement, dated June 19, 2012, between the Beneficiary and the Grantor, or as set forth in Section 3 of the Trust Agreement.

3.    The Trustee is hereby instructed to sell Assets in the amount specified in Paragraph No. 1, above, from the Trust Account and to transfer the cash from the sale of such Assets to the Beneficiary on or before[insert date].

4.    The Beneficiary acknowledges and agrees that the Trustee will consult with the Investment Manager prior to selecting those Assets which are to be sold pursuant to this Withdrawal Notice, and that the Trustee shall have no liability to any person for its non-negligent, good faith reliance on the advice of the Investment Manager with respect to the selection of such Assets.

17

     5.     This Withdrawal Notice has been signed by at least two of the following: Beneficiary's Chief Executive Officer, Chief Financial Officer, Appointed Actuary and Treasurer.

Sincerely,

Great Western Insurance Company


_____         _____
Name                                        Name
Chief Executive Officer               Chief Financial Officer


_____         _____
Name                                          Name
Appointed Actuary                   Treasurer

**EXHIBIT D**

**INCUMBENCY CERTIFICATE**

RE:                     Great Western Insurance Company Reinsurance Trust Account
ACCOUNT NO.:     _____
DATE:                  _____

The following are duly authorized by the Grantor, Investment Manager and the Beneficiary to act in all respects with respect to the above-named account.

**ALPHA RE LIMITED**

| | NAME | TITLE | SIGNATURE |
|---|---|---|---|
| 1. | Any two (2) "A" signatories or an "A" and "B" signatory from the AIM (C) Ltd. authorised signature listing. Latest listing attached. | | Kieran O'Mahony<br>Deputy M.D., AIM(C) Ltd. |
| 2. | _____ | _____ | _____ |
| 3. | _____ | _____ | _____ |
| 4. | _____ | _____ | _____ |

**BLUE ALTERNATIVE ASSET MANAGEMENT, LLC**

| | NAME | TITLE | SIGNATURE |
|---|---|---|---|
| 1. | _____ | _____ | _____ |
| 2. | _____ | _____ | _____ |
| 3. | _____ | _____ | _____ |
| 4. | _____ | _____ | _____ |

**GREAT WESTERN INSURANCE COMPANY**

| | NAME | TITLE | SIGNATURE |
|---|---|---|---|
| 1. | _____ | _____ | _____ |
| 2. | _____ | _____ | _____ |
| 3. | _____ | _____ | _____ |
| 4. | _____ | _____ | _____ |

19



THE AUTHORISED "A" AND "B" SIGNATORIES OF AON INSURANCE MANAGERS
(CAYMAN) LTD ARE AS NOTED BELOW (WITH SPECIMEN SIGNATURES):

| Daniel MacLean | "A" | |
| Kieran O'Mahony | "A" | |
| Janet Sairsingh | "A" | |
| Karen Attenborough | "A" | |
| Olive Gregory | "A" | |
| Jayne Tivnan | "A" | |
| Howard Byrne | "B" | |
| Helen Stephenson | "B" | |
| Damon Bilchuris | "B" | |
| Colleen Artuch | "B" | |
| Lynsey Marfleet | "B" | |

I certify that the above is a true copy of the list of Authorised Signatories of Aon Insurance
Managers (Cayman) Ltd., as at January 1, 2011.

Olive Gregory – Secretary

Aon Risk Solutions | Global Risk Consulting | Captive & Insurance Management
Buckingham Square | 720 West Bay Road | P.O. Box 69 | Grand Cayman KY1-1102 | Cayman Islands
t +1.345.945.2888 | f +1.345.945.2889 | aon.com

Aon Insurance Managers (Cayman) Ltd. | License Number: 1159

## EXHIBIT D

## INCUMBENCY CERTIFICATE

RE:                    Great Western Insurance Company Reinsurance Trust Account
ACCOUNT NO.:     _____
DATE:            _____

The following are duly authorized by the Grantor, Investment Manager and the Beneficiary to act in all respects with respect to the above-named account.

### ALPHA RE LIMITED

| | NAME | TITLE | SIGNATURE |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

### BLUE ALTERNATIVE ASSET MANAGEMENT, LLC

| | NAME | TITLE | SIGNATURE |
|---|---|---|---|
| 1. | Mark R. Graham | President | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

### GREAT WESTERN INSURANCE COMPANY

| | NAME | TITLE | SIGNATURE |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

19

**EXHIBIT D**

**INCUMBENCY CERTIFICATE**

RE:            Great Western Insurance Company Reinsurance Trust Account
ACCOUNT NO.:   _____
DATE:         _____

The following are duly authorized by the Grantor, Investment Manager and the Beneficiary to act in all respects with respect to the above-named account.

