# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GREAT WESTERN INSURANCE COMPANY, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| MARK GRAHAM, DONALD SOLOW, BLUE | : |
| CAPITAL MANAGEMENT, INC., BLUE | : |
| ALTERNATIVE ASSET MANAGEMENT LLC, | : |
| WILMINGTON SAVINGS FUND SOCIETY, | : |
| FSB, CHRISTIANA TRUST, REGATTA | : |
| HOLDINGS LLC, CYGNET 001 MASTER | : |
| TRUST, CYGNET 001 MASTER TRUST SERIES | : |
| 2011-A, CYGNET 001 MASTER TRUST SERIES | : CIVIL ACTION NO. |
| 2011-C, CYGNET 001 MASTER TRUST SERIES | : 1:18-CV-06249 (VSB) |
| 2013-A, ALPHA RE LIMITED, ALPHA RE | : |
| HOLDINGS (CAYMAN) LIMITED, ATLANTIC | : |
| SPECIALTY FINANCE, BLUE ELITE FUND | : |
| LTD., BLUE ELITE FUND LP, BLUE II LTD., | : |
| SANCUS CAPITAL BLUE CREDIT | : |
| OPPORTUNITIES FUND LTD., ABILITY | : |
| INSURANCE COMPANY, JOHN DRAKE, | : |
| EDWARD BRENDAN LYNCH, AND GREGORY | : |
| TOLARAM. | : |
| | : |
| Defendants. | : |
| | : |
| | : |
| | : |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MARK GRAHAM, BLUE CAPITAL MANAGEMENT, INC., BLUE ALTERNATIVE ASSET MANAGEMENT, LLC, BLUE ELITE FUND LTD., BLUE ELITE FUND L.P., AND BLUE II, LTD.'S MOTION TO DISMISS GREAT WESTERN INSURANCE COMPANY'S <u>SECOND AMENDED COMPLAINT</u>**

**DUANE MORRIS LLP**
**A DELAWARE LIMITED LIABILITY PARTNERSHIP**

Eric R. Breslin
P. Ryan McElduff
Melissa S. Geller
Leah A. Mintz (admitted *pro hac vice*)
One Riverfront Plaza
1037 Raymond Blvd., Suite 1800
Newark, New Jersey 07102-5429
Tel.: (973) 424 2000
Fax: (973) 424 2001
ERBreslin@duanemorris.com
PRMcElduff@duanemorris.com
MSGeller@duanemorris.com
LMintz@duanemorris.com
*Attorneys for Mark Graham, Blue Capital Management, Inc.,*
*Blue Alternative Asset Management, LLC,*
*Blue Elite Fund, Ltd., Blue Elite Fund, L.P., Blue II, Ltd.*

# TABLE OF CONTENTS

FACTS ..................................................................................................................2

    A.    Coinsurance Agreements in the Reinsurance Industry. ......................... 2

    B.    The Trust Agreement. ............................................................................. 3

    C.    The Repurchase Agreement. .................................................................. 5

ARGUMENT ........................................................................................................6

**I.**    **The Complaint Against BCM, Blue Elite, Ltd., and Blue II Should Be Dismissed For Lack of Personal Jurisdiction under Fed. R. Civ. P. 12(b)(2).** .............7

    **A.**    **Great Western Cannot Establish That the Court Has General Jurisdiction over Blue Elite Ltd., Blue II, or BCM.** ......................... 7

    **B.**    **Great Western Cannot Establish Specific Jurisdiction over Blue Elite Ltd., Blue II, or BCM.** ...................................... 8

**II.**    **Count One: Great Western Fails to State a Cause of Action for Breach of Fiduciary Duty Against BAAM and Graham.** ...............................9

    **A.**    **Count One should be dismissed because Great Western fails to set forth allegations apart from the contract establishing a relationship of higher trust.** ............................... 10

    **B.**    **Great Western Fails to Establish that BAAM Owed Great Western a Fiduciary Duty.** ............................... 11

    **C.**    **Great Western Cannot Establish that Graham Owed a Fiduciary Duty.** ............................... 12

**III.**    **Count Two: Great Western Fails to State a Claim for Aiding and Abetting a Breach of Fiduciary Duty Against BCM, Blue Elite Ltd., Blue Elite L.P., and Blue II.** ...............................13

**IV.**    **Count Three: Great Western's Claims of Fraud against Graham, BCM, and BAAM Should Be Dismissed.** ...............................15

**V.**    **Count Four for Aiding and Abetting Fraud Against Blue Elite Ltd., Blue Elite L.P., and Blue II Should Be Dismissed for Failure to State a Claim.** .................17

**VI.**    **Count Eight Alleging Civil Conspiracy to Commit Fraud Against the Blue Defendants Should Be Dismissed.** ...............................18

**VII.**    **Counts Five through Seven Alleging Damages Under Civil RICO Should Be Dismissed.** ...............................19

    **A.**     **Great Western's RICO Claims Are Barred By the PSLRA.** ......................... 19

    **B.**     **Count Five Should Be Dismissed against Graham, BAAM, and BCM Because Great Western Fails to State a Claim for a Violation of RICO, 18 U.S.C. § 1962(c).** ................................................................. 21

          1.     *Great Western Fails to Allege the Existence of an Enterprise.* ............... 21

          2.     *Great Western Fails to Allege that Each Defendant Committed at Least Two Predicate Acts.* ................................................................... 24

    **C.**     **Count Six: Great Western Fails to State a Claim for a Violation of RICO, 18 U.S.C. § 1962(a) against Graham, BCM, and BAAM.** ................... 26

    **D.**     **Great Western Fails to State a Claim for a Violation of RICO subsection (d) against the Blue Defendants.** ...................................................... 27

    **E.**     **Great Western's Claims of Damages or Reputational Injury and for the Sale of Great Western Should Be Rejected.** ................................................. 28

**VIII.**  **Count 11: Great Western's Unjust Enrichment Claims Should Be Dismissed.** .........28

**CONCLUSION** ..............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allen v. New World Coffee, Inc.*
No. 00 CIV. 2610 (AGS), 2002 WL 432685 (S.D.N.Y. Mar. 19, 2002)................................27

*AMP Servs. Ltd. v. Walanpatrias Found.*
34 A.D.3d 231 (1st Dep't 2006) ..............................................................................................9

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)...................................................................................................................6

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*
171 F.3d 779 (2d. Cir. 1999)....................................................................................................8

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007)...................................................................................................................6

*Bennett v. U.S. Tr. Co.*
770 F.2d 308 (2d Cir. 1985).....................................................................................................22

*Brooks v. Key Trust Co. Nat'l Ass'n*
26 A.D.3d 628 (3d Dep't 2006) ........................................................................................ 10-11

*Brownstone Inv. Grp., LLC v. Levey*
468 F. Supp. 2d 654 (S.D.N.Y. 2007).....................................................................................19

*Burrowes v. Combs*
312 F. Supp. 2d 449 (S.D.N.Y. 2004)......................................................................................28

*Chevron Corp. v. Donziger*
833 F.3d 74 (2d Cir. 2016).......................................................................................................28

*Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*
187 F.3d 229 (2d Cir. 1999).....................................................................................................26

*Conte v. Newsday, Inc.*
703 F. Supp. 2d 126 (E.D.N.Y. 2010) .....................................................................................22

*Daimler AG v. Bauman*
571 U.S. 117 (2014)...................................................................................................................7

*DeFalco v. Bernas*
244 F.3d 286 (2d Cir. 2001).....................................................................................................22

*DiStefano v. Carozzi N. Am., Inc.*
   286 F.3d 81 (2d Cir. 2001)................................................................8

*Eades v. Kennedy, PC Law Offices*
   799 F.3d 161 (2d Cir. 2015)............................................................8-9

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*
   837 F. Supp. 2d 162 (S.D.N.Y. 2011)...............................................10

*Elsevier Inc. v. W.H.P.R., Inc.*
   692 F. Supp. 2d 297 (S.D.N.Y. 2010)...............................................23

*Eurycleia Partners, L.P. v. Seward & Kissel, LLP*
   12 N.Y.3d 553 (2009) ......................................................................15

*Fahlenbach v. Trans Pac. Capital, Inc.*
   No. 95-cv-8776, 1996 WL 22602 (S.D.N.Y. Jan. 19, 1996) ..................13

*Fantis Foods, Inc. v. Std. Importing Co.*
   49 N.Y.2d 317 (1980) .......................................................................9

*Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*
   552 F. App'x 13 (2d Cir. 2014) ........................................................10

*Finance One Public Co. v. Lehman Bros. Special Financing, Inc.*
   414 F.3d 325 (2d Cir. 2005).............................................................10

*Gelfand v. Tanner Motor Tours, Ltd.*
   339 F.2d 317 (2d Cir. 1964)..............................................................9

*Georgia Malone & Co., Inc. v. Rieder*
   19 N.Y.3d 511 (N.Y. 2012) .............................................................30

*Gilmore v. Gilmore*
   No. 09 Civ. 6230 (WHP), 2011 WL 2874880 (S.D.N.Y. Sept. 1, 2011) ................20

*Grand River Enters. Six Nations, Ltd. v. Pryor*
   425 F.3d 158 (2d Cir. 2005)..............................................................7

*Hecht v. Commerce Clearing House, Inc.*
   897 F.2d 21 (2d Cir. 1990)...............................................................27

