**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
GREAT WESTERN INSURANCE COMPANY,⋮

                   Plaintiff,      ⋮    Civil Action No. 18-cv-06249-VSB

     vs.⋮

MARK GRAHAM, DONALD SOLOW, BLUE ⋮    Hon. Vernon S. Broderick
CAPITAL MANAGEMENT, INC., BLUE ⋮
ALTERNATIVE ASSET MANAGEMENT LLC, ⋮
WILMINGTON SAVINGS FUND SOCIETY, ⋮
FSB, CHRISTIANA TRUST, REGATTA ⋮
HOLDINGS LLC, CYGNET 001 MASTER ⋮
TRUST, CYGNET 001 MASTER TRUST SERIES ⋮
2011-A, CYGNET 001 MASTER TRUST SERIES ⋮
2011-C, CYGNET 001 MASTER TRUST SERIES ⋮
2013-A, ALPHA RE LIMITED, ALPHA RE ⋮
HOLDINGS (CAYMAN) LIMITED, ATLANTIC ⋮
SPECIALTY FINANCE, BLUE ELITE FUND ⋮
LTD., BLUE ELITE FUND LP, BLUE II LTD., ⋮
SANCUS CAPITAL BLUE CREDIT ⋮
OPPORTUNITIES FUND LTD., ABILITY ⋮
INSURANCE COMPANY, JOHN DRAKE, ⋮
EDWARD BRENDAN LYNCH, GREGORY ⋮
TOLARAM, ADVANTAGE CAPITAL HOLDING⋮
LLC, DAN CATHCART, AND KENNETH KING.⋮

              Defendants.    ⋮

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS**
**ABILITY INSURANCE COMPANY, ADVANTAGE CAPITAL HOLDING LLC, DAN**
**CATHCART, AND KENNETH KING'S MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 2

LEGAL STANDARD......................................................................................................... 6

ARGUMENT ...................................................................................................................... 7

    I.    GREAT WESTERN PROPERLY PLED ITS CLAIM FOR AIDING AND
        ABETTING BREACH OF FIDUCIARY DUTY AGAINST ACH, KING,
        AND CATHCART (COUNT TWO).................................................................. 7

        A.    "Knowledge" Of A Breach of Fiduciary Duty. .................................... 7

        B.    Substantial Assistance..................................................................... 9

        C.    Proximate Cause ........................................................................... 11

    II.    GREAT WESTERN PROPERLY PLED ITS CLAIM FOR AIDING AND
        ABETTING FRAUD AGAINST ACH, KING, AND CATHCART (COUNT
        FOUR). ....................................................................................................... 11

    III.    GREAT WESTERN PROPERLY PLED ITS CLAIM FOR UNJUST
        ENRICHMENT AGAINST THE ABILITY DEFENDANTS (COUNT
        ELEVEN).................................................................................................... 13

        A.    The Ability Defendants and Great Western Have a Sufficient Relationship for an
            Unjust Enrichment Claim. ............................................................ 14

        B.    Great Western's Pleadings Satisfy New York's "Equity and Good Conscience"
            Requirement for an Unjust Enrichment Claim. ............................... 18

    IV.    GREAT WESTERN HAS PROPERLY PLED CONVERSION AGAINST
        ABILITY (COUNT TWELVE)................................................................... 20

CONCLUSION................................................................................................................. 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Allou Distribs., Inc.*,
  387 B.R. 365 (Bankr. E.D.N.Y. 2008)......................................................................8

*Banco Indus. De Venezuela, C.A. v. CDW Direct, LLC*,
  888 F. Supp. 2d 508 (S.D.N.Y. 2012)....................................................................22

*Bank of Am. Corp. v. Lemgruber*,
  385 F. Supp. 2d 200 (S.D.N.Y. 2005)....................................................................18

*Belin v. Weissler*,
  No. 97-8787, 1998 WL 391114 (S.D.N.Y. July 14, 1998)....................................18

*BLT Rest. Grp. LLC v. Tourondel*,
  855 F. Supp. 2d 4 (S.D.N.Y. 2012) .......................................................................23

*Brass v. Am. Film Techs., Inc.*,
  987 F.2d 142 (2d Cir. 1993).....................................................................................5

*Calcutti v. SBU, Inc.*,
  224 F. Supp. 2d 691 (S.D.N.Y. 2002)......................................................................5

*Caprer v. Nussbaum*,
  36 A.D.3d 176 (2d Dept. 2006) .............................................................................10

*Chen v. New Trend Apparel, Inc.*,
  8 F. Supp. 3d 406 (S.D.N.Y. 2014) ..................................................................14, 17

*Childers v. N.Y. & Presbyterian Hosp.*,
  36 F. Supp. 3d 292 (S.D.N.Y. 2014)......................................................................20

*Cohen v. BMW Invs. L.P.*,
  144 F. Supp. 3d 492 (S.D.N.Y. 2015)....................................................................16

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991).......................................................................................5

*Encore Preakness, Inc. v. Chestnut Health & Rehab. Grp., Inc.*,
  No. N17C-03-1677, 2017 WL 5068753 (Del. Super. Ct. Nov. 1, 2017)................16

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*,
  375 F.3d 168 (2d Cir. 2004).....................................................................................6

*Galasso, Langione, & Botter, LLP v Galasso,*
   43 N.Y.S.3d 767 (2016)................................................................................21

*Granite Partners, L.P v. Bear, Stearns & Co.,*
   58 F. Supp. 2d 228 (S.D.N.Y. 1998)...........................................................10

*Grund v. Del. Charter Guarantee & Tr. Co.,*
   788 F. Supp. 2d 226 (S.D.N.Y. 2011)..........................................................14

*JP Morgan Chase Bank v. Winnick,*
   406 F. Supp. 2d 247 (S.D.N.Y. 2005).........................................................12

*Kaufman v. Cohen,*
   307 A.D.2d 113 (2003) ...............................................................................7, 9

*Kolodin v. Valenti,*
   147 A.D.3d 459 (1st Dept. 2017)..................................................................22

*Kottler v. Deutsche Bank AG,*
   607 F. Supp. 2d 447 (S.D.N.Y. 2009).........................................................12

*Krasner v. Rahfco Funds LP,*
   No. 11 CV 4092(VB), 2012 WL 4069294 (S.D.N.Y. Aug. 9, 2012) ............22

