**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :

GREAT WESTERN INSURANCE COMPANY,   :     Civil Action No. 18-cv-06249-VSB
                           :

           Plaintiff,     :     Hon. Vernon S. Broderick
                           :
                           :

    vs.                      :
                           :
                           :

MARK GRAHAM, DONALD SOLOW, BLUE     :
CAPITAL MANAGEMENT, INC., BLUE      :
ALTERNATIVE ASSET MANAGEMENT LLC,  :
WILMINGTON SAVINGS FUND SOCIETY,   :
FSB, CHRISTIANA TRUST, REGATTA     :
HOLDINGS LLC, CYGNET 001 MASTER    :
TRUST, CYGNET 001 MASTER TRUST SERIES :
2011-A, CYGNET 001 MASTER TRUST SERIES :
2011-C, CYGNET 001 MASTER TRUST SERIES :
2013-A, ALPHA RE LIMITED, ALPHA RE   :
HOLDINGS (CAYMAN) LIMITED, ATLANTIC :
SPECIALTY FINANCE, BLUE ELITE FUND  :
LTD., BLUE ELITE FUND LP, BLUE II LTD.,  :
SANCUS CAPITAL BLUE CREDIT      :
OPPORTUNITIES FUND LTD., ABILITY   :
INSURANCE COMPANY, JOHN DRAKE,   :
EDWARD BRENDAN LYNCH, GREGORY   :
TOLARAM, ADVANTAGE CAPITAL HOLDING:
LLC, DAN CATHCART, AND KENNETH KING. :
                           :
          Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS**
**WILMINGTON SAVINGS FUND SOCIETY, FSB, AND CHRISTIANA TRUST'S**
**MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

**<u>TABLE OF CONTENTS</u>**

Page

INTRODUCTION ......................................................................................................1

STATEMENT OF FACTS .........................................................................................3

ARGUMENT .............................................................................................................8

I.     GREAT WESTERN HAS ADEQUATELY PLED ITS CLAIMS UNDER 12(B)(6) ......8

    A.     Standard of Review .........................................................................8

    B.     Great Western Has Properly and Adequately Pled its Claim for Breach of
        Contract Against WSFS (Count Thirteen) ..........................................8

    C.     Great Western Has Properly and Adequately Pled its Claim for Breach of the
        Implied Covenant of Good Faith and Fair Dealing Against WSFS (Count
        Fourteen) ..................................................................................10

    D.     Great Western Has Properly and Adequately Pled its Claim for Negligent
        Misrepresentation Against WSFS (Count Nine) ..................................13

    E.     Great Western Has Properly and Adequately Pled its Claim for Negligence
        Against WSFS (Count Ten) ...........................................................16

    F.     Great Western Has Properly and Adequately Pled its Claim of Aiding and
        Abetting Fraud Against WSFS (Count Four) ......................................16

II.    WSFS IS SUBJECT TO PERSONAL JURISDICTION IN NEW YORK UNDER
     12(B)(2)...................................................................................19

    A.     Standard of Review.......................................................................19

    B.     This Court Has General Personal Jurisdiction Over WSFS. ..............19

    C.     This Court Has Specific Personal Jurisdiction Over WSFS..................20

        a.    This Court Has Personal Jurisdiction Over WSFS Under New York's
            Long-Arm Statute .................................................................21

        b.    This Court's Exercise of Personal Jurisdiction Over WSFS Comports with
            the Constitutional Requirements of the Due Process Clause .........................23

    D.     At a Minimum, Great Western is Entitled to Conduct Jurisdictional Discovery...25

CONCLUSION...........................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Balance Return Fund Ltd. v. Royal Bank of Can.*,
   83 A.D.3d 429 ..................................................................................................................17

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
   902 F.2d 194 (2d Cir. 1990) ...........................................................................................19

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
   305 F.3d 120 (2d Cir. 2002) ............................................................................................24

*Best Van Lines, Inc. v. Walker*,
   490 F.3d 239 (2d Cir. 2007) ............................................................................................21

*BLT Rest. Grp. LLC v. Tourondel*,
   855 F. Supp. 2d 4 (S.D.N.Y. 2012) ...............................................................................25

*Brady v. Basic Research, LLC*,
   101 F.Supp.3d 217 (E.D.N.Y. 2015) ..............................................................................24

*Brown v. Lockheed Martin Corp.*,
   814 F.3d 619 (2d Cir. 2016) ...........................................................................................20

*C. Mahendra (N.Y.), LLC v. Nat'l Gold & Diamond Ctr., Inc.*,
   125 A.D.3d 454 (1st Dept. 2015) ...................................................................................22

*Century Pac., Inc. v. Hilton Hotels Corp.*,
   No. 03-8258, 2004 WL 868211 (S.D.N.Y. Apr. 21, 2004) .................................................14

*Chloé v. Queen Bee of Beverly Hills, LLC*,
   616 F.3d 158 (2d Cir. 2010) ............................................................................................21

*Daventree Ltd. v. Azerbaijan*,
   349 F. Supp. 2d 736 (S.D.N.Y. 2004) .............................................................................25

*DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*,
   911 N.Y.S.2d 7 (2010) .....................................................................................................18

*Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*,
   7 N.Y.3d 65 (N.Y. Ct. App. 2006) ..................................................................................22

*Dieckman v. Regency GP LP*,
   155 A.3d 358 (Del. 2017) ..........................................................................................11, 12

*Dunlap v. State Farm Fire & Cas. Co.*,
   878 A.2d 434 (Del. 2005) ............................................................................... 10, 11

*Eades v. Kennedy, PC Law Offices*,
   799 F.3d 161 (2d Cir. 2015) ..................................................................... 20, 23, 24

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*,
   375 F.3d 168 (2d Cir. 2004) ...................................................................................8

*Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*,
   414 F.3d 325 (2d Cir. 2005) .................................................................................13

*Frazer Exton Dev., LP v. Kemper Envtl., Ltd.*,
   No. 03–cv–0637 (HB), 2004 WL 1752580 (S.D.N.Y. July 29, 2004)...................13

*Gerber v. Enter. Prods. Holdings, LLC*,
   67 A.3d 400 (Del. 2013)........................................................................................11

*Greenstar, LLC v. Heller*,
   814 F. Supp. 2d 444 (D. Del. 2011) ........................................................................9

*HSH Nordbank AG v. RBS Holdings USA Inc.*,
   No. 13-3303, 2015 WL 1307189 (S.D.N.Y. Mar. 23, 2015)...............................18

*In Touch Concepts, Inc. v. Cellco P'ship*,
   949 F. Supp. 2d 447 (S.D.N.Y. 2013)...................................................................11

*JP Morgan Chase Bank v. Winnick*,
   406 F. Supp. 2d 247 (S.D.N.Y. 2005)...................................................................17

*Kimmell v. Schaefer*,
   89 N.Y.2d 257 (N.Y. Ct. App. 1996) ....................................................................15

*Kottler v. Deutsche Bank AG*,
   607 F. Supp. 2d 447 (S.D.N.Y. 2009) ..................................................................16

