**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| GREAT WESTERN INSURANCE COMPANY, | Civil Action No. 18-cv-06249-VSB |
| Plaintiff, | Hon. Vernon S. Broderick |
| vs. | |
| MARK GRAHAM, DONALD SOLOW, BLUE CAPITAL MANAGEMENT, INC., BLUE ALTERNATIVE ASSET MANAGEMENT LLC, WILMINGTON SAVINGS FUND SOCIETY, FSB, CHRISTIANA TRUST, REGATTA HOLDINGS LLC, CYGNET 001 MASTER TRUST, CYGNET 001 MASTER TRUST SERIES 2011-A, CYGNET 001 MASTER TRUST SERIES 2011-C, CYGNET 001 MASTER TRUST SERIES 2013-A, ALPHA RE LIMITED, ALPHA RE HOLDINGS (CAYMAN) LIMITED, ATLANTIC SPECIALTY FINANCE, BLUE ELITE FUND LTD., BLUE ELITE FUND LP, BLUE II LTD., SANCUS CAPITAL BLUE CREDIT OPPORTUNITIES FUND LTD., ABILITY INSURANCE COMPANY, JOHN DRAKE, EDWARD BRENDAN LYNCH, GREGORY TOLARAM, ADVANTAGE CAPITAL HOLDING LLC, DAN CATHCART, AND KENNETH KING. | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**GREAT WESTERN'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS
MARK GRAHAM, BLUE CAPITAL MANAGEMENT, INC., BLUE ALTERNATIVE
ASSET MANAGEMENT, LLC, BLUE ELITE FUND LTD., BLUE ELITE FUND L.P.,
AND BLUE II LTD.'S MOTION TO DISMISS GREAT WESTERN INSURANCE
COMPANY'S SECOND AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................................1

STATEMENT OF FACTS.......................................................................................3

    The Coinsurance, Novation, and Trust Agreements .........................................3

    BAAM and Graham's Self-Dealing Investments...............................................3

    SEC Investigation...............................................................................................7

ARGUMENT ...........................................................................................................8

I.     BCM, BLUE ELITE FUND, LTD., AND BLUE II ARE SUBJECT TO PERSONAL JURISDICTION IN NEW YORK. ..................................................8

    A.    Standard of Review..................................................................................8

    B.    This Court Has Personal Jurisdiction Over BCM, Blue Elite Fund, Ltd., and Blue II Under New York's Long-Arm Statute. ...................................9

    C.    This Court's Exercise of Personal Jurisdiction Over BCM, Blue Elite Fund, Ltd., and Blue II Comports with the Constitutional Requirements of the Due Process Clause. ..................................................................................11

    D.    At a Minimum, Great Western is Entitled to Conduct Jurisdictional Discovery. ..13

II.    GREAT WESTERN HAS ADEQUATELY PLED ITS CLAIMS................................14

    A.    Standard of Review................................................................................14

    B.    Great Western Has Properly and Adequately Pled its Claim for Breach of Fiduciary Duty Against BAAM and Graham....................................................15

    C.    Great Western Has Properly and Adequately Pled its Claim for Aiding and Abetting a Breach of Fiduciary Duty Against BCM, Blue Elite Fund Ltd., Blue Elite Fund L.P., and Blue II.....................................................................18

    D.    Great Western Has Properly and Adequately Pled its Claim of Fraud Against Graham, BCM, and BAAM...................................................................20

    E.    Great Western Has Properly and Adequately Pled its Claim of Aiding and Abetting a Fraud Against Blue Elite Fund Ltd., Blue Elite Fund LP, and Blue II.....................................................................................................................23

F.      Great Western Has Properly and Adequately Pled its Claim for Civil
        Conspiracy to Commit Fraud Against Graham and the Blue Entities. .................24

G.      Great Western Has Properly and Adequately Pled its Claim for Civil RICO
        Subsection (c) (18 U.S.C. § 1962(c)), Civil RICO Subsection (a) (18 U.S.C. §
        1962(a)), and Civil RICO Conspiracy (18 U.S.C. § 1962(d)) Against Graham
        and the Blue Entities. .........................................................................................26

H.      Great Western Has Properly and Adequately Pled its Claim of Unjust
        Enrichment Against Graham and the Blue Entities. ............................................26

CONCLUSION.....................................................................................................................29

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ABF Capital Mgmt. v. Askin Capital Mgmt.*,
　L.P., 957 F.Supp. 1308 (S.D.N.Y. 1997)..............................................................................24

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
　902 F.2d 194 (2d Cir. 1990) ...............................................................................................8

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
　305 F.3d 120 (2d Cir. 2002) ..............................................................................................12

*Best Cellars Inc. v. Grape Finds at Dupont, Inc.*,
　90 F.Supp.2d 431 (S.D.N.Y. 2000)....................................................................................25

*Best Van Lines, Inc. v. Walker*,
　490 F.3d 239 (2d Cir. 2007) ...............................................................................................9

*BLT Rest. Grp. LLC v. Tourondel*,
　855 F. Supp. 2d 4 (S.D.N.Y. 2012)....................................................................................29

*Brady v. Basic Research, LLC*,
　101 F. Supp. 3d 217 (E.D.N.Y. 2015)................................................................................13

*Bullmore v. Ernst & Young Cayman Islands*,
　45 A.D.3d 461 (1st Dept. 2007)....................................................................................15, 17

*C. Mahendra (N.Y.), LLC v. Nat'l Gold & Diamond Ctr., Inc.*,
　125 A.D.3d 454 (1st Dept. 2015).......................................................................................11

*Caprer v. Nussbaum*,
　36 A.D.3d 176 (2006)...................................................................................................18, 24

*Chen v. New Trend Apparel, Inc.*,
　8 F. Supp. 3d 406 (S.D.N.Y. 2014)....................................................................................28

*Childers v. New York & Presbyterian Hosp.*,
　36 F. Supp. 3d 292 (S.D.N.Y. 2014)..................................................................................27

*Chloé v. Queen Bee of Beverly Hills, LLC*,
　616 F.3d 158 (2d Cir. 2010) ...............................................................................................9

*Daventree Ltd. v. Azerbaijan*,
　349 F. Supp. 2d 736 (S.D.N.Y. 2004)................................................................................13

*Eades v. Kennedy, PC Law Offices*,
    799 F.3d 161 (2d Cir. 2015) .................................................................. 8, 9, 11, 12

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003) .................................................................................23

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*,
    375 F.3d 168 (2d Cir. 2004) .................................................................................14

*Fezzani v. Bear, Stearns & Co. Inc.*,
    592 F.Supp.2d 410 (S.D.N.Y. 2008) .....................................................................25

*FIA Leveraged Fund Ltd. v. Grant Thornton LLP*,
    150 A.D.3d 492 (1st Dept. 2017) .................................................................. 10, 11

*Kaufman v. Cohen*,
    307 A.D.2d 113 (2003) .............................................................................. 18, 19, 20

*Kottler v. Deutsche Bank AG*,
    607 F. Supp. 2d 447 (S.D.N.Y. 2009) ...................................................................23

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) .................................................................................18

*Licci v. Lebanese Canadian Bank, SAL*,
    673 F.3d 50 (2d Cir. 2012) .....................................................................................9

*Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ............................................................................ 8, 11

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) .................................................................................21

*Mandelblatt v. Devon Stores, Inc.*,
    132 A.D.2d 162 (1st Dept. 1987) ..........................................................................15

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014) .................................................................................14

*Musalli Factory for Gold & Jewelry v. JPMorgan Chase Bank. N.A.*,
    261 F.R.D. 13 (S.D.N.Y. 2009), .............................................................................15

*Myun-Uk Choi v. Tower Research Capital LLC*,
    890 F.3d 60 (2d Cir. 2018) ...................................................................................28

