**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                     :

GREAT WESTERN INSURANCE COMPANY,   :      Civil Action No. 18-cv-06249-VSB
                                     :

               Plaintiff,         :      Hon. Vernon S. Broderick
                                     :

                                     :

      vs.                             :

                                     :

MARK GRAHAM, DONALD SOLOW, BLUE      :
CAPITAL MANAGEMENT, INC., BLUE         :
ALTERNATIVE ASSET MANAGEMENT LLC,  :
WILMINGTON SAVINGS FUND SOCIETY,    :
FSB, CHRISTIANA TRUST, REGATTA       :
HOLDINGS LLC, CYGNET 001 MASTER     :
TRUST, CYGNET 001 MASTER TRUST SERIES :
2011-A, CYGNET 001 MASTER TRUST SERIES :
2011-C, CYGNET 001 MASTER TRUST SERIES :
2013-A, ALPHA RE LIMITED, ALPHA RE     :
HOLDINGS (CAYMAN) LIMITED, ATLANTIC  :
SPECIALTY FINANCE, BLUE ELITE FUND    :
LTD., BLUE ELITE FUND LP, BLUE II LTD.,   :
SANCUS CAPITAL BLUE CREDIT         :
OPPORTUNITIES FUND LTD., ABILITY     :
INSURANCE COMPANY, JOHN DRAKE,     :
EDWARD BRENDAN LYNCH, GREGORY     :
TOLARAM, ADVANTAGE CAPITAL        :
HOLDING LLC, DAN CATHCART, AND      :
KENNETH KING.
                                     :

              Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS DONALD**
**SOLOW, REGATTA HOLDINGS LLC, CYGNET 001 MASTER TRUST, CYGNET 001**
**MASTER TRUST SERIES 2011-A, CYGNET 001 MASTER TRUST SERIES 2011-C, AND**
**CYGNET MASTER TRUST SERIES 2013-A'S MOTION TO DISMISS COUNTS TWO**
**THROUGH EIGHT AND ELEVEN OF PLAINTIFF'S SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 2

    Solow's Self-Dealing ..................................................................................................... 2

    Misrepresentations About Status of Trust Account Assets ........................................... 3

    Solow, Regatta, and Cygnet Entities Payments ........................................................... 6

ARGUMENT ....................................................................................................................... 6

I.      GREAT WESTERN HAS ADEQUATELY PLED ITS CLAIMS ................................ 6

    A.    Standard of Review ........................................................................................ 6

    B.    Great Western Has Properly and Adequately Pled its Claim for RICO. ....... 7

          1.    The RICO Claim Is Not Barred By PSLRA Section 107. ................ 7

          2.    The RICO Claim Properly Alleges a Pattern of Racketeering Under
               Section 1962(c). ........................................................................... 10

          3.    Great Western Sufficiently Alleges a RICO Conspiracy Under Section
               1962(d). ........................................................................................ 13

          4.    Great Western Has Sufficiently Pled a Claim for Investment of
               Racketeering Income Under Section 1962(a). ............................... 13

    C.    Great Western Has Properly and Adequately Pled its Claim for Aiding and
        Abetting a Breach of Fiduciary Duty Against Solow, Regatta, Cygnet, Series
        2011-A, Series 2011-C, and Series 2013-A. ............................................... 14

    D.    Great Western Has Properly and Adequately Pled its Claim for Fraud Against
        Solow and Regatta. ..................................................................................... 17

    E.    Great Western Has Properly and Adequately Pled its Claim of Aiding and
        Abetting a Fraud Against the Cygnet Entities. ............................................ 20

    F.    Great Western Has Properly and Adequately Pled its Claim of Civil
        Conspiracy to Commit Fraud Against Solow, Regatta, and the Cygnet Entities. ... 21

    G.    Great Western Has Properly and Adequately Pled its Claim of Unjust
        Enrichment Against Solow, Regatta, and the Cygnet Entities. ............................. 23

CONCLUSION ................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*,
    957 F. Supp. 1308 (S.D.N.Y. 1997) .................................................................................... 21

*Acito v. IMCERA Grp, Inc.*,
    47 F.3d 47 (2d Cir. 1995) ....................................................................................... 18, 19

*Best Cellars Inc. v. Grape Finds at Dupont, Inc.*,
    90 F. Supp. 2d 431 (S.D.N.Y. 2000) ..................................................................................... 22

*BLT Rest. Grp. LLC v. Tourondel*,
    855 F. Supp. 2d 4 (S.D.N.Y. 2012) ..................................................................................... 25

*Blythe v. Deutsche Bank AG*,
    399 F. Supp. 2d 274 (S.D.N.Y. 2005) ................................................................................... 7

*Boudinot v. Shrader*,
    No. 09 Civ. 10163(LAK), 2012 WL 489215 (S.D.N.Y. Feb. 15, 2012) .................................... 7

*Caprer v. Nussbaum*,
    36 A.D.3d 176 (2d Dept. 2006) .................................................................................15, 16, 21

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001) .................................................................................................. 11, 12

*Chadbourne & Parke, LLP v. Troice*,
    571 U.S. 377 (2014) ......................................................................................................... 8

*Childers v. N.Y. & Presbyterian Hosp.*,
    36 F. Supp. 3d 292 (S.D.N.Y. 2014) .................................................................................... 24

*Constellation Bank, N.A. v. C.L.A. Mgmt. Co.*,
    No. 94 CIV 0989 (RPP), 1995 WL 42285 (S.D.N.Y. Feb. 1, 1995) ..................................... 14

*Dabit v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*,
    395 F.3d 25 (2d Cir. 2005) ............................................................................................ 7, 9

*Dayton Monetary Assocs. v. Donaldson, Lufkin, & Jenrette Sec. Corp.*,
    No. 91-2050, 1993 WL 410503 (S.D.N.Y. Oct. 14, 1993) ..................................................... 11

*DeFalco v. Bernas*,
    244 F.3d 286 (2d Cir. 2001) ........................................................................................... 10

*Dervan v. Gordian Grp. LLC*,
    No. 16-1694, 2017 WL 819494 (S.D.N.Y. Feb. 28, 2017) .................................................... 25

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003) ........................................................................................... 19

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*,
  375 F.3d 168 (2d Cir. 2004) ............................................................................ 7

*Falkowski v. Imation Corp.*,
  309 F.3d 1123 (9th Cir. 2002) ......................................................................... 9

*Fezzani v. Bear, Stearns & Co.*,
  592 F. Supp. 2d 410 (S.D.N.Y. 2008) ........................................................... 22

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
  385 F.3d 159 (2d Cir. 2004) .......................................................................... 11

*Kaufman v. Cohen*,
  307 A.D.2d 113 (2003) ............................................................................ 14, 15

*Kottler v. Deutsche Bank AG*,
  607 F. Supp. 2d 447 (S.D.N.Y. 2009) ................................................ 20, 21, 25

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006) .......................................................................... 14

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) .......................................................................... 17

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
  175 F. Supp. 2d 593 (S.D.N.Y. 2001) ........................................................... 21

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ............................................................................ 6

*In re Monahan Ford Corp. of Flushing*,
  340 B.R. 1 (Bankr. E.D.N.Y. 2006) .............................................................. 16

*Nielsen v. Rabin*,
  746 F.3d 58 (2d Cir. 2014) .............................................................................. 6

*Overton v. Art Fin. Partners LLC*,
  166 F. Supp. 3d 388 (S.D.N.Y. 2016) ........................................................... 23

