**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| GREAT WESTERN INSURANCE COMPANY, | : : : : | |
| Plaintiff, | : : | |
| v. | : : | Civil Action No.: 1:18-cv-06249-VSB-SN |
| MARK GRAHAM, *et al.*, | : : | |
| Defendants. | : : | |

**DEFENDANTS WILMINGTON SAVINGS FUND SOCIETY, FSB AND CHRISTIANA TRUST'S REPLY IN FURTHER IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(2) AND 12(b)(6)**

Dated: April 2, 2019

BLANK ROME LLP

Alan Lieberman, Esq. (AL6517)
Huaou Yan, Esq. (HY8128)
Daniel E. Rhynhart, Esq. (*pro hac vice*)
Stephanie C. Chomentowski, Esq. (*pro hac vice*)
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Telephone: (212) 885-5000
ALieberman@BlankRome.com
HYan@BlankRome.com
Rhynhart@BlankRome.com
Chomentowski@BlankRome.com

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I.   There Is No Basis to Exercise Personal Jurisdiction over WSFS. .......................................1

II.   Great Western Has Not Identified a Contractual Obligation that WSFS Breached. ...........4

III.   Great Western Has Failed to Adequately Plead that WSFS Had Actual Knowledge of the Other Defendants' Fraud and Provided Substantial Assistance to Them. ...............................................................................................................7

IV.   Great Western Fails to Identify Any "Special Duty" or "Misrepresentation" for its Negligence-Based Claims Against WSFS. ...........................................................9

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                   **Page(s)**

*Amusement Indus., Inc. v. Stern*,
   786 F. Supp. 2d 758 (S.D.N.Y. 2011) ................................................................................10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...............................................................................................................4

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ...............................................................................................................4

*Brown v. Lockheed Martin Corp.*,
   814 F.3d 619 (2d Cir. 2016) ..................................................................................................2

*Capitaliza-T Sociedad de Responsabilidad Limitada de Capital Variable v.
   Wachovia Bank of Del. Nat. Ass'n.*,
   2011 WL 864421 (D. Del. Mar. 9, 2011) .............................................................................9

*Conley v. Gibson*,
   355 U.S. 41 (1957) .................................................................................................................4

*Dunlap v. State Farm Cas. Co.*,
   878 A.2d 434 (Del. 2004) ......................................................................................................6

*Kirschner v. Bennett*,
   648 F. Supp. 525 (S.D.N.Y. 2009)........................................................................................7

*Laydon v. Mizuho Bank, Ltd.*,
   2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015) .....................................................................4

*Ritchie Capital Mgmt., L.L.C. v. Costco Wholesale Corp.*,
   2015 WL 13019620 (S.D.N.Y. Sept. 21, 2015)...................................................................4

*Waldman v. Palestine Liberation Org.*,
   835 F.3d 317 (2d Cir. 2016)..................................................................................................4

**Statutes**

12 DEL. CODE. ANN. § 3313 ...............................................................................................5, 6, 7

**Other Authorities**

31 C.F.R § 1020.220 ...................................................................................................................10

Federal Rule of Civil Procedure
   9(b)........................................................................................................................................8
   12(b)(2) .................................................................................................................................1
   12(b)(6) .................................................................................................................................1

WSFS begins by addressing personal jurisdiction, as its obvious absence leads to the clearest and quickest path to dismissal. Great Western's Opposition offers nothing of substance to justify personal jurisdiction, relying instead on patently incorrect, contradictory, and unsupported assertions. At bottom, Great Western's lone basis to justify jurisdiction over WSFS (a non-New York entity) is that WSFS ***received emails*** from a person alleged to have been located in New York. This is insufficient as a matter of law.

