UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                   :

GREAT WESTERN INSURANCE CO.,     :
                                   :

                  Plaintiff,    :

                                   :

        - against -         :

                                   :

MARK GRAHAM, et al.,          :

                                 :

                 Defendants.  :

                                 :
--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __6/22/2020__

18-CV-6249 (VSB)

**OPINION & ORDER**

<u>Appearances</u>:

Gerard D. Kelly
John Prinzivalli
Nicholas Kord Lagemann
Stephen McInerney
Sidley Austin LLP
Chicago, IL

Nicholas Kord Lagemann
McElroy, Deutsche, Mulvaney & Carpenter, LLP
New York, NY
*Counsel for Plaintiff*

Eric R. Breslin
Melissa S. Geller
Leah Ariel Mintz
Duane Morris LLP
Newark, NJ and Philadelphia, PA
*Counsel for Defendants Mark Graham, Blue Capital Management, Inc., Blue Alternative Asset Management, LLC, Blue Elite Fund Ltd., Blue Elite Fund LP, and Blue II Ltd.*

Daniel E Rhynhart
Huaou Yan
Stephanie C Chomentowski
Blank Rome LLP
Philadelphia, PA
*Counsel for Defendants Wilmington Savings Fund Society, FSB, and Christiana Trust*

Michael Steven Gordon
Marco Molina
Baker & Hostetler LLP
New York, NY
*Counsel for Defendants Donald Solow, Regatta Holdings LLC, Cygnet 001 Master Trust, Cygnet 001 Master Trust Series 2011-A, Cygnet 001 Master Trust Series 2011-C, Cygnet 001 Master Trust Series 2013-A*

Jack Yoskowitz
Andrew Jacobson
Laura Elizabeth Miller
Shrey Sharma
Seward & Kissel LLP
New York, NY
*Counsel for Defendant Sancus Capital Blue Credit Opportunities Fund Ltd.*

Harold S. Shaftel
Greenberg Traurig, LLP
New York, NY
*Counsel for Defendants Ability Insurance Company, Advantage Capital Holding, LLC, Dan Cathcart, and Kenneth King*

Andy S. Oh
Law Office of Andy S. Oh, PLLC
Forest Hills, NY
*Counsel for Defendant Gregory Tolaram*

<u>VERNON S. BRODERICK, United States District Judge</u>:

Plaintiff Great Western Insurance Company brings this action against Defendants, asserting various state common law claims as well as violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq.  Before me are six motions to dismiss, filed by the following groups of Defendants:  (1) Mark Graham, Blue Capital Management, Inc. ("BCM"), Blue Alternative Asset Management, LLC ("BAAM"), Blue Elite Fund Ltd. ("BEF Ltd."), Blue Elite Fund LP ("BEF LP"), and Blue II Ltd ("Blue II") (collectively, the "Blue Defendants"); (2) Wilmington Savings Fund Society, FSB, and Christiana Trust ("WSFS"); (3) Donald Solow, Regatta Holdings LLC ("Regatta"), Cygnet 001 Master Trust ("Cygnet"), Cygnet 001 Master Trust Series 2011-A ("Series 2011-A"), Cygnet 001 Master Trust Series 2011-C

("Series 2011-C"), Cygnet 001 Master Trust Series 2013-A ("Series 2013-A," and, together with Series 2011-A and Series 2011-C, the "Cygnet Series Trusts") (the "SRC Defendants"); (4) Sancus Capital Blue Credit Opportunities Fund Ltd. ("Sancus"); (5) Ability Insurance Company ("Ability"), Advantage Capital Holding, LLC ("ACH"), Dan Cathcart, and Kenneth King (the "Ability Defendants"); and (6) Gregory Tolaram ("Tolaram").   Because Plaintiff has not made a prima facie showing of jurisdiction as to BEF Ltd., Blue II, or WSFS, but has made a sufficient start toward establishing jurisdiction, Plaintiff is granted leave to conduct limited jurisdictional discovery as to BEF Ltd., Blue II, and WSFS.   Because I cannot reach the merits of the claims against those defendants without being satisfied that I have jurisdiction over them, the motions to dismiss by BEF Ltd., Blue II, and WSFS are denied without prejudice to refiling after the completion of jurisdictional discovery.   Because Plaintiff has made a prima facie showing of jurisdiction as to Tolaram and BCM, their motions to dismiss for lack of personal jurisdiction are DENIED.

Because Plaintiff has alleged conduct that would be actionable as securities fraud, Defendants' motions to dismiss Plaintiff's RICO claims are GRANTED.   Defendants' motions to dismiss Plaintiff's state common law claims against them are also GRANTED IN PART AND DENIED IN PART.   Defendants' motions are granted to the extent that Plaintiff has failed to state claims of:   fraud against Regatta; aiding and abetting a breach of fiduciary duty against Regatta, Cygnet, Series 2011-A, Series 2013-A, and ACH; aiding and abetting fraud against BEF LP, Regatta, Cygnet, Series 2011-A, Series 2013-A, Sancus, and ACH; and civil conspiracy to commit fraud against any Defendant.   Defendants' remaining motions are DENIED.

I.    **Background**[1]

Plaintiff is a Utah-based insurance company alleging that Defendants engaged in a complex and massive fraud against it, resulting in losses exceeding $135 million.  Plaintiff alleges that during the course of this fraud, Defendants maintained numerous interconnections with one another, unbeknownst to Plaintiff, that allowed Defendants to loot Plaintiff's assets and engage in self-dealing.

To aid in understanding the alleged scheme, I briefly summarize the alleged interconnections among Defendants.  Mark Graham, Donald Solow, Gregory Tolaram, Dan Cathcart, and Kenneth King are the individual defendants.  Atlantic is the ultimate beneficial owner of Alpha Holdings, which is the owner of Alpha.  (SAC ¶¶ 47–48.)[2]  Graham and Solow together owned roughly 100 percent of the common stock of Alpha Holdings; Alpha Holdings and Atlantic together owned 100 percent of the preferred shares of Alpha.  (*Id.* ¶ 65.)  Tolaram, Graham, and Solow, along with dismissed defendants Drake and Lynch,[3] were directors and owners of Alpha; Tolaram served as chief operating officer.  (*Id.* ¶¶ 46–48, 65; Am. Trust Agmt. 14.)  Tolaram was the chief operating officer of Alpha as well as a director and owner of Atlantic, and served as a representative of Alpha, Alpha Holdings, and Atlantic in the companies' dealings with Plaintiff.  (*Id.* ¶ 47; Am. Trust Agmt. 15.)[4]  Graham co-founded

---

[1] The following factual summary is drawn from the allegations contained in Plaintiff's Second Amended Complaint and the documents attached thereto.  (Doc. 106.)  I assume the allegations set forth in the Second Amended Complaint to be true for purposes of this motion.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

[2] "SAC" refers to Plaintiff's Second Amended Complaint, filed on December 19, 2018.  (Doc. 106.)

[3] On April 24, 2019, Plaintiff and Defendants Drake and Lynch filed a notice of voluntary dismissal with prejudice as to Drake and Lynch.  (Doc. 164.)

[4] "Am. Trust Agmt." refers to the Amended Trust Agreement, filed on December 19, 2018 as Exhibit C to the Second Amended Complaint.  (Doc. 106-3.)

BAAM and has owned "all interest and LLC stock" in it since 2009.  (SAC ¶¶ 3, 67.)  Graham is also president and sole owner of BCM, a Puerto Rico corporation.  (*Id.* ¶ 11, 78.)  BEF Ltd., BEF LP, Blue II, and Sancus were all allegedly created and operated by Graham.  (*Id.* ¶¶ 49–51.)  Tolaram served as an authorized signatory for Blue II.  (*Id.* ¶ 107.)  ACH wholly owns Ability; Ability owns 13.68 percent of Sancus; and ACH owns 80 percent of Sancus.  (*Id.* ¶ 128.)  Cathcart was the former CFO of Ability Re; both Cathcart and King are directors of Ability; and King is president and CEO of Ability, as well as chairman and CEO of ACH.  (*Id.* ¶¶ 125, 129.)  ACH and King also own Atlantic Coast Life, which is run by Cathcart as CEO.  (*Id.* ¶ 127, 129.)  Solow is the sole owner of Regatta, which in turn owns Cygnet and all the Cygnet Series Trusts.  (*Id.* ¶ 41.)

In 2009, Plaintiff entered into a Coinsurance Agreement with Ability Reinsurance (Bermuda) Limited ("Ability Re").  (*Id.* ¶ 2.)  Pursuant to that agreement (the "Coinsurance Agreement"), Ability Re assumed 75 percent of dollars paid in claims by Plaintiff on certain policies.  (*Id.* ¶ 60; *id.* at 29 n.2).  In order to secure Ability Re's payment obligations, and in compliance with Utah's Insurance Code, the parties entered into a trust agreement, under which they created a trust account into which Ability Re was to deposit and maintain "qualifying assets," as defined by the Coinsurance Agreement and the Utah Insurance Code, with a market value of no less than 102 percent of Ability Re's share of reserve liabilities.  (*Id.* ¶ 61.)  Plaintiff transferred $135 million in cash to Ability Re, which in turn established the trust account with BNY Mellon as trustee and transferred that $135 million, along with $18 million of its own funds, into the account in order to meet the 102 percent threshold.  (*Id.* ¶ 62.)  This brought the total value of the assets backing the Coinsurance Agreement to $153 million.  (*Id.*)

In 2012, Cathcart, who at the time was the Chief Financial Officer ("CFO") of Ability

Re, informed Plaintiff that Ability Re was leaving the reinsurance business.  (*Id.* ¶ 63.)  Cathcart

introduced Plaintiff to Graham, Solow, and Alpha, on whose board Graham and Solow served,

vouched for Graham's investment management skills, and "recommended" that Plaintiff move

its business to Alpha.  (*Id.*)  Plaintiff requested to buy its business back from Ability Re, but

Cathcart refused on the basis that "Alpha had offered Ability Re more money to buy the business

than Great Western could afford to pay."  (*Id.*)

At the same time as Ability Re and Cathcart were "pressuring" Plaintiff into entering into

a reinsurance relationship with Alpha, and unbeknownst to Plaintiff, Graham, Solow and Alpha

were assisting ACH in acquiring Ability.  (*Id.* ¶ 68.)  Among other things, Alpha provided

Ability with a surplus infusion, including by issuing a surplus note, entered into its own

coinsurance agreement with Ability, and paid Ability Re a commission on the ultimate novation

of Plaintiff's business.  (*Id.*)

In June 2012, Alpha replaced Ability Re as the reinsurer for Plaintiff through a Novation

Agreement that modified the Coinsurance Agreement by, among other things, requiring that the

BNY Mellon trust account be liquidated and the assets transferred to a new trust account.  (*Id.* ¶

64.)  The Novation Agreement required Alpha to establish a trust account[5] and maintain in it 102

percent of its reserve obligations, in the form of certain qualifying assets, as well as a

supplementary trust account with 4 percent of Alpha's reserve obligations.  (*Id.* ¶ 66.)

Accordingly, Alpha established the Trust Account and a Supplementary Trust Account

with WSFS as trustee, and in July 2012, Alpha, Plaintiff, and WSFS entered into an "Amended

and Restated Trust Agreement" (the "Trust Agreement").  (*Id.* ¶ 67.)  This Trust Agreement

---

[5] The trust account established by Alpha pursuant to the Novation Agreement is defined in the Second Amended
Complaint as the "Trust Account."  (SAC ¶ 66.)

established Alpha as the grantor of the trust, Great Western as the beneficiary, and WSFS as the

trustee; it also identifies BAAM, a non-signatory, as the investment manager for the Trust

Account.  (*Id.*)  The Trust Agreement required that the assets be invested in certain qualified

assets in order for Great Western to receive "reinsurance credit" from its regulator.  (*Id.* ¶ 69.)

According to Plaintiff, these assets "generally needed to be cash or low-risk investments, such as

U.S. Treasury securities," (*id.*); however, the Trust Agreement itself contains an exhibit entitled

"Sample Portfolio Allocation" that suggests a range of assets are acceptable.  (Am. Trust Agmt.

87.)

In September 2012, BAAM—owned and operated by Graham—invested $148 million of

the assets in the Trust Account into a Master Repurchase Agreement (the "Repurchase

Agreement") with Series 2011-C—a trust owned by Regatta—which is in turned owned by

Solow.[6]  (*Id.* ¶ 70.)  Under the Repurchase Agreement,[7] Series 2011-C agreed that, "[f]rom time

to time," it would sell to Plaintiff "securities and financial instruments," *i.e.*, collateral, in

exchange for cash and a promise by Plaintiff to sell those securities back to Series 2011-C at

some specified date.  (*Id.*; *see also* Repurchase Agmt. at § 1(a).)  Each such transaction was to be

memorialized in a written "Confirmation," containing the purchase date, price, repurchase rate,

and other relevant details.  (Repurchase Agmt. § 3(b).)  Further, if either party accrued any net

exposure, as defined by the Repurchase Agreement—in other words, a loss of value relative to

the assets held by the counterparty—then the counterparty had the right to demand that the

---

[6] Plaintiff states that Series 2011-C was an "Alpha Re Reinsurance Trust" but does not provide further detail on what this means.  (SAC ¶ 104.)

[7] The Second Amended Complaint defines "Repurchase Agreement" as "an agreement on behalf of one party (here, Series 2011-C) to sell assets to another entity (here, the Trust Account securing Great Western) and then to re-purchase them in the future at a set price plus interest, and a corresponding agreement on behalf of the other party (the Trust Account securing Great Western) to buy those assets and then sell them back to the first party (Series 2011-C) in the future."  (SAC ¶ 71.)

exposed party make a margin transfer into its account to make up the shortfall.  (*See* Repurchase Agmt. § 4.)[8]

In 2012, a Repurchase Confirmation was executed setting forth the terms and conditions of the first transaction (the "Repurchase") between the Trust Account and Series 2011-C.  (SAC ¶ 73.)  WSFS was trustee for both the Trust Account and Series 2011-C, and executed the Repurchase Confirmation on behalf of both parties.  (*Id.*)

The Repurchase was set to last for one day less than a year, and on the repurchase date, Series 2011-C was to buy back its collateral in exchange for cash.  (*Id.* ¶ 75.)  From 2012 to 2017, WSFS provided monthly account statements representing that the value of the Trust Account was between $140 and $150 million, including the Repurchase Agreement, which was always assigned a market value of over $130 million.  (*Id.* ¶ 81.)

Shortly after the initial funding of the Trust Account and the Repurchase Agreement, Graham and Solow began directing the cash in Series 2011-C into risky investments, including investments in vehicles that they owned or part-owned, *i.e.*, Cygnet, Series 2011-A, Series 2013-A, BEF Ltd., BEF LP, Blue II Ltd., and Sancus.  (*Id.* ¶¶ 89, 90.)  In December 2013, BCM, solely owned and operated by Graham, became the collateral manager of Series 2011-C.  (*Id.* ¶ 77.)  The Repurchase was renewed, or rolled over, each year, in September 2013 and September 2014, and both times the Repurchase Confirmations were signed by the trust officer for WSFS.  (*Id.* ¶ 73.)

Within a few years, the value of Series 2011-C plummeted.  As of December 31, 2014, the value of Series 2011-C was negative $18.5 million, considering both assets and liabilities.

---

[8] "Repurchase Agmt." Refers to the Master Repurchase Agreement, filed on December 19, 2018, as Exhibit D to the Second Amended Complaint.  (Doc. 106-4.)

(*Id.* ¶ 92.)  As of December 2015, the value of Series 2011-C was negative $50.9 million, considering both assets and liabilities.  (*Id.* ¶ 94.)  Yet in September 2015, after that year's Repurchase expired, Graham rolled it over, signing multiple Repurchase Confirmations on behalf of both BAAM and BCM.  (*Id.* ¶¶ 73, 93.)  One Repurchase Confirmation stated that Plaintiff would pay a purchase price of $134.7 million in exchange for $134 million worth of collateral, (*id.*), despite the fact that Series 2011-C had negative value, (*id.* ¶ 92).  The other Repurchase Confirmation listed a purchase price of about $7.4 million in exchange for an unspecified amount of securities.  (*Id.*)  WSFS' December 2015 account statement for the Trust Account listed the market value of the Repurchase Agreement as $134.7 million and $7.4 million.  (*Id.* ¶ 95.)

In September 2016, Graham rolled the Repurchase Agreement over again, listing the same cash prices and collateral value as the previous year's agreement, representing that the value of the collateral remained $134.7 million in one account, and $7.4 million in the other account.  (*Id.* ¶ 98.)  In fact, however, the September 2016 account statement generated by WSFS for Series 2011-C showed that Series 2011-C was worth only $84 million, accounting only for assets and not liabilities.  (*Id.* ¶ 99.)  And, in April 2016, Alpha's accountants had determined that the fair value of Series 2011-C was negative $50.86 million.  (*Id.* ¶ 102.) (Plaintiff does not explain the precise connection between Alpha and Series 2011-C, if any, beyond the common involvement of Solow in both entities.)

In April 2016, WSFS asked to resign as trustee due to a "falling out" between it and Graham; Plaintiff asked WSFS to hold off on resigning until it was able find a replacement.  (*Id.* ¶ 96.)  In June 2017, WSFS resigned as trustee.  (*Id.* ¶ 101.)

Throughout the life of the Trust Account, various Defendants received payments from

assets that were originally held in it.  (*Id.* ¶ 103.)  For example, from September 2012 to March

2017, "Alpha Re Reinsurance Trusts," which included Series 2011-C, made the following

payments:  $15.9 million to BAAM and BCM; $6.3 million to Regatta; at least $340,000 to

Solow; at least $545,911 to WSFS; and at least $75,000 to Alpha Holdings.  (*Id.* ¶ 104.)  In

addition, Graham used the other Blue Defendants and Sancus to move around money that

originated in the Trust Account.  (*Id.* ¶¶ 106, 108.)  For example, Plaintiff alleges that Series

2011-C invested a significant amount of money with BEF, Ltd., and that BEF Ltd. paid an

incentive fee to BAAM in 2013, in the amount of $2.44 million.  (*Id.* ¶ 105.)

Plaintiff also alleges that throughout the course of the parties' contractual relationship,

Defendants repeatedly represented that the Trust Account was fully funded and backed by

adequate collateral—when it was not—and they concealed their relationships with one another

from Plaintiff.  (*Id.* ¶¶ 74, 79, 85–87.)

In September 2016, the Securities and Exchange Commission informed Plaintiff that it

was investigating BAAM and various associated entities.  (*Id.* ¶ 130.)  Later that month, Plaintiff

asked Alpha to identify the collateral backing the Trust Account and provide assurance that the

collateral was equal to 102 percent of Alpha's reserve liabilities.  (*Id.* ¶ 131.)  After Alpha

refused to provide Plaintiff with the requested details, Plaintiff contacted Cathcart—former CFO

for Ability Re, and a director of Ability—to determine whether Ability knew anything about the

SEC investigation.  (*Id.* ¶ 114.)  King and Cathcart reassured Plaintiff about Ability's

relationship with Alpha, Graham's investments, and the state of the Trust Account.  (*Id.* ¶¶ 114–

115.)

In a conference call on October 24, 2016, Plaintiff asked representatives from Alpha and

BAAM, including Graham, for identification of the collateral.  (*Id.* ¶ 132.)  Although the

representatives promised to provide more information by October 28, 2016, this did not happen. (*Id.*)  On December 8, 2016, representatives from Plaintiff's office met with Alpha and BAAM representatives in New York; Graham and BAAM once again agreed to provide a full statement of the collateral, but failed to do so.  (*Id.* ¶ 133.)

In November 2016, Ability, with the assistance and permission of Graham and WSFS, withdrew $109 million from Series 2011-C, funds Plaintiff asserts belonged to it.  (*Id.* ¶¶ 116–17, 119.)  The following month, despite the fact this withdrawal of funds should have decreased the value of the assets in Series 2011-C, WSFS sent Great Western an account statement listing the value of the Repurchase Agreement as $135.37 million.  (*Id.* ¶ 120.)

Around this time, Graham and Solow, during in-person meetings, telephone calls, and emails, represented to Plaintiff that the assets backing the Repurchase Agreement were sufficient to satisfy Plaintiff's obligations, knowing that this representation was false.  (*Id.* ¶ 121.)  Tolaram also knew that Ability had withdrawn funds from Series 2011-C and that the assets in it were insufficient, but did not tell Plaintiff.  (*Id.* ¶ 122.)

