UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GREAT WESTERN INSURANCE
COMPANY,

                          Plaintiff,

              -v-

MARK GRAHAM, DONALD SOLOW, BLUE
CAPITAL MANAGEMENT, INC., BLUE
ALTERNATIVE ASSET MANAGEMENT
LLC, WILMINGTON SAVINGS FUND
SOCIETY, FSB, CHRISTIANA TRUST,
REGATTA HOLDINGS LLC, CYGNET 001
MASTER TRUST, CYGNET 001 MASTER
TRUST SERIES 2011-A, CYGNET 001
MASTER TRUST SERIES 2011-C, CYGNET
001 MASTER TRUST SERIES 2013-A,
ALPHA RE LIMITED, ALPHA RE
HOLDINGS (CAYMAN) LIMITED,
ATLANTIC SPECIALTY FINANCE, BLUE
ELITE FUND LTD., BLUE ELITE FUND LP,
BLUE II LTD., SANCUS CAPITAL BLUE
CREDIT OPPORTUNITIES FUND LTD.,
ABILITY INSURANCE COMPANY,
GREGORY TOLARAM, ADVANTAGE
CAPITAL HOLDING LLC, DAN
CATHCART, and KENNETH KING,

                          Defendants.

18-CV-6249-LTS-SN

---

<u>MEMORANDUM ORDER</u>

          Plaintiff Great Western Insurance Company ("Plaintiff" or "GWI") brings the

above-captioned action against numerous Defendants, asserting various state common law

claims and violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

§ 1961, <u>et</u> <u>seq</u>, all of which stem from an alleged massive and complex fraud that resulted in

losses exceeding $135 million.  (See docket entry no. 106 ("Second Amended Complaint" or "SAC").)

During prior motion practice, six groups of Defendants each filed a motion to dismiss.  Those motions were largely resolved by an Opinion and Order issued by United States District Judge Vernon S. Broderick.  (See docket entry no. 190 ("VSB Op.").)  Judge Broderick found that GWI had failed to make a prima facie showing of personal jurisdiction as to three Defendants: (1) Wilmington Savings Fund Society, FSB, and Christiana Trust ("WSFS"); (2) Blue Elite Fund Ltd. ("BEF Ltd."); and (3) Blue II Ltd. ("Blue II").  (VSB Op. at 3.) Nevertheless, because GWI had made a sufficient start toward establishing personal jurisdiction as to all three Defendants, Judge Broderick granted GWI leave to conduct limited jurisdictional discovery as to WSFS, BEF Ltd., and Blue II.  (Id.)  In so doing, Judge Broderick denied these Defendants' motions to dismiss without prejudice to refiling after completion of limited jurisdictional discovery, and ordered supplemental briefing from the respective parties only on the question of personal jurisdiction.  (Id.)  Following completion of that supplemental briefing, this case was reassigned to the undersigned.

Before the Court are: (1) the original papers of Plaintiff GWI, and Defendants WSFS, BEF Ltd., and Blue II in connection with the Defendants' motions to dismiss[1], and (2) the parties' supplemental papers, solely addressing the issue of personal jurisdiction following limited jurisdictional discovery.[2]  The Court has reviewed carefully the parties'

---

[1]    The original papers are located at docket entry nos. 240-41, and 243-48.  The operative motions are located at docket entry nos. 239 and 242.

[2]    The supplemental papers, including supporting declarations that were later amended and/or filed with redactions, are located at docket entry nos. 249-50, 252-60, 262-63, 269-70, and 272-73.

submissions in connection with their motions, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), and, for the following reasons, WSFS' motion to dismiss for lack of personal jurisdiction is granted; BEF Ltd.'s and Blue II's motion to dismiss for lack of personal jurisdiction is denied; and BEF Ltd.'s and Blue II's motion to dismiss for failure to state a claim is granted in part, and denied in part.

<u>Background</u>

The Court assumes the parties' familiarity with the facts, adopts the factual recitation portion of Judge Broderick's prior Opinion and Order, and discusses primarily those facts that are relevant to the resolution of the pending motions to dismiss.[3]

In 2009, GWI, a Utah-domiciled insurance company, entered into a Coinsurance Agreement with Defendant Ability Reinsurance (Bermuda) Limited ("Ability Re") to reinsure certain policies issued by GWI.  (SAC ¶ 2.)  To secure Ability Re's payment obligations pursuant to the Coinsurance Agreement, and in compliance with Utah's Insurance Code, the parties entered into a trust agreement, under which they created a trust account into which Ability Re was to deposit and in which it was to maintain "qualifying assets."  (<u>Id.</u> ¶ 61.)  GWI transferred $135 million in cash to Ability Re, which in turn established the trust account with BNY Mellon as trustee and transferred the $135 million into that account, along with $18 million of its own funds, bringing the total value of the assets backing the Coinsurance Agreement to $153 million.  (<u>Id.</u> ¶ 62.)

In 2012, Defendant Dan Cathcart, who at the time was Chief Financial Officer of Ability Re, informed GWI that Ability Re was leaving the reinsurance business.  (<u>Id.</u> ¶ 63.)

---

[3] The following facts are drawn primarily from Plaintiffs' Second Amended Complaint, the well-pleaded allegations of which are taken as true for the purposes of this motion practice.

Cathcart introduced Plaintiff to Defendants Alpha Re Limited ("Alpha"), Mark Graham, and Donald Solow (Graham and Solow both served on the board of Alpha), vouched for Graham's investment management skills, and "recommended" that Plaintiff move its reinsurance business to Alpha.  (Id.)  Alpha was a limited liability company that was registered, and had its principal place of business, in the Cayman Islands.  (SAC ¶ 20.)  GWI alleges it requested to buy back its business from Ability Re, but Cathcart refused because "Alpha had offered Ability Re more money to buy the business than Great Western could afford to pay."  (Id. ¶ 63.)  In June 2012, Alpha replaced Ability Re as GWI's reinsurer when the parties entered into a Novation Agreement that modified the Coinsurance Agreement by, among other things, requiring that the BNY trust account be liquidated, and the assets be transferred into a new trust account.  (Id. ¶ 64.)

Accordingly, in July 2012, Alpha established the Trust Account and a Supplementary Trust Account with Wilmington Savings Fund Society, FSB, and Christiana Trust ("WSFS") as trustee, Alpha as the grantor, and GWI as the beneficiary.  (Id. ¶ 67.)  WSFS is a corporation registered in Delaware with its principal place of business in Wilmington, Delaware.  (Id. ¶ 13.)  In addition to setting forth the foregoing relationships among the parties, the resulting Amended and Restated Trust Agreement ("Trust Agreement") also identifies Defendant Blue Alternative Asset Management, Inc. ("BAAM"), a non-signatory, as the investment manager for the Trust Account.  (Id. ¶ 67.)  Defendant Graham, who GWI already knew to be a director of Alpha, signed the Trust Agreement's Incumbency Certificate in his capacity as "President" of BAAM.  (Id.)  Graham co-founded BAAM in 2003 and, since 2009, he has owned all interest and LLC stock in the entity.  (Id.)

In September 2012, BAAM invested $148 million of the assets in the Trust Account into a Master Repurchase Agreement ("MRA") with Defendant Series 2011-C. (Id. ¶ 70.) Series 2011-C is a trust owned by Defendant Regatta Holdings LLC, which in turn is owned by Defendant Donald Solow, who, as previously mentioned, sat alongside Graham on Alpha's board. (Id.) Under the MRA, Series 2011-C would sell to the Trust Account securities, i.e., collateral, in exchange for cash and then re-purchase them at some specified future date at a set price plus interest, with a corresponding promise by the Trust Account to buy and sell those assets. (Id. ¶ 71.) Each such transaction was to be memorialized in a written "Confirmation," containing the purchase date, price, repurchase rate, and other relevant details. (VSB Op. at 7.)

In 2012, a repurchase Confirmation was executed setting forth the terms and conditions of the first transaction between the Trust Account and Series 2011-C. (SAC ¶ 73.) WSFS was the trustee for both the Trust Account and Series 2011-C and executed the Confirmation on behalf of both parties. (Id.) From 2012 to 2017, WSFS provided monthly account statements representing that the value of the Trust Account was between $140 and $150 million. (Id. ¶ 81.) This represented value included the value of the MRA, which was always assigned a market value of over $130 million. (Id.)

Shortly after the initial funding of the Trust Account and the MRA, Defendants Graham and Solow began directing the cash in Defendant Series 2011-C into risky investments, including investments in vehicles that they owned or part-owned, i.e., Defendants Cygnet 001 Master Trust, Cygnet 001 Master Trust Series 2011-A, Cygnet 001 Master Trust Series 2013-A, BEF Ltd., Blue Elite Fund LP, Blue II Ltd., and Sancus Capital Blue Credit Opportunities Fund Ltd. ("Sancus"). (Id. ¶¶ 89-90.) The MRA was renewed, or rolled over, in September 2013 and September 2014, and a WSFS trust officer signed the repurchase Confirmations on both

occasions.  (Id. ¶ 73.)  Graham signed the repurchase Confirmations for the subsequent renewals in 2015 and 2016 in New York.  (Id.)

       In December 2013, Defendant Regatta (owner of Series 2011-C, and owned by Donald Solow) and Defendant Blue Capital Management, Inc. ("BCM") (owned by Graham) entered into a Collateral Management Agreement, whereby BCM was installed as the collateral manager for Series 2011-C.  (Id. ¶ 77.)  Thus, for the MRA renewals from 2014 through 2016, Defendant Graham stood on both sides of the transaction, as President of BAAM (investment manager for the Trust Account), and as President of BCM (collateral manager for Series 2011-C.)  (Id. ¶ 78.)  Plaintiff alleges that, "at no time from 2012 to 2016 did any party advise Great Western" of, among other things, Graham's significant simultaneously-held interests in Alpha and BCM, Solow's significant interests in Series 2011-C, or that WSFS's trust officer, Donna Lockerman, served as trustee for Series 2011-C.  (Id. ¶ 79.)

       Within a few years after the Trust Account and Series 2011-C arrangement began, the value of the latter trust plummeted.  As of December 31, 2014, the value of Series 2011-C was negative $18.5 million, and, as of December 2015, the value dipped further to negative $50.9 million, considering both assets and liabilities.  (Id. ¶¶ 92, 94.)  Yet in September 2015, after that year's MRA expired, Graham rolled it over, signing multiple repurchase Confirmations on behalf of both BAAM and BCM.  (Id. ¶¶ 73, 93.)  One repurchase Confirmation stated that the Trust Account would pay Series 2011-C a purchase price of $134.7 million in exchange for $134 million worth of collateral (id. ¶ 93), despite the fact that Series 2011-C had a negative value (id. ¶¶ 92, 94).  In September 2016, Graham rolled the MRA over again, listing the same cash prices and collateral value as the previous year's agreement, representing that the value of the collateral remained $134.7 million in one account, and $7.4 million in the other account.  (Id.

¶ 98.)  In fact, however, the September 2016 account statement generated by WSFS for Series 2011-C showed that Series 2011-C was worth only $84 million, accounting only for assets and not liabilities.  (Id. ¶ 99.)

In April 2016, WSFS asked to resign as trustee of the Trust Account due to a "falling out" with Defendant Graham; GWI asked WSFS to hold off on resigning until it was able to find a replacement.  (Id. ¶ 96.)  In June 2017, WSFS resigned as trustee.  (Id. ¶ 101.)

Throughout the life of the Trust Account, various Defendants received payments from assets that were originally held in the Trust Account.  (Id. ¶ 103.)  For instance, from September 2012 to March 2017, "Alpha Re Reinsurance Trusts," which encompassed Defendant Series 2011-C, made the following payments: $15.9 million to BAAM and BCM; $6.3 million to Regatta; at least $340,000 to Solow; at least $545,911 to WSFS; and at least $75,000 to Defendant Alpha Re Holdings (Cayman) Limited ("Alpha Holdings").  (Id. ¶ 104.)

Defendant Graham also used several other Defendants and Sancus to move around money that originated in the Trust Account; for instance, GWI alleges that Series 2011-C invested a significant amount of money with BEF Ltd., and that BEF Ltd. paid a $2.44 million incentive fee to BAAM in 2013.  (Id. ¶ 105.)  GWI further alleges that Graham, using BAAM and BCM, would sell certificates, notes, shares, or the like in various entities that he controlled in exchange for money.  (Id. ¶¶ 108-09.)  In one example, on January 4, 2016, Graham signed a resolution on behalf of Blue II to redeem $875,039 from "Blue Elite Fund," and GWI alleges that this redemption indicates that "Blue Elite Fund," which was also under Graham's direction, had previously invested that amount in Blue II in exchange for a certificate.  (Id. ¶ 109.)

The remaining factual chronology as alleged in the SAC does not bear on the instant motions to dismiss, and therefore the Court next addresses the parties' legal arguments in

connection with the pending motions, and includes where appropriate a discussion of the facts uncovered during jurisdictional discovery.  WSFS moves to dismiss the claims against it for lack of personal jurisdiction, arguing that GWI has not shown that the Court can exercise specific jurisdiction under New York long-arm statute over WSFS.[4]  BEF Ltd. and Blue II together likewise move to dismiss for lack of personal jurisdiction, arguing that they are subject to neither general nor specific jurisdiction.

DISCUSSION

Lack of Personal Jurisdiction Under Rule 12(b)(2)

*Legal Standard*

On a Rule 12(b)(2) motion, the plaintiff has the burden of establishing that the court maintains jurisdiction over the defendant.  See In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003).  The Court has broad discretion to hear and decide a motion to dismiss for lack of personal jurisdiction before trial or defer the matter until trial.  See FED. R. CIV. P. 12(i).  Even where the Court decides the motion before trial, however, a plaintiff's burden "varies with the procedural posture of the case."  Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp. 2d 736, 757 (S.D.N.Y. 2004), opinion clarified on denial of reconsideration, No. 02-CV-6356-SHS, 2005 WL 2585227 (S.D.N.Y. Oct. 13, 2005) (citation omitted).

---

[4]     The Court notes that, although GWI continues to insist, as it did before Judge Broderick, that this Court has general personal jurisdiction over WSFS, it concedes that "limited discovery did not unveil new material information in support of general jurisdiction" and advances no supplemental legal arguments in support of that contention.  (See docket entry no. 252 at 7 n.4).  Given Plaintiff's representation, the Court declines to revisit Judge Broderick's ruling—which constitutes the law of the case—as to the lack of general jurisdiction and holds that this Court cannot exercise general jurisdiction over WSFS.  Accordingly, the Court limits its discussion as to WSFS to specific jurisdiction.

Prior to discovery, a plaintiff can defeat a Rule 12(b)(2) motion to dismiss by pleading "good faith, legally sufficient allegations of jurisdiction, i.e., by making a prima facie showing of jurisdiction."  Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 184 (2d Cir. 1998) (internal quotation marks and citations omitted).  Where, as here, the parties have conducted jurisdictional discovery, a plaintiff's prima facie case showing must be "factually supported"— that is, it must "include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant."  Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996) (quoting Ball v. Metallurgie Hoboken Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990)).  The Court must credit plaintiff's factual averments in support of jurisdiction as true and construe all pleadings and any supporting materials in the light most favorable to plaintiffs.  Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 167 (2d Cir. 2013) (citing Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 163 (2d Cir. 2010)).

However, "[p]leadings that assert only 'conclusory non-fact-specific jurisdictional allegations' or state a 'legal conclusion couched as a factual allegation' do not meet this burden." Pruthi v. Empire City Casino, No. 18-CV-10290, 2022 WL 596370, at *2 (S.D.N.Y. Feb. 28, 2022) (quoting Jazini, 148 F.3d at 185); see also Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994) (explaining that a court cannot "draw 'argumentative inferences' in the plaintiff's favor" in considering a Rule 12(b)(2) motion) (quoting Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992)).  The Court is authorized to consider affidavits and exhibits in support of the motion, so long as the Court resolves any factual disputes in favor of the non-moving party.  Kiobel v. Royal Dutch Petroleum Co., No. 02-CV-7618-KMW-HBP, 2010 WL 2507025, at *3 (S.D.N.Y. June 21, 2010) (citing

Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala, 989 F.2d 572, 580 (2d Cir. 1993)).

Turning to the applicable law of personal jurisdiction, the amenability of a foreign defendant to suit in a federal court "is determined in accordance with the law of the state where the court sits, with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee." Metro. Life Ins. Co., 84 F.3d at 567 (quoting Arrowsmith v. United Press Int'l, 320 F.2d 219, 223 (2d Cir. 1963) (en banc)). A court may exercise two types of personal jurisdiction: general and specific. Brown v. Lockheed Martin Corp., 814 F.3d 619, 624 (2d Cir. 2016). "District courts resolving issues of personal jurisdiction must engage in a two-part analysis." Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 165 (2d Cir. 2005). The court determines, first, whether personal jurisdiction is authorized by New York law and, second, "whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 163 (2d Cir. 2010).

N.Y. C.P.L.R. § 301 provides for the exercise of general jurisdiction when "a company 'has engaged in such a continuous and systematic course of "doing business" [in New York] that a finding of its "presence" [in New York] is warranted.'" Sonera Holding B.V. v. Cukurova Holding A.S., 750 F.3d 221, 224 (2d Cir. 2014) (alterations in original) (citations omitted) (quoting Landoil Res. Corp. v. Alexander & Alexander Servs., 77 N.Y.2d 28, 33 (1990)); see also Fernandez v. DaimlerChrysler, A.G., 40 N.Y.S.3d 128, 130 (App. Div. 2d Dep't 2016). "The Due Process Clause, however, is more restrictive." MTS Logistics, Inc. v. Innovative Commodities Grp., LLC, No. 19-CV-4216-PAE, 2020 WL 917321, at *10 (S.D.N.Y. Feb. 26, 2020). "A court may exercise general jurisdiction over foreign corporations only 'when

their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." Id. (quoting Goodyear Dunlop Tires, S.A. v. Brown, 564 U.S. 915, 919 (2011).  Outside of "truly exceptional" cases, "a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business." Lockheed Martin Corp., 814 F.3d at 627.

In contrast, specific jurisdiction exists when "a [s]tate exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum."  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8 (1984).  New York's long-arm statute permits the assertion of specific jurisdiction over a defendant who:

> (1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or
> (2) commits a tortious act within the state . . .; or
> (3) commits a tortious act without the state causing injury to person or property within the state, . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

N.Y. C.P.L.R. § 302(a).  "To establish personal jurisdiction under § 302(a)(1), two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity."  Barrett v. Tema Dev. (1988), Inc., 251 F. App'x 698, 700 (2d Cir. 2007) (internal quotation marks and citation omitted).  A foreign party "transacts business" in New York when, looking at the totality of the circumstances, he "purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws."  Fagan v. Republic of Austria, No. 08-CV-6715-LTS-JCF, 2011 WL 1197677, at *13 (S.D.N.Y. Mar. 25, 2011) (internal quotation marks and citations omitted).  It is the "nature and quality" and not the number of New York contacts

that determine whether purposeful activity occurred.  SAS Grp., Inc. v. Worldwide Inventions, Inc., 245 F. Supp. 2d 543, 548 (S.D.N.Y. 2003) (internal quotation marks and citation omitted).

Further, "New York courts have held that a claim 'aris[es] from' a particular transaction when there is 'some articulable nexus between the business transacted and the cause of action sued upon," Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006) (quoting McGowan v. Smith, 52 N.Y.2d 268, 272 (1981)), or when "'there is a substantial relationship between the transaction and the claim asserted,'" id. (quoting Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467 (1988)).

If there is a statutory basis for the exercise of specific jurisdiction over the defendant, the court next turns to the Due Process Clause analysis, which has two related components: the "minimum contacts" inquiry and the "reasonableness" inquiry.  See Queen Bee of Beverly Hills, LLC, 616 F.3d at 163.  "With respect to minimum contacts, [the court] must determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction."  Id. (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  The court "evaluate[]s the quality and nature of the defendant's contacts with the forum . . . under [the] totality of the circumstances."  Licci, 732 F.3d at 170; see also Grand River Enters., 425 F.3d at 166 (2d Cir. 2005) ("No single event or contact connecting defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper.").  It is "insufficient to rely on a defendant's 'random, fortuitous, or attenuated contacts'" with the forum or "on the 'unilateral activity' of a plaintiff" to establish specific jurisdiction.  Walden v. Fiore, 571 U.S. 277, 286 (2014) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)). Importantly, to establish specific jurisdiction, "[t]he relationship between the defendant and the

forum 'must arise out of contacts that the defendant himself creates with the forum.'" Waldman v. Palestine Liberation Org., 835 F.3d 317, 335 (2d Cir. 2016) (citing Walden, 571 U.S. at 284 (2014)). "The 'minimum contacts analysis looks to the defendant's contacts with the forum [s]tate itself, not the defendant's contacts with persons who reside there.'" Id. (citing Walden, 571 U.S. at 284).

With respect to the "reasonableness" inquiry, the court must satisfy itself that exercising jurisdiction is "reasonable under the circumstances" and "does not offend traditional notions of fair play and substantial justice." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 129 (2d Cir. 2002); see also Int'l Shoe Co., 326 U.S. at 316 (internal quotation marks omitted).

*WSFS*

Even with the benefit of jurisdictional discovery, Plaintiff has again failed to make the showing needed to establish grounds for specific personal jurisdiction over WSFS. What Judge Broderick observed during GWI's first bite at the apple—that Plaintiff had "not alleged a single volitional act [that WSFS] directed at New York in particular out of which its claims arise"—remains as true at this stage as it did before jurisdictional discovery. (VSB Op. at 25.) At the outset, the Court notes, as did Judge Broderick, that Plaintiff needlessly complicates the Court's task by making unsupported averments as to WSFS' purported jurisdictional contacts in its unsworn memorandum of law. (Id.; see also id. at 46, 47 n.21.) Plaintiff has cited no authority suggesting that the Court may properly rely on factual averments in a brief in its assessment of a jurisdictional challenge, see id. at 26, and the Court declines to draw "argumentative inferences" in GWI's favor in considering a Rule 12(b)(2) motion. See Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992).

GWI asserts that jurisdictional discovery uncovered the following "evidence" in support of exercising personal jurisdictional over WSFS: (1) that WSFS "negotiated" with Defendants Donald Solow and Mark Graham and Graham's New-York-based counsel "regarding the structure of the Master Repurchase Agreement prior to the execution of the Trust Agreement and the Novation Agreement through which it assumed its role as Trustee"; (2) that WSFS "knowingly and purposefully entered into the MRA, which has a New York choice of law provision"; (3) that WSFS also "directly engaged in negotiations" with Graham and his attorney regarding the Trust Agreement; (4) that "Donna Lockerman, on behalf of WSFS and in her role as Trust Officer, had regular telephone and email contact with Graham while he was in New York"; (5) that, "further thrusting WSFS into New York," Lockerman executed transactions from the Series 2011-C Trust Account at Graham's behest, and "she inquired about purported improprieties with the financial reporting of these transactions, without alerting Great Western"; (6) that WSFS sent account statements for the Series 2011-C Trust Account to Graham in New York; and (7) that Lockerman sent Defendant BCM's collateral management fees to New York, in care of Defendant BAAM, "highlighting WSFS' knowledge that Graham was managing both sides of the transaction that is the centerpiece of this massive fraud."  (Docket entry no. 252 ("Pl. Consol. Br.") at 4-5.)

After stripping away improper "argumentative inferences," the Court addresses each of the factual assertions in turn.  None of them, either singly or in combination, establishes that WSFS "purposefully avail[ed] [itself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws."  Fagan v. Republic of Austria, No. 08-CV-6715-LTS-JCF, 2011 WL 1197677, at *13 (S.D.N.Y. Mar. 25, 2011) (internal quotation marks and citations omitted).  In support of its allegations that WSFS "negotiat[ed]" the

"structure of the Master Repurchase Agreement" with Defendants Solow and Graham (and

Graham's New York-based lawyer), and "knowingly and purposefully enter[ed] into the MRA,"

GWI cites (1) a portion of WSFS' Trust Officer Donna Lockerman's deposition, and (2) an email

exchange between Solow and Louis Geibel, a Vice President of WSFS.  (Pl. Consol. Br. at 2,

10.)  Contrary to Plaintiff's representation that Lockerman "admit[ed] in her deposition that she

could not think of anyone other than New York-based BAAM or their New York-based counsel

who could have drafted the Master Repurchase Agreement," suggesting that she had some

knowledge of those who participated in the drafting of the agreement, the deposition transcript

reveals that Lockerman testified that she "do[es] not know who drafted" the MRA.  (Docket

entry no. 255 ("Kelly Decl.") Ex. 2 at 37:1-25.)

       In any event, the cited email exchange is more revealing of the "nature and

quality" of New York contacts that determine whether purposeful activity occurred.  <u>SAS Grp.,</u>

<u>Inc. v. Worldwide Inventions, Inc.</u>, 245 F. Supp. 2d 543, 548 (S.D.N.Y. 2003) (internal quotation

marks and citation omitted).  The chain begins with Defendant Solow emailing WSFS' Vice

President Geibel on June 13, 2012, and stating, "I just want to confirm that as a trustee WSFS

can hold a repurchase agreement.  We expect the new trust (with Great Western as beneficiary)

will invest in some repos."  (Kelly Decl. Ex. 3.)  GWI has been unable to uncover evidence that

WSFS initiated the business relationship with Graham or Solow that would ultimately lead to

execution of either the Trust Agreement or the Master Repurchase Agreement, and this email

exchange undercuts that possibility.  After all, it is Solow who appears to start the conversation

and ask whether WSFS can invest in repurchase agreements as a trustee.  More importantly,

neither on its own, nor in conjunction with Lockerman's testimony, does this exchange establish

that WSFS "[it]self create[ed]" contacts with New York, <u>see Walden v. Fiore</u>, 571 U.S. 277, 284

(2014), nor does it indicate that WSFS "actively negotiated the Master Repurchase Agreement," as GWI insists.  (Cf. Pl. Consol. Br. at 10.)

   As Judge Broderick observed, and as the agreements themselves set forth, (1) the Trust Agreement, governed by Delaware law, was executed by Delaware (WSFS), Utah (GWI), and Cayman Islands (Alpha) domiciliaries, with GWI and Alpha selecting a New-York domiciliary—investment manager BAAM—as their agent; and (2) under the Trust Agreement, Alpha or its agent, BAAM, could order WSFS, as a directed trustee, to invest in selected assets, such as in the Master Repurchase Agreement, and WSFS was required to do so.  (VSB Op. at 28; SAC Ex. C ("Trust Agreement") § 4(c); docket entry no. 260 ("WSFS Resp.") Ex. G (investment order by BAAM instructing WSFS to execute MRA).)   The MRA, in turn, is a contract between two Delaware trusts (the GWI Trust Account and Series 2011-C, a Delaware statutory trust), that was executed in Delaware.  (SAC ¶¶ 15, 17; see also Kelly Decl. Ex. 2 at 34:20-35:9.)  It appears that Solow, who sat on Alpha's board, previewed for WSFS not only the Trust Agreement but also the later Master Repurchase Agreement investment before either agreement was executed. These communications do not, however, plausibly support any inference that WSFS made purposeful contacts with New York.  See Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996).[5]

---

[5] GWI focuses throughout its supplemental briefing on what it terms "inconvenient facts" that purportedly link WSFS to New York.  (Docket entry no. 258 at 1.)  Beyond the foregoing attempt, which effectively asks this Court to draw an "argumentative inference" to find sufficient jurisdictional contacts because Solow and a WSFS representative communicated about the agreements prior to their execution, GWI also, among other things, asks this Court to do the same based on: (1) WSFS' Vice President Geibel's emails with Graham referencing one or two meetings in New York, (id. at 7-8); and (2) WSFS having worked with Solow and Graham on a separate trust agreement, over which litigation is currently pending in Delaware Chancery Court, (id. at 5-6.)  As to (1), there is no evidence that those meetings were related to the instant transactions, as the emails do not reference any particular subject matter, and the meetings are not alleged

Even though WSFS was contractually obligated to execute the MRA, GWI next cites, and relies heavily on, the fact that the agreement contains a New York choice-of-law provision as further evidence that WSFS "'deliberate[ly] affiliate[ed]' with New York and could reasonably foresee being sued there." (Pl. Consol. Br. at 10 (quoting <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 482 (1985)).) This contention is unpersuasive for at least two reasons. First, as Judge Broderick previously noted, all of WSFS' alleged contacts with New York were created by the "unilateral activity" of Alpha or other parties, not from the unilateral acts or actions of WSFS, and are thus insufficient to establish personal jurisdiction. <u>Walden v. Fiore</u>, 571 U.S. 277, 286 (2014) (quoting <u>Burger King Corp.</u>, 471 U.S. at 475).

Second, the prevailing case law holds that a choice-of-law provision on its own cannot suffice to establish jurisdiction. <u>Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.</u>, 667 F. Supp. 3d 83, 140 (S.D.N.Y. 2023) (collecting cases); <u>see</u> <u>also</u> <u>Gatx Corp. v. Ga. Power Co.</u>, No. 18-CV-9758-AJN, 2019 WL 4511629, at *4 (S.D.N.Y. Sept. 19, 2019) ("Accordingly, while relevant, a contract with a New York choice-of-law clause is not sufficient to qualify as transacting business for the purposes of New York's long-arm statute."); <u>Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez</u>, 171 F.3d 779, 788-89 (2d Cir. 1999) ("[N]o court has extended § 302(a)(1) to reach a nondomiciliary who never entered New York, who was

_____

to have occurred in temporal proximity to events relevant to the transactions; GWI merely posits "[w]hat else could the parties be talking about?" (<u>Id.</u> at 8; <u>see also</u> docket entry no. 259, Ex. A.) Such is also the case with (2), where GWI insists that a prior, separate trust arrangement between WSFS, Solow, and Graham ought to show that "there is nothing passive about WSFS' choice to work with these New York-based actors." (Docket entry no. 258 at 6.) Neither contention meets a core element that is required to establish specific jurisdiction under New York's long-arm statute—that the "claim[s] asserted must arise from [WSFS'] business activity." <u>Barrett v. Tema Dev. (1988), Inc.</u>, 251 F. App'x 698, 700 (2d Cir. 2007). Nor do they suggest, let alone establish, WSFS' purposeful contacts with New York in <u>this</u> case. <u>See</u> <u>Metro. Life Ins. Co. v. Robertson-Ceco Corp.</u>, 84 F.3d 560, 567 (2d Cir. 1996).

soliciting outside of New York, who performed outside of New York such services as were performed, and who is alleged to have neglected to perform other services outside of New York.")

GWI's next assertion—that WSFS "also directly engaged in negotiations with Defendant Graham and attorney Marc Tract," both of whom are New York domiciliaries, regarding the Trust Agreement is also unavailing, for the reasons outlined above.  (Cf. Pl. Consol. Br. at 5, 10-11.)  The evidence on which GWI relies in this regard are a series of email exchanges between, among others, WSFS' Vice President Geibel, WSFS' Trust Officer Lockerman, Solow, Graham, and Graham's lawyer, and which contain a portion of the Trust Agreement as the parties traded edits in the lead up to its execution.  (Kelly Decl. Exs. 4-9.)  As previously noted, the key issue guiding the Court's analysis of these supporting materials is the "nature and quality" of New York contacts giving rise to "purposeful activity" with the forum state.  SAS Grp., Inc. v. Worldwide Inventions, Inc., 245 F. Supp. 2d 543, 548 (S.D.N.Y. 2003). Further, "[t]he 'minimum contacts analysis looks to the defendant's contacts with the forum [s]tate itself, not the defendant's contacts with persons who reside there.'"  Waldman v. Palestine Liberation Org., 835 F.3d 317, 335 (2d Cir. 2016) (citing Walden, 571 U.S. at 284).  This focused inquiry belies GWI's position on the significance of this evidence.  To reiterate, only out-of-state domiciliaries executed the Trust Agreement, which was governed by Delaware law, and whose performance was contemplated to occur outside of New York.  (VSB Op. at 28.)  Its lone connection to the forum state—the selection of New York-based BAAM (and its President Graham) as the trust's investment manager—was the result of Plaintiff's and Alpha's choice, not WSFS'.  (Id.)  None of the supporting materials that GWI cites supplies a contrary plausible inference—that WSFS "[it]self create[ed]" contacts with New York, see Walden, 571 U.S at

284, as opposed to simply engaging in "contacts with persons who reside there.'"  Waldman, 835 F.3d at 335.

GWI's final arguments in support of personal jurisdiction over WSFS are reiterations of points from its original briefing before Judge Broderick—that WSFS communicated via telephone and email with, and sent account statements and fees to, New York-based entities.  (See Pl. Consol. Br. at 5, 13-14; see also VSB. Op. at 27-29.)  Because GWI's factual averments as to these contacts, even if credited as true, do not alter the underlying fact that these contacts were created by "unilateral activity" of other parties, not from the unilateral acts from WSFS, the Court declines to revisit Judge Broderick's analysis.  See, e.g., Walden, 571 U.S. at 286; VSB Op. at 28 ("Rather, WSFS's communications with New York and authorization of fund transfers to and from New York were undertaken 'in connection with [its] . . . administration and/or custodial duties' as a trustee of Series 2011-C, a Delaware trust, pursuant to the Trust Agreement." (citing SAC ¶¶ 15, 17)); Roper Starch Worldwide, Inc. v. Reymer & Assocs., Inc., 2 F. Supp. 2d 470, 474-75 (S.D.N.Y. 1998) (communications and sending of payments that "seek to insure fulfillment of contract terms do not 'project' a defendant into a state sufficiently to confer jurisdiction"); Hau Yin To v. HSBC Holdings PLC, No. 15-CV-3590-LTS-SN, 2017 WL 816136, at *6 (S.D.N.Y. Mar. 1, 2017) (no jurisdiction under § 302(a)(1), even though foreign defendants "communicated with and transmitted information and funds to and from BLMIS located in New York, in connection with their fund administration and/or custodial duties" because "[n]one of the business activities allegedly conducted by the Foreign Defendants"—i.e., the fund administration and custodial duties— "occurred in New York," nor were any contracts "negotiated or executed in New York"), aff'd 700 F. App'x 66 (2d Cir. 2017).

For the foregoing reasons, the Court grants WSFS' motion to dismiss the claims against it for lack of personal jurisdiction, and therefore does not reach the merits of WSFS' motion to dismiss for failure to state a claim.[6]

*BEF Ltd. and Blue II*

Judge Broderick previously found that GWI had failed to carry its burden with respect to personal jurisdiction as to either BEF Ltd. or Blue II, both of which are Cayman Islands domiciliaries.  (VSB Op. at 31.)  He noted that Plaintiff's allegations as to these entities were "sparse and lacking in detail," and highlighted the following jurisdictionally relevant factual assertions in the SAC:

> (1) Graham created and operated the entities and transacted daily business on their behalf from New York, (id. ¶¶ 36, 106); (2) Graham and Solow, New York domiciliaries, had an ownership interest in the entities, (id. ¶ 90); (3) Lynch and Tolaram, Bermuda domiciliaries, served as authorized signatories for Blue II, (id. ¶ 107); (4) they concealed information from Plaintiff, (id. ¶ 79), and (5) they received and made transfers of funds that belonged to Plaintiff (id. ¶¶ 90, 104–05), and funds that were originally held in Plaintiff's Trust Account, (id. ¶ 103).

---

[6]   The Court notes that GWI argues, for the first time, in its opening supplemental brief that the Court can alternatively exercise specific personal jurisdiction over WSFS under a separate provision of New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(3), although it neglects to address WSFS' arguments regarding that provision in its responsive briefing.  (See Pl. Consol. Br. at 14-16; see generally docket entry no. 258 ("Pl. Suppl. Resp.").)  As WSFS noted, citing the text of the provision and additional legal authorities, section 302(a)(3) is unavailable to GWI based on its own allegations, in that the provision (1) covers only torts, meaning that it cannot supply jurisdiction for two of the five claims against WSFS, which are contract-based; and (2) requires that GWI's injury—i.e., reliance on alleged misrepresentations—have occurred in New York, when the allegations plausibly suggest GWI was injured in Utah.  (See WSFS Resp. at 11-15.)  In any event, however, even if section 302(a)(3) could authorize jurisdiction over WSFS, GWI is unable to clear the "minimum contacts" threshold under the Due Process Clause, because, as detailed above, Plaintiff's factual proffers, at best, establish contacts between WSFS and "persons who reside" in New York, through the unilateral activity of others, rather than contacts that WSFS "[it]self create[d] with the forum."  Waldman v. Palestine Liberation Org., 835 F.3d 317, 335 (2d Cir. 2016) (citing Walden, 571 U.S. at 284 (2014)).

(VSB Op. at 31.)  First, as to Graham's alleged ownership of these entities, Judge Broderick

noted that "'[c]ommon ownership or control of a nondomiciliary, alone, is 'not enough' to

establish jurisdiction."  (Id. (quoting Gear, Inc. v. L.A. Gear Cal., Inc., 637 F. Supp. 1323, 1328

(S.D.N.Y. 1986).)  Second, Judge Broderick acknowledged that although GWI alleged

"volitional acts" through which BEF Ltd. and Blue II "avail[ed] [themselves] of the privilege of

conducting activities within the forum State," C. Mahendra (N.Y.), LLC v. Nat'l Gold &

Diamond Ctr., Inc., 125 A.D.3d 454, 457 (N.Y. App. Div. 1st Dept. 2015), "GWI has not shown

that these acts gave rise to the claims at issue here."  (VSB Op. at 31-32.)  That said, Judge

Broderick found the question of jurisdiction over these entities to be "close," because GWI

"never had direct contact with BEF Ltd. or Blue II" due to the nature of the alleged scheme, and

because GWI had alleged sufficient facts to suggest that these particular "non-domiciliary

defendant[s] . . . [are] interrelated with other defendants."  (Id. at 32.)  He therefore granted GWI

leave to conduct jurisdictional discovery to uncover, among other things, whether "any improper

transfers of funds were executed in New York, or that Graham transacted all Blue Elite Ltd. and

Blue II business from New York, which would allow the inference that the improper transfers

were executed in New York."  (Id.)

       Following jurisdictional discovery, the Court finds that GWI has indeed

uncovered evidence that permits the inference that improper transfers involving BEF Ltd. and

Blue II were executed from New York.  Specifically, GWI proffers a capital subscription letter-

agreement, regarding "Subscription from Cygnet 2011-C into Blue II, Ltd., Subscription from

Blue II, Ltd. into Blue Elite Fund, Ltd.," and dated February 25, 2016, which is addressed to, and

signed by, Defendant Graham in his capacity as "Director" of both BEF Ltd. and Blue II.  (Kelly

Decl. Ex. 21.)  This letter-agreement, which sets out an $8.5 million capital subscription,

plausibly supports GWI's allegations that Defendant Graham used the various Blue entities, including BEF Ltd. and Blue II, to obfuscate transactions and transfer assets that were originally held in the Trust Account for the benefit of GWI, in this case by transferring assets from the Series 2011-C trust.  (See, e.g., SAC ¶¶ 103-109.)  Moreover, Defendant Graham's address on the capital subscription agreement is listed as one in Manhattan, which allows a reasonable inference that at least some of the allegedly improper transactions at issue in this case were executed from or in New York.  (Kelly Decl. Ex. 21 (listing Graham's address, as point of contact for both BEF Ltd and Blue II, as "32 Old Slip, 33rd Floor, New York, NY 10005.").)  The Court therefore finds that it can properly exercise specific personal jurisdiction over both BEF Ltd. and Blue II, and their challenge as to this Court's jurisdiction is dismissed.

Failure to State a Claim under Rule 12(b)(6)

GWI's allegations as to both BEF Ltd. and Blue II can be grouped together, because they are substantively identical, and each paragraph in the SAC that references one also references the other.  (See, e.g., SAC ¶¶ 90, 103-109, 112.)  Critically, these allegations align with those against Defendant Blue Elite Fund LP ("BEF LP"), an entity which Defendant Graham is also alleged to have controlled, but which did not challenge this Court's exercise of personal jurisdiction.  (See generally id.; see also VSB Op. at 2-3.)  GWI asserts identical claims against BEF Ltd., Blue II, and BEF LP, for (1) aiding and abetting breach of fiduciary duty (Count Two); (2) aiding and abetting fraud (Count Four); and unjust enrichment (Count Eleven). (See generally SAC.)

Given that Judge Broderick previously addressed the merits of BEF LP's motion to dismiss, based on allegations that are substantively identical as against BEF Ltd. and Blue II, the Court declines to disturb the law of the case and to create inconsistent rulings among similarly situated

Defendants, at least at this early stage of the litigation.  Therefore, for the reasons explained by Judge Broderick, (see VSB Op. at 61-63, 68-75), the Court (1) grants BEF Ltd.'s and Blue II's motion to dismiss Count Four (aiding and abetting fraud); (2) denies their motion to dismiss Count Two (aiding and abetting breach of fiduciary duty); and (3) denies their motions to dismiss Count Eleven (unjust enrichment).

CONCLUSION

For the foregoing reasons, Defendant WSFS' motion to dismiss for lack of personal jurisdiction is granted; Defendants BEF Ltd.'s and Blue II's motion to dismiss for lack of personal jurisdiction is denied; and Defendants BEF Ltd.'s and Blue II's motion to dismiss for failure to state a claim is granted as to Count Four, and denied as to Counts Two and Eleven.

This Memorandum Order resolves docket entry nos. 239 and 242.  This case remains referred to Magistrate Judge Sarah Netburn for general pretrial management.


SO ORDERED.


Dated: June 25, 2024
    New York, New York


                    /s/ Laura Taylor Swain
                    LAURA TAYLOR SWAIN
                    Chief United States District Judge