UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GREAT WESTERN INSURANCE COMPANY,

Plaintiff,

v.                                                    18-CV-06249-LTS-SN

MARK GRAHAM, et al.,

Defendants.

---

MEMORANDUM OPINION AND ORDER[1]

Before the Court is Plaintiff Great Western Insurance Company's ("Great

Western" or "Plaintiff") motion for leave to file a Third Amended Complaint.  (Docket entry

no. 421.)  In its proposed Third Amended Complaint ("PTAC") (docket entry no. 425), Plaintiff

asserts claims against Defendants Mark Graham ("Graham"), Blue Capital Management, Inc.

("BCM"), Blue Alternative Asset Management LLC ("BAAM"), Blue Elite Fund Ltd. ("BEF

Ltd."), and Blue II Ltd. ("Blue II") (collectively, the "Blue Defendants"); Cygnet 001 Master

Trust Series 2011-C ("Series 2011-C") and Cygnet 001 Master Trust Series 2013-A ("Series

2013-A") (collectively, the "Cygnet Defendants"); Sancus Capital Blue Credit Opportunities

Fund Ltd. ("Sancus"); and Ability Insurance Company ("Ability") and Advantage Capital

Holding, LLC ("ACH") (collectively, the "ACH Defendants") (all, collectively, the

"Defendants").  The Court has subject matter jurisdiction pursuant to 28 U.S.C. Sections 1331,

1332, and 1367.

---

[1]     All pin cites to materials filed on the docket refer to ECF-designated pages.

As compared to the Second Amended Complaint (docket entry no. 106), the

Proposed Third Amended Complaint seeks to, inter alia:

- conform the complaint to the Court's June 22, 2020 decision on certain Defendants' motions to dismiss (docket entry no. 190, also available at Great W. Ins. Co. v. Graham, No. 18-CV-6249-VSB, 2020 WL 3415026 (S.D.N.Y. June 22, 2020)) and the Court's June 25, 2024 decision on certain Defendants' motions to dismiss (docket entry no. 354, also available at Great W. Ins. Co. v. Graham, No. 18-CV-6249-LTS, 2024 WL 3161747 (S.D.N.Y. June 25, 2024)) by deleting claims against Wilmington Savings Fund Society, FSB ("WSFS"), and Christiana Trust and by deleting certain other claims that have been dismissed;[2]

- reflect various stipulations of dismissal by deleting the claims against John Drake and Edward Brendan Lynch (docket entry no. 165); Gregory Tolaram (docket entry no. 293); Dan Cathcart and Kenneth King (docket entry no. 410); and Donald Solow and Regatta Holdings LLC (docket entry no. 419);

- delete claims against Defendants Cygnet 001 Master Trust, Cygnet 001 Master Trust Series 2011-A, Alpha Re Limited, Alpha Re Holdings (Cayman) Limited, Atlantic Specialty Finance, and Blue Elite Fund LP;[3]

- amend the case caption accordingly;

- reduce the damages claims against Defendant Ability Insurance Company by $44 million (see docket entry no. 428 at 10, 27);

- and add new Counts Seven, Eight, Nine, and Ten (see docket entry no. 427 (redline); docket entry no. 428 at 8-10).

The Court has considered carefully the parties' submissions.  (Docket entry nos.

425 ("PTAC"); 428 ("Pl. Mem."); 445 ("ACH Opp."); 446 ("Blue Opp."); 453 ("Sancus Opp.");

464 ("Pl. Reply").)  For the reasons set forth below, Plaintiff's motion for leave to amend is

granted in part and denied in part.

---

[2]    In these decisions, the Court dismissed certain claims against certain defendants and dismissed all of the claims against WSFS and Christiana Trust for lack of personal jurisdiction.  (See docket entry nos. 190, 354.)

[3]    Defendants Alpha Re Limited, Alpha Re Holdings (Cayman) Limited, and Atlantic Specialty Finance never appeared in this action.

I.    BACKGROUND

The following facts are drawn from Plaintiff's PTAC, of which all well-pleaded factual allegations are accepted as true.  See Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 604 (2d Cir. 2005).  The Court only recites those facts necessary to resolve the instant motion.

A.    Plaintiff Enters into the Coinsurance Agreement with Ability Re

In 2009, Plaintiff entered into a Coinsurance Agreement with Ability Reinsurance (Bermuda) Limited ("Ability Re").  (PTAC ¶ 40.)  Under the Coinsurance Agreement, Ability Re assumed a 75% quota share participation on certain policies issued by Plaintiff and agreed to establish a trust account for the benefit of Plaintiff in order to secure these payment obligations. (Id. ¶¶ 40-41.)  As set forth in the Coinsurance Agreement, and in compliance with Utah's Insurance Code, the parties also agreed that Ability Re was to deposit, and maintain in the trust account, "qualifying assets" with a market value of no less than 102% of Ability Re's share of reserve liabilities.  (Id. ¶ 41.)  Accordingly, Ability Re established a trust account with itself as grantor, BNY Mellon as trustee, and Plaintiff as beneficiary, and the three parties entered into a trust agreement.  (Id. ¶ 42.)  Plaintiff transferred $135 million to Ability Re, which in turn transferred that $135 million, along with additional funds of its own as necessary to meet the 102% threshold, into the trust account.  (Id.)

B.    Alpha Replaces Ability Re and Sets up the Trust Account and Supplemental Trust
      Account

In early 2012, the CFO of Ability Re, Dan Cathcart, informed Plaintiff that Ability Re was exiting the reinsurance business.  (Id. ¶ 43; see id. ¶ 114.)  Cathcart recommended that Plaintiff move its reinsurance to Alpha Re Limited ("Alpha") and introduced Plaintiff to Alpha and Defendant Graham, who had helped found and owned a significant interest

in Alpha.  (Id. ¶¶ 43, 45.)  Cathcart also vouched for Graham and for Graham's investment

acumen.  (Id. ¶ 43.)  At the same time, however, Plaintiff asked to buy back its ceded book of

business from Ability Re, but Cathcart refused because Alpha had offered to pay Ability Re a

significant ceding commission for Plaintiff's book of business.  (Id.)

On June 28, 2012, Plaintiff entered into a Novation Agreement with Ability Re

and Alpha, whereby Alpha replaced Ability Re as the reinsurer under the Coinsurance

Agreement.  (Id. ¶ 44.)  The Novation Agreement required Alpha to fund a trust account (the

"Trust Account") for the benefit of Plaintiff and to maintain 102% of Alpha's reserve obligations

in that Trust Account.  (Id. ¶ 46.)  The Novation Agreement also required Alpha to establish and

maintain a separate trust account (the "Supplemental Trust Account") for the benefit of Plaintiff

and to maintain an additional 4% of Alpha's share of the reserve liabilities in that Supplemental

Trust Account.  (Id.)

On July 11, 2012, Alpha established the Trust Account with itself as grantor,

Wilmington Savings Fund Society, FSB ("WSFS") as trustee, and Plaintiff as beneficiary, and

the three parties entered into a Trust Agreement.  (Id. ¶ 47.)  Under the Trust Agreement,

Defendant BAAM, an entity owned and operated by Defendant Graham, was appointed as the

"investment manager" for the Trust Account.  (Id.)  On July 18, 2012, the old trust account was

liquidated, and the proceeds ($153 million) were deposited into the new Trust Account.  (Id.

¶ 44; id. Ex. E ¶ 69.)

On August 1, 2012, Defendant Graham misappropriated approximately $22

million of Plaintiff's funds from the Trust Account.  (Id. ¶¶ 48-50, 52 n.2, 68, 72, 74.c, 162; id.

Ex. E ¶ 69.)  First, Alpha was required to fund the Supplemental Trust Account with $6 million

of its own funds, but instead, Graham improperly "round-tripped part of the money used to fund

the Trust Account," effectively using Plaintiff's own funds to satisfy Alpha's collateral obligations.  (Id. ¶ 48.)  Second, Graham paid the $15 million ceding commission that Alpha owed to Ability Re by diverting funds from the Trust Account, again using Plaintiff's funds to satisfy Alpha's obligations.  (Id. ¶¶ 49-50.)

C.      The Trust Account Enters into the Repurchase Agreements with Series 2011-C

On September 26, 2012, Defendants Graham and BAAM, as the investment managers of the Trust Account, invested $148 million of the $153 million in the Trust Account in a Repurchase Agreement with Defendant Series 2011-C.  (Id. ¶ 52; id. Ex. D.)  Under the Repurchase Agreement, Series 2011-C agreed to sell assets (i.e., collateral) at a set price to—and subsequently repurchase those assets at the set price plus interest from—the Trust Account.  (Id. ¶¶ 53-54.)  Correspondingly, the Trust Account agreed to buy those assets from, and subsequently sell them back to, Series 2011-C.  (Id.)

The duration of the Repurchase Agreement was for one year less one day.  (Id. ¶ 59.)  Each year from September 2013 to September 2016, however, the Repurchase Agreement was renewed for another year less one day.  (Id. ¶ 60.)  Graham owned and operated BAAM, which was the "collateral manager" of Series 2011-C before December 2013.  (Id. ¶¶ 4, 61; see id. ¶ 12.)  Graham was also the sole owner and President of BCM, which became the collateral manager of Series 2011-C starting in December 2013.  (Id. ¶ 61.)  Consequently, when the Repurchase Agreement was signed and renewed by and between Series 2011-C and the Trust Account, Graham stood on both sides of the purported "negotiation" as the collateral manager of Series 2011-C and as the investment manager of the Trust Account.  (Id. ¶ 62.)

Pursuant to the Trust Agreement, the Trust Account assets could only be invested in qualified assets as defined by the Utah Insurance Code.  (Id. ¶ 51.)  Generally, this meant that

the assets needed to be cash or low-risk investments, such as U.S. Treasury securities.  (Id.) Graham had, however, directed the Series 2011-C assets that backed the Repurchase Agreements into risky investment vehicles, such as Defendants Series 2013-A, BEF Ltd., Blue II, and Sancus, all of which Graham had an ownership interest in and/or control over.  (Id. ¶ 77.)  Within a few years, the value of the assets of Series 2011-C dropped far below the asset values recited in the Repurchase Agreements.  (Id. ¶¶ 80-90.)  Defendants Graham, BCM, BAAM, Series 2011-C, and Alpha knew about the true financial status of Series 2011-C based on valuation reports from Series 2011-C's accountants.  (Id. ¶¶ 80, 82, 90.)  Plaintiff, however, did not learn these facts until much later because Graham repeatedly misrepresented to Plaintiff that the Repurchase Agreements were fully secured by cash and securities that met the requirements of the Utah Insurance Code and because Graham caused the monthly Trust Account statements to show that the value of the Trust Account was in excess of $130 million when that was not true.  (Id. ¶¶ 5, 55-57, 64-79, 85.)

D.     Series 2011-C Sells Its Assets and Defendants Divert the Purchase Consideration

In addition to reinsuring Plaintiff, Alpha also reinsured Defendant Ability and set up the Ability Reinsurance Trust to satisfy Alpha's reinsurance obligations to Ability.  (Id. ¶¶ 6, 49, 204.)  Alpha, in which Graham owned a significant interest, purported to invest the Ability Reinsurance Trust's funds in securities described as "custodial receipts."  (Id. ¶ 229.)  These custodial receipts purportedly entitled the Ability Reinsurance Trust to approximately $49 million in municipal bonds and $50 million in U.S. Treasury securities, but the Ability Reinsurance Trust never held or paid any money to acquire the Treasury securities.  (Id. ¶¶ 107-08, 229.)  Rather, Series 2011-C held the Treasury securities, and the Ability Reinsurance

Trust never did.  (Id. ¶ 107.)  Defendant Ability and its parent company, Defendant ACH,[4] raised numerous questions about the custodial receipts, including why there was no documentation of Ability Reinsurance Trust's entitlement to the Treasury securities.  (Id. ¶¶ 107-08, 230.)  Ability and ACH grew suspicious, commenting on the need to "fix the Mark Graham problem" and stating that "we will never work with them [Graham and Alpha] again" and that "it is important to address the inappropriate activity of the Collateral Manager [Graham]."  (Id. ¶ 106.)

In late 2016, Ability and ACH withdrew all of the assets from the Ability Reinsurance Trust.  (Id. ¶ 111.)  This still left a $54 million shortfall due to the "sham" Treasury securities.  (Id. ¶¶ 107, 111.)  Consequently, representatives from Ability and ACH met with Graham in New York, and Graham subsequently made up the shortfall by liquidating the assets in Series 2011-C and diverting the proceeds to the Ability Reinsurance Trust.  (Id. ¶ 111.)

On March 24, 2017, Series 2011-C sold all of its assets, consisting of investments in Defendants Sancus and BEF Ltd., for $54.43 million.  (Id. ¶ 113.)  Series 2011-C did not receive the purchase consideration, however.  (Id. ¶ 111.)  Instead, Series 2011-C, at Graham's direction, used the consideration to "redeem" the sham custodial receipts held by the Ability Reinsurance Trust and thus diverted the consideration to the Ability Reinsurance Trust.  (Id. ¶¶ 113, 231.)  This ultimately benefitted Ability, which was the beneficiary of the Ability Reinsurance Trust, and hurt Plaintiff, which was relying on the value of Series 2011-C, as Plaintiff was the beneficiary of the Trust Account, which had entered into the Repurchase Agreements with Series 2011-C.  (Id. ¶¶ 51-58, 113, 231.)  In return for Graham's assistance in making the Ability Reinsurance Trust whole, Ability and ACH arranged for Graham to receive a

---

[4]    Defendant ACH acquired Defendant Ability on February 25, 2013, and Alpha and Defendant Graham assisted in this acquisition, including by having Alpha reinsure Ability for a portion of Ability's policies.  (PTAC ¶ 49; id. Ex. E ¶¶ 30, 35.)

six-figure "consulting fee" payout.  (<u>Id.</u> ¶ 231.)  Graham, Ability, and ACH all knew that Ability

and ACH had no right to the transfer of assets from Series 2011-C.  (<u>Id.</u> ¶¶ 115-16, 235-37.)

Ability and ACH also knew that Graham and BAAM owed fiduciary duties to Plaintiff because

they knew that BAAM, which Graham controlled, was the investment manager for the Trust

Account.  (<u>Id.</u> ¶ 232.)

E.    The Series 2011-C Fraudulent Transfers

In addition to the misappropriation of the liquidation proceeds, Series 2011-C

diverted other funds that purportedly secured its Repurchase Agreements with the Trust Account.

These transfers (including the liquidation) are summarized below:

- From December 2012 to September 2016, Series 2011-C transferred $17.15 million to Defendants BAAM and BCM for management fees.  (<u>Id.</u> ¶ 202; <u>id.</u> Ex. F.)

- From June 2015 to May 2017, Series 2011-C transferred $3.48 million to Defendant Series 2013-A.  (<u>Id.</u> ¶ 203; <u>id.</u> Ex. G.)

- From June 2013 to April 2016, Series 2011-C transferred $10.76 million to the Ability Reinsurance Trust.  (<u>Id.</u> ¶¶ 6, 101, 204; <u>id.</u> Ex. H.)  Alpha reinsured Ability and set up the Reinsurance Ability Trust to satisfy Alpha's reinsurance obligations to Ability.  (<u>Id.</u> ¶ 6.)

- In March 2017, Series 2011-C redirected $54.43 million from the proceeds of its sale to the Ability Reinsurance Trust, which had been set up for Ability's benefit.  (<u>Id.</u> ¶ 205.)

- In March 2017, Series 2011-C transferred shares in Blue Elite Fund Ltd. valued at $45.56 million to ACH in return for unreasonably small compensation.  (<u>Id.</u> ¶ 206.)

Plaintiff contends that Series 2011-C was insolvent at the time it made each of

these transfers.  (<u>Id.</u> ¶ 207.)  Specifically, Series 2011-C was insolvent as early as September 26,

2012, when the Trust Account and Series 2011-C first entered into the Repurchase Agreement.

(<u>Id.</u>)  On August 1, 2012, Graham had misappropriated $22 million from the Trust Account to

satisfy Alpha's obligations to pay the ceding commission to Ability Re and to fund the

Supplemental Trust Account.  (<u>Id.</u> ¶¶ 52-58, 71-72, 207.)  Thus, when the Trust Account and

Series 2011-C entered into the Repurchase Agreement on September 26, 2012, Series 2011-C

owed more than $148 million to the Trust Account but its assets fell short of that amount because the Trust Account only transferred $126 million to Series 2011-C due to Graham's earlier misappropriation of $22 million.  (Id. ¶¶ 52-58, 71-72, 207.)  All of these fraudulent transfers hurt Plaintiff, which—as the beneficiary of the Trust Account—was relying on the value of Series 2011-C because the Trust Account had entered into the Repurchase Agreements with Series 2011-C.  (Id. ¶¶ 51-58.)

F.    The New Claims in the PTAC

The PTAC asserts four new claims, which are set forth in Counts Seven, Eight, Nine, and Ten.

a.    Count Seven (Section 10(b) Securities Fraud)

Count Seven is a claim for violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, against Defendants BCM, BAAM, and Graham.  (Id. ¶¶ 193-200.) Plaintiff alleges that BCM, BAAM, and Graham made materially false misstatements in connection with the Repurchase Agreements entered into between the Trust Account and Series 2011-C, including misstatements "concerning the ownership and control of Series 2011-C, Alpha and its owner's ties to Series 2011-C, and the value of the Repurchase Agreement and assets in Great Western's Trust Account[.]"  (Id. ¶¶ 194, 197.)  Plaintiff claims damages of at least $130 million.  (Id. ¶ 200.)

b.    Count Eight (Violation of Delaware Uniform Fraudulent Transfer Act)

Count Eight is a claim for fraudulent transfers in violation of the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. Sections 1304, 1305, and 1307, asserted against Defendants ACH, Ability, BAAM, BCM, Series 2013-A, and Graham.  (Id. ¶¶ 201-14.)  Plaintiff alleges that Series 2011-C made various transfers to ACH, Ability, BAAM, BCM, Series

2013-A, and Graham while Series 2011-C was "insolvent." (<u>Id.</u> ¶ 207.) "Specifically, Series 2011-C was insolvent from the moment it entered into the initial 2012 repurchase agreement as a result of the Series 2011-C obligations under the repurchase agreements and Graham diverting funds to pay the ceding commission to Ability Re and to fund the Supplemental Trust Account." (<u>Id.</u>) Plaintiff seeks damages of at least $130 million and relief under 6 Del. C. Section 1307(a). (<u>Id.</u> ¶ 214.)

### c.    Count Nine (Constructive Trust)

Count Nine is a claim for constructive trust against Defendants Series 2011-C, Series 2013-A, BEF Ltd., Blue II, Sancus, BAAM, BCM, ACH, and Ability. (<u>Id.</u> ¶¶ 215-25.) Plaintiff contends that Alpha, BAAM, and Graham owed fiduciary duties to Plaintiff and that Plaintiff owned equitable title to the funds in the Trust Account. (<u>Id.</u> ¶¶ 216-18.) In reliance on Graham's and BAAM's promises, Plaintiff transferred the funds into the Trust Account, whereupon Graham and BAAM transferred those funds to Series 2011-C. (<u>Id.</u> ¶¶ 219-20.) Subsequently, Graham and BCM caused Series 2011-C to invest those funds in a manner inconsistent with Graham's and BAAM's promises. (<u>Id.</u> ¶ 221.) Specifically, Series 2011-C made investments in, and other transfers to, various related entities, insiders, and affiliates (<u>i.e.,</u> Graham, Series 2011-C, Series 2013-A, BEF Ltd., Blue II, Sancus, BAAM, BCM, ACH, and Ability) to the detriment of Plaintiff. (<u>Id.</u> ¶ 222.) Plaintiff alleges that Series 2011-C and the recipients of the funds would be unjustly enriched if they were permitted to retain those funds. (<u>Id.</u> ¶ 223.) Accordingly, Plaintiff seeks to have those funds, which total at least $130 million, held in a constructive trust for Plaintiff's benefit. (<u>Id.</u> ¶¶ 224-25.)

   d.  <u>Count Ten (Aiding and Abetting Breach of Fiduciary Duty)</u>

    Count Ten is a claim against Defendants ACH and Ability for aiding and abetting breach of fiduciary duty.[5]  (<u>Id.</u> ¶¶ 226-40.)  Plaintiff alleges that ACH and Ability "knew that Graham, BAAM and BCM were violating their fiduciary duties to Great Western and Series 2011-C by stripping Series 2011-C of assets [in March 2017] for ACH and Ability's benefit, when ACH and Ability had no legal right to the assets."  (<u>Id.</u> ¶ 238.)  Plaintiff further alleges that "ACH and Ability knowingly participated in and induced this breach, including by (a) pressuring Graham to allow the transfer of assets from Series 2011-C, (b) signing off on the agreements to cause the sale and transfer of proceeds away from Series 2011-C, (c) signing resolutions approving the sales, and (d) agreeing to pay a six-figure 'consulting fee' to Graham, as one of the conditions of the sales."  (<u>Id.</u> ¶ 239.)  Plaintiff seeks damages of at least $55 million in connection with this claim.  (<u>Id.</u> ¶ 240.)

## II.  DISCUSSION

    Defendants raise various arguments in opposition to Plaintiff's motion to amend. As explained below, Defendants' arguments regarding undue delay, bad faith, and undue prejudice are unpersuasive.  Some of Defendants' arguments regarding the futility of the proposed amendments are persuasive, but others are not.  Accordingly, Plaintiff's motion to amend is granted in part and denied in part.

---

[5]  The Court previously dismissed an aiding and abetting breach of fiduciary duty claim against ACH because the complaint "contain[ed] no allegations of specific conduct by ACH and no facts to establish knowledge."  <u>Great W. Ins.</u>, 2020 WL 3415026, at *30. The paragraph above summarizes Plaintiff's new allegations.

A.      The Relevant Legal Standard

As a threshold issue, the parties dispute the relevant legal standard—specifically, whether Federal Rules of Civil Procedure Rule 15(a)(2) and 16(b)(4) both apply, or whether only the former applies.  Where "a scheduling order set[s] a date after which no amendment will be permitted," a plaintiff must meet the requirements of Rule 15(a)(2) and Rule 16(b)(4).  Sacerdote v. New York Univ., 9 F.4th 95, 115 (2d Cir. 2021); see, e.g., Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000); Calltrol Corp. v. LoxySoft AB, No. 18-CV-09026-NSR-VR, 2023 WL 5041541, at *2 n.6 (S.D.N.Y. Aug. 8, 2023).  If there is no applicable scheduling order, a plaintiff only needs to meet the requirements of Rule 15(a)(2).  Sacerdote, 9 F.4th at 115.  Rule 16(b)(4), which requires a showing of "good cause," is more stringent than the "permissive" and "liberal" standard of Rule 15(a)(2), under which "[t]he court should freely give leave [to amend] when justice so requires."  Id. (citations omitted).

Defendants argue that Rule 16(b)(4) applies because Plaintiff's motion was filed months after the close of discovery.  (ACH Opp. at 15-16.)  While the scheduling orders in this action set deadlines for discovery, they have never set deadlines for amendments.  (See docket entry nos. 362, 416.)  Because the scheduling orders "set no expiration date after which all amendments were prohibited," Rule 16(b)(4) does not apply.  Sacerdote, 9 F.4th at 115 (declining to apply Rule 16(b)(4) where the scheduling order only "set the deadline (ten days) for amending without leave of court"); see, e.g., Pilkington N. Am., Inc v. Mitsui Sumitomo Ins. Co. of Am., No. 18-CV-8152-JFK, 2021 WL 4991422, at *5 (S.D.N.Y. Oct. 27, 2021) (same where the scheduling order only prohibited the parties from amending their pleadings "except as provided under the [Federal Rules of Civil Procedure]"); Cherotti v. Exphand, Inc., No. 20-CV-

11102-SLC, 2022 WL 2108604, at *6 (S.D.N.Y. June 10, 2022) (same where the scheduling

order "set no such deadline, i.e., a 'date after which all amendments were prohibited'").

Thus, the Court turns to Rule 15(a)(2), which sets a "liberal" and "permissive"

standard for amendments. Sacerdote, 9 F.4th at 115 (quoting Loreley Fin. (Jersey) No. 3 Ltd. v.

Wells Fargo Sec., LLC, 797 F.3d 160, 190 (2d Cir. 2015)). Indeed, under that Rule, the "only

'grounds on which denial of leave to amend has long been held proper' are upon a showing of

'undue delay, bad faith, dilatory motive, [or] futility.'" Id. (quoting Loreley, 797 F.3d at 190).

The non-movant bears the burden of establishing these circumstances. Grant v. Citibank

(S. Dakota), N.A., No. 10-CV-2955-KNF, 2010 WL 5187754, at *6 (S.D.N.Y. Dec. 6, 2010).

Defendants' objections invoke each of the four prongs. For the reasons discussed

below, Defendants fail to meet their burden as to the first three prongs and fail in part as to the

fourth prong.

B.    Undue Delay

"[W]hen a motion 'is made after an inordinate delay, no satisfactory explanation

is offered for the delay, and the amendment would prejudice [the non-moving party],' the undue

delay weighs against granting leave to amend." Perez v. Escobar Constr., Inc., 342 F.R.D. 378,

381 (S.D.N.Y. 2022) (quoting Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 72 (2d Cir.

1990)). "[M]ere delay, however, absent a showing of bad faith or undue prejudice, does not

provide a basis for a district court to deny the right to amend." State Teachers Ret. Bd. v. Fluor

Corp., 654 F.2d 843, 856 (2d Cir. 1981).

Defendants argue that Plaintiff improperly delayed by filing its motion to amend

on July 17, 2025—nearly seven years after the case commenced in 2018, six months after fact

discovery closed on January 17, 2025, and five months after Plaintiff served its expert report on

February 21, 2025.  (ACH Opp. at 16; Blue Opp. at 7; see docket entry no. 362 (setting

discovery deadlines).)  This argument fails to meet Defendants' burden.

        First, Defendants' proffered timeline is misleading.  As Plaintiff explains, the

initial February 21, 2025 expert report did not represent the expert's final analysis; rather,

rebuttal reports were exchanged, and expert depositions continued through May 2025.  (Pl. Reply

at 8-9.)  Plaintiff's motion was filed less than two months after the May 30, 2025 close of expert

discovery.  (Docket entry no. 362 at 1 (setting expert discovery deadlines).)  This was

sufficiently diligent.  See State Teachers, 654 F.2d at 856-57 (granting leave to amend where

amendment was filed three years after suit was initiated and where "the amendment will not

involve a great deal of additional discovery"); In re Tether & Bitfinex Crypto Asset Litig., No.

19-CV-9236-KPF, 2024 WL 3520363, at *8 (S.D.N.Y. July 24, 2024) (finding sufficient

diligence where "the facts comprising the substantive amendments in the PSAC did not emerge

until late in discovery" and plaintiffs moved to amend two months thereafter); Schleifer v. Lexus

of Manhattan, No. 17-CV-8789-AJN, 2018 WL 11593271, at *3 (S.D.N.Y. Nov. 21, 2018)

(noting that "courts in this circuit have found that parties who moved to amend within two

months of acquiring the new information showed sufficient diligence" (quoting Mason Tenders

Dist. Council of Greater N.Y. v. Phase Constr. Servs., 318 F.R.D. 28, 37 (S.D.N.Y. 2016)));

AT&T Corp. v. Atos IT Sols. & Servs., Inc., 714 F. Supp. 3d 310, 326 n.14 (S.D.N.Y. 2024)

(noting that "courts commonly find that a party acts diligently if it seeks leave to amend within

approximately two months of acquiring information of a new claim or defense" (collecting

cases)).

        Second, Plaintiff proffers a satisfactory explanation for its delay.  As supported by

the extensive record, this case involves a complex fraud that required "sophisticated forensic

analysis" to "unwind deliberately obfuscated transactions."  (Pl. Mem. at 6-7.)  Most of the

additional factual allegations pleaded in the PTAC only came to light "[w]ith the benefit of

discovery and expert forensic analysis."  (Id. at 9; see generally PTAC Ex. E.)  Leave to amend

is appropriate when, as here, a party learns new facts through complex discovery that were

previously unavailable and "moves promptly" thereafter.  Schleifer, 2018 WL 11593271, at *2;

see also Samad Bros., Inc. v. Bokara Rug Co., Inc., No. 09-CV-5843-JFK-KNF, 2010 WL

2835754, at *3 (S.D.N.Y. June 30, 2010) (finding diligence where plaintiff moved to amend after

"receiving, during the discovery phase . . . additional relevant information . . . it did not possess

previously").

C.    Bad Faith

   "It is well-established . . . that 'when the opponent of an amendment asserts that

the movant is acting in bad faith, there must be something more than mere delay or inadvertence'

to warrant denial of a Rule 15 motion."  Diaz v. Shanklin Corp., No. 16-CV-2332-ADS-AYS,

2017 WL 2226574, at *6 (E.D.N.Y. May 19, 2017) (quoting Oneida Indian Nation v. County of

Oneida, 199 F.R.D. 61, 80 (N.D.N.Y. 2000)).  Rather, there must be "[a] finding that a party is

seeking leave solely to gain a tactical advantage" or for some other "improper purpose."  Id.

(first quoting Oneida, 2017 WL 2226574, at *6; then quoting Adams v. City of New York, 993

F. Supp. 2d 306, 322 (E.D.N.Y. 2014)); see also Dass v. City Univ. of N.Y., No. 18-CV-11325-

VSB, 2024 WL 4986914, at *5 (S.D.N.Y. Dec. 5, 2024) ("where an amendment is made merely

to 'gain a tactical advantage,' bad faith may preclude future amendments" (citation omitted)).

   Defendants argue that Plaintiff's motion was a "bad faith" tactic intended "to

[s]ecure [s]trategic [a]dvantage and [d]elay [p]roceedings" because it was made on the eve of

summary judgment and after discovery closed.  (Blue Opp. at 18-19; see docket entry no. 416

(summary judgment motions due on August 1, 2025); docket entry no. 362 (fact discovery closed

on January 17, 2025, and expert discovery closed on May 30, 2025).)  Defendants complain of

unfair surprise in having to defend new allegations and of having to expend resources to draft

summary judgment briefs that would be rendered moot by Plaintiff's proposed amendments.

(Blue Opp. at 18-19.)  The allegations of bad faith, however, are belied by the record.  Prior to

filing the motion to amend, Plaintiff's counsel offered to stay summary judgment proceedings

pending the outcome of the motion, as well as to extend the case schedule to allow for litigation

of the motion.  (Pl. Reply at 12.)  Defendants declined these offers.  (Id.)  Furthermore,

Plaintiff's PTAC deletes certain claims and defendants and reduces the damages sought from

Ability Insurance Company by $44 million.  These actions are not indicative of bad faith.  See

Blagman v. Apple, Inc., No. 12-CV-5453-ALC-JCF, 2014 WL 2106489, at *3 (S.D.N.Y. May

19, 2014) ("To the extent that the defendants claim that [the plaintiff's] delay was strategic, they

provide no showing of bad faith apart from the delay itself." (citation omitted)).

D.    Undue Prejudice

        "In determining whether a proposed amendment will result in undue prejudice,

courts 'generally consider whether the assertion of the new claim or defense would (i) require the

opponent to expend significant additional resources to conduct discovery and prepare for trial;

[or] (ii) significantly delay the resolution of the dispute.'"  Pilkington, 2021 WL 4991422, at *7

(quoting Monahan v. New York City Dep't of Corr., 214 F.3d 275, 284 (2d Cir. 2000)).  "The

fact that a proposed amendment would add new issues is normally not prejudicial unless the

opposing party would be confronted with some unique difficulty in defending against the new

issues."  Id. (quoting Duling v. Gristede's Operating Corp., 265 F.R.D. 91, 102 (S.D.N.Y.

2010)).

Defendants argue that allowing the PTAC would be unduly prejudicial because the amendment introduces new claims that assert new legal theories and factual allegations, which would require Defendants to reopen fact and expert discovery and brief new issues.  (ACH Opp. at 17-19; Blue Opp. at 13-14.)  Defendants also point to the advanced stage of the litigation, which is at summary judgment already, and the personal prejudice to Defendant Graham, whose health is declining due to terminal cancer.  (Blue Opp. at 13-14.)

While Defendants raise valid concerns, they do not rise to the level of undue prejudice that would warrant denying Plaintiff's motion because the new claims are "related closely to the original claim[s]."  State Teachers, 654 F.2d at 856; see also Pilkington, 2021 WL 4991422, at *8 (declining to find undue prejudice where the "new claim is based on the same factual allegations that were included in the original" complaint).  From the outset of this action, Plaintiff's central claim has been that Defendants systematically looted the Trust Account.  (See docket entry nos. 5 (Complaint), 69 (First Amended Complaint), 106 (Second Amended Complaint).)  The new claims for securities fraud, fraudulent transfer, constructive trust, and aiding and abetting breach of fiduciary duty arise from the same core operative facts that have already been the subject of this litigation.  For that same reason, while the Court is mindful of Defendant Graham's declining health and the fact that further delay may prejudice Graham and his ability to assist in preparing a defense, those considerations do not compel the Court to deny Plaintiff's motion.

Nonetheless, the new claims do raise new issues, which may require the parties to reopen discovery.  For example, Plaintiff's new fraudulent transfer claim may require additional discovery on whether Series 2011-C was "insolvent," and Plaintiff's new aiding and abetting claim may require additional discovery regarding Defendants ACH's and Ability's knowledge.

(See ACH Opp. at 6-7; Blue Opp. at 11-13.)  Any such additional discovery required, however, would be narrow, and Defendants will not be unduly prejudiced by a targeted and limited reopening of discovery.  See Pilkington, 2021 WL 4991422, at *7 (granting leave where "no trial date has been set" even though "additional discovery will be necessary"); Spectrum Dynamics Med. Ltd. v. Gen. Elec. Co., No. 18-CV-11386-VSB-KHP, 2023 WL 242721, at *4 (S.D.N.Y. Jan. 18, 2023) (granting leave to amend and ordering "[f]act discovery [to be] reopened to permit discovery as to any added claims").

E.    Futility of the Proposed Amendments

Finally, the Court turns to Defendants' arguments that the new claims would be futile.  "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)."  Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002).  Accordingly, the PTAC must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A proper complaint cannot simply recite legal conclusions or bare elements of a cause of action; there must be factual content pleaded that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  As on a motion to dismiss, the Court accepts as true the nonconclusory factual allegations in the PTAC and draws all reasonable inferences in the Plaintiff's favor.  Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).  Finally, the party opposing the motion to amend bears the burden of establishing futility.  Pilkington, 2021 WL 4991422, at *8 (citing Ho Myung Moolsan Co. v. Manitou Min. Water, Inc., 665 F. Supp. 2d 239, 249 (S.D.N.Y. 2009)).

Defendants challenge each of the new claims in the PTAC as futile, but they largely fail to meaningfully develop their arguments.  Many of Defendants' arguments are

cursory, briefly mentioning pertinent legal principles but failing to provide any deeper analysis.

Nonetheless, some of their arguments warrant further consideration.  For the reasons explained

below, the Court concludes that Counts Seven and Ten are not futile; Count Eight is futile in

part; and Count Nine is futile but Plaintiff may, under appropriate circumstances, seek the relief

targeted by Count Nine at a later time as a remedy.

a.     Count Seven (Section 10(b) Securities Fraud)

In Count Seven, Plaintiff brings a claim for securities fraud under Section 10(b) of

the Securities Exchange Act of 1934, 15 U.S.C. § 78j, against Defendants BCM, BAAM, and

Graham.[6]  (PTAC ¶¶ 193-200.)  Defendants' only argument for futility of this claim is that

Plaintiff lacks statutory standing because it was not the actual purchaser or seller of any

securities.  (Blue Opp. at 14-15.)

"The purchaser-seller rule requires plaintiffs to have bought or sold the security

about which a misstatement was made in order to have standing to sue under Section 10(b)."

Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd., 54 F.4th 82, 86 (2d Cir. 2022) (citing Blue

Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731 (1975)).  Here, Plaintiff alleges that

Defendants made material misrepresentations regarding the securities that were purchased from

Series 2011-C via the Repurchase Agreements.  (PTAC ¶¶ 194-96.)  While Plaintiff did not

directly purchase those securities, it was the beneficiary of the Trust Account, which in turn

---

[6]     The Court's June 22, 2020 decision held that Plaintiff's RICO claims were barred by 18 U.S.C. section 1964, which provides that "no person may rely upon conduct that would have been actionable as fraud in the purchase or sale of securities to establish" a RICO violation.  Great W. Ins., 2020 WL 3415026, at *37-40.  In doing so, the Court found that "Plaintiff has alleged conduct that would be actionable as fraud in connection with the purchase or sale of securities," citing authority holding that repurchase agreements are securities, as well as authority that "a fraud in connection with a purchase or sale of securities is actionable even if the fraudster initiated the purchase, so long as the victim 'maintained an ownership interest' in the securities."  Id. at *38-39 (citations omitted).

purchased those securities from Series 2011-C via the Repurchase Agreements. (Id. ¶¶ 44-47, 51-63.) In these circumstances, courts have held that the beneficiary has standing because the "beneficiary of the trust . . . is the only person who was actually harmed by the securities transaction in question and was thus a de facto buyer." Gross v. Diversified Mortg. Invs., 431 F. Supp. 1080, 1093 (S.D.N.Y. 1977), aff'd sub nom. Michael C. Duban v. Diversified Mortg. Invs., 636 F.2d 1201 (2d Cir. 1980); see also Kirshner v. United States, 603 F.2d 234, 240-41 (2d Cir. 1978) ("[Plaintiff] has standing, as a beneficiary of the fund, to bring this action on behalf of the fund against those alleged to have defrauded the fund in its purchase of securities."), abrogated on other grounds, Finkel v. Stratton Corp., 962 F.2d 169 (2d Cir. 1992); In re Oxford Health Plans, Inc. Sec. Litig., 199 F.R.D. 119, 123 (S.D.N.Y. 2001); Grubb v. Fed. Deposit Ins. Corp., 868 F.2d 1151, 1161 (10th Cir. 1989); Norris v. Wirtz, 719 F.2d 256, 259 (7th Cir. 1983); James v. Gerber Prods. Co., 483 F.2d 944, 948-49 (6th Cir. 1973).[7] Accordingly, Plaintiff has standing under the trust beneficiary exception to the purchaser-seller rule.

---

[7]    The recent Second Circuit decision, Menora, which rejected the standing claim of a stockholder of the corporate acquiror of the entity that made the allegedly fraudulent statements, does not address or undermine the trust beneficiary exception to the purchaser-seller rule. 54 F.4th 82. In Menora, the court rejected plaintiffs' argument that "they ha[d] standing because there was a sufficiently 'direct relationship' between [the defendant company's] misstatements about itself and the price of [the acquiror's] shares," in part because a "direct relationship" test would be "'a shifting and highly fact-oriented' inquiry" that "would begin exactly the 'endless case-by-case erosion' of the purchaser-seller rule about which Blue Chip Stamps warned." Id. at *86 (quoting Blue Chip Stamps, 421 U.S. at 755). Menora's holding that "Section 10(b) standing does not depend on the significance or directness of the relationship between two companies [i.e., defendant and defendant's parent]" has no application here, where standing is premised on the relationship between the purchaser of the securities (the Trust Account) and Plaintiff's interest, as the Trust Account beneficiary, in the purchaser. Cf. id. at 88. Nor are Blue Chip Stamps' concerns that adopting a "shifting and highly fact-oriented" exception would work "endless case-by-case erosion" to the purchaser-seller rule implicated, as it is clearly established that Plaintiff was the sole, intended beneficiary of the purchased securities. Cf. Blue Chip Stamps, 421 U.S. at 755.

        **b.**      <u>Count Eight (Violation of Delaware Uniform Fraudulent Transfer Act)</u>

In Count Eight, Plaintiff brings fraudulent transfer claims under 6 Del. C. Sections 1304, 1305, and 1307 against Defendants ACH, Ability, BAAM, BCM, Series 2013-A, and Graham. (PTAC ¶¶ 201-14.) Sections 1304(a)(2) and 1305(a) provide causes of action for constructive fraudulent transfer[8] where "(i) [] the transferor failed to receive reasonably equivalent value for the asset transferred; and (ii) [] the transferor was insolvent at the time of the transfer, or was rendered insolvent by the transfer.'" <u>Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC</u>, No. 2022-0378-LWW, 2023 WL 5688392, at *9 (Del. Ch. Sept. 5, 2023). Section 1305(b) provides a cause of action for fraudulent preferential transfer where "(1) the transfer was made to an insider for an antecedent debt; (2) the debtor was insolvent at the time of transfer; and (3) the insider had reasonable cause to believe that the debtor was insolvent." <u>Wilmington Sav. Fund Soc., FSB v. Kaczmarczyk</u>, No. 2005-1769-DFP, 2007 WL 704937, at *7 (Del. Ch. Mar. 1, 2007). Finally, "Section 1304(a)(1) provides a cause of action for actual fraudulent transfer where 'the debtor made the transfer . . . [w]ith actual intent to hinder, delay or defraud any creditor of the debtor.'" <u>Cleveland-Cliffs</u>, 2023 WL 5688392, at *10.

      For the reasons explained below, all of Plaintiff's proposed Section 1305(b) claims are futile; Plaintiff's Section 1304(a)(2) and Section 1305(a) claims that arise from transfers made before July 10, 2014 are futile; and all of Plaintiff's proposed fraudulent transfer

---

[8]      "The difference between DUFTA Sections 1304(a)(2) and 1305(a) is that the latter 'provides a cause of action only to present creditors.' Otherwise, the two sections are essentially identical." <u>Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC</u>, No. 2022-0378-LWW, 2023 WL 5688392, at *9 n.107 (Del. Ch. Sept. 5, 2023) (citations omitted).

claims against Defendant Graham are futile.  The remainder of Plaintiff's proposed claims may be added.

1.     <u>Statutes of Limitations</u>

First, Defendants contend that the fraudulent transfer claims are barred by the applicable statutes of limitations.  (Blue Opp. at 16-18.)  Under 6 Del. C. Section 1309, Plaintiff's fraudulent transfer claims are subject to the following statutes of limitations: a Section 1304(a)(1) claim must be brought "within 4 years after the transfer was made . . . or, if later, within 1 year after the transfer . . . was or could reasonably have been discovered by the claimant"; a Section 1304(a)(2) or Section 1305(a) claim must be brought "within 4 years after the transfer was made"; and a Section 1305(b) claim must be brought "within 1 year after the transfer was made[.]"  Because the original complaint alleged that Series 2011-C improperly transferred money to the same Defendants, the new fraudulent transfer claims "ar[i]se out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading," and the PTAC relates back to the original complaint under Federal Rule of Civil Procedure 15(c)(1)(B).  (<u>See</u> docket entry no. 5 ¶¶ 79-80, 101-07; <u>see also</u> Blue Opp. at 17 (failing to meaningfully dispute the applicability of Rule 15(c)(1)(B)).)  Thus, the relevant issue is the timeliness of the original complaint, which was filed on July 10, 2018.

Plaintiff does not dispute that all of its Section 1305(b) claims are time-barred.  (<u>See</u> Pl. Reply at 13-14.)  Nor does Plaintiff dispute that its Section 1304(a)(2) and Section 1305(a) claims are time-barred to the extent that those claims relate to transfers made before July 10, 2014—four years before the original complaint was filed.  (<u>See</u> <u>id.</u> at 13-14; docket entry nos. 1, 5 (original complaint filed on July 10, 2014).)

Plaintiff does, however, contend that its Section 1304(a)(1) claims survive the statute of limitations because the claims were made "within 1 year after the transfer . . . was or could reasonably have been discovered by the claimant."  (Pl. Reply at 13-14 (quoting 6 Del. C. § 1309(1)).)  According to Plaintiff, it did not discover the fraudulent transfers until November 29, 2017, when, during an arbitration, counsel for Defendant Alpha repeatedly blamed Defendants Graham, BCM, and BAAM for the dissipation of Plaintiff's funds.  (Id. at 14 (citing PTAC ¶ 147).)  Plaintiff explains that, until that time, Defendants had concealed the fraudulent transfers.  Plaintiff alleges: that it received inaccurate monthly Trust Account statements up until June 2017 showing that the value of the Trust Account was in excess of $130 million, when in fact the true value was much less; that Defendant Graham caused the monthly account statements to be misleading and inaccurate; that Graham repeatedly misrepresented to Plaintiff that the Repurchase Agreements were fully secured by cash and securities that met the requirements of the Utah Insurance Code; and that Defendants knew the true financial status of Series 2011-C based on valuation reports from Series 2011-C's accountants.  (PTAC ¶¶ 5, 55-57, 64-80, 82, 85, 89-90.)  Altogether, Plaintiff has plausibly pleaded that it could not have discovered, and did not actually discover, the fraudulent transfers until late in the fall of 2017, which is less than a year before the complaint was filed on July 10, 2018.  See JPMorgan Chase Bank, N.A. v. Ballard, 213 A.3d 1211, 1239 (Del. Ch. 2019) ("[T]he central question under Section 1309(1) is . . . when the plaintiff discovered or reasonably could have discovered the facts that caused it to file the lawsuit, i.e., not just that a transfer had occurred but that the transfer was fraudulent in nature.").

2.    "Debtor"

Second, Defendants argue that the fraudulent transfer claims fail because Series 2011-C was not a "debtor" of Plaintiff.  (ACH Opp. at 20.)  Under the DUFTA, a "[d]ebtor" is "a person who is liable on a claim."  6 Del. C. § 1301(6).

First, a "[p]erson" is defined as to include a "trust" "or any other legal or commercial entity."  6 Del. C. § 1301(9).  Series 2011-C plainly satisfies that definition because it is a series of the Cygnet 001 Master Trust, which is a statutory trust registered in Delaware.  (PTAC ¶¶ 15-16.)

Next, a "[c]laim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."  6 Del. C. § 1301(3).  Series 2011-C is liable to Plaintiff on a "claim" within the meaning of the statute because Series 2011-C is potentially liable to Plaintiff for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and unjust enrichment.  (PTAC ¶¶ 179-83); Great W. Ins., 2020 WL 3415026, at *28, 32-34, 40 (sustaining Plaintiff's aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and unjust enrichment claims against Series 2011-C at the motion to dismiss stage).  Those liabilities, although unliquidated and disputed, are rights to payment that plausibly make Series 2011-C a "debtor" of Plaintiff under DUFTA's broad definitions.  See Burkhart v. Genworth Fin., Inc., 250 A.3d 842, 855 (Del. Ch. 2020) ("[A] creditor with an unmature and contingent claim does have standing to bring a claim under the DUFTA even though her contractual right to payment is contingent and not yet mature."); Burkhart v. Genworth Fin., Inc., 275 A.3d 1259, 1276 n.90 (Del. Ch. 2022) ("The case law on fraudulent transfer is replete with 'claims' (as defined in DUFTA) that arise outside of contracts.  There are cases involving tort claims[,] . . . marital

claims . . . and claims based on statutes." (citing, <u>inter alia</u>, <u>In re W.R. Grace & Co.</u>, 281 B.R.

852, 859-66 (Bankr. D. Del. 2002); <u>Luchi v. Luchi</u>, No. 2019-0747-PWG, 2020 WL 1274879, at

*5 (Del. Ch. Mar. 17, 2020), <u>report and recommendation approved</u>, No. 2019-0747-AGB, 2020

WL 1652526 (Del. Ch. Apr. 2, 2020); <u>Roland v. United States</u>, 838 F.2d 1400, 1402-03 (5th Cir.

1988))).

            3.      "Insolvency"

Third, Defendants argue that Plaintiff fails to plead that Series 2011-C was

insolvent at the time of the transfers.  (ACH Opp. at 20.)  As an initial matter, insolvency is only

a required element of constructive fraudulent transfer claims under Sections 1304(a)(2) and

1305(a).  <u>See</u> <u>Cleveland-Cliffs</u>, 2023 WL 5688392, at *9.  For an actual fraudulent transfer claim

under Section 1304(a)(1), "[i]nsolvency is but one factor to be considered while determining

actual intent."  <u>Venables v. Smith</u>, No. CIV.A. 02C-09-126JOH, 2003 WL 1903779, at *3 (Del.

Super. Ct. Mar. 14, 2003); <u>see</u> 6 Del. C. § 1304(b)(9)).

As to whether Plaintiff has pleaded plausibly that Series 2011-C was insolvent,

the Court looks to the language of 6 Del. C. Section 1302(a), which provides that "[a] debtor is

insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair

valuation."  Plaintiff has alleged specific facts that are sufficient to meet that standard.

According to the PTAC, shortly before Series 2011-C entered into the Repurchase Agreement

with the Trust Account, Graham misappropriated approximately $22 million from the Trust

Account to pay the ceding commission to Ability Re and to fund the Supplemental Trust—both

of which were obligations owed by Alpha.  (PTAC ¶¶ 52-58, 71-72, 207.)  Thus, when the

Repurchase Agreement was executed on September 26, 2012, Series 2011-C was insolvent

because it owed more than $148 million to the Trust Account but had insufficient assets to cover

that liability because the Trust Account's initial transfer was net of Graham's $22 million misappropriation.  (Id. ¶¶ 52-58, 71-72, 207.)  The PTAC further alleges that, in the years following the initial execution of the Repurchase Agreement, Series-2011-C's assets were continuously dissipated and Series 2011-C did not have sufficient assets to meet its obligations to the Trust Account under the Repurchase Agreement and its renewals.  (Id. ¶¶ 59-63, 81-83, 87-88, 92.)

4.     Transfers to Defendant Graham

Lastly, Defendant Graham argues that the fraudulent transfer claims against him are futile because the PTAC does not allege any transfer to him specifically.  (Blue Opp. at 16.) Count Eight only alleges that Series 2011-C fraudulently transferred approximately $17 million to "BAAM/BCM" for purported "management fees."  (PTAC ¶ 202.)  While Graham controls and owns BAAM and BCM, Count Eight does not specifically allege any transfer to Graham himself.  Plaintiff points to the PTAC's allegation that "ACH and Ability . . . agree[d] to pay a six-figure 'consulting fee' to Graham" as part of the March 2017 sale of Series 2011-C's assets. (Id. ¶ 239.)  Not only is this allegation not specifically part of Count Eight, but this allegation also relates to transfers made by ACH and Ability rather than transfers made by Series 2011-C. Because Plaintiff fails to allege any transfer made by Series 2011-C to Graham, the proposed fraudulent transfer claims against Graham are futile.  See Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P., 906 A.2d 168, 203 (Del. Ch. 2006) ("[T]he only proper defendants in a fraudulent conveyance action . . . are the transferor and any transferees.").

c.     Count Nine (Constructive Trust)

In Count Nine, Plaintiff brings a claim for constructive trust against Defendants Series 2011-C, Series 2013-A, BEF Ltd., Blue II, Sancus, BAAM, BCM, ACH, and Ability.

(PTAC ¶¶ 215-25.)  "While courts in this district have allowed constructive trust claims to proceed as separate causes of action, the Second Circuit has historically treated constructive trusts under New York law as a remedy for unjust enrichment rather than a separate cause of action."  Barnes v. Block, No. 22-CV-07236-LTS-RWL, 2025 WL 1736519, at *9 (S.D.N.Y. June 23, 2025) (citing cases).  However, "[e]ven if a constructive trust claim cannot proceed as an independent cause of action, 'plaintiffs may, if appropriate, later request, as a remedy, the imposition of a constructive trust.'"  Id. (quoting Winklevoss v. Cap. Fund, LLC v. Shrem, 351 F. Supp. 3d 710, 721 (S.D.N.Y. 2019)).  "Notably, a constructive trust is an equitable remedy 'to be imposed only in the absence of an adequate remedy at law.'"  Id. (quoting Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 419 (S.D.N.Y. 2010) (internal citations omitted)).

Because Plaintiff has asserted many other state and federal claims that, "if successful, may yield a substantial monetary recovery," "the Court cannot determine whether the equitable remedy of a constructive trust would be appropriate or if Plaintiff's other claims will provide 'an adequate remedy at law.'"  Id. (quoting Anwar, 728 F. Supp. 2d at 419). Accordingly, "the Court finds the question of whether to impose a constructive trust is one better considered after the merits of [Plaintiff's other claims] have been determined."  Id. (citing I.B. Trading, Inc. v. TriPoint Glob. Equities, LLC, 280 F. Supp. 3d 524, 545 (S.D.N.Y. 2017); Blank v. TriPoint Glob. Equities, LLC, 338 F. Supp. 3d 194, 220 (S.D.N.Y. 2018)).  At this stage, the addition of Count Nine would be futile, but Plaintiff may later seek constructive trust as a remedy if Defendants' liability is established.

### d.    Count Ten (Aiding and Abetting Breach of Fiduciary Duty)

In Count Ten, Plaintiff brings a claim for aiding and abetting breach of fiduciary duty against Defendants ACH and Ability.  (PTAC ¶¶ 226-40.)  The Court previously dismissed

an aiding and abetting breach of fiduciary duty claim against ACH because the complaint

"contain[ed] no allegations of specific conduct by ACH and no facts to establish knowledge."

Great W. Ins., 2020 WL 3415026, at *30.  Plaintiff avers that it has now corrected those

deficiencies and that it has adequately pleaded a new aiding and abetting breach of fiduciary duty

claim against Ability.

An aiding and abetting breach of fiduciary duty claim requires facts showing: "(1)

a breach by a fiduciary of obligations to [the plaintiff], (2) that the defendant knowingly induced

or participated in the breach, and (3) that [the] plaintiff suffered damage as a result of the

breach."  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 294 (2d Cir. 2006) (quoting Kaufman v.

Cohen, 760 N.Y.S.2d 157, 165 (App. Div., 1st Dep't 2003)).  As to the second prong, actual

knowledge is required.  Id. at 294 (citing Kaufman, 760 N.Y.S.2d at 165).  Furthermore, because

the aiding and abetting claim involves fraud, Federal Rule of Civil Procedure 9(b) applies.  Krys

v. Pigott, 749 F.3d 117, 129 (2d Cir. 2014).  Under that rule, the "complaint is required to plead

the circumstances that allegedly constitute fraud 'with particularity,'" but knowledge "may be

alleged generally."  Id. (quoting Fed. R. Civ. P. 9(b)).  While knowledge need not be pleaded

"with particularity," that does not mean that "courts [may] credit a complaint's conclusory

statements without reference to its factual context."  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662,

686 (2009)).  "[P]laintiffs must still plead the events which they claim give rise to an inference of

knowledge."  Id. (quoting Devaney v. Chester, 813 F.2d 566, 568 (2d Cir. 1987)).

Defendants contend that Plaintiff has failed to meet its burden to plead

knowledge.  (ACH Opp. at 21-22.)  That contention, however, is belied by the PTAC, which

sufficiently alleges that Graham and BAAM breached their fiduciary duties to Plaintiff by

liquidating Series 2011-C in March 2017 and subsequently diverting the proceeds of that sale to

the Ability Reinsurance Trust, and that Defendants ACH and Ability aided and abetted that breach.  (PTAC ¶ 238.)[9]

First, the PTAC alleges that ACH and Ability knew that BAAM and Graham owed fiduciary duties to Plaintiff because ACH and Ability knew that BAAM was the investment manager for Plaintiff and that Graham controlled BAAM.  (Id. ¶ 232.)  For example, Dan Cathcart, who was a Director of Ability and an Executive Vice President of ACH, knew that Graham was responsible for investing the Trust Account's funds because Cathcart was actively involved in negotiating the Novation Agreement (Cathcart was the CFO of Ability Re at the time).  (Id. ¶¶ 114, 232.)  Likewise, Kenneth King, who was a Director, CEO, and President of Ability and Chairman and CEO of ACH, received documents that Graham signed as the President of BAAM.  (Id. ¶¶ 114, 232.)

Second, the PTAC alleges that ACH and Ability knew that BAAM and Graham had breached their fiduciary duties to Plaintiff, specifically with respect to the March 2017 liquidation of Series 2011-C and the subsequent diversion of the proceeds of that sale to the

---

[9]    The PTAC also alleges that that ACH and Ability aided and abetted Graham and BCM in breaching fiduciary duties that were owed to Series 2011-C.  (PTAC ¶¶ 233, 238.)  Those allegations, however, are insufficient to sustain Plaintiff's claims because those breaches were not of fiduciary duties that were owed to Plaintiff or even to the Trust Account whose assets were invested in Series 2011-C, but rather of duties owed to Series 2011-C itself.  See Great W. Ins., 2020 WL 3415026, at *26 (requiring "a breach by a fiduciary of obligations to the plaintiff" (internal quotations and citation omitted)); Oddo Asset Mgmt. v. Barclays Bank PLC, 19 N.Y.3d 584, 593-94 (2012) (holding that "plaintiff failed to allege facts giving rise to a fiduciary duty owed to it, and therefore [defendants] cannot be liable for aiding and abetting a breach of such fiduciary duty"); Schandler v. New York Life Ins. Co., No. 09-CV-10463-LMM, 2011 WL 1642574, at *13 (S.D.N.Y. Apr. 26, 2011) ("[A] plaintiff must allege that there was 'a breach by a fiduciary of obligations to' the plaintiff." (citation omitted)); Black v. Dain, No. 16-CV-1238-CBA-ST, 2017 WL 11696660, at *17 (E.D.N.Y. Aug. 16, 2017) (requiring "that a fiduciary duty owed to the plaintiff was breached" (quoting Smallberg v. Raich Ende Malter & Co., LLP, 35 N.Y.S.3d 134, 137 (App. Div., 2d Dep't 2016)).

Ability Reinsurance Trust. (Id. ¶¶ 234-39.) Prior to the liquidation, Ability and ACH had become suspicious of Graham's management of the Ability Reinsurance Trust. (Id. ¶ 106.) They commented on "the need to fix the Mark Graham problem" and questioned the validity of their entitlement to Treasury bonds that Graham had purportedly deposited into the Ability Reinsurance Trust. (Id. ¶¶ 106-09.) They also observed that Graham was self-dealing, noting that "[s]ome of the $ went directly to his [Graham's] own Blue Elite fund." (Id. ¶ 110.) All of this suspicion came to a head in late 2016, when representatives from Ability and ACH met with Graham in New York. (Id. ¶ 111.) Following that meeting, in March 2017, Graham liquidated Series 2011-C and, instead of depositing the proceeds of that sale into Series 2011-C, Graham deposited the proceeds into the Ability Reinsurance Trust for the benefit of Ability. (Id. ¶¶ 111-14.) Ability and ACH knew that they had no right to those proceeds because they never signed an agreement entitling them to those funds and they had never sent any money to Series 2011-C. (Id. ¶ 116.) They nonetheless assisted in the scheme by pressuring Graham into it, by approving the transactions, and by rewarding Graham with a six-figure "consulting fee." (Id. ¶ 239.)

### III.     PLAINTIFF'S MOTION TO SEAL

Plaintiff moves to seal and redact certain documents that were filed in connection with its motion to amend, namely (1) the Proposed Third Amended Complaint, (2) Exhibit E to the Proposed Third Amended Complaint, which is the report of Plaintiff's expert Michelle J. Avery, (3) a redline comparison between the Second Amended Complaint and the Proposed Third Amended Complaint, and (4) Plaintiff's Memorandum of Law in Support of its Motion to Amend. (Docket entry no. 424.) Plaintiff has filed the first three documents under seal without

filing a redacted version on the public docket,[10] and Plaintiff has filed a redacted version of the fourth document on the public docket.  (Docket entry nos. 422-23.)

Plaintiff moves to seal and redact "on the grounds that these materials include information reproduced from and/or derived from information produced in discovery in this action and designated as 'Confidential' by Defendants and by former Defendants Christiana Trust and Wilmington Savings Fund Society FSB . . . pursuant to the Stipulation and Protective Order entered in this action on August 23, 2021 (ECF No. 230) (the 'Protective Order')." (Docket entry no. 424 at 1.)  Plaintiff further states that "[it] does not believe that any of the information contained in the Proposed Sealed Materials meets the standard for the sealing of documents set forth in Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110 (2d Cir. 2006), but Plaintiff remains bound by the Protective Order."  (Id. at 2.)  Plaintiff's motion also represents that Plaintiff asked Defendants for their positions on the motion, but Defendants did not respond. (Id. at 1-2.)  For their parts, Defendants did not file a response to Plaintiff's motion within the time period prescribed by Local Civil Rule 6.1(b).  After that time period expired, the Court gave Defendants another opportunity to respond, which Defendants again did not do.  (Docket entry no. 433.)

Under Lugosch v. Pyramid Co. of Onondaga, federal courts undertake a three-part inquiry in addressing a motion to seal.  435 F.3d 110, 119 (2d Cir. 2006).  First, the Court must determine whether the document at issue is a "judicial document."  Id. at 119.  A document is "judicial" when it is "relevant to the performance of the judicial function and useful in the

---

[10]     Docket entry no. 422 purports to contain a "provisionally redacted" version of these three documents; however, the actual documents are single-page slip sheets.  Thus, the Court takes the Plaintiff's request to be a motion to seal the documents in their entirety.  Even if Plaintiff had requested permission to redact only certain portions of these documents, the Court's analysis would be unchanged.

judicial process." <u>United States v. Amodeo</u>, 44 F.3d 141, 145 (2d Cir. 1995). "A document is . . . relevant to the performance of the judicial function if it would reasonably have the tendency to influence a district court's ruling on a motion or in the exercise of its supervisory powers, without regard to which way the court ultimately rules or whether the document ultimately in fact influences the court's decision." <u>Brown v. Maxwell</u>, 929 F.3d 41, 49 (2d Cir. 2019) (internal quotations and citations omitted). If the document is "judicial" in nature, "a presumption of access attaches," and the Court must determine the "weight" to afford this presumption. <u>Lugosch</u>, 435 F.3d at 119. At the third step, the Court "must identify all of the factors that legitimately counsel against disclosure of the judicial document, and balance those factors against the weight properly accorded the presumption of access." <u>Mirlis v. Greer</u>, 952 F.3d 51, 59 (2d Cir. 2020) (citation omitted).

   All of the documents at issue are "judicial" because Plaintiff "asks the Court to rely on the document[s] when ruling." <u>Rocket Pharms., Inc. v. Lexeo Therapeutics, Inc.</u>, No. 23-CV-09000-PKC-SDA, 2024 WL 5206409, at *2 (S.D.N.Y. Dec. 24, 2024) (quoting <u>Lohnn v. Int'l Bus. Machines Corp.</u>, No. 21-CV-06379-LJL, 2022 WL 3359737, at *3 (S.D.N.Y. Aug. 15, 2022)); <u>see also</u> <u>Lugosch</u>, 435 F.3d at 120-21 ("As a matter of law, . . . we hold that the contested documents—by virtue of having been submitted to the court as supporting material in connection with a [motion]—are unquestionably judicial documents under the common law.").

   The weight of the presumption of access that attaches to these judicial documents is strong because they "are used to determine litigants' substantive legal rights" and "directly affect an adjudication." <u>Lugosch</u>, 435 F.3d at 121. Thus, the Court turns to the third prong and those factors that weigh against public access. The only countervailing consideration raised by any party is Plaintiff's recognition that the documents were designated as "Confidential" under

the governing Stipulation and Protective Order (Docket entry no. 230).  This interest is weak and does not justify sealing here, especially because Defendants have not made any attempt to assert it, or to defend their designation decisions, on their own behalf.  See Fed. Trade Comm'n v. Quincy Bioscience Holding Co., Inc., No. 17-CV-0124-LLS, 2023 WL 3919217, at *1 (S.D.N.Y. Mar. 7, 2023) ("The existence of a protective order is not a compelling reason to justify sealing judicial documents." (citing Lugosch, 435 F.3d at 126)).

Accordingly, Plaintiff's motion to seal is denied in its entirety, and Plaintiff is directed to publicly file unredacted versions of (1) the Proposed Third Amended Complaint, (2) Exhibit E to the Proposed Third Amended Complaint, which is the report of Plaintiff's expert Michelle J. Avery, (3) a redline comparison between the Second Amended Complaint and the Proposed Third Amended Complaint, and (4) Plaintiff's Memorandum of Law in Support of its Motion to Amend.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for leave to file a Third Amended Complaint (docket entry no. 421) is granted in part and denied in part.  Counts Seven and Ten may be included in the Third Amended Complaint; inclusion of Count Eight is permitted to the extent outlined above; and Count Nine may not be included as such, but Plaintiff may seek constructive trust treatment of assets at a later time as a remedy, under appropriate circumstances.  Plaintiff is directed to file a Third Amended Complaint conforming with this Memorandum Order and Opinion **within 14 days** of the entry of this Memorandum Opinion and Order.  The Clerk of the Court is directed to terminate Defendants Cygnet 001 Master Trust, Cygnet 001 Master Trust Series 2011-A, Alpha Re Limited, Alpha Re Holdings (Cayman) Limited, Atlantic Specialty Finance, and Blue Elite Fund LP from this action.

The parties are ordered to meet and confer and, **within 14 days** of the entry of this Memorandum Opinion and Order, submit a joint letter addressed to Magistrate Judge Sarah L. Cave proposing a schedule for limited, targeted discovery relating to the new claims asserted in the Third Amended Complaint, if any party believes that such additional discovery is necessary. This action remains referred to Magistrate Judge Cave for general pretrial management.

The parties are also ordered to meet and confer and, **within 14 days** of the entry of this Memorandum Opinion and Order, submit a joint letter to the undersigned setting forth each party's positions on how the Court should handle the pending motions for summary judgment at docket entry nos. 437, 441, 448, 454, and 460, the pending motions to strike at docket entry nos. 480, 482, and 484, the pending motion to seal at docket entry no. 475, and the pending motion for leave to file documents at docket entry no. 502, including whether any additional or revised briefing will be necessary in light of the Court's decision regarding the Third Amended Complaint, and whether any of the motions should be terminated, with or without prejudice, pending additional discovery or in light of this decision.

Furthermore, Plaintiff's motion to seal (docket entry no. 424) is denied in its entirety, and Plaintiff is directed to publicly file, **within 7 days** of the entry of this Memorandum Opinion and Order, unredacted versions of the documents listed above.

Finally, the June 10, 2025 stay of claims against Defendants Series 2011-C and Series 2013-A is reimposed, except for the limited purpose of the allowed filing of the Third Amended Complaint, which asserts a new claim against Series 2013-A. (See docket entry nos. 420 (June 10, 2025 stay), 431 (temporarily lifting the stay for the limited purpose of resolving Plaintiff's motion to amend).)

This Memorandum Opinion and Order resolves docket entry nos. 421 and 424.


SO ORDERED.

Dated: New York, New York
        January 6, 2026


                                        /s/ Laura Taylor Swain
                                        LAURA TAYLOR SWAIN
                                        Chief United States District Judge