**ALPHA RE LIMITED**

| | NAME | TITLE | SIGNATURE |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

**BLUE ALTERNATIVE ASSET MANAGEMENT, LLC**

| | NAME | TITLE | SIGNATURE |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

**GREAT WESTERN INSURANCE COMPANY**

| | NAME | TITLE | SIGNATURE |
|---|---|---|---|
| 1. | Nathan D Felt | CFO | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

19

## EXHIBIT E

## NOTICE TO UTAH INSURANCE DEPARTMENT

## [ON WILMINGTON SAVINGS FUND SOCIETY, FSB LETTERHEAD]

Examination Division
Utah Department of Insurance
State Office Building, Room 3110
Salt Lake City, Utah 84114

Attention: _____

### Re: Great Western Insurance Company Trust Agreement

Reference is made to the Amended & Restated Trust Agreement (the "Trust Agreement"), dated July 11, 2012, by and among Alpha Re Limited ("Grantor"), Great Western Insurance Company ("Beneficiary"), and Wilmington Savings Fund Society, FSB ("Trustee").

All capitalized terms used in this Notice that are not otherwise defined herein shall have the meanings given to them in the Trust Agreement.

The Trustee hereby provides notice to the Utah Insurance Department that all the Assets in the Trust Account established pursuant to the Trust Agreement have been withdrawn.

Sincerely,

Wilmington Savings Fund Society, FSB
(Not in its individual capacity, but solely as Trustee)

_____
Name
Title

20

**EXHIBIT F**

**COMPENSATION OF TRUSTEE**

21



Greenville Wealth Management Center
3801 Kennett Pike, C200
Greenville, Delaware 19807
www.christianatrust.com

Louis W. Geibel
*Vice President*
(302) 888-7424
Lgeibel@christianatrust.com

March 19, 2012

Kieran O'Mahony
Alpha Re Limited
C/o Aon Insurance Mangers (Cayman) Ltd.
720 West Bay Road
Grand Cayman, Cayman Islands

Re: Trust Agreement between Alpha Re Ltd. (the "Grantor"), Great Western Insurance Company (the "Beneficiary")

Dear Kieran,

Christiana Trust welcomes the opportunity to act in our capacity as Trustee and Custodian for the above reference Trust. Fees for the services provided per transaction and are as follows:

I.     Acceptance Fee (per trust)...................................................................$2,500.00

II.    Plus On the funds fair market value at the following annual rates:
       $ .50 per thousand (5 bpts) on the first $25,000,000 of the accounts fair market value
       $ .30 per thousand (3 bpts) on the Balance

       **Plus: $15 for each DTC or FED eligible transaction and $60 for each mutual fund transaction and out-of-pocket expenses**
       **Outgoing Wire Transfers: $20 per outgoing**
       **Preparation of a Trust Tax Return if Required: $775**

       Minimum Fee Per year........................................................................$4,000.00

Out of pocket legal expenses will be billed at cost in addition to the above. During the administration of the Trust, Christiana Trust will be reimbursed for any extraordinary out-of-pocket expenses such as counsel fees. The first year's fee are payable at closing. All fees and expenses will appear on the trust statement.

Christiana Trust shall be entitled to reimbursement by you for all reasonable out of pocket expenses incurred or made by it in connection with this transaction, including costs of collection, in addition to the compensation for its services. Such expenses shall include the reasonable compensation and expenses, disbursements and advances of Christiana Trust's agents, counsel, accountants and experts.

Please call me at (302) 888-7424 if there are any questions concerning this proposal. Assuming that it meets your approval, please have it signed by an authorized individual and returned to my attention. If preferred, it can be faxed to my attention at (302) 421-9015.



Page 2

We appreciate the opportunity to make this proposal and look forward to working with and the other parties to this transaction.

Fees paid to Christiana Trust for the services required are based on Christiana Trust acting as custodian and trustee for the above mentioned services. The quote is subject to the final review of the trust and other documentation, formal acceptance by Christiana Trust's Trust Committee and approval of the account documentation by Christiana's counsel. This fee proposal is based on the transaction as we understand it.

Funds available for temporary investment will purchase units of the Wilmington Savings Fund Society Money Market Deposit account.

Upon appointment, kindly distribute documents to each of the following individuals:

| | | | |
|---|---|---|---|
| * | Donna Lockerman<br>Assistant Vice President<br>Christiana Trust<br>500 Delaware Avenue, 11th Floor<br>Wilmington, De 19801<br>dlockerman@christianatrust.com | Telephone:<br>Telecopy: | 302 888-7739<br>302 421-9015 |
| * | Louis W Geibel<br>Vice President<br>Christiana Trust<br>3801 Kennett Pike, C200<br>Greenville, De 19807<br>Lgeibel@Christianatrust.com | Telephone:<br>Telecopy: | 302 888-7424<br>302 421-5815 |

Please sign and date below to indicate your Acceptance of the foregoing terms and accompanying fee schedule. Please return this document to the attention of Louis Geibel at the above address prior to the closing.

Sincerely,

Louis W Geibel
Vice President

Accepted: Alpha Re Ltd.

By:

Name:

Title:                     as Managers of ALPHA RE LIMITED

Date: 26/06/2012.

WSFS
NASDAQ
LISTED