*Horn v. 440 East 57th Co.*
   151 A.D.2d 112 (1st Dep't 1989) ......................................................10

*In re Agape Litig.*
   773 F. Supp. 2d 298 (E.D.N.Y. 2011) ...........................................17-18

*In re: Gen. Motors LLC Ignition Switch Litig.*
   No. 14-MD-2543 (JMF), 2016 WL 3920353 (S.D.N.Y. July 15, 2016) ...............................28

*In re Livent, Inc. Sec. Litig.*
   78 F. Supp. 2d 194 (S.D.N.Y. 1999)....................................................................................15

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*
   930 F. Supp. 68 (S.D.N.Y. 1996) ........................................................................................21

*In re Sharp Int'l Corp.*
   403 F.3d 43 (2d Cir. 2005).................................................................................................14

*Katzman v. Victoria's Secret Catalogue*
   167 F.R.D. 649 (S.D.N.Y. 1996) ........................................................................................19

*Kaufman v. Cohen*
   307 A.D.2d 113 (1st Dep't 2003) .......................................................................................13

*Kim v. Kimm*
   884 F.3d 98 (2d Cir. 2018)................................................................................................21

*Kirch v. Liberty Media Corp.*
   449 F.3d 388 (2d Cir. 2006)...............................................................................................18

*Koehler v. Bank of Bermuda Ltd.*
   101 F.3d 863 (2d. Cir. 1996)..............................................................................................7

*Lehigh Valley Ind., Inc. v. Birenbaum*
   527 F.2d 87 (2d Cir. 1975)................................................................................................8

*Lewis v. Rosenfeld*
   138 F. Supp. 2d 466 (S.D.N.Y. 2011)................................................................................19

*Luzerne Cty. Ret. Bd. v. Makowski*
   627 F. Supp. 2d 506 (M.D. Pa. 2007).................................................................................20

*Mandarin Trading Ltd. v. Wildenstein*
   16 N.Y.3d, 173, 179 (2011) ........................................................................................17, 30

*Mathon v. Marine Midland Bank, N.A.*
   875 F. Supp. 986 (E.D.N.Y. 1995) ....................................................................................19

*McBride v. KPMG Int'l*
   135 A.D.3d 576 (1st Dep't 2016) .......................................................................................9

*Meisel v. Grunberg*
   651 F. Supp. 2d 98 (S.D.N.Y. 2009)...................................................................................10

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*
   651 F.3d 268 (2d Cir. 2011)............................................................................20

*Mueller v. Michael Janssen Gallery Pte. Ltd.*
   225 F. Supp. 3d 201 (S.D.N.Y. 2016)............................................................29

*Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc.*
   165 F. Supp. 2d 514 (S.D.N.Y. 2001)........................................................24, 27

*Ne. Gen. Corp. v. Wellington Adv.*
   82 N.Y.2d 158 (1993) ..................................................................................11

*Oddo Asset Mgmt. v. Barclays Bank PLC*
   19 N.Y.3d 584 (2012) ..................................................................................12

*Ozelkan v. Tyree Bros. Envtl. Servs.*
   29 A.D.3d 877 (2d Dep't 2006) ....................................................................10

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*
   446 F. Supp. 2d 163 (S.D.N.Y. 2006).............................................................14

*Physicians Mut. Ins. Co. v. Greystone Serv. Corp., Inc.*
   No. 07 Civ. 10490(NRB), 2009 WL 855648 (S.D.N.Y. Mar. 25, 2009)................17

*Plount v. Am. Home Assur. Co., Inc.*
   668 F. Supp 204 (S.D.N.Y. 1987) ................................................................21

*Prickett v. New York Life Insurance Co.*
   896 F. Supp. 2d 236 (S.D.N.Y. 2012)............................................................12

*Pungitore v. Barbera*
   506 F. App'x 40 (2d Cir. 2012) ......................................................................6

*Ritchie Capital Mgmt., L.L.C. v. Gen. Elec. Capital Corp.*
   121 F. Supp. 3d 321 (S.D.N.Y. 2015)............................................................18

*Rombach v. Chang*
   355 F.3d 164 (2d Cir. 2004)..........................................................................15

*Rondi LLC v. Arfa*
   15 N.Y.3d 826 (2010) ..................................................................................13

*Saul v. Cahan*
   153 A.D.3d. 947 (2d Dep't 2017) ..................................................................11

*Sedima, S.P.R.L. v. Imrex Co.*
   473 U.S. 479 (1985)......................................................................................21

*Seiden Assocs., Inc. v. ANC Hldgs., Inc.*
   959 F.2d 425 (2d Cir. 1992).........................................................................11

*Seippel v. Jenkens & Gilchrist, P.C.*
   341 F. Supp. 2d 363 (S.D.N.Y. 2004)..........................................................20

*Sell v. Zions First Nation Bank*
   No. CV-05-0684, 2006 WL 322469 (D. Ariz. Feb. 9, 2006)........................20

*Shea v. Hambros PLC*
   244 A.D.2d 39 (1st Dep't 1998) ...................................................................13

*SNS Bank v. Citibank*
   7 A.D.3d 352 (1st Dep't 2004) .....................................................................13

*Spool v. World Children Int'l Adoption Agency*
   520 F.3d 178 (2d Cir. 2008)..........................................................................26

*Stein v. World-Wide Plumbing Supply, Inc.*
   71 F. Supp. 3d 320 (E.D.N.Y. 2014) ...........................................................23

*United States v. Binday*
   804 F.3d 558 (2d Cir. 2015)..........................................................................24

*Villoldo v. BNP Paribas S.A.*
   648 F. App'x 53 (2d Cir. 2016) ....................................................................28

*Walden v. Fiore*
   571 U.S. 277 (2014).........................................................................................8

*Wood v. Inc. Vill. of Patchogue of N.Y.*
   311 F. Supp. 2d 344 (E.D.N.Y. 2004) .........................................................23

*Zorbas v. U.S. Tr. Co.*
   48 F. Supp. 3d 464 (E.D.N.Y. 2014) ...........................................................10

**STATUTES**

18 U.S.C. § 1962.....................................................................................................1-2, 6

18 U.S.C. § 1964(c) ...........................................................................................19, 21, 28

N.Y. C.P.L.R. 302(a) ................................................................................................8-9

**RULES**

Fed. R. Civ. P. 9(b) ..............................................................1, 10, 13, 15-17, 24, 26

Fed. R. Civ. P. 12(b) .................................................................................................1, 7

**OTHER AUTHORITIES**

Investopedia, *Market Value vs. Book Value*, April 18, 2018 .........................................................25

Investopedia, "Ceding Company" ......................................................................................3

Fed. Ins. Office, U.S. Dep't of the Treasury, *The Breadth & Scope of the Global Reinsurance Market & the Critical Role Such Market Plays in Supporting Insurance in the United States* ................................................................. 2-3

Nat'l Assoc. of Ins. Comm'rs & Center for Ins. Policy and Research, "Repurchase Agreements, Dollar Repurchase Agreements and Reverse Repurchase Agreements in the Insurance Industry," ..................................................................5

Defendants Mark Graham, Blue Capital Management, Inc. ("BCM"), Blue Alternative Asset Management, LLC ("BAAM"), Blue Elite Fund, Ltd. ("Blue Elite Ltd."), Blue Elite Fund, L.P., ("Blue Elite L.P.") and Blue II, Ltd. ("Blue II") (together the "Blue Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Second Amended Complaint (the "SAC"), filed by Plaintiff Great Western Insurance Company on December 19, 2018, pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(2), and 12(b)(6).[1]

This is a contract dispute between Great Western and Alpha Re Limited ("Alpha Re"); indeed, Great Western and Alpha Re have already resolved this contract dispute through arbitration, with Great Western securing a $131.4 million judgment.  (SAC ¶ 160.)  Relying now on this same contractual relationship, Great Western seeks not just a double recovery (first from Alpha Re and now from everyone else), but a treble recovery in the form of RICO damages.  As far as concerns the Blue Defendants, Great Western seeks that recovery from entities with whom it had no contractual relationship and that owed it no fiduciary duties.  Allegations of fraud are stated in conclusory fashion, with the only details provided failing to state a claim for fraud.  For most of the Blue Defendants, the only way a claim is asserted at all is by grouping the Blue Defendants together or with other defendants via improper group pleading.  For most of the SAC, Great Western simply disregards the corporate form.  The RICO allegations are not only barred by the Private Litigation Securities Reform Act ("PSLRA"), but fail to state a RICO claim under any subsection of 18 U.S.C. § 1962.

This is Great Western's second shot at formulating an adequate complaint.  Yet, despite having the benefit of all the defendants' motions to dismiss prior to drafting the SAC, Great Western still fails to state a viable cause of action against the Blue Defendants.  Despite the

---

[1] All Terms used but not defined in this memorandum are defined as set forth in the SAC.  All relevant arguments raised by the other defendants are incorporated by reference.

bombast of Great Western's SAC, all of its claims against the Blue Defendants flounder and fail. The SAC should be dismissed.

## FACTS

This is a contract action, arising out of an alleged breach of the reinsurance agreement between Alpha Re, a reinsurer, and Great Western, an insurer.  Great Western, an insurance company domiciled in Utah, first entered into a coinsurance (reinsurance) agreement with Ability Re in 2009 (the "Coinsurance Agreement").  (SAC ¶¶ 2, 60.)  In 2012, Alpha Re assumed Ability Re's obligations via a novation agreement (the "Novation Agreement").  (*Id.* at ¶¶ 64-67; Ex. B, § 4.)  Great Western received $2 million as consideration for the novation.  (*Id.*)  The parties also executed a trust agreement (the "Trust Agreement") for the establishment of a trust account with Great Western as the beneficiary (the "Trust Account").  Great Western, Alpha Re, and WSFS were the only parties to the Trust Agreement.

These three agreements define the relationship of Great Western, Alpha Re, and WSFS: the Coinsurance Agreement (SAC, Ex. A), the Novation Agreement (SAC, Ex. B), and the Trust Agreement (SAC, Ex. C).  They set forth all the rights, responsibilities, and obligations of all the parties and the exclusive remedies for breaches of the agreements.  These were all comprehensive agreements drafted and agreed to by sophisticated parties, represented by counsel.

A.    Coinsurance Agreements in the Reinsurance Industry.

Reinsurance is a contract "by which, in exchange for a premium, a specified portion of the risks under one or more insurance policies written by the cedent [the insurer] are transferred ("ceded") to the reinsurers."  Fed. Ins. Office, U.S. Dep't of the Treasury, *The Breadth & Scope of the Global Reinsurance Market & the Critical Role Such Market Plays in Supporting*

*Insurance in the United States*, December 2014, p. 1 (hereinafter, *Global Reinsurance*).[2]  In addition to hedging against the risk of large losses, reinsurance, by permitting an insurer to move risk off its books, can free up capital and increase underwriting capacity.  *Id.*; *see also* "Ceding Company," Investopedia, available at https://www.investopedia.com/terms/c/ceding-company.asp (last visited February 2, 2019).  Although reinsurers operating outside the United States are not subject to state collateralization requirements, they are indirectly bound by applicable state laws because an insurer based in the United States must obtain qualifying collateral in order to take financial statement credit for ceding the risk.  *Global Reinsurance*, p. 1.

There are many forms of reinsurance.  Here, Great Western and Alpha Re entered into a "pro rata" form of reinsurance known as "quota share," also known, as in this case, as a "coinsurance agreement."  *See id.*, at p. 9; (SAC, Ex. A, § 2.01 (defining coverage).)  Under a "quota share" agreement, "a cedent and reinsurer share a predetermined percentage of both the premium charged for the underlying insurance policies" as well as the exposure.  *Global Reinsurance*, p. 9.  In this case, Great Western ceded 75% of benefits and liabilities to Alpha Re. (SAC, Ex. A, § 2.01(a) and p. 2 (definitions).)

B.    The Trust Agreement.

Great Western is a company regulated by the laws of the State of Utah.  (SAC ¶ 2.)  To obtain financial statement credit, and therefore free up capital, any reinsurance Great Western obtained was required to be collateralized by certain approved forms of security.  (*See* SAC ¶ 61.)  As a result, the parties entered into the Trust Agreement, which was to serve as "security for the payment of the Reinsurer's [Alpha Re] obligations to the Company [Great Western]." (SAC, Ex. A, § 12.02.)

---

[2] Available at: https://www.treasury.gov/initiatives/fio/reports-and-notices/Documents/FIO%20-%20Reinsurance%20Report.pdf

By the terms of the Trust Agreement, Great Western was the beneficiary, Alpha Re was the Grantor, and WSFS was the Trustee.  (SAC, Ex. C, p. 2.)  But, it does not follow that the funds in the Trust Account belonged to Great Western.  To the contrary, the funds ceded by Great Western were the funds that Great Western owed to Alpha Re as consideration for Alpha Re taking on 75% of Great Western's liability for the specified insurance policies.  (SAC, Ex. A, § 2.01(a) & p. 2 (definitions).)  They were Alpha Re's funds.  Alpha Re was free to invest those funds as it saw fit, provided that the collateral in the Trust Account conformed to the types of assets permitted by the Trust Agreement ("Allowable Assets").  (*See* SAC ¶ 20; Ex. C, § 1.)[3]

As part of the Trust Agreement, Alpha Re provided Great Western "Investment Guidelines," which included a "Sample Portfolio Allocation for the Trust Account."  (*See* SAC, Ex. C, § 1(c) & pp. 86-87.)  The Sample Portfolio Allocation, among other proposed assets, listed "cash and short term investments (including cash and repurchase agreements)."  (*Id.*)

The Trust Agreement permitted Alpha Re to appoint an investment manager, upon the written approval of Great Western.  (SAC, Ex. C, § 4(b).)  While Great Western had the right to approve the proposed investment manager, it did not have the right to select the investment manager.  Furthermore, the Trust Agreement expressly states:

> The Investment Manager is the agent of, and is acting on behalf of, the Grantor. The Grantor shall be solely responsible for all fees charged by and all obligations to the Investment Manager in connection with the Trust Account.

(*Id.*)

---

[3] Allowable assets were listed as "assets rated investment grade by at least one Nationally Recognized Statistical Rating Organization ("NRSRO"), cash (United States legal tender), securities listed by the National Association of Insurance Commissioner's Securities Valuation Office and qualifying as assets under the Utah Insurance Code, and "Eligible Securities."  (SAC, Ex. C, § 1(c).)  "Eligible Securities" is defined as "certificates of deposit issued by a United States bank and payable in United States legal tender, and investments of the types specified in Section 31A-18-105 of the Utah Insurance Code."  (*Id.*)

At the time the Trust Agreement was executed, Great Western was aware that Graham would be handling the Trust Account for BAAM.  (SAC ¶ 67; *see also* Ex. C, p. 92.)

       C.      <u>The Repurchase Agreement.</u>

In September 2012, Alpha Re entered into the Repurchase Agreement with Series 2011-C. (SAC, Ex. D.)  The Repurchase Agreement here is a "reverse repurchase agreement," where "insurance companies purchase securities from a counterparty in exchange for cash and agree to resell the same or substantially the same securities to the counterparty on an agreed-upon date for a predetermined price within a 12-month time frame."  Nat'l Assoc. of Ins. Comm'rs & Center for Ins. Policy and Research, "Repurchase Agreements, Dollar Repurchase Agreements and Reverse Repurchase Agreements in the Insurance Industry," available at https://www.naic.org/capital_markets_archive/120112.htm (last visited Feb. 2, 2019). Repurchase agreements are generally considered a low-risk method of raising capital.  *Id.*

Series 2011-C is an investment vehicle owned by Regatta, which, in turn, is owned by Solow.  (SAC ¶ 70.)  In December 2013, over a year after the Repurchase Agreement was executed, BCM became the collateral manager for Series 2011-C.  (*Id.* at ¶ 77.)  Although Great Western claims that it did not know about Graham and BCM's involvement with Series 2011-C (*id.* at ¶ 79), according to the SAC, Graham signed the Repurchase Agreements in 2015 and 2016, belying this claim.  (*Id.* at ¶¶ 93, 98.)

For years, there were no serious issues between the parties.  (*See, e.g.*, *id.* at ¶ 136.) Indeed, during this time period, the parties executed two repurchase confirmation agreements. (*Id.* at ¶¶ 92-102.)  Then, in late 2016, news of an SEC investigation and a large redemption from the Series 2011-C fund impacted the fund's liquidity, resulting, according to Great Western, in a series of events culminating in Great Western's sale.  (*See id.* at ¶¶ 113-35.)

Based on these events, Great Western asserts the following counts in the SAC against the Blue Defendants:

| Count | Allegation | Blue Defendants Named |
|---|---|---|
| I | Breach of Fiduciary Duty | Graham, BAAM |
| II | Aiding and Abetting Breach of Fiduciary Duty | BCM, Blue Elite Ltd., Blue Elite LP, Blue II |
| III | Fraud | Graham, BCM, BAAM |
| IV | Aiding and Abetting a Fraud | Graham, BCM, BAAM |
| V | Civil RICO, subsection (c) (18 U.S.C. § 1962(c)) | Graham, BCM, BAAM |
| VI | Civil RICO, subsection (a) (18 U.S.C. § 1962(a)) | Graham, BCM, BAAM |
| VII | RICO conspiracy (18 U.S.C. § 1962(d)) | All Blue Defendants |
| VIII | Civil Conspiracy to Commit Fraud | All Blue Defendants |
| XI | Unjust Enrichment | All Blue Defendants |

## **ARGUMENT**

While the Court must accept all well-pleaded allegations in the SAC as true, it must ignore bare-bones conclusory statements, lacking any factual support. *Pungitore v. Barbera*, 506 F. App'x 40, 42 (2d Cir. 2012) (noting "[a] court must first ignore 'mere conclusory statements' or legal conclusions, which are not entitled to the presumption of truth"). If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the SAC should be dismissed. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing Fed. R. Civ. P. 8(a)(2)); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that "[f]actual allegations must be enough to raise a right to relief above the speculative level"). Once the conclusory statements

and legal conclusions are disregarded, it is clear that Great Western fails plead any cause of action against the Blue Defendants.  Thus, the SAC should be dismissed.

I.     **The Complaint Against BCM, Blue Elite, Ltd., and Blue II Should Be Dismissed For Lack of Personal Jurisdiction under Fed. R. Civ. P. 12(b)(2).**

Great Western cannot carry its burden to establish personal jurisdiction over defendants Blue Elite Ltd., Blue II, and BCM.  *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005); *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d. Cir. 1996).

A.     **Great Western Cannot Establish That the Court Has General Jurisdiction over Blue Elite Ltd., Blue II, or BCM.**

The text of the SAC itself establishes that the Court lacks general jurisdiction over these three entities.  For general jurisdiction to exist, each defendant's contacts with New York must be "so constant and pervasive as to render it essentially at home in [New York]." *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014).  "With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction." *Id.* at 137.

Great Western concedes: 1) that defendant Blue Elite Ltd., a mutual fund regulated by the laws of the Cayman Islands, is incorporated and maintains a principal place of business in the Cayman Islands, and 2) that defendant BCM is incorporated and maintains a principal place of business in the Commonwealth of Puerto Rico.  (SAC ¶¶ 22 and 11, respectively).  Great Western concedes that Blue II is a Cayman Islands entity, but generically alleges that it maintains a principal place of business in New York.  (*Id.* at ¶ 24.)  In fact, Blue II, a mutual fund regulated by the laws of the Cayman Islands, has maintained a principal place of business in the Cayman Islands since its inception in June 2012.  (*See* Declaration of Mark Graham, at ¶ 2.) Further, none of these entities had offices or employees in New York.  (*Id.* at ¶¶ 4-7.) Accordingly, the Court lacks general jurisdiction over Blue Elite Ltd., Blue II, and BCM. *Daimler*, 571 U.S. at 136-37.

B.     **Great Western Cannot Establish Specific Jurisdiction over Blue Elite Ltd., Blue II, or BCM.**

Nor can Great Western establish specific jurisdiction over these entities under New York's long arm statute. *See* N.Y. C.P.L.R. 302(a). The long arm statute is constrained by due process, which requires that the alleged "suit-related conduct must create a substantial connection with the forum State" and "arise out of the contacts that the defendant *himself* creates with the forum." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (citations and internal quotations omitted, emphasis in original). In New York, this requires, at a minimum, that some business be transacted in New York, and that Great Western's claim "arise from that business activity." *Eades v. Kennedy, PC Law Offices,* 799 F.3d 161, 168 (2d Cir. 2015); N.Y. C.P.L.R. 302(a)(1).

Furthermore, "a defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d. Cir. 1999). Finally, under C.P.L.R. 302(a)(3), the injury claimed must occur in New York. *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84-85 (2d Cir. 2001). Great Western's reliance on "blank assertion[s] of conspiracy or agency" is insufficient when "there are no allegations of specific acts which would connect" the defendant to New York. *Lehigh Valley Ind., Inc. v. Birenbaum*, 527 F.2d 87, 94 (2d Cir. 1975).

Blue Elite Ltd. and Blue II are hardly mentioned in the SAC save for some conclusory claims that they "received money" that potentially originated in the Trust Account in Delaware (when, where, what, and how, are not pled), and that they concealed conflicts of interest (although to whom they allegedly owed a duty of disclosure is not pled). (SAC ¶¶ 79, 90, 103.)

The only alleged connection to New York is a relationship with Mr. Graham. But Great Western has not identified how this relationship, only vaguely defined as drafting emails, participating in telephone conferences, and conducting "other business," from New York on

behalf of Blue Elite Ltd. and Blue II (*id.* at ¶¶ 49, 51), relates to Great Western's claims or how these transactions are substantially related to the claims in the SAC. *Eades*, 799 F.3d at 168. This is insufficient to establish personal jurisdiction over international entities.

The allegations against BCM also fail to establish specific jurisdiction. BCM is alleged to have "received money," to have transferred money between overseas entities, and "entered into a Collateral Management Agreement" with Regatta, a Delaware limited liability company with a principal place of business in New Jersey. (SAC ¶¶ 14, 77, 103, 108.) This is insufficient to establish the existence of jurisdiction. *See AMP Servs. Ltd. v. Walanpatrias Found.*, 34 A.D.3d 231, 232 (1st Dep't 2006) (transfer of assets occurs where the assets are located). That leaves Great Western with the same generic and insufficient allegations of "business activity" allegations that it proffers for Blue Elite Ltd. and Blue II. (*See id.* at ¶ 38.)

Finally, personal jurisdiction against these three entities, unconnected with New York, cannot exist because the claimed injury is "out of state": a loss of funds from a Delaware trust account held for Great Western, a Utah corporation, through a series of alleged actions taken overseas. N.Y. C.P.L.R. 302(a)(3) therefore does not apply. *See, e.g.*, *Fantis Foods, Inc. v. Std. Importing Co.*, 49 N.Y.2d 317, 325-26 (1980); *Gelfand v. Tanner Motor Tours, Ltd.*, 339 F.2d 317, 321-22 (2d Cir. 1964); *McBride v. KPMG Int'l*, 135 A.D.3d 576, 577 (1st Dep't 2016).

The SAC should be dismissed against Blue Elite Ltd., Blue II, and BCM for lack of personal jurisdiction.

## II.    Count One: Great Western Fails to State a Cause of Action for Breach of Fiduciary Duty Against BAAM and Graham.

Under New York law, to plead a breach of fiduciary duty, Great Western must show: (1) the existence of a fiduciary duty; (2) a knowing breach of that fiduciary duty; and (3) damages

resulting from the breach.[4]  *Zorbas v. U.S. Tr. Co.*, 48 F. Supp. 3d 464, 478 (E.D.N.Y. 2014); *see also Ozelkan v. Tyree Bros. Envtl. Servs.*, 29 A.D.3d 877, 879 (2d Dep't 2006); *Horn v. 440 East 57th Co.*, 151 A.D.2d 112 (1st Dep't 1989).  These elements must be pled with particularity. Fed. R. Civ. P. 9(b); *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 108 (S.D.N.Y. 2009) (Leisure, J.).

      **A.**      **Count One should be dismissed because Great Western fails to set forth allegations apart from the contract establishing a relationship of higher trust.**

Where there is a "formal written agreement covering the precise subject matter of the alleged fiduciary duty," there can be no cause of action for breach of fiduciary duty.  *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 17 (2d Cir. 2014) (citing *Pane v. Citibank, N.A.*, 797 N.Y.S.2d 76, 77 (1st Dep't 2005)); *see also Brooks v. Key Trust Co. Nat'l Ass'n*, 26 A.D.3d 628, 630 (3d Dep't 2006) (holding that a fiduciary duty claim "based on the same facts and theories as [a] breach of contract claim" must be "dismissed as duplicative").

Great Western's breach of fiduciary duty allegations are entirely encompassed within the three operative agreements between Great Western, Alpha Re, and WSFS.  Any such claim would be entirely duplicative of a breach of contract claim, which Great Western already litigated in arbitration.  *See Great Western Ins. Co. v. Alpha Re Ltd.*, Pet. to Confirm Arbitration Award, No. 1:17-cv-09446 (AKH) (S.D.N.Y.) (ECF No. 1); *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 196 (S.D.N.Y. 2011) (observing "[i]n New York, a cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand").  As Great Western fails to "'set forth allegations that, *apart from the terms of the contract*'. . .'created a relationship of higher trust than would arise from [their contracts]

---

[4] The Trust Agreement contains a choice of law clause that reads: "All matters concerning the construction and interpretation of this Agreement and performance under this Agreement shall be interpreted and construed according to the laws of the State of Delaware without regard to said state's conflict of laws rules."  (SAC, Ex. C, § 9.) Consistent with the Second Circuit's opinion in *Finance One Public Co. v. Lehman Bros. Special Financing, Inc.*, this contractual choice of law clause is not sufficiently broad to encompass tort claims.  414 F.3d 325, 334-35 (2d Cir. 2005) (citing *Twinlab Corp. v. Paulson,* 724 N.Y.S.2d 496, 496 (App. Div. 2d Dep't 2001)).

alone,'" Count One should be dismissed.  *Brooks*, 26 A.D.3d at 630 (emphasis and alterations in original) (quoting *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 20 (2005)).

**B.    Great Western Fails to Establish that BAAM Owed Great Western a Fiduciary Duty.**

Great Western also cannot establish that BAAM owed it a fiduciary duty.  BAAM is identified solely as the agent of Alpha Re.  (SAC, Ex. C, § 4(b).)  All of its rights flow from, and all of its obligations flow to, Alpha Re.  The terms of the contract have clearly defined and articulated the rights and obligations between the parties, including the rights and obligations of Alpha Re's agent, BAAM.

A contract should interpreted to give effect to the intent of the parties.  *Seiden Assocs., Inc. v. ANC Hldgs., Inc.*, 959 F.2d 425, 428 (2d Cir. 1992); *see also Ne. Gen. Corp. v. Wellington Adv.*, 82 N.Y.2d 158, 13 (1993) (noting that the terms of the contract control the relationship of the parties).  Where sophisticated parties to an arms-length transaction delineate rights and obligations in a formal written agreement, courts should not read additional duties and obligations into the agreements.  *See Ne. Gen. Corp.*, 82 N.Y.2d at 162 (noting that if the parties "do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them"); *Saul v. Cahan*, 153 A.D.3d. 947, 949 (2d Dep't 2017) (explaining that courts will generally not infer a fiduciary relationship in "arm's-length business transaction[s] involving sophisticated business people" (internal quotations omitted)).

Had the parties intended for BAAM also to owe duties to Great Western, the Trust Agreement could easily have provided as such, or even remained silent.  But the parties were not silent on the question of to whom BAAM owed a duty; they made a direct and pointed statement that BAAM is solely the agent of, and acts on behalf of, Alpha Re.  (SAC, Ex. C, § 4(c).)

*Prickett v. New York Life Insurance Co.*, 896 F. Supp. 2d 236 (S.D.N.Y. 2012) (Griesa, J.), is instructive here.  In *Prickett*, a sophisticated life insurance policyholder sued New York Life and other parties after the investments backing the policy were lost in a Ponzi scheme.  New York Life had invested in the Tremont Fund, a "fund of funds" hedge fund.  *Id.* at 239.  After the premiums were lost, the policyholder sued, among others, the investment advisor for the Tremont Fund, alleging breach of fiduciary duty.  *Id.* at 250.  The court held that there was no fiduciary duty because "Tremont did not assume any duty to 'act for' or 'give advice to'" the plaintiff; and "Tremont's relation was with its investor, New York Life, whose money to fund the investment came from policyholders."  *Id.*  The court further observed that "Tremont did not serve as an investment advisor for [the plaintiff]; Tremont served as an investment advisor to the Tremont Fund, whose limited partners included New York Life, but not" the plaintiff.  *Id.*; *see also Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 593-94 (2012) (collateral managers in complicated investment scheme did not have fiduciary duty to plaintiff where there was no contractual relationship, no direct dealings, and no direct communications between plaintiff and collateral managers).

BAAM never assumed any duty to advise or act for Great Western.  To the contrary, the operative agreements here expressly establish that BAAM's fiduciary obligations were to Alpha Re.  Great Western cannot establish the existence of a fiduciary duty owed by BAAM.

### C.   Great Western Cannot Establish that Graham Owed a Fiduciary Duty.

The claims founded on fiduciary duty against Graham are even more tenuous.  Graham is not a signatory to or mentioned in any of the three agreements.[5]  Great Western alleges that it

---

[5] Graham's sole appearance in the three core agreements is when he signed, on BAAM's behalf, the "Incumbency Certificate" attached to the Trust Agreement, which is the formal authorization for BAAM to act as Investment Manager for the Trust Account.  (*See* SAC, Ex. C, p. 92).

communicated with Graham "prior and subsequent to the execution of the Trust Agreement" (SAC ¶ 74) and "on many occasions" (*id.* ¶ 86), but these generic allegations do not establish a fiduciary duty. *See SNS Bank v. Citibank*, 7 A.D.3d 352, 355-56 (1st Dep't 2004) (holding that "plaintiff's 'subjective claims of reliance on defendant's expertise' did not give rise to a 'confidential relationship' whose 'requisite high degree of dominance and reliance' was not in existence prior to the transaction giving rise to the alleged wrong"). Nor do these allegations suffice to plead a breach of fiduciary duty claim with particularity, as required by Rule 9(b). *See Fahlenbach v. Trans Pac. Capital, Inc.*, No. 95-cv-8776, 1996 WL 22602, at *4 (S.D.N.Y. Jan. 19, 1996) (Patterson, J.) (dismissing breach of fiduciary duty claim in securities case for plaintiffs' failure to allege facts sufficient to evaluate the claim).

Great Western fails to establish that either BAAM or Graham owed any fiduciary duty to Great Western. Accordingly, Count One should be dismissed.

## III.   Count Two: Great Western Fails to State a Claim for Aiding and Abetting a Breach of Fiduciary Duty Against BCM, Blue Elite Ltd., Blue Elite L.P., and Blue II.

To state a cause of action for aiding and abetting a breach of fiduciary duty, Great Western must allege: (1) that it was owed a fiduciary duty; (2) that defendants knowingly induced the breach or participated in aiding the breach; and, (3) that it suffered damages as a result of the breach. *Kaufman v. Cohen*, 307 A.D.2d 113, 125 (1st Dep't 2003), *cited with approval*, *Rondi LLC v. Arfa*, 15 N.Y.3d 826, 827 (2010). A failure to allege any one of these three elements is reason enough to dismiss the claim. *Shea v. Hambros PLC*, 244 A.D.2d 39, 46 (1st Dep't 1998). Great Western fails to demonstrate even a single element, much less all three.

As discussed above, there was no fiduciary duty owed by Graham or BAAM. Nor has Great Western alleged a fiduciary duty owed by any of the other Blue Defendants. Blue Elite Ltd., Blue Elite L.P., and Blue II are hardly mentioned in the SAC at all. There are no

13

allegations directed specifically to these entities.  Rather, when they are discussed (outside of the pro forma party and jurisdiction recitations), they are always grouped together in some conclusory allegation.  (*See, e.g.*, SAC ¶¶ 106, 177.)  The SAC contains no direct factual statement as to what these entities knew about Great Western, what they did, and why they did it, much less that these entities knew they were receiving funds that originated from the Trust Account.  These entities were entirely passive.  *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 203 (S.D.N.Y. 2006) (Scheindlin, J.) (finding aiding and abetting liability could not attach where defendant's role in the scheme was "entirely passive" and merely involved permitting the principal to "use its resources in the same manner as any other customer").

The allegations against BCM are similarly lacking.  BCM is alleged to have been the collateral manager of Series 2011-C, an entity entirely separate and independent from any entity connected to Great Western.  BCM had no role in the agreements with Great Western, or the Trust Account, and is not alleged to have had any direct contact with Great Western.

There are only two semi-concrete allegations made in the SAC with regard to BCM. Great Western alleges that: (1) in September 2015 and 2016, BCM signed confirmations related to the repurchase agreements, and (2) BCM did not tell Great Western that the Series 2011-C fund was heavily leveraged.  (*See* SAC ¶¶ 92-102.)  But, aiding and abetting a breach of fiduciary duty based on a failure to act is only valid if the defendant was somehow obligated to act.  *In re Sharp Int'l Corp.*, 403 F.3d 43, 50 (2d Cir. 2005) (observing that "mere inaction of an aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff" (quoting *Cohen*, 307 A.D.2d at 126)).  And because neither Graham nor

14

any other Blue Defendant owed a fiduciary duty to Great Western, BCM cannot have aided and abetted a breach of that duty by failing to report to Great Western.

The SAC fails to offer any detail as to the obligations and duties that it claims were owed. Great Western has failed to offer any non-conclusory, substantive allegations of the existence of a fiduciary duty of which Blue Elite Ltd., Blue Elite L.P., Blue II, or BCM had actual knowledge. Nor has Great Western alleged that any of these entities actually induced or participated in any breach. Thus, Count Two of the SAC for aiding and abetting a breach of fiduciary duty should be dismissed.

## IV. Count Three: Great Western's Claims of Fraud against Graham, BCM, and BAAM Should Be Dismissed.

To state a claim for fraud, Great Western must allege: (1) a material misrepresentation, (2) an intent to induce reliance, (3) justifiable reliance, and (4) resulting damages. *Eurycleia Partners, L.P. v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009). Rule 9(b) requires that any fraud claim allege the time, place, and speaker of the fraudulent statement and explain why the statement was fraudulent. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). This standard requires more than vague allegations that track the basic elements of a cause of action. Moreover, group pleading is insufficient; each defendant's particular participation must be specifically pled. *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 213 (S.D.N.Y. 1999) (Sweet, J.). As Great Western fails to allege every necessary fact for even one of the allegedly numerous misrepresentations (*see* SAC ¶ 74), Great Western's fraud claims should be dismissed.

In summary fashion, Great Western alleges the following misstatements: (1) the ownership of Series 2011-C, (2) who was responsible for running Series 2011-C, (3) the purpose of the investments into Series 2011-C; (4) the valuation of the Trust Account assets through false

15

monthly and annual statements; and (5) the funding and collateral supporting Series 2011-C.  (*Id.* at ¶¶ 70-86.)  None of these allegations are supported by dates, names, or other specifics.

In fact, at least one of these allegations is directly contradicted by the SAC itself.  Only WSFS is alleged to have sent monthly statements.  (*See id.* at ¶ 81.)  Neither Graham, BAAM, nor BCM had any obligation to provide statements to Great Western.

The most fully formed Great Western allegations are:[6]

- that Graham and Solow "repeatedly affirmed that the collateral backing the Repurchase Agreement were only cash and United States Treasury securities," (*id.* at ¶ 74);

- that from 2012 to 2016 Defendants Alpha Re, Graham, BAAM, Solow, Tolaram, and WSFS made statements as to the collateral behind the Repurchase Agreement (*id.* at ¶ 80);

- that "on many occasions" Graham was asked (it is not alleged by whom, other than "Great Western") if the Trust Account Statements showed the true value of the Repurchase Agreement (*id.* at ¶ 86); and

- Graham and BAAM were asked to provide information, and said that they would, but ultimately did not provide the information.[7]  (*Id.* at ¶¶ 132-33.)

These are precisely the sort of dishwater conclusions that Rule 9(b) is designed to prevent.  This is not a mere form objection.  The misrepresentations that Great Western alleges are entirely dependent on when the underlying representations were made.  A statement as to value or collateral of an active investment fund, with fluctuating values, can only be analyzed

---

[6] Throughout the SAC, Great Western's conflation of Graham with any number of entities, including BAAM and BCM, often makes it impossible to tell from the face of the SAC the defendant to which Great Western is ascribing certain conduct.

[7] It is difficult to comprehend how statements saying that information would be provided, when that information was not later turned over, can constitute a "material" misrepresentation or omission for purposes of fraud liability, or why it was justifiable for Great Western to rely on these promises.  It is similarly difficult to understand how Great Western can claim fraud based upon Graham and BCM's failure to turn over an internal report, where they had no duty to do so.  (*See* SAC ¶ 111.)

relative to when the statement was made.  Great Western fails to infuse its allegations of fraud with any particularity, much less sufficient detail to survive a motion to dismiss.

Additionally, Great Western cannot establish liability for fraud based upon omissions (*see, e.g.*, *id.* at ¶¶ 79, 91-92, 102, 111) as fraud by omission is only a viable cause of action where a fiduciary duty is owed.  *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d, 173, 179 (2011).  Further, Great Western cannot allege both fraud and contract claims without some legal duty separate from the contractual obligations.  *Physicians Mut. Ins. Co. v. Greystone Serv. Corp., Inc.*, No. 07 Civ. 10490(NRB), 2009 WL 855648, at *5 (S.D.N.Y. Mar. 25, 2009) (Buchwald, J.).

As Great Western has failed to plead any allegation sounding in fraud against either BAAM, BCM, or Graham, Count Three of the SAC should be dismissed.

## V.   Count Four for Aiding and Abetting Fraud Against Blue Elite Ltd., Blue Elite L.P., and Blue II Should Be Dismissed for Failure to State a Claim.

To state a claim against Blue Elite Ltd., Blue Elite, L.P., and Blue II for aiding and abetting a fraud, Great Western must show: (1) the existence of a fraud, (2) the defendant's actual knowledge of a fraud, and (3) that the defendant provided substantial assistance to advance the fraud.  *In re Agape Litig.*, 773 F. Supp. 2d 298, 307 (E.D.N.Y. 2011).  Just as the specificity required by Rule 9(b) is absent from the SAC for Great Western's claims of fraud, so too is it lacking for the follow-on claims of aiding and abetting fraud.  Indeed, even a cursory review of the SAC reveals that there are no allegations to support any inference that Blue Elite, Ltd., Blue Elite L.P., or Blue II, Ltd. knew of the alleged fraud.[8]  The allegations against these entities portray them as entirely passive entities in indirect receipt of funds that may have

---

[8] The only way that Great Western could plead that these entities had knowledge is by imputing some alleged knowledge of Graham to each one of them.  But then, the aiding and abetting fraud claim is just duplicative of the fraud claim itself and should be dismissed.

originated from the Trust Account through several intervening layers of investment.  (*See* SAC ¶
90.)  These are hardly facts that "give rise to a 'strong inference' of actual knowledge."  *In re
Agape Litig.*, 773 F. Supp. 2d at 307 (quoting *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.,
LLC*, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007)).  Nor are there any allegations at all of
substantial assistance by any of these entities.  Accordingly, Count Four of the SAC should be
dismissed against Blue Elite Ltd., Blue Elite L.P., and Blue II.

## VI.    Count Eight Alleging Civil Conspiracy to Commit Fraud Against the Blue Defendants Should Be Dismissed.

Great Western's claim of civil conspiracy to commit fraud against Graham and the Blue
Defendants fails because "New York does not recognize an independent tort of conspiracy."
*Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006).  Since Great Western fails to
state a claim for fraud, it cannot state a claim for civil conspiracy.  *Id.*

Even if the Court finds that Great Western states a claim for fraud, Great Western still
fails to state a proper civil conspiracy claim.  To do so, Great Western must "demonstrate the
primary tort, plus the following four elements: (1) an agreement between two or more parties; (2)
an overt act in furtherance of the agreement; (3) the parties' intentional participation in the
furtherance of a plan or purpose; and (4) resulting damage or injury."  *Ritchie Capital Mgmt.,
L.L.C. v. Gen. Elec. Capital Corp.*, 121 F. Supp. 3d 321, 339 (S.D.N.Y. 2015) (Engelmayer, J.).

Great Western's failure to allege any agreement between the defendants is fatal to its
claim.  At best, Great Western states that defendants "together and with others, conspired with
each other for the unlawful objective of defrauding Great Western," and that the "civil
conspirators"—an amorphous and undefined term—"reached an agreement or understanding to
commit the fraud described."  (SAC ¶¶ 223-24.)  But, Great Western fails to support these
allegations with any "specific times, facts, and circumstances of the alleged conspiracy."

*Brownstone Inv. Grp., LLC v. Levey*, 468 F. Supp. 2d 654, 661 (S.D.N.Y. 2007) (Marrero, J.). As against Blue Elite Ltd., Blue Elite L.P., and Blue II, Great Western also fails to allege any overt action in connection to or the intentional participation in any alleged fraud.

Moreover, because conspiracy claims are used "to connect someone to an otherwise actionable tort committed by another and establish that those actions were part of a common scheme," this Court should dismiss any conspiracy claims that merely duplicate the underlying tort claims. *Lewis v. Rosenfeld*, 138 F. Supp. 2d 466, 479 (S.D.N.Y. 2011) (Scheindlin, J.). The allegations against BCM, BAAM, and Graham are duplicative of those alleged in Count Three, and should be dismissed.

## VII.   Counts Five through Seven Alleging Damages Under Civil RICO Should Be Dismissed.

A Civil RICO allegation is the "litigation equivalent of a thermonuclear device," with its access to extreme sanctions. *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (Sweet, J.) (quoting *Miranda v. Ponce Fed. Bank,* 948 F.2d 41, 44 (1st Cir. 1991)). Consequently, courts should review Civil RICO claims with particular scrutiny, and ensure that "actions traditionally brought in state courts do not gain access to treble damages and attorneys fees in federal courts simply because they are cast in terms of RICO violations." *Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1001 (E.D.N.Y. 1995); *see also Katzman*, 167 F.R.D. at 655 (observing that "courts should strive to flush out frivolous RICO allegations at an early stage of the litigation").

### A.   Great Western's RICO Claims Are Barred By the PSLRA.

Enacted in 1995, the Private Securities Litigation Reform Act ("PSLRA"), codified in relevant part at 18 U.S.C. § 1964(c), bars any Civil RICO suit involving "any conduct that would have been actionable as fraud in the purchase or sale of securities." 18 U.S.C. § 1964(c); *see*

19

*also MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 278-79 (2d Cir. 2011).  The

term "securities fraud," most commonly brought as a 10b-5 action, applies to a broad range of

conduct beyond just the purchase and sale of a specific security, including "the trading process."

*Luzerne Cty. Ret. Bd. v. Makowski*, 627 F. Supp. 2d 506, 557 (M.D. Pa. 2007); *Seippel v.*

*Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 373 (S.D.N.Y. 2004) (Scheindlin, J.) (noting that

"all that is required for a section 10(b) violation is that the scheme to defraud and the sale of

securities coincide").

     The PSLRA bars RICO claims based on "conduct undertaken to keep a securities fraud

Ponzi scheme alive," as well as claims where the plaintiff lacks standing to pursue a securities

fraud claim against the defendant, such as when aiding and abetting is alleged.  *MLSMK Inv. Co.*,

651 F.3d at 277 n.11, 279.  Thus, "the question is not whether a plaintiff can state a claim under

a non-securities-related predicate act, but whether the allegations that form the basis of that

predicate act occur 'in connection with' securities fraud."  *Sell v. Zions First Nation Bank*, No.

CV-05-0684, 2006 WL 322469, at *10 (D. Ariz. Feb. 9, 2006) (quoted with approval in *MLSMK*

*Inv. Co.*, 651 F.3d at 277 n.11).  And if at least "one predicate act" in the alleged RICO scheme

occurred in connection with securities fraud, "the whole scheme is subject to the PSLRA bar."

*Gilmore v. Gilmore*, No. 09 Civ. 6230 (WHP), 2011 WL 2874880, at *6 (S.D.N.Y. Sept. 1,

2011) (Pauley, J.).  This broad reading of the PSLRA bar is necessary to "prevent litigants from

using artful pleading to boot-strap securities fraud cases into RICO cases, with their threat of

treble damages."  *MLSMK Inv. Co.*, 651 F.3d at 274.

     Here, Great Western has admitted that the "misconduct" that was already investigated

and settled by the SEC serves as the "the basis [of its] Complaint in this action."  (Dkt. No. 56, p.

2.)  Great Western also claims that there were "repeated instances of wire fraud" related to the

purchase and sale of securities and financial instruments for the benefit of the Trust Account. (*See, e.g.*, SAC ¶¶ 80-83, 86 (alleging misrepresentations about purchased securities), ¶ 87 (alleging that Graham and others made misrepresentations and transferred money into risky securities), ¶ 93 (referring to the "purchased securities" underlying the Repurchase Agreement); ¶ 112 (referring to shares of various funds in Series 2011-C).)

This is precisely the sort of action that Congress contemplated would be excluded from Civil RICO.  *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 77 (S.D.N.Y. 1996) (Pollack, J.) (noting that Congress intended to prevent the pleading of offenses such a mail or wire fraud if the offenses were "based on conduct that would have been actionable as securities fraud" (quotation omitted)).  Section 1964(c) expressly bars Great Western from proceeding with this action under Civil RICO.  Counts Five, Six, and Seven should be dismissed with prejudice.

**B.  Count Five Should Be Dismissed against Graham, BAAM, and BCM Because Great Western Fails to State a Claim for a Violation of RICO, 18 U.S.C. § 1962(c).**

To establish a RICO violation under 18 U.S.C. § 1962(c), Great Western must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018); *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).  As the alleged underlying predicate acts sound in fraud, the allegations must be pled with specificity.  *Plount v. Am. Home Assur. Co., Inc.*, 668 F. Supp 204, 207 (S.D.N.Y. 1987) (Sweet, J.).  Because Great Western fails to allege an enterprise, and fails to allege the predicate acts of wire fraud with specificity, Count Five should be dismissed.

1.  *Great Western Fails to Allege the Existence of an Enterprise.*

To establish the existence of an enterprise, Great Western must allege that the defendants: (1) formed an entity distinct from the individual defendants, and (2) engaged in a course of

fraudulent or illegal conduct with a common purpose.  *See DeFalco v. Bernas*, 244 F.3d 286,

306-07 (2d Cir. 2001) (discussing elements of a RICO enterprise).

> a.    *Great Western cannot allege that Alpha Re, BCM, BAAM, and Regatta constitute four separate RICO enterprises.*

Great Western alleges four separate corporate "enterprises":  Alpha Re, BCM, BAAM,

and Regatta.  (SAC ¶ 190.)  It then alleges, without any specificity, that Graham and others are

"associated with each of the four [e]nterprises."  (*Id.* at ¶ 199.)  These four entities are not RICO

"enterprises" because a "RICO 'person' and a RICO 'enterprise' must be distinct."  *DeFalco*,

244 F.3d at 307 (quoting *Cedric Kushner Promotions, Ltd. v. King*, 219 F.3d 115, 116 (2d Cir.

2000)); (*compare* SAC ¶ 189 (identifying Alpha Re, BCM, BAAM, and Regatta as "persons" for

purposes of RICO) *with* ¶ 190 (calling these same entities "enterprises")).  A plaintiff cannot

circumvent the rule by pleading an association-in-fact enterprise between a company and its

employees.  *DeFalco*, 244 F.3d at 307; *see also Bennett v. U.S. Tr. Co.*, 770 F.2d 308, 315 (2d

Cir. 1985) (explaining that a "corporate entity may not be simultaneously the 'enterprise' and the

'person' who conducts the affairs of the enterprise through a pattern of racketeering activity").

In other words, a company cannot be an enterprise with itself.  *DeFalco*, 244 F.3d at 307; *see

also Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 133-34 (E.D.N.Y. 2010).  Allegations that

BCM and BAAM are separate, stand-alone RICO enterprises should be rejected and any claim

based on these allegations dismissed.

> b.   *Great Western fails to plead an association-in-fact enterprise distinct from the Racketeering predicate acts.*

Great Western further claims the existence of an "association-in-fact [enterprise] between and among Alpha [Re], BCM, BAAM, and Regatta employees and entities" (the "Enterprise").[9] (SAC ¶ 190.)  The RICO allegation thus fails against Graham because he is not named as participating in the Enterprise.

Moreover, this alleged Enterprise fails the distinctiveness test.  A distinct association-in-fact enterprise exhibits at least three features: "a purpose, relationships among the individuals associated with the [E]nterprise, and longevity."  *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 306 (S.D.N.Y. 2010) (McMahon, J.).  An enterprise "coterminous with the pattern of racketeering activity," is not a distinct entity.  *Stein v. World-Wide Plumbing Supply, Inc.*, 71 F. Supp. 3d 320, 327 (E.D.N.Y. 2014).  A RICO enterprise must have "some sort of existence independent of the commission of the predicate acts."  *Wood v. Inc. Vill. of Patchogue of N.Y.*, 311 F. Supp. 2d 344, 357 (E.D.N.Y. 2004).

Great Western alleges that a collection of disparate entities all banded together to obtain control of Great Western's assets.  Great Western attempts to give its fictive "Enterprise" longevity by claiming a scheme to "fraudulently secure reinsurance contracts with insurance companies," but identifies no other insurance company or any other instances of alleged improper conduct.  There is no indication that this manufactured cabal operated together before or after the facts alleged in the SAC.  As such, the alleged Enterprise is not distinct from the pattern of racketeering activity.

---

[9] The term "Enterprise" is never defined in the SAC, but appears to be used interchangeably to refer to the four alleged corporate enterprises, and the one alleged association-in-fact enterprise.  (*See* SAC ¶¶ 191, 198-99.)  In this memorandum, "Enterprise" is used to refer to the alleged association-in-fact enterprise.

Second, Great Western fails to allege a common purpose beyond a conclusory statement that the aim was to "enrich the scheme's founders."  (SAC ¶ 190).  Enrichment is presumably the aim of every business deal, for good or for ill.  Further, the claim of common purpose is undercut by the fact that Ability, allegedly part of the RICO scheme, abruptly (and improperly) withdrew significant assets from Series 2011-C, creating a critical loss of liquidity in Series 2011-C and freezing up the assets of the entire investment structure.  (*See id.* at ¶¶ 113-122, 126.)  Great Western's failure to plead an enterprise is fatal to the RICO claim.

> 2.    *Great Western Fails to Allege that Each Defendant Committed at Least Two Predicate Acts.*

The SAC alleges repeated instances of wire fraud but fails to identify any actual wire fraud and certainly does not do so with the particularity required by Rule 9(b).  *Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc.*, 165 F. Supp. 2d 514, 537 (S.D.N.Y. 2001) (Schwartz, J.) (holding that Rule 9(b) applies with particular force to RICO claims and that plaintiffs must plead with particularity as to each defendant).  For wire fraud, Great Western must plead: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the [] wires to further the scheme."  *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015).  There must also be, at a minimum, the contemplation of some harm or injury.  *Id.*

The essential problem with Great Western's allegations of wire fraud as RICO predicate acts is Great Western's failure to identify any actual fraud.  It alleges only vague conversations occurring over a four-year period between or among any number of defendants, but nothing more.  (*See, e.g.*, SAC ¶ 74.)  Further, Great Western's claims that BCM, BAAM, and Graham's interconnectedness was deliberately concealed (purportedly amounting to fraud), is directly contradicted by the SAC.  BAAM was disclosed in the Trust Agreement.  (*Id.*, Ex. C, § 4.)

24

Great Western admits that it had multiple conversations with Graham over the years, so it clearly was aware that Graham was involved with BAAM.  (*Id.* at ¶ 74.)  Graham also signed the "Incumbency Certificate" attached to the Trust Agreement.  (*Id.*, Ex. C, p. 92.)  The Repurchase Confirmations were all sent to WSFS, signed by Graham on behalf of BCM.  (*Id.* at ¶¶ 93-99.)  Clearly there was no active concealment.

Great Western's allegations about the value of the Repurchase Agreements do not save the SAC.  Great Western suggests that the Repurchase Confirmations were false because Series 2011-C had a value lower than the value of the Repurchase Agreement.  But the Repurchase Confirmations do not make any representations as to the value of Series 2011-C, just its purchase price.  Further, as the SAC makes clear, there were sufficient assets in Series 2011-C to cover the Repurchase Agreement.  (*See id.* at ¶¶ 93-94 (stating that the September 2015 Repurchase Agreement identified collateral of $134.7 million, while the December 2015 valuation of Series 2011-C showed assets of $148.5 million); ¶¶ 98-99 (identifying only the "market value" of Series 2011-C, not total or net assets).)[10]  The fund may have been leveraged, but the SAC pleads no misrepresentation.  Moreover, the nature of the leverage, i.e., long-term or short term, is not alleged.  This, of course, is a critical consideration when attempting to determine the value of Series 2011-C when the Repurchase Confirmation came due.

Perhaps recognizing this deficiency, Great Western has added new allegations to the SAC, stating that, "[b]etween 2012 and 2017, the RICO Enterprises all withdrew significant

---

[10] The Market Value of an investment vehicle is not an analysis of assets or even net assets; that is known as "book value" or "accounting value."  Market value is the measure of what an entity is worth on the open market. Investopedia, *Market Value vs. Book Value*, April 18, 2018 (available at https://www.investopedia.com/articles/investing/110613/market-value-versus-book-value.asp).  Among other things, it takes account of leverage as well as assets.  A fund's book value – the amount of assets subtracted by liabilities – may differ substantially from market value, and total assets differ substantially from both.  *Id.*  In other words, market value is of little use in determining whether Series 2011-C actually held the collateral identified in the Repurchase Confirmations.

amounts of money from the Great Western Trust Account as part of the scheme to defraud Great Western under the auspices of 'management fees' or the like. All of the money and asset transfers occurred via wires." (*Id.* at ¶ 202(e).)  Again, this general, conclusory allegation fails to satisfy the pleading requires of Rule 9(b).

"Allegations of . . . wire fraud acts 'should state the contents of the communications, who was involved, [and] where and when they took place., and [should] explain why they were fraudulent." *Spool v. World Children Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993)).  The complaint must have at least *something* specific that the defense can identify and evaluate.  Generally alleging "wires" and withdrawals made at some undefined point within a six-year period does not satisfy the continuity requirement for Civil RICO.  *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999).

In short, Great Western identifies no transaction that used wires that was actually or even arguably fraudulent and makes no allegations sufficient to support an inference of an intent to deceive.  The allegations that do allege fraud are drafted in the blandest, most generic terms.  Nor does Great Western allege any predicate acts specifically performed specifically by Graham, BCM, or BAAM.  Count Five of the SAC should be dismissed.

### C.  Count Six: Great Western Fails to State a Claim for a Violation of RICO, 18 U.S.C. § 1962(a) against Graham, BCM, and BAAM.

Great Western's allegations that Graham, BCM, and BAAM violated 18 U.S.C. § 1962(a) are confined to three conclusory paragraphs that do nothing more than state the elements of the claim.  (*See* SAC ¶¶ 212-14.)  The claim is supported by no substantive allegations at all.  Count Six should be dismissed.

To state a claim under 18 U.S.C. § 1962(a), Great Western must allege that Graham, BCM, and BAAM: (1) "used or invested racketeering income to acquire or maintain an interest in the alleged enterprise," and (2) that Great Western "suffered an injury *as a result of that investment by defendants*." *Allen v. New World Coffee, Inc.*, No. 00 CIV. 2610 (AGS), 2002 WL 432685, at *2 (S.D.N.Y. Mar. 19, 2002) (Schwartz, J.) (emphasis in original, quotation omitted).

Nothing in the SAC even suggests that Graham, BCM, or BAAM invested anything into the alleged "Enterprise," much less racketeering income invested for the purpose of acquiring or maintaining an interest in the "Enterprise."  It is not even clear what such an investment would have looked like, given that the "Enterprise" is, at best, a loose association of various entities without any centralized funding base.  More to the point, Great Western has not and cannot allege that it suffered any injury as a result of any investment.  The locus of Great Western's alleged injury is that the defendants failed to maintain sufficient acceptable collateral, not that the defendants took over and ruined a going concern.  As Great Western fails to allege that Graham, BCM, or BAAM violated 18 U.S.C. § 1962(a), Count Six should be dismissed.

### D.     Great Western Fails to State a Claim for a Violation of RICO subsection (d) against the Blue Defendants.

As Great Western has not and cannot plead any substantive RICO claim, Count Seven, alleging a RICO conspiracy, should also be dismissed.

Additionally, Count Seven should be dismissed because Great Western fails to "allege facts implying any agreement involving each of the defendants to commit at least two predicate acts," *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990), or facts sufficient to support an inference that each defendant agreed to participate in a conspiracy, *Nasik Breeding*, 165 F. Supp. 2d at 540.  The RICO conspiracy claim particularly fails against Blue Elite Ltd., Blue Elite L.P., and Blue II, who hardly appear in the SAC at all, and never in any

substantive fashion.  The failure to plead any agreement by the Blue Defendants to participate in

a conspiracy should result in the dismissal of the claim.

      **E.     Great Western's Claims of Damages or Reputational Injury and for the Sale of Great Western Should Be Rejected.**

Great Western claims damages for the value of Trust Account assets, harm to its business

reputation, and the forced sale of its business.  But RICO compensates only injury to business or

property.  18 U.S.C. §1964(c).  Thus, Great Western cannot state a claim for damages under

RICO for either the loss of business reputation or "forced sale."

Reputational harm is not cognizable under RICO.  *Burrowes v. Combs*, 312 F. Supp. 2d

449, 452 (S.D.N.Y. 2004) (Rakoff, J.).  As to the "forced sale" of the business, Great Western

alleges that, under pressure from the Utah Department of Insurance, it was sold to the American

Enterprise Group for "pennies on the dollar."  (SAC ¶ 145.)  This is essentially a "loss of value"

argument that cannot form the basis of a RICO injury.  *In re: Gen. Motors LLC Ignition Switch

Litig.*, No. 14-MD-2543 (JMF), 2016 WL 3920353, at *16 (S.D.N.Y. July 15, 2016) (Furman, J.)

(quoting *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228 (2d Cir. 2008)).  A RICO injury

must be quantifiable.  *Chevron Corp. v. Donziger*, 833 F.3d 74, 139-40 (2d Cir. 2016).

Intangible "loss of value" claims are a form of "expectation" injury.  *In re: Gen. Motors*, 2016

WL 3920353, at *16.  Such expectation injuries "cannot constitute 'business or property' under

RICO."  *Villoldo v. BNP Paribas S.A.*, 648 F. App'x 53, 55 (2d Cir. 2016).

Thus, Great Western's cognizable RICO damages, were it even able to state a RICO

claim, are confined solely to the quantifiable loss to the Trust Account.

**VIII.   Count 11: Great Western's Unjust Enrichment Claims Should Be Dismissed.**

Great Western's claim for unjust enrichment also fails, because "an unjust enrichment

claim is barred 'if there is a valid contract governing the subject matter of the dispute, *even if one*

*of the parties to the claim is not a party to that contract.*'"  *Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 207 (S.D.N.Y. 2016) (Buchwald, J.) (emphasis in original) (quoting *Vista Food Exch., Inc. v. Champion Foodservice, LLC*, 124 F. Supp. 3d 301, 312 (S.D.N.Y. 2015) (collecting cases)).

Here, Great Western has expressly pled the existence of a contract governing the entirety of the subject matter at issue—namely, the parties' rights and obligations under the Coinsurance, Novation, and Trust Agreements.  (SAC ¶¶ 64-67 & Ex. C.)  The existence of written contracts covering the subject of the unjust enrichment claim means the unjust enrichment claim must fail.

Additionally, Great Western fails to plead that any Blue Defendant has been unjustly enriched.  To plead a claim for unjust enrichment under New York law, "a plaintiff must allege that '(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover.'"  *Mueller*, 225 F. Supp. 3d at 207 (quoting *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011)).  Great Western claims that it "does not know the whereabouts of the over $135 million that should be in the Trust Account," although Alpha Re had no obligation, under any agreement, to maintain such cash assets.  (SAC ¶ 7.)  It makes no allegation, however, that Graham, Blue Elite Ltd., Blue Elite L.P., or Blue II were ever unjustly enriched by any of Great Western's funds.  As for BAAM and BCM, it alleges only that, from September 2012 to March 2017, they received a combined total of $15.9 million from sources specified only as the "Alpha Re Reinsurance Trusts," a term that is never defined, could mean literally anything, and apparently includes non-Alpha Re related entities, such as Series 2011-C.  (*Id.* at ¶ 104.)

Equally unavailing is Great Western's claim that BAAM received an "incentive fee" from Blue Elite Ltd., out of funds that should have been reserved for Great Western.  (*Id.* at

¶ 105).  Aside from a few conclusory allegations, Great Western offers no facts as to the amount of Alpha Re funds invested in Blue Elite Ltd., when those funds were invested, the value of Blue Elite Ltd. at the time the alleged payment was made, or any other fact to support an inference that Great Western has a claim to Blue Elite Ltd. assets.

Finally, Blue Elite Ltd., Blue Elite L.P., and Blue II all lack a sufficient relationship with Great Western for Great Western to assert a claim of unjust enrichment.  *Mandarin Trading, Inc.*, 16 N.Y.3d at 182 (holding that "a claim [for unjust enrichment] will not be supported if the connection between the parties is too attenuated").  Great Western was separated from Blue Elite Ltd., Blue Elite L.P., and Blue II by multiple levels of investment, including the Trust Account and Series 2011-C.  Furthermore, the SAC alleges no facts that "indicate a relationship between the parties that could have caused reliance or inducement[,]" further dooming the claim.  *Id.* at 183.  The reality, as evidenced by the SAC, is that Great Western and Blue Elite Ltd., Blue Elite L.P., and Blue II "simply had no dealings with each other," and certainly not dealings that "could have caused reliance or inducement."  *Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 517-18 (N.Y. 2012) (quotation omitted).

Given the myriad deficiencies in the unjust enrichment claim as a matter of law, Count 11 should be dismissed for failure to state a claim.

## CONCLUSION

Great Western fails to correctly plead any of its causes of action against the Blue Defendants.  This entire overblown SAC is no more than a predictable attempt to magically transform an already adjudicated contract claim into a newer and better fraud claim.  This tactic should be rejected.  This is not a fraud case and certainly not a claim appropriate for the imposition of treble damages and attorney's fees.  The SAC should be dismissed in its entirety against the Blue Defendants with prejudice.

Dated: February 5, 2019            By:    <u>/s/ Eric R. Breslin</u>
      Newark, New Jersey                 Eric R. Breslin
                                          P. Ryan McElduff
                                          Melissa S. Geller
                                          Leah A. Mintz (admitted *pro hac vice*)
                                          **DUANE MORRIS LLP**
                                          **A Delaware Limited Liability Partnership**
                                          One Riverfront Plaza
                                          1037 Raymond Blvd., Suite 1800
                                          Newark, NJ 07102-5429
                                          Telephone: +1 973 424 2000
                                          Fax: +1 973 424 2001
                                          *Attorneys for Mark Graham, Blue Capital*
                                          *Management, Inc., Blue Alternative Asset*
                                          *Management, LLC, Blue Elite Fund, Ltd.,*
                                          *Blue Elite Fund, L.P., Blue II, Ltd.*