*Lerner v. Fleet Bank, N.A.,*
   459 F.3d 273 (2d Cir. 2006).......................................................................7, 8

*Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.,*
   87 F.3d 44 (2d Cir. 1996)..............................................................................22

*Meyer v. Jinkosolar Holdings Co.,*
   761 F.3d 245 (2d Cir. 2014)............................................................................6

*In re Monahan Ford Corp. of Flushing,*
   340 B.R. 1 (Bankr. E.D.N.Y. 2006)......................................................7, 9, 10

*Myun-Uk Choi v. Tower Research Capital LLC,*
   890 F.3d 60 (2d Cir. 2018)............................................................................14

*Newbro v Freed,*
   409 F Supp 2d 386 (S.D.N.Y. 2006)m ....................................................20, 21

*Nielsen v. Rabin,*
   746 F.3d 58 (2d Cir. 2014)..............................................................................6

*Overton v. Art Fin. Partners LLC,*
   166 F. Supp. 3d 388 (S.D.N.Y. 2016)......................................................14, 17

*Oxon Italia, S.p.A. v. Farmland Indus., Inc.*,
   546 F. Supp. 681 (S.D.N.Y. 1982) ..........................................................................21

*Petrone v Davidoff Hutcher & Citron, LLP*,
   150 A.D.3d 776 (2d Dept. 2017) ..............................................................................21

*Scheuer v. Rhodes*,
   416 U.S. 232 (1974) ....................................................................................................6

*Simpson & Simpson PPLC v. Lippes Mathias Wexler Friedman LLP*,
   130 A.D.3d 1543 (4th Dept. 2015) ...........................................................................21

*In re Stillwater Asset Backed Offshore Fund Ltd.*,
   559 B.R. 563 (Bankr. S.D.N.Y. 2016) ......................................................................22

*Sweet v. Sheahan*,
   235 F.3d 80 (2d Cir. 2000) ...........................................................................................6

*United Health All., LLC v. United Med., LLC*,
   No. 7710-VCP, 2014 WL 6488659 (Del. Ch. Nov. 20, 2014) ..................................16

*Valentini v. Citigroup, Inc.*,
   837 F. Supp. 2d 304 (S.D.N.Y. 2011)........................................................................22

*Villager Pond, Inc. v. Town of Darien*,
   56 F.3d 375 (2d Cir. 1995) ...........................................................................................6

## Other Authorities

Fed. R. Evid. 201(b)(2) .......................................................................................................5

Rule 12(b)(6) ........................................................................................................................6

Utah Admin. Code R590-173-10(A)(4)(a) ........................................................................19

Plaintiff Great Western Insurance Company ("Great Western") submits this Memorandum of Law in Opposition to the Motion to Dismiss the Specific Claims Pleaded Against Movants ("Motion") filed by Defendants Ability Insurance Company ("Ability"), Advantage Capital Holding LLC ("ACH"), Dan Cathcart ("Cathcart"), and Kenneth King ("King") (collectively, the "Ability Defendants").

## INTRODUCTION

Great Western has been the victim of a massive fraud.  Great Western filed this action because over $135 million that was entrusted to defendants to be available to meet coinsurance obligations on Great Western insurance policies is unaccounted for.  Every single one of the defendants to this action had some combination of legal, fiduciary and/or contractual obligations related to the missing funds.  Every single one of the defendants to this action played a role in the disappearance of those funds.  Yet, not a single one of the defendants to this action has even tried to explain, either before or after Great Western filed this action, what happened to those funds.  And every single one of the defendants to this action has denied, either in this action or the reinsurance arbitration that preceded it, any responsibility for the disappearance of those funds.

The Ability Defendants have longstanding ties—which continue to this day—to the other defendants that were instrumental in (a) positioning the other defendants so that they could gain control over Great Western's funds, and (b) positioning the Ability Defendants to withdraw $109 million from defendant Cygnet 001 Master Trust Series 2011-C ("Series 2011-C"),  a series trust account where other defendants comingled Ability and Great Western's trust assets, thereby resulting in the Ability Defendants withdrawing funds that belong to Great Western.  ***Thus,***

1

***Ability, its parent company ACH, and its directors/officers Cathcart and King have possession***

***of a substantial portion of Great Western's missing money.***

The allegations in the Second Amended Complaint ("SAC") clearly meet the legal standard for pleading aiding and abetting a breach of fiduciary duty against ACH, King, and Cathcart (Count Two), aiding and abetting fraud against ACH, King, and Cathcart (Count Four), unjust enrichment against all Ability Defendants (Count Eleven), and conversion against Ability (Count Twelve).

## STATEMENT OF FACTS

In 2009, Great Western entered into a Coinsurance Agreement with Ability Reinsurance (Bermuda) Limited ("Ability Re").  Cathcart, Ability Re's Chief Financial Officer, negotiated the Coinsurance Agreement on behalf of Ability Re.

In early 2012, Ability Re informed Great Western that it was exiting the reinsurance business and recommended that Great Western move its reinsurance to Defendant Alpha Re Limited (Cayman) ("Alpha").  (SAC at ¶ 63.)  In early 2012, Cathcart introduced Great Western to defendants Alpha, Mark Graham ("Graham"), and Don Solow ("Solow"). Cathcart vouched for Graham and said that many of the members of Ability Re's Board of Directors invested with Graham and earned terrific returns on their investments.  (*Id.*)  At the same time, Great Western requested to buy back its ceded book of business from Ability Re, but Cathcart refused the offer, asserting that Alpha had offered Ability Re more money to buy the business than Great Western could afford to pay.  (*Id.*)  Shortly thereafter, Great Western signed the Novation Agreement with Alpha.  (*Id.* at ¶¶ 64, Ex. B.)

Unbeknownst to Great Western, defendants Graham, Solow and Alpha were assisting ACH in acquiring Ability at the same time Ability Re and Cathcart were pressuring Great

Western into a reinsurance relationship with Alpha.  (SAC at ¶ 68.)  As a condition of ACH's acquisition of Ability, ACH was required to add $5.75 million to Ability's surplus.  (*Id.*)  Alpha assisted ACH with its acquisition of Ability by (1) providing Ability with $2.25 million of the $5.75 million surplus infusion in the form of a surplus note, (2) entering into a new Coinsurance Agreement, effective 12/31/2012, reinsuring 20% of Ability's LTC Medico policies with Alpha, and (3) paying Ability Re a commission for the novation of the Great Western business – money that was then used to fund a $20 million trust with Ability as the beneficiary.  (*Id.*)

The Ability Defendants' characterization of Ability and Ability Re as "indisputably [] distinct entities since 2013" (Doc. 135, cited herein as "Memorandum" at 6, fn. 3) is misleading and self-serving.  It ignores the fact that Ability and Ability Re were owned by the same entity, Ability Reinsurance Holding Limited, from 2007 until February 25, 2013, and were controlled by the same person, Cathcart.  It also ignores the fact that, on February 25, 2013, Advantage Capital Holding, LLC (owned by King) purchased Ability.  Therefore, Ability was already positioned to benefit from Great Western's relationship with Alpha Re, and the incestuous relationships between Ability and many of the other defendants were already well established.

By 2016, the financial scheme concocted to bilk Great Western was crumbling.  (*See* SAC at ¶¶ 6, 113-129.)  The events that followed conclusively rebut Ability's cynical and, at this stage, legally untenable protestations of innocence:

- In early September 2016, Great Western contacted Cathcart to see if Ability knew about the SEC's investigation into Alpha, Graham, Solow, Blue Alternative Asset Management, Blue Elite Fund, and others.  Cathcart told Great Western he did not know about the investigation and that Ability's reinsurance relationship with Alpha was "going smoothly."  (*See* SAC at ¶ 113.)  This turned out to be not true.

- Soon thereafter, King reached out to Great Western and told them he would "get to the bottom" of the SEC investigation.  Great Western told King that Graham and Alpha refused to show Great Western any details about the underlying investments

supporting the repurchase agreements in Great Western's Trust Account. (*See* SAC at ¶ 114.)

- Within a few weeks, Cathcart informed Great Western that Graham had given King a view of the investments and reassured Great Western that Ability was not concerned about any of its reinsurance investments with Alpha.  (*See* SAC at ¶ 115.)  This also turned out to be not true.

- Based on the insider information Cathcart and King received from Graham, Ability withdrew $109 million from Series 2011-C.  Unbeknownst to Great Western at the time, Graham and Solow comingled Ability and Great Western's trust account funds together in Series 2011-C.  (*See* SAC at ¶¶ 6, 116.)  ***Therefore, when Ability withdrew $109 million (the vast majority of the assets in the account), much of the money withdrawn belonged to Great Western, not Ability***.

- In December 2016, an entity named Alpha Re (US)—the US-version of defendant Alpha that was owned and operated by Solow—changed its name to Vista Life & Casualty Reinsurance Company ("Vista Re").  Solow specifically stated that the reason for this change was to insulate the U.S. entity from any reputational damage that might be incurred in the event the Cayman regulatory authorities took action against Alpha.  (*See* SAC at ¶ 123.)

- On December 31, 2016, one month after Ability withdrew $109 million from Series 2011-C, Ability signed a new coinsurance agreement with Vista Re (owned by Solow).  Under Ability's coinsurance agreement with Alpha (owned, in part, by Solow)—which remained in-force even after the $109 million withdrawal—Ability ceded 20% of its business to Alpha under a quota share.[1]  Now, under the new coinsurance agreement, Ability agreed to cede an additional 40% of its business to Vista Re; ***tripling*** the amount of its business it ceded to entities owned or controlled by Solow to 60%.  (*See* SAC at ¶ 124.)

- On March 24, 2017, Cathcart (former CFO of Ability Re, current director of Ability), King (Director, CEO and President of Ability), and Ian Kilpatrick (owner and director of Ability), who directed and negotiated the withdrawal of $109 million from Series 2011-C with Solow and Graham (and entities they both own and control), joined the board of directors for defendant Blue Elite Fund LP (which is owned and operated by Graham).  (*See* SAC at ¶125.)  ***Importantly, this means***

---

[1] A quota share coinsurance agreement means the reinsurer pays a percentage of every dollar the cedent pays in claims.  For instance, a 20% quota share means the reinsurer is obligated to pay $0.20 of every dollar, and the cedent pays $0.80.

*that Cathcart, King, and Kilpatrick joined the Blue Elite Fund board after learning that the SEC was investigating Blue Elite Fund (among others).*

- On March 30, 2017, Atlantic Coast Life Insurance Company (owned by ACH and King, and run by Cathcart), along with SQN Fund IV, purchased the surplus note from Alpha for $2.25 million.  (*See* SAC at ¶ 127.)  This meant that Ability now owed Atlantic Coast Life Insurance Company $2.25 million.

- According to Ability's Form-Y Annual Statement for the Year Ended December 31, 2017, filed with the Nebraska Department of Insurance, Ability is a wholly-owned subsidiary of ACH, which owns 80% of defendant Sancus Blue Credit Opportunities Fund Ltd. ("Sancus").[2]  Sancus is one of the investment vehicles into which Graham and Solow (through the entities they controlled) invested Great Western's $135+ million.  (*See* SAC at ¶ 128.)  This means that Ability and its directors and officers (through ACH) controlled part of, and profited from, Great Western's $135+ million.

- Lest there be any doubt as to the intimate connection between these entities, King is the Chairman & CEO of A-Cap Holdings, and Cathcart is "Head of M&A/CEO of Atlantic Coast Life."  As of December 31, 2017, King was the President and CEO of Ability, and both Cathcart and King were listed as "Directors/Trustees" of Ability.  (*See* SAC at ¶ 129.)

---

[2] In deciding Ability's Motion, this Court may utilize "documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir. 1993); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir. 1991); *Calcutti v. SBU, Inc.,* 224 F. Supp. 2d 691, 696 (S.D.N.Y. 2002). Rule 201 of the Federal Rules of Evidence generally permits a court to take judicial notice of any facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

## **LEGAL STANDARD**

A motion to dismiss pursuant to Rule 12(b)(6) must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). When deciding a motion to dismiss under Rule 12(b), this Court must "accept[ ] all factual allegations [in the complaint] as true and draw[ ] all reasonable inferences in favor of the plaintiff." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014) (alterations in original); *accord Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer,* 416 U.S. at 236). In other words, "'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.,* 375 F.3d 168, 176 (2d Cir. 2004) (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir. 1980)). Dismissal is only appropriate when "it appears beyond doubt that the [claimant] can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir. 2000); *accord Eternity Glob. Master Fund Ltd.,* 375 F.3d at 176-77.

As discussed herein, the Ability Defendants have not met and cannot meet their burden under Rule 12(b)(6), and their Motion should be denied.

## ARGUMENT

**I.    GREAT WESTERN PROPERLY PLED ITS CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST ACH, KING, AND CATHCART (COUNT TWO).**

To state a claim for aiding and abetting a breach of fiduciary under New York law, the plaintiff must allege: (1) a breach of a fiduciary duty, of which the aider and abettor had knowledge, (2) that the defendant provided substantial assistance to the breach, and (3) that plaintiff suffered damage as a result of the breach. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294-95 (2d Cir. 2006); *Kaufman v. Cohen*, 307 A.D.2d 113, 126 (2003).  Great Western has done so.

### A.  **"Knowledge" Of A Breach of Fiduciary Duty.**

ACH, King, and Cathcart do not dispute that Great Western properly pled that Blue Alternative Asset Management ("BAAM") and Graham, among other defendants, breached fiduciary duties owed to Great Western.  (SAC ¶¶ 165-171.)  (*See* discussion at Memorandum of Law in Opposition to Graham and Blue Entities' Motion to Dismiss ("Graham Opposition Memorandum"), Section II.B.)  ACH, King, and Cathcart only challenge the SAC as to the second part of the first element:  arguing that Great Western did not properly plead that the three defendants had knowledge of BAAM, Graham, and others' breach of fiduciary duty to Great Western.  (*See* Memorandum at 11.)

The "knowledge" prong is satisfied if the individual has "knowledge as to the primary violator's status as a fiduciary and knowledge that the primary's conduct contravenes a fiduciary duty." *In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 43 (Bankr. E.D.N.Y. 2006) (citation omitted).  This means, as the Second Circuit has held, that knowledge of a fiduciary comingling funds (which is clearly a breach of a fiduciary duty) is sufficient to satisfy the "knowledge" prong of aiding and abetting a breach of fiduciary duty.  *See Lerner*, 459 F.3d at 294-95 (2d Cir.

2006).  In *Lerner*, the plaintiff alleged that the defendants knew that a law firm had overdrawn and bounced numerous checks out of bank accounts to which the law firm owed a fiduciary duty. *Id.* at 294.  Based on these alleged facts, the Second Circuit held that "comingling of funds was not only an ***indication*** of a breach of fiduciary duty—it was, in and of itself, a breach," and, therefore, defendants had "knowledge" of the law firm's breach of fiduciary duty.  *Id*. (emphasis supplied); *see also In re Allou Distribs., Inc.*, 387 B.R. 365, 410 (Bankr. E.D.N.Y. 2008).

This is precisely what Great Western has alleged here.  ACH, Cathcart, and King knew of Alpha, Graham, and other defendants' fiduciary relationships to Great Western based on Ability Re's (a) previous role as Great Western's reinsurer, (b) long-standing and continuing connections to Alpha, Graham, Solow, and other defendants, and (c) subsequent conversations with Great Western, including those in late 2016.  (SAC at ¶¶ 60-68; 113-14.)  Moreover, ACH, Cathcart, and King received "inside information" from Graham and others in late 2016 about the status of investments in Series 2011-C, which showed Series 2011-C was significantly underfunded and that, therefore, Graham and others had repeatedly provided Great Western with false statements about its Trust Account assets.  (*Id.* at ¶¶ 115-16; 175-76.)  This knowledge is what caused King and Cathcart to lie to Great Western about the status of Graham's investments, and immediately withdraw $109 million from Series 2011-C, most of which was Great Western's Money.[3]  (*Id.* at ¶¶ 115-18.)

---

[3] In 2012, Graham, acting through BAAM as the Investment Manager of the Great Western Trust Account, entered into multiple Repurchase Agreements, whereby $148 million was transferred from the Trust Account to Series 2011-C. In exchange, the Trust Account (for which Great Western was the sole beneficiary) was supposed to receive ownership of collateral in the Series 2011-C trust account. These assets are collectively referred to herein as "Great Western's Money."

Thus, Great Western has alleged that ACH, King, and Cathcart had knowledge of Graham and others' "status as a fiduciary" to Great Western, and that Graham and others' "conduct contravene[d] a fiduciary duty." *In re Monahan Ford Corp.*, 340 B.R. at 43.

ACH, King, and Cathcart argue that "suspected fraudulent activity … do[es] not raise an inference of actual knowledge of [the] fraud." (*See* Memorandum at 11.) However, this has nothing to do with the "knowledge" prong for aiding and abetting breach of fiduciary duty, as the only case cited by defendants for this proposition ***does not even involve a claim for aiding and abetting breach of fiduciary duty***. *See id.* (quoting and citing *Ryan v. Hunton & Williams*, No. 99-5938, 2000 WL 1375265 (E.D.N.Y. Sep. 20, 2000)).

**B.   Substantial Assistance**

The second element of aiding and abetting breach of fiduciary duty—providing "substantial assistance"—is not a high bar.  Rather, "[s]ubstantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Kaufman*, 307 A.D.2d at 126.

As alleged, ACH, King, and Cathcart helped conceal the breach of fiduciary duty by Graham, BAAM, and others by (a) telling Great Western that they would speak to Graham and "get to the bottom" of concerns regarding money managed by Graham for Ability and Great Western, (b) receiving "inside information" regarding the status of Graham's investment, which prompted the Ability Defendants to immediately start the process of withdrawing $109 million from Series 2011-C, and (c) lying to Great Western that they felt "comfortable" with Graham's investments, even though the Ability Defendants had already started the process of withdrawing money from Series 2011-C.  (SAC at ¶¶ 113-15.)  These false statements to Great Western about the status of Graham's investments affirmatively assisted and helped conceal Graham, BAAM, and others' breach of fiduciary duty to Great Western and prolong their scheme.

In protestation to "substantial assistance," ACH, Cathcart, and King wholly misstate New York law in one instance, and discuss irrelevant New York law in another.

*First*, ACH, Cathcart, and King reserve a whole subsection of their substantial assistance argument (titled "No Justifiable Reliance") for their argument that Great Western could not reasonably have relied on any statements by ACH, Cathcart, and King.  (*See* Memorandum at 13-14.)  However, ***there is absolutely no requirement for pleading justifiable reliance under New York law***.  ACH, Cathcart, and King did not cite to any cases that identify justifiable reliance as an element of aiding and abetting a breach of fiduciary duty.  In fact, the only case cited in the subsection titled "No Justifiable Reliance"—*Granite Partners, L.P v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228 (S.D.N.Y. 1998)—is a case ***that does not even include a claim for aiding and abetting breach of fiduciary duty***.  The discussion in that case about justifiable reliance relates to a claim for common law fraud, and is completely irrelevant.  *Id.* at 259-60.

*Second*, ACH, Cathcart, and King argue that Great Western "fails to allege, ***as it must***, any requirement to act to 'alert' GWIC as a claimed ongoing breach of fiduciary duty." (Memorandum at 13.) (emphasis added).  However, a plaintiff must only allege a duty to act if the "substantial assistance" prong is predicated on a failure to act.  *In re Monahan Ford Corp.*, 340 B.R. at 43 ("However, the inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.").  Where as here, substantial assistance is based on the other two types of substantial assistance—affirmative assistance or concealment—then the plaintiff need not allege any duty on behalf of the aider and abettor.  *See Caprer v. Nussbaum*, 36 A.D.3d 176, 193 (2d Dept. 2006) (holding that aiders and abettors are liable for the breach, even if they have "no independent fiduciary obligation to the

allegedly injured party, if the alleged aider/abettor rendered 'substantial assistance' to the fiduciary in the course of effecting the alleged breaches of duty") (citation omitted).

### C.  **Proximate Cause**

The last element of aiding and abetting breach of fiduciary duty is proximate cause. Great Western alleged that the investigation by King and Cathcart into Graham's investments— and their subsequent false statements that they were comfortable with Graham's investments— reassured Great Western about the then current state of its Trust Account.  (SAC at ¶¶ 113-15.) In doing so, King and Cathcart allowed the Ability Defendants to race to grab the funds in the Series 2011-C account and to withdraw $109 million, much of which was Great Western's Money.

ACH, King, and Cathcart argue that these false statements could not have proximately caused Great Western's injury, as "the breaches of fiduciary duty took place over almost five years, from June 2012 until early 2017."  (Memorandum at 14.)  But this is simply not true, plus, acceptance of this argument would require the Court to construe the SAC and to draw inferences therefrom *against* Great Western – which is impermissible.  As alleged in the SAC, ACH, King, and Cathcart's false statements to Great Western occurred when the Series 2011-C account had at least $109 million (if not, more) in it.  (SAC at ¶¶ 115-116.)  Of course statements by ACH, King, and Cathcart that deceived Great Western about the state of its investments caused significant damage to Great Western.

## II.  <u>GREAT WESTERN PROPERLY PLED ITS CLAIM FOR AIDING AND ABETTING FRAUD AGAINST ACH, KING, AND CATHCART (COUNT FOUR).</u>

Similar to aiding and abetting a breach of fiduciary duty, to state a claim for aiding and abetting fraud under New York law, Great Western must allege: "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3)

substantial assistance by the aider and abettor in achievement of the fraud." *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 464 (S.D.N.Y. 2009).  It has done so.

*First*, as alleged in the SAC, Great Western was the victim of systemic fraud.  (SAC at ¶¶ 1-7, 178-81.)  *See* discussion at Introduction and Statement of Facts, above; *see also* Graham Opposition Memorandum at Section II.D.

*Second*, ACH, King, and Cathcart had knowledge of such fraud.  As alleged, in September 2016, King and Cathcart told Great Western they would "get to the bottom" of the status of Graham's investments of Great Western's Money and spoke with Graham about the status of the investments.  (SAC at ¶¶ 114-115.)  This conversation provided ACH, King, and Cathcart with insights into Graham's activities, and as a result they learned (if they did not already know) what was in Series 2011-C (or, put more accurately, what was ***not*** in Series 2011-C).  Thereafter, ACH, King, and Cathcart immediately began the process of withdrawing $109 million from Series 2011-C.  (SAC at ¶ 16.)

*Third*, for aiding and abetting fraud, "[t]he substantial assistance element has been construed as a causation concept, requiring that the plaintiff allege that the acts of the aider and abettor proximately caused the harm upon which the primary liability is predicated."  *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005) (alteration in original).  "Substantial assistance can take many forms … executing transactions, even ordinary course transactions, can constitute substantial assistance under some circumstances, such as where there is an extraordinary motivation to aid the fraud."  *Id.* at 257 (omission in original).

Here, as alleged in the SAC, ACH, Cathcart, and King's false statements regarding the "comfort" they received from Graham regarding his investments affirmatively assisted and further concealed Graham and others' systemic fraud – allowing it to continue.  (SAC at ¶¶ 114-

117.)  Great Western's allegations here are very specific, and detail the what (lies about comfort with Graham's investments), the who (King and Cathcart—directors of ACH), and the when (September 2016).  (*Id.*)

As with aiding and abetting breach of fiduciary duty, ACH, King, and Cathcart repeat the same two wholly incorrect arguments: (1) that Great Western could not "justifiably rely" on their statements regarding Graham's investments; and (2) ACH, King, and Cathcart had "no duty to make disclosures" to Great Western.  (*See* Memorandum at 16-17.)  As explained above at pages 10-11, ***there is absolutely no requirement for pleading justifiable reliance under New York law*** for aiding and abetting fraud, and there is no requirement for duty since Great Western's allegations for "substantial assistance" are based on affirmative action and concealment, not a duty to act.

*Lastly*, ACH, King, and Cathcart do not challenge the proximate cause prong of aiding and abetting fraud.  Nevertheless, Great Western points out that, similar to aiding and abetting breach of fiduciary duty, but for ACH, King, and Cathcart's false statements to Great Western about the status of Graham's investments when a large amount of money remained in the Series 2011-C account (as evidence by the Ability Defendants' withdrawal of $109 million), Great Western would not have been deceived into thinking their investments with Graham were safe.

## III.   GREAT WESTERN PROPERLY PLED ITS CLAIM FOR UNJUST ENRICHMENT AGAINST THE ABILITY DEFENDANTS (COUNT ELEVEN).

In Count Eleven of the SAC, Great Western alleges that the Ability Defendants have been unjustly enriched in connection with their withdrawal of approximately $109 million from Series 2011-C, much of which was Great Western's Money.  (SAC at ¶¶ 244-47.)

To maintain a claim for unjust enrichment under New York law, a plaintiff must simply plead that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good

conscience militate against permitting defendant to retain what plaintiff is seeking to recover."

*See Overton v. Art Fin. Partners LLC*, 166 F. Supp. 3d 388, 403 (S.D.N.Y. 2016).  The Ability

Defendants do not dispute that Great Western has properly pled the first two elements.  Instead,

the Ability Defendants argue that Great Western's claim for unjust enrichment fails because (a)

the Ability Defendants and Great Western did not have the "requisite relationship"

(Memorandum at 17-21), and (b) the Ability Defendants exercised Ability's contractual right to

withdraw the $109 million, "negating" a finding that the Ability Defendants' conduct offends

equity and good conscience.  (*Id.* at 21-22.)  Both of these arguments are meritless.

### A.  <u>The Ability Defendants and Great Western Have a Sufficient Relationship for an Unjust Enrichment Claim.</u>

Under New York law, "[g]iven that unjust enrichment is a claim in quasi-contract, it

requires some relationship between plaintiff and defendant."  *Overton*, 166 F. Supp. 3d at 403

(citation omitted).  However, "some relationship" is a "modest" requirement that only requires

"[a] claim will not be supported if the connection between the parties is too attenuated."  *Myun-*

*Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (citation omitted)

(reversing the district court's dismissal of plaintiff's unjust enrichment claim because plaintiff

did not need to show the parties had a "direct relationship"); *Grund v. Del. Charter Guarantee &*

*Tr. Co.*, 788 F. Supp. 2d 226, 251 (S.D.N.Y. 2011) ("Unjust enrichment does not require a direct

relationship between the parties.").  "The [New York] Court of Appeals has observed that the

nexus between parties is too attenuated if the parties 'simply had no dealings with each other'. .

."  *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 464 (S.D.N.Y. 2014) (quoting *Georgia*

*Malone & Co., Inc. v. Rieder,* 19 N.Y.3d 511, 517–18 (2012)).

As alleged in the SAC, Great Western and the Ability Defendants had significant

dealings with each other over the years:

- From 2009 – 2012, Ability Re served as Great Western's reinsurer.  This resulted in a close business relationship between Great Western and Ability Re and Cathcart (Chief Financial Officer of Ability Re).  (SAC at ¶¶ 60, 63, 125.)

- In early 2012, Cathcart introduced Great Western to Alpha, Graham, and Solow, vouching for them and their business expertise.  Great Western offered to go a different direction and to buy back its ceded book of business from Ability Re; however, Cathcart refused – leading Great Western into business with Alpha.  (*Id.* at ¶ 63.)

- In late 2016, at the time when the Ability Defendants withdrew the $109 million that included Great Western's Money from Series 2011-C, Cathcart and King (principals of Ability) had multiple conversations with Great Western about the financial condition of Alpha and the strength of Graham's investment strategy and activities.  (*Id.* at ¶¶ 113-15.) At the same time that Cathcart and King were telling Great Western that Graham showed them his investments and that they feel comfortable with Graham, Cathcart and King (on behalf of Ability and ACH) were aggressively moving to withdraw $109 million from Series 2011-C.  (*Id.* at ¶ 116.)

- To make matters worse, once the Ability Defendants withdrew the $109 million – instead of ending its relationship with Graham and Solow – the Ability Defendants kept Ability's coinsurance agreement with Alpha in-force and (literally) ***tripled-down*** by signing a new coinsurance agreement with Vista Re (formerly Alpha Re (US)) and Solow.  (SAC at ¶¶ 123-24.)

- On or about March 24, 2017, Cathcart and King also joined the board of directors of Blue Elite Fund—an entity ***they knew was under SEC investigation*** at the time they chose to join the board.  (SAC at ¶ 125.)

These facts clearly distinguish this case from the two main cases on pages 18 and 19 of the Ability Defendants' Memorandum: *Cohen v. BMW Invs. L.P.*, 144 F. Supp. 3d 492 (S.D.N.Y. 2015); *Encore Preakness, Inc. v. Chestnut Health & Rehab. Grp., Inc.*, No. N17C-03-1677, 2017 WL 5068753 (Del. Super. Ct. Nov. 1, 2017).

In *BMW Investments*, not only were there no allegations of a "relationship between Cohen and BMW of any kind prior to this litigation," there were no allegations "indicating that BMW and Cohen even knew of each other's existence prior to this litigation." *Id.* at 501. Nor were there any allegations that "BMW even knew of [the fraudster's] other fraudulent transactions, with Cohen or otherwise." *Id.* at 502. Based on that, the court found that the relationship between the two parties was "too attenuated" to maintain a claim for unjust enrichment.

As alleged in the SAC, all of the facts that were missing from the *BMW Investments* case have been alleged here. Based on the parties' reinsurance relationship in 2009 – 2012 and the multiple conversations they had in late 2016, the two parties certainly had a relationship and knew of each other prior to this litigation. Furthermore, the Ability Defendants ***knew*** not only of Great Western's existence, they knew that Great Western was a victim of Alpha, Graham, and Solow's scheme – ***which is why the Ability Defendants seized the $109 million***.

*Encore Preakness* is a wholly irrelevant Delaware state case—applying Delaware law—that ***does not even discuss*** the "too attenuated" standard or anything similar. Instead, that case held that while the defendant may have been unjustly enriched, it was enriched at the expense of a third-party, not the plaintiff. *Encore Preakness*, 2017 WL 2068753, at *3-4. Therefore, since the plaintiff was not "the impoverished party," the plaintiff could not bring a claim for unjust enrichment. *Id.* at *3; *see also United Health All., LLC v. United Med., LLC*, No. 7710-VCP,

2014 WL 6488659, at *8 (Del. Ch. Nov. 20, 2014) (another Delaware case cited by the Ability Defendants that is wholly irrelevant for precisely the same reasons as *Encore Preakness*).

Importantly, New York courts have held that "a defendant's awareness of the plaintiff and of the potential negative impact of its own conduct on the plaintiff" can demonstrate the "required closeness between parties" to maintain a claim for unjust enrichment. *Chen*, 8 F. Supp. 3d at 465. In *Chen*, a multi-party dispute, the Chen plaintiffs alleged that the Chang defendants were unjustly enriched at the Chen plaintiffs' expense when certain inventory was transferred. Similar to the Ability Defendants' arguments here, the Chang defendants disputed this claim "on the grounds that they were good-faith purchasers for value and had no relations with the Chen parties." *Id.* at 464-65. The district court ruled in favor of the Chen plaintiffs and held that, "despite the lack of any direct dealings between the Chen plaintiffs and the Chang defendants, there was sufficient connection between them to potentially support an unjust enrichment claim." *Id.* at 465. The court continued, "[a] trier of fact could, therefore, conclude that the Chang defendants were aware of the potential negative impact that their business dealings with New Trend might impose on the Chen plaintiffs." *Id.*; *see also Overton*, 166 F. Supp. 3d at 414 (denying defendant's motion for summary judgment for plaintiff's unjust enrichment claim because a factual dispute existed "which may be probative of defendants' awareness of how their conduct would affect [plaintiff]").

Like in *Chen*, as alleged in the SAC and explained above on pages 15-16, the Ability Defendants indisputably had an "awareness" of the "potential negative impact of [their] own conduct" (*Chen*, 8 F. Supp. 3d at 465) on Great Western when they withdrew almost all of the money and assets in Series 2011-C (totaling $109 million), which included Great Western's Money.

17

Lastly, as discussed above on pages 10-11 and 13, the Ability Defendants—again—argue that Great Western "cannot show justifiable reliance." (Memorandum at 20-21.) And again, **New York law does not require justifiable reliance to state a claim for unjust enrichment**. The main case on which the Ability Defendants rely—*Belin v. Weissler*, No. 97-8787, 1998 WL 391114 (S.D.N.Y. July 14, 1998)—**does not even involve a claim for unjust enrichment**. It is a fraud case. The same is true for the case cited by the Ability Defendants in footnote 8 on pages 20-21: *Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200 (S.D.N.Y. 2005) (does not involve a claim for unjust enrichment).

## B. Great Western's Pleadings Satisfy New York's "Equity and Good Conscience" Requirement for an Unjust Enrichment Claim.

The Ability Defendants' actions prior to, in connection with, and after, the withdrawal of the $109 million show that it would be "against equity and good conscience" to permit the Ability Defendants to retain that money.

Prior to the withdrawal, the Ability Defendants informed Great Western that Graham had given King a view of the investments, and Cathcart reassured Great Western that the Ability Defendants were not concerned about any of its reinsurance investments with Alpha. (SAC ¶¶ at 115-17.) All the while, the Ability Defendants were taking steps to withdraw $109 million from the Series 2011-C account, much of which was Great Western's Money. Then, immediately after the withdrawal, rather than inform Great Western of its actions or move its business elsewhere, since it knew the reinsurance trusts were underfunded, Ability entered into a new coinsurance agreement worth **triple the amount of money** with Vista Re, formerly known as Alpha Re (US) and owned and operated by Solow. As explained above at pages 4-5 and 15-16, Ability went from ceding 20% of its business to Alpha to 60% of its business to Alpha and Vista. Three months later, beginning in March 2017, Cathcart and King joined the board of directors

for Blue Elite Fund LP, which is owned and operated by Graham.  (SAC at ¶ 125.)  Indeed, Cathcart and King joined defendant Blue Elite Fund LP's board of directors *after learning Blue Elite Fund LP was under investigation by the SEC.*

Some of the $109 million withdrawn by the Ability Defendants included non-liquid assets, such as redemption certificates for defendant Blue Elite Fund LP.  Over the course of 2017, and while Cathcart and King sat on the board of directors for Blue Elite Fund LP, Graham and others helped the Ability Defendants liquidate the assets withdrawn by the Ability Defendants, including the Blue Elite Fund LP redemption certificates.  (*See* SAC ¶¶ 109.)  The SEC has determined these, among others, were "*improper redemptions*."  (*See* Doc. 56 at Ex. A ¶ 26.)  Having intentionally misled Great Western so that it could seize the assets in question, the Ability Defendants' argument that their Motion should somehow be granted because Great Western "took no steps to recover or protect any assets in which it allegedly held an interest" (Memorandum at 22) is a classic example of chutzpah and a premature argument at the motion to dismiss stage.

The Ability Defendants claim that "the exercise of a statutory or contractual right does not violate, as a matter of law, equity and good conscience," *but cite no cases that holds this "as a matter of law*."  (Memorandum at 21.)  The fact that Nebraska insurance law required Alpha to hold money accessible to Ability is no different from the fact that Utah insurance law required Alpha to similarly hold money accessible to Great Western.  *See* Utah Admin. Code R590-173-10(A)(4)(a); SAC at Ex. C (Trust Agreement) Section 2(a).  Alpha, Graham, and Solow certainly broke both states' insurance laws by comingling Ability and Great Western's trust accounts.  However, that does not give Ability a superior right to money or assets that belonged to Great Western in the first instance.

Thus, the SAC certainly satisfies the "equity and good conscience" requirement for Great Western to maintain a claim for unjust enrichment.  *See Childers v. N.Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 305 (S.D.N.Y. 2014) (denying defendant's motion to dismiss because "equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover").  Thus, the Ability Defendants' Motion should be denied.

## IV.   GREAT WESTERN HAS PROPERLY PLED CONVERSION AGAINST ABILITY (COUNT TWELVE).

Ability's argument appears to be that Nebraska law and Ability's coinsurance agreement with Alpha "authorized" Ability to withdraw $109 million from Series 2011-C; and, therefore, Great Western's conversion claim must fail.  (*See* Memorandum at 22-25.)  However, this misses the point.  Any rights Ability may have had under Nebraska law or its coinsurance agreement were limited to ***Ability's*** money held by Alpha and did not include any rights to ***Great Western's*** Money held by Alpha.  As alleged, Ability inappropriately withdrew ***Great Western's*** Money after Graham/Alpha comingled Great Western and Ability's money together.  (SAC at ¶ 251.) Nothing under Nebraska law or the Ability-Alpha coinsurance agreement gave Ability a right to take ***Great Western's*** Money.

New York law is clear that comingled money in an account may serve as the subject of a conversion claim.  *See Newbro v Freed*, 409 F Supp. 2d 386 (S.D.N.Y. 2006), *aff'd.*, No. 06-1722-CV, 2007 WL 642941 (2d Cir. Feb. 27, 2007).  In *Newbro*, plaintiff's accountant transferred $1.12 million from the plaintiff's account into another client's account (defendant) to cover a "shortfall," and the plaintiff sued on a theory of conversion to "merely [] undo the improper transfer."  *Id.* at 396.  The court granted the plaintiff's motion for summary judgment for conversion because, "[g]iven that plaintiff owned the money invested in his account and lost possession without his consent, defendant[] had an obligation to return such funds to plaintiff."

20

*Id.* at 397.  Even if the "crooked broker" "may have owed defendants $1 million before the transfer, [] 'one who receives money from a thief in satisfaction of pre-existing debt does not have a defense against the person from whom the money was stolen.'"  *Id.* at 396-97 (quoting *Eisenberg v. Grand Bank for Sav. FSB*, 207 F. Supp. 2d 553, 561 (S.D. Miss. 2002), *aff'd*, 70 Fed. Appx. 765 (5th Cir. 2003)).

The *Newbro* case is not alone.  There are numerous other cases applying New York law where courts have held that a party may maintain a claim for conversion based on allegations that one party withdrew the other party's money from an account; including, specifically, where the allegations are that the funds were inappropriately comingled.  *See, e.g.*, *Simpson & Simpson PPLC v. Lippes Mathias Wexler Friedman LLP*, 130 A.D.3d 1543, 1544-45 (4th Dept. 2015) (reversing the lower court because "the court erred in determining that the comingling of the embezzled funds in the employee's joint checking account precluded a cause of action for conversion . . . [since] the embezzled funds are sufficiently identifiable and traceable to sustain a cause of action for conversion"); *Petrone v Davidoff Hutcher & Citron, LLP*, 150 A.D.3d 776, 778 (2d Dept. 2017) ("Contrary to the defendant's contention, the fact that the children's funds were commingled with other money in the escrow account does not preclude a cause of action for conversion."); *Galasso, Langione, & Botter, LLP v Galasso*, 43 N.Y.S.3d 767 (2016).

None of the cases cited by Ability (*see* Memorandum at 22-25) even remotely suggest otherwise.  The *Oxon* case from 1982 involved a contractual dispute whereby the plaintiff's agent, the middle-party in the transactions, was empowered by the plaintiff to enter into a contract with the defendant which excused the defendant's non-payment (hence, the defendant was not unjustly enriched).  *Oxon Italia, S.p.A. v. Farmland Indus., Inc.*, 546 F. Supp. 681 (S.D.N.Y. 1982).  This has nothing to do with a claim for conversion based on the transfer of

Great Western's Money to Ability to cover Alpha's shortfall.  And, in any event, the *Oxon* case involved a final judgment after a trial, not a ruling on a motion to dismiss.

The other cases cited by Ability are similarly off-point.  *See Kolodin v. Valenti*, 147 A.D.3d 459, 459-60 (1st Dept. 2017) (ruling on summary judgment, based on deposition testimony, that plaintiff willingly transferred her interests in a joint investment account into an account held solely in the defendant's name); *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 330-31 (S.D.N.Y. 2011) (plaintiff failed to allege that defendant possessed the items plaintiff accused defendant of converting); *Krasner v. Rahfco Funds LP*, No. 11 CV 4092(VB), 2012 WL 4069294 (S.D.N.Y. Aug. 9, 2012) (plaintiff failed to make a pre-litigation demand, which was necessary because the defendant lawfully possessed the funds); *In re Stillwater Asset Backed Offshore Fund Ltd.*, 559 B.R. 563, 588 (Bankr. S.D.N.Y. 2016) (analyzing whether plaintiff properly stated a claim for alter ego liability under Cayman Law, not conversion under New York law); *Banco Indus. De Venezuela, C.A. v. CDW Direct, LLC*, 888 F. Supp. 2d 508 (S.D.N.Y. 2012) (the case has absolutely nothing to do with conversion or comingled funds).

Lastly, buried in a footnote at the end of their brief, Ability argues that Great Western's conversion claim is defective because Great Western did not make a pre-litigation demand on Ability to return the money.  (*See* Memorandum at 25, n.9.)  This misstates the law.  A pre-litigation demand is only necessary if defendant's initial possession of the property was lawful; not, whereas here, Great Western alleges that Ability unlawfully took Great Western's Money from the outset.  (SAC ¶¶ 6.)  *See Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 49 (2d Cir. 1996) ("New York law does not, however, always require that a demand be made and be met by a refusal to make out a claim of conversion. Instead, a demand is necessary only where the property is held lawfully by the defendant."); *Krasner*, 2012 WL

4069294, at*7 (requiring plaintiff to make a pre-litigation demand because plaintiff alleged defendant initially maintained plaintiff's investment funds lawfully, but then converted those funds for defendant's own purpose).

## **CONCLUSION**

For the foregoing reasons, Great Western respectfully requests that the Court deny the Ability Defendants' Motion.  However, given that the current motion to dismiss is the first time the Court has addressed the substance of Great Western's claims, if the Court dismisses any claims in the SAC against the Ability Defendants, Great Western requests that such dismissal be without prejudice, so Great Western may replead to cure any such deficiencies.[4]

---

[4] *See BLT Rest. Grp. LLC v. Tourondel,* 855 F. Supp. 2d 4, 13 (S.D.N.Y. 2012) ("Rule 15(a) of the Federal Rules of Civil Procedure specifies that courts should 'freely give' leave to amend 'when justice so requires.'")

Dated: March 12, 2019

SIDLEY AUSTIN LLP

By: */s/ Gerard D. Kelly*_____
    Gerard D. Kelly
    (admitted *pro hac vice*)
    gkelly@sidley.com
    Stephen W. McInerney
    (admitted *pro hac vice*)
    smcinerney@sidley.com

    One South Dearborn Street
    Chicago, Illinois 60603
    (312) 853-7000

    Steven M. Bierman
    sbierman@sidley.com
    Michael P. Morrissey
    mmorrissey@sidley.com

    787 Seventh Avenue
    New York, New York 10019
    (212) 839-5300

    Nicholas K. Lagemann
    nlagemann@mdmc-law.com
    McElroy, Deutsch, Mulvaney & Carpenter, LLP
    225 Liberty Street
    36th Floor
    New York NY 10281
    (973) 425-0161

    *Attorneys for Plaintiff Great Western Insurance Company.*

ACTIVE 240356879