*Krock v. Lipsay*,
   97 F.3d 640 (2d Cir. 1996) ...................................................................................13

*Licci v. Lebanese Canadian Bank, SAL*,
   673 F.3d 50 (2d Cir. 2012) ...................................................................................21

*Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013) ............................................................................19, 23

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   No. 12-3723, 2016 WL 5719749 (S.D.N.Y. Sept. 29, 2016) ..........................17, 18

*McDuffie v. Wilner,*
    415 F.Supp.2d 412 (S.D.N.Y. 2006)........................................................................16

*Meyer v. Jinkosolar Holdings Co.,*
    761 F.3d 245 (2d Cir. 2014) ...................................................................................8

*Miller v. HCP & Co.,*
    No. CV 2017-0291-SG, 2018 WL 656378 (Del. Ch. Feb. 1, 2018) .....................11

*NAMA Holdings, LLC v. Related WMC LLC,*
    No. 7934–VCL, 2014 WL 6436647 (Del. Ch. Nov. 17, 2014) ......................10, 11

*Nielsen v. Rabin,*
    746 F.3d 58 (2d Cir. 2014) .....................................................................................8

*In re: Nine West Holdings, Inc., et al.,*
    No. 18-10947 (SCC) (Bankr. S.D.N.Y. Jan. 24, 2019)........................................20

*Estate of Osborn ex rel. Osborn v. Kemp,*
    No, 3171-VCP, 2009 WL 2586783 (Del. Ch. Aug. 20, 2009) ..............................10

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,*
    446 F.Supp.2d 163 (S.D.N.Y. 2006). ....................................................................14

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,*
    652 F. Supp. 2d 495 (S.D.N.Y. 2009) ...................................................................18

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.,*
    No. 14-CV-4394, 2016 WL 439020 (S.D.N.Y. Feb. 3, 2016)..............................11

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974) .................................................................................................8

*Sweet v. Sheahan,*
    235 F.3d 80 (2d Cir. 2000) ......................................................................................8

*Villager Pond, Inc. v. Town of Darien,*
    56 F.3d 375 (2d Cir. 1995) ......................................................................................8

*Winter-Wolff Int'l, Inc. v. Alcan Packaging Food and Tobacco Inc.,*
    499 F. Supp. 2d 233 (E.D.N.Y. 2007).................................................................13

**Other Authorities**

31 CFR 1020.220 (2011).................................................................................................13

CPLR § 302(a)(1) .........................................................................................................21

Rule 12(b)(2) ...................................................................................................................3

Rule 12(b)(6) ......................................................................................................................3, 8

Plaintiff Great Western Insurance Company ("Great Western") submits this Memorandum of Law in Opposition to the Motion to Dismiss Plaintiff's Second Amended Complaint ("Motion") filed by defendants Wilmington Savings Fund Society, FSB, and Christiana Trust (together, "WSFS").[1]

## INTRODUCTION

Great Western has been the victim of a massive fraud.  Great Western filed this action because over $135 million that was entrusted to defendants to be available to meet coinsurance obligations on Great Western insurance policies is unaccounted for.  Every single one of the defendants to this action had some combination of legal, fiduciary and/or contractual obligations related to the missing funds.  Every single one of the defendants to this action played a role in the disappearance of those funds.  Not a single one of the defendants to this action has even tried to explain, either before or after Great Western filed this action, what happened to those funds.  And yet, every single one of the defendants to this action has denied, either in this action or the reinsurance arbitration that preceded it, any responsibility.

Through a series of arrangements, including the Trust Agreement,[2] Great Western deposited approximately $152 million into a Trust Account (as defined below) to reinsure certain policies issued by Great Western.  Under the Trust Agreement, WSFS served as the trustee of the Trust Account into which Great Western's assets were deposited and for which Great Western was the sole beneficiary.  However, Great Western sustained significant economic losses due to the misconduct of defendants, including WSFS.  As a result, Great Western filed this lawsuit.

---

[1] Defendant Christiana Trust ("Christiana") is a division of Defendant Wilmington Savings Fund Society, FSB ("Wilmington Savings"), which is a corporation registered in Delaware with its principal place of business in Wilmington, Delaware.
[2] All capitalized, undefined terms shall have the same definition and meaning as in the SAC.

In short, WSFS's liability stems from its role as trustee of *both* the Great Western Trust Account and defendant Cygnet Master Trust Series 2011-C ("Series 2011-C"). Specifically, WSFS trust officer Donna Lockerman ("Lockerman") sent Great Western monthly Trust Account statements that included a single line item for a Repurchase Agreement with Series 2011-C for $142+ million – while, beginning in 2016, simultaneously sending monthly statements to defendant Don Solow ("Solow") for Series 2011-C listing assets of less than $80 million.  (SAC at ¶¶ 81, 83, 85.)  *As a result, WSFS knew of a $60+ million shortfall and sent Great Western false account statements anyway*.

In fact, when asked directly and repeatedly by Great Western about the assets backing the Repurchase Agreement – Lockerman repeatedly told Great Western that WSFS was unaware of the assets.  (SAC at ¶¶ 84, 88, 96.)  But this was completely false – as the account statements sent by WSFS to Solow identified those very assets.  (SAC at ¶¶ 85-86.)

To make matters worse, as Great Western has recently learned, WSFS tendered its resignation as trustee of the Great Western Trust Account in April 2016 (which went into effect in July 2017) after learning about the SEC investigation into Graham, Blue Alternative Asset Management ("BAAM"), and others.[3]  But, at the time, WSFS did not tell Great Western this was why WSFS was resigning as trustee.  Instead, WSFS concealed the truth and vaguely claimed it had had a "falling out" with Graham.  (SAC at ¶ 96.)  Thus, WSFS, fully aware that Graham was under investigation by the SEC for investment fraud, and fully aware that Series 2011-C contained $60+ million less than the amount the Great Western Trust

---

[3] Great Western has met the pleadings requirement for all of its claims in the SAC. However, Great Western's continuing investigation has revealed that WSFS resigned as trustee of the Great Western account after it learned of the SEC investigation, and not because of a "falling out" with Graham, as WSFS told Great Western at the time (and as alleged here, *see* SAC at ¶ 96).

Account statements said Series 2011-C contained – continued to lie to Great Western about the disastrous situation and continued to send Great Western false Trust Account statements.

WSFS has submitted its Memorandum of Law in Support of its Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 137, cited herein as "Memorandum"). WSFS argues that Great Western's claims against it should be dismissed pursuant to Rule 12(b)(6) and 12(b)(2). Neither argument is well-founded. First, WSFS's arguments under Rule 12(b)(6) are unavailing. Great Western has more than adequately pled allegations to support each of its five current claims against WSFS, which are for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) negligent misrepresentation; (4) negligence; and (5) aiding and abetting fraud. *See* Section I, below. Likewise, WSFS claims that it is not subject to this Court's jurisdiction. (Memorandum at 20–25.) However, as the SAC's well-pleaded allegations make clear (SAC at ¶¶ 2–6, 40, 73, 87–89), WSFS is indisputably subject to personal jurisdiction in the Southern District of New York. *See* Section II, below. Accordingly, Great Western respectfully requests that the Court deny WSFS's Motion.

## STATEMENT OF FACTS[4]

In 2009, Great Western entered into a Coinsurance Agreement with Ability Reinsurance (Bermuda) Limited to reinsure certain policies issued by Great Western. (SAC at ¶ 60.) In connection with the Coinsurance Agreement and the related Novation Agreement, Great Western, defendant Alpha Re Limited ("Alpha"), and WSFS also entered into an Amended & Restated Trust Agreement ("Trust Agreement") effective July 11, 2012, whereby Great Western

---

[4] For further discussion of this factual background, please see Plaintiff's Opposition to Graham, Blue Capital Management, Inc., Blue Alternative Asset Management, LLC, Blue Elite Fund Ltd., Blue Elite Fund L.P., and Blue II Ltd.'s Motion to Dismiss Great Western Insurance Company's Second Amended Complaint ("Graham Opposition Memorandum") and Plaintiff's Opposition to Donald Solow, Regatta Holdings LLC, Cygnet 001 Master Trust, Cygnet 001 Master Trust Series 2011-A, Cygnet 001 Master Trust Series 2011-C, and Cygnet Master Trust Series 2013-A's Motion to Dismiss Plaintiff's Second Amended Complaint ("Solow Opposition Memorandum"), which are incorporated herein by reference.

deposited approximately $153 million into a trust account ("Trust Account") for the sole benefit of Great Western.[5]  (*Id.* at ¶¶ 64, 67; Ex. C.)  The Novation Agreement required Alpha to fund the Trust Account in the amount of 102% of Alpha's reserve obligations under the Coinsurance Agreement.  (*Id.* at ¶ 66.)  WSFS drafted the Trust Agreement.  (*Id.* at ¶ 67.)  Under the Trust Agreement, WSFS served as the trustee of the Trust Account.  (*Id.*)

Great Western received monthly account statements from WSFS making representations as to the value of the Trust Account.  (SAC at ¶ 81.)  From 2012 to 2017, ***every single account statement received by Great Western from WSFS stated the value of the Trust Account was between $140 – 150 million***.  (*Id.*)  Every account statement received by Great Western also showed that the vast majority of the Trust Account's value came from a single Repurchase Agreement with Series 2011-C.  (*Id.*)

As trustee, WSFS was tasked with providing Great Western and Alpha monthly statements of all Trust Account assets, ensuring assets deposited to the Trust Account were negotiable, and notifying Great Western and Alpha following deposits to and withdrawals from the Trust Account.  (SAC at Ex. C, Sections 5(b), (c), and (e).)  WSFS frequently interacted with New York-based defendants Mark Graham ("Graham"), Blue Capital Management ("BCM"), and Blue Alternative Asset Management ("BAAM").  (*Id.* at ¶ 40.)  For example, WSFS received withdrawal and deposit instructions from these parties.  (*Id.*)  And there was ample communication, both documentary (*e.g.*, emails) and oral (*e.g.*, telephone calls), between WSFS and the New York-based defendants Graham, BCM, BAAM, and the other Blue Entities.  (*Id.*)

---

[5] These assets were placed by Great Western into its own reserves for meeting policy obligations that were then transferred in connection with the Coinsurance Agreement into the Trust Account to be held and used solely for the purpose of the coinsurance obligations.

Sometime after the initial investment in cash and United States Treasury securities, defendants Graham and Solow began to direct the funds backing the Repurchase Agreement in Series 2011-C into risky investments, including numerous hedge funds and swap agreements. (SAC at ¶ 89.)  WSFS had immediate knowledge of these activities based on the fact that, unbeknownst to Great Western, WSFS and specifically its trust officer, Lockerman, *also served as the Trustee for Series 2011-C, the counterparty to the Repurchase Agreement*.  (*Id.* at ¶ 82.) WSFS, through Lockerman, also signed the Master Repurchase Agreement and subsequent Repurchase Confirmations in 2013 and 2014, which re-entered into the Repurchase Agreement after it expired annually.  (*Id.* at ¶ 73.)  For 2015 and 2016, WSFS curiously did not sign the Repurchase Confirmations, but nevertheless still accepted their deposit in the Great Western Trust Account.  (*Id.*)  Neither Lockerman nor anyone else at WSFS ever informed Great Western: (a) that the assets in Series 2011-C were not cash and United States Treasury securities (as Great Western had been told); or (b) that beginning in at least 2014, the value of the Series 2011-C account was significantly below $142 million (meaning the Repurchase Agreement was not worth anywhere close to $142+ million).  (*Id.* at ¶ 83.)

For example, the December 2015 WSFS statement for Great Western's Trust Account showed a Market Value of $142,085,895 for the Repurchase Agreement, even though WSFS knew that valuation was entirely inconsistent with the statements WSFS provided to Solow; thus, WSFS knowingly sent Great Western materially incorrect statements.  (SAC at ¶ 95.)  In fact, an independent third-party chosen by Alpha, Graham, and Solow *valued Series 2011-C at approximately negative $50.9 million* as of December 2015.  (*Id.* at ¶ 94.)  Similarly, the September 2016 WSFS account statement for Great Western's Trust Account still showed a Market Value of $142+ million for the Repurchase Agreement, even though—as trustee of Series

2011-C—WSFS knew that such valuation was incorrect.  (*Id.* at ¶ 100.)  In fact, the September

2016 WSFS Account Statement for Series 2011-C ***showed a Market Value of approximately***

***$83.9 million***.  (*Id.* at ¶ 99.)  This valuation only accounted for assets, not liabilities, so the real

value was even lower.  (*Id.*)  Despite this knowledge that Series 2011-C was significantly under-

collateralized (and becoming more so), in September 2016, WSFS knowingly assisted in the

rollover of the Repurchase Agreement with Series 2011-C.  (*Id.* at ¶ 76.)

On or about April 20, 2016, WSFS sent Great Western written notice of its intent to

resign as trustee of the Trust Account (although, this did not end up going to effect until just over

a year later – July 2017).  (SAC at ¶ 96.)  Subsequently, Great Western, through its then General

Counsel, Brian Lindquist ("Lindquist"), and CFO, Nathan Felix ("Felix"), had regular contact

with WSFS, either through Lockerman or Richard Facciolo, WSFS's attorney.  (*Id.*)  In these

conversations, WSFS informed Great Western that it was resigning as trustee because of a

"falling out" between it and Graham.  (*Id.*)  This assertion was repeated by Marc Tract, an

attorney for Alpha, who gave Lindquist a similar explanation.  (*Id.*)  All of these assertions were

clearly false because—as Great Western has recently learned—the real reason for the tendered

resignation was that WSFS had learned of the SEC investigation into Graham and others. (*See*

above at page 2, n.3.)

Into mid- and late-2016, Lindquist spoke several times to WSFS and its attorney to

inform WSFS that Great Western was unable to obtain any information on the collateral backing

the Repurchase Agreement and to demand such information.  (SAC at ¶ 87.)  On September 27,

2016, Great Western sent an email to WSFS informing WSFS of Great Western's concern that

the Repurchase Agreement was under-collateralized and that Great Western would be harmed if

a rollover of the Repurchase Agreement were allowed.  (*Id.*)  WSFS's attorney Alan Lieberman

responded to the email, ignoring the request for information on the collateral, stating simply that counsel for Alpha were already drafting Repurchase Agreement rollover confirmations.  (*Id.*)  At no time did WSFS inform Great Western that Series 2011-C was completely underwater.  (*Id.*)

Similarly, on several occasions throughout 2016, Great Western asked WSFS to send it statements of the accounts containing United States Treasury securities WSFS purportedly held as collateral backing the repurchase agreements.  (SAC at ¶ 88.)  WSFS, through Lockerman, refused to give Great Western any such information until late 2016, when Lockerman reluctantly told Great Western that ***no such account containing United States Treasury securities existed***. (*Id.*)  But, even then, WSFS and Lockerman failed to tell Great Western the fact that ***they knew***, because of their role as trustee of the Series 2011-C account, that the Repurchase Agreement was not worth anywhere near $142+ million.

In November 2016, defendant Ability Insurance Company ("Ability") caused the transfer of approximately $109 million of assets from the Series 2011-C account at WSFS to an Ability account at BNY Mellon.  (*Id.* at ¶ 116.)  WSFS, as the Trustee for both Great Western's Trust Account and Series 2011-C, knew that the assets in Series 2011-C belonged to Great Western's Trust Account as part of the Repurchase Agreement.  Yet, WSFS approved and allowed the transfer of these assets to Ability's account at BNY Mellon.  (*Id.* at ¶ 119.)  Instead of alerting Great Western about this decrease in funds backing the Repurchase Agreement, WSFS sent Great Western a December 2016 account statement stating that the Market Value of the Repurchase Agreements were approximately $142+ million.  WSFS knew this was false.  (*Id.* at ¶ 120.)  In fact, ***every*** statement Great Western received from WSFS from October 2016 to June 2017 showed a Market Value of $142+ million for the Repurchase Agreement.  (*Id.* at ¶ 101.) All of these statements were false.  (*Id.*)

## ARGUMENT

### I.   GREAT WESTERN HAS ADEQUATELY PLED ITS CLAIMS UNDER 12(B)(6).

#### A.   Standard of Review.

A motion to dismiss pursuant to Rule 12(b)(6) must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).  When deciding a motion to dismiss under Rule 12(b)(6), this court must "accept[ ] all factual allegations [in the complaint] as true and draw[ ] all reasonable inferences in favor of the plaintiff."  *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014) (alterations in original); *accord Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995).  In other words, "'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'"  *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.,* 375 F.3d 168, 176 (2d Cir. 2004).  Dismissal is only appropriate when "it appears beyond doubt that the [claimant] can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir. 2000); *accord Eternity Glob. Master Fund Ltd.,* 375 F.3d at 176–77.  WSFS has not met the requirements of Rule 12(b)(6), and its Motion should be denied.

#### B.   Great Western Has Properly and Adequately Pled its Claim for Breach of Contract Against WSFS (Count Thirteen).

As the Trust Agreement is governed by Delaware law (*see* SAC at Ex. C, Section 9), to state a claim for breach of contract under Delaware law, the plaintiff must allege: "(1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage

to the plaintiffs." *Greenstar, LLC v. Heller*, 814 F. Supp. 2d 444, 451 (D. Del. 2011). In its Memorandum, WSFS only challenges the second element, claiming that it did not breach a duty owed to Great Western. (*See* Memorandum at 9-11.)

Great Western has sufficiently pled WSFS breached the Trust Agreement. (SAC at ¶¶ 253–58.) Specifically, WSFS contracted, in part, to "furnish to [Alpha] and [Great Western] a statement of all Assets in the Trust Account upon the inception of the Trust Account and on a monthly basis thereafter." (*Id.* at Ex. C, Sections 5(e).) And, WSFS is contractually liable for "bad faith, willful misconduct or negligence in the performance of its express duties under this Agreement." (*Id.* at Ex. C § 5(i).) However, as alleged, WSFS knowingly provided numerous account statements to Great Western falsely stating that the account contained $142+ million.

WSFS is flat wrong that it "could not have known—and did not know—that the valuations were inaccurate…" (Memorandum at 10-11.) Not only is WSFS' claim wrong, but for purposes of WSFS' Motion, this Court ***must presume the opposite.*** As alleged, WSFS knew those statements were false because WSFS (and specifically its trust officer, Lockerman) served as the Trustee for both Great Western and Series 2011-C, and provided Series 2011-C account statements showing less than $80 million beginning in 2016. (SAC at ¶¶ 82, 95, 100, 120.)

These are not "astounding" or "entirely conclusory" allegations, as WSFS puts it. (Memorandum at 10.) Instead, these are very specific allegations of knowledge (which must be presumed true) based on contradictory account statements Lockerman sent to Great Western and Series 2011-C which establish WSFS's knowledge.

WSFS attempts to obfuscate the issue by arguing that WSFS was not responsible for "fair valuation" of the assets. (Memorandum at 9-10.) ***But there is a difference between WSFS undertaking the task of independently valuing account assets (which is what WSFS is arguing***

*it did not have a duty to do), and WSFS providing statements that it knew contained false valuations (which is what Great Western alleges WSFS did here in breach of the Trust Agreement).*  As alleged, despite actual knowledge that the Great Western account statements contained false information, WSFS and Lockerman nonetheless continued to provide false account statements to Great Western.  (SAC at ¶¶ 263–264.)  When Great Western contracted for Trust Agreement Sections 5(e), it understood that WSFS would provide a "statement of all Assets in the Trust Account" to mean that WSFS would provide a statement of all assets *as known to be accurate to WSFS*.  (*Id.* at Ex. C, Sections 5(e).)  Anything less nullifies the utility of the obligation—a statement of all assets.

Further, even if these terms are viewed as ambiguous, "Delaware courts apply the general principle of *contra proferentum*, which holds that ambiguous terms should be construed against their drafter."  *Estate of Osborn ex rel. Osborn v. Kemp*, No, 3171-VCP, 2009 WL 2586783, at *9 (Del. Ch. Aug. 20, 2009).  WSFS was the drafter of the Trust Agreement.  (SAC ¶ 67.)  As such, the Court should construe the terms used against WSFS and in favor of Great Western.

### C. Great Western Has Properly and Adequately Pled its Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Against WSFS (Count Fourteen).

As the Trust Agreement is governed by Delaware law (*see* SAC at Ex. C, Section 9), to state a claim for breach of the implied covenant of good faith and fair dealing under Delaware law, the plaintiff must allege: (1) a specific implied contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiff.  *See NAMA Holdings, LLC v. Related WMC LLC*, No. 7934–VCL, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014).

Under Delaware law, "*the implied covenant [of good faith and fair dealing] attaches to every contract*."  *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (emphasis added).  It is the doctrine by which Delaware law "supplies terms to fill gaps in the

express provisions of a specific agreement" to ensure the "parties' reasonable expectations are fulfilled." *NAMA Holdings*, 2014 WL 6436647, at *16–17. "Stated in its most general terms, the implied covenant requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." *Dunlap*, 878 A.2d at 442.

Though WSFS points to a general disclaimer of implied duties in the Trust Agreement (*see* Memorandum at 11), Delaware courts have repeatedly held that—even with such disclaimers—contracts still have an implied covenant of good faith and fair dealing to "analyze unanticipated developments or to fill gaps in the contract's provisions." *Dunlap*, 878 A.2d at 441; *see also, e.g.*, *Dieckman v. Regency GP LP*, 155 A.3d 358, 367–368 (Del. 2017) (holding that "the implied covenant of good faith and fair dealing [] cannot be eliminated by contract," despite a limited partnership agreement that waived fiduciary duties, since); *Miller v. HCP & Co.*, No. CV 2017-0291-SG, 2018 WL 656378, at *8 (Del. Ch. Feb. 1, 2018) (an LLC agreement "may not eliminate the implied contractual covenant of good faith and fair dealing…the implied covenant inheres in every contract governed by Delaware law").[6] Thus, WSFS is still bound by the implied covenant.

Great Western has sufficiently alleged a violation of the implied covenant of good faith and fair dealing. First, Great Western properly alleges that WSFS owed it several implied contractual obligations. (SAC ¶¶ 262, 264.) To supply an implicit term, the court "looks to the past" and asks "what the parties would have agreed to themselves had they considered the issue

---

[6] New York case law suggests a similar conclusion. *See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, No. 14-CV-4394, 2016 WL 439020, at *8 n.5 (S.D.N.Y. Feb. 3, 2016) ("Although no court has definitively answered the question, it does not appear that the implied covenant of good faith and fair dealing can be waived under New York law."); *In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 466–467 (S.D.N.Y. 2013) (where the court questioned enforcing a direct waiver of the implied covenant that read, "[i]t is understood and agreed that this Agreement is not subject to any implied duties of good faith or fair dealing").

in their original bargaining positions at the time of contracting." *Gerber v. Enter. Prods.*

*Holdings, LLC*, 67 A.3d 400, 418 (Del. 2013).  Here, WSFS contracted in the Trust Agreement

to, in part, "furnish to [Alpha] and [Great Western] a statement of all Assets in the Trust Account

upon the inception of the Trust Account and on a monthly basis thereafter."  (SAC at Ex. C,

Sections 5(e).)  This has nothing to do with "authority" or "power to direct the investments of

Trust assets"—as WSFS repeatedly argues.  (Memorandum at 12-13.)  Rather, part of WSFS's

obligation to furnish account statements is the covenant that WSFS would provide a "statement

of all Assets in the Trust Account" *as known to be accurate to WSFS*.  (SAC at Ex. C, Sections

5(e).)  Anything less nullifies the purpose of the account statements; and there was not, of

course, any express disclaimer allowing WSFS to provide statements it knew to be inaccurate.

Second, WSFS breached these implied contractual obligations by knowingly providing

false account statements to Great Western.  (SAC ¶ 263–264.)  A breach occurs when the

breaching party "acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain

that the asserting party reasonably expected."  *Dieckman*, 155 A.3d at 367.  WSFS defends these

false account statements—not by claiming the statements were correct (which they clearly were

not)—but by arguing that WSFS did not have a duty to "value" the assets in the account.

(Memorandum at 14.)  That is *not* the point.  As explained above at page 10, there is a difference

between WSFS independently valuing account assets (which is not at issue) --- and, WSFS

knowingly providing false account statements (which is what WSFS did).  (SAC at ¶¶ 263–264.)

These false account statements breached WSFS's implied duties under the Trust Agreement.

Additionally, WSFS failed to disclose that investments under common control or

ownership with any of the parties exceeded the contractual 5% limit, in breach of the Trust

Agreement.  (SAC at ¶ 264; Ex. C, Sections 4(f).)  WSFS argues that Great Western "has not

alleged that WSFS had any more knowledge of these interrelationships than Great Western itself." (Memorandum at 15.)  This is wrong.  Great Western did not know that Solow (an owner of Alpha) also owned Regatta and Series 2011-C, but WSFS did – WSFS sent Series 2011-C statements to Solow's home address.  This means that WSFS knew that Solow owned both Series 2011-C and Alpha; making the Repurchase Agreement a clear violation of the Trust Agreement, which prohibited investments exceeding 5% of trust assets with an entity "controlling, controlled by, or under common control with either [Alpha] or [Great Western]…" (*Id.* at ¶ 264; Ex. C, Sections 4(f).)  Lest there be any doubt of WSFS's knowledge, WSFS also bore a regulatory burden to know the true identity/ownership structures of its clients, despite WSFS's claims to the contrary.  *See, e.g.*, 31 CFR 1020.220 (2011); Memorandum at 12.

Finally, Great Western adequately alleges that WSFS's breach caused damages to Great Western in an amount to be determined at trial, as Great Western reasonably relied upon WSFS's incorrect and untruthful information.  (SAC ¶¶ 235, 263–265.)  Thus, Great Western has properly pled its claim for breach of the implied covenant of good faith and fair dealing.

### D.    Great Western Has Properly and Adequately Pled its Claim for Negligent Misrepresentation Against WSFS (Count Nine).

To state a claim for negligent misrepresentation under New York law,[7] the plaintiff must allege that:

---

[7] New York law governs Great Western's tort claims.  New York law does not give determinative effect to choice-of-law clauses involving torts incidental to the contract. *See Winter-Wolff Int'l, Inc. v. Alcan Packaging Food and Tobacco Inc.*, 499 F. Supp. 2d 233, 239 (E.D.N.Y. 2007) ("Under New York law, a choice-of-law provision indicating that a contract will be governed by a certain body of law does not dispositively determine the law which will govern a tort claim arising incident to a contract").  "[I]n order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties." *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996).  Here, the Trust Agreement states that "all matters concerning the construction and interpretation of this Agreement and performance under this Agreement shall be interpreted and construed according to the laws of the State of Delaware." (SAC at Ex. C § 9.)  The Court has found this choice-of-law language insufficient to cover additional tort claims. *See Frazer Exton Dev., LP v. Kemper Envtl., Ltd.*, No. 03–cv–0637 (HB), 2004 WL 1752580, at *10 (S.D.N.Y. July 29, 2004) (Provision stating that "[i]n the event that [the parties] dispute the meaning, interpretation or operation of any term, condition, definition or provision of this Policy, or the fulfillment . . . of any

(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the defendant knew that the plaintiff desired the information supplied in the representation for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 446 F.Supp.2d 163, 198 (S.D.N.Y. 2006). WSFS's Memorandum only challenges the first element (duty) and fifth element (reasonable reliance). (*See* Memorandum at 13-17.)

Importantly, for the first element, "a determination of whether a special relationship exists is highly fact-specific and 'generally not susceptible to resolution at the pleadings stage.'" *Century Pac., Inc. v. Hilton Hotels Corp.*, No. 03-8258, 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004). As alleged in the SAC, WSFS had a duty to provide correct information. (SAC at ¶ 232.) As trustee, WSFS's tasks included providing Great Western monthly statements of all Trust Account assets, ensuring assets deposited to the Trust Account were negotiable, and notifying Great Western and Alpha following deposits to and withdrawals from the Trust Account. (*Id.* at Ex. C, Sections 5(b), (c), and (e).) As such, WSFS was an essential intermediary between Great Western and its assets in the Trust Account, and certainly owed a duty to Great Western as a result of that relationship.

WSFS's counterargument is that even if WSFS had an "inkling" of nefarious activities by Graham and others, WSFS had no duty to "investigate" such "inkling[s]." (Memorandum at 14-16.) However, WSFS again completely misses the point. WSFS did not need to "investigate" to learn of the maleficence because—as alleged in the SAC and explained above at pages 5-8—

---

other obligations with respect to the Policy, resulting in litigation, arbitration or other form of dispute resolution . . . agree that the law of [a particular state]" was found insufficient); *see also Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 335 (2d Cir. 2005) (Provision stating that "[t]his Agreement will be governed by and construed in accordance with the laws of [a particular state]" was found insufficient).

***WSFS knew everything***.  WSFS knew of Solow's relationship to the Series 2011-C account. (SAC at ¶¶ 4, 73, 82.)  Contrary to WSFS's argument that this was a "secret relationship" (*see* Memorandum at 14)—WSFS knew of Solow's ownership, because WSFS sent Series 2011-C statements to Solow's home address.  WSFS also knew Series 2011-C had less than $80 million throughout 2016 and 2017.  (SAC at ¶¶ 100-101.)  And, WSFS knew of the SEC investigation into Graham and others.  (*See* above at page 2, n.3.)  Yet, not only did WSFS not tell Great Western any of this information --- WSFS continued to send Great Western monthly account statements showing a Repurchase Agreement for $142+ million which WSFS ***knew was false***.

For the fifth element, Great Western properly alleges that it reasonably relied on WSFS's false statements to its detriment.  (*Id.* at ¶¶ 235-236.)  Whether reliance is justified raises an issue of fact.  *See Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (N.Y. Ct. App. 1996).  Reliance is justified where "the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose."  *Id.*

On page 16 of its Memorandum, WSFS states in conclusory fashion that "Great Western could not possibly have ***justifiably*** relied on any failure on WSFS's part to do what it never promised to do or what it did not have authority to do."  (Memorandum at 16) (emphasis in original.)  Of course, this argument requires the Court to disregard the well-pled allegations of the SAC, which it cannot do.  The most fundamental task of a trustee is to provide accurate account statements.  Great Western justifiably relied upon the information WSFS provided; as it had every reason to believe, and no reason to doubt, WSFS's accuracy and fidelity.  As a result of this reliance, Great Western lost at least $135 million.  (*Id.* at ¶¶ 7, 236.)

E.   **Great Western Has Properly and Adequately Pled its Claim for Negligence Against WSFS (Count Ten).**

To state a claim for negligence under New York law, the plaintiff must allege four elements: "[1] the existence of a duty, [2] the breach of which [3] may be considered the proximate cause of [4] the damages suffered by the injured party." *McDuffie v. Wilner*, 415 F.Supp.2d 412, 418–419 (S.D.N.Y. 2006).

First, as explained above at page 15, Great Western properly alleges that WSFS owed it a duty to act with reasonable care as the trustee of its Trust Account.  (SAC at ¶ 240.)

Second, Great Western properly alleges that WSFS breached this duty by, for example, failing to (a) provide accurate account statements to Great Western; (b) not telling Great Western about the breach of the Trust Agreement based on Solow's co-ownership of Series 2011-C and Alpha; and (3) misrepresenting to Great Western the reason for WSFS tendering its resignation as trustee (which, it turns out, was due to WSFS learning about the SEC investigation in April 2016).  (SAC at ¶ 96; *see* Great Western's explanation at page 2, n.3.)

Finally, Great Western properly and adequately alleges that such negligence actually caused and proximately caused damages to Great Western in an amount in excess of $135 million.  (SAC at ¶ 243.)  Thus, Great Western has properly pled its claim for negligence.

F.   **Great Western Has Properly and Adequately Pled its Claim of Aiding and Abetting Fraud Against WSFS (Count Four).**

To state a claim for aiding and abetting fraud under New York law, a plaintiff must allege: "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud." *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 464 (S.D.N.Y. 2009).  WSFS has not challenged the existence of an underlying fraud, instead focusing its challenge on the last two elements in its Memorandum.  (*See* Memorandum at 17-19.)

16

To satisfy the "knowledge" element, Great Western has alleged that WSFS knew of the fraud perpetrated by Alpha, Graham, Solow, and others based on (1) the account information WSFS had—and separately provided to Series 2011-C and Great Western—which showed a $60+ million discrepancy between what was in Series 2011-C (less than $80 million) and what WSFS represented was in Great Western's Trust Account (a single line item Reinsurance Agreement tied to Series 2011-C worth $142+ million); (2) WSFS's knowledge of Solow's ownership role in Alpha and Series 2011-C; and (3) WSFS's knowledge of the SEC investigation of Graham and others as of April 2016.  (SAC at ¶¶ 81-86; *see* Great Western's explanation at page 2, n.3.)  All of these facts separately—and, certainly collective—satisfy the pleading requirements.  *See Balance Return Fund Ltd. v. Royal Bank of Can.*, 83 A.D.3d 429, 431(2011) ("[T]hus, plaintiffs' allegations that defendants had the authority to track fund performance, which allowed them to know that the net asset value of the fund was overstated, sufficiently plead 'actual knowledge of the fraud as discerned from the surrounding circumstances.'").

Second, for aiding and abetting fraud, "[a] defendant provides substantial assistance only if [it] affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 12-3723, 2016 WL 5719749, at *6 (S.D.N.Y. Sept. 29, 2016).  "The substantial assistance element has been construed as a causation concept, requiring that the plaintiff allege that the acts of the aider and abettor proximately caused the harm upon which the primary liability is predicated."  *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005).

Importantly, "the pleading requirements should not be narrowly construed, and a plaintiff alleging an aiding-and-abetting fraud claim may plead actual knowledge generally, particularly

at the prediscovery stage, so long as such intent may be inferred from the surrounding circumstances." *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 911 N.Y.S.2d 7, 9 (2010).

Here, the SAC sets forth allegations that WSFS knowingly provided Great Western with false account statements.  (SAC at ¶¶ 81-84, 120.)  These inaccurate statements misled Great Western to believe its Trust Account was funded with $142+ million in assets; when, in reality – and as WSFS knew – the account had much less.  *HSH Nordbank AG v. RBS Holdings USA Inc.*, No. 13-3303, 2015 WL 1307189 (S.D.N.Y. Mar. 23, 2015) is instructive on this point.  In that case, the court applied the "prediscovery stage" pleading standard that "fraudulent intent may be inferred from the surrounding circumstances" outlined in *DDJ Mgmt., LLC v. Rhone Grp.*, and held that allegations the defendant "delivered the Offering Materials prepared by [the alleged fraudsters] that contained the false statements" were "sufficient to show 'substantial assistance.'" *Id.* at *16.

And that was not all.  As alleged, when asked directly by Great Western on the phone and via email about the assets backing the Repurchase Agreement – Lockerman repeatedly told Great Western that WSFS was unaware of the assets.  (SAC at ¶¶ 88, 96.)  But, this was completely false – as the account statements sent by WSFS to Solow and Graham identified the assets.

WSFS's argument that "purely clerical issuance of monthly account statements" and "use [of] accounts at a financial institution" do not qualify as "substantial assistance" is a misdirection.  (Memorandum at 19.)  As multiple New York courts have observed, "[t]he critical test [for substantial assistance] is not ... whether the alleged aiding and abetting conduct was routine, but whether it made a substantial contribution to the perpetration of the fraud." *Loreley Fin. (Jersey) No. 3 Ltd.*, 2016 WL 5719749 at *7 (denying defendant's motion to dismiss based, in part, on the same argument); *see, e.g. Pension Comm. of Univ. of Montreal Pension Plan v.*

*Banc of Am. Sec., LLC*, 652 F. Supp. 2d 495, 511 (S.D.N.Y. 2009) (rejecting defendant's argument that certain "clerical" tasks did not constitute "substantial assistance" because, at the pleading stage, the "conduct is sufficient to raise a genuine issue of material fact as to whether [defendant] substantially assisted [the fraudsters]"). Thus, WSFS's actions substantially contributed to the fraud perpetrated against Great Western.

## II.   WSFS IS SUBJECT TO PERSONAL JURISDICTION IN NEW YORK UNDER 12(B)(2).

### A.   Standard of Review.

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) ("Licci I"). A plaintiff establishes a *prima facie* case by "pleading in good faith . . . legally sufficient allegations of jurisdiction." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). Indeed, "[a]t that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Id.* In evaluating whether this standard is met, the pleadings and any supporting materials are construed in the light most favorable to the plaintiff. *Licci I*, 732 F.3d at 167. Great Western has met this standard.

### B.   This Court Has General Personal Jurisdiction Over WSFS.

WSFS argues that a corporation may be subject to general jurisdiction in a state only where its contacts are so "continuous and systematic," judged against the corporation's national and global activities, that it is "essentially at home" in that state. (Memorandum at 20.)

However, the Second Circuit has observed that a factually intensive contacts analysis may warrant the exercise of general jurisdiction in a forum other than a corporate defendant's place of incorporation and principal place of business. Citing *Daimler*'s instruction that "in

assessing the extent of a corporation's contacts in a state for general jurisdiction purposes, we

must assess the company's local activity . . . *in the context of the company's overall activity*," the

Second Circuit has taken into account relevant details regarding the defendant's business in the

forum. *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 629 (2d Cir. 2016) (emphasis in

original). For example, the Second Circuit has considered the magnitude of the defendant's

workforce and revenues in the forum state. *Id.*

Here, WSFS is a sizable financial services company with a market capitalization in

excess of $1.3 billion, $7.0 billion in assets, and $18.6 billion in assets under management.[8]

Naturally, WSFS has performed countless New York-based deals alongside New York-based

banks.[9] To name a few, WSFS has served as indenture trustee for certain notes of New York-

based Nine West Holdings, Inc. and as collateral agent under a term loan agreement with New

York-based J. Crew Group, in addition to executing the financing of its own notes with New

York-based investment bankers.[10] Thus, this Court has general personal jurisdiction over WSFS.

### C.   This Court Has Specific Personal Jurisdiction Over WSFS.

To determine whether the Court may exercise specific personal jurisdiction over a non-

domiciliary, the Court must first apply the forum state's long-arm statute. *See Eades v. Kennedy,*

*PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015). "If the long-arm statute permits personal

jurisdiction, [courts then] analyze whether personal jurisdiction comports with due process

---

[8] *WSFS Financial Corporation*, Yahoo Finance, https://finance.yahoo.com/quote/WSFS?p=WSFS&.tsrc=fin-srch (last visited Feb. 28, 2019); WSFS Financial Corp., Annual Report (Form 10-K), at 3 (Apr. 26, 2018).
[9] New York is often referred to as the financial center of the United States, if not the world. *See, e.g.*, Andrew MacAskill, *London loses top spot to New York in financial survey due to Brexit*, Reuters, (Sept. 12, 2018), https://www.reuters.com/article/us-britain-eu-financialcentres/london-loses-top-spot-to-new-york-in-financial-survey-due-to-brexit-idUSKCN1LS16I.
[10] Motion to File Objection to Debtor's Plan of Reorganization at 2, *In re: Nine West Holdings, Inc., et al.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Jan. 24, 2019); David W. Morse, *Where Did My Collateral Go?*, The Secured Lender, (July 15, 2017), https://community.cfa.com/tsl/tslextra/davidmorse-collateral; Press Release, WSFS, WSFS Financial Corporation Announces Pricing of Senior Notes Offering (June 8, 2016).

protections established under the Constitution." *Id.* It is beyond cavil that this Court has jurisdiction over WSFS on such a basis.

### a.    This Court Has Personal Jurisdiction Over WSFS Under New York's Long-Arm Statute.

This Court has personal jurisdiction over WSFS under CPLR § 302(a)(1). CPLR § 302(a)(1) provides in relevant part: "[a]s to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary" that "transacts any business within the state." To determine the existence of jurisdiction under section 302(a)(1), "a court must decide (1) whether the defendant transacts any business in New York and, if so, (2) whether this cause of action arises from such a business transaction." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007).

Importantly, "section 302 is a single act statute and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010). A suit arises out of a transaction in New York "if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 66 (2d Cir. 2012) ("Licci II"). There is "no bright-line test for determining whether the 'nexus' is present in a particular case." *Id.* at 67. Rather, the "inquiry is a fact-specific one." *Id.*

Here, Great Western has alleged that WSFS transacted business in New York and that this dispute arises out of that transaction. Alpha executed the Trust Agreement in New York, and the investment manager for the Great Western Trust Account (BAAM) operated out of its offices in New York. (SAC at ¶¶ 2–4, 36, 38-39.) In executing WSFS's duties under the Trust

Agreement, WSFS received withdrawal and deposit instructions from Graham and BAAM in New York.  (*Id.* at ¶ 40.)  Further, the SAC makes clear that WSFS had broad knowledge of the other defendants' malfeasance – for example, that Graham and Solow were directing the funds backing the Repurchase Agreement in Series 2011-C into risky investments and that Series 2011-C was grossly under-collateralized from New York.  (*Id.* at ¶¶ 87–89.)

In fact, New York courts have found that "using electronic and telephonic means to project [oneself] into New York to conduct business transactions" is enough to satisfy the long-arm statute.  *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71 (N.Y. Ct. App. 2006).  As part of WSFS's work as Trust Account trustee, there was ample email and telephone communication between WSFS and the New York-based defendants ***through which WSFS acquired knowledge of the systemic fraud***.  (SAC at ¶ 40.)  These communications were not "incidental consequences" of fulfilling its contractual obligations as WSFS argues (Memorandum at 22-23), but rather paramount to its duties as trustee.  Sending account statements to New York, coordinating payments to entities in New York, executing trades in New York (e.g., Repurchase Confirmations signed by Lockerman), and directing trades received from New York—to name a few—are some of the paramount responsibilities of a trustee.  (SAC at ¶¶ 40, 256, 262.)  Certainly these actions by WSFS were "volitional acts" by which it "avail[ed] itself of the privilege of conducting activities within the forum State."  *C. Mahendra (N.Y.), LLC v. Nat'l Gold & Diamond Ctr., Inc.*, 125 A.D.3d 454, 457 (1st Dept. 2015).

Regardless of WSFS's attempt to argue the contrary, of course WSFS "chose" to do business in New York as part of the Trust Agreement.  (*See* Memorandum at 22-23.)  Graham, Solow, and the Blue Entities have always fully operated their business out of New York.  WSFS's argument would require the court to ignore over 6 years of constant communication and

business with entities based in New York.  This includes not only the Great Western Trust

Account, but also defendants Regatta Holdings, Cygnet 001 Master Trust, Series 2011-C, 2011-

A, and 2013-A.  Lest there be any doubt, WSFS also previously availed itself of the New York

forum through related agreements, for example, agreeing to a governing law provision in the

Master Repurchase Agreement, whereby all transactions and matters arising out of or related to

the agreement would be governed by New York law.  (SAC at ¶ 73.)

Ultimately, this suit arises from WSFS's contacts with New York.  Great Western seeks

to recover damages for the over $135 million in assets that defendants siphoned away from Great

Western's Trust Account – a plot concealed by WSFS's concerted misstatements and omissions,

each informed by its interactions with New York-based Graham, BCM, and BAAM.  The

"arising from" prong of § 302(a)(1) "does not require a causal link between the defendant's New

York business activity and a plaintiff's injury."  *Licci I*, 732 F.3d at 168.  However, but for

WSFS's concerted misstatements and omissions, Great Western would not have suffered the

losses it did.  Thus, this lawsuit is a direct result of WSFS's actions.  There is a more than

sufficient relationship between Great Western's claims and WSFS's contacts with New York.

(SAC at ¶¶ 2–6, 40, 73, 87–89.)

> **b.** **This Court's Exercise of Personal Jurisdiction Over WSFS Comports with the Constitutional Requirements of the Due Process Clause.**

To established personal jurisdiction, "due process requires a plaintiff to allege (1) that a

defendant has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of

jurisdiction is reasonable in the circumstances."  *Eades*, 799 F.3d at 168–69.  Minimum contacts

necessary to support specific personal jurisdiction "exist where the defendant purposefully

availed itself of the privilege of doing business in the forum and could foresee being haled into court there," and the commission of "some single or occasional acts" may be enough. *Id.* at 169.

As discussed at page 21-24, WSFS repeatedly and continuously transacted business in New York over the past six years related to this case. This purposeful availment and contacts with New York are sufficient to satisfy the minimum contacts requirement.

If minimum contacts exist, the defendant must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Eades*, 799 F.3d at 169. Factors in determining whether exercising jurisdiction is reasonable include:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Id.*

Here, exercising personal jurisdiction is reasonable under the circumstances. Any inconvenience is mitigated by "modern communication and transportation." *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129–30 (2d Cir. 2002). Factors two and three also favor New York as the forum state, as New York has an interest in adjudicating business conducted within its borders and Great Western willfully engaged in such business.

The fourth and fifth factors are particularly persuasive. In multiparty actions, New York courts have frequently cited the benefits to judicial economy in litigating all issues in one forum as a positive factor in asserting personal jurisdiction over a defendant. *See, e.g.*, *Brady v. Basic Research, LLC*, 101 F.Supp.3d 217, 231-232 (E.D.N.Y. 2015) ("[B]ecause this Court has personal jurisdiction over defendant corporations, judicial economy will be served by litigating all the issues in one (1) forum. For these reasons, the exercise of personal jurisdiction over [the defendant] comports with due process."). Here, administrative efficiency for this multiparty

litigation demands joint litigation in New York; especially given that 17 of the named defendants have conceded or have not contested this Court's jurisdiction.

     **D.**    **At a Minimum, Great Western is Entitled to Conduct Jurisdictional Discovery.**

Although Great Western believes it has made a *prima facie* showing of the Court's general and specific personal jurisdiction over WSFS, should the Court determine otherwise, Great Western respectfully requests leave to take such jurisdictional discovery. *See, e.g.*, *Daventree Ltd. v. Azerbaijan*, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004) ("If a plaintiff has identified a genuine issue of jurisdictional fact, jurisdiction discovery is appropriate even in the absence of a *prima facie* showing as to the existence of jurisdiction.").

## CONCLUSION

For the foregoing reasons, Great Western respectfully requests that the Court deny WSFS's Motion.  However, given that the current motion to dismiss is the first time the Court has addressed the substance of Great Western's claims, if the Court dismisses any claims in the SAC against WSFS, Great Western requests that such dismissal be without prejudice, so Great Western may replead to cure such deficiencies.[11]

---

[11] *See BLT Rest. Grp. LLC v. Tourondel,* 855 F. Supp. 2d 4, 13 (S.D.N.Y. 2012) ("Rule 15(a) of the Federal Rules of Civil Procedure specifies that courts should 'freely give' leave to amend 'when justice so requires.'")

25

Dated: March 12, 2019

SIDLEY AUSTIN LLP

By: */s/ Gerard D. Kelly*
    Gerard D. Kelly
    (admitted *pro hac vice*)
    gkelly@sidley.com
    Stephen W. McInerney
    (admitted *pro hac vice*)
    smcinerney@sidley.com
    One South Dearborn Street
    Chicago, Illinois 60603
    (312) 853-7000

    Steven M. Bierman
    sbierman@sidley.com
    Michael P. Morrissey
    mmorrissey@sidley.com
    787 Seventh Avenue
    New York, New York 10019
    (212) 839-5300

    Nicholas K. Lagemann
    nlagemann@mdmc-law.com
    McElroy, Deutsch, Mulvaney & Carpenter,
    LLP
    225 Liberty Street, 36th Floor
    New York, NY 10281
    (973) 425-0161

    *Attorneys for Plaintiff Great Western Insurance*
    *Company*