*Neogenix Oncology, Inc. v. Gordon*,
    133 F. Supp. 3d 539 (E.D.N.Y. 2015) ...................................................................16

*Nielsen v. Rabin*,
    746 F.3d 58 (2d Cir. 2014) ...................................................................................14

*Overton v. Art Fin. Partners LLC*,
    166 F. Supp. 3d 388 (S.D.N.Y. 2016) ............................................................26, 28

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    446 F.Supp.2d 163 (S.D.N.Y. 2006) ..............................................................15, 19

*Prickett v. N.Y. Life Ins. Co.*,
    896 F. Supp. 2d 236 (S.D.N.Y. 2012) ...................................................................17

*Primavera Familienstifung v. Askin*,
    130 F. Supp. 2d 450 (S.D.N.Y. 2001), .................................................................20

*Rolf v. Blyth, Eastman Dillon & Co.*,
    570 F.2d 38 (2d Cir. 1978) ...................................................................................20

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974) .............................................................................................14

*Schlaifer Nance & Co. v. Estate of Warhol*,
    119 F.3d 91 (2d Cir. 1997) ...................................................................................23

*Sergeants Benevolent Ass'n Annuity Fund v. Renck*,
    19 A.D.3d 107 (1st Dept. 2005) ...........................................................................16

*Sweet v. Sheahan*,
    235 F.3d 80 (2d Cir. 2000) ...................................................................................14

*U.S. ex rel. Taylor v. Gabelli*,
    345 F. Supp. 2d 313 (S.D.N.Y. 2004) ...................................................................21

*United States v. Wells Fargo Bank, N.A.*,
    972 F. Supp. 2d 593 (S.D.N.Y. 2013) ...................................................................21

*Villager Pond, Inc. v. Town of Darien*,
    56 F.3d 375 (2d Cir. 1995) ...................................................................................14

*Wiener v. Lazard Freres & Co.*,
    241 A.D.2d 114 (1st Dept. 1998).........................................................................15

*Zaccaro v. Shah*,
    746 F. Supp. 2d 508 (S.D.N.Y. 2010) ...................................................................16

**Statutes**

18 U.S.C. § 1962(d) ................................................................................2, 4, 5, 26

18 U.S.C. § 1962(a) ...........................................................................................................2, 26

18 U.S.C. § 1962(c) ...........................................................................................................2, 26

**Other Authorities**

CPLR § 302(a)(1) ....................................................................................................................9

FRCP 15(a) ...........................................................................................................................29

Rule 9(b) ...............................................................................................................................21

Rule 12(b)(2) ......................................................................................................................2, 8

Rule 12(b)(6) .................................................................................................................2, 8, 14

Plaintiff Great Western Insurance Company ("Great Western") hereby opposes the Motion to Dismiss ("Motion") filed by defendants Mark Graham ("Graham") and Blue Capital Management, Inc. ("BCM"), Blue Alternative Asset Management, LLC ("BAAM"), Blue Elite Fund Ltd., Blue Elite Fund L.P., and Blue II Ltd. ("Blue II") (collectively, the "Blue Entities").

## INTRODUCTION

Great Western has been the victim of a massive fraud.  Great Western filed this action because over $135 million that was entrusted to defendants to be available to meet coinsurance obligations on Great Western insurance policies is unaccounted for.  Every single one of the defendants to this action had some combination of legal, fiduciary and/or contractual obligations related to the missing funds.  Every single one of the defendants to this action played a role in the disappearance of those funds.  Not a single one of the defendants to this action has even tried to explain, either before or after Great Western filed this action, what happened to those funds.  And yet, every single one of the defendants to this action has denied, either in this action or the reinsurance arbitration that preceded it, any responsibility for the disappearance of those funds.

Great Western's Second Amended Complaint (Doc. 106, cited herein as "SAC") details numerous ways in which Graham and the Blue Entities contributed to the fraud.  For years, unbeknownst to Great Western, Graham, both individually, and as principal for the Blue Entities, leveraged a network of secretly-related entities to siphon away Great Western's assets.  Graham and the Blue Entities outwardly represented they were engaged in arms-length transactions and providing steady asset values to funds they managed in Great Western's Trust Account.  But these were falsehoods.  When the truth emerged in 2017, Great

1

Western had already, and unbeknownst to it, sustained very significant losses.  Thus, Great Western filed this lawsuit.

Graham and the Blue Entities have submitted a Memorandum of Law in Support of their Motion to Dismiss Great Western Insurance Company's Second Amended Complaint (Doc. 127, cited herein as "Memorandum").  They argue that the case should be dismissed pursuant to Rule 12(b)(2) and 12(b)(6).  Neither argument is well-founded.  First, they claim that BCM, Blue Elite Fund, Ltd., and Blue II are not subject to this Court's jurisdiction.  (*See* Memorandum at 7-9.)  However, as the SAC's well-pleaded allegations make clear (SAC at ¶¶ 36, 38, 49, 51, 77), Graham lived and worked in New York City—and as essentially the sole person controlling the Blue Entities—routinely transacted business in New York.  Thus, BCM, Blue Elite Fund, Ltd., and Blue II are subject to New York's long-arm jurisdiction. (*See* Section I, below.)

Likewise, Graham and the Blue Entities' arguments under Rule 12(b)(6) are unavailing.  Great Western has more than adequately pled each of its nine current claims against Graham and the Blue Entities, which are for: (1) breach of fiduciary duty; (2) aiding and abetting a breach of fiduciary duty; (3) fraud; (4) aiding and abetting a fraud; (5) civil conspiracy to commit fraud; (6) civil RICO, subsection (c) (18 U.S.C. § 1962(c)); (7) civil RICO, subsection (a) (18 U.S.C. § 1962(a)); (8) RICO conspiracy (18 U.S.C. § 1962(d)); and (9) unjust enrichment.  *See* Section II, below.  Accordingly, Great Western respectfully requests that the Court deny Graham and the Blue Entities' Motion.

## STATEMENT OF FACTS

### The Coinsurance, Novation, and Trust Agreements

In 2009, Great Western entered into a Coinsurance Agreement[1] with Ability Reinsurance (Bermuda) Limited ("Ability Re") to reinsure certain insurance policies issued by Great Western. (SAC at ¶ 60.)

Approximately three years later, in 2012, Great Western entered into a Novation Agreement, whereby the Coinsurance Agreement remained in-force, except defendant Alpha Re Limited ("Alpha") replaced Ability Re as Great Western's reinsurer.  In connection with the Novation Agreement, Great Western, Alpha, and defendants Wilmington Savings Fund Society, FSB and Christiana Trust (together, "WSFS") also entered into an Amended & Restated Trust Agreement ("Trust Agreement") effective July 11, 2012, whereby Great Western deposited approximately $153 million into the Trust Account.  (*Id.* at ¶¶ 64, 67; Ex. C.)  The Novation Agreement required Alpha to fund the Trust Account in the amount of 102% of Alpha's reserve obligations under the Coinsurance Agreement.  (*Id.* at ¶ 66.)  Under the Trust Agreement, BAAM served as the investment manager for the assets held in the Trust Account.  (*Id.* at ¶ 67.) Graham co-founded BAAM in 2003, has owned all of BAAM since 2009, and signed the Trust Agreement's Incumbency Certificate as "President" of BAAM.  (*Id.* at Ex. C at Ex. D.)

### BAAM and Graham's Self-Dealing Investments

In September 2012—a mere two months after obtaining control over the $153 million in the Great Western Trust Account—Graham and BAAM invested $148 million of the $153 million in a Repurchase Agreement with defendant Cygnet 001 Master Trust Series 2011-C ("Series 2011-C") (herein, referred to as "Great Western's Money").  (SAC at ¶ 70.)  Series

---

[1] All capitalized, undefined terms shall have the same definition and meaning as in the SAC.

3

2011-C is a series trust that is part of a master trust – defendant Cygnet 001 Master Trust

("Cygnet") – along with defendants Cygnet 001 Master Trust Series 2011-A ("Series 2011-A")

and Cygnet 001 Master Trust Series 2012-A ("Series 2012-A").  The master trust and series

trusts are all owned and operated by defendants Regatta Holdings LLC ("Regatta") and Don

Solow ("Solow").

Unbeknownst to Great Western, in December 2013, Regatta and BCM entered into a

Collateral Management Agreement, whereby BCM became the Collateral Manager of Series

2011-C.  (*Id.* at ¶ 77.)  Graham was the President of BCM, and has owned 100% of BCM since

its inception.  (*Id.*)  Consequently, for the Repurchase Agreements signed in September 2014 –

2016, ***Graham was on both sides of the purported "negotiation"***:  as President of BAAM

(investment manager of the Trust Account for Great Western) and as President of BCM

(collateral manager of Series 2011-C).  (*Id.* at ¶ 78.)  At no time from 2012 to 2016 did any

defendant advise Great Western of the significant interests that Graham simultaneously held in

Alpha and BCM, or of his role at Series 2011-C (the counter-party to the Repurchase

Agreement).  (*Id.* at ¶ 79.)

From 2012 to 2016, all representations by Graham and BAAM to Great Western were

that the collateral backing the Repurchase Agreements were properly valued and appropriate –

specifically, cash and United States Treasury securities.  (SAC at ¶ 80.)  To confirm this, Great

Western asked Graham about the assets backing the Repurchase Agreement on many occasions.

(*Id.* at ¶ 86.)  In response, Graham repeatedly said there was no issue and that the Great Western

Trust Account statements showed the true value of the Repurchase Agreement and that the Trust

Account was fully funded.  (*Id.*)  This was false.  Along with the many other hats he has worn,

Graham's entity BCM was the Collateral Manager for Series 2011-C, thus he *knew its actual value was far below what was being represented to Great Western*.[2]  (*Id.*)

Graham and the Blue Entities also deceived Great Western about the types of investments being made with Great Western's Money.  Prior to—and subsequent to—the execution of the Trust Agreement, Graham repeatedly affirmed that the collateral backing the Repurchase Agreement would only be cash and United States Treasury securities, in a series of conversations and electronic communications that included Nathan Felix ("Felix"), the then Chief Financial Officer of Great Western.  (SAC at ¶ 74.)  However, contrary to the misrepresentations made by Graham, BAAM, and other defendants to Great Western, sometime after the initial investment in cash and United States Treasury securities, Graham and defendant Don Solow began to direct the funds backing the Repurchase Agreement in Series 2011-C into *risky investments, including numerous hedge funds and swap agreements*.  (*Id.* at ¶ 89.)  Defendants Cygnet, Series 2011-A, Series 2013-A, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II, and Sancus Capital Blue Credit Opportunities Fund Ltd. ("Sancus") are seven such investment vehicles to which Graham and Solow repeatedly transferred money, both directly and indirectly, from Series 2011-C.  (*Id.* at ¶ 90.)

Graham and/or Solow have an ownership interest and served in a primary role of responsibility (such as the President, Founder, or similar position) for all seven of those investment vehicles or entities, as well as the investment managing firms BAAM and BCM.

---

[2] Graham and the Blue Entities make a preposterous claim on page 25 of the Memorandum that the "Repurchase Confirmations do not make any representations as to the value of Series 2011-C," when the Repurchase Confirmations clearly state the purchase price.  For instance, in 2016, one of the Repurchase Confirmations states:  "Purchase Price: $135,373,500 (USD)."

(SAC at ¶ 106.).  ***This enabled Graham to self-deal and to coordinate the actions of and to conspire with other defendants to perpetrate their massive fraud upon Great Western***.

Graham and Solow operated this systemic circle of self-dealing out of New York.  Both BAAM and BCM maintain offices in New York through which they have transacted business. (*Id.* at ¶¶ 38-39.)  Blue Elite Fund Ltd., Blue Elite Fund LP, and Blue II and Sancus were created and operated by Graham from New York-based offices, through which they have transacted business.  (*Id.* at ¶¶ 49-51.)

In September 2015, Graham, on behalf of BCM and of BAAM, signed several Repurchase Confirmations to re-enter into the Repurchase Agreement with Great Western's Trust Account for $142,085,095.  (SAC at ¶ 93.)  Yet, ***three months earlier***, in June 2015, an independent third party chosen by Alpha, Graham, and Solow ***valued Series 2011-C to be worth approximately negative $18.5 million***.  (*Id.* at ¶ 94.)  Graham, BCM, and BAAM all knew of this valuation, did not alert Great Western, and have ***never*** explained the source of the discrepancy.  (*Id.* at ¶ 92.)  Similarly, in September 2016, Graham again signed several Repurchase Confirmations to re-enter into the Repurchase Agreement with Great Western's Trust Account for $142,085,095; precisely the same amount as before.  (*Id.* at ¶ 98.)  Yet, the September 2016 WSFS Account Statement for Series 2011-C showed a Market Value of $83,968,197.92.  (*Id.* at ¶ 99.)  This valuation excluded liabilities, so the real value was likely even lower.  (*Id.*)

Although the whereabouts of some of Great Western's Money is unknown,[3] Great Western has since learned that Graham, the Blue Entities, and other defendants received many

---

[3] Great Western does know that a large portion of its Money was taken by Ability Insurance Company when it swept Series 2011-C in late 2016.  (SAC at ¶¶ 113-118.)

payments—both directly and indirectly—from assets originally held in Great Western's Trust Account.  (SAC at ¶ 103.)  For example, from September 2012 – March 2017, "Alpha Re Reinsurance Trusts," which included Series 2011-C, provided cash disbursements to BAAM and BCM for at least $15.9 million.  (*Id.* at ¶ 104.)  Similarly, BAAM received an "incentive fee" for $2.44 million for the year 2013 from Blue Elite Fund, Ltd.  (*Id.* at ¶ 105.)  A significant amount of money from Series 2011-C was invested in Blue Elite Fund, Ltd.  (*Id.*)  That $2.44 million payment was made with funds to which the Trust Account for Great Western had a superior claim and should never have been made.  (*Id.*)

**SEC Investigation**

In September 2016, the U.S. Securities and Exchange Commission ("SEC") informed Great Western that it was investigating BAAM and various persons and entities, including defendants Regatta, WSFS, Atlantic Specialty Finance ("Atlantic"), Alpha Re Holdings (Cayman) Limited ("Alpha Holdings"), BCM, Alpha, Blue Elite Fund, Blue II, Solow, and Graham.  (SAC at ¶ 130.)  On a conference call on October 24, 2016, Great Western requested an identification of all assets backing the Trust Account.  (*Id.* at ¶ 132.)  The Alpha and BAAM representatives, including Graham, were unable to identify *any* such assets but said they would provide such information by October 28, 2016.  (*Id.*)  That did not happen.  (*Id.*)  On December 8, 2016, Great Western representatives met with Alpha and BAAM representatives at the offices of Alpha's counsel in New York.  (*Id.* at ¶ 133.)  At that meeting, Graham and BAAM provided a brief overview of what they purported was the collateral backing the Repurchase Agreements, and agreed to provide a full statement of Trust Account collateral within 5 days.  (*Id.*)  That never happened.  (*Id.*)  To date, Graham, the Blue Entities and other defendants have ***failed to***

*identify the nine-figure sum of assets that were and are supposed to be backing the Trust Account.* (*Id.* at ¶ 135.)

Due to defendants' misconduct, breaches of fiduciary duty, and fraudulent activity, Great Western has sustained losses in excess of $135 million. (*Id.* at ¶ 7.)

## ARGUMENT

Graham and the Blue Entities seek dismissal on two grounds. The first, a Rule 12(b)(2) argument, is meritless, because this Court has personal jurisdiction over Graham and the Blue Entities. The second, a Rule 12(b)(6) argument, is equally meritless, as Great Western has met the pleading requirements for each of its claims against Graham and the Blue Entities. Accordingly, the Court should deny the Motion in its entirety.

## I.   BCM, BLUE ELITE FUND, LTD., AND BLUE II ARE SUBJECT TO PERSONAL JURISDICTION IN NEW YORK.

### A.   Standard of Review.

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) (citation omitted) ("*Licci I*"). A plaintiff establishes a *prima facie* case by "pleading in good faith . . . legally sufficient allegations of jurisdiction." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). Indeed, "[a]t that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Id.* In evaluating whether this standard is met, the pleadings and any supporting materials are construed in the light most favorable to the plaintiff. *Licci I,* 732 F.3d at 167.

To determine personal jurisdiction over a non-domiciliary, courts first apply the forum state's long-arm statute. *See Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015). "If the long-arm statute permits personal jurisdiction, [courts] analyze whether personal

jurisdiction comports with due process protections established under the Constitution." *Id.*
Here, Great Western has satisfied both New York's long-arm statute and the constitutional
requirement and, therefore, BCM, Blue Elite Fund, Ltd., and Blue II's arguments fail.

> **B.   This Court Has Personal Jurisdiction Over BCM, Blue Elite Fund, Ltd., and Blue II Under New York's Long-Arm Statute.**

This Court has personal jurisdiction over BCM, Blue Elite Fund, Ltd., and Blue II under
CPLR § 302(a)(1).  CPLR § 302(a)(1) provides in relevant part: "[a]s to a cause of action arising
from any of the acts enumerated in this section, a court may exercise personal jurisdiction over
any non-domiciliary" that "transacts any business within the state."  "To determine the existence
of jurisdiction under section 302(a)(1), a court must decide (1) whether the defendant transacts
any business in New York and, if so, (2) whether this cause of action arises from such a business
transaction." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (internal
quotation marks omitted).  In fact:

> [S]ection 302 is a single act statute and proof of one transaction in New York is
> sufficient to invoke jurisdiction, even though the defendant never enters New York,
> so long as the defendant's activities here were purposeful and there is a substantial
> relationship between the transaction and the claim asserted.

*Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010) (citation and
internal quotation marks omitted).  New York decisions "tend to conflate the long-arm statutory
and constitutional analyses by focusing on . . . whether the defendant's conduct constitutes
'purposeful availment.'" *Id.* at 169.  A suit arises out of a transaction in New York "if there is an
articulable nexus, or a substantial relationship, between the claim asserted and the actions that
occurred in New York." *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 66 (2d Cir. 2012)
(citation omitted).

Here, Great Western has alleged that BCM, Blue Elite Fund, Ltd., and Blue II all
transacted business in New York and that this dispute arises out of those transactions.  Although

BCM is a corporation registered in Puerto Rico, Graham is the President of BCM, the sole owner of BCM since its inception, and BCM's primary and definitive operator.  (SAC at ¶¶ 11, 77.)  Graham lives and works in New York, where he has transacted all BCM-related business at issue herein.  (*Id.* at ¶¶ 9, 36.)  Graham conducted daily BCM business activity (*e.g.*, email correspondence, telephone conferences, and other business activities, such as executing contracts and authorizing fund transfers) from, and directed within, New York, on BCM's behalf.  For instance, Graham signed the Repurchase Confirmations, a key contract in this case, in September 2016 from New York.  (*Id.* at ¶ 73.)  New York courts have found such contacts sufficient to satisfy the long-arm statute.  *See FIA Leveraged Fund Ltd. v. Grant Thornton LLP*, 150 A.D.3d 492, 493–94 (1st Dept. 2017).  BCM also maintains an office in New York through which it transacted business at issue herein.  (SAC at ¶ 38.)  Courts have found New York's long-arm statute satisfied by defendants that lease space in New York and have far less sustained and substantial interactions with New York than Graham's New York-based actions on behalf of BCM.  *See FIA Leveraged Fund Ltd.*, 150 A.D.3d at 494 ("In light of [defendant's] numerous other contacts with New York (e.g., leasing New York apartments . . ., meeting with . . . employees in New York on many occasions between January 1999 and March 2007, and attending [an] event in September 2007), it does not violate due process to exercise jurisdiction over him.").

Although Blue Elite Fund, Ltd. and Blue II are registered in the Cayman Islands, Graham is the creator and operator of both entities.  (SAC at ¶¶ 22, 24, 49, 51.)  Graham transacted all Blue Elite Fund, Ltd. and Blue II-related business at issue in this case from Graham's New York office.  (*Id.* at ¶ 36.)  Again, Graham conducted daily business activity (*e.g.*, email correspondence, telephone conferences, and other business activities, such as executing contracts

and authorizing fund transfers) from, and directed within, New York, on Blue Elite Fund, Ltd. and Blue II's behalf.  New York courts have found such contacts sufficient to satisfy the long-arm statute.  *See FIA Leveraged Fund*, 150 A.D.3d at 493–94.  Thus, BCM, Blue Elite Fund, Ltd., and Blue II's actions were "volitional acts" by which they "avail[ed] [themselves] of the privilege of conducting activities within the forum State."  *C. Mahendra (N.Y.), LLC v. Nat'l Gold & Diamond Ctr., Inc.*, 125 A.D.3d 454, 457 (1st Dept. 2015).

Further, this suit arises from BCM, Blue Elite Fund, Ltd., and Blue II's contacts with New York.  Great Western seeks to recover damages for the over $135 million in assets that defendants siphoned away from Great Western's Trust Account – a plot that included, for example, Repurchase Confirmations signed by New York-based Graham as President of BCM, and furthered by New York-based Graham's diversion of Series 2011-C assets to and from Blue Elite Fund, Ltd., and Blue II.  "[T]he 'arising from' prong of § 302(a)(1) does not require a causal link between the defendant's New York business activity and a plaintiff's injury."  *Licci I*, 732 F.3d at 168.  However, but for BCM, Blue Elite Fund, Ltd., and Blue II's concerted misstatements and omissions, Great Western would not have suffered the losses it did.  Thus, there is a more than sufficient relationship between Great Western's claims and BCM, Blue Elite Fund, Ltd., and Blue II's contacts with New York.

### C.    This Court's Exercise of Personal Jurisdiction Over BCM, Blue Elite Fund, Ltd., and Blue II Comports with the Constitutional Requirements of the Due Process Clause.

"To establish personal jurisdiction over a defendant, due process requires a plaintiff to allege (1) that a defendant has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances."  *Eades*, 799 F.3d at 168–69 (citation omitted).  Minimum contacts necessary to support specific personal jurisdiction "exist where the defendant purposefully availed itself of the privilege of doing business in the forum

11

and could foresee being haled into court there," and the commission of "some single or occasional acts" may be enough. *Id.* at 169 (citations omitted).  As discussed above, BCM, Blue Elite Fund, Ltd., and Blue II's transaction of business in New York is sufficient to satisfy the minimum contacts prong of the due process test.  BCM, Blue Elite Fund, Ltd., and Blue II purposefully availed themselves of the opportunity to do business in New York when they occupied office space in New York, accepted sole ownership and operation by New York-based Graham, and, through Graham, sent emails, made telephone calls, executed contracts, and authorized fund transfers within New York.  Such purposeful contacts are sufficient to satisfy the minimum contacts requirement.

Once minimum contacts are established, the defendant must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Eades*, 799 F.3d at 169.  The *Eades* court explained that factors to be considered include:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Id.*

Here, exercising personal jurisdiction is reasonable under the circumstances.  The first factor, the potential inconvenience to BCM, Blue Elite Fund, Ltd., and Blue II of litigating this case in New York, is mitigated by modern technology and infrastructure.  *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129–30 (2d Cir. 2002) ("Even if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because 'the conveniences of modern communication and transportation ease what would have been a serious

burden only a few decades ago.'")  And, of course, there is no actual inconvenience – Graham runs BCM, Blue Elite Fund, Ltd., and Blue II from New York.

The other factors weigh in favor of personal jurisdiction.  Factors two and three favor New York, which has an interest in adjudicating business conducted within its borders.  And, the fourth and fifth factors are particularly persuasive.  In multiparty actions, the benefits to litigating all issues in one forum are obvious.  *See, e.g.*, *Brady v. Basic Research*, *LLC,* 101 F. Supp. 3d 217, 231-232 (E.D.N.Y. 2015) ("[B]ecause this Court has personal jurisdiction over defendant corporations, judicial economy will be served by litigating all the issues in one (1) forum.  For these reasons, the exercise of personal jurisdiction over [the defendant] comports with due process.").  Here, the demands of the multiparty litigation are particularly acute.  The SAC lists 25 Defendants, where the claims against each arise from the same set of facts.  Of those 25 Defendants, 17 have conceded or have not contested this Court's jurisdiction.  Because Defendants are numerous and there are questions of law and fact common to all Defendants, the Court and the parties would benefit from, among other things, the administrative efficiency of hearing claims against all Defendants, including BCM, Blue Elite Fund, Ltd., and Blue II, in the same venue and at the same time.  Therefore, this Court's exercise of personal jurisdiction over BCM, Blue Elite Fund, Ltd., and Blue II is entirely reasonable, appropriate, and lawful.

### D.    At a Minimum, Great Western is Entitled to Conduct Jurisdictional Discovery.

Although Great Western believes it has made a *prima facie* showing of the Court's general and specific personal jurisdiction over BCM, Blue Elite Fund, Ltd., and Blue II, should the Court determine otherwise, Great Western respectfully requests leave to take such jurisdictional discovery.  *See, e.g.*, *Daventree Ltd. v. Azerbaijan*, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004) ("If a plaintiff has identified a genuine issue of jurisdictional fact, jurisdiction

discovery is appropriate even in the absence of a *prima facie* showing as to the existence of jurisdiction.").

## II.   GREAT WESTERN HAS ADEQUATELY PLED ITS CLAIMS.

### A.   Standard of Review.

A motion to dismiss pursuant to Rule 12(b)(6) must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957)).  Under Rule 12(b)(6), this court must "accept[ ] all factual allegations [in the complaint] as true and draw[ ] all reasonable inferences in favor of the plaintiff." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014) (alterations in original, citation omitted); *accord Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  Under this standard, the Motion should be denied.

"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer,* 416 U.S. at 236).  In other words, "the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.,* 375 F.3d 168, 176 (2d Cir. 2004) (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir. 1980)).  Dismissal is only appropriate when "it appears beyond doubt that the [claimant] can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir. 2000); *accord Eternity Glob. Master Fund Ltd.,* 375 F.3d at 176–77.  Clearly, when Great Western proves its factual allegations, it will be entitled to judgment on every one if its claims against Graham and the Blue Entities.

**B.     Great Western Has Properly and Adequately Pled its Claim for Breach of Fiduciary Duty Against BAAM and Graham.**

To state a claim for breach of fiduciary duty under New York law, the plaintiff must allege: (1) the existence of a fiduciary duty between the parties, (2) a breach of that duty, and (3) damages resulting from that breach.  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F.Supp.2d 163, 196-98 (S.D.N.Y. 2006).  Importantly, "New York courts generally avoid dismissing a claim of breach of fiduciary duty . . . because it usually involves a question of fact: whether someone reposed trust and confidence in another who thereby gains a resulting superiority or influence."  *Musalli Factory for Gold & Jewelry v. JPMorgan Chase Bank. N.A.*, 261 F.R.D. 13, 26 (S.D.N.Y. 2009), *aff'd*, 382 Fed. App'x 107, 2010 WL 2588195 (2d Cir. June 29, 2010).

With respect to the first element, Great Western has sufficiently pled that BAAM and Graham owed Great Western fiduciary duties.  (SAC at ¶¶ 165, 167-169.)  A fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 168 (1st Dept. 1987).  A fiduciary relationship does not need to be memorialized in writing.  *See Wiener v. Lazard Freres & Co.*, 241 A.D.2d 114, 122 (1st Dept. 1998).  "***Professionals such as investment advisors***, who owe fiduciary duties to their clients, 'may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties.'"  *Bullmore v. Ernst & Young Cayman Islands*, 45 A.D.3d 461, 463 (1st Dept. 2007) (citation omitted) (emphasis added).

Here, Great Western placed its confidence in Graham and BAAM to invest its assets prudently.  Graham and BAAM were investment managers for all Trust Account assets.  (SAC at ¶ 70, Ex. C § 4(b).)  Graham co-founded BAAM in 2003, has owned all interest and stock in

BAAM since 2009, and signed the Trust Agreement's Incumbency Certificate as President of BAAM. (*Id.* at ¶ 67, Ex. C at Ex. D.) Although Graham attempts to distinguish BAAM from himself, Graham alone controlled BAAM. As such, BAAM and Graham were effectively one entity, and, thus, Graham cannot hide behind BAAM to avoid liability for his conduct. *See Sergeants Benevolent Ass'n Annuity Fund v. Renck*, 19 A.D.3d 107, 110 (1st Dept. 2005) (Breach of fiduciary duty claim against investment advisor "does not involve an attempt to pierce the corporate veil. A corporate officer can be held personally liable for his tortious conduct.").

Graham and BAAM first try to avoid culpability by arguing that Great Western's breach of fiduciary duty claims are barred because the claims are "entirely duplicative of a breach of contract claim" under the Novation and Trust Agreements. (*See* Memorandum at 10-11.) This argument is incorrect. Great Western's alleged fiduciary duty claims against Graham and BAAM arise entirely out of their role and actions as investment manager to the Trust Accounts (as described above), not out of the Novation or Trust Agreements. All of the cases cited by Graham and BAAM for this argument are irrelevant, as they involve contracts between the defendants and plaintiffs, not plaintiffs and third-parties – as is the case here. (*See id.*)

BAAM tries to avoid culpability by arguing that it only owed Alpha a fiduciary duty, not Great Western. (*See* Memorandum at 11-12.) But again, an entity can owe more than one party a fiduciary duty --- so, simply because BAAM may have owed Alpha a fiduciary duty does not mean BAAM could not also owe Great Western a fiduciary duty. *Zaccaro v. Shah*, 746 F. Supp. 2d 508, 523 (S.D.N.Y. 2010) (permitting plaintiff's breach of fiduciary duty claims to proceed against two separate entities); *Neogenix Oncology, Inc. v. Gordon*, 133 F. Supp. 3d 539, 554 (E.D.N.Y. 2015) (same).

The main case cited by BAAM for its argument against a breach of fiduciary duty is inapposite. *See Prickett v. N.Y. Life Ins. Co.*, 896 F. Supp. 2d 236 (S.D.N.Y. 2012). In *Prickett*, the plaintiff directed his insurance company to invest his premiums with a hedge fund, but was "prohibited from having any contact with" the hedge fund investment manager. *Id.* at 250. As a result, the plaintiff could not maintain a claim for breach of fiduciary duty, because he did not have "any contact or relationship" with the hedge fund investment manager whatsoever. *Id.* at 245. That lack of relationship does not come even remotely close to resembling the relationship between BAAM and Great Western. As alleged, BAAM had significant direct contact with Great Western and routinely corresponded with Great Western during their six-year relationship, including, most significantly, the numerous false assurances BAAM provided Great Western via telephone and in emails about the Trust Account assets from 2016 to 2017. (SAC at ¶¶ 132-33.)

Graham similarly tries to avoid culpability by arguing that Great Western's "generic allegations" are insufficient to allege that Graham owed Great Western a fiduciary duty. (*See* Memorandum at 12-13.) This argument is astonishing. Graham, as the sole owner and operator of BAAM, acted as a fiduciary in every conceivable way. For over six years, Graham served as the investment manager in charge of over $154 million that belonged to Great Western. This role is the epitome of a fiduciary. *See Bullmore*, 45 A.D.3d at 463 (identifying "investment managers" as an example of a fiduciary).

Although neither BAAM or Graham challenge the second and third elements, for completeness, Great Western has sufficiently pled that BAAM and Graham breached these fiduciary duties, resulting in damage to Great Western. (SAC at ¶¶ 170-171.) For example, Graham entered into the Repurchase Agreements as a representative for both parties to the agreements—BAAM (on behalf of Great Western) on the one side, and BCM (on behalf of

17

Series 2011-C) on the other side.  (*Id.* at ¶ 170.)  In doing so, Graham failed to perform his duties

as investment manager and act solely in the interest of Great Western.  (*Id.* at ¶ 78.)  Similarly,

Graham repeatedly directed the funds backing the Repurchase Agreement into risky investments

in which he had ownership interests (in direct violation of the Trust Agreement, which only

permitted 5% of investments to be in an entity under common control or ownership with Alpha),

and then repeatedly lied to Great Western about the value of the assets backing the Repurchase

Agreement.  (*Id.* at ¶¶ 89-90, 92-102.)  As a result of these and other breaches of fiduciary duty,

Great Western suffered damages of at least $135 million and has properly and adequately pled its

claim for breach of fiduciary duty against BAAM and Graham.  (*Id.* at ¶ 171.)

C.   **Great Western Has Properly and Adequately Pled its Claim for Aiding and
Abetting a Breach of Fiduciary Duty Against BCM, Blue Elite Fund Ltd.,
Blue Elite Fund L.P., and Blue II.**

To state a claim for aiding and abetting a breach of fiduciary under New York law, the

plaintiff must allege: (1) a breach of a fiduciary duty, of which the aider and abettor had

knowledge, (2) that the defendant provided substantial assistance to the breach, and (3) that

plaintiff suffered damage as a result of the breach.  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273,

294-95 (2d Cir. 2006); *Kaufman v. Cohen*, 307 A.D.2d 113, 126 (2003).

First, Great Western has alleged that BAAM, Graham, and other defendants breached

fiduciary duties owed to Great Western.  (SAC at ¶¶ 165-171); *see* Section II.B.

Second, BCM, Blue Elite Fund Ltd., Blue Elite Fund L.P., and Blue II knew that

Graham, BAAM, and others breached their fiduciary duties to Great Western.  (SAC at ¶¶ 173-

176.)  Graham served as the principal for each of these entities, and repeatedly used these entities

to transfer money, both directly and indirectly, from Series 2011-C.  "[I]t is impossible for the

alter ego of a fiduciary to dispute an allegation of aiding and abetting, since the alter ego, of

necessity, has actual knowledge of the fiduciary's intentions and conduct."  *Caprer v. Nussbaum*,

18

36 A.D.3d 176, 177 (2006).  As alleged, BCM, Blue Elite Fund Ltd., Blue Elite Fund L.P., and Blue II enabled Graham to self-deal and to coordinate the actions of and to conspire with other defendants to perpetrate their massive fraud upon Great Western.  (SAC at ¶¶ 172-276.)

BCM, Blue Elite Fund Ltd., Blue Elite Fund L.P., and Blue II were not "entirely passive" entities, as defendants argue.  (*See* Memorandum at 13-14.)  Rather, as alleged, Graham used these entities as vessels for, and collaborators with, Graham, BAAM, and others' systemic fraud and breaches of fiduciary duty owed to Great Western.  The allegations here stand in stark contrast with the case cited by defendants—*Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC*, 446 F. Supp. 2d 163 (S.D.N.Y. 2006)—where the court found the defendant did not have "knowledge" of the fraud scheme (and was therefore only "passive") based on allegations that the defendant only provided the fraudster with "dial-in access to its computer network and allow[ed] him to generate reports on BAS stationery" without reviewing the documents.  *Id.* at 201-202.  Here, BCM, Blue Elite Fund Ltd., Blue Elite Fund L.P., and Blue II actively participated in the fraud conducted by Graham, BAAM, and others by repeatedly completing self-dealing transactions, which was a breach of Graham, BAAM, and others' fiduciary duty.

Third, BCM, Blue Elite Fund Ltd., Blue Elite Fund L.P., and Blue II provided "substantial assistance" to BAAM, Graham, and others' breach of fiduciary duty.  "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur."  *Kaufman*, 307 A.D.2d at 126.  For example, Graham owned and operated BCM, which served as the collateral manager for Series 2011-C.  (SAC at ¶ 77.)  Despite knowledge that Series 2011-C was under-collaterized in 2015 and 2016, BCM still entered into the fraudulent Repurchase Agreements with BAAM (on behalf

19

of Great Western's Trust Account), thereby substantially assisting BAAM and Graham in their breach of fiduciary duty. (*Id.* at ¶¶ 92-93)  Subsequently, Graham, through BCM as the collateral manager of Series 2011-C, transferred assets from Series 2011-C to and from Blue Elite Fund Ltd., Blue Elite Fund L.P., and Blue II. (*Id.* at ¶¶ 90, 108.)  "Executing transactions, even ordinary course transactions, can constitute substantial assistance under some circumstances, such as where there is an extraordinary economic motivation to aid in the fraud." *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 511 (S.D.N.Y. 2001), *abrogated on different grounds by Casey v. Merck & Co., Inc.*, 653 F.3d 95 (2d Cir. 2011); *see also Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 48 (2d Cir. 1978) ("[S]ubstantial assistance might include … executing transactions or investing proceeds, or perhaps … financing transactions.").

BCM, Blue Elite Fund Ltd., Blue Elite Fund L.P., and Blue II's argument that Great Western failed to allege "obligations and duties" owed by these entities to Great Western is irrelevant. (*See* Memorandum at 14-15.)  As alleged, the substantial assistance provided by these entities involved affirmative assistance and concealment, not failure to act.  The requirement to allege a "duty" to act is only necessary if the substantial assistance element is predicated on a failure to act. *See Kaufman*, 307 A.D. at 126 ("However, the mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.").  Great Western does not allege these entities failed to act; therefore, their arguments regarding failure to allege a "duty" owed by these entities to Great Western is irrelevant.

D. **Great Western Has Properly and Adequately Pled its Claim of Fraud Against Graham, BCM, and BAAM.**

To state a claim for fraud under New York law, a plaintiff must allege: "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to

induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015).  Graham, BCM, and BAAM allege that the misrepresentations described in the SAC do not meet Rule 9(b) pleading standards.  (*See* Memorandum at 16.)  That is preposterous.  Graham, BCM, and BAAM have made $135+ million of Great Western's Money entrusted to them disappear; it would be hard to find a more compelling fraud case than what is described in the SAC.

Although Great Western certainly believes its 60-page SAC has easily clears the standard Rule 9(b) pleading standard for particularity, Rule 9(b) is relaxed in cases involving "complex or extensive fraudulent schemes," where "the fraudulent conduct is alleged to have taken place over a number of years." *U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 326 (S.D.N.Y. 2004).  If so, the plaintiff "need not plead the details of every false or fraudulent claim," rather, it only need plead the scheme "with particularity and provide representative examples." *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 618 (S.D.N.Y. 2013).  The facts alleged here are exactly the type of complex scheme, over several years, and involving myriad defendants, that is entitled to relaxed pleading standards.

The SAC is replete with examples of the many knowingly fraudulent statements made by Graham, BCM, and BAAM.  (SAC at ¶¶ 178-180.)  For example, Graham and BAAM repeatedly affirmed to Great Western's Nathan Felix that the Repurchase Agreement collateral were only cash and United States Treasury securities.  (*Id.* at ¶ 74.)  In speaking with Great Western, Graham and BAAM repeatedly said no issue existed with Repurchase Agreement collateral, that account statements showed the true value of the Repurchase Agreement, and that the Trust Account was fully funded.  (*Id.* at ¶ 86.)  In addition, Graham and BAAM—on multiple occasions via in-person meetings, telephone calls, and emails—falsely represented to Great

Western that the assets backing the Repurchase Agreement were of sufficient value to meet all of the obligations to Great Western.  (*Id*. at ¶ 121.)

BAAM and BCM were at the epicenter of the fraud scheme as the counter-parties to the 2012 Repurchase Agreement and subsequent Repurchase Confirmations.  Under the disguise of these "negotiated" agreements, Graham was able to move $148 million out of Great Western's Trust Account and into Series 2011-C in 2012, and maintain control over the funds.  In September 2015, Graham, as President of BCM and Collateral Manager of Series 2011-C, signed several Repurchase Confirmations to re-enter into the Repurchase Agreement with Great Western's Trust Account for $142,085,095.  (SAC at ¶ 93.)  Yet, ***three months earlier***, in June 2015, an independent third party chosen by Alpha, Graham, and Solow ***valued Series 2011-C to be worth approximately negative $50.9 million***.  (*Id*. at ¶ 94.)  Graham, BCM, and BAAM all knew of these valuations, yet still chose to enter into the Repurchase Confirmations that stated false valuations of Series 2011-C.  This happened again in September 2016, when BAAM and BCM entered into a Repurchase Confirmation valued at $142,085,095, even though the WSFS Account Statement for Series 2011-C showed a Market Value of $83,968,197.92.  (*Id.* at ¶¶ 98-99.)

All the while, Graham, BCM, and BAAM kept all of these connections and other conflicts of interest with other defendants secret from Great Western. *Id*. at ¶ 79.  Given the timeline and complexity of the fraud, Great Western has clearly pled with sufficient particularity that Graham, BCM, and BAAM made material misrepresentations.

In footnote 7 on page 16, Graham, BCM, and BAAM make a passing argument that Great Western did not plead "why it was justifiable for Great Western to rely" on the defendants' false statements.  That argument, of course, requires inferences to be drawn against, rather than

in favor of, Great Western, which is contrary to the standards for a motion to dismiss.  Moreover, it cannot reasonably be doubted that Great Western was justified in relying on representations by the investment manager (Graham and BAAM) of Great Western's Trust Account and the counter-party to the Repurchase Agreement (BCM) that those agreements were fair, arms-length transactions.  *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) (explaining that courts assess the reasonableness of justifiable reliance by considering "factors such as [the transaction's] complexity and magnitude, the sophistication of the parties, and the content of any agreements").  Furthermore, the question of reliance generally cannot be resolved on motion to dismiss, as "reliance is always nettlesome because it is so fact-intensive."  *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997).

Finally, Great Western has sufficiently pled that it suffered damages of at least $135 million (*see* SAC at ¶ 171), thus it has properly and adequately pled its claim for fraud against Graham, BCM, and BAAM.

> **E.     Great Western Has Properly and Adequately Pled its Claim of Aiding and Abetting a Fraud Against Blue Elite Fund Ltd., Blue Elite Fund LP, and Blue II.**

To state a claim for aiding and abetting fraud under New York law, a plaintiff must allege: "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud."  *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 464 (S.D.N.Y. 2009) (citation omitted).

First, as alleged in the FAC, Great Western was the victim of systemic fraud.  (SAC at ¶¶ 178-181; *see* discussion at Section II.D herein.)

Second, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II had actual knowledge of the Graham, BCM, BAAM, and others' fraud through their intimate relationship with Graham, who

created, owned, and operated all of these entities.  (SAC at ¶¶ 49-51, 90; *see* discussion at Section II.C herein.)[4]

Finally, Blue Elite Fund Ltd., Blue Elite Fund LP, and Blue II provided substantial assistance to the scheme.  Each were recipients of—and transferors of—money from Series 2011-C.  (SAC at ¶¶ 90, 106.)  This participation facilitated Graham, BCM, and BAAM's broader fraud and helped to conceal it from Great Western.  Similarly, Blue Elite Fund Ltd., Blue Elite Fund LP, and Blue II received profit payments from assets originally held in Great Western's Trust Account for their assistance.  (*Id.* at ¶ 103.)  As such, Blue Elite Fund Ltd., Blue Elite Fund LP, and Blue II were integral to the facilitation of the fraudulent scheme.  *See* Doc. 56-1, SEC Order, *In the Matter of Mark Graham, Blue Capital Management, and Blue Alternative Asset Management*, at ¶ 20; *see also ABF Capital Mgmt. v. Askin Capital Mgmt.*, L.P., 957 F.Supp. 1308, 1328 (S.D.N.Y. 1997) ("[p]laintiffs here allege a highly interdependent scheme in which both parties benefitted . . . [i]n such circumstances, allegations that a defendant actively assisted and facilitated the fraudulent scheme itself . . . are sufficient").  Thus, Great Western has properly and adequately pled its claim for aiding and abetting fraud against Graham, BCM, and BAAM.

F.    **Great Western Has Properly and Adequately Pled its Claim for Civil Conspiracy to Commit Fraud Against Graham and the Blue Entities.**

To state a claim for civil conspiracy under New York law, the plaintiff must allege "a primary tort and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the

---

[4] Although the Defendants claim that imputing knowledge of Graham to the Blue entities would render the aiding and abetting fraud claim duplicative of the underlying fraud claim, alter egos of an entity can be held liable for aiding and abetting. *See Caprer v. Nussbaum*, 36 A.D.3d 176, 177, 825 N.Y.S.2d 55 (2006).

furtherance of a plan or purpose; and (4) resulting damage or injury." *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F.Supp.2d 431, 446 (S.D.N.Y. 2000). "While New York law does not contain an actionable tort of conspiracy alone, a plaintiff may still plead the tort of civil conspiracy 'in order to connect someone to an otherwise actionable tort committed by another and establish that those actions were part of a common scheme.'" *Fezzani v. Bear, Stearns & Co. Inc.*, 592 F.Supp.2d 410, 423 (S.D.N.Y. 2008).

First, Great Western has properly and adequately pled its claim for fraud against Graham, BCM, and BAAM. (SAC at ¶¶ 178-181.) *See* discussion at Section II.D herein.

Second, Great Western sufficiently alleges (1) the corrupt agreement to defraud Great Western made between the Graham and the Blue Entities, *i.e.*, the co-conspirators, and (2) various overt acts in furtherance of said agreement. (*Id.* at ¶¶ 222-225.) Here, Graham, through BAAM and BCM, and in conjunction with the other Blue Entities, conspired to defraud Great Western by diverting Great Western assets from the Trust Account to the various Blue Entities. (*Id.*) Graham and the Blue Entities orchestrated a vast number of self-dealing transactions— whereby one Blue Entity would invest in another Blue Entity through fraudulent valuations—all with Graham, BCM, and BAAM on both sides of the transaction. For instance, in September 2015 and September 2016, Graham, BCM, and BAAM entered into self-dealing Repurchase Confirmations for approximately $142 million, when the value of Series 2011-C was far less. (*Id.* at ¶¶ 93-94; 99.) Blue Elite Fund Ltd., Blue Elite Fund LP, and Blue II were investment vehicles to which Graham, BCM, and BAAM transferred money, both directly and indirectly, from Series 2011-C via redemption receipts that had inaccurate and fraudulent valuations. (*Id.* at ¶¶ 89-91; 100.) The defendant co-conspirators—through these transactions—actively stymied

Great Western's efforts to perform due diligence on the Trust Account assets through pervasive misstatements and omissions.

Finally, the defendant co-conspirators' participation in the plan to defraud Great Western was intentional and the cause of great damage.  (*Id.* at ¶¶ 225-226.)  By the nature of Graham and Solow's sweeping ownership and control of the defendants, Great Western has sufficiently pled that the participation of each co-conspirator was intentional and the agreement among them was feasible.  (*Id.* at ¶¶ 67, 77, 90.)  Further, Great Western properly alleges damages in an amount of at least $135 million.  (*Id.* at ¶ 226.)  Thus, Great Western has properly and adequately pled its claim for civil conspiracy to commit fraud against Graham and the Blue Entities.

**G.**     **Great Western Has Properly and Adequately Pled its Claim for Civil RICO Subsection (c) (18 U.S.C. § 1962(c)), Civil RICO Subsection (a) (18 U.S.C. § 1962(a)), and Civil RICO Conspiracy (18 U.S.C. § 1962(d)) Against Graham and the Blue Entities.**

Great Western has pled a valid claim for Civil RICO, subsection (c) (18 U.S.C. § 1962(c)), subsection (a) (18 U.S.C. § 1962(a)), and subsection (d) (18 U.S.C. § 1962(d)) against Graham and the Blue Entities.  (*See* discussion at Memorandum of Law in Opposition to Solow, Regatta, and Cygnet Entities Motion to Dismiss Plaintiff's Second Amended Complaint ("Solow Opposition Memorandum"), Section I.B. – I.C., which are incorporated herein by reference.)

**H.**     **Great Western Has Properly and Adequately Pled its Claim of Unjust Enrichment Against Graham and the Blue Entities.**

To state a claim for unjust enrichment under New York law, the plaintiff must allege that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."  *See Overton v. Art Fin. Partners LLC*, 166 F. Supp. 3d 388, 403 (S.D.N.Y. 2016).

First, Great Western properly alleges that Graham and the Blue Entities were enriched at Great Western's expense.  (SAC at ¶¶ 244-245.)  Graham and the Blue Entities received portions

of the assets removed from the Great Western Trust Account, that, but for their improper conduct, would never have been paid to Alpha, and then distributed the money to Graham and the Blue Entities.  (*Id.* at ¶¶ 103-105, 244-245.)  For example, "Alpha Re Reinsurance Trusts," which included Series 2011-C, provided cash disbursements to BAAM and BCM for at least $15.9 million.  (*Id.* at ¶ 104.)  Similarly, BAAM received an "incentive fee" for $2.44 million from Blue Elite Fund, Ltd. – a payment to which Great Western's Trust Account had superior claim.  (*Id.* at ¶ 105.)

Graham and the Blue Entities criticize Great Western for offering limited facts as to the amount and nature of the funds invested in Blue Elite Ltd (*see* Memorandum at 29-30); however, this is the exact information that Great Western sought for years from defendants and that defendants refused to provide.  (SAC at ¶¶ 80-91.)  The SAC is predicated on the fact that defendants are unable to account or document for over $135 million that they were entrusted to maintain on behalf of Great Western.  (*Id.* at ¶ 7.)  As such, defendants are actively responsible for the suggested information limitations.

Second, Great Western properly alleges that equity and good conscience militate against permitting Graham and the Blue Entities to retain the disbursement of the Great Western's assets.  (*Id.* at ¶ 245.)  As alleged, Graham and the Blue Entities have repeatedly lied to and deceived Great Western over the past six years—and continue to do the same to this day— regarding the whereabouts of Great Western's Money. (*Id.* at ¶¶ 80-102.)  Such deceit certainly meet the pleading standard for equity and good conscience.  *See, e.g., Childers v. New York & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 305 (S.D.N.Y. 2014) (denying defendant's motion to dismiss because plaintiff simply pled "equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover").

27

Graham and the Blue Entities argue that the Coinsurance, Novation, and Trust Agreements preclude any unjust enrichment claims against them. (*See* Memorandum at 28-29.) However, neither Graham nor the Blue Entities were a party to any of these agreements, and Graham and the Blue Entities' roles and responsibilities go beyond the scope of those agreements. (SAC at Ex. A and C.) The Coinsurance and Novation Agreements related to a coinsurance business arrangement outlining Alpha and Great Western's rights and responsibilities for ceding certain insurance claims. The Trust Agreement outlined WSFS's duties as the trustee for the Great Western Trust Account. None of those agreements detailed Graham and BAAM's duties as investment manager, nor did they detail any responsibilities between the Blue Entities and investors in those Blue Entities (*e.g.*, investors in Blue Elite Fund). As such, the deceit used by Graham and the Blue Entities to gain control of Great Western's Money—and the subsequent lies they told to maintain control of, and siphon off, Great Western's Money—is wholly unrelated to the Coinsurance, Novation, and Trust Agreements.

Lastly, Blue Elite Ltd., Blue Elite L.P., and Blue II argue they lack sufficient privity with Great Western. (*See* Memorandum at 30.) However, this is an incorrect characterization of the legal standard. Under New York law, unjust enrichment "requires some relationship between plaintiff and defendant." *Overton*, 166 F. Supp. 3d at 403. This is a "modest" requirement. *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018). "[T]he nexus between parties is too attenuated if the parties 'simply had no dealings with each other.'" *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 464 (S.D.N.Y. 2014) (citation omitted). Blue Elite Ltd., Blue Elite L.P., and Blue II were all owned and operated by Graham. (SAC at ¶¶ 49-51, 109.) Because of Graham's role as principal for these entities, his knowledge of and connection with Great Western is imputed to each of them. Graham knew not only of Great

Western's existence, but that Great Western was a victim of Defendants' scheme.  (*Id.* at ¶¶ 67, 70, 74, 77-78, 86, 91, 98.)  As such, there is a sufficient relationship between Great Western and Blue Elite Ltd., Blue Elite L.P., and Blue II.

## **CONCLUSION**

For the foregoing reasons, Great Western respectfully requests that the Court deny Graham and the Blue Entities' Motion.  However, given that the current motion to dismiss is the first time the Court has addressed the substance of Great Western's claims, if the Court dismisses any claims in the SAC against Graham and the Blue Entities, Great Western requests that such dismissal be without prejudice, so that Great Western may replead to cure such deficiencies.[5]

---

[5] *See BLT Rest. Grp. LLC v. Tourondel,* 855 F. Supp. 2d 4, 13 (S.D.N.Y. 2012) ("Rule 15(a) of the Federal Rules of Civil Procedure specifies that courts should 'freely give' leave to amend 'when justice so requires.'")

Dated: March 12, 2019

SIDLEY AUSTIN LLP

By: */s/ Gerard D. Kelly*_____

Gerard D. Kelly
(admitted *pro hac vice*)
gkelly@sidley.com
Stephen W. McInerney
(admitted *pro hac vice*)
smcinerney@sidley.com

One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Steven M. Bierman
sbierman@sidley.com
Michael P. Morrissey
mmorrissey@sidley.com

787 Seventh Avenue
New York, New York 10019
(212) 839-5300

Nicholas K. Lagemann
nlagemann@mdmc-law.com

McElroy, Deutsch, Mulvaney & Carpenter, LLP
225 Liberty Street
36th Floor
New York NY 10281
(973) 425-0161

*Attorneys for Plaintiff Great Western Insurance Company.*

30