*Palatkevich v. Choupak*,
  No. 12 Civ. 1681 (CM), 2014 WL 1509236 (S.D.N.Y. Jan. 24, 2014) ....................... 13

*Rao v. BP Prods. N. Am.*,
  589 F.3d 389 (7th Cir. 2009) ......................................................................... 14

*Scheuer v. Rhodes*,
  416 U.S. 232 (1974) ........................................................................................ 6

*Schlaifer Nance & Co. v. Estate of Warhol*,
  119 F.3d 91 (2d Cir. 1997) ...................................................................... 10, 19

*Sec. and Exch. Comm'n v. Northshore Asset Mgmt.*,
  No. 05 Civ. 2191(WHP), 2008 WL 1968299 (S.D.N.Y. May 5, 2008) ...................... 9

*Sec. and Exch. Comm'n v. Zandford*,
  535 U.S. 813 (2002) ......................................................................................................... 9

*Stechler v. Sidley, Austin Brown & Wood, L.L.P.*,
  382 F. Supp. 2d 580 (S.D.N.Y. 2005) ............................................................................ 7

*Sweet v. Sheahan*,
  235 F.3d 80 (2d Cir. 2000) ............................................................................................. 7

*U.S. ex rel. Taylor v. Gabelli*,
  345 F. Supp. 2d 313 (S.D.N.Y. 2004) .......................................................................... 17

*United States v. Bagaric*,
  706 F.2d 42 (2d Cir. 1983) ........................................................................................... 11

*United States v. Wells Fargo Bank, N.A.*,
  972 F. Supp. 2d 593 (S.D.N.Y. 2013) .......................................................................... 17

*Vantone Grp. Ltd. Liab. Co. v. Yangpu NGT Indus. Co.*,
  No. 13-7639, 2015 WL 4040882 (S.D.N.Y. July 2, 2015) ............................................ 20

*Villager Pond, Inc. v. Town of Darien*,
  56 F.3d 375 (2d Cir. 1995) ............................................................................................. 6

*Zweiman v. AXA Equitable Life Ins. Co.*,
  146 F. Supp. 3d 536 (S.D.N.Y. 2015) ............................................................................ 7

**Statutes**

18 U.S.C. § 1341 .................................................................................................................. 10

18 U.S.C. § 1343 .................................................................................................................. 10

18 U.S.C. § 1961(1)(B) ....................................................................................................... 10

18 U.S.C. § 1961(4) ............................................................................................................. 12

18 U.S.C. § 1962(a) ...................................................................................................... 2, 13, 14

18 U.S.C. § 1962(c) ................................................................................................ 2, 10, 12, 13

18 U.S.C. § 1962(d) ........................................................................................................ 2, 13

18 U.S.C. § 1964(c) ............................................................................................................... 7

Securities Litigation Uniform Standards Act .................................................................... 7

**Other Authorities**

FRCP 15(a) .......................................................................................................................... 25

iii

Rule 8(a) .................................................................................................................................... 20

Rule 9(b) .................................................................................................................................... 17

Rule 12(b)(6) ......................................................................................................................... 2, 6

Plaintiff Great Western Insurance Company ("Great Western") submits this Memorandum of Law in Opposition to the Motion to Dismiss Counts Two through Eight and Eleven of Plaintiff's Second Amended Complaint ("Motion") filed by Donald Solow ("Solow"), Regatta Holdings LLC ("Regatta"), and Cygnet 001 Master Trust ("Cygnet"), Cygnet 001 Master Trust Series 2011-A ("Series 2011-A"), Cygnet 001 Master Trust Series 2011-C ("Series 2011-C"), and Cygnet Master Trust Series 2013-A ("Series 2013-A") (Cygnet and Series 2011-A, 2011-C and 2013-A are together the "Cygnet Entities").

## INTRODUCTION

Great Western has been the victim of a massive fraud.  Great Western filed this action because over $135 million that was entrusted to defendants to be available to meet coinsurance obligations on Great Western insurance policies is unaccounted for.  Every single one of the defendants to this action had some combination of legal, fiduciary and/or contractual obligations related to the missing funds.  Every single one of the defendants to this action played a role in the disappearance of those funds.  Not a single one of the defendants to this action has even tried to explain, either before or after Great Western filed this action, what happened to those funds.  And yet, every single one of the defendants to this action has denied, either in this action or the reinsurance arbitration that preceded it, any responsibility for the disappearance of those funds.

Great Western's Second Amended Complaint (Doc. 106, cited herein as "SAC") details numerous ways in which Solow, Regatta, and the Cygnet Entities contributed to the fraud.  For years, unbeknownst to Great Western, Solow, both individually and as principal for Regatta and the Cygnet Entities, leveraged a network of secretly-related entities to siphon away Great Western's assets.  Solow, Regatta, and the Cygnet Entities outwardly represented that they were engaged in arms-length transactions and providing steady asset values to funds they managed in

Great Western's Trust Account.  But these were falsehoods.  When the truth emerged in 2017, Great Western had already, and unbeknownst to it, sustained very significant losses.  Thus, Great Western filed this lawsuit.

Solow, Regatta, and the Cygnet Entities have submitted a Memorandum of Law in Support of their Motion to Dismiss Counts Two through Eight and Eleven of Plaintiff's Second Amended Complaint (Doc. 132, cited herein as "Memorandum").  They argue that Great Western's claims against them should be dismissed pursuant to Rule 12(b)(6).  However, Great Western has more than adequately pled each of its eight claims against them, which are for: (1) RICO – 18 U.S.C. § 1962(c); (2) RICO – 18 U.S.C. § 1962(a); (3) RICO Conspiracy 18 U.S.C. § 1962(d); (4) aiding and abetting a breach of fiduciary duty; (5) fraud; (6) aiding and abetting a fraud; (7) civil conspiracy to commit fraud; and (8) unjust enrichment.  Accordingly, Great Western respectfully requests that the Court deny the Motion.

## STATEMENT OF FACTS[1]

### Solow's Self-Dealing

In connection with the Coinsurance Agreement[2] and subsequent Novation Agreement, Great Western, defendant Alpha Re Limited ("Alpha"), and defendants Wilmington Savings Fund Society, FSB and Christiana Trust (together, "WSFS") also entered into an Amended & Restated Trust Agreement ("Trust Agreement") effective July 11, 2012, whereby Great Western deposited approximately $152 million into a trust account ("Trust Account") for the sole benefit of Great Western. (SAC ¶¶ 3; Ex. C.)  The Novation Agreement required Alpha to fund the Trust

---

[1] For further discussion of this factual background, please see Plaintiff's Opposition to Mark Graham, Blue Capital Management, Inc., Blue Alternative Asset Management, LLC, Blue Elite Fund Ltd., Blue Elite Fund L.P., and Blue II Ltd.'s Motion to Dismiss Great Western Insurance Company's Second Amended Complaint ("Graham Opposition Memorandum"), which is incorporated herein by reference.

[2] All capitalized, undefined terms shall have the same definition and meaning as in the SAC.

Account in the amount of 102% of Alpha's reserve obligations under the Coinsurance Agreement.  (*Id.* at ¶ 61.)

In September 2012—two months after obtaining control over the $153 million in the Great Western Trust Account—defendants Mark Graham ("Graham") and Blue Alternative Asset Management ("BAAM") invested $148 million of the $153 million in a Repurchase Agreement with Series 2011-C.  (*Id.* at ¶ 70, Ex. D.)  This means that on the one side of this transaction was Alpha (as Grantor of the Great Western Trust Account), and on the other side of this transaction was Regatta.

***Unbeknownst to Great Western at the time, Solow was on both sides of this transaction, thus enabling him to self-deal and to coordinate the actions of and conspire with other defendants to perpetrate their massive fraud upon Great Western***.  Regatta owns all of the Cygnet Entities, including Series 2011-C, and Solow is the sole owner and operator of Regatta— all of which were unknown to Great Western.  (*Id.* at ¶¶ 41-45, 70.)  Solow also owns roughly 40-percent of Alpha (with Graham owning the other 60-percent), and founded Alpha (along with other defendants).  (*Id.* at ¶ 65.)  Solow (and the other defendants) completely hid these relationships and conflicts of interest from Great Western.  (*Id.* at ¶ 79.)

**Misrepresentations About Status of Trust Account Assets**

From 2012 to 2016, all representations by Alpha, Graham, BAAM, Solow, Tolaram, and WSFS to Great Western were that the collateral backing the Repurchase Agreements were properly valued and appropriate, specifically, cash and United States Treasury securities.  (*Id.* at ¶ 80.)  Prior to, and subsequent to, the execution of the Trust Agreement, Solow and Graham repeatedly affirmed to Great Western that the collateral backing the Repurchase Agreement were only cash and United States Treasury securities which met the requirements of the Utah Insurance Code.  (*Id.* at ¶¶ 74, 84.)  Thus, Graham and Solow ***falsely and knowingly reassured***

3

***Great Western that the Trust Account was fully funded***. (*Id.* at ¶ 84.)

Contrary to the misrepresentations made by Graham and Solow to Great Western, sometime after the initial investment in cash and United States Treasury securities, they began to direct the funds backing the Repurchase Agreement in Series 2011-C into ***risky investments, including numerous hedge funds and swap agreements***. (SAC at ¶ 89.) Cygnet, Series 2011-A, Series 2013-A, Blue Elite Fund Ltd., Blue Elite Fund LP, Blue II Ltd., and Sancus are seven such investment vehicles to which Graham and Solow transferred money, both directly and indirectly, from Series 2011-C. (*Id.* at ¶ 90.) Graham and/or Solow have an ownership interest in all seven of these investment vehicles or entities. (*Id.*)

As explained in the SAC, Great Western first learned a few details about these investments in November 2016. (SAC at ¶ 91.) However, even at that time, Alpha, Graham, BAAM, Solow, Tolaram, and WSFS failed to give Great Western specifics, despite repeated promises by Graham, Solow and the entities they represented or controlled to do so. (*Id.*) Great Western did not learn any details about any of these investments, and the fact that they included hedge funds, swaps, and other risky investments, until June 2018. (*Id.*)

In fact, as of December 31, 2014, the ***valuation of Series 2011-C was negative $18.5 million***. (SAC at ¶ 92.) Graham, Solow, Regatta, the Cygnet Entities, BCM, BAAM, Alpha, Drake, Lynch, and Tolaram all knew of this valuation and did not alert Great Western to this fact. (*Id.*) Similarly, as of December 31, 2015, the ***valuation of Series 2011-C was negative $50.86 million***. (*Id.* at ¶ 102.) This negative valuation accounted for the assets and liabilities of Series 2011-C. (*Id.*) Graham, Solow, Regatta, the Cygnet Entities, BCM, BAAM, Alpha, Drake, Lynch, and Tolaram all knew of this valuation and did not alert Great Western to this fact. (*Id.*)

Lest there be any doubt of the fraud perpetrated against Great Western, in September

4

2016 the account statement for Series 2011-C showed $83.9 million in assets.  (SAC at ¶¶ 99.) Yet, sometime in September 2016, Series 2011-C re-entered the Repurchase Agreement with the Great Western Trust Account—meaning, Series 2011-C needed $143+ million in its account. Solow, Regatta, and the Cygnet Entities knew this was fraudulent—yet, they re-entered into the Repurchase Agreement and lied to Great Western.  (*Id.* at ¶¶ 98-102.)

Graham, Solow, Regatta, and the Cygnet Entities all knew that the assets in Series 2011-C were significantly insufficient to back the Repurchase Agreement.  (SAC at ¶ 121.)  Yet, Graham and Solow—on multiple occasions via in-person meetings, telephone calls, and emails—*continued to falsely represent to Great Western that the assets backing the Repurchase Agreement were of sufficient value to meet all of the obligations to Great Western* under the Coinsurance Agreement, the Novation Agreement, and the Repurchase Agreement. (*Id.*)

In December 2016, Alpha Re (US), the US-version of defendant Alpha, owned and operated by Solow, changed its name to Vista Life & Casualty Reinsurance Company ("Vista Re").  (SAC at ¶ 123.)  Solow specifically said that this name change was designed to insulate the U.S. entity from reputational damage incurred by action against Alpha that was being pursued by Cayman regulatory authorities.  (*Id.*)  On December 31, 2016, after Ability withdrew $109 million from Series 2011-C, Ability signed a new coinsurance agreement with Vista Re that gave them an additional 40% of Ability's business.  This tripled the amount of overall business given by Ability to entities owned or controlled by Solow.  (*Id.* at ¶ 124.)

In September 2016, the U.S. Securities and Exchange Commission ("SEC") contacted Great Western and informed it that it was investigating BAAM and various persons and entities associated with it, including but not limited to Regatta, WSFS, Atlantic, Alpha Holdings, BCM, Alpha, Blue Elite Fund, Blue II Fund Ltd., Solow, and Graham.  (SAC at ¶ 130.)  To date,

Solow, Regatta, the Cygnet Entities, and the other defendants have **_failed to identify the nine-figure sum of assets that were and are supposed to be backing the Trust Account_** (*Id.* at ¶ 135); resulting in Great Western sustaining losses in excess of $135 million.  (*Id.* at ¶ 7.)

**Solow, Regatta, and Cygnet Entities Payments**

Defendants Solow, Regatta, and the Cygnet Entities have received many payments—both directly and indirectly—from assets originally held in Great Western's Trust Account.  (SAC at ¶ 103.)  For instance, from September 2012 – March 2017, "Alpha Re Reinsurance Trusts," which included Series 2011-C, disbursed at least $6.3 million to Regatta and at least $340,000 to Solow. (*Id.* at ¶ 104.)

## ARGUMENT

Solow, Regatta, and the Cygnet Entities seek dismissal pursuant to Rule 12(b)(6). Their position is meritless, because Great Western has met the pleading requirements for each of its claims against them. Accordingly, the Court should deny the Motion in its entirety.

## I.    GREAT WESTERN HAS ADEQUATELY PLED ITS CLAIMS.

### A.  Standard of Review.

A motion to dismiss pursuant to Rule 12(b)(6) must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957)).  Under Rule 12(b)(6), this court must "accept[ ] all factual allegations [in the complaint] as true and draw[] all reasonable inferences in favor of the plaintiff." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014) (alterations in original, citation omitted); *accord Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir. 2014).

"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Villager Pond, Inc. v. Town of Darien,* 56 F.3d

375, 378 (2d Cir. 1995) (quoting *Scheuer,* 416 U.S. at 236).  In other words, "the office of a

motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the

weight of the evidence which might be offered in support thereof."  *Eternity Glob. Master Fund*

*Ltd. v. Morgan Guar. Tr. Co.,* 375 F.3d 168, 176 (2d Cir. 2004) (quoting *Geisler v. Petrocelli,*

616 F.2d 636, 639 (2d Cir. 1980)).  Dismissal is only appropriate when "it appears beyond doubt

that the [claimant] can prove no set of facts which would entitle him or her to relief."  *Sweet v.*

*Sheahan,* 235 F.3d 80, 83 (2d Cir. 2000); *accord Eternity Glob. Master Fund Ltd.,* 375 F.3d at

176–77.

## B.  Great Western Has Properly and Adequately Pled its Claim for RICO.

### 1.  The RICO Claim Is Not Barred By PSLRA Section 107.

Section 107 of the Private Securities Litigation Reform Act ("PSLRA") provides that a

plaintiff may bring a federal action under the RICO statute "except that no person may rely upon

any conduct that would have been actionable as fraud ***in the purchase or sale*** of securities to

establish a violation of section 1962 [the RICO statute]."  18 U.S.C. § 1964(c) (emphasis added).

But, the RICO allegations made in the SAC do not involve "the purchase or sale of

securities."  The Second Circuit has recognized, in the context of the Securities Litigation

Uniform Standards Act ("SLUSA") preemption (which is commonly used in evaluating PSLRA

Section 107 preemption arguments),[3] that courts "must look beyond the face of the complaint to

analyze the substance of the allegations made." *Dabit v. Merrill Lynch, Pierce, Fenner, & Smith,*

---

[3] Congress "enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA") and SLUSA to regulate the purchase and sale of securities and the securities industry." *Zweiman v. AXA Equitable Life Ins. Co*., 146 F. Supp. 3d 536, 544 (S.D.N.Y. 2015). As a result, courts routinely use decisions related to SLUSA preemption to analyze PSLRA preemption, or visa versa, including, specifically, the *Dabit I* case.  *See, e.g., Blythe v. Deutsche Bank AG*, 399 F. Supp. 2d 274, 279 (S.D.N.Y. 2005) (in analyzing a PSLRA preemption argument, the court used *Dabit I's* SLUSA analysis; stating that "the Second Circuit [in *Dabit I*] has recently cautioned that, even under *Zandford'* s expansive reading of the Act, "[t]he fraud must be integral to the purchase and sale of the securities in question"); *Stechler v. Sidley, Austin Brown & Wood, L.L.P.*, 382 F. Supp. 2d 580, 594 (S.D.N.Y. 2005) (same); *Boudinot v. Shrader*, No. 09 Civ. 10163(LAK), 2012 WL 489215, at \*5 (S.D.N.Y. Feb. 15, 2012).

*Inc.*, 395 F.3d 25, 34 (2d Cir. 2005) ("*Dabit I*"), *rev'd on other grounds*, 547 U.S. 71 (2006).

Thus, particular wording or turns of phrase will not override the gravamen of a complaint.  But

that is precisely what defendants seek to do here: parse and cherry-pick individual allegations

that have the appearance of a nexus to securities transactions while willfully ignoring the clear

substance of the claim.  This effort is contrary to law and should be rejected by this Court.

      The nexus of this dispute is a coinsurance arrangement.  (*See* SAC ¶¶ 60-66.)  This is

how Great Western became involved with defendants, and most importantly, the sole reason why

Great Western transferred $153 million into the Trust Account.  (*See id.* at ¶ 62.)

      Importantly, Great Western neither purchased, nor sold, nor instructed any party to

purchase or sell securities.  Although it appears that defendants subsequently used Great

Western's Money [4] to purchase or sell securities, those purchases and sales had nothing to do

with the origination or purpose of the defendants' scheme.  Instead, the SAC describes

misconduct by defendants in appropriating Great Western's funds to themselves, in particular:

> The association-in-fact's purpose was to fraudulently secure reinsurance arrangements
> with insurance companies, take control of reinsurance trust funds, use those assets to conceal
> and perpetuate its ongoing fraud scheme, and ultimately enrich the scheme's founders.

(*Id.* at ¶ 190.)

      Defendants' misconduct clearly falls outside the Section 107 bar.  *See Chadbourne &*

*Parke, LLP v. Troice*, 571 U.S. 377, 387 (2014) ("A fraudulent misrepresentation or omission is

not made 'in connection with' … a 'purchase or sale of a covered security' unless it is ***material***

to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered

---

[4] In 2012, Graham, as the Investment Manager of the Great Western Trust Account, entered into multiple Repurchase Agreements, whereby $148 million was transferred from the Trust Account to defendant Cygnet 001 Master Trust Series 2011-C. In exchange, the Trust Account (for which, Great Western was the sole beneficiary) was supposed to receive ownership of collateral in the Series 2011-C trust account. These assets are collectively referred to herein as "Great Western's Money."

security.'" (emphasis added)).

The SAC's allegations—that certain defendants, after obtaining access to $153 million of Great Western's Money as part of a reinsurance relationship, looted and stole Great Western's Money through, in part, the purchase and sale of securities (*see* SAC ¶ 202(d))—does not convert this case into a suit over fraud in the purchase or sale of securities. As the Second Circuit has observed, "[t]he incidental involvement of securities d[oes] not implicate the anti-fraud provisions of the federal securities laws." *Dabit I*, 395 F.3d at 37; *see also Sec. and Exch. Comm'n v. Zandford*, 535 U.S. 813, 820 (2002) (cautioning that the phrase "in connection with the purchase or sale of any security" must not "be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)").

Instead, "[t]he fraud must be '***integral*** to the purchase and sale of the securities in question,'" *Dabit I*, 395 F.3d at 37 (quoting *Pross v. Katz*, 784 F.2d 455, 459 (2d Cir. 1986)) (emphasis added), and therefore "fraud unattached to any particular purchase or sale" would not satisfy the "in connection with" requirement. *Id.* (*see also Falkowski v. Imation Corp.*, 309 F.3d 1123, 1131 (9th Cir. 2002)) (the alleged fraud and the securities transactions must have "more than some tangential relation"). Thus, the "incidental purchases and sales [of securities] … do not 'implicate the anti-fraud provisions of the federal securities laws.'" *Sec. and Exch. Comm'n v. Northshore Asset Mgmt.*, No. 05 Civ. 2191(WHP), 2008 WL 1968299, at *10 (S.D.N.Y. May 5, 2008). Defendants' position to the contrary is without merit.

This is not "boot-strapp[ing] a securities fraud case[] into [a] RICO case[]," as defendants have argued. (*See* Memorandum at 8-10.) The central agreement in this case is the Coinsurance Agreement (and subsequent Novation Agreement) – insurance agreements that formed the foundation of defendants' fraud. Moreover, Great Western has included additional allegations of wire fraud as predicate acts to its RICO Claim – none of which have any connection to the sale or

purchase of securities.  From 2012 to present, the RICO Enterprises profited from management fees they withdrew from Great Western's Trust Account via wires.  (*See* SAC ¶ 202.)  The RICO Enterprises also furthered their scheme to defraud Great Western by sending e-mails via wires with fraudulent misrepresentations about the whereabouts of Great Western's Money to prevent Great Western from discovering the RICO Enterprises' massive fraud.  (*Id.*)

### 2.   The RICO Claim Properly Alleges a Pattern of Racketeering Under Section 1962(c).

In order to state a claim under § 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) though a pattern (4) of racketeering activity."  *DeFalco v. Bernas,* 244 F.3d 286, 306 (2d Cir. 2001) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496,  (1985)). "Racketeering activity" encompasses, among other things, any act indictable for crimes enumerated under 18 U.S.C. § 1961(1)(B), which include acts of wire fraud (18 U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341).  To establish a "pattern" of racketeering activity, a "plaintiff must plead at least two predicate acts, [and] show that the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity."  *Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91, 97 (2d Cir. 1997) (citation omitted).  "Predicate acts are 'related' for RICO purposes when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'"  *Id.*  Great Western has met these standards.

The SAC includes numerous predicate acts that were related to continuing criminal activity, easily satisfying the "pattern of racketeering activity" threshold.  In 2012, Alpha portrayed itself as a trustworthy reinsurer to deceive Great Western to agree to the Novation Agreement (modifying the Coinsurance Agreement) (*see* SAC ¶ 202(a)), and transfer $153 million via wires to a Trust Account at WSFS (*see id.* at ¶ 202(b)).  Over the course of the next five years, the association-in-fact Enterprise directed the movement of funds via wires to enrich

10

the scheme participants and/or protect the scheme by paying demands from other entities (*i.e.,* use Great Western's money to repay old debts). *Id.* at ¶ 181(j); *see also id.* at ¶ 181(c)-(i).

The RICO statute requires "the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise.'" *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164, (2001). This requirement "is satisfied . . . when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner . . ." *Id.* at 166..

The SAC alleges that Regatta itself was an Enterprise (as well as part of the association-in-fact Enterprise),[5] and Don Solow is the sole owner of Regatta. (*See* SAC ¶ 41.) Regatta could only have been owned and operated by Don Solow, and Series 2011-C (wholly owned by Regatta) is the counter-party to the Repurchase Agreement that transferred $135 million into a series trust owned wholly by Regatta. *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 176 (2d Cir. 2004) (holding that the operation or management test poses "a relatively low hurdle for plaintiffs to clear . . . especially at the pleading stage"); *Dayton Monetary Assocs. v. Donaldson, Lufkin, & Jenrette Sec. Corp.*, No. 91-2050, 1993 WL 410503, at *3 (S.D.N.Y. Oct. 14, 1993).

The RICO Enterprise consists of four defendants: Alpha, BCM, BAAM, and Regatta. (SAC ¶¶ 190.) In addition, there was an association-in-fact between and among these four defendants which also constitutes a RICO Enterprise. (*Id.* ); *see United States v. Bagaric*, 706 F.2d 42, 56 (2d Cir. 1983) (holding that there does not need to be a formal structure for an association-in-fact Enterprise because "it is logical to characterize any associative group in terms of what it *does* rather than by abstract analysis of its structure), *abrogated by Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994). These four defendants as the "enterprise" (both

---

[5] Great Western has pled that Alpha, BCM, BAAM, and Regatta are each, individually, an Enterprise. In addition, Great Western has also pled that the four collectively constitute an association-in-fact Enterprise. (SAC at ¶ 190.)

individually and as an association-in-fact) are distinct from the allegations of the seven

defendants that qualify as a RICO "person."  The RICO "person" defendants include Graham,

Solow, Alpha Holdings, Atlantic, Drake, Lynch, and Tolaram.  (SAC at ¶¶ 191-199.)

Each of these RICO "persons" are "associated with each of the four Enterprises" and

"participated, directly or indirectly, in the management or direction of the Enterprise within the

meaning of 18 U.S.C. §§ 1961(4) and 1962(c)."  (SAC at ¶ 199.)  For example, the SAC alleges,

among other things, that:

- Graham is the investment manager of Great Western's Trust Account as owner of BAAM, and collateral manager of Cygnet 001 Master Trust Series 2011-C as owner of BCM (*id.* at ¶ 4, 65, 67, 78), majority owner of Alpha common stock;

- Solow is the owner of Regatta and Cygnet 001 Master Trust Series 2011-C (*id.* at ¶ 67, 70), minority owner of Alpha common stock;

- Alpha Holdings is the beneficial owner of Alpha (*id.* at ¶ 47);

- Atlantic is the ultimate beneficial owner of Alpha Holdings (*id.* at ¶ 48);

- Drake is the director of Alpha (*id.* at ¶ 54);

- Lynch is the director of Alpha (*id.* at ¶ 55); and

- Tolaram has an ownership interest in Alpha and is heavily involved in the day to day operations of Alpha and investments of Graham and the Blue Parties (*id.* at ¶ 56).

All of these actions by these seven defendants were in furtherance of the scheme and

were conducted through the four RICO Enterprises (and, collectively, the RICO association-in-

fact Enterprise).  *See Cedric Kushner Promotions,* 533 U.S. at 163-65 ("[T]he employee and the

corporation are different 'persons,' even where the employee is the corporation's sole owner'"

and "'[a] corporate employee who conducts the corporation's affairs through an unlawful RICO

'pattern … of activity,' § 1962(c), uses that corporation as a 'vehicle' whether he is, or is not, its

sole owner."); *see also Palatkevich v. Choupak*, No. 12 Civ. 1681 (CM), 2014 WL 1509236, at

*15 (S.D.N.Y. Jan. 24, 2014) ("[W]ithin the meaning of § 1962(c) a *natural person* named as the defendant 'person' is inherently distinct from a corporate entity 'enterprise' for which he acts as an agent; in such a case, the distinctness requirement is met." (emphasis in original)).

### 3.   Great Western Sufficiently Alleges a RICO Conspiracy Under Section 1962(d).

Solow, Regatta, and the Cygnet Entities argue that because the SAC once states "upon information and belief" that Solow, Regatta, and the Cygnet Entities agreed to further the RICO conspiracy, the entire claim is "woefully insufficient."  (Memorandum at 13.)  Regatta and Solow's focus on that phrase belies the many other times that the SAC alleges particular activities related to § 1962(d).  Solow, Regatta, and the Cygnet Entities agreed to engage in a pattern of racketeering activity.  (*See* SAC at ¶ 218.)  An agreement could reasonably be inferred from their close professional ties and from their mutually dependent, coordinated efforts in achieving the objectives of each Enterprise.  (*Id.* at ¶ 219.)  The objects of the conspiracy included, without limitation, the misappropriation of funds from Great Western and others by means of a scheme to defraud.  (*Id.* at ¶ 217.)  By these misappropriations, Solow, Regatta, and the Cygnet Entities gained personal benefits and supported the fraudulent scheme.  (*Id.*) Solow, Regatta, and the Cygnet Entities all knew of this [negative] valuation of the Series 2011-C and did not alert Great Western to this fact.  (*Id.* at ¶ 102.)  They received many payments from assets originally held in Great Western's Trust Account.  (*Id.* at ¶ 103.)  These are all overt acts that caused harm to Great Western.

### 4.   Great Western Has Sufficiently Pled a Claim for Investment of Racketeering Income Under Section 1962(a).

Section 1962(a) prohibits any person who has received income from racketeering "to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is

engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. §

1962(a). To satisfy § 1962(a), a plaintiff must allege sufficient facts showing that the "money

was used or invested in the operation of the enterprise" and that the plaintiff "suffered an injury

caused by the use or investment of the racketeering income." *Rao v. BP Prods. N. Am.*, 589 F.3d

389, 399 (7th Cir. 2009). Great Western has done so.

All of the RICO defendants received income derived, directly or indirectly, from the

pattern of racketeering and used or invested, directly or indirectly, that income or the proceeds of

that income back into the Enterprises. (SAC at ¶ 212.) Once defendants obtained access to

Great Western's $153 million, they used that money to continue to run their RICO Enterprises.

This use of Great Western's $153 million injured Great Western by "reducing value of the assets

in the Great Western Trust Accounts." (*Id.* at ¶ 213); *see Constellation Bank, N.A. v. C.L.A.*

*Mgmt. Co.*, No. 94 CIV 0989 (RPP), 1995 WL 42285, at *3 (S.D.N.Y. Feb. 1, 1995) (denying

defendants' motion to dismiss on Section 1962(a) claim when plaintiff alleged that the

defendants fraudulently obtained loans that they then used to invest in their various real estate

enterprises).

C.  **Great Western Has Properly and Adequately Pled its Claim for Aiding and Abetting a Breach of Fiduciary Duty Against Solow, Regatta, Cygnet, Series 2011-A, Series 2011-C, and Series 2013-A.**

To state a claim for aiding and abetting a breach of fiduciary under New York law, the

plaintiff must allege: (1) a breach of a fiduciary duty, of which the aider and abettor had

knowledge, (2) that the defendant provided substantial assistance to the breach, and (3) that

plaintiff suffered damage as a result of the breach." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273,

294-95 (2d Cir. 2006); *Kaufman v. Cohen*, 307 A.D.2d 113, 126 (2003).

First, BAAM and Graham, among other defendants, owed—and breached—their

fiduciary duties owed to Great Western. (SAC ¶¶ 165-171; *see* Graham Opposition

14

Memorandum, Section II.B.)

Great Western has also alleged that Solow, Regatta, and the Cygnet Entities knew of these breaches based on their roles as owners/operators of Series 2011-C and Alpha. (*See* SAC at ¶¶ 58, 62.) To name one instance, Solow, Regatta, and the Cygnet Entities specifically knew BAAM and Graham had entered into fraudulent Repurchase Agreements in September 2016 on behalf of the Great Western Trust Account—when the Repurchase Agreement was valued at $143+ million—but Series 2011-C had less than $80 million in assets. (*Id.* at ¶¶ 86-90.) Thus, Solow, Regatta, and the Cygnet Entities knew this agreement was a breach of the fiduciary duty BAAM, Graham, and others owed to Great Western.

Second, Solow, through Regatta and the Cygnet Entities which Solow solely owned and operated, repeatedly and consistently provided "substantial assistance" to Graham and BAAM in breaching their fiduciary duties to Great Western. (*See* SAC at ¶¶ 173-177.) "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Kaufman*, 307 A.D.2d at 126; *see also Caprer v. Nussbaum*, 36 A.D.3d 176, 193 (2d Dept. 2006) ("It is impossible for the alter ego of a fiduciary to dispute an allegation of aiding and abetting, since the alter ego, of necessity, has actual knowledge of the fiduciary's intentions and conduct.").

Prior to, and subsequent to, the execution of the Trust Agreement, Solow repeatedly affirmed that the collateral backing the Repurchase Agreement were only cash and United States Treasury securities which met the requirements of the Utah Insurance Code. (SAC at ¶ 74.) These affirmations were made in a series of conversations and electronic communications that included Nathan Felix, the then Chief Financial Officer of Great Western. (*Id.*) These knowingly false statements provided affirmative assistance and helped provide cover to BAAM, Graham, and other defendants to obtain control of Great Western's Money and subsequently

15

breach their fiduciary duty to Great Western as they pilfered the assets in Great Western's Trust Account.

As time went on, Solow (as owner of Regatta) and Regatta/Cygnet (as owners of Series 2011-C) knew that the assets in Series 2011-C were significantly deficient to back the Repurchase Agreement, yet repeatedly lied to Great Western about the status of assets via in-person meetings, telephone calls, and emails. (SAC at ¶¶ 74, 79-80, 86.) In response to numerous inquiries from Nathan Felix directly asking about the assets backing the Repurchase Agreement, Solow reassured Felix that the Great Western trust was fully funded. (*Id.* at ¶ 86.) This was false, as Solow well knew, and provided substantial assistance to Graham, BAAM, and others by providing cover for their breaches of fiduciary duty. (*Id.*) Additionally, as the value of Series 2011-C began to decrease significantly in 2015, and then rapidly decreased in 2016 and 2017, Solow kept Blue Capital Management ("BCM") and Graham in charge as the collateral manager of Series 2011-C, which helped Graham breach his fiduciary duty to Great Western as a result of his role as investment manager of the Great Western Trust. (*Id.* at ¶ 111.)

Solow, Regatta, and the Cygnet Entities argue that Great Western "must" plead that these entities owed a "duty" to Great Western, and that Great Western has failed to do so. (Memorandum at 18.) However, a plaintiff must only allege a "duty" to act if the "substantial assistance" prong is predicated on a failure to act. *In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 43 (Bankr. E.D.N.Y. 2006) ("However, the inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff."). If, where as here, substantial assistance is based on the other two types of substantial assistance—affirmative assistance or concealment—then plaintiff need not allege any duty on behalf of the aider and abettor. *See Caprer*, 36 A.D.3d at 193 (holding that aiders and abettors are liable for the breach, even if they have "no independent fiduciary obligation to the allegedly

injured party, if the alleged aider and abettor rendered 'substantial assistance' to the fiduciary in the course of effecting the alleged breaches of duty.").

Great Western has properly alleged damages in an amount in excess of $135 million. (SAC at ¶ 177). Great Western has properly pled its claim against Solow, Regatta, and the Cygnet Entities of aiding and abetting a breach of fiduciary duty.

**D.  <u>Great Western Has Properly and Adequately Pled its Claim for Fraud Against Solow and Regatta.</u>**

To state a claim for fraud under New York law, a plaintiff must allege: "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015).

Although Great Western certainly believes its 60-page SAC has easily clears the standard Rule 9(b) pleading standard for particularity, Rule 9(b) is relaxed in cases involving "complex or extensive fraudulent schemes," where "the fraudulent conduct is alleged to have taken place over a number of years." *U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 326 (S.D.N.Y. 2004).  In these situations, courts have held that the plaintiff "need not plead the details of every false or fraudulent claim," but rather a plaintiff need only plead the scheme "with particularity and provide representative examples." *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 618 (S.D.N.Y. 2013).  The fraudulent scheme alleged here is exactly the type of complex scheme, over several years, and involving myriad defendants, that is entitled to such relaxed pleading standards.

For the first and second elements (knowingly providing material misrepresentation or omission of fact), the SAC is replete with examples of the many knowingly fraudulent statements made by Solow and Regatta.  (*See* SAC at ¶¶ 178-181.)  Solow and Regatta

17

repeatedly affirmed to Great Western that the Repurchase Agreement collateral were only cash and United States Treasury securities.  (*Id.* at ¶ 74.)  In speaking with Great Western about the assets backing the Repurchase Agreement, Solow gave reassuring answers that the trust was fully funded.  (*Id.* at ¶ 86.)  Solow on multiple occasions via in-person meetings, telephone calls, and emails—falsely represented to Great Western that the assets backing the Repurchase Agreement were of sufficient value to meet all of the obligations to Great Western.  (*Id.* at ¶ 121.)  Solow kept all of his connections with Regatta and Series 2011-C—and the conflicts of interest that arose out of these connections—secret from Great Western.  (*Id.* at ¶ 79.)

Similarly, Solow and Regatta never revealed the interrelationships between the defendants or the depletion of the Trust Account assets.  Solow and Regatta continually provided Great Western with assurances that Trust assets were properly invested, despite knowledge such statements were false because, in fact, Series 2011-C was severely under-collateralized.  (SAC at ¶ 92-102, 180.)  As the fraudulent scheme began to unravel, Solow and Regatta scrambled to hide the interconnected nature of the various entities.  For example, years before, Solow created, owned, and operated an entity named Alpha Re (US).  However, in December 2016, Solow changed the name of the Alpha-related entity to Vista Re in order to hide its affiliation with Alpha after the SEC investigation.  (*Id.* at ¶¶ 123.)  Shortly thereafter, defendant Ability Insurance Company ("Ability") went into business with Vista Re; tripling the amount of overall business Ability ceded to Solow-owned entities (changing from 20% with Alpha, to 60% with Vista Re).  (*Id.* at ¶ 124.)

For the third element (intent), in order to establish fraud *scienter*, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent."  *Acito v. IMCERA Grp, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).  Such an inference may arise either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that

18

constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 52.
Considering the purposefully obfuscated relationships between the parties (SAC at ¶¶ 68, 73-74,
79, 91, 123-124), and the hundreds of millions in Trust assets readily available to transfer among
the related entities—at least $6.8+ million of which Great Western knows was taken by Solow
and Regatta (*id.* at ¶ 104)—there was ample motive and opportunity to commit fraud.[6]

For the fourth element (justified reliance), courts determine the reasonableness of reliance
based on "factors such as [the transaction's] complexity and magnitude, the sophistication of the
parties, and the content of any agreements." *Emergent Capital Inv. Mgmt., LLC v. Stonepath
Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003). The question of reliance generally cannot be
resolved on motion to dismiss, as "reliance is always nettlesome because it is so fact-intensive."
*Schlaifer Nance & Co.*, 119 F.3d at 98.

Great Western was certainly justified in relying on statements by Regatta and Solow – the
owner of Alpha, who was Great Western's reinsurer. Astonishingly, Solow argues that it was
unjustifiable for Great Western to rely on statements by Solow about the assets in the Trust
Account because "Alpha" was in charge of valuation, not Solow. (Memorandum at 21-22.) But
Solow was Alpha; as, Solow was one of the two co-owners of Alpha (along with Graham), and
the main person at Alpha that Great Western spoke with as part of their reinsurance relationship
with Alpha. Thus, Great Western had no reason to doubt Solow – individually, as an owner of
Alpha, and in his capacity as sole owner/operator of Regatta and the Cygnet Entities. (*See* SAC
at ¶ 70.)

---

[6] Trying to refute Great Western's *scienter* allegations, Solow and Regatta falsely claim that Series 2011-C is not owned
by Solow and/or Regatta. "Party A" in the Master Purchase Agreement is Cygnet 001 Master Trust, which owned Series
2011-C. Cygnet 001 Master Trust, in turn, is owned by Regatta, which is owned by Solow. (SAC at ¶ 70, Ex. D at 1.)
Regatta and Solow's argument that the SAC names other defendants involved in the movement of Trust assets, and that
they thus cannot own Series 2011-C, is factually incorrect and only further emphasizes the tangled relationships of those
involved in the fraud scheme. And, in any event, all pleadings must be accepted as true.

Lastly, Solow and Regatta argue that the fraud claim "does not satisfy the notice pleading requirements of Rule 8(a)" based on their position that Great Western "provided only blanket allegations" against both defendants.  (Memorandum at 19.)  However, Great Western has carefully pled all counts in its 60-page complaint, specifically detailing what it knows about the systemic fraud perpetrated by Solow and Regatta, among others.  The fact that some of these claims (like fraud) are brought against a large number of defendants simply shows the systemic nature of the illegal enterprise, not that Great Western's claims are improperly pled.  *See, e.g., Vantone Grp. Ltd. Liab. Co. v. Yangpu NGT Indus. Co.*, No. 13-7639, 2015 WL 4040882, at *3 (S.D.N.Y. July 2, 2015) ("[C]ourts within this Circuit have held that '[n]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant'").

### E.   Great Western Has Properly and Adequately Pled its Claim of Aiding and Abetting a Fraud Against the Cygnet Entities.

To state a claim for aiding and abetting fraud under New York law, a plaintiff must allege: "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud." *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 464 (S.D.N.Y. 2009).

First, as alleged in the SAC, Great Western was the victim of systemic fraud. (SAC at ¶¶ 178-181; *see also* discussion at Section I.D herein, Graham Opposition Memorandum at Section II.D.)

Second, the Cygnet Entities had knowledge of the fraud through their intimate relationship with Solow, who, either directly or indirectly, created, owned, or operated the Cygnet Entities. (SAC at ¶¶ 41-45, 70, 90; *see* discussion at Section I.C herein.)  Due to Solow and Regatta's pervasive control, the Cygnet Entities became vessels for, and collaborators with,

Solow and Regatta. "[I]t is impossible for the alter ego of a fiduciary to dispute an allegation of aiding and abetting, since the alter ego, of necessity, has actual knowledge of the fiduciary's intentions and conduct." *Caprer*, 36 A.D.3d at 193.

Finally, the Cygnet Entities provided substantial assistance to the scheme. Each were recipients of money transferred from Series 2011-C by Graham and Solow. (SAC at ¶ 90, 103-104.) In accepting these transfers, they facilitated Solow, Regatta, and the other defendants' broader fraud and concealed it from Great Western. Similarly, the Cygnet Entities received substantial payments from assets originally held in Great Western's Trust Account. (*Id.* at ¶ 103-104.) As such, the Cygnet Entities not only substantially assisted, but were integral to the facilitation of, the fraudulent scheme. *See ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.,* 957 F. Supp. 1308, 1328 (S.D.N.Y. 1997) ("[p]laintiffs allege a highly interdependent scheme in which both parties benefitted . . . [i]n such circumstances, allegations that a defendant actively assisted and facilitated the fraudulent scheme itself . . . are sufficient"). Thus, Great Western has properly and adequately pled its claim for aiding and abetting fraud against the Cygnet Entities.

### F.   Great Western Has Properly and Adequately Pled its Claim of Civil Conspiracy to Commit Fraud Against Solow, Regatta, and the Cygnet Entities.

As an initial matter, despite Solow, Regatta, and the Cygnet Entities' suggestion otherwise (*see* Memorandum at 23), claims for civil conspiracy are not "duplicative" of claims for fraud or aiding and abetting fraud as a matter of law. *See, e.g.*, *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 633 (S.D.N.Y. 2001) ("[A] claim for civil conspiracy is not an independent tort, but rather, a derivative claim of an underlying substantive tort."); *Kottler*, 607 F. Supp. 2d at 464  (same). Instead, whether or not the claims are duplicative turns on each allegation; and, as set forth below, the acts supporting the claim for civil conspiracy are separate and apart from the underlying tort claim of fraud.

21

To state a claim for civil conspiracy under New York law, the plaintiff must allege "a primary tort and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 446 (S.D.N.Y. 2000). "While New York law does not contain an actionable tort of conspiracy alone, a plaintiff may still plead the tort of civil conspiracy 'in order to connect someone to an otherwise actionable tort committed by another and establish that those actions were part of a common scheme.'" *Fezzani v. Bear, Stearns & Co.*, 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008).

First, Great Western has properly and adequately pled its claim for fraud against Solow, Regatta, and other defendants.  (SAC at ¶¶ 178-181; *see* discussion at Section I.D herein, Graham Opposition Memorandum at Section II.D.)

Second, Great Western sufficiently alleges (a) the corrupt agreement to defraud Great Western made between the all defendants (except WSFS, Ability, King, and Cathcart), *i.e.*, the co-conspirators, and (b) numerous overt acts in furtherance of the conspiracy by Solow, Regatta, and the Cygnet Entities. (SAC at ¶¶ 222-226.)  Solow, Regatta, and the Cygnet Entities, in conjunction with the other co-conspirators, repeatedly acted to further the scheme of diverting Great Western asserts from the Trust Account to related entities.  (*Id.*)  For example, in September 2012, Graham and BAAM invested $148 million of Great Western's $153 million Trust Account assets in a Repurchase Agreement with Series 2011-C. (*Id.* at ¶ 73.)  From Series 2011-C, Graham and Solow directed the funds backing the Repurchase Agreement into risky investments in which they had ownership interests, including the Cygnet Entities.  (*Id.* at ¶¶ 89-91.)  Further, though the co-conspirators entered into various Repurchase Confirmations for approximately $142 million, in truth, Series 2011-C had a negative valuation.  (*Id.* at ¶¶ 92-102.)

22

Various defendant co-conspirators, including Solow, Regatta, and the Cygnet Entities, knew of this valuation and either lied directly to Great Western about the status of the Trust Account investments, or did not alert Great Western to this fact.  (*Id.* at ¶¶ 91, 97.)  These were all overt acts in furtherance of the conspiracy by which defendant co-conspirators actively stymied, by pervasive misstatements and omissions, Great Western's efforts to review the Trust Account.

Finally, the defendant co-conspirators' participation in the plan to defraud Great Western was intentional and the cause of great damage. (SAC at ¶¶ 222-226.)  By the nature of Graham and Solow's sweeping ownership and control of the defendants, Great Western has sufficiently pled that the participation of each co-conspirator was intentional and the agreement among them was feasible.  (*Id.* at ¶¶ 67-68, 77, 90.)  Further, Great Western alleges damages in an amount of at least $135 million.  (*Id.* at ¶ 226.)  Thus, Great Western has properly and adequately pled its claim for civil conspiracy to commit fraud against Solow, Regatta, and the Cygnet Entities.

### G. Great Western Has Properly and Adequately Pled its Claim of Unjust Enrichment Against Solow, Regatta, and the Cygnet Entities.

To state a claim for unjust enrichment under New York law, a plaintiff must allege that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *See Overton v. Art Fin. Partners LLC*, 166 F. Supp. 3d 388, 414 (S.D.N.Y. 2016).  Great Western has certainly done so.

First, Solow, Regatta, and the Cygnet Entities were enriched from cash disbursements out of certain accounts that included the Great Western Trust Account.  (SAC at ¶ 120.)  And these were not small cash disbursements.  Great Western knows of at least $340,000 provided to Solow, and $6.3 million to Regatta.  Solow, Regatta, and the Cygnet Entities (falsely) argue these funds did not come from the Great Western Trust (Memorandum at 24-25), but, in any

event, the allegations must be accepted as true at the pleading stage.  Thus, Great Western has sufficiently pled that Solow, Regatta, and the Cygnet Entities siphoned money out of Great Western's Trust Account for their own benefit.

Additionally, Vista Re, owned and operated by Solow, obtained $100+ million new business from Ability *after* Ability withdrew Great Western's Money from Series 2011-C – further evidence of how Solow unjustly enriched himself at Great Western's expense.  (SAC at ¶ 146.)  Solow, Regatta, and the Cygnet Entities knew of Ability's improper withdrawal of Great Western's Money—yet did not stop the withdrawal—because Solow had positioned himself to further benefit from Ability's withdrawal through Vista Re's new coinsurance agreement.  (*Id.* at ¶¶ 123-124.)

Second, although Solow, Regatta, and the Cygnet Entities do not challenge the third prong—for completeness—equity and good conscience militate against permitting Solow, Regatta, and the Cygnet Entities to maintain the money disbursements they received, given the extensive wrongdoing committed by all of them that resulted in Great Western selling its company for pennies on the dollar.  (SAC at ¶ 145); *see Childers v. N.Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 305 (S.D.N.Y. 2014) (denying defendant's motion to dismiss because "equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover").

Solow, Regatta, and the Cygnet Entities also raise two additional arguments that necessitate a response.  First, the unjust enrichment claim is not "duplicative" of the tort claims (Memorandum at 24), as the unjust enrichment claim is based on any money these three groups of defendants unjustly received from the Great Western Trust Account (which is at least $6.7 million).  (SAC at ¶ 104.)  This is distinct from the other tort claims, where the damages total all of Great Western's losses – not merely Solow, Regatta, and the Cygnet Entities' unjust gains.  Thus, the unjust enrichment claim is not duplicative and should not be dismissed.

24

Second, neither Solow, Regatta, nor the Cygnet Entities have a contract with Great Western.  Certainly the Coinsurance and Trust Agreements do not provide cover—indeed, until recently, Great Western was **_unaware of their roles and the money they received from the Great Western Trust Account_**.  *See Kottler*, 607 F. Supp. 2d at 468 ("'[W]here there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue,' a court should not dismiss a claim of unjust enrichment at the motion-to-dismiss stage"); *Dervan v. Gordian Grp. LLC*, No. 16-1694, 2017 WL 819494, at *12 (S.D.N.Y. Feb. 28, 2017) ("[If it] remains unsettled whether an enforceable contract in fact governs the dispute at hand…the Court sees no reason not to permit [Plaintiff] to proceed with the unjust enrichment theory of liability.").

## <u>CONCLUSION</u>

Great Western respectfully requests that the Court deny Solow, Regatta, and the Cygnet Entities' Motion.  However, given that the current motion to dismiss is the first time the Court has addressed the substance of Great Western's claims, if the Court dismisses any claims in the SAC against Solow, Regatta, or the Cygnet Entities, Great Western requests that such dismissal be without prejudice, so that Great Western may replead to cure such deficiencies.[7]

---

[7] *See BLT Rest. Grp. LLC v. Tourondel,* 855 F. Supp. 2d 4, 13 (S.D.N.Y. 2012) ("Rule 15(a) of the Federal Rules of Civil Procedure specifies that courts should 'freely give' leave to amend 'when justice so requires.'")

Dated: March 12, 2019                    SIDLEY AUSTIN LLP

                                         By: */s/ Gerard D. Kelly*___
                                              Gerard D. Kelly
                                              (admitted *pro hac vice*)
                                              gkelly@sidley.com
                                              Stephen W. McInerney
                                              (admitted *pro hac vice*)
                                              smcinerney@sidley.com
                                              One South Dearborn Street
                                              Chicago, Illinois 60603
                                              (312) 853-7000

                                              Steven M. Bierman
                                              sbierman@sidley.com
                                              Michael P. Morrissey
                                              mmorrissey@sidley.com
                                              787 Seventh Avenue
                                              New York, New York 10019
                                              (212) 839-5300

                                              Nicholas K. Lagemann
                                              nlagemann@mdmc-law.com
                                              McElroy, Deutsch, Mulvaney & Carpenter,
                                              LLP
                                              225 Liberty Street
                                              36th Floor
                                              New York NY 10281
                                              (973) 425-0161


                                         *Attorneys for Plaintiff Great Western Insurance*
                                         *Company.*