Regarding its substantive claims, Great Western's Opposition fares no better. Great Western again resorts to "facts" that are not alleged in its 60-page Second Amended Complaint, hyperbole, and its constant conclusory refrain that "***WSFS knew everything.***" Those tactics fall short. Great Western's refrain that "WSFS knew" rests on a slender branch: a single factual allegation that WSFS sent statements of trust assets reflecting different total values for the Great Western Reinsurance Trust and Series 2011-C, respectively, in September 2016. As explained below, this is irrelevant. The two asset statements could have different total values at any given point in time, and it means nothing to this case. This single allegation comes nowhere close to establishing Great Western's repeated claim that "***WSFS knew everything***"—a claim that is undermined by the rest of Great Western's allegations—and certainly does not save Great Western's claims from their fatal legal deficiencies.[1]

## I.      There Is No Basis to Exercise Personal Jurisdiction over WSFS.

Great Western first contends that this Court has general personal jurisdiction over WSFS because "WSFS is a sizable financial services company" and therefore must have "performed

---

[1] Capitalized terms have the meanings afforded such terms in WSFS's Memorandum of Law in Support of Their Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) ("WSFS Memo.") (ECF 137). WSFS refers to Great Western's Memorandum of Law in Opposition to WSFS's Motion to Dismiss Plaintiff's Second Amended Complaint (ECF 143) as "Opposition" or "Opp."

countless New York-based deals alongside New York-based banks." Opp. at 20.[2] This is fanciful. "[E]xcept in a truly 'exceptional' case," general personal jurisdiction is only appropriate where a corporate defendant "is incorporated or maintains its principal place of business." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016). If being "sizable" and having "performed countless New York-based deals" were "truly exceptional," nearly every major corporation would be subject to general personal jurisdiction in New York. Such an "exception" would swallow the rule.

Great Western's arguments in support of specific personal jurisdiction are equally fanciful. Because Great Western's sole pleaded allegation about WSFS's jurisdictional contacts with New York—that WSFS received "withdrawal and deposit instructions from Graham and BAAM," SAC ¶ 40—is clearly insufficient, *see* WSFS Memo. at 22-24; Memo. of Law in Supp. of WSFS's (First) Mot. to Dismiss ("First WSFS Memo.") at 11-13 (ECF 84), Great Western makes up new "facts," without regard for the actual pleadings.

For example, Great Western now claims that WSFS "sen[t] account statements to New York." Opp. at 22. But there is no allegation that WSFS sent statements to New York or why that would matter. On the contrary, the Trust Agreement requires WSFS to send statements to Great Western (in Utah) and Alpha (in the Cayman Islands). *See* Ex. C § 5(e); SAC ¶¶ 8, 19.

Great Western next claims that WSFS "coordinat[ed] payments to entities in New York" but completely fails to explain what "payments" WSFS "coordinat[ed]" to which "entities in New York." Opp. at 22. Great Western cites to paragraphs 40, 256, and 262 of the SAC here, but these paragraphs do not even mention or have anything to do with "payments." *See id*. The only alleged payments that WSFS made on behalf of the Great Western trust were Alpha's monthly

---

[2] In any case, none of these allegations are in the SAC and must therefore be disregarded.

2

payments pursuant to the Coinsurance Agreement to Great Western (in Utah). *See* SAC ¶ 136.

Third, Great Western claims that WSFS "execut[ed] trades in New York (*e.g.*, Repurchase Confirmations signed by Lockerman)." Opp. at 22. But, no "trades" are alleged in the SAC. The Repurchase Agreement is between a Delaware trust and a Delaware Statutory Trust (both administered by a Delaware trustee in Delaware), and Lockerman signed the Repurchase Confirmations (in 2013 and 2014) in Delaware. *See* Ex. 1 to WSFS Memo. ¶ 7. There is no allegation that Lockerman, a WSFS employee, signed the Repurchase Confirmations in New York, where WSFS does not have any offices or regular operations. *See id.* ¶ 6.

Great Western's fourth claim, that WSFS "direct[ed] trades received from New York," Opp. at 22, is just an attempt at repackaging its allegation that "Graham, BCM, and BAAM … sent withdrawal and deposit instructions from New York to WSFS." SAC ¶ 40. This allegation is legally insufficient. *See, e.g.*, WSFS Memo. at 22-24; First WSFS Memo. at 11-13.

Further, because it cannot overcome the fact that any communications that WSFS had with the New York-based entities were the result of Great Western's and Alpha's—not WSFS's—choice of Graham and BAAM as investment manager, Great Western now claims that WSFS chose to communicate and do business "with entities based in New York … includ[ing] not only the Great Western Trust Account, but also defendants Regatta Holdings, Cygnet Master Trust, Series 2011-C, 2011-A, and 2013-A." Opp. at 23. But according to Great Western, none of these entities is based in New York. *See* SAC ¶¶ 14-18; *see also id.* ¶ 10.

Finally, Great Western's claim that "this suit arises from WSFS's contacts with New York" is belied by its own feeble argument that "WSFS's concerted misstatements and omissions"—all of which were allegedly made in Delaware to Great Western in Utah—were "informed by its interactions with New York-based Graham, BCM, and BAAM." Opp. at 23.

3

Great Western all but concedes WSFS's point: as it writes, "this lawsuit is a direct result of WSFS's *actions*," which WSFS took (or did not take) in Delaware—not New York. Opp. at 23. There is no basis for WSFS to be in this Court, and it must be dismissed from this case.[3,4]

## II.    Great Western Has Not Identified a Contractual Obligation that WSFS Breached.

Great Western relies entirely on Section 5(e), which obligated WSFS to "furnish to [Alpha] and [Great Western] a statement of all Assets in the Trust Account … on a monthly basis ...." Opp. at 9. But Great Western does not claim that this section as written was breached. Instead, Great Western *rewrites* this provision to claim that WSFS was responsible for the *values* assigned to those assets and then claims that WSFS breached this rewritten provision because certain *values* on statements WSFS supplied were purportedly false or inaccurate. *Id.* at 9-10.[5]

This contrived interpretation is contradicted by other provisions of the Trust Agreement that clearly state that WSFS is not responsible for asset values:

(1) WSFS "shall not be personally liable for … the value of the Assets," Ex. C § 5(i)(iii);

(2) "For purposes of determining the fair market value of any Assets in the Trust Account pursuant to this Agreement, the Parties agree" that WSFS shall not incur "any liability … for any incorrect fair valuation of Assets, howsoever caused," *id.* § 4(j); and

(3) WSFS "shall not be a party to any dispute between [Alpha] and [Great Western] relating to the valuation of Assets," *id.*

---

[3] Great Western focuses on the second prong of the Due Process test for personal jurisdiction, noting the special factors, like judicial economy, to consider. *See, e.g.*, *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016). But, these factors are not relevant if the first prong—minimum contacts—is not met, and that has not been met here. *See, e.g.*, *Laydon v. Mizuho Bank, Ltd.*, 2015 WL 1515358, at *6 (S.D.N.Y. Mar. 31, 2015).

[4] As a last-ditch effort, Great Western makes a plea for "jurisdictional discovery," but courts "routinely reject requests for jurisdictional discovery where a plaintiff's allegations are insufficient to make out a *prima facie* case of jurisdiction." *Ritchie Capital Mgmt., L.L.C. v. Costco Wholesale Corp.*, 2015 WL 13019620, at *7 (S.D.N.Y. Sept. 21, 2015) (citations and alterations omitted). Here, Great Western has not made such a case. Because Great Western has "identified no facts amounting to a sufficient start towards establishing jurisdiction" and has "not put forth any arguments … suggesting that they could prove jurisdiction through additional discovery," this Court should deny Great Western's transparent attempt to go fishing. *Id.* (quotations and citations omitted).

[5] Shockingly, Great Western even misrepresents the standard of review, citing caselaw from before *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which abrogated the "no set of facts" standard set forth in *Conley v. Gibson*, 355 U.S. 41 (1957). Opp. at 8.

4

Great Western does not even mention—let alone substantively address—any of these provisions, which are rooted in Delaware law. *See, e.g.*, 12 DEL. CODE. ANN. § 3313.

To be clear, Great Western agreed in the Trust Agreement that WSFS would be a directed trustee; as such, it was obligated to follow the directions of others, was exculpated from following those directions in good faith, and had no obligation to do anything in the absence of clear direction from the Trust Agreement or certain designated parties. *See, e.g.*, Ex. C §§ 5(g); 5(i). And WSFS did exactly what it was directed to do—namely, issue statements reflecting asset valuations that were provided to WSFS. *See, e.g., id.* § 4(j). Was the Repurchase Agreement with Series 2011-C undervalued? Was the Great Western Reinsurance Trust overvalued? WSFS had no duty to make such a determination, nor did it have a basis to undertake any sort of reconciliation. That was the job of Graham (and one or more of his "Blue" companies), which Great Western chose to serve as Investment Manager, *id.* § 4(b), and which also served as Collateral Manager for Series 2011-C (as Great Western knew), *see* Supp. Terms § 1(m), Ex. D at 38.[6] Graham (and those consultants chosen by Graham) provided asset lists and valuations to WSFS, as they possessed the information necessary to account for and value those assets. The Trust Agreement is clear that WSFS "***shall not be bound to make any investigation into the facts or matters*** stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, instruction, Investment order, Withdrawal Notice, entitlement order, approval or other paper or document." *Id.* § 5(i)(iv) (emphasis added); *see also id.* § 5(g). So is Delaware law, which is clear that ***a directed trustee, "shall have no duty to (1) Monitor the conduct of the adviser; … or (3) Communicate with or warn or apprise any beneficiary … concerning instances in which the fiduciary would or might have exercised the fiduciary's***

---

[6] Great Western alleges that BCM replaced BAAM as Collateral Manager in December of 2013. SAC ¶ 77. Both entitles were owned and controlled by Graham. *Id.* ¶¶ 3-4.

5

*own discretion in a manner different from the manner directed by the adviser.*" 12 DEL. CODE. ANN. § 3313(e) (emphasis added). Had WSFS acted on its own with respect to evaluating the values of the Repurchase Agreement, or the assets in Series 2011-C, without the specific direction of the adviser, WSFS would have abandoned the above protections by making discretionary decisions that it had no duty to make and was not authorized to make under the Trust Agreement.[7]

Great Western's implied covenant of good faith and fair dealing claim fails for the same reasons. The implied covenant of good faith and fair dealing cannot "circumvent the parties' bargain or … create a free-floating duty unattached to the underlying legal document." *Dunlap v. State Farm Cas. Co.*, 878 A.2d 434, 441 (Del. 2004) (citations omitted). Here, Great Western again seeks to imply "duties" and corresponding liability on WSFS's part (1) to ensure that the valuations of the Trust assets were accurate and (2) to verify and affirmatively disclose whether "investments under common control or ownership with any of the parties exceeded the contractual 5% limit" set forth in Section 4(f). But this would require the Court to circumvent the clear terms of the Trust Agreement that explicitly disclaim these very duties:

First, the Trust Agreement clearly states that WSFS would not have any duty or liability regarding the valuations of the Trust assets. *See, e.g.*, *supra*; Ex. C §§ 4(f), 5(i)(iii).

Second, the parties agreed that WSFS would have no responsibility to determine, verify, or affirmatively disclose whether more than 5% of the Trust's assets were invested in "an entity … under common control with" Alpha. *Id.* § 4(f). The Trust Agreement clearly provides that WSFS "shall have no liability or obligation to verify compliance with the Investment Guidelines,

---

[7] Of course, to force such a position on WSFS today also requires one to ignore the SEC's September 6, 2018 Order imposing sanctions against Graham and his "Blue" entities. See SEC Order. As part of his scheme, Graham admitted to repeatedly having provided false valuation information to WSFS. *Id.* ¶¶ 20-24.

6

Section 4(g), or *the other provisions of this Section 4*," including Section 4(f), and shall have only such "duties and obligations … as are specifically set forth in this Agreement … *and no implied duties* … or obligations shall be read into this Agreement against the Trustee." Ex. C §§ 4(g), 5(h) (emphasis added); *see also* 12 DEL. CODE. ANN. § 3313(b), (e).

Great Western has no legally competent response and simply resorts to the mantra "WSFS knew" (which is untrue and, in any event, irrelevant to these contract claims) to avoid the clear and dispositive language in the Trust Agreement. Both the contract and implied covenant claims must be dismissed.

## III. Great Western Has Failed to Adequately Plead that WSFS Had Actual Knowledge of the Other Defendants' Fraud and Provided Substantial Assistance to Them.

Great Western contends that it has sufficiently pleaded that WSFS "knew" of the other defendants' fraud for three reasons: WSFS sent separate asset statements in September 2016 to Great Western and 2011-C that "showed a $60+ million discrepancy;" WSFS knew that Solow owned both Alpha and 2011-C; and WSFS knew in April 2016 that the SEC was investigating Graham.[8] This contention is unavailing. As an initial matter, Great Western never pleaded in its SAC (or any other complaint) facts demonstrating that WSFS knew that Solow owned both Series 2011-C and Alpha[9] or that because the SEC told WSFS in April 2016 of an investigation into Graham, then WSFS must have known of Graham's and the other defendants' fraud. Even if

---

[8] Great Western's claim that fraudulent intent may be inferred from the "surrounding circumstances" is misleading. Opp. at 17-18. The governing legal standard requires that the plaintiff plead facts sufficient to "giv[e] rise to a 'strong inference' of defendant's actual knowledge of the underlying harm," *Kirschner v. Bennett*, 648 F. Supp. 525, 544 (S.D.N.Y. 2009)

[9] Great Western cites to paragraphs 81 through 86 of the SAC for the contention that WSFS knew Solow also owned Alpha, but these paragraphs and others only suggest that *Great Western* knew that Solow was involved with Alpha. Indeed, in "early 2012," Great Western was introduced to "defendants Alpha, Graham, and Solow." SAC ¶ 63. Great Western then alleges that "[o]n many occasions … Great Western asked Solow about the assets backing the Repurchase Agreement" and Solow confirmed that "the trust was fully funded." *Id.* ¶ 85. There are absolutely no allegations that WSFS knew that Solow owned Alpha.

7

that had been pleaded, such unfounded speculation does not pass muster under *Twombly* or *Iqbal*, let alone Federal Rule of Civil Procedure 9(b).

Excising those unsupported allegations, Great Western's entire basis for arguing that it sufficiently pleaded both "knowledge" and "substantial assistance" of the fraud is its allegation that WSFS sent separate trust asset statements in September 2016 to Great Western and 2011-C that "showed a $60+ million discrepancy" and were therefore "false." *See* SAC ¶¶ 98-99. But that allegation comes nowhere close to demonstrating "actual knowledge." As noted above, WSFS was a directed trustee that followed the directions of Great Western's designated representatives and had no obligation to monitor the investments in the Series 2011-C trust to determine if they complied with any contractual obligations to Great Western under the Repurchase Agreement. Yet, now, Great Western wants to saddle WSFS with such a reporting obligation about Series 2011-C's asset levels that unquestionably did not exist under any contract, statute, or law. And even if WSFS had a duty to monitor the assets of the Series 2011-C trust, such an exercise would have been futile because, just as the Series 2011-C asset statement was not supposed to (and did not) account for liabilities of Series 2011-C (which were unknown to WSFS), it also would not have accounted for assets that were unknown to WSFS.[10]

Aware that WSFS had no such contractual obligation, Great Western calls this "aiding and abetting fraud." This is an outrageous distortion of an aiding and abetting fraud claim. Great Western has alleged no facts that would show that WSFS actually "knew" that the other defendants were engaged in an extensive, multi-year, international ***fraud*** designed to harm Great Western. *See Capitaliza-T Sociedad de Responsabilidad Limitada de Capital Variable v. Wachovia Bank of Del. Nat. Ass'n.*, 2011 WL 864421, at *4 (D. Del. Mar. 9, 2011) ("The

---

[10] Indeed, Great Western concedes the existence of such assets, pointing out that, in July 2017, "Alpha Holdings deposited assets allegedly worth $100 million into the Series 2011-C account at WSFS." *Id.* ¶ 146.

universal rule requires actual knowledge of the tortious conduct by the wrongdoer, not merely that the defendant knew something was wrong in general").

Great Western's conclusory claims of WSFS's knowledge are particularly implausible given its own repeated allegations that the other defendants continually concealed their fraud from those on the outside of the conspiracy—including WSFS—and the SEC Order that detailed Graham's fraud. *See, e.g.*, SAC ¶¶ 180, 206, 219; SEC Order ¶¶ 1, 20, 30. Great Western's claim that WSFS—which indisputably was not a part of the conspiracy, had no incentive to participate, and had no duty whatsoever to "make any investigation into … facts or matters"—must inexplicably have had ***actual knowledge*** of the fraud is implausible, has not been sufficiently pleaded, and must be rejected.[11]

## IV.   Great Western Fails to Identify Any "Special Duty" or "Misrepresentation" for its Negligence-Based Claims Against WSFS.

Great Western summarily states that WSFS owed Great Western some undefined "duty, as a result of a special relationship" and that WSFS breached that "special duty" in three ways: by "(a) failing to provide accurate account statements to Great Western; (b) not telling Great Western about the breach of the Trust Agreement based on Solow's co-ownership of Series 2011-C and Alpha; and (3) [*sic*] misrepresenting to Great Western the reason for WSFS tendering its resignation as trustee." Opp. at 14-16. These claims are baseless:

First, there is no legal basis to conclude that WSFS owed any "special duties" to Great Western beyond the duties set forth in the Trust Agreement, because the parties explicitly agreed that WSFS would not have any. *See* Ex. C § 5(h); *see also id.* § 5(i); First WSFS Memo at 13-15. Indeed, Great Western has conceded this by having withdrawn its fiduciary duty claim against

---

[11] Great Western also failed to adequately plead that WSFS "substantially assisted" the fraud. Because WSFS had no duty to value the Trust assets, Great Western's claim that it was somehow "misled" into not monitoring the valuation as it was expected to under the Trust Agreement is self-serving and baseless. *See supra* Section II.

WSFS. Great Western's only argument to save its claims is that the Court must engage in some undefined analysis that is "highly fact-specific and 'generally not susceptible to resolution at the pleadings stage'" to permit a special duty to be found, later, in discovery. Opp. at 14 (citation omitted). No "highly fact-specific" inquiry is necessary here. Great Western already disclaimed any such "special duty" in the Trust Agreement[12] and has pleaded no facts to suggest otherwise.

Great Western also failed to allege any negligent misrepresentation of material fact by WSFS in breach of such duty. As explained above, Great Western fails to sufficiently allege that WSFS should have known that any of that information was false or incorrect. Great Western also claims that WSFS knew that Solow owned Alpha, but Great Western has not pleaded any facts to support that claim[13] and has not identified a single misrepresentation that WSFS made regarding the ownership of Alpha.[14] Great Western now also claims that WSFS misrepresented the reason why it resigned as trustee, but this, too, is nowhere alleged in the SAC. It is also irrelevant, because WSFS's purported failure to tell Great Western of an ongoing SEC investigation is not a "false representation," and WSFS had no duty to disclose such investigations or the reasons for its resignation. *See* Ex. C § 5(h)-(i); *see also id.* § 7(a).[15]

---

[12] Even if the Trust Agreement did not explicitly disclaim any "special duties," Great Western would have still failed to state a negligent misrepresentation claim, because "an arm's length business arrangement between sophisticated and experienced parties" is "insufficient to create a 'special relationship.'" *See, e.g.*, *Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 778-79 (S.D.N.Y. 2011) (collecting cases).

[13] Great Western's "eureka" moment—that because "WSFS sent Series 2011-C statements to Solow's home address … WSFS knew that Solow owned both Series 2011-C and Alpha"—is a red herring. Opp. at 13. This unpleaded allegation completely misses the point: WSFS does not deny that it knew Solow was involved with *2011-C*; the flaw is that there is not a single factual allegation suggesting how WSFS could have known that Solow owned *Alpha*.

[14] Great Western's citation to 31 C.F.R. § 1020.220 is another red herring. That regulation merely requires a bank to obtain and verify from its corporate customers a name, address, and taxpayer identification number. 31 C.F.R. § 1020.220(a)(2)(i)(A). There is no allegation as to whether that was required here or whether it was not done.

[15] Also, Great Western exculpated WSFS from all liability except due to WSFS's "own bad faith, willful misconduct, or negligence *in the performance of its express duties under this Agreement*." Ex. C § 5(i) (emphasis added). Great Western has made no factual allegation that WSFS's actions breached any of its *express duties*.

10

Dated: April 2, 2019                          BLANK ROME LLP

                                              */s/ Huaou Yan*
                                              Alan Lieberman, Esq. (AL6517)
                                              Huaou Yan, Esq. (HY8128)
                                              Daniel E. Rhynhart, Esq. (*pro hac vice*)
                                              Stephanie C. Chomentowski, Esq. (*pro hac vice*)
                                              The Chrysler Building
                                              405 Lexington Avenue
                                              New York, NY 10174
                                              Telephone: (212) 885-5000
                                              ALieberman@BlankRome.com
                                              HYan@BlankRome.com
                                              Rhynhart@BlankRome.com
                                              Chomentowski@BlankRome.com

                                              *Counsel for Wilmington Savings Fund Society, FSB
                                              and Christiana Trust*