In December 2016, the United States "version" of Alpha—called Alpha Re and owned and operated by Solow—changed its name to Vista Life & Casualty Reinsurance Company ("Vista Re"), according to Solow in order to insulate it from any reputational damage that Alpha Re might incur.  (*Id.* ¶ 123.)  On December 31, 2016, Ability, which had previously ceded 20 percent of its business to Alpha, entered into a coinsurance agreement with Vista Re in which it ceded a total of 60 percent of its business.  (*Id.* ¶ 124.)  On March 24, 2017, King and Cathcart joined the board for BEF LP.  (*Id.* ¶ 125.)  On March 30, 2017, Atlantic Coast Life Insurance Company—a company that is owned by ACH and King and run by Cathcart—purchased for $2.24 million the surplus note that had been issued to Ability by Alpha at the same time as they

entered into the Novation Agreement.  (*Id.* ¶ 127.)

Beginning in February 2017, Alpha began to fall behind on its monthly obligations to pay amounts due under the Coinsurance Agreement.  (*Id.* ¶¶ 136–37.)  By April 2017, Alpha was in default and failed to cure.  (*Id.* ¶¶ 137–39.)  That same month, the Utah Insurance Department sent Alpha and BAAM requests for information about the collateral backing the Repurchase Agreements, to determine whether those assets qualified for reinsurance credit.  (*Id.* ¶¶ 140–142.)  It received no response.  (*Id.* ¶ 141.)  On June 6, 2017, Great Western sent a letter to Alpha's counsel, "demanding compliance with the Coinsurance Agreement and an identification of all assets in the Trust Account, including any and all collateral backing any Repurchase Agreements."  (*Id.* ¶ 152.)  The letter stated that if the information was not provided by June 20, 2017, Great Western would "pursue formal dispute resolution."  (*Id.*)  Alpha still did not provide the requested information.  (*Id.* ¶ 153.)

In July 2017, Alpha Holdings deposited a $100 million promissory note into Series 2011-C, which WSFS accepted and incorporated in its calculation of the value of Series 2011-C, which it set forth in its account statements.  (*Id.* ¶¶ 146–47.)  Graham later testified that Tolaram had been responsible for negotiation of the note.  (*Id.* ¶ 151.)  In fact, however, the note was worthless.  (*Id.* ¶ 147.)

Plaintiff met with Graham, Solow, and Tolaram in New York on November 16, 2017.  (*Id.* ¶¶ 37, 47, 54, 55.).  From September through November 2017, Alpha, Graham, Solow, and Tolaram all represented on multiple occasions that the note was genuine and that Series 2011-C was fully funded with respect to the Repurchase Agreement, knowing this was not true, and failed to disclose to Plaintiff their relationships with one another and their conflicts of interest.  (*Id.* ¶¶ 148–49.)

Ultimately, in fall 2017, the Utah Department of Insurance informed Plaintiff that it could no longer apply the value of the Coinsurance Agreement to its financial statements, causing Plaintiff's surplus to drop to from $86 million to negative $41 million.  (*Id.* ¶¶ 142–44.)  The Department informed Plaintiff that if it did not show evidence of a positive surplus by the end of the calendar year, the Department would take control of the company.  (*Id.* ¶ 144.)  Instead, in a deal that closed in early 2018, American Enterprise Group purchased Plaintiff "for pennies on the dollar."  (*Id.* ¶ 145.)

Plaintiff obtained an arbitration award against Alpha in April 2018, which was confirmed by a federal court.  (*Id.* ¶¶ 155–159.)  Alpha did not pay the award, (*id.* ¶ 160), and was voluntarily liquidated in early 2018, (*id.* ¶¶ 163–164.)

## II.    Procedural History

Plaintiff commenced this action by filing its complaint on July 10, 2018 against Ability, Alpha Re Limited, Alpha Re Holdings (Cayman) Limited, Atlantic Specialty Finance, BAAM, BCM, BEF LP, BEF Ltd., Blue II, BCM, Christiana Trust, WSFS, FSB, Cygnet, the Cygnet Series Trusts, Regatta, Sancus, Graham, Solow, Tolaram, John Drake, and Edward Lynch.  (Doc. 1.)  To date, Alpha Re Limited, Alpha Re Holdings (Cayman Limited), and Atlantic Specialty Finance have not appeared in this action.

After various Defendants requested extensions and/or informed me of their intent to move to dismiss the complaint, (Docs. 52, 56, 58–62), I issued an order scheduling a telephonic pre-motion conference and directing the parties to meet and confer about a proposed briefing schedule.  (Doc. 63.)  On October 3, 2018, Plaintiff, the Blue Defendants, the SRC Defendants, Sancus, Drake, and Lynch submitted a letter that granted Plaintiff leave to make a minor jurisdictional amendment to its complaint, and set forth a briefing schedule for motions to

dismiss.  (Doc. 66.)

On October 5, 2018, Plaintiff filed its Amended Complaint.  (Doc. 69.)  Between October 31, 2018 and November 21, 2018, the Blue Defendants, Ability, the SRC Defendants, Sancus, WSFS, Drake, and Lynch filed motions to dismiss and supporting materials.  (Docs. 73–81, 83–93.)  On December 12, 2018, Plaintiff filed opposition memoranda of law to some of these motions.  (Doc. 99–103), as well as a letter motion for leave to file a second amended complaint, (Doc. 104.)  No Defendant objected, and I granted the requested leave by order issued December 18, 2018.  (Doc. 104.)  On December 19, 2018, Plaintiff filed its Second Amended Complaint against all the originally named defendants, as well as ACH, Cathcart, and King.  (Doc. 106.)

The parties subsequently submitted an amended briefing schedule for motions to dismiss the Second Amended Complaint on December 21, 2018.  (Doc. 110.)  On February 5, 2019:  the Blue Defendants filed their motion to dismiss, along with a declaration and memorandum in support, (Docs. 125–27); Sancus filed its motion to dismiss and memorandum in support, (Docs. 128–29); the SRC Defendants filed their motion to dismiss, with declaration and memorandum in support, (Docs. 130–32); the Ability Defendants filed their motion to dismiss, with declaration, exhibits, and memorandum in support, (Docs. 133–35); and WSFS filed its motion to dismiss with memorandum and declaration in support, (Docs. 136–38).  On March 11, 2019, Plaintiff filed memoranda of law in opposition to all five motions to dismiss, (Docs. 141–45).  On April 2, 2019, the Blue Defendants, Sancus, the SRC Defendants, the Ability Defendants, and WSFS filed separate replies in further support of their motions to dismiss.  (Docs. 157–61.)  On April 24, 2019, Plaintiff and Defendants Drake and Lynch filed a notice of voluntary dismissal with prejudice as to Drake and Lynch.  (Doc. 164.)

On May 17, 2019, Tolaram filed a motion to dismiss, with declaration and memorandum

in support.  (Docs. 168–170.)  On May 28, 2019, Plaintiff submitted a letter requesting leave to

conduct limited jurisdictional discovery as to Tolaram and proposing a briefing schedule.  (Doc.

173.)  Following limited discovery, Plaintiff filed its memorandum of law in opposition, with

declarations and exhibits in support, on July 10, 2019.  (Docs. 183–85).  Tolaram submitted a

reply memorandum and affirmation in further support of his motion on July 24, 2019.  (Docs.

186–87.)

### III.   <u>Legal Standards</u>

#### A.  *Rule 12(b)(2)*

"[A] federal court generally may not rule on the merits of a case without first determining

that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the

parties (personal jurisdiction)."  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp*., 549 U.S.

422, 430–31 (2007) (citing *Steel Co. v. Citizens For A Better Env't*, 523 U.S. 83, 93–102

(1998).  On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), the

"plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against

whom it seeks to bring suit."  *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir.

2010) (citing *In re Magnetic Audiotape Antitrust Litig*., 334 F.3d 204, 206 (2d Cir. 2003) (per

curiam)); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784

(2d Cir. 1999).

To defeat a jurisdiction-testing motion, the plaintiff's burden of proof "'varies depending

on the procedural posture of the litigation.'"  *Dorchester Fin. Sec., Inc. v. Banco BRJ*, S.A., 722

F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken–Overpelt, S.A*., 902 F.2d 194,

197 (2d Cir. 1990)).  At the pleading stage, a plaintiff need only make a prima facie showing that

jurisdiction exists, and that showing may be established solely by allegations.  *Id*. at 84–85; *see*

*also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015) ("'In order to

survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie

showing that jurisdiction exists.'" (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,

732 F.3d 161, 167–68 (2d Cir. 2013))).

Courts may rely on materials outside the pleadings in considering a motion to dismiss for

lack of personal jurisdiction.  *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir.

2001).  If the court considers pleadings and affidavits submitted by the parties, the plaintiff's

prima facie showing "must include an averment of facts that, if credited by the ultimate trier of

fact, would suffice to establish jurisdiction over the defendant."  *In re Terrorist Attacks on Sept.

11*, 2001, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*,

616 F.3d 158, 163 (2d Cir. 2010)).   "'The allegations in the complaint must be taken as true to

the extent they are uncontroverted by the defendant's affidavits.'"  *MacDermid, Inc. v. Deiter*,

702 F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft

MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir.

1993)).  If the parties present conflicting affidavits, however, "all factual disputes are resolved in

the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the

contrary presentation by the moving party."  *Seetransport Wiking*, 989 F.2d at 580 (citation

omitted).

Finally, where a plaintiff has failed to a make a *prima facie* case of personal jurisdiction,

particularly where the jurisdictional allegations are simply insufficiently developed rather than

insufficiently specific, a district court has broad discretion to permit jurisdictional discovery

rather than dismissing the claim outright.  *Tese-Milner v. De Beers Centenary A.G.*, 613 F. Supp.

2d 404, 417 (S.D.N.Y. 2009) (citing *Tex. Int'l Magnetics, Inc. v. BASF Aktiengesellschaft*, 31 Fed. App'x 738, 739 (2d Cir. 2002)).

    **B.** *Rule 12(b)(6)*

    To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

    In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237.  A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  And though all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

    Finally, on a motion to dismiss, a court may consider a document integral to the complaint even if is not attached or formally incorporated by reference. *See, e.g.*, *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005).  A court need not accept Plaintiff's

description of the terms of the document as true, but instead "may look to the [document] itself." *See id.*

### C. *Rule 9(b)*

Rule 9(b) of the Federal Rules of Civil Procedure provides that a party alleging fraud must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b). Specifically, when the fraud is premised on affirmative misstatements, the pleading must:  "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).  When the fraud is premised on omissions, such that the plaintiff "is unable to specify the time and place because no act occurred," the complaint must still allege:  "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud."  *In re Platinum-Beechwood Litig.*, No. 18-cv-12018 (JSR), 2019 WL 4934967, at *22 (S.D.N.Y. Oct. 7, 2019) (quoting *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000)); *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 434 (S.D.N.Y. 2010).

Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed R. Civ. P. 9(b), "this leeway is not a license to base claims of fraud on speculation and conclusory allegations," *Eternity*, 375 F.3d at 187 (internal quotation marks omitted).  "Plaintiffs must allege facts that give rise to a strong inference of fraudulent intent, which may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness." *Id.* (internal quotation marks omitted).

The goals of Rule 9(b) are to provide each defendant with "fair notice of [the] plaintiff's claim" against it and to "safeguard [their] reputation from improvident charges of wrongdoing." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). "[W]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of [its] alleged participation in the fraud." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 176 (S.D.N.Y. 2009) (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)). At the same time, however, "[w]ether a complaint complies with Rule 9(b) depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties[,] and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 522 (S.D.N.Y. 2015) (internal quotation marks omitted); *Hertz Corp. v. Accenture LLP*, No. 19cv3508, 2019 WL 5537997, at *3 (S.D.N.Y. Oct. 25, 2019) (same).

Rule 9(b) applies broadly to "any cause of action that bears a close legal relationship to fraud" and "any non-fraud claim that the plaintiffs have made little, if any, effort to differentiate from the fraud allegations upon which the action is predicated." *Matsumura v. Benihana Nat'l Corp.,* 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008). Thus, when "the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim," then it must state with particularity the circumstances constituting that underlying fraud. *Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 442 (S.D.N.Y. 2015).

IV.   **Discussion**

Because "jurisdiction [must] be established as a threshold matter," *see In re Rationis Enterprises, Inc. of Panama*, 261 F.3d 264, 267 (2d Cir. 2001), I first consider the jurisdictional issues before considering whether the amended complaint states a claim, *see Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 512 (S.D.N.Y. 2016); *see also Rationis*, 26 F.3d at 267–68.

A.   *Personal Jurisdiction*

Defendants BCM, Blue Elite Fund Ltd., Blue II, Tolaram, and WSFS ("the Personal Jurisdiction Defendants") move to dismiss for lack of personal jurisdiction.  Plaintiff contends that all five Personal Jurisdiction Defendants are subject to jurisdiction pursuant to N.Y. C.P.L.R. § 302(a), and that WSFS is also subject to general jurisdiction.  In the alternative, Plaintiff seeks leave to conduct jurisdictional discovery.

1.   **Applicable Law**

The amenability of a foreign defendant to suit in a federal court "is determined in accordance with the law of the state where the court sits, with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (quoting *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir. 1963) (en banc)).  A court may exercise two types of personal jurisdiction:  general and specific.  *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016).   "District courts resolving issues of personal jurisdiction must engage in a two-part analysis." *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005).  First, the court determines whether personal jurisdiction is authorized by New York law, and second, "whether personal jurisdiction comports

with the Due Process Clause of the United States Constitution." *Queen Bee of Beverly Hills, LLC*, 616 F.3d at 163; *see also Grand River Enterprises*, 425 F.3d at 165.

N.Y. C.P.L.R. § 301 provides for the exercise of general jurisdiction when "a company 'has engaged in such a continuous and systematic course of "doing business" [in New York] that a finding of its "presence" [in New York] is warranted.'" *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014) (alterations in original) (citations omitted) (quoting *Landoil Res. Corp. v. Alexander & Alexander Servs.*, 77 N.Y.2d 28, 33 (1990)); *see also Fernandez v. DaimlerChrysler, A.G.*, 40 N.Y.S.3d 128, 130 (App. Div. 2d Dep't 2016). "The Due Process Clause, however, is more restrictive." *MTS Logistics, Inc. v. Innovative Commodities Grp., LLC*, No. 19 CIV. 4216 (PAE), 2020 WL 917321, at *10 (S.D.N.Y. Feb. 26, 2020). "A court may exercise general jurisdiction over foreign corporations only 'when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." (*Id.* (quoting *Goodyear Dunlop Tires, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Outside "truly exceptional" cases, "a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business." *Lockheed Martin Corp.*, 814 F.3d at 627.

In contrast, specific jurisdiction exists when "a [s]tate exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). New York's long-arm statute, N.Y. C.P.L.R. § 302(a), permits the assertion of specific jurisdiction over a defendant who:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state. . .;or

3. commits a tortious act without the state causing injury to person or property within the state, . . . if he (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce

N.Y. C.P.L.R. § 302.

A non-domiciliary transacts business in New York when it "projects [itself] into this state to engage in a sustained and substantial transaction of business," such as by "seek[ing] out and initiat[ing] contact with New York, solicit[ing] business in New York, and establish[ing] a continuing relationship." *Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370, 377 (2014). When looking at the "totality of the circumstances," the defendant must have "purposefully avail[ed] [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *Hill v. HSBC Bank PLC*, 207 F. Supp. 3d 333, 338 (S.D.N.Y. 2016). Where, however, "a defendant's interactions with New York residents [are] not distinguishable from [the defendant's] interaction with those located in any other jurisdiction, the allegations are insufficient because they lack the traditional indicia of purposeful availment." *Royalty Network Inc. v. Dishant.com, LLC*, 638 F. Supp. 2d 410, 421 (S.D.N.Y. 2009) (internal quotation marks omitted).

Further, "New York courts have held that a claim 'aris[es] from' a particular transaction when there is 'some articulable nexus between the business transacted and the cause of action sued upon," *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC,* 450 F.3d 100, 103 (2d Cir. 2006) (quoting *McGowan v. Smith*, 52 N.Y.2d 268, 272 (1981)), or when "'there is a substantial relationship between the transaction and the claim asserted,'" *id.* (quoting *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988)). "[E]ven a single New York business transaction may be sufficient, provided the cause of action arises 'out of the subject matter of the transaction.'"

*Warner Bros. Entm't Inc. v. Ideal World Direct*, 516 F. Supp. 2d 261, 266 (S.D.N.Y. 2007)

(quoting *Viacom Int'l, Inc. v. Melvin Simon Prods.*, 774 F. Supp. 858, 862 (S.D.N.Y. 1991).

     If there is a statutory basis for specific jurisdiction, the court next turns to the Due

Process Clause analysis, which has two related components: the "minimum contacts" inquiry

and the "reasonableness" inquiry. *See Queen Bee of Beverly Hills, LLC*, 616 F.3d at 163. "With

respect to minimum contacts, [the court] must determine whether the defendant has sufficient

contacts with the forum state to justify the court's exercise of personal jurisdiction." *Id.* (citing

*Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The court "evaluate[]s the quality and

nature of the defendant's contacts with the forum . . . under [the] totality of the circumstances."

*Licci*, 732 F.3d at 170; *see also Grand River Enters.*, 425 F.3d at 166 (2d Cir.2005) ("No single

event or contact connecting defendant to the forum state need be demonstrated; rather, the

totality of all defendant's contacts with the forum state must indicate that the exercise of

jurisdiction would be proper."). It is "insufficient to rely on a defendant's 'random, fortuitous, or

attenuated contacts' or on the 'unilateral activity' of a plaintiff" with the forum to establish

specific jurisdiction. *Walden*, 571 U.S. at 286 (quoting *Burger King*, 471 U.S. at 475).

     Importantly, to establish specific jurisdiction, "[t]he relationship between the defendant

and the forum 'must arise out of contacts that the defendant *himself* creates with the forum.'"

*Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016) (citing *Walden v. Fiore*,

571 U.S. 277, 284 (2014)). "The 'minimum contacts analysis looks to the defendant's contacts

with the forum [s]tate itself, not the defendant's contacts with persons who reside there.'" *Id.*

(citing *Walden*, 571 U.S. at 284).

     With respect to the "reasonableness" inquiry, the court must satisfy itself that exercising

jurisdiction is "reasonable under the circumstances" and "does not offend traditional notions of

fair play and substantial justice." *Bank Brussels,* 305 F.3d 120 at 129; *see also Int'l Shoe Co.*,

326 U.S. at 316 (internal quotation marks omitted).  In determining reasonableness, the court

should consider the following factors:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the
> interests of the forum state in adjudicating the case; (3) the plaintiff's interest in
> obtaining convenient and effective relief; (4) the interstate judicial system's interest
> in obtaining the most efficient resolution of the controversy; and (5) the shared
> interest of the states in furthering substantive social policies.

*Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 169 (2d Cir. 2015).  "While the exercise of

jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at

the first stage of the inquiry, it may be defeated where the defendant presents 'a compelling case

that the presence of some other considerations would render jurisdiction unreasonable.'"  *Queen*

*Bee of Beverly Hills, LLC*, 616 F.3d at 164–65 (citing *Burger King*, 471 U.S. at 477).

### 2.  Application

I find that Plaintiff has made a prima facie showing of personal jurisdiction with respect

to Defendant BCM and Tolaram, but that it fails to carry its burden with respect to Defendants

WSFS, Blue Elite Fund Ltd., and Blue II.  However, Plaintiff is entitled to jurisdictional

discovery as to WSFS, Blue Elite Fund Ltd., and Blue II.

### a.  <u>WSFS</u>

Plaintiff fails to make a prima facie showing of both general jurisdiction and specific

jurisdiction under § 302(a)(1) over WSFS, a Delaware domiciliary, (SAC ¶ 13).  With respect to

general jurisdiction, Plaintiff asks me to "assess the company's local activity . . . in the context of

the company's overall activity."  (Pl.'s Opp. WSFS 20 (citing *Lockheed Martin Corp.*, 814 F.3d

at 629.) [9]  In *Lockheed Martin*, the Second Circuit observed that "the general jurisdiction inquiry

---

[9] "Pl.'s Opp. WSFS" refers to Plaintiff's Memorandum of Law in Opposition to Defendants Wilmington Savings

does not focus solely on the magnitude of the defendant's in-state contacts, but calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide." *Id.* In light of that directive, the Second Circuit concluded that the Connecticut district court lacked general jurisdiction over the defendant because its "business in Connecticut, while not insubstantial, constitute[d] only a very small part of its portfolio." *Id.* Plaintiff asserts that WSFS is a "sizable financial services company" that has "performed countless New York-based deals alongside New York-based banks." (Pl.'s Opp. WSFS 20.) These allegations, though they provide scattershot details on certain of WSFS' New York deals, do not provide any detail about WSFS' national business. Without that context, I cannot properly assess the significance of WSFS' New York contacts with respect to its "overall activity." Thus, Plaintiff falls far short of making a prima facie showing that WSFS is "essentially at home" in New York. *See Daimler*, 571 U.S. at 127.

Plaintiff also fails to make a prima facie showing under § 302(a)(1), because Plaintiff has not alleged a single volitional act directed at New York in particular out of which its claims arise. As an initial matter, I must disregard several of the purported contacts put forth by Plaintiff's counsel in their memorandum of law. Although counsel cites to the Second Amended Complaint for each alleged contact set forth in the brief, upon inspection it is clear that these citations do not support Plaintiff's claims that: (1) Alpha executed the Trust Agreement that designated WSFS as trustee in New York, (Pl.'s WSFS Opp. 21); (2) WSFS sent account statements to New York, (Pl.'s WSFS Opp. 22); (3) Lockerman signed Repurchase Confirmations in New York, (*id.*); and (4) the Master Repurchase Agreement, signed by WSFS, contained a New York choice of law

---

Fund Society, FSB, and Christiana Trust's Motion to Dismiss Plaintiff's Second Amended Complaint, filed March 12, 2019. (Doc. 143.)

provision, (*id.* 23.)

First, nothing in the Trust Agreement or Plaintiff's Second Amended Complaint suggests that document was signed in New York, and the signatories are all foreign domiciliaries.  (*See* Trust Agmt., at 13–15 (listing signatories as Tolaram on behalf of Alpha, Nathan Felix on behalf of Plaintiff, and WSFS' Trust Officer on behalf of WSFS); SAC ¶¶ 8 (Plaintiff domiciled in Utah); 13 (WSFS domiciled in Delware); 19 (Alpha domiciled in Cayman); 29 (Tolaram resident of Bermuda)).  Second, as to statements, the Second Amended Complaint only alleges that "Great Western [a Utah domiciliary] received monthly account statements from WSFS," (*id.* ¶ 81; *see also, e.g.*, *id.* ¶ 120).  Third, no document indicates that Lockerman signed any Repurchase Confirmations in New York, and the Second Amended Complaint alleges only that "WSFS signed the Repurchase Confirmations through 2014, after which Graham signed the Repurchase Confirmations in 2015 and 2016 in New York."[10]  (*Id.* ¶ 73.)  Fourth, the Master Repurchase Agreement does contain a governing law provision—but it provides that it is to be "governed by and construed in accordance with the laws of England."  (Repurchase Agmt. § 17.)

Although "affidavits and supporting materials" outside the pleadings may be considered on a Rule 12(b)(2) motion, *Whitaker*, 261 F.3d at 208, and although "all factual disputes" arising out of conflicting affidavits are to be resolved in the plaintiff's favor, *Seetransport Wiking*, 989 F.2d at 580, Plaintiff has supplied no authority suggesting that acceptable materials include averments by counsel in an unsworn memorandum of law.  Accordingly, because these assertions appear only in a document submitted by a person with no personal knowledge, and

---

[10] WSFS avers that the Repurchase Confirmations were signed in Delaware.  (WSFS Reply 3; Olsen Decl. ¶ 7.) "WSFS Reply" refers to Defendants Wilmington Savings Fund Society, FSB and Christiana Trust's Reply in Further Support of Their Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), filed April 2, 2019.  (Doc. 161.)  "Olsen Decl." refers to the Declaration of John L. Olsen in Support of Wilmington Savings Fund Society, FSB and Christiana Trust's Motion to Dismiss, filed February 5, 2019.  (Doc. 138.)

"do not appear in [Plaintiff's] complaints or affidavits," I will not consider them.  *See Langenberg v. Sofair*, No. 03 CV 8339 KMK, 2006 WL 2628348, at *4 (S.D.N.Y. Sept. 11, 2006) (declining to consider jurisdictional allegations made for the first time in memorandum of law); *see also Austin v. Snapper Power Equip. Corp.*, No. 90 CIV. 0320 (LBS), 1992 WL 28141, at *4 (S.D.N.Y. Feb. 7, 1992) (granting motion to dismiss third-party complaint for want of personal jurisdiction because asserted jurisdictional facts were merely allegations made in brief, unsupported by affidavits or other substantiation).

Setting aside Plaintiff's unsupported assertions, I consider only the following supported allegations:  (1) that Graham and BAAM, investment manager of the Trust, for which WSFS served as trustee, operated out of New York offices, (SAC ¶¶ 36, 39, 67); (2) that WSFS engaged in e-mail and telephone communication with the Blue Defendants, who were based in New York, (*id.* ¶ 40); (3) that WSFS, as trustee of Series 2011-C, a Delaware trust, received and executed withdrawal and deposit instructions from Graham and BAAM, who were in New York, (*see, e.g. id.* at ¶¶ 40, 103–105, 119); (4) WSFS "had broad knowledge of the other defendants' malfeasance," (*id.* ¶¶ 87–89); and (5) WSFS coordinated payments to entities in New York, (Pl.'s Opp. WSFS 22), such as Ability's transfer of funds from Series 2011-C into a BNY Mellon account, (SAC ¶¶ 116, 119).

It is well settled under New York law that "using electronic and telephonic means to *project* [oneself] into New York to conduct business transactions" is enough to satisfy the long-arm statute.  *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71 (N.Y. 2006) (emphasis added).  But defendants must do just that: "project themselves."  *Id.*  A plaintiff must show that the "defendant's direct and personal involvement on [its] own initiative projected [itself] into New York to engage in a sustained and substantial transaction of business."  *Grant &*

*Eisenhofer, P.A. v. Bernstein Liebhard LLP*, No. 14-CV-9839 (JMF), 2015 WL 5751252, at *4

(S.D.N.Y. Sept. 30, 2015) (quoting *Aquiline Capital Partners v. Finarch, LLC,* 861 F.Supp.2d

378, 386 (S.D.N.Y. 2012).  When defendants have not done so, "courts have routinely held that

e-mails, letters, and telephone calls . . . are not enough to establish personal jurisdiction under

Section 302(a)(1)."  *Id.* (collecting cases).

Even drawing all inferences in Plaintiff's favor, Plaintiff's factual allegations are

insufficient to show that WSFS projected itself into New York with the purpose of conducting

business here.  WSFS is not alleged to have solicited, negotiated, or executed a contract in New

York, to have executed transactions in New York, or to have pursued the services or business of

any New York domiciliaries.  Rather, Plaintiff alleges only that WSFS contracted with Plaintiff

and Alpha, a Cayman domiciliary, to administer a trust that Plaintiff and Alpha had created;

Alpha then selected a New York domiciliary as its agent.  That New York agent then

communicated with WSFS by telephone and by e-mail, including by sending investment

instructions, which WSFS executed in Delaware.  Thus, WSFS' alleged contacts with New York

were created by the "unilateral activity" of Alpha, not from unilateral acts or actions of WSFS.

*See Walden*, 571 U.S. at 286 (internal quotation marks omitted).  Rather, WSFS's

communications with New York and authorization of fund transfers to and from New York were

undertaken "in connection with [its] . . . administration and/or custodial duties" as a trustee of

Series 2011-C, a Delaware trust, pursuant to the Trust Agreement.  (SAC ¶¶ 15, 17.).  *Hill*, 207

F. Supp. 3d at 338.  These were "incidental consequences of fulfilling a . . . contract and are

insufficient to 'project' [WSFS] into New York," particularly given that, in contrast to *Hill*, there

are no allegations that the contract was a New York contract.  *Id.*; *see also DirecTV Latin Am.,*

*LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 420 (S.D.N.Y. 2010) ("[C]ommunications into New

York will only be sufficient to establish personal jurisdiction if they were related to some transaction that had its center of gravity inside New York, into which a defendant projected himself."); *Roper Starch Worldwide, Inc. v. Reymer & Assocs., Inc.*, 2 F. Supp. 2d 470, 474–475 (S.D.N.Y. 1998) (communications and sending of payments that "seek to insure fulfillment of contract terms do not 'project' a defendant into a state sufficiently to confer jurisdiction.")  There is no suggestion that WSFS' interactions with New York "are distinguishable from [its] interactions with [entities] in any other jurisdiction" that have contracted with it for trust administration services.  *Royalty*, 638 F. Supp. 2d at 421 (internal quotation marks omitted).

Accordingly, Plaintiff has not satisfied its jurisdictional burden as to WSFS.  However, a court may order jurisdictional discovery where "even if [a] plaintiff has not made a prima facie showing of jurisdiction, [it has] made a sufficient start toward establishing personal jurisdiction." *City of Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 809 (S.D.N.Y. 2017) (internal quotation marks omitted); *accord In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 207–08 (2d Cir. 2003). An order for jurisdictional discovery is appropriate where "'plaintiff's jurisdictional allegations are neither sparse nor insufficiently specific,' but 'are simply insufficiently developed at this time to permit judgment as to whether personal jurisdiction is appropriate.'"  *Tese-Milner*, 613 F. Supp. 2d at 417 (S.D.N.Y. 2009) (quoting *Tex. Int'l Magnetics, Inc.*, 31 Fed. App'x at 739). Because Plaintiff's memorandum of law suggests it may be aware of additional jurisdictional facts that have not yet been properly put before the Court—for example, the process by which WSFS was contracted to serve as trustee, and the place where Lockerman signed Repurchase Agreements—I will grant Plaintiff leave to conduct limited jurisdictional discovery.  *See, e.g.*, *City of Almaty*, 278 F. Supp. 3d at 810; *Tese-Milner*, 613 F. Supp. 2d at 417.  Because I cannot be satisfied at this stage that I have jursidiction over WSFS, however, I cannot consider the

remainder of WSFS' motion under Rule 12(b)(6).  *See Gundlach v. Int'l Bus. Machines Corp.*,

No. 11-CV-846 CS, 2012 WL 1520919, at *13 (S.D.N.Y. May 1, 2012), *aff'd on other grounds*

*sub nom. Gundlach v. Int'l Bus. Machines Inc.*, 594 F. App'x 8 (2d Cir. 2014).  Accordingly,

WSFS' motion to dismiss is denied without prejudice to refiling after the completion of

jurisdictional discovery.  *See Tese-Milner*, 613 F. Supp. 2d at 418; *Sokolow v. Palestine*

*Liberation Org.*, 583 F. Supp. 2d 451, 460 (S.D.N.Y. 2008); *Ayyash v. Bank Al-Madina*, No. 04

CIV. 9201 (GEL), 2006 WL 587342, at *9 (S.D.N.Y. Mar. 9, 2006).

### b.  BCM

Plaintiff has made the requisite showing of specific jurisdiction as to BCM, a Puerto Rico

corporation, (SAC ¶ 11), by alleging that:  (1) it was solely owned and operated by Graham, a

New York domiciliary, (*id.* ¶ 4, 9, 77); (2) it maintained an office in New York, from which

Graham transacted all of BCM's business, (*id.* ¶ 38); and (3) Graham signed Repurchase

Confirmations on behalf of BCM in 2015 and 2016 in New York, (*id.* ¶ 73).  These Repurchase

Confirmations are alleged to have contained false information about the value of Series 2011-C,

(*see id.* ¶ 83), and to have provided the basis and repeat authorization for Graham and Solow to

"direct the funds backing the Repurchase Agreement in Series 2011-C into risky investments,"

(*id.* ¶ 89).  Graham's conduct as agent for and principal of BCM constituted a purposeful,

"sustained and substantial transaction of business," *Paterno*, 24 N.Y.3d at 377, that led directly

to Plaintiff's cause of action.  *See, e.g.*, *FIA Leveraged Fund Ltd. v. Grant Thornton LLP*, 56

N.Y.S.3d 12, 16 (App. Div. 1st Dep't 2017) (personal jurisdiction over certain defendants where

individual, as agent for those defendants, "engaged in purposeful activities in this State in

relation to [the] transaction [sued upon] for the benefit of and with the knowledge and consent of

[these other] defendants," and defendants "exercised some control over [him] in the matter").

For the same reasons, I find BCM also had sufficient minimum contacts with New York within the meaning of the due process analysis. Evaluating "the quality and nature of [BCM's] contacts with [New York]," it is plain that through its continuous transaction of business in New York, it "purposefully availed itself of the privilege of doing business" here and "could foresee being haled into court." *Licci*, 732 F.3d at 170. It would also "comport with fair play and substantial justice" to assert jurisdiction over BCM because its sole owner and primary operator is Graham, a New York domiciliary who is already a defendant in this case, and so BCM will not be unduly burdened. Further, it serves Plaintiff's interests and the interests of judicial economy to hear all the claims in this complex litigation in a single forum. *See id.*

### c.  Blue Elite Ltd. and Blue II

Plaintiff has not carried its burden as to BEF Ltd. and Blue II, both Cayman domiciliaries. (SAC ¶¶ 22, 24.) Plaintiff's allegations as to these two entities are sparse and lacking in detail: (1) Graham created and operated the entities and transacted daily business on their behalf from New York, (*id.* ¶¶ 36, 106); (2) Graham and Solow, New York domiciliaries, had an ownership interest in the entitities, (*id.* ¶ 90); (3) Lynch and Tolaram, Bermuda domiciliaries, served as authorized signatories for Blue II, (*id.* ¶ 107); (4) they concealed information from Plaintiff, (*id.* ¶ 79), and (5) they received and made transfers of funds that belonged to Plaintiff (*id.* ¶¶ 90, 104–05), and funds that were originally held in Plaintiff's Trust Account, (*id.* ¶ 103).

I do not find these allegations sufficient to support exercise of jurisdiction. "Common ownership or control" of a nondomiciliary, alone, is "not enough" to establish jurisdiction. *Gear, Inc. v. L.A. Gear California, Inc.*, 637 F. Supp. 1323, 1328 (S.D.N.Y. 1986) (citing *Volkswagenwerk,* 751 F.2d at 120).) Although Plaintiff has alleged "volitional acts" by which

Blue II and BEF Ltd. "avail[ed] [themselves] of the privilege of conducting activities within the forum State," *C. Mahendra (N.Y.), LLC v. Nat'l Gold & Diamond Ctr., Inc.*, 125 A.D.3d 454, 457 (App. Div. 1st Dept. 2015), Plaintiff has not shown that these acts gave rise to the claims at issue here. *Cf. Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 594 B.R. 167, 191 (Bankr. S.D.N.Y. 2018) (jurisdiction over claims regarding fraudulent transfer of funds where funds were managed from New York, agreements were sent to New York, funds were wired to New York, redemptions were requested to and received from New York, and "[t]he redemption and any other payments the Defendants received as direct investors in the [] Funds arose from the aforementioned New York contacts and were the proximate cause of the injuries" sought to be redressed). For example, Plaintiff has not specifically alleged that any improper transfers of funds were executed in New York, or that Graham transacted all Blue Elite Ltd. and Blue II business from New York, which would allow the inference that the improper transfers were executed in New York.[11]

Accordingly, because this court lacks jurisdiction over BEF Ltd. and Blue II, I do not reach the merits of Plaintiff's claims against them. However, I find this to be a close question, particularly since by the very nature of the scheme that is alleged, Plaintiff never had direct contact with BEF Ltd. or Blue II, and because Plaintiff has alleged sufficient facts to suggest that these "non-domiciliary defendant[s] . . . [are] interrelated with other defendants." *See Langenberg*, 2006 WL 2628348, at *6. Because Plaintiff's jurisdictional allegations may simply be "insufficiently developed at this time to permit judgment as to whether personal jurisdiction is

---

[11] Although Plaintiff contends in its opposition that it did make this allegation, citing to paragraph 36 of the Second Amended Complaint, this contention is not supported by the cited paragraph, which states only that "Graham is a resident of New York and maintains an office in New York through which he has transacted business, maintained substantial contacts, and/or committed overt acts that are the basis of the claims herein." (SAC ¶ 36.) Neither Blue Elite Ltd. nor Blue II are mentioned in this paragraph of the Second Amended Complaint.

appropriate," I find jurisdictional discovery is warranted. *Texas Int'l Magnetics, Inc.*, 31 F.

App'x at 739. Accordingly, Plaintiff is granted leave to engage in limited jurisdictional

discovery.

As with WSFS, because I cannot be satisfied at this stage that I have jursidiction over

Blue II and BEF Ltd., I decline to rule on the merits of the claim against them. Instead, I deny

their motions without prejudice to refiling after the completion of jurisdictional discovery.

d.   <u>Tolaram</u>

With the aid of discovery, Plaintiff has made a prima facie showing of personal

jurisdiction as to Tolaram under CPLR §302(1)[12] and the Due Process Clause. Section 302(a)

"confers [specific] jurisdiction over individual corporate officers who supervise and control an

infringing activity." *Queen Bee of Beverly Hills, LLC*, 616 F.3d at 164 (citing *Kreutter*, 71

N.Y.2d at 467); *see also Belabbas v. Inova Software Inc.*, No. 16-CV-7379, 2017 WL 3669512,

at *3 (S.D.N.Y. Aug. 24, 2017) ("New York law does not distinguish actions taken in a

defendant's personal capacity from actions taken in his 'corporate' capacity." (citing *id.*)). In

evaluating control, courts consider "whether the officer had any direct involvement, knowledge,

or consented to the transactions at issue," *Trisvan v. Heyman*, 305 F. Supp. 3d 381, 393

(E.D.N.Y. 2018) (collecting cases), and whether he received "personal benefit" from the

transactions, *Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 328 (S.D.N.Y. 2015). *See also*

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (stating that "New

York law and due process [are] satisfied [for specific jurisdiction] where corporate officers

allegedly 'benefitted from [corporation's in-forum] activities and exercised extensive control

---

[12] This is the only basis for jurisdiction over Tolaram that Plaintiff asserts. (Pl.'s Opp. Tolaram 9–18.)

over corporation in the transaction underlying the suit'" (quoting *Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988))).[13]

Tolaram is alleged to be an owner, director, and chief operating officer of Alpha, (SAC ¶ 122; Lindquist Decl. ¶ 3) as well as a representative of Alpha in its business with Plaintiff, (SAC ¶ 47; Lindquist Decl. ¶ 3).  According to Plaintiff, "Alpha was not considered [present during meetings unless Tolaram was involved.'"  (Lindquist Decl. ¶ 4.)  Tolaram was the sole "representative of Alpha on telephone calls negotiating the trust agreements," (Lindquist Decl. ¶ 3), which ultimately designated BAAM, a Delaware LLC with its principal place of business in New York, as the investment manager for the Trust Account.  (Am Trust Agmt. 4(b); SAC ¶ 39, 67.)  Tolaram signed that agreement, identifying himself as "COO."[14]  (Am. Trust. Agmt. 15.) Graham appeared by telephone at least one Alpha board meeting to provide an update on investments managed by him, (*see* McInerney Decl. Ex. 4, at 7, 10), and in connection with the Trust Agreement, Tolaram communicated with Graham in New York and Alpha's counsel in New York, arranged a meeting in New York between Plaintiff and representatives of Alpha and BAAM in December 2016, and ultimately attended a meeting in New York in November 2017 along with Graham, Alpha's New York counsel, and others.  (Lindquist Decl. ¶ 15.)  According

---

[13] Tolaram argues that as a matter of law I must disregard any contacts with New York that are "based on [his] role as a member of the Board of Directors of Alpha Re" because "'[j]urisdiction over a corporation's board member, officer or employee, in his or her individual capacity must be premised on the defendant's own personal contacts with the forum, and not the acts and/or contacts carried out by the defendant in his or her corporate capacity.'" (Tolaram Reply 3–4 (quoting *In re Terrorist Attacks on September 11, 2001*, 718 F. Supp. 2d 456, 470–71 (S.D.N.Y. 2010)).  The court in *In re Terrorist Attacks* made this statement as part of its analysis of whether it had *general* jurisdiction over the individual defendants, not specific jurisdiction, and so it is inapplicable.  It is true that courts have held that, as Tolaram points out, "a person's status as a board member is not alone sufficient to establish jurisdiction."  (Tolaram Reply 3–4 (quoting *In re Astra Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008)).  Here, however, Plaintiff's claim to jurisdiction does not rest solely on Tolaram's formal membership on the board, but also on his active role in the management of Alpha as its chief operating officer and control over its activities, including the transactions giving rise to jurisdiction.

[14] "COO" stands for chief operating officer.

to Plaintiff, at that meeting "Tolaram and Graham discussed with Great Western the current state of the collateral and options for liquidating the collateral to purchase appropriate assets for the reinsurance trust" and that "Tolaram and Graham asked Great Western to hold off on its pursuit of a judgment in the Arbitration."[15]  (Pl.'s Opp. Tolaram 2; Lindquist Decl. ¶¶ 14–15.)[16] Tolaram did not disclose the actual location of the collateral.  (Lindquist Decl. ¶¶ 16–18.) Finally, separately from his corporate role in Alpha, Tolaram served a director in various offshore vehicles managed by Graham in New York, some of which received investments derived from money originally placed in the Trust Account.  (Lindquist Decl. ¶ 17.)

By seeking out and contracting BAAM to be its agent and maintaining that relationship for years, Alpha and Tolaram "deliberately engaged a New York entity for the purpose of conducting activities on their behalf in New York." *Gramercy Advisors, LLC v. Ripley*, No. 13-CV-9070 (VEC), 2014 WL 4188099, at *5 (S.D.N.Y. Aug. 25, 2014) (jurisdiction was proper under section 302(a)(1) where the foreign defendants had engaged a New York investment manager, attended a meeting in New York, communicated with the manager in New York, executed the contracts in New York, and transferred money in New York).  While this fact alone might not necessarily be sufficient, *see id.*, upon consideration of the "totality of the circumstances," *Hill*, 207 F. Supp. 3d at 338, including Alpha and Tolaram's ongoing

---

[15] Tolaram asks me to disregard the November 2017 meeting because it was unrelated to any of Plaintiff's claims. Tolaram alleges that in fact, the meeting was held for the purposes of "addressing an issue raised by its regulator" and discussing potential recomposition by BAAM and Graham of the assets in the insurance trust.  (Tolaram Decl. ¶¶ 9–14.)  Tolaram further disputes the nature of his role in Alpha, contending that he did not direct Alpha to transact business in New York, maintain substantial contacts in New York, or commit tortious acts in New York. (*Id.* ¶ 17.)  Of course, at this stage, I cannot and do not credit these factual assertions by a defendant. *See transport Wiking*, 989 F.2d at 580 (citation omitted).

[16] "Plaintiff's Opp. Tolaram" refers to Great Western's Memorandum of Law in Opposition to Gregory Tolaram's Motion to Dismiss, filed July 10, 2019.  (Doc. 183.)  "McInerney Decl." refers to the Declaration of Stephen McInerney in Support of Opposition to Tolaram's Motion to Dismiss, filed July 10, 2019.  (Doc. 185.)  "Lindquist Decl." refers to the Declaration of Brian Lindquist in Support of Opposition to Tolaram's Motion to Dismiss, filed July 10, 2019.  (Doc. 184.)

communications with Graham about the investment assets in the Trust Account, their communications with Graham and Plaintiff in connection with Plaintiff's concerns about the Trust Account, and their appearance at the November 2017 meeting, Plaintiff has demonstrated that Alpha purposefully "s[ought] out and initiate[d] contact with New York . . . and establish[ed] a continuing relationship" with this forum, *Paterno*, 24 N.Y.3d at 377.

Further, it can be inferred—from Plaintiff's allegations that Tolaram was chief operating officer, held himself out as the primary representative of Alpha, signed the Trust Agreement, and was involved in conference calls concerning the Trust Account—that he controlled Alpha in all relevant respects. *See EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 98 (2d Cir. 2016) (affirming district court's imputation of contacts of corporation to individual defendant who was founder and CEO and had "extensive control over . . . day-to-day activities;" and was the only person to make "any final decisions"); *Queen Bee of Beverly Hills, LLC*, 616 F.3d at 164 (court had personal jurisdiction over individual defendant who had shared in profits of company's in-forum handbag sales, had access to company bank account, and "shared in the decision-making and execution of the purchase and sale of handbags"); *Vista Food Exch., Inc. v. Champion Foodservice, LLC.*, No. 14-CV-804, 2014 WL 3857053, at *7 (S.D.N.Y. Aug. 5, 2014) (observing that courts have imputed personal jurisdiction to individual defendants where the officers had "negotiated[,] . . . signed[,] . . . or were parties to the agreements"). Plaintiff's allegation that Tolaram served as a director in some of the entities to which Trust Account monies were directed also suggests that he personally benefited from Alpha's relationship with BAAM in New York. (*See* McInerney Decl. Ex. 13 (indicating that Tolaram was paid as COO of Alpha and received director fees for his roles in Alpha, Alpha Re Holdings (Cayman Ltd.), Blue Elite Fund, Ltd., Blue Elite Enhanced, Ltd., Sancus, and others.))

In addition, Plaintiff's claims against Tolaram arise directly out of his contacts with New York, including Alpha's relationship with BAAM, his own physical attendance at a meeting in New York in connection with that relationship, and his personal affiliation with the Blue Defendants.  It was Alpha and Plaintiff's designation of BAAM as the investment manager of the Trust Account that allegedly provided Tolaram and his co-Defendants with the opportunity to self-deal, and it was during phone calls with Plaintiff and Graham on behalf of BAAM, and at the November 2017 meeting, that Tolaram is alleged to have provided false assurances about the state of the Trust Account.  Accordingly, jurisdiction under section 302(a)(1) is proper because Tolaram transacted business within the State of New York.

Turning to the constitutional inquiry, I find that jurisdiction over Tolaram "comports with due process for the same reasons that it satisfies New York's long-arm statute."  *Queen Bee of Beverly Hills, LLC*, 616 F.3d at 171 (imputing corporation's contacts to individual defendant for the purposes of jurisdictional inquiry under 302(a)(1) and the Due Process clause); *see also Licci*, 732 F.3d at 170 ("[D]espite the fact that section 302(a)(1) of New York's long-arm statute and constitutional due process are not coextensive, and that personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis, we would expect such cases to be rare.")  By contracting with an investment manager operating out of New York, and serving as director in various entities also managed out of New York, Tolaram "purposefully avail[ed] [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Id.* (quoting *Burger King*, 471 U.S. at 475); *see also Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 477 (S.D.N.Y. 2001) (finding that due process satisfied allowed personal jurisdiction over Bermuda-based administrator of an offshore fund which was managed out of New York).

While it may be burdensome for Tolaram, a Bermuda resident, to defend a suit in New York, Plaintiff and the judicial system have a strong interest in adjudicating all its claims in one forum. New York has a similar interest in hearing the claims here, given that the core fraud allegations are against Graham, a New York resident who allegedly committed the fraud in New York. Because Plaintiff has made a prima facie showing of jurisdiction over Tolaram, his motion to dismiss for lack of personal jurisdiction must be denied.

## B.   *Substantive Claims*[17]

I next address Defendants' motions to dismiss for failure to state a claim. However, because I have found I do not have personal jurisdiction over WSFS, BEF Ltd., and Blue II, at this time, I do not address the merits of their claims at this time.

### 1.   Breach of Fiduciary Duty

Plaintiff sufficiently alleges a breach of fiduciary duty by Graham and BAAM.

#### a.   Applicable Law

To establish a breach of fiduciary duty under New York law, a plaintiff must prove "the existence of a fiduciary relationship, misconduct by the defendant, and damages directly caused by the defendant's misconduct." *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 204 (S.D.N.Y. 2008). A "fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 592–93 (2012). Such a relationship

---

[17] Plaintiff asserts that New York law applies to its tort claims, (*see, e.g.*, Pl.'s Opp. WSFS 13 n.7), and all parties cite almost exclusively to New York law in their briefs, with the exception of the Ability Defendants, who cite two Delaware cases without explanation and without arguing that Delaware should apply. (Ability Mem. 18–19.) I take this to be an oversight. "[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997). Such consent may be implied by the parties' reliance on New York law in their briefs. *Tehran-Berkeley Civil & Envtl. Engineers v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989). Accordingly, I apply New York law to all of Plaintiff's common law claims.

exists where "influence has been acquired . . . [and] confidence has been reposed," *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 502 (S.D.N.Y. 2011) (quoting *Penato v. George*, 383 N.Y.S.2d 900, 904–05 (App. Div. 2d Dep't 1976)), or, put the opposite way, where one party "reposes confidence in another and reasonably relies on the other's superior expertise or knowledge," *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 191 (S.D.N.Y. 2011).  An "arms-length business relationship" will not create a fiduciary obligation.  *Id.* (quoting *WIT Holding Corp. v. Klein,* 724 N.Y.S.2d 66, 68 (App. Div. 2d Dept. 2001)).

A cause of action for breach of fiduciary duty that duplicates a breach of contract claim must be dismissed.  *Bullmore v. Ernst & Young Cayman Islands*, 846 N.Y.S.2d 145, 148 (App. Div. 1st Dep't 2007).  But the mere "existence of a contract between the parties defining the broad contours of their relationship does not preclude a finding of a fiduciary relationship."  *St. John's Univ., New York v. Bolton*, 757 F. Supp. 2d 144, 166–67 (E.D.N.Y. 2010).  To the contrary, "if a contract establishes a relationship of trust and confidence between the parties," that relationship may give rise to "a fiduciary duty . . . which is independent of the contractual obligation."  *Id.* (quoting *Lumbermens Mutual Casualty Co. v. Franey Muha Alliant Ins. Servs.*, 388 F. Supp. 2d 292, 305 (S.D.N.Y. 2005)).  Thus, the same conduct that "constitute[s] the breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract" so long as it is "independent of the contract itself."  *Id.* (quoting *Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 676 (App. Div. 1st Dep't 1987) (collecting cases)); *see also Bullmore*, 846 N.Y.S.2d at 148 ("Professionals such as investment advisors, who owe fiduciary duties to their clients, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties," because "policy, not the parties'

contract, [] gives rise to a duty of care").  In addition, a court may look "[b]eyond what may be memorialized in writing . . . to whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge."  *Id.*  (quoting *Wiener v. Lazard Freres & Co.,* 241 A.D.2d 114, 122 (App. Div. 1st Dep't 1998)).

Courts have recognized that New York law on breach of fiduciary duty is broad and amorphous, *see Refco*, 826 F. Supp. 2d at 502; *Ellington Credit Fund, Ltd.*, 837 F. Supp. 2d at 191 (internal quotation marks omitted), and so whether one party owes another a fiduciary duty is a fact-specific inquiry.  *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 415 (S.D.N.Y. 2010).  "New York courts generally avoid dismissing a claim of breach of fiduciary duty . . . because it usually involves a question of fact:  whether someone reposed trust and confidence in another who thereby gains a resulting superiority or influence."  *Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank,* 261 F.R.D. 13, 26 (S.D.N.Y. 2009), *aff'd.,* 382 Fed. App'x 107 (2d Cir. 2010).

b.  <u>Application</u>

Plaintiff alleges that under the Trust Agreement, BAAM was the designated Investment Manager for the assets in the Trust Account, (Am. Trust Agmt. § 4(b)), and that Graham, as the sole owner and operator of BAAM, was responsible for the investments it made, (SAC ¶¶ 67, 70, 73.).  Because of this relationship and because of Solow and Graham's assurances that trust assets would be invested prudently and in the best interest of Plaintiff, Plaintiff alleges that it "reposed trust and confidence" in Graham, Solow and Alpha.  (SAC ¶¶ 167–68.)  As a result, Plaintiff alleges, Alpha, BAAM and Graham owed it a duty of candor and a duty of loyalty, which they breached.

BAAM and Graham contend that Plaintiff's claim fails because the alleged duty is

entirely encompassed within the terms of the Coinsurance Agreement, the Novation Agreement, and the Amended Trust Agreement, and so is duplicative of a breach of contract claim.  (Blue Mem. 10–11).  They argue further that BAAM could not owe a fiduciary duty to Plaintiff because the Amended Trust Agreement specifically states that BAAM was the agent of Alpha Re, (*id.* 11–12), and that Graham could not owe a fiduciary duty because he was not a signatory to any of the agreements.  Great Western's "generic allegations" of communications with Graham fail to establish a fiduciary duty, they argue.  (*Id.* at 12–13.)

Plaintiff has the better of the argument.  As an initial matter, in contrast to the cases cited by BAAM and Graham, Plaintiff's claim of breach of fiduciary duty cannot be dismissed as duplicative of a breach of contract claim because (1) it asserts no breach of contract claim and (2) BAAM and Graham are not even alleged to have been parties to any of the operative agreements.  *Cf. Ellington Credit Fund, Ltd.*, 837 F. Supp. 2d at 196; *Brooks v. Key Tr. Co. Nat. Ass'n*, 809 N.Y.S.2d 270, 272 (2006).

Rather, the Trust Agreement was executed by Plaintiff, Alpha, and WSFS only.  In order to secure Alpha's payment obligation under the Coinsurance and Novation Agreements, the Trust Agreement created the Trust Account "for the sole use and benefit of" Plaintiff and funded it primarily with assets belonging to Plaintiff.  (*See* Trust Agmt. 2–3; SAC ¶¶ 62, 67, 69.) The Trust Agreement named BAAM as the Investment Manager for the assets in the Trust Account and directed BAAM to provide periodic instructions to WSFS, the Trustee, on how to invest the assets in the Trust Account "in a manner consistent with the Investment Guidelines." (Am. Trust. Agmt. § 4(b), (c).)  BAAM was designated as "the agent of, and . . . acting on behalf of" Alpha.  (*Id.* § 4(b).)  Graham then signed an Incumbency Certificate to the Trust Agreement on behalf of BAAM, which authorized him and BAAM to act "with respect" to the Trust

Account.  (Am. Trust Agmt. Ex. D.)

Thus, it is plausible that in creating the Trust Account for Plaintiff's benefit and providing BAAM with circumscribed discretion to invest the assets, the Trust Agreement implicitly created a relationship of trust and confidence between Graham and BAAM on the one hand and Plaintiff on the other, which was independent from any of the explicit contractual obligations created by the Trust Agreement.  *See, e.g., St. John's University*, 757 F. Supp. 2d at 155, 167 (plaintiff university had plausibly alleged that researchers owed it a fiduciary duty to disclose the patentability of their inventions that arose from an agreement under which researchers agreed to notify university "if their work produced a patentable invention" but had discretion to conduct research "as they saw fit;" university lacked ability to "obtain information about the progress of the research from sources other than the researchers); *see also Bullmore*, 846 N.Y.S.2d at 145 (plaintiff stated claim of breach of fiduciary duty against investment manager who allegedly engaged in fraudulent valuation scheme, even though there was also an investment management agreement in place).  As in *St John's University*, Plaintiff lacked the ability to "independently obtain information" about the status of the assets from anyone other than BAAM and Graham, particularly given that the account statements from WSFS were infected by the same false information that BAAM and Graham were providing to Plaintiff.  757 F. Supp. 2d at 167.

Indeed, courts often conclude, as a matter of policy, that investment advisors and managers owe "fiduciary duties to their clients" separate and apart from their contractual duties, especially when they have discretion over the funds they manage.  *Bullmore*, 846 N.Y.S.2d at 145; *see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.*, 376 F. Supp. 2d 385, 414 (S.D.N.Y. 2005), *as amended* (July 6, 2005) (collecting cases); *Assured Guar. (UK) Ltd. v. J.P.*

*Morgan Inv. Mgmt. Inc.*, 915 N.Y.S.2d 7, 16 (App. Div. 1st Dep't 2010) ("Since [investment manager] had discretionary authority to manage [client's] investment accounts, it owed [client] a fiduciary duty of the highest good faith and fair dealing"), *aff'd,* 18 N.Y.3d 341 (2011). Similarly, a trustee owes a fiduciary duty to the beneficiary of the trust to manage the assets consistent with the beneficiary's best interests. *Cushman v. Comm'r*, 153 F.2d 510, 514 (2d Cir. 1946); *Wells v. Hurlbut Rd. Co., LLC*, 43 N.Y.S.3d 637, 638 (App. Div. 4th Dep't 2016).

The "parties' course of conduct" lends further support to Plaintiff's claim. *Id.* Around the time of the execution of the Trust Agreement, Plaintiff alleges, Graham provided personal assurances to Plaintiff that the Repurchase Agreement was backed only by cash and U.S. Treasury securities, in compliance with the guidelines agreed by the parties, (*id.* ¶ 74), and continued to provide such assurances throughout the life of the Trust Account, on which Plaintiff further relied, (*see, e.g.*, *id.* ¶ 86). In addition, because Graham was the sole owner and operator of BAAM, the signatory of the Incumbency Certificate, and the sole representative of BAAM that communicated with Plaintiff, it is plausible that these assurances caused Plaintiff to "repose[] trust and confidence" in Graham personally, who accepted that trust and confidence and "thereby gain[ed] a resulting superiority or influence." *Musalli*; *see also Sergeants Benev. Ass'n Annuity Fund v. Renck*, 796 N.Y.S.2d 77, 80 (App. Div. 1st Dep't 2005) (plaintiff trust stated a claim for breach of fiduciary duty against investment management firm as well as individual officers of that firm because "the ongoing conduct between parties may give rise to a fiduciary relationship that will be recognized by the courts" and "[a] corporate officer can be held personally liable for his tortious conduct").

Defendants also rely on *Prickett v. New York Life Ins. Co.*, 896 F. Supp. 2d 236, 241 (S.D.N.Y. 2012) and *Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 588–91 (2012),

to support their argument that BAAM owed no fiduciary duty to the parties.  (Blue Defs.' Mem. 12.)  Both *Prickett* and *Oddo* are distinguishable because, unlike the instant case, they involved arms-length business relationships, which do not create fiduciary duties.[18]

Finally, Plaintiff has alleged that Graham and BAAM breached their fiduciary duty with the requisite particularity.  *See Sheppard v. Manhattan Club Timeshare Ass'n, Inc.*, 11 Civ. 4362(PKC), 2012 WL 1890388, at *8 (S.D.N.Y. May 23, 2012) ("When a breach of fiduciary duty claim is premised upon fraudulent misconduct, Rule 9(b) applies.").  Plaintiff alleges that Graham and BAAM engaged in the following fraudulent conduct:  concealing the true ownership structure of Alpha and their connections with the SRC Defendants and the Blue Defendants for their own benefit, (*id.* ¶¶ 78–79, 170); investing trust assets to benefit themselves and other entities, rather than Plaintiff, (*id.* ¶¶ 89–90, 98, 190); allowing Ability to withdraw money from Series 2011-C despite knowing it belonged to Plaintiff, (*id.* ¶ 117); improperly disbursing payments to themselves, (*id.* ¶¶ 103–109); applying false valuations to the Trust Account and the Repurchase Agreement to suggest the Trust Account was fully funded when it was not and to enable the removal of funds from the account, (*id.* ¶¶ 80, 86, 92–94, 98–99, 121, 170); and making assurances to Plaintiff that its assets were properly invested when they were not and

---

[18] In *Prickett*, a life insurance policyholder had directed his life insurance company to invest his premiums in a hedge fund; when the premiums were lost after the collapse of a Ponzi scheme, the policyholder sued the life insurance company and the hedge fund.  896 F. Supp. 2d at 241.  The district court held that the policyholder had not sufficiently alleged that he was owed a fiduciary duty by either entity:  he and the life insurer were engaged in an arms-length commercial transaction, and he was prohibited from having any contact with the hedge fund.  *Id.* at 250.  In *Oddo*, the plaintiff had purchased notes for two investment vehicles, which eventually collapsed.  19 N.Y.3d at 588–91.  The plaintiff then sued the collateral managers of the vehicles for breach of fiduciary duty.  *Id.* at 592.  The New York Court of Appeals upheld dismissal of that claim, finding that the plaintiff had essentially been a note-holding creditor, and therefore was not owed any special relationship of confidence and trust by its debtor.  *Id.* at 593.  In addition, the parties had no contractual relationship, and the plaintiff had no dealings or communications with the collateral managers. *Id.* at 594.  Here, in contrast, BAAM and Graham were not the recipients of Plaintiff's investment or an arms-length contracting partner, but the managers of a trust created specifically for the benefit of Plaintiff.  In addition, unlike in *Prickett* and *Oddo*, Plaintiff alleges that it communicated directly and repeatedly with BAAM and Graham, who provided assurances about the state of the assets on which Plaintiff relied.

generally concealing the state of the assets, (*id.* ¶¶ 74, 86, 91, 121, 148–49, 170).  These

allegations, in conjunction with the ultimate disappearance of the assets that were in the Trust

Account, "constitute strong circumstantial evidence of conscious misbehavior or recklessness."

*Eternity*, 375 F.3d at 187 (internal quotation marks omitted).

Accordingly, the Blue Defendants' motion to dismiss Count One is denied.

### 2.  Fraud

#### a.  Applicable Law

To state a claim for common law fraud under New York law, a plaintiff must allege facts

showing (1) a misrepresentation or a material omission of fact which was false and known to be

false by defendant, (2) made for the purpose of inducing the other party to rely upon it, (3)

justifiable reliance of the other party on the misrepresentation or material omission, and (4)

injury.  *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama

Holding Co. v. Smith Barney Inc*., 668 N.E.2d 1370, 1373 (N.Y. 1996)).  Material omissions are

actionable only when one party owes the other a duty to disclose, which may arise "where the

parties enjoy a fiduciary relationship" or "where one party possesses superior knowledge, not

readily available to the other, and knows that the other is acting on the basis of mistaken

knowledge."  *Childers v. New York & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 309 (S.D.N.Y.

2014) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006).

#### b.  Application

BCM, BAAM, Graham, Regatta, Solow, and Tolaram all move to dismiss Plaintiff's

fraud claim against them.  (SAC ¶¶ 178–181.)  These Defendants contend that Plaintiff has not

set forth its fraud claim with particularity because it has failed to set forth the time, place, and

speaker of the fraudulent statements allegedly made by each Defendant.  (Blue Mem. 16–17[19];

*see also* SRC Mem. 19; Tolaram Mem. 13).  The Blue Defendants take particular issue with

Plaintiff's "conflation of Graham with any number of entities, including BAAM and BCM,"

(Blue Mem. 16 n.6),[20] while Tolaram, Solow, and Regatta also contend that Plaintiff has failed to

set forth circumstances giving rise to an inference of fraudulent intent, (SRC Mem. 19–21;

Tolaram Mem. 3).  Solow and Regatta also contend that (1) Plaintiff does not allege any

misrepresentations on their part, only omissions, which is insufficient in the absence of

allegations that they owed a duty to Plaintiff, (SRC Mem. 19–20); and (2) Plaintiff's reliance on

Solow and Regatta was unjustified.  I first address the question of whether plaintiff has pled each

Defendant's participation with particularity, then turn to the arguments by the SRC Defendants

and Tolaram concerning whether Plaintiff has sufficiently alleged the elements of fraudulent

intent and justifiable reliance.

|   | i. | *Whether the Knowing Misrepresentations and Omissions Have Been Pled With Particularity* |

As Defendants point out, the Second Amended Complaint is decidedly lacking in clarity.

In addition, in the briefs, Plaintiff's counsel needlessly complicates the Court's task by

repeatedly making unsupported and contradictory assertions of fact, conflating allegations about

---

[19] In addition, the Blue Defendants also argue that Plaintiff "cannot establish liability for fraud based on omissions as fraud by omission is only a viable cause of action where a fiduciary duty is owed."  (Blue Mem. 17.)  As I have already held that Graham and BAAM did owe a fiduciary duty to Plaintiff, I do not address this argument with respsect to those defendants.  On reply, they also argue that Plaintiff's fraud claim is duplicative of its breach of contract claim.  (Blue Reply 6–7.)  Because that argument is raised for the first time on reply, I do not discuss it here.  *See Ocean Partners, LLC v. N. River Ins. Co.*, 546 F. Supp. 2d 101, 111 n.8 (S.D.N.Y. 2008).  In any event, that argument fails for the reasons detailed *supra*, Part IV(B)(1)(b), because Plaintiff does not assert a breach of contract claim nor has it alleged that there was a contract between it and Graham, BCM, or BAAM.

[20] "Blue Mem." refers to the Memorandum of Law in Support of Defendant Mark Graham, Blue Capital Management, Inc., Blue Alternative Asset Management, LLC Blue Elite Fund Ltd., Blue Elite Fund LP, and Blue II Ltd.'s Motion to Dismiss Great Western Insurance Company's Second Amended Complaint, filed February 5, 2019. (Doc. 127.)

different individuals,[21] and dodging Defendants' arguments, including, for example, by declining

to respond individually to Tolaram's arguments about its fraud claim and instead simply

incorporating its arguments made in opposition to other Defendants' motions.  (*See* Pl.'s Opp.

Tolaram 19.)[22]  Despite these deficiencies, in keeping with my obligation to draw inferences in

Plaintiff's favor, I have closely parsed the pleading to identify all relevant allegations.  I

conclude that Plaintiff has satisfied its pleading burden with respect to Graham, BAAM, BCM,

Solow, and Tolaram, but not as to Regatta.

- *Graham, Solow, and Tolaram*

Plaintiff has alleged numerous misrepresentations and omissions[23] made by Graham,

Solow, and Tolaram.  Although many of these allegations are leveled at groups of defendants

rather than at each defendant individually, for the reasons stated below I find them particular

---

[21] I have already noted, at *supra*, Part IV(A)(2)(a), the unsupported allegations in support of Plaintiff's claim of jurisdiction over WSFS.  As another example, the Second Amended Complaint states under Count Three, fraud, that it has alleged that BCM, BAAM, Graham, Solow, and Tolaram misrepresented "the valuation of the Great Western Trust assets by providing false and erroneous monthly and annual statements."  (SAC ¶ 180.)  Yet the body of the SAC only alleges that WSFS sent monthly statements to Plaintiff.  (*Id.* ¶ 81.)  Similarly, in its brief in opposition to the SRC Defendants' motion to dismiss, Plaintiff's counsel states "Solow was Alpha; as, Solow was one of the two co-owners of Alpha (along with Graham), and the main person at Alpha that Great Western spoke with as part of their reinsurance relationship with Alpha."  (Pl.'s Opp. SRC 19.)  This assertion is unsupported by any allegation in the Second Amended Complaint, contains no citation to the pleading, and contradicts the statement of Plaintiff's counsel and Lindquist in connection with its opposition to Tolaram's motion to dismiss that Tolaram was the primary representative of Alpha with whom Plaintiff communicated.

[22] It is true that Tolaram also adopts the arguments of his co-Defendants, (*see* Tolaram Mem. 14), but he does set forth an individualized argument that Plaintiff's fraud claim against him is deficiently pled, yet Plaintiff provides no individualized response.

[23] Under these circumstances, a fraud claim based on material omissions by these defendants is cognizable.  As I have already held, Plaintiff has plausibly alleged that Graham and BAAM owed it a fiduciary duty.  In addition, as discussed in further detail *infra*, Plaintiff has also alleged that Solow and Tolaram knew the true value of the assets in Series 2011-C and that Plaintiff did not, as demonstrated by Plaintiff's efforts to determine the status of the money in the Trust Account.  This is sufficient to show that Solow and Tolaram had "superior knowledge, not readily available to [Plaintiff], and kn[e]w[] that [Plaintiff] [wa]s acting on the basis of mistaken knowledge." *Childers*, 36 F. Supp. 3d at 309.  However, to the extent that Plaintiff seeks to assert a claim of fraud on its allegation that various defendants "kept [their] connections and other conflicts of interest secret from [Plaintiff]," (SAC ¶ 79; Pl.'s Opp. SRC 17), that claim fails because Plaintiff has offered no allegations to suggest that Plaintiff's actions were in any way influenced by its lack of knowledge of those connections.  For instance, Plaintiff does not allege that if it had been informed about those connections, it would have conducted itself differently.

enough to "inform each defendant of the nature of [his] alleged participation in the fraud." *Abu Dhabi Commercial Bank*, 651 F. Supp. 2d at 176.

I first address the Defendants' knowledge.  All the alleged misrepresentations or omissions are related to the facts that (1) Series 2011-C had lost and was continuing to lose value beginning in 2014, meaning that the Trust Account was correspondingly losing value, and (2) that the $100 million promissory note deposited by Alpha Holdings into Alpha and assigned to Series 2011-C in July 2017 was actually worthless.  Plaintiff has sufficiently alleged that Graham, Solow, and Tolaram knew these facts.  It is plausible Graham knew them as collateral manager of Series 2011-C and director of Alpha Holdings; and that Tolaram and Solow knew them through their respective roles in Alpha and Series 2011-C.  Specifically, Tolaram was the chief operating officer of Alpha; one of only five directors and owners of Alpha Holdings and one of only three directors and owners of Atlantic, which together owned 100 percent of the preferred stock of Alpha and 80.2 percent of the vote.  (Am. Trust. Agmt. 14; SAC ¶¶ 47–48. 65.)  He also allegedly negotiated the promissory note.  (*Id.* ¶ 151.)  Solow was similarly one of the five directors and owners of Alpha Holdings, as well as the sole owner of Regatta, which in turn solely owns Series 2011-C.  (*Id.* ¶¶ 4, 41, 42, 44, 47.)  It is reasonable to infer that Solow knew the value of a trust solely owned by him, and given that Alpha had received accurate valuations of Series 2011-C in 2015 and 2016, (*id.* ¶¶ 92, 102), it is reasonable to infer that its chief operating officer, Tolaram, was also aware of those valuations.

Accordingly, I turn next to whether the statements have been set forth with particularity. The relevant allegations are:

(1) On many occasions, Graham told Plaintiff that "there was no issue" with the assets backing the Repurchase Agreement, that the Trust Account statements were accurate, and that the Trust Account was fully funded, (SAC ¶¶ 86, 121);

(2) On many occasions, Plaintiff's CFO, Nathan Felix, asked Solow about the assets backing the Repurchase Agreement, and Solow reassured Felix that the trust was fully funded, even though he knew this was false, (*id.* ¶ 85);

(3) Graham and Solow falsely represented on "multiple occasions via in-person meetings, telephone calls, and emails" that the trust was backed by sufficient assets, (*id.* ¶ 121);[24]

(4) "From 2012 to 2016, *all* representations" by Graham, Solow, and Tolaram "were that the collateral backing the Repurchase Agreements were properly valued and appropriate; specifically, cash and United States Treasury Securities," (*id.* ¶ 80);

(5) On June 29, 2015, Alpha received a valuation of Series 2011-C showing that it was worth negative $18.5 million as of December 31, 2014, and on April 29, 2016, Alpha received a valuation of Series 2011-C showing that it was worth negative $50.86 million as of December 31, 2015, yet even though Graham, Solow, and Tolaram were aware of this, they did not disclose it to Plaintiff;

(6) In November 2017, when Plaintiff learned information about how the Trust Account had been invested, it asked for specific details on the investments, which Graham, Solow, and Tolaram "failed to give";

---

[24] Although this allegation, contains no indication of when these representations were made, it is contained within the section of the Second Amended Complaint that concerns Ability's withdrawal of $109 million from Series 2011-C in November 2016, and is sandwiched between other allegations about events that occurred in November and December 2016.  (*Id.* ¶¶ 116, 120, 123.)

(7) Around July 2017 and prior to that, "Graham, Solow, and Tolaram all repeatedly
assured Great Western that the Series 2011-C account was fully funded," (*id.* ¶¶ 146,
148);

(8) Plaintiff met with Graham, Solow, Tolaram and others for a meeting in November
2017, (*id.* ¶¶ 37, 47, 54); and

(9) "From September through November 2017, Alpha Graham, Solow, and Tolaram all
represented on multiple occasions to Great Western that [the] $100 million
promissory note provided sufficient backing of the Repurchase Agreement," even
though it was worthless, (*id.* ¶ 146).

As an initial matter, several of these allegations are omissions, about which a plaintiff
may be unable to provide specifics "because no act occurred." *In re Platinum-Beechwood Litig.*,
2019 WL 4934967, at *22. Plaintiff does, however, provide the names of the people responsible,
and ample evidence of the context, the manner in which they were misleading, and what
defendants obtained through the fraud—the opportunity to loot the Trust Account. *See id.*

As to the affirmative misrepresentations, Plaintiff's allegations are sufficiently particular
to give Graham, Solow, and Tolaram notice of the fraud claims against them. First, even though
Plaintiff groups Defendants together in its allegations, which Defendants suggest is
impermissible group pleading, I find this to be sufficiently related to and a feature of the
collaborative scheme alleged. Plaintiff's allegations indicate that Plaintiff often spoke with
multiple defendants at a time in connection with the Trust Account and Trust Agreement,
because of their respective roles in the underlying transactions, and that these multiple
defendants made the same misrepresentations as part of their joint plan to deceive Plaintiff. This
reading of the Second Amended Complaint is supported by the fact that for different alleged

misrepresentations, Plaintiff alleges different combinations of defendants and references them by name, rather than generically referencing "Defendants" or simply lumping all defendants together for every allegation.  (*Cf.* SRC Mem. 19[25] (citing *Targum v. Citrin Cooperman & Co., LLP*, 2013 WL 6087400, at *6 & n. 99 (S.D.N.Y. Nov. 19, 2013) (group pleading was inadequate where complaint treated two defendants "as a unit" throughout the complaint)).

Second, "[w]hile Plaintiff does not allege the specific date of every alleged misstatement, it is not required to do so at this juncture." *Minnie Rose LLC*, 169 F. Supp. 3d at 516.  Although Plaintiff fails to link the allegedly fraudulent statements with the specific meetings and calls on which they were made, I find that the "where and when" particulars required by Rule 9(b) can be properly inferred.  Specifically, the combination of (1) the dates and time frames on which Plaintiff engaged in specific communications with Defendants and (2) the allegations that the parties had a yearslong business relationship, and that in all communications during that business relationship, Solow, Graham, and Tolaram either falsely represented or concealed the value of the Trust Account, together give rise to the inference that they made these representations on the dates provided by Plaintiff.  For example, Plaintiff has detailed the dates of specific meetings and calls in October 2016 and December 2016, (*see* SAC ¶¶ 37, 132, 133) and also has provided an allegation about "*all* representations" by Graham and Solow from 2012 to 2016, (*id.* ¶ 80).  Plaintiff also alleges Graham, Solow, and Tolaram gathered for a meeting in November 2017, (*id.* ¶¶ 37, 47, 54), and alleged that"[f]rom September through November 2017, Alpha Graham, Solow, and Tolaram all represented on multiple occasions to Great Western that [the] $100

---

[25] "SRC Mem." refers to the Memorandum of Law in Support of the SRC Defendants' Motion to Dismiss Counts Two Through Eight and Eleven of Plaintiff's Second Amended Complaint.  (Doc. 132.)

million promissory note provided sufficient backing of the Repurchase Agreement," (*id.* at ¶ 149).

Thus, Plaintiff's failure to "plead [exact] dates, times, and places with absolute precision" is not fatal to its claim at this juncture because it "gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based." *Rana v. Islam*, 305 F.R.D. 53, 58 (S.D.N.Y.2015); *see Minnie Rose*, 169 F. Supp. 3d at 516 (finding fraud claim stated with particularity where plaintiffs alleged that "*all* of the invoices submitted by [d]efendants were fraudulent" and submitted two sample invoices); *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 180 F. Supp. 2d 444, 455 n. 11 (S.D.N.Y. 2001) ("If a complaint alleges that a defendant made the same representation repeatedly over a specified period of time, the inability to provide the exact dates will not defeat a claim."); *Pollack v. Laidlaw Holdings, Inc.*, No. 90 CIV. 5788 (DLC), 1995 WL 261518, at *9 (S.D.N.Y. May 3, 1995) ("Where the plaintiffs have alleged the general time frame of the communications, the person who made the statements, and the content of the statement, the inability to provide the exact dates will not defeat a claim.").

- *BAAM*

The above analysis regarding Plaintiff's fraud claim against Graham applies equally to its fraud claim against BAAM. While Plaintiff does not set forth any specific statements by BAAM, a corporation, the Second Amended Complaint suggests that all of Graham's communications with Plaintiff about the Trust Account assets were made to Plaintiff in his capacity as principal of BAAM, investment manager for the Trust Account. This is sufficient to allege, at this stage, that both Graham and BAAM are liable for fraud arising out of those misrepresentations and omissions.

- *BCM*

The Second Amended Complaint contains only one type of alleged statement by BCM: its signing of the Repurchase Confirmations in September 2014, September 2015, and September 2016 that listed the value of the securities in Series 2011-C at $143 million in total, when in fact it was worth negative $50.9 million in September 2015, and no more than $83 million (a figure that does not include liabilities) in September 2016.  (SAC ¶¶ 76, 78, 93–94, 98–99.)

Plaintiff's allegations make it plausible that BCM knew this valuation was false because it was the manager of the assets it was valuing, and its "sole shareholder" was Graham, allowing me to "impute [his] knowledge . . . to the corporation."  *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 759 F. Supp.2d 363, 380 (S.D.N.Y. 2010) (citing *Mediators, Inc. v. Manney*, 105 F.3d 822, 827 (2d Cir. 1997)); *see also 546-552 W. 146th St. LLC v. Arfa*, 863 N.Y.S.2d 412, 414 (App. Div. 1st Dep't 2008) ("[T]he alleged malefactors were the only members and managers of the LLCs at the time the agreements for the payment of the undisclosed commissions were entered into, and, therefore, their acts and knowledge are imputed to the LLCs." (citing *Center v. Hampton Affiliates*, 497 N.Y.S.2d 898 (1985)).

In addition, this misrepresentation is actionable even though the Second Amended Complaint contains no allegation that the Repurchase Confirmations were ever provided to Plaintiff.  The counterparty to the Repurchase Confirmations was WSFS, (SAC ¶ 76), who in turn generated account statements for Plaintiff that indicated the Trust Account was fully funded. (*Id.* ¶ 81.)  Under New York law, "a claim for fraud may lie even when a plaintiff does not directly rely on a fraudulent representation made by the defendant, if (1) the plaintiff received the information from someone who had received it from the defendant, and (2) the defendant intended the misrepresentation to be conveyed to [the plaintiff]."  *Amusement Indus., Inc. v. Stern*, 693 F. Supp.2d 327, 348 (S.D.N.Y. 2010) (*Turtur v. Rothschild Registry Int'l, Inc.*, 26

F.3d 304, 310 (2d Cir. 1994).  As discussed in further detail *infra*, Plaintiff has pled sufficient matter to suggest that Graham intended for Plaintiff to continue believing that the Trust Account was properly backed, so that he could continue to use the money for his own ends.

- *Regatta*

However, I cannot isolate any misrepresentations that Regatta is alleged to have made, nor does Plaintiff in its opposition.  Nor does Plaintiff suggest that Solow was ever acting on behalf of Regatta in his dealings with Plaintiff; indeed, the Second Amended Complaint suggests that Solow was acting on behalf of Alpha.  In the absence of more substantive allegations, Plaintiff's pleading of its fraud claim against Regatta is insufficient and must be dismissed.

ii.     *Whether Intent Has Been Pled With Particularity*

Plaintiff has also raised a strong inference of fraudulent intent by alleging facts to suggest that Graham, Solow, Tolaram, BCM, and BAAM were engaged in a scheme to loot the Trust, meeting the standard of showing "strong circumstantial evidence of conscious misbehavior" as well as the lesser standard of "motive and opportunity to commit fraud."  *Eternity*, 375 F.3d at 187 (citation omitted).

Chief among the relevant allegations is that despite the repeated knowing, false reassurances by these five defendants that the Trust Account was fully funded even as the value of the backing collateral plummeted, the money that was in the Trust Account is now gone. Indeed, on the face of Plaintiff's allegations, it is difficult to identify a benign explanation for Defendants' repeated false reassurances.  This is underscored by Plaintiff's allegations about the interconnections between Defendants and their service on the boards of the different corporations used to move funds that originated in the Trust Account, which establish their opportunity to engage in fraud.

Plaintiff has also alleged Defendants' motive to engage in fraud by showing that Defendants "benefitted . . . from the purported fraud" in "concrete and personal way[s]." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). BAAM and BCM received cash disbursements from Series 2011-C of at least $15.9 million that came from assets originally held in the Trust Account; it can be inferred that Graham, as sole owner and operator of these entities, benefited as well. (SAC ¶¶ 103–105.) He also received an unspecified amount from the same source, and initiated various share redemptions using the Blue entities. (*Id.*) Solow received at least $340,000; and Tolaram received "many payments" from assets originally held in the Trust Account. (*Id.*) Plaintiff also alleges that Graham and Solow used Series 2011-C as a "slush fund" whose liquidity they used to make risky investments. (*Id.* ¶ 6.) Tolaram was an authorized signatory for Blue II, Ltd., one of the vehicles Graham, BAAM, and BCM used to direct money that originated in the Trust Account, (*id.* ¶¶ 107–08.) Plaintiff also suggests more generally, that as directors of Alpha Holdings, Graham, Solow and Tolaram, who was also chief operating officer, benefited from Plaintiff keeping its money in the Trust Account even when the value of the Repurchase Agreement had dropped, because that money could be used to "repay old debts" owed by Alpha. (*See id.* ¶¶ 202, 212.) Finally, Plaintiff alleges that Solow benefited from the fact that Plaintiff did not attempt withdraw its funds from the Trust Account, because that enabled Ability to withdraw funds from Series 2011-C and cede additional business to Vista Re, a United States reinsurance company owned and operated by Solow. (*Id.* ¶¶ 123–25.) These benefits extend beyond the kind of ordinary-course-of-business economic self-interest—like general profitability or the success of an investment—that courts have held does not raise an inference of fraud. (*Cf.* SRC Mem. 20–21 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000); *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*, 941 F. Supp. 1369,

1377 (S.D.N.Y. 1996))).

### iii.    *Reliance*

Plaintiff plausibly alleges that it reasonably relied on Solow's misrepresentations.[26]

Solow was a representative of Alpha, which as Plaintiff's reinsurer owed Plaintiff a duty of

"utmost good faith," if not a fiduciary duty.  *See Christiania Gen. Ins. Corp. of New York v.*

*Great Am. Ins. Co.*, 979 F.2d 268, 280 (2d Cir. 1992); *United Fire & Cas. Co. v. Arkwright Mut.*

*Ins. Co.*, 53 F. Supp. 2d 632, 642 (S.D.N.Y. 1999) (duty of utmost good faith between reinsurer

and cedent is "mutual").  More specifically, it had agreed that the Trust Account was "for the

sole use and benefit of" Plaintiff and had undertaken a contractual obligation to use

"commercially reasonable efforts" to ensure the assets in the Trust Account conformed to the

Investment Guidelines.  (SAC Ex. C, §1(c).)  Thus, Plaintiff has plausibly alleged that it was

reasonable for it to rely on Solow's representations as made on behalf of Alpha.  The SRC

Defendants' counterargument that Plaintiff was not entitled to rely on Solow's oral

representations because the Trust Agreement contained investment guidelines and a merger

clause is unconvincing.  (*See* SRC Mem. 21–22 (citing SAC Ex. C, pp. 86–87; *id.* §§ 13, 14).)

That the contract set forth the types of acceptable investments, and that a merger clause

precluded oral modification of the contract, did not preclude Plaintiff from seeking assurances

years after the contract had been executed as to whether Alpha was complying with that contract,

---

[26] Because Graham, BCM, BAAM, and Tolaram do not argue that Plaintiff has failed to establish justifiable reliance
as part of its fraud claim against them, I consider that element conceded.  Even if they had not conceded it, however,
I would have found it sufficiently established:  as to Tolaram for the reasons stated above with respect to Solow; as
to Graham and BAAM because they were investment managers of the Trust Account, who owed Plaintiff a fiduciary
duty; and as to BCM because as discussed above, BCM made the misrepresentation to a third party, WSFS, who it
knew would convey the statement to Plaintiff, who in turn reasonably relied on WSFS as trustee of the Trust
Account.

and relying on the responses of Alpha's agents.  Accordingly, Plaintiff has stated a claim of fraud against Graham, BAAM, BCM, Solow, and Tolaram.

### 3.  Aiding and Abetting Fraud and Breach of Fiduciary Duty

#### a.  Applicable Law

A cause of action for aiding and abetting a breach of fiduciary duty requires:  "(1) a breach by a fiduciary of obligations to [the plaintiff], (2) that the defendant knowingly induced or participated in the breach, and (3) that [the] plaintiff suffered damage as a result of the breach."  *Lerner,* 459 F.3d at 294 (quoting *Kaufman v. Cohen,* 760 N.Y.S.2d 157, 165 (App. Div. 1st Dep't 2003)).  To have participated knowingly, the defendant must have "provide[d] substantial assistance to the primary violator."  *Id.*  Similarly, to state a claim for aiding and abetting fraud, a plaintiff must plead "(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission."  *Id.* at 292 (internal quotation marks omitted).

"These causes of action are parallel in several respects, especially where, as here, the same activity is alleged to constitute the primary violation underlying both claims."  *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 360 (S.D.N.Y. 2007) (internal quotation marks omitted).  [B]oth causes of action require . . . actual knowledge, substantial assistance, and proximate causation."  *Overton*, 166 F. Supp. 3d at 388.  "Knowledge of the primary violation with respect to one claim will entail knowledge of the primary violation with respect to the other . . . . when a plaintiff adequately pleads substantial assistance in connection with a fraud claim, he or she fulfills also the participation element of the breach of fiduciary duty claim."  *Fraternity Fund*, 479 F. Supp. 2d at 360.  "New York law requires that the alleged aider and abettor have 'actual,' as opposed to merely constructive, knowledge of the primary wrong."

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018).  Actual

knowledge need not be explicit and may instead be "divined from surrounding circumstances."

*Id.* (quoting *Oster v. Kirschner*, 905 N.Y.S.2d 69, 72 (App. Div. 1st Dep't 2010)).

      "Substantial assistance may only be found where the alleged aider and abettor

affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling" the

underlying tort to occur.  *In re Sharp Int'l Corp.*, 403 F.3d 43, 50 (2d Cir. 2005) (quoting

*Kaufman*, 760 N.Y.S.2d at 170).  "The mere inaction of an alleged aider and abettor constitutes

substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff."

*Lerner*, 459 F.3d at 295 (quoting *Kaufman*, 760 N.Y.S.2d at 170).  "Substantial assistance

requires the plaintiff to allege that the actions of the aider/abettor proximately caused the harm

on which the primary liability is predicated," such that the "injury [is] a direct or reasonably

foreseeable result of the conduct."  *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018).

### b.  <u>Application</u>

      Plaintiff asserts claims of aiding and abetting breach of fiduciary duty against Defendants

BCM, BEF LP, Solow, Regatta, Cygnet, the Cygnet Trusts, Sancus, Tolaram, ACH, King, and

Cathcart,  (SAC ¶¶ 172–177), and aiding and abetting a fraud against BEF LP, Regatta,[27]

Cygnet, the Cygnet Trusts, Sancus, ACH, King, and Cathcart, (SAC ¶¶ 182–186.)  Both claims

are directed at most of the same defendants, except that those defendants who are charged with

committing primary fraud—BCM, BAAM, Graham, Solow, and Tolaram—are not charged with

aiding and abetting fraud.  Because the two aiding and abetting claims contain similar elements

and encompass some common allegations,[28] I address them together wherever they are both

---

[27] The header for Plaintiff's count of aididng and abetting fraud omits Regatta.  Because Regatta is mentioned in the subsequent paragraph, I consider this to be a clerical error.

[28] I have already found that Plaintiff has stated a claim of breach of fiduciary duty against Graham and BAAM.

asserted against a given defendant.  In addition, in light of my findings *supra* that Plaintiff has stated claims of breach of fiduciary duty and fraud, I consider the following elements of both claims to have been already established:  breach by a fiduciary of obligations to the Plaintiff, injury to Plaintiff as a result of that breach, and the existence of a fraud.  Finally, I note that both sets of aiding and abetting claims sound in fraud and must be alleged with particularity.  *See Berman v. Morgan Keegan & Co.*, No. 10 CIV. 5866 PKC, 2011 WL 1002683, at *7 (S.D.N.Y. Mar. 14, 2011) (claims of aiding and abetting a breach of fiduciary duty that sound in fraud must be pled with particularity), *aff'd,* 455 F. App'x 92 (2d Cir. 2012).

i.   *Solow and Tolaram*

Plaintiff  successfully alleges aiding and abetting a breach of fiduciary duty against Solow and Tolaram based on substantially the same allegations that I have already concluded support a claim of fraud against them.  I find that in engaging in that fraud, Solow and Tolaram also aided and abetted Graham's breaches of fiduciary duty.  Both allegedly made repeated false statements to Plaintiff about the status of the assets in Series 2011-C, preventing Plaintiff from withdrawing its funds or attempting to terminate the Trust Agreement.  Solow, in his capacity as

---

However, Plaintiff has also alleged fraud and breach of fiduciary duty by Alpha, and references breaches of fiduciary duty by WSFS in the allegations supporting Plaintiff's aiding and abetting claim.  (*See* SAC ¶¶ 165–170, 172–177, 178–180.)  Because Alpha has not appeared or moved, and because I have found I may not at this time exercise jurisdiction over WSFS, I have not addressed the merits of these allegations.  However, neither has Plaintiff.  In its opening brief, WSFS specifically states that "Plaintiff concedes that WSFS did not breach any fiduciary duty it owed to Great Western" by dropping WSFS from its fiduciary duty claim, (WSFS Mem. 8), and the SRC Defendants argue that Plaintiff has failed to state a claim for breach of fiduciary duty against Alpha (SRC Mem. 15).  Plaintiff  repeatedly makes unsupported conclusory references to other parties' breaches of fiduciary duty, such as that "BAAM and Graham, among other defendants, owed—and breached—their fiduciary duties owed to Great Western."  (Pl.'s Opp. SRC 14.)  Plaintiff does not address the SRC Defendants' argument that Alpha did not owe a fiduciary duty to Plaintiff, (*see* SRC Mem. 15), nor WSFS' assertion that it has "concede[d] that WSFS did not breach any fiduciary duty it owed to Great Western," (*see* WSFS Mem. 8.)  Accordingly, any argument Plaintiff might make about WSFS' fraud or breach of fiduciary duty, or Alpha's breach of fiduciary duty, is deemed waived for the purposes of the instant motions.  *See, e.g.*, *AT&T Corp. v. Syniverse Techs., Inc.*, No. 12 Civ. 1812(NRB), 2014 WL 4412392, at *7 (S.D.N.Y. Sept. 8, 2014) (holding that the plaintiff's failure to address an issue in its opposition brief "concedes the point"); *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225(RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (holding that plaintiff conceded issue through silence in opposition brief), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).

ultimate and sole owner of Series 2011-C, knew that BCM, owned and operated by Graham, was contracted as the collateral manager for Series 2011-C, as well as the investment manager of the Trust Account, and did not tell Plaintiff despite being asked.  (SAC ¶¶ 74, 79–80, 86, 111.)  Solow also, along with Graham, commingled Plaintiff's funds in Series 2011-C with the funds of other entities, and redirected those funds into risky investments in order to enrich himself.  (*Id.* ¶¶ 6, 104.)  Similarly, Tolaram, as an officer and director of Alpha and signatory to the Trust Agreement, participated in the selection of BAAM as investment manager of the Trust Account and in continuing to retain BAAM as investment manager despite his knowledge of Graham's role in BCM.  Based on Plaintiff's allegations, these acts facilitated BAAM and Graham's breaches of their fiduciary duty to Plaintiff to continue, leading to the diminution of the Trust Account's assets and ultimately causing monetary losses to Plaintiff.

Plaintiff has also sufficiently alleged the knowledge prong with particularity by alleging that Solow knew the true value of the collateral in Series 2011-C through his role as the owner of Series 2011-C and his role in Alpha, and that Tolaram knew the true value based on his role in Alpha.  (*Id.* ¶ 102.)  Plaintiff has also plausibly alleged that Solow knew Graham and BAAM owed Plaintiff a fiduciary duty because Series 2011-C was the counterparty to the Repurchase Agreement, (*id.* ¶ 78), and that Tolaram also knew this fact because of his role in Alpha, which had selected BAAM as the investment manager of the Trust Account, (*see generally* Am. Trust Agmt).

### ii.    BCM and Series 2011-C

Plaintiff states a claim of aiding and abetting breach of fiduciary duty against BCM and a claim of aiding and abetting fraud against BCM and Series 2011-C.  BCM, as collateral manager for and agent of Series 2011-C, allegedly signed the Repurchase Confirmations knowing that

they contained inaccurate valuations of the Series 2011-C collateral. (SAC ¶¶ 92–102). This act was an affirmative one—not a failure to act, as Defendants contend, (*see* Blue Mem. 14–15); SRC Mem. 17–18)—and enabled the underlying fraudulent misrepresentations to continue undetected, preventing Plaintiff from withdrawing its money or seeking a margin transfer, and allowing Graham and BAAM to continue their improper investment activities, thus ultimately causing the total loss of Plaintiff's assets. The element of actual knowledge is established by imputing the knowledge of BCM and Series 2011-C's respective sole owners, Graham and Solow.

### iii. BEF LP and Sancus

Plaintiff has stated a claim of aiding and abetting fiduciary duty as to BEF LP and Sancus, but fails to state a claim of aiding and abetting fraud against them. Plaintiff contends that BEF LP and Sancus assisted the scheme by receiving and transferring money from Series 2011-C that was originally held in the Trust Account. (Pl.'s Opp. Blue 24; Pl.'s Opp. Sancus 8.)[29] Specifically, BEF LP and Sancus are alleged to have received money that was originally in the Trust Account and transmitted it by selling certificates, notes, and shares to the BAAM, BCM, each other, and the other Blue Funds in exchange for cash, (*id.* ¶¶ 106–109, 112), facilitating unearned payments for purported services to other Defendants, (*id.* ¶¶ 103–108), proximately causing reductions in the value of the Trust Account in the amount of those payments.

These allegations do not set forth any actions by BEF LP and Sancus with respect to the misrepresentations by Graham that constitute the heart of Plaintiff's fraud claim. While Plaintiff

---

[29] "Pl.'s Opp. Blue" Refers to Great Western's Memorandum of Law in Opposition to Defendants Mark Graham, Blue Capital Management, Inc., Blue Alternative Asset Management, LLC, Blue Elite Fund Ltd., Blue Elite Fund L.P. and Blue II Ltd.'s Motion to Dismiss Great Western Insurance Company's Second Amended Complaint, filed March 12, 2019. (Doc. 144.)

makes the conclusory assertion that BEF LP and Sancus helped Graham "obfuscate[] his money movements," they fail to link the fund transfers by BEF LP and Sancus to Graham's concealment of the value of Series 2011-C and the Trust Account, or to any other misrepresentation.  In the absence of allegations of substantial assistance, the aiding and abetting fraud claim must fail.  *Cf. Kirschner v. Bennett*, 648 F. Supp. 2d 525, 544 (S.D.N.Y. 2009) (for breach of aiding and abetting claim that concerned fraud, trustee had to show that the defendants knowingly aided the insiders in "making affirmative misrepresentations that provided the customers with a false understanding of how RCM handled the assets in their accounts," while for aiding and abetting fiduciary duty, plaintiff had to show knowingly aiding "us[e] [of] customers' funds in a way that breached the insiders' duty of loyalty").

However, Plaintiff's allegations about BEF LP and Sancus' money movements are sufficient to demonstrate substantial assistance to the breaches of fiduciary duty by Graham and BAAM; *i.e.*, the looting of the Trust Account.  I reject the argument by BEF LP and Sancus that they were merely passive recipients of money, and the authorities they cite on this question are distinguishable, as they uniformly involve large banks or other companies that served not just the individual accused of the underlying misconduct, but also other customers.[30]  In contrast, Plaintiff alleges that Graham actively directed and controlled the activities of BCM, BEF LP, and Sancus to further his fraud and breaches of fiduciary duty, rather than simply using their services along with other customers from the public at large.

Plaintiff has also sufficiently alleged facts giving rise to a strong inference of actual

---

[30] (*See* Blue Mem. 14 (citing *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 203 (S.D.N.Y. 2006)); Sancus Mem. 7–8 (citing *Williams v. Bank Leumi Tr. Co.*, No. 96-cv-6692, 1997 WL 289865, at *14 (S.D.N.Y. May 29, 1997); *Banco Indus. de Venez. v. CDW Direct, L.L.C.*, 888 F. Supp. 2d 508, 516 (S.D.N.Y. 2012); *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 427 (S.D.N.Y. 2007); *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*, No. 98-cv-4960, 1999 WL 558141, at *26 (S.D.N.Y. July 29, 1999).)

knowledge.  Under New York law, the general rule is that the knowledge of an agent obtained in

the course of employment is imputed to the principal, except where the agent has "totally

abandoned his principal's interests."  *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 466 (2010).

Plaintiff's allegations that Graham was the owner and operator of BCM, BEF LP, and Sancus,

(*see* SAC ¶¶ 4, 52, 106, 125), in the absence of facts suggesting he was acting adversely to these

entities, are sufficient to allege actual knowledge.[31]  The arguments by the Blue Defendants and

Sancus that Plaintiff has failed to plead alter ego liability, (*see* Blue Reply 3; Sancus Reply 2–3)

are irrelevant.  Plaintiff does not seek to reverse-pierce the corporate veil to hold the corporations

liable for Graham's conduct.  *See Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134

(2d Cir. 1997).  Rather, Plaintiff seeks to impute Graham's knowledge to them and to hold them

liable for their own conduct.[32]

### iv.  Regatta, Cygnet, Series 2011-A, and Series 2013-A

Plaintiff's aiding and abetting claims against Regatta, Cygnet, Series 2011-A, and Series

2013-A also fail.  Plaintiff has alleged no facts establishing "substantial assistance" provided by

these defendants, beyond the assertions that they (1) "received many payments . . . from assets

originally held in Great Western's Trust Account," (SAC ¶ 103) and (2) that Graham identified

"Cygnet 2011-A Certificates" and "Cygnet 2013-A Certificates" as being "securities or assets

related in any way to Alpha and/or Great Western," (*id.* ¶ 112).  These bare allegations do not

plausibly suggest that these entities affirmatively assisted in the improper transfer of assets out of

---

[31] This argument holds even more true for BCM, whose alleged sole shareholder was Graham.  *See IMG Fragrance Brands*, 759 F. Supp. 2d at 380.

[32] In a footnote, BEF LP argues that if the Court finds that Graham's knowledge can be imputed to BCM and BEF LP, then the aiding and abetting claim is duplicative of the fraud claim and should be dismissed.  (Blue Mem. 17 n.8.)  To the extent this argument is properly raised, it fails for the same reason as BEF LP's argument about alter ego liability—simply because a corporate defendant's knowledge may be inferred from an agent's knowledge, does not necessarily mean that the actions of the corporation and the agent are one and the same.

the Trust Account, assisted in the misrepresentations by Graham, BAAM, BCM, Solow or Tolaram, or otherwise helped to conceal Graham's fraud and breaches of fiduciary duty.

*v. ACH, King, and Cathcart*

Plaintiff's aiding and abetting claims against ACH fails.  The Second Amended Complaint contains no allegations of specific conduct by ACH and no facts to establish knowledge.

However, Plaintiff has stated claims of aiding and abetting fraud and breach of fiduciary duty claims against King and Cathcart.  Plaintiff alleges that after it approached King and Cathcart in an attempt to learn more about the SEC investigation related to Graham, Cathcart told Plaintiff that King had met with Graham and learned enough detail about their investments to make him comfortable.  King also directly told Plaintiff about this meeting and that he now felt "comfort" about Graham's investments.  (*Id.* ¶ 115.)  These statements reassured Plaintiff about the status of its own investments, and it did not withdraw its funds.  (*Id.* ¶ 115.)  This enabled Graham to prolong his fraud, and enabled Ability to withdraw funds from Series 2011-C.  (*Id.* ¶ 116.)  I find that this demonstrates substantial assistance both with respect to the underlying fraud and the breaches of fiduciary duty.

Plaintiff has also alleged circumstances that create a strong inference that King and Cathcart had actual knowledge about the fraud by Graham and Solow, namely that (1) King and Cathcart knew Graham for many years, vouched for him, and pressured Plaintiff into entering into a reinsurance agreement with Alpha; (2) ACH, chaired by King (*id.* ¶ 57), wholly owns Ability, which maintained its own reinsurance agreement with Alpha and which owns the majority of of Sancus, (*id.* ¶ 128), an investment vehicle created and operated by Graham that he used to further the scheme, (*id.* ¶¶ 49–51); (3) in September 2016, King and Cathcart told

Plaintiff that they had spoken with Graham and were reassured about the investments backing

the Repurchase Agreement in Series 2011-C, despite the ongoing SEC investigation into Alpha,

Solow, Graham, and others; (4) two months or less after those conversations, Ability withdrew

money from Series 2011-C and placed 40 percent of its business with Vista Re, a company

owned and operated by Solow; and (5) Cathcart and King joined the board of BEF LP, one of the

investment vehicles created and operated by Graham, in March 2017, (*id.* ¶ 125).  The timing of

Ability's withdrawal illustrates a motive for King and Cathcart to make false statements;

conversely, if Graham really did reassure King and Cathcart and their statements to Plaintiff

were true, the withdrawal lacks a motive.  Although I agree that Plaintiff's allegations form a

convoluted story that may not withstand discovery, I find the circumstances just barely allow a

plausible inference of fraud at this stage.

The Ability Defendants raise several arguments in opposition based on incorrect

interpretations of case law and their applicability to Plaintiff's allegations.  First, they contend

that King and Cathcart's "subjective oral communications. . . are not actionable," and cite two

cases assessing claims of fraud.  (*See* Ability Mem. 12–13 (citing *In re Salomon Analyst AT&T*

*Litig.*, 350 F. Supp. 2d 455, 465-66 (S.D.N.Y. 2004); *Am. Food & Vending Corp. v. Int'l Bus.*

*Machines Corp.*, 245 A.D.2d 1089, 1090, (App. Div. 1st Dep't 1997).)  It is true that fraud

claims require pleading a false statement, such that a statement of opinion cannot be a false

statement.  However, the question here is not whether statements by King and Cathcart are

actionable misstatements for the purpose of alleging a fraud claim against them.  Instead, the

question is whether King and Cathcart's statements of opinion constitute substantial assistance

for the purposes of an aiding and abetting claim.

The Ability Defendants also cite caselaw holding that failure to act cannot constitute

substantial assistance in the absence of a fiduciary duty, despite the fact that Plaintiff alleges

affirmative misleading statements by King and Cathcart.  (Ability Mem. 13 (citing *Stanfield*

*Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.*, 64 A.D.3d 472, 476 (App. Div. 1st Dep't

2009).)  Finally, Ability cites a number of cases in support of its contention that it was not

"justifiable" for Plaintiff to rely on King and Cathcart's opinions, (Ability Mem. 13, Ability

Reply 4), all of which concern primary fraud claims.  For example, the Ability Defendants argue

that *Kyrs v. Surgue (In re Refco Inc. Sec. Litig.)*, No. 07 MDL 1902 (JSR), 2012 WL 12941970,

at *42-43 (S.D.N.Y. Feb. 10, 2012), *adopted* by 2012 WL 3126834, stands for the proposition

that when "substantial assistance is in the form of alleged misstatements, it cannot be found

where the alleged misstatements were not justifiably relied upon."  (Ability Reply 4.)  In fact,

however, this case stands for the proposition that the plaintiff must have reasonably relied on the

*underlying* fraudulent statements; it does not involve misstatements by the aider and abettor.

Justifiable reliance is not an element of an aiding and abetting claim, and the Ability Defendants

cite no relevant caselaw to suggest otherwise.

Accordingly, I find that Plaintiff has stated a claim for aiding and abetting a breach of

fiduciary duty against BCM, BEF LP, Solow, and Tolaram, and has stated a claim for aiding and

abetting a breach of fiduciary duty and fraud against Series 2011-C, Cathcart and King.

Plaintiff's aiding and abetting claims against Regatta, Cygnet, Series 2011-A, Series 2013-A, and

ACH are dismissed, and Plaintiff's aiding and abetting fraud claims against BEF LP and Sancus

are also dismissed.

### 4.   Civil Conspiracy to Commit Fraud

"New York does not recognize an independent tort of conspiracy."  *Kirch v. Liberty*

*Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (citing *Alexander & Alexander of New York, Inc.*

*v. Fritzen*, 503 N.E.2d 102, 102 (1986).)  However, a "civil conspiracy may be alleged for the purpose of showing that an otherwise actionable tort was committed jointly by the conspirators and that, because of the conspirators' common purpose and interest, the acts of one may be imputed to the others."  *DDR Const. Servs., Inc. v. Siemens Indus., Inc.*, 770 F. Supp. 2d 627, 659 (S.D.N.Y. 2011) (internal quotation marks omitted).  "To state a claim for civil conspiracy, a plaintiff must demonstrate the primary tort, plus the following four elements:  (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury."  *Ritchie Capital Mgmt., L.L.C. v. Gen. Elec. Capital Corp.*, 121 F. Supp. 3d 321, 339 (S.D.N.Y. 2015), *aff'd,* 821 F.3d 349 (2d Cir. 2016) (internal quotation marks omitted).

Since civil conspiracy must be derivative of an underlying tort, a civil conspiracy claim "should be dismissed if the underlying tort claim either is not adequately pleaded or has been dismissed."  *Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc.*, No. 99 CIV. 9623 (RWS), 2007 WL 1040809, at \*25 (S.D.N.Y. Apr. 4, 2007) (citing *Kirch*, 449 F.3d at 401), *aff'd sub nom. Briarpatch Ltd. LP v. Phoenix Pictures, Inc.*, 312 F. App'x 433 (2d Cir. 2009).  "Additionally, where the acts underlying a claim of conspiracy are the same as those underlying other claims alleged in the complaint," the conspiracy claim must be dismissed as duplicative.  *Id.*; *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 12-CV-3723 (RJS), 2016 WL 5719749, at \*7 (S.D.N.Y. Sept. 29, 2016); *accord Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.,* 404 F.3d 566, 591 (2d Cir. 2005).

Plaintiff asserts civil conspiracy to commit fraud against the same Defendants against whom it asserts fraud and aiding and abetting fraud:  Graham, BCM, BAAM, BEF LP, Solow, Regatta, Cygnet, the Cygnet Master Trusts, Sancus, and Tolaram.  In support of this claim,

Plaintiff offers only the conclusory allegation that Defendants "conspired with each other for the unlawful objective of defrauding Great Western."  (SAC ¶ 233.)  Because Plaintiff "adds no new allegations distinct from those underlying their fraud and aiding and abetting fraud claims," its conspiracy claim must be "dismissed as duplicative" against those defendants against whom a fraud or aiding and abetting claim survives, *i.e.* Graham, BCM, BAM, Solow, and Tolaram. *Loreley Fin.*, 2016 WL 5719749, at *7; *see also 380544 Canada, Inc. v. Aspen Tech., Inc.*, 633 F. Supp. 2d 15, 36 (S.D.N.Y. 2009) (dismissing conspiracy claim as duplicative of fraud claim); *Briarpatch*, 2007 WL 1040809, at *26 (dismissing conspiracy claim in part because it was duplicative of aiding and abetting claim).

With respect to BEF LP, Sancus, Regatta, Series 2011-A, Series 2011-C, and ACH Plaintiff's civil conspiracy to commit fraud claim fails against them for the same reason as Plaintiff's claim of aiding and abetting fraud.  There are simply no allegations in the Second Amended Complaint that would demonstrate that these defendants had any participation in the fraud, much less an agreement and an overt act in furtherance of that agreement.  *Ritchie*, 121 F.Supp. at 339.

### 5.  Unjust Enrichment

#### a.  Applicable Law

To state a claim of unjust enrichment claim under New York law, a plaintiff must allege "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (internal quotation marks omitted).  Unjust enrichment is only available "in the absence of any agreement," *id.* (quoting *Goldman v. Metropolitan Life Ins. Co.,* 5 N.Y.3d 561, 572 (N.Y.2005) (internal quotation marks omitted),

where "circumstances create an equitable obligation running from the defendant to the plaintiff," *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012). "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Id.*

An unjust enrichment claim requires that the defendant have received a "specific and direct benefit," *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000), but it does not require a "direct relationship between plaintiff and defendant," nor does it "matter whether the benefit [was] directly or indirectly conveyed,'" *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (quoting *Cox v. Microsoft Corp.*, 778 N.Y.S.2d 147 (App. Div. 1st Dep't 2004)). At the same time, however, "there must exist [some] relationship or connection between the parties that is not 'too attenuated.'" *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012) (quoting *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215–16 (2007)). "Although the nature of the relationship required to establish an unjust enrichment claim has not been clearly defined," *Marks v. Energy Materials Corp.*, No. 1:14-cv-8965-GHW, 2015 WL 3616973, at *6 (S.D.N.Y. June 9, 2015) (internal quotation marks omitted), the relationship is "too attenuated" if all that is alleged is that the defendant's "mere knowledge" of the plaintiff, *Georgia Malone*, 19 N.Y.3d at 416, or if the parties "simply had no dealings with each other," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 479 (S.D.N.Y. 2014).

b. <u>Application</u>

Plaintiff advances a claim of unjust enrichment against all Defendants. Defendants argue that any connection between Plaintiff and Defendants is too attenuated to justify an unjust enrichment claim. (Blue Mem. 28–30; SRC Mem. 24–25; Sancus Mem. 16–17; Ability Mem. 17–21; Tolaram Mem. 14.) The Blue Defendants, the SRC Defendants, and Tolaram argue that

Plaintiff has not shown that they were enriched at Plaintiff's expense.  In addition, the Blue

Defendants, SRC Defendants, Sancus, and Tolaram argue that the claim is barred by a contract

governing the subject matter of the action; the SRC Defendants and Tolaram argue that the

unjust enrichment claim is duplicative of Plaintiff's other tort claims; (SRC Mem. 24), and

Ability argues that it had an independent right to withdraw the assets it was allegedly enriched

by, barring Plaintiff's claim, (Ability Mem. 21–22).

I conclude that all of Plaintiff's unjust enrichment claims should survive at this stage

based on the facts alleged and reasonable inferences drawn from those facts.  I first address the

claims of unjust enrichment against the Blue Defendants, the SRC Defendants, Sancus, and

Tolaram, as they are based on the same or similar facts, then turn to the claims aginst the Ability

Defendants.

> i.   *The Blue Defendants, the SRC Defendants, Sancus,*
> *and Tolaram*

Plaintiff alleges that Graham, Solow, BCM, BAAM, Regatta, Cygnet, Series 2011-

A, Series 2011-C, Series 2013-A, BEF LP, Sancus, and Tolaram "received many payments—

both directly and indirectly—from assets originally held in [the] Trust Account."  (SAC ¶ 103.)

More specifically, Plaintiff alleges, Series 2011-C—in which the Trust Account assets were

invested—was a member of "Alpha Re Reinsurance Trusts,"[33] which made cash disbursements

in various amounts to BAAM, BCM, Regatta, Solow, WSFS and Alpha.  (*Id.* ¶ 104.)  Plaintiff

also alleges that Series 2011-C invested a significant amount of money in BEF Ltd., which in

---

[33] Plaintiff does not define "Alpha Re Reinsurance Trusts" or use the term elsewhere in the Second Amended
Complaint.  However, I find it reasonable to infer that the term encompasses trusts affiliated in some way with
reinsurance agreements between Alpha Re and other companies, including the Trust Account.  (*See* SAC ¶¶ 104,
112, 246)

turn paid BAAM a $2.4 million incentive fee.  (*Id.* ¶ 105.)[34]  Finally, Plaintiff alleges that as of

February 20, 2018, well after Plaintiff discovered that its money was gone, Graham identified the

following securities or assets related to Plaintiff or Alpha:  Cygnet 2011-A Certificates, Cygnet

2013-A Certificates, Sancus Capital Blue Shares, BEF shares, and Blue II shares, (*id.* ¶ 112),

indicating, in other words, that funds relating to Plaintiff or Alpha had been invested in those

entities.  Tolaram was an authorized signatory for Blue II.  (*Id.* ¶ 107.)

      While some of these allegations border on conclusory—particularly the allegations

against Regatta, Cygnet, the Cygnet Series Trusts, and Tolaram—I find that the overall context

of this case makes it plausible that the listed Defendants did receive and retain improper

payments of assets that were originally contained in the Trust Account, thus diminishing the

acceptable assets available to secure Alpha's obligations to Plaintiff, and ultimately causing

Plaintiff's negative surplus.

      Several Defendants take issue with the fact that the source of the alleged improper

payments is alleged to be either Plaintiff or Alpha, rather than simply Plaintiff; relatedly, the

SRC Defendant also claim that the assets in Series 2011-C did not belong to Plaintiff.

I do not find this to be fatal to Plaintiff's claim.  Plaintiff alleges that Defendants invested the

assets into Series 2011-C through the Repurchase Agreement and Repurchase Confirmations,

commingled it with funds from other sources, and reinvested it in other instruments.  To the

extent that Defendants drew from that pool of funds, that either diminished the value of Series

2011-C or reduced the funds available to secure Alpha's payment obligation to Plaintiff,

---

[34] In its opposing brief, Plaintiff also rests its unjust enrichment claim against Solow on the fact that Ability ceded more of its business to Vista Re—an entity owned and operated by Solow—after withdrawing $109 million from Series 2011-C.  Plaintiff has not pled a connection between Ability's withdrawal from Series 2011-C and any ceding of business to Vista Re, much less a connection between that act and any benefit to Solow.

regardless of whether the specific dollar came directly from Plaintiff's account.  That is

sufficient to show a "specific and direct" benefit to Defendants, at Plaintiff's expense.[35]  *Kaye*,

202 F.3d at 616; *see also Grgurev v. Licul*, 229 F. Supp. 3d 267, 298 (S.D.N.Y. 2017) ("[An]

unjust enrichment . . . differs from a conversion claim in that it does not require

a specific and identifiable fund.").

  I also find that Plaintiff has sufficiently pled a connection between itself and Defendants

that is not "too attenuated," by alleging a course of dealings with Graham, BAAM, BCM, Solow,

and Tolaram, as well as interrelatedness among them and the various investment vehicles that

have also been named as Defendants.  Plaintiff alleges that Graham, Solow, and Tolaram

provided repeated assurances that Trust Account assets were invested appropriately,  (SAC ¶¶

74, 80, 86), which plausibly "could have caused reliance or inducement" sufficient to establish

an extracontractual relationship.  *Mandarin Trading Ltd*, 16 N.Y.3d at 173.  Although the

corporate Defendants did not directly transact with Plaintiff, as I have already held, the

knowledge of Graham, Solow, and Tolaram about Plaintiff's relationship with BAAM, Graham,

Series 2011-C, and Alpha can be imputed to the corporate Defendants given that they are alleged

to have been the principals and owners.  "Because [Plaintiff] alleges that [Defendants] knew that

they were receiving [the] funds illegitimately, this is not a case in which the parties are simply

to[o] far removed from one another for an unjust enrichment claim to stand."  *Amusement Indus.,*

*Inc. v. Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 510, 537 (S.D.N.Y. 2011) (one defendant

improperly diverted to co-defendants a portion of funds invested by plaintiff and placed in

escrow for use in connection with the purchase of shopping centers by corporate defendant);

---

[35] No Defendant sets forth an argument that the third prong of an unjust enrichment claim has not been satisfied, and so I deem that element—that retaining the benefit would not be in equity and good conscience—conceded.  If they had raised it, I would disagree for the reasons substantially set forth in my discussion on Plaintiff's claims of fraud, breach of fiduciary duty, and aiding and abetting fraud and fiduciary duty.

*Overton v. Art Fin. Partners LLC*, 166 F. Supp. 3d 388, 403 (S.D.N.Y. 2016) ("[A] defendant's awareness of the plaintiff and of the potential negative impact of its own conduct on the plaintiff may serve as further indication of the required closeness between [the] parties."); *cf. Georgia Malone*, 19 N.Y.3d at 518–19 (no unjust enrichment claim where parties "simply had no dealings with each other" and there was no suggestion that the defendant was aware of the circumstances that rendered his enrichment unjust); *Cohen v. BMW Invs. L.P.*, 144 F. Supp. 3d 492, 501 (S.D.N.Y. 2015) (dismissing unjust enrichment claim where plaintiff did not allege actions by defendant that might lead to reliance or inducement and did not allege any dealings between the parties or even that defendant was aware of plaintiff's existence), *aff'd*, 668 F. App'x 373 (2d Cir. 2016).

Plaintiff's unjust enrichment claim against these defendants is not duplicative of a breach of contract claim because there is no "valid and enforceable contract cover[ing] the subject matter of the dispute." *First Hill Partners, LLC v. BlueCrest Capital Mgmt. Ltd.*, 52 F. Supp. 3d 625, 634 (S.D.N.Y. 2014); *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382 (1987)) ("It is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties.").

Defendants' reliance on *Mueller v. Michael Janssen Gallery PTE. Ltd.*, 225 F. Supp. 3d 201, 207 (S.D.N.Y. 2016), is misplaced.  (*See* Sancus Mem. 17 n.9; Blue Mem. 28–29; SRC Mem. 24).  In *Mueller*, the plaintiff, an art buyer, had entered into an agreement with a gallery to purchase a particular work of art.  225 F. Supp. 3d at 204.  The agreement provided that a nonparty art advisor would facilitate the purchase of the work, and the art advisor recommended the parties insert a buy-back clause in the event that the artist disavowed her work.  *See id.*

When the artist did so, however, the gallery refused to honor the clause, and plaintiff sued both

the gallery and the art advisor.  *See id.* at 207–208.  In other words, the plaintiff was trying to

hold the art advisor liable for the breach of contract of another.

   Here, the Coinsurance Agreement, the Novation Agreement, and the Trust Agreement

dictate the terms of the reinsurance relationship between Plaintiff and Alpha, create the Trust

Account, and establish BAAM as the investment manager of the Trust Account.   The

agreements create no other explicit obligations on the part of any of the Defendants charged with

unjust enrichment, and there are no alleged contract breaches that directly gave rise to the alleged

unjust enrichment such that the two claims "simply duplicate[]" each other.  *Corsello v. Verizon*

*N.Y., Inc.*, 18 N.Y.3d 777 (2012); *see also Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447,

468 (S.D.N.Y. 2009) ("'[W]here . . . the contract does not cover the dispute in issue,' a court

should not dismiss a claim of unjust enrichment at the motion-to-dismiss stage"); *cf. Ellington*

*Credit Fund, Ltd.*, 837 F. Supp. 2d at 203 (dismissing unjust enrichment claim against

defendants who were alleged to have received improper payments from another defendant, in

breach of the contract between latter defendant and trustee of plaintiff trusts).

   Similarly, Plaintiff's unjust enrichment claim is not wholly duplicative of any of its tort

claims.  An unjust enrichment duplicates a tort claim if under all circumstances when the tort

claim fails the unjust enrichment claim also fails, or when the tort claim succeeds that unjust

enrichment claim also succeeds.  *See Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 525

(S.D.N.Y. 2015) (dismissing unjust enrichment claim in part because "[i]f Plaintiff's GBL

and fraud claims are not successful, the reason for their insufficiency would not be remedied by

an unjust enrichment claim"); *Koenig v. Boulder Brands, Inc.,* 995 F. Supp. 2d 274, 291

(S.D.N.Y. 2014).  Here, if Plaintiff's tort claims succeed, its unjust enrichment claim would

indeed duplicate the relief awarded. However, if the tort claims fail, the unjust enrichment claim could partially "remedy the defects" of those other claims. *Id.* at 291 (quoting *Corsello*, 18 N.Y.3d at 777). Plaintiff's tort claims sound in fraud and require eventual proof of intent or knowledge, while Plaintiff's unjust enrichment claims are premised only on certain specific improper withdrawals of assets from the Trust Account, and seek a corresponding subset of damages. Accordingly, because I can "conceive of [a] circumstance in which [plaintiff's tort] claim[s] would fail yet they would still be entitled, in equity and good conscience, to restitution," *Paulino v. Conopco, Inc.*, No. 14–CV–5145, 2015 WL 4895234, at *3–4, 6 (E.D.N.Y. Aug. 17, 2015), dismissing this claim as duplicative would be premature at this time.

### ii.   The Ability Defendants

I also find that Plaintiff's connection with King, Cathcart, Ability, and ACH was not "too attenuated." In 2012, Cathcart had introduced Plaintiff to Alpha, Graham, and Solow, vouched for Graham, encouraged Plaintiff to invest with Graham, and pressured Plaintiff into a reinsurance relationship with Alpha. (SAC ¶ 63.) Later, in September 2016, when Plaintiff approached King and Cathcart with concerns about the investments supporting the Repurchase Agreements, King and Cathcart made assurances to Plaintiff as to the appropriateness of Graham's trust investments based on their experiences and alleged conversations with Graham. (SAC ¶¶ 114–116.) They did this while serving as directors of Ability, which was also in a reinsurance agreement with Alpha, and while King served as chairman and CEO of ACH, which wholly owns Ability. Two months after they provided these reassurances, Ability withdrew $109 million from Series 2011-C and then doubled down on its business with Solow's reinsurance company, Vista Re. In March 2017, Cathcart and King became directors of BEF LP, which is owned and operated by Graham. These allegations demonstrate an ongoing relationship

of trust and reliance between Plaintiff and King and Cathcart that enabled them to provide false assurances to Plaintiff about the status of Series 2011-C, only to turn around and withdraw Ability's funds from that trust.  The allegations also suggest that King and Cathcart were aware that Plaintiff's assets were invested in Series 2011-C, and were therefore aware of "the potential negative impact of [their] own conduct,"[36] *Overton*, 166 F. Supp. 3d at 403.  The withdrawal clearly came at Plaintiff's expense and enriched Ability and ACH, as well as King and Cathcart as directors.  *See In re Platinum-Beechwood Litig.*, 377 F. Supp. 3d 414, 427 (S.D.N.Y. 2019) (plaintiff who invested in corporation pursuant to fraud scheme, stated unjust enrichment claim against individual defendants who "had significant ownership positions in [corporation], such that the Court c[ould] reasonably infer that these defendants improperly benefitted from [plaintiff's] investment." (citation omitted)).

The Ability Defendants argue that any unjust enrichment claim against them is barred because Ability's withdrawal of $109 million from Series 2011-C was merely an exercise of their contractual and statutory rights.  Pursuant to their reinsurance contract with Alpha—which

---

[36] The Ability Defendants assert that to give rise a claim of unjust enrichment, "[t]he relationship must be one that could have caused reliance or inducement," quoting *Crescimanni v. Trovato*, 80 N.Y.S.3d 89 (2d Dep't 2018).  As discussed *supra* Part IV(B)(5)(a), reliance is one way but not the only way in which an equitable obligation may arise.  *See, e.g.*, *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (vacating district court's dismissal of unjust enrichment claim where plaintiffs "alleged it to be a near statistical certainty that they directly traded with [d]efendants" when defendants were alleged to have manipulated prices, with no discussion of reliance).  *Crescimanni*, in contrast, is premised on an incorrect reading of New York precedent.  In support of the proposition quoted by the Ability Defendants, the Appellate Division, Second Department relied on the First Department's ruling in *Georgia Malone*, which had dismissed an unjust enrichment claim for failure to allege reliance.  *See Crescimanni*, 80 N.Y.S.3d 89 (citing *Georgia Malone & Co., Inc. v Rieder*, 926 N.Y.S.2d 494 (App. Div. 1st Dep't 2011)).  The Court of Appeals, however, affirmed the dismissal but did not explicitly discuss reliance, basing its decision instead on the facts that the plaintiff and defendant had never had contact with each other and there was no suggestion that the defendant was aware of the circumstances that rendered his enrichment unjust.  *Georgia Malone II* at 519.  Indeed, in dissent, Justice Jonathan Lippman observed that "the majority "correctly refrains from applying [a] heightened reliance/inducement standard" to unjust enrichment actions.  *Id.* at 521 (Lippman, J., dissenting).  Subsequently, federal district courts have read *Georgia Malone II* to suggest that "a defendant's awareness of the plaintiff and of the potential negative impact of its own conduct on the plaintiff may serve as further indication of the required closeness between [the] parties."  *Overton*, 166 F. Supp. 3d at 403; *see also Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 465 (S.D.N.Y. 2014));

they annex as an exhibit, along with the trust agreement—and Nebraska insurance law, they

contend, they had the right to withdraw their monies at any time.  (Ability Mem. 21–22.)

On a motion to dismiss, I may, of course, take judicial notice of the Nebraska Insurance Code,

which provides that for a reinsurance trust to count towards the asset threshold an insurance

company must meet, "[t]he beneficiary should have the right to withdraw assets from the trust

account at any time."  210 Neb. Admin. Code §65-011.02(D)(1) (2018).  I may also consider

"documents incorporated by reference" or "integral to the complaint.  *See, e.g.*, *Broder v.

Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005).  Although Plaintiff mentions that

Ability and Alpha entered into a coinsurance agreement in 2012, (SAC ¶ 68), and that Ability

and Plaintiff's funds were commingled in Series 2011-C, (*id.* ¶ 246), Plaintiff was not a party to

those agreements, and does not suggest that it possessed copies of the agreements prior to this

litigation, much less relies on them as "integral" to its cause of action.  The cases cited by the

Ability Defendants, (*see* Ability Mem. 4 n.4), all involved consideration of materials central to

the allegations or the cause of action, and they are not applicable here.[37]  Accordingly, I do not

find it proper to consider the alleged contract between Alpha and Ability at this time.

Moreover, even if I did consider the contract and accept the Ability Defendants'

contention that they had a contractual right to withdraw their money at any time, I cannot

conclude at this stage, on the facts alleged, that the money in Series 2011-C that Ability

withdrew did not rightfully belong to Plaintiff.  As the Ability Defendants well know, on a

motion to dismiss, I must accept as true all well-pleaded facts alleged in the Second Amended

---

[37] *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (finding that it was proper for the district court to consider emails referred to in complaint, but not emails that were not attached, incorporated by reference, or integral); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (district court could have considered documents not attached to complaint "because there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim); *Advanced Marine Techs., Inc. v. Burnham Sec., Inc.*, 16 F. Supp. 2d 375, 378 (S.D.N.Y. 1998) (considering entirety of letter heavily quoted from in complaint).

Complaint and must draw all reasonable inferences in Plaintiff's favor.  *Kassner*, 496 F.3d at 237.

### 6.  Conversion

Under New York law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403–04 (2d Cir. 2006) (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.*, 87 N.Y.2d 36, 44 (1995)).  Accordingly, to state a claim of conversion, the plaintiff must typically allege that "(1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another, (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused." *Lefkowitz v. Bank of New York*, 676 F. Supp. 2d 229, 251 (S.D.N.Y. 2009) (internal quotation marks omitted).  Where the initial possession of the property was unlawful, however, no demand is necessary.  *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 49 (2d Cir. 1996).  The initial possession does not need to be "theft or misappropriation" to be unlawful; rather, "it is sufficient if there be interference with the owner's dominion over his property to the exclusion of his rights."  *Id.* (quoting *Mendelson v. Boettger*, 12 N.Y.S.2d 671, 673 (App. Div. 2d Dep't 1939), *aff'd*, 281 N.Y. 747 (1939).)  Finally, a "plaintiff alleging conversion need not show fault by the defendant."  *Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd.*, 888 F. Supp. 2d 385, 396 (S.D.N.Y. 2012).

Here, Plaintiff has sufficiently alleged that (1) it did not authorize Ability to withdraw $109 million from Series 2011-C; (2) that the funds withdrawn belonged to Plaintiff; and (3) that Ability's initial possession was unlawful because it belonged to Plaintiff, and that therefore no demand was required.

Ability argues its withdrawal of the funds was authorized by its reinsurance agreement with Alpha and by Nebraska insurance law.  (Ability Mem. 22–23.)  As discussed *supra*, Part IV(B)(5)(b)(ii), this argument is premised on factual allegations—that Ability had the right to withdraw money from Series 2011-C at any time, and that the money Ability withdrew from Series 2011-C belonged to Ability—that I may not credit at this time since they contradict the allegations in the Second Amended Complaint.  (*Id.*)

Ability also argues that Plaintiff's allegation that Ability and Plaintiff's funds were commingled in Series 2011-C are "conclusory" and therefore cannot support Plaintiff's allegation that the withdrawn funds belonged to Plaintiff.  (Ability Mem. 24.)  As an initial matter, the case cited by Ability in support of this argument is entirely inapposite; in *In re Stillwater Asset Backed Offshore Fund Ltd.*, 559 B.R. 563, 588 (Bankr. S.D.N.Y. 2016), the court found that a specific allegation about commingling merely stated a legal conclusion as to alter ego liability that could not be credited; it did not find that the assertion of commingling itself could not be credited.

Moreover, Plaintiff's allegation of commingling is not conclusory within the overall context of the facts alleged in the Second Amended Complaint.  Plaintiff alleged that the Trust Account and Series 2011-C entered into a Repurchase Agreement that was repeatedly renewed, such that the value of the Trust Account depended on the value of the assets in Series 2011-C. This allegation, in conjunction with Plaintiff's claim that Ability, an entity unrelated to Plaintiff, withdrew funds from Series 2011-C, plausibly alleges that the funds in Series 2011-C were commingled.

Accordingly, Plaintiff has stated a claim for conversion against Ability.

### 7.  RICO Claims

Plaintiff asserts the following RICO claims (1) 18 U.S.C. § 1962(c) against Graham, Solow, BCM, BAAM, Regatta; (2) 18 U.S.C. § 1962(a) against Graham, Solow, BCM, BAAM, Regatta, and Tolaram; and (3) RICO conspiracy under 18 U.S.C. § 1962(d) against Graham, Solow, BCM, BAAM, Regatta, Cygnet, the Cygnet Series Trusts, BEF LP, Sancus, and Tolaram. However, as Defendants argue, these claims are all barred by the Private Securities Litigation Reform Act ("PSLRA").

a.   Applicable Law

RICO provides for civil and criminal liability for entities engaged in "a pattern of racketeering activity." 18 U.S.C. §§ 1962(a)–(d), 1964.  To demonstrate a "pattern" of racketeering activity, a plaintiff must show at least two "predicate acts" of racketeering activity occurring within a ten-year period.  18 U.S.C. § 1961(5).

Section 107 of the PSLRA amended and limited the scope of the RICO statute by providing that "no person may rely upon conduct that would have been actionable as fraud in the purchase or sale of securities to establish" a RICO violation.  18 U.S.C. § 1964(c).  The purpose of section 107 "was to prevent litigants from using artful pleadings to boot-strap securities fraud cases into RICO cases, with their threat of treble damages."  *Id.*; *see also* S. Rep. 104–98, at 19 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 698 (describing Congress's intent "to eliminate securities fraud as a predicate act of racketeering in a civil RICO action").  Thus, the PSLRA not only "eliminate[s] securities fraud as a predicate offense in a civil RICO action," but also bar[s] a plaintiff from 'pleading other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.'"  *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 273 (2d Cir. 2011) (quoting 18 U.S.C. § 1964(c)).

"Where plaintiffs allege 'a single scheme, courts have held that 'if *any* predicate act is barred by the PSLRA it is fatal to the entire RICO claim.'" *Awad v. Omar*, No. 18 CIV. 10810 (NRB), 2019 WL 5727327, at *4 (S.D.N.Y. Nov. 5, 2019) (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F.Supp. 2d 666, 730 (S.D.N.Y. 2013), *vacated on other grounds sub nom., Gelboim v. Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016)); *Ling v. Deutsche Bank*, No. 04 CV 4566(HB), 2005 WL 1244689, at *4 (S.D.N.Y. May 26, 2005). "[T]he . . . statute does not require that the same plaintiff who sues under RICO must be the one who can sue under securities laws." *MLSMK Inv. Co.*, 651 F.3d at 278 (internal quotations omitted). Rather, it bars claims actionable as securities fraud "even in situations where a plaintiff lacks standing or is otherwise precluded from asserting a valid claim under the securities laws." *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634, 643 (S.D.N.Y. 2017); *see also MLSMK Inv. Co.*, 651 F.3d at 277.

To determine whether a given predicate act constitutes "conduct actionable as fraud in the purchase or sale of securities," it is necessary to consult Section 10(b) of the Exchange Act. *Zohar*, 286 F. Supp. 3d at 643; *see also Ling*, 2005 WL 1244689. Section 10(b) makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002). Section 10(b) is violated if "a person has (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (quoting *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013)). The

scienter requirement is satisfied if the misrepresentation or omission "was made with the 'intent

to deceive, manipulate, or defraud.'"  *Id.*

As to the third element, the phrase "in connection with" is to be "construed flexibly . . .

to effectuate [the statute's] remedial purposes," but "must not be construed so broadly as to

convert every common-law fraud that happens to involve securities into a violation of § 10(b)."

*Zandford*, 535 U.S. at 813.  Consistent with that broad mandate, "a fraud 'coinciding' with a

securities transaction—whether by the plaintiff or by someone else, runs afoul of the securities

laws."  *Zohar*, 286 F. Supp. 3d at 644–45 (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v.

Dabit*, 547 U.S. 71, 85, (2006).).

b.  Application

Plaintiff concedes that defendants "used [its] [m]oney to purchase or sell securities"—by

way of the Repurchase Agreements—and that "certain defendants . . . looted and stole [its]

[m]oney through, in part, the purchase and sale of securities."[38]  (Pl.'s Opp. SRC 8–9.)

Nevertheless, Plaintiff argues, its RICO claims remain viable because "the nexus of this dispute

is a coinsurance arrangement," and the fraud alleged is merely "incidental" rather than

"integral" to any purchases and sales of securities.  (*Id.* at 8.)  In addition, Plaintiff argues, it

pleads multiple allegations of wire fraud that are entirely separate from any purchases or sales of

securities, such as its allegation that Defendants "profited from management fees they withdrew

from [the] Trust Account via wires."  (*Id.* 9–10.)  Plaintiff appears to conflate two separate

inquiries, which I address separately:  (1) whether the fraud alleged is in connection with the

purchase or sale of securities, and (2) whether such fraud is fatal to the RICO claim.

---

[38] Despite making these concessions, Plaintiff also, inexplicably, claims that "the RICO allegations made in the SAC do not involve 'the purchase or sale of securities.'"  (Pl.'s Opp. SRC. 7.)

First, I find that Plaintiff has alleged conduct that would be actionable as fraud in connection with the purchase or sale of securities.  Plaintiff alleges that Defendants engaged in the following predicate acts "with intent to defraud Plaintiff," among others:  "Alpha, BAAM, and Graham [] invested $148 million of the $153 million via wires directly in a Repurchase Agreement . . . in violation of the Coinsurance Agreement;" Graham and Solow "directed the investment of [Plaintiff's] funds in numerous entities owned and controlled by" them; that Graham signed the Repurchase Agreement Confirmations in 2015 and 2016 to reinvest around $135 million from Plaintiff's trust account in purchased securities from Series 2011-C, even though it knew the value of the assets in Series 2011-C was significantly lower than that; and that various Defendants "engaged in self-dealing and fraud by investing Trust Account assets with entities they controlled in order to enrich [themselves] and/or protect the scheme by paying demands from other entities."  (SAC ¶ 202.)  Plaintiff also alleges that Defendants knowingly provided repeated false assurances to Plaintiff that its money was safe.  (*Id.*)

There is no question that these predicate acts entailed purchases and sales of securities, as Plaintiff concedes.  (Pl.'s Opp. SRC 8–9); *see also Manufacturers Hanover Tr. Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 19 (2d Cir. 1986) (holding that repurchase agreements are securities transactions within the meaning of section 10(b)).  It is also clear that the alleged fraud more than merely "coincide[d]" with the relevant securities transactions.  *Dabit*, 547 U.S. at 85.  Indeed, Graham, BCM, and BAAM's misrepresentations in the Repurchase Confirmations about the value of the Trust Account and the collateral that backed it and subsequent failure to disclose the true value of the assets in Series 2011-C[39] were the linchpin of the scheme:  they allowed

---

[39] I have already found these allegations sufficient to state a claim for common law fraud.  Therefore, the allegations satisfy the first two elements of a securities fraud claim, *see Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 414 (S.D.N.Y. 2010) ("Courts in the Second Circuit have found that the elements of

Defendants to avoid any obligation to make a margin transfer into Series 2011-C,[40] and provided

them with liquidity to continue directing investments into entities they controlled without

running the risk that Plaintiff would withdraw its money, and further allowed Defendants to

withdraw management fees from those various entities.  The "'securities [transactions] and

[Defendants'] fraudulent practices were not independent events . . . each [transaction] was made

to further their fraudulent scheme' without [Plaintiff's] knowledge or permission, thus

amounting to a violation of the securities laws."  *Zohar*, 286 F. Supp. 3d at 644 (quoting

*Zandford*, 535 U.S. at 820–21) (finding that purchase of stock was integral to the fraud because it

enabled Defendants to claim dividends and exercise control over the portfolio in order to

misappropriate equity and equity distributions)); *see also MLSMK*, 651 F.3d at 277 n.11

("[C]onduct undertaken to keep . . . [the] scheme alive is conduct undertaken in connection with

the purchase and sale of securities."); *In re Platinum-Beechwood Litig.*, No. 18-CV-12018 (JSR),

2019 WL 4934967, at *29 (S.D.N.Y. Oct. 7, 2019) (overvaluation of funds' net asset value that

left the funds cash-poor and allowed defendants to draw inflated management fees were

actionable as securities fraud because they were "made in substantial part to sustain defendants'

Ponzi scheme" (internal quotation marks omitted)).

    Plaintiff contends that it is "important" that it "neither purchased, nor sold, nor instructed

any party to purchase or sell securities."  (Pl.'s Opp. SRC 8–9 (citing *Chadbourne & Parke LLP

v. Troice*, 571 U.S. 377, 383 (2014)).  I disagree.  In truth, the Supreme Court's analysis in

*Chadbourne* makes clear that this factual allegation is *not* important under these circumstances.

---

common law fraud are 'essentially the same' as those that must be pleaded to establish a claim under Section 10(b)
and Rule 10b–5."), *aff'd sub nom. Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636 (2d Cir.
2012).

[40] As detailed *supra*, section 4 of the Master Repurchase Agreement allowed one party to demand that the other
party make a margin transfer into its account in event of a shortfall in assets.

*Chadbourne* concerned the interpretation of the Securities Litigation Uniform Standards Act

("SLUSA"), which forbids certain state-law class actions that allege fraud "in connection with

the purchase or sale of a covered security."[41]  571 U.S. at 380.  The Court held that within the

meaning of the SLUSA, "[a] fraudulent misrepresentation or omission is not made 'in connection

with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or

more individuals (other than the fraudster) to buy or to sell a 'covered security.'"  *Id.* at 387

(quoting 15 U.S.C. § 78bb(f)(1)(A)).  Because only the fraudsters were alleged to have

purchased covered securities, not the victims, the plaintiffs had not alleged "fraud in connection

with the purchase or sale of covered securities."  *Id.* at 396–97.  However, the Court went on to

explain that its holding did not abrogate the validity of section 10(b) precedents that

characterized fraudulent acts as "in connection with a purchase or sale of security" when they

"involved victims who took, who tried to take, who divested themselves of, who tried to divest

themselves of, or who maintained *an ownership interest* in financial instruments that fall within

the relevant statutory definition."  *Id.* at 388 (emphasis in original) (citing, inter alia, *Zandford*,

535 U.S. at 820 (the "fraudster told customers he would conservatively invest *their* money" in

the stock market and made sales of *his customer's* securities, but pocketed the proceeds.").  In

other words, a fraud in connection with a purchase or sale of securities is actionable even if the

fraudster initiated the purchase, so long as the victim "maintained an ownership interest" in the

securities.  571 U.S. at 1067.  That is the case here:  because Plaintiff maintained an ownership

---

[41] Although *Chadbourne* concerned the SLUSA rather than the PSLRA, I find it applicable here because (1) the language at issue here is almost identical to the SLUSA language considered by the *Chadbourne* court, but for the word "covered" preceding "securities" in the SLUSA; (2) the two statutes were both "designed to remedy perceived abuses in the bringing of claims authorized by the anti-falsity provisions" of the securities law, and both "expressly replicate terms used in those [anti-falsity] provisions," *In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128, 139 (2d Cir. 2015); and (3) the Supreme Court in *Chadbourne* explicitly contemplated and did not object to the application of its holding in the context of § 10(b) claims, *see* 571 U.S. at 393–94.

interest in the assets in the Trust Account, which were then traded by Graham through Repurchase Agreements as part of his alleged fraudulent scheme, the fact that Plaintiff did not itself purchase any securities is of no import.

Second, I find that Plaintiff's allegations of securities fraud are part of a "course of conduct [that] amounts to a single scheme." *Awad*, 2019 WL 5727327, at *4.  They are inextricable from Plaintiff's allegation that the purpose of the putative RICO enterprise was to "fraudulently secure reinsurance agreements with insurance companies, take control of reinsurance trust funds, use those assets to conceal and perpetuate its ongoing fraud scheme, and ultimately enrich the scheme's founders."  (SAC ¶ 190.)  The mechanism by which Defendants allegedly accomplished this purpose was the redirection of Trust Account assets into Series 2011-C and the attendant misrepresentations about its value; without those securities transactions and the corresponding misrepresentation, there could have been no fraud.  Nor are Plaintiff's allegations about ancillary acts of wire fraud—such as the withdrawal of management fees from the Trust Account and the sending of e-mails containing fraudulent misrepresentations about the whereabouts of the money compelling—because they were part of the same "overarching . . . plot[] to loot [the Trust Account] . . . That conduct counts as a single scheme, and the securities aspects of the fraud must be aggregated with the non-securities aspects." *Gilmore v. Gilmore*, No. 09 CIV. 6230 WHP, 2011 WL 3874880, at *6 (S.D.N.Y. Sept. 1, 2011) (quoting *Seippel v. Jenkens & Gilchrest P .C.*, 341 F. Supp. 2d 363, 373 (S.D.N.Y. 2004), *aff'd,* 503 F. App'x 97 (2d Cir. 2012), and *aff'd,* 503 F. App'x 97 (2d Cir. 2012).  "[H]aving alleged . . . that Defendants' acts were part of a single fraudulent scheme[,] [P]laintiff cannot divide the scheme into its various component parts.  Allowing such surgical presentation here would undermine the Congressional purpose behind the amendment to RICO." *Id.*; *see also Zohar*, 286 F. Supp. 3d at

643 (dismissing RICO claims as barred where "[m]uch of the Complaint allege[d] a complex scheme to abscond with millions of dollars in fees, obfuscate title to assets, or simply loot the assets of a portfolio company, which all appear, at least superficially, like non-securities conduct. But this Court cannot ignore allegations that an integral component of that scheme to loot included pillaging portfolio companies of their equity, re-directing Zohar's equity interests for Defendants' benefit, and diverting the equity distributions into Defendants' coffers—all actions coinciding with the purchase or sale of securities.").

Accordingly, all of Plaintiff's RICO claims are barred by the PSLRA.

## V.   <u>Conclusion</u>

For the foregoing reasons, the Moving Defendants' motions are GRANTED IN PART AND DENIED IN PART, as follows:  The motions to dismiss for lack of personal jurisdiction by BCM and Tolaram are DENIED.  Plaintiff is granted leave to conduct jurisdictional discovery as to WSFS, BEF Ltd., and Blue II, and their motions to dismiss are denied without prejudice to refiling after the completion of jurisdictional discovery.  Plaintiff shall meet and confer with WSFS, BEF Ltd., and Blue II and submit a schedule for jurisdictional discovery and supplemental briefing on the motions to dismiss within thirty (30) days.

The following of Plaintiff's claims are dismissed:  fraud against Regatta; aiding and abetting a breach of fiduciary duty against Regatta, Cygnet, Series 2011-A, Series 2013-A, and ACH; aiding and abetting fraud against BEF LP, Regatta, Cygnet, Series 2011-A, Series 2013-A, Sancus, and ACH; all RICO claims; and all civil conspiracy to commit fraud claims.

The following of Plaintiff's claims against the Moving Defendants survive:  breach of fiduciary duty against BAAM and Graham; aiding and abetting breach of fiduciary duty against BCM, BEF LP, Solow, Series 2011-C, Sancus, Tolaram, King, and Cathcart; fraud against BCM,

BAAM, Graham, Solow, and Tolaram; aiding and abetting fraud against Series 2011-C, King, and Cathcart; unjust enrichment against all Moving Defendants; and conversion against Ability. Defendants shall file answers within sixty (60) days of this Opinion & Order.

The Clerk of Court is respectfully directed to terminate the open motions at Documents 125, 128, 130, 133, 136, and 168.

SO ORDERED.

Dated: June 22, 2020
        New York, New York

Vernon S. Broderick
United States District Judge