UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GREAT WESTERN INSURANCE COMPANY,

Plaintiff,

v.

MARK GRAHAM, et al.,

Defendants.

18-CV-06249-LTS-SN

MEMORANDUM OPINION AND ORDER

In this action, Plaintiff Great Western Insurance Company ("GWI" or "Plaintiff") brings nine counts of claims against Defendants Mark Graham ("Graham"), Blue Capital Management, Inc. ("BCM"), Blue Alternative Asset Management LLC ("BAAM"), Blue Elite Fund Ltd. ("BEF Ltd."), and Blue II Ltd. ("Blue II") (collectively, the "Blue Defendants"); Sancus Capital Credit Master Fund f/k/a Sancus Capital Blue Credit Opportunities Fund Ltd. ("Sancus"); Ability Insurance Company ("Ability"); and Advantage Capital Holding, LLC ("ACH") (all, collectively, the "Defendants").[1] (See docket entry no. 509 ("TAC").)[2] The Court has subject matter jurisdiction pursuant to 28 U.S.C. sections 1331, 1332, and 1367.

Defendants have moved for summary judgment with respect to six counts of the Third Amended Complaint (docket entry nos. 437, 441, 448, 454) and seek relief striking certain elements of Plaintiff's responsive papers (docket entry nos. 480. 482, 484, 487 (collectively,

1 Plaintiff also brings claims against Cygnet Master Trust Series 2011-C and Cygnet Master Trust Series 2013-A, but those claims are stayed. (See docket entry no. 505, at 34.)

2 All pincites to materials filed on the docket refer to ECF-designated pages.

"Defendants' Motions to Strike")). Plaintiff moves for leave to file additional documents (docket entry no. 502) and to file certain documents under seal (docket entry no. 475).

The Court has considered carefully the parties' submissions.[3] For the reasons discussed below, Defendants' motions to strike Plaintiff's filings are denied, but in the future, Plaintiff's filings must conform to the principles set forth below. Plaintiff's motion to file additional documents is granted, and its motion to seal is denied. Defendant Ability's motion for summary judgment is granted in part and denied in part, Defendant ACH's motion for summary judgment is granted, the Blue Defendants' motions for summary judgment are granted in part and denied in part, and Defendant Sancus' motion for summary judgment is denied.

## I. Miscellaneous Motions

The Court begins with Defendants' Motions to Strike, Plaintiff's motion for leave to file additional documents, and Plaintiff's motion to seal. For the following reasons, Defendants' Motions to Strike are denied, Plaintiff's motion for leave to file additional documents is granted, and Plaintiff's motion to seal is denied.

### A. Defendants' Motions to Strike

Defendants move to strike Plaintiff's four Rule 56.1 Counterstatements and Plaintiff's Statement of Additional Material Facts, arguing that Plaintiff violated Local Civil

---

[3] (See Docket entry no. 437 ("Ability 56.1 St."); docket entry no. 461 ("Ability Mem."); docket entry no. 443 ("ACH 56.1 St."); docket entry no. 442 ("ACH Mem."); docket entry no. 451 ("Sancus 56.1"); docket entry no. 449 ("Sancus Mem."); docket entry no. 457 ("Blue 56.1 St."); docket entry no. 455 ("Blue Mem."); docket entry no. 475-1 ("Pl. Opp. to Blue and Sancus"); docket entry no. 457-2 ("Pl. Opp. to Ability and ACH"); docket entry no. 475-3 ("Pl. SAMF"); docket entry no. 475-4 ("Pl. Counterst. to Ability 56.1 St."); docket entry no. 475-5 ("Pl. Counterst. to ACH 56.1 St."); docket entry no. 475-6 ("Pl. Counterst. to Blue 56.1 St."); docket entry no. 475-6 ("Pl. Counterst. to Sancus 56.1 St."); docket entry no. 492 ("Ability Reply"); docket entry no. 493 ("Sancus Reply"); docket entry no. 494 ("ACH Reply"); docket entry no. 496 ("Blue Reply").)

Rule 56.1 by filing excessively voluminous and argumentative papers that fail to respond clearly and directly to Defendants' contentions regarding material facts. "[M]otions to strike are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute." Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A., 596 F. Supp. 2d 821, 829 (S.D.N.Y. 2008) (internal quotation marks and citation omitted); see also Christians of Cal., Inc. v. Clive Christian N.Y., LLP, No. 13-CV-0275-KBF, 2014 WL 3407108, at *2 (S.D.N.Y. July 7, 2014).

For the most part, Plaintiff's four Rule 56.1 Counterstatements, which respond to each of the Defendants' four Rule 56.1 Statements, adhere to the requirements of Local Civil Rule 56.1. See Mayaguez S.A. v. Citigroup, Inc., No. 16-CV-6788-PGG-JLC, 2021 WL 1799653, at *6 (S.D.N.Y. Apr. 30, 2021) ("The Court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." (internal quotation marks and citations omitted)). In its Rule 56.1 Counterstatements, Plaintiff addresses each of Defendant's factual assertions with ample citations to the record, and while some portions of Plaintiff's Rule 56.1 Counterstatements arguably come close to being improper, "courts in this Circuit frequently deny motions to strike paragraphs in Rule 56.1 statements, and [instead] simply disregard any improper assertions." Id. (internal quotation marks and citation omitted). Accordingly, Defendants' motions to strike Plaintiff's four Rule 56.1 Counterstatements are denied.

Next, Defendants challenge Plaintiff's Rule 56.1 Statement of Additional Material Facts (docket entry no. 475-3), which is a 183-page, 764-paragraph document that attaches 689 exhibits. Defendants argue that Plaintiff's submission is an attempt to interject legal argumentation and evade briefing page limits. Defendants did not file counterstatements to Plaintiff's Rule 56.1 Statement of Additional Material Facts because they contend that doing so

would have been extremely onerous given the length of the document, an abundance of factual assertions Defendants characterize as improper, and the fact that the single, consolidated document fails to specifically differentiate between those facts that are relevant to each Defendant's motion.

Defendants' criticisms are not unjustified. Local Civil Rule 56.1(b) calls for a "short and concise statement of additional material facts," and Plaintiff's Rule 56.1 Statement of Additional Material Facts is anything but short or concise. Plaintiff submitted a single, consolidated statement instead of four separate statements, and a significant number of Plaintiff's factual assertions are not relevant to, or even cited in opposition to, each specific Defendant's motion. Plaintiff compounds the challenges posed by the length of its statement, citing long passages of its statement when only certain portions contain relevant information. (E.g., docket entry no. 475-1, at 36 (citing paragraphs 192 through 395).) Nevertheless, the length of Plaintiff's Rule 56.1 Statement of Additional Material Facts is neither unprecedented nor entirely unwarranted, especially given the complexity of the case. Olin Corp. v. Lamorak Ins. Co., 332 F. Supp. 3d 818, 839 (S.D.N.Y. 2018) ("The appropriate length of the 'short and concise' statement contemplated by Local Civil Rule 56.1 varies by case complexity, and there is no hard and fast page limit." (internal quotations and citation omitted)); see, e.g., id. (denying motion to strike 450-paragraph, 147-page statement).

In light of these considerations and to avoid the necessity of another round of submissions in connection with the instant summary judgment motions, the Court denies Defendants' Motions to Strike. Plaintiff is hereby admonished, however, that its responses to any future motion practice must be concise, specific to the particular motion (i.e., no

consolidated responses unless the Court has, for good cause shown, granted advance permission to file a consolidated response[4]), and free of extraneous legal argumentation.

Generally, where a party "fail[s] to respond to [opposing party's] counterstatement of additional material facts, the Court may deem those facts admitted so long as they are supported by the record evidence." Marseille v. Nat'l Freight Inc., No. 15-CV-7924-ALC, 2018 WL 2041387, at *1 n.1 (S.D.N.Y. Apr. 30, 2018). Because Defendants instead filed Motions to Strike Plaintiff's Rule 56.1 Statement of Additional Material Facts, and because the Court denied those Motions, Defendants have not had the opportunity to file substantive responses to that document. Accordingly, although the Court has taken note of facts asserted and documented in Plaintiff's Rule 56.1 Statement of Additional Material Facts, it does not treat those facts as admitted.[5]

## B. Plaintiff's Motion for Leave to File Additional Documents

Next, the Court turns to Plaintiff's motion for leave to file declarations and deposition testimony from its experts. (Docket entry no. 502.) These declarations and depositions incorporate and affirm the contents of Plaintiff's experts' reports, and Plaintiff makes this motion in response to the Blue Defendants' contention that unsworn expert reports are inadmissible hearsay and cannot be considered in connection with the instant summary judgment motion practice. (See docket entry no. 495, at 7; docket entry no. 497, at 5.)

---

4 The Court granted Plaintiff's request for a word-limit extension and to file two combined summary judgment briefs. (Docket entry no. 466.) Plaintiff's request, however, did not make any mention of a consolidated Rule 56.1 Statement. In the future, Plaintiff must file concise, separate Rule 56.1 statements or make a specific request for permission to file a concise, consolidated Rule 56.1 Statement.

5 For the avoidance of doubt, the Court also denies the Blue Defendants' oblique request that "the Court exercise its discretion to impose sanctions and order attorneys' fees." (Docket entry no. 485, at 2.)

The Court has discretion to permit Plaintiff to file these additional documents, if no prejudice would result. See Capobianco v. City of New York, 422 F.3d 47, 55 (2d Cir. 2005); Gache v. Town of Harrison, N.Y., 813 F. Supp. 1037, 1052 (S.D.N.Y. 1993); Cornell Rsch. Found., Inc. v. Hewlett-Packard Co., No. 01-CV-1974-NAM-DEP, 2007 WL 4349135, at *19 (N.D.N.Y. Jan. 31, 2007), report and recommendation adopted, No. 01-CV-1974-NAM, 2007 WL 2791120 (N.D.N.Y. Sept. 24, 2007). Here, no prejudice would result from granting Plaintiff's motion because Plaintiff submitted the expert reports to Defendants in a timely fashion, Defendants have fully deposed Plaintiff's experts, and Plaintiff filed the additional documents promptly after Defendants raised their objection. Accordingly, Plaintiff's motion is granted. Plaintiff may now rely on, and the Court will consider, those reports in connection with this summary judgment motion practice. Richardson v. Corr. Med. Care, Inc., No. 22-210, 2023 WL 3490904, at *2 (2d Cir. May 17, 2023) ("[S]ubsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment.").

C. Plaintiff's Motion to Seal

Finally, Plaintiff moves to seal various documents that were filed in connection with its opposition to Defendants' motions for summary judgment. (Docket entry no. 475.) Plaintiff moves to seal these documents in their entirety and has not filed them on the public docket, although courtesy copies were provided to Chambers. (See docket entry nos. 467-74 (slipsheets).)

Plaintiff moves to seal "on the grounds that these materials include information reproduced from and/or derived from information produced in discovery in this action and designated as 'Confidential' by Defendants and by former Defendants Christiana Trust and Wilmington Savings Fund Society FSB . . . pursuant to the Stipulation and Protective Order

entered in this action on August 23, 2021 (ECF No. 230)." (Docket entry no. 475, at 1.) Plaintiff further states that it "does not believe that any of the information contained in the Proposed Sealed Materials meets the standard for the sealing of documents set forth in Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110 (2d Cir. 2006)." (Id. at 2.) Plaintiff's motion also represents that Plaintiff asked Defendants for their positions on the motion, but Defendants did not respond. (Id.) Defendants also did not respond to Plaintiff's motion to seal.

Under Lugosch v. Pyramid Co. of Onondaga, federal courts undertake a three-part inquiry in addressing a motion to seal. 435 F.3d 110, 119 (2d Cir. 2006). That three-step inquiry counsels denying Plaintiff's motion because all of the documents at issue are "judicial," the weight of the presumption of access is strong, and no party has proffered any specific information to justify sealing. Id. at 121 (holding that the weight of the presumption of access is strong where the documents at issue "are used to determine litigants' substantive legal rights" and "directly affect an adjudication"); Great W. Ins. Co. v. Graham, No. 18-CV-06249-LTS-SN, 2026 WL 34966, at *14 (S.D.N.Y. Jan. 6, 2026) (denying motion to seal in similar circumstances, where the only asserted privacy interest was a confidentiality designation under the governing protective order).

Accordingly, Plaintiff's motion to seal is denied, and Plaintiff is directed to file the above-referenced documents on the public docket within 14 days of the entry of this decision on the docket.

## II. BACKGROUND

The Court now turns to the Defendants' motions for summary judgment, beginning with a recitation of the factual background. The following background is, unless

otherwise noted, drawn from the undisputed facts presented in the pleadings and documentary exhibits submitted by the parties.[6]

A. Plaintiff Enters into the Coinsurance Agreement with Ability Re

In 2009, Plaintiff, which provided pre-paid burial expenses for its insureds, entered into a Coinsurance Agreement with Ability Reinsurance (Bermuda) Limited ("Ability Re") for Ability Re to reinsure certain of its policies. (Pl. Counterst. to Ability 56.1 St. ¶ 2; Pl. Counterst. to Blue 56.1 St. ¶ 1.) Under the Coinsurance Agreement, Ability Re agreed to establish a trust account for the benefit of Plaintiff. (Pl. Counterst. to Ability 56.1 St. ¶ 3.) This trust account would secure Ability Re's payment obligations under the Agreement and would allow Plaintiff to obtain statutory statement credit, as a deduction from reserve liabilities, for the business that Plaintiff ceded to Ability Re. (Pl. Counterst. to Ability 56.1 St. ¶ 3; Pl. SAMF ¶¶ 67-68.) To enable Plaintiff to obtain statutory statement credit, Ability Re agreed to deposit, and maintain in a trust account, qualifying assets under Utah's Insurance Code with a market value of

---

6 Citations to the parties' Local Rule 56.1 statements incorporate by reference the documents and deposition testimony cited therein. See Local Rule 56.1(d). Likewise, citations to each party's briefs incorporate by reference the citations to the materials and exhibits cited therein. Generally speaking, where facts stated in a party's Local Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be undisputed. See S.D.N.Y. Local Civil Rule 56.1(c), (d); Biberaj v. Pritchard Indus., Inc., 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012). When a nonmoving party fails to respond to a Local Civil Rule 56.1 Statement, the court is "permit[ted] . . . to conclude that the facts asserted in the statement are uncontested and admissible." T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009). However, "[b]efore summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." Jackson v. Fed. Exp., 766 F.3d 189, 194 (2d Cir. 2014). "In doing so, the Court may rely on other evidence in the record even if uncited." Id. (citing Fed. R. Civ. P. 56(c)(3)). Finally, although the Court has taken note of facts asserted and documented in Plaintiff's 56.1 Statement of Additional Material Facts, it does not treat those facts as admitted, as explained above.

no less than 102% of Ability Re's share of the reinsurance reserve liabilities under the Coinsurance Agreement. (Pl. SAMF ¶ 69.)

As required by the Coinsurance Agreement, Plaintiff transferred $135 million to Ability Re, which in turn used that $135 million, along with $18 million of its own funds, to establish a trust account with an entity called BNY Mellon (the "BNY Mellon Trust Account"). (Pl. Counterst. to Ability 56.1 St. ¶ 5.) In total, the BNY Mellon Trust Account held over $150 million at the time it was opened. (Id. ¶ 6.)

B. Alpha Replaces Ability Re and Sets up the Trust Account

Plaintiff proffers that, in early 2012, the CFO of Ability Re, Dan Cathcart, informed Plaintiff that Ability Re was exiting the reinsurance business. (Pl. SAMF ¶ 74.) Cathcart recommended that Plaintiff move its reinsurance to Alpha Re Limited ("Alpha") and introduced Plaintiff to Alpha and two of its principals and owners, Donald Solow and Defendant Mark Graham. (Id. ¶¶ 6, 8, 74-76.) Cathcart also vouched for Graham and Graham's investment acumen. (Id. ¶ 79.) At the same time, however, Plaintiff asked to buy back its ceded book of business from Ability Re, but Cathcart refused because Alpha had offered to pay Ability Re a significant ceding commission for Plaintiff's book of business. (Id. ¶ 80.)

Plaintiff then entered into a Novation Agreement with Ability Re and Alpha, whereby Alpha replaced Ability Re as Plaintiff's reinsurer under the Coinsurance Agreement. (Pl. Counterst. to Ability 56.1 St. ¶ 7.) The Novation Agreement required Alpha to fund a trust account (the "Trust Account") for the benefit of Plaintiff and to maintain assets equal to 102% of Alpha's reinsurance reserve obligations in that Trust Account. (Id. ¶ 8.) Shortly thereafter, Plaintiff, Alpha, and Wilmington Savings Fund Society, FSB ("WSFS") entered into an Amended & Restated Trust Agreement (the "Trust Agreement") to govern the maintenance of the Trust Account. (Id. ¶ 9.) Under the Trust Agreement, Alpha was the grantor, WSFS was the

trustee, and Plaintiff was the beneficiary. (Id. ¶¶ 9-11.) The Trust Agreement also designated Defendant BAAM, which Graham wholly owned, as the "Investment Manager" of the Trust Account. (Pl. SAMF ¶¶ 11, 16.)

On July 30, 2012, the old BNY Mellon Trust Account was liquidated and the proceeds, which totaled approximately $153 million, were deposited into the Trust Account. (Pl. Counterst. to Ability 56.1 St. ¶¶ 13-14.) WSFS, as trustee, was the "legal owner" of the assets in the Trust Account, and Great Western, as the beneficiary, was the "beneficial owner." (Id. ¶ 16.)

The Novation Agreement also required Alpha to fund a separate trust account (the "Supplementary Trust Account") with an additional amount of assets equal to 4% of Alpha's share of the reinsurance reserve liabilities. (Pl. SAMF ¶ 90.) Alpha (as grantor), WSFS (as trustee), and Plaintiff (as beneficiary) entered into a Supplementary Trust Agreement to govern the maintenance of the Supplementary Trust Account. (Id. ¶ 103.)

## C. The August 1, 2012 Alleged Misappropriation

Shortly after the Novation Agreement was entered into, WSFS, as trustee of the Trust Account, entered into a Repurchase Agreement[7] with Cygnet 001 Master Trust Series 2012-A ("Series 2012-A").[8] (Id. ¶ 122.) On July 30, 2012, the Trust Account transferred $148 million to Series 2012-A pursuant to the Repurchase Agreement. (Id. ¶ 122.) A few days later, on August 1, 2012, Alpha and Graham allegedly misappropriated $22 million from the Trust Account through a complicated series of transactions involving Series 2012-A. (Id. ¶¶ 120-31.) Alpha allegedly used these funds to satisfy obligations that it owed under the Novation Agreement. (Id. ¶¶ 129-30.) Specifically, Plaintiff claims that Alpha used about $15 million to

---

7 In a repurchase agreement, the seller sells a security to the buyer, and the buyer promises to repurchase that security in the future from the buyer. (Pl. SAMF ¶ 123.)

8 Series 2012-A was a series of Cygnet 001 Master Trust. (Pl. SAMF ¶¶ 36, 39.)

pay a ceding commission to Ability Re and about $6 million to fund the Supplementary Trust Account. (Id.)

D. The Repurchase Agreements Between the Trust Account and Series 2011-C

In September 2012, the Series 2012-A/Trust Account Repurchase Agreement was terminated. (Id. ¶ 133.) On September 26, 2012, WSFS, as trustee of the Trust Account, and Defendant Cygnet 001 Master Trust Series 2011-C ("Series 2011-C") entered into a Master Repurchase Agreement (docket entry no. 509-4 ("Master Repurchase Agreement"). (Pl. Counterst. to Ability 56.1 St. ¶¶ 19-21.) Defendant BAAM, which Graham wholly owned, was the "Collateral Manager" of Series 2011-C at that time. (Pl. SAMF ¶¶ 17-20.) BAAM continued to be Collateral Manager until 2014, when Defendant BCM, which Graham also wholly owned, replaced BAAM as the Collateral Manager. (Id.)

The Master Repurchase Agreement provides that "[f]rom time to time the parties hereto may enter into transactions in which one party . . . agrees to sell to the other . . . securities and financial instruments . . . against the payment of the purchase price by Buyer [WSFS, as trustee,] to Seller [Series 2011-C], with a simultaneous agreement by Buyer to sell to Seller Securities equivalent to such Securities at a date certain or on demand against the payment of the repurchase price by Seller to Buyer." (Master Repurchase Agreement § 1(a).) Under the Master Repurchase Agreement, "[a]ll right, title and interest in . . . money transferred or paid under this agreement, shall pass to the transferee [i.e., Series 2011-C] upon transfer or payment." (Id. § 6(f).) The Master Repurchase Agreement also provides that "[u]pon agreeing to enter into a Transaction hereunder Buyer or Seller (or both), as shall have been agreed, shall promptly deliver to the other party written confirmation of such Transaction (a 'Confirmation')." (Id. § 3(b).)

On September 26, 2012, WSFS, as trustee of the Trust Account, and Defendant Series 2011-C entered into a Confirmation memorializing a repurchase transaction and a repurchase date of one year less one day. (Ability 56.1 St. ¶ 23.) The next year, and for each year thereafter through September 24, 2017,[9] the parties entered into Confirmations memorializing further repurchase transactions with a repurchase date of roughly one year. (Id. ¶¶ 25-33.)

Plaintiff contends that the Confirmations were fraudulent. The value of the collateral described by the Confirmations was false and misleading, according to Plaintiff, because the valuation reports of Series 2011-C showed that Series 2011-C did not have sufficient collateral to back up the Confirmations. (Pl. SAMF ¶¶ 176-91.) For example, the September 26, 2012 Confirmation stated that the collateral consisted of "148,000,000 (USD) cash, all or part of which may be used to purchase United States Treasury securities," but this was false because Graham had misappropriated $22 million from the Trust Account on August 1, 2012. (Id. ¶¶ 139-48.) Similarly, on September 25, 2015, Graham executed four separate Repurchase Confirmations that collectively stated that the collateral was worth more than $141 million. (Id. ¶¶ 156.) At that time, however, Series 2011-C's account statements showed that Series 2011-C had less than $85 million. (Id. ¶¶ 176-91.)

Plaintiff confirmed that the Trust Account transferred monies pursuant to the Confirmations and the Master Repurchase Agreement. (Ability 56.1 St. ¶ 35.) Series 2011-C used those transferred funds to make investments. (Id. ¶¶ 36, 38-39.) Specifically, Series 2011-C invested the bulk of its funds into a fund interest basket swap derivative. (Pl. SAMF ¶¶

---

9 The last Confirmation was entered on September 25, 2016, with an expiration date of September 24, 2017. (Ability 56.1 St. ¶¶ 31, 33.)

398-420.) This investment was highly volatile, and Graham, BCM, and BAAM earned millions in fees as the "basket manager" of the swap derivative. (Id. ¶¶ 185-88, 397-99, 433-36.) This investment was also not disclosed by the Confirmations. (Id. ¶¶ 137-48, 396-402.)

On August 2, 2016, Graham terminated the swap derivative and turned to other investments. (Id. ¶ 413.) By the end of 2016, Series 2011-C's investments were concentrated in shares of Defendant Sancus and Defendant BEF Ltd.[10] (Ability 56.1 St. ¶¶ 38-39.) Plaintiff proffers that, in addition to these investments, Series 2011-C used the funds from the Trust Account to make payments that did not even appear to benefit the Trust Account or Plaintiff. (Pl. SAMF ¶¶ 442-43.) These payments totaled millions of dollars and some were made to Defendants or parties that were affiliated with Defendants. (Id. ¶¶ 442-43.)

## E. The Ability Reinsurance Trust

From February 2013 to around 2022, Defendant Ability was a wholly-owned subsidiary of Defendant ACH.[11] (Id. ¶¶ 688, 690.) Kenneth King was the President, CEO, and a director of Ability; he was also the founding member, majority owner, Chairman, and CEO of ACH. (Id. ¶¶ 45, 49.) Dan Cathcart, the former CFO of Ability Re, was a director of Ability, Head of Insurance at ACH, and part owner of both Ability and ACH. (Id. ¶¶ 46, 50.)

When ACH acquired Ability on February 25, 2013, Alpha (which reinsured Plaintiff pursuant to the June 28, 2012 Novation Agreement) assisted in the transaction, including by providing Ability with a $2.25 million surplus note and by reinsuring a portion of Ability's policies. (Id. ¶¶ 117-18.) That reinsurance obligation was memorialized in a

---

10 Series 2011-C purchased $20,000,000 of shares of Sancus on October 1, 2016. (Pl. SAMF ¶ 414.) Series 2011-C acquired 480,160 shares of BEF Ltd. through a series of transactions in March through December 2016. (Id. ¶ 415.)

11 In 2022, ACH sold Ability for approximately $20 million. (Pl. SAMF ¶ 690.)

Coinsurance Agreement dated December 31, 2012. (Pl. SAMF ¶ 444; docket entry no. 475-23, at 285-304.) Around that same time, Alpha set up the Ability Reinsurance Trust to secure Alpha's reinsurance obligations to Ability; and Alpha (as grantor), Ability (as beneficiary), and WSFS (as trustee) entered into a Trust Agreement dated February 15, 2013. (Pl. SAMF ¶ 445; docket entry no. 475-23, at 305-20.) Thus, Alpha owed reinsurance obligations to both Plaintiff and Ability.

On March 20, 2013, the Ability Reinsurance Trust transferred $102 million of cash to an entity called Series 2013-A[12] in exchange for a Series 2013-A Certificate. (Pl. SAMF ¶ 451.) According to Plaintiff, the Series 2013-A Certificate was worthless because it was backed by deposits that were pledged as collateral for uncollectible loans. (Id. ¶ 453.) On August 30, 2013, the Nebraska Department of Insurance ("NEDOI") sent a letter to Ability, expressing concerns that Ability was not entitled to full reinsurance credit because the Series 2013-A Certificate was not compliant with Nebraska regulations. (Id. ¶ 456.) In response to that letter, and after negotiations with the Nebraska Department of Insurance, Alpha, Ability, and others entered into a Letter of Intent on February 28, 2014, to reduce the amount of the Series 2013-A Certificate held in the Ability Reinsurance Trust to zero. (Id. ¶ 457.)

Pursuant to the Letter of Intent, the Ability Reinsurance Trust sold portions of the Series 2013-A Certificate for cash in March and June 2014. (Id. ¶¶ 460, 462.) Then, on September 25, 2014, Ability Reinsurance Trust exchanged $47 million of the Series 2013-A Certificate for $49.6 million in "Custodial Receipts" from Defendant Series 2011-C. (Id. ¶¶ 464-65.) The Custodial Receipts were purportedly backed by municipal bonds, a financial guaranty policy, and the value of "additional collateral." (Id. ¶¶ 473, 478.) The "additional collateral"

---

12 Series 2013-A was a series of Cygnet 001 Master Trust. (Pl. SAMF ¶¶ 36, 40.)

was comprised of repurchase agreement confirmations between two of Series 2011-C's bank accounts for $49.6 million in U.S. Treasury securities. (Id. ¶¶ 479, 492-93.) However, the Ability Reinsurance Trust did not pay for the U.S. Treasury securities that backed the repurchase confirmations that formed the "additional collateral"; rather, according to Plaintiff, funds from a Series 2011-C account that had been funded by the Trust Account were used. (Id. ¶¶ 499-510, 516.) Thus, Plaintiff maintains, the repurchase agreement confirmations, and the underlying U.S. Treasury securities, could not properly have backed the Custodial Receipts. (See Id. ¶¶ 499-510, 516.) Likewise, the municipal bonds did not actually appear to back the Custodial Receipts. (Id. ¶¶ 473, 494, 565.) Ultimately, according to Plaintiff, the Custodial Receipts and the underlying transactions did not appear to entitle the Ability Reinsurance Trust to any funds. (Id. ¶¶ 469, 480, 484-85, 489, 491, 519, 522, 527, 532-33.)

Defendant Ability and its parent company, Defendant ACH, repeatedly expressed concerns over the structure of, and the documentation backing, the Custodial Receipts. (Pl. SAMF ¶ 535.) NEDOI also raised concerns. (Id. ¶¶ 537, 563, 590-91.) Ability's and ACH's concerns intensified in the fall of 2016. (Id. ¶¶ 544-584.) On November 21, 2016, Ability and ACH advised Alpha that Alpha had failed to make a required deposit and that the Ability Reinsurance Trust was underfunded. (Id. ¶ 553.) A little over a week later, on November 29, 2016, Ability withdrew all of the assets in the Ability Reinsurance Trust. (Id. ¶ 565.) In response, Alpha demanded the return of the assets to the Ability Reinsurance Trust and initiated an arbitration demand. (Id. ¶¶ 568, 582, 587.) On December 19, 2016, Ability wrote to Alpha to give notice of its intent to terminate the Coinsurance Agreement. (Id. ¶ 575.) That same day, Ability attempted to redeem the Custodial Receipts, but Alpha objected, saying that it was actually the rightful owner. (Id. ¶¶ 576-78.)

On February 23, 2017, Ability/ACH and Alpha resolved their dispute by entering into a Letter of Intent for Alpha to recapture Ability's coinsurance agreement (i.e., take back the ceded policies). (Id. ¶ 588.) To recapture the coinsurance agreement, however, the parties had to resolve NEDOI's concerns about the Custodial Receipts by filling the shortfall in the Ability Reinsurance Trust with another source of cash. (Id. ¶¶ 563, 590-91.) King and Graham met to discuss the matter, and they decided to sell Series 2011-C's investments, which consisted of shares of Defendant Sancus and Defendant BEF Ltd., and use those sale proceeds to fund the Ability Reinsurance Trust. (Id. ¶¶ 592-614.) Series 2011-C's investments, however, backed the Repurchase Agreements between Series 2011-C and the Trust Account; Plaintiff contends that the proceeds of the sale of Series 2011-C's investments were improperly diverted from the Trust Account/Series 2011-C Repurchase Agreements in order to fund the Ability Reinsurance Trust. (Id. ¶¶ 469, 480, 484-85, 489, 491, 519, 522, 527.)

F. The March 24, 2017 Alleged Misappropriation

On March 24, 2017, Defendant Series 2011-C sold its investments in Defendant Sancus and Defendant BEF Ltd. (Ability 56.1 St. ¶¶ 38-43, 48.) The sales were effectuated by two Purchase Agreements. The BEF Ltd. Purchase Agreement identifies Series 2011-C as the "Seller" and "Advantage Capital Holdings LLC [i.e., ACH] . . ., on behalf of its affiliated accounts" as the "Buyer." (Id. ¶¶ 43-45; docket entry no. 440-1.) Defendant ACH purchased the BEF Ltd. shares for $35.1 million plus accrued interest, and then ACH transferred those shares to three of its subsidiaries, Sentinel Security Life Insurance Corporation, Ability Life Insurance Company, and Atlantic Coast Life Insurance Company. (Id. ¶ 42.) The Sancus Purchase Agreement identifies Series 2011-C as the "Seller" and Sentinel Security Life Insurance Corporation, Ability Life Insurance Company, and Atlantic Coast Life Insurance Company, which were all owned by ACH, as the "Buyers." (Ability 56.1 St. ¶¶ 48-49; docket entry no.

440-2.) Sentinel Security Life Insurance Corporation, Ability Life Insurance Company, and Atlantic Coast Life Insurance Company purchased the Sancus shares for $20.4 million plus accrued interest. (ACH 56.1 St. ¶ 42.) According to Plaintiff, the vast majority of the proceeds of Series 2011-C's two sales were diverted to the Ability Reinsurance Trust, for the benefit of Defendant Ability—instead of going to Series 2011-C.[13] (Pl. SAMF ¶ 615-51.) Specifically, Graham executed a Cross-Receipt and Direction Letter, which stated that Series 2011-C was "required to return" $54.4 million of the proceeds to the Ability Reinsurance Trust "in accordance with a valid redemption request of" the Custodial Receipts. (Id. ¶ 615.) Plaintiffs contend that those Custodial Receipts were not valid and did not entitle the Ability Reinsurance Trust to the proceeds. (Id. ¶¶ 469, 480, 484-85, 489, 491, 519, 522, 527.) Ultimately, as a result of the diversion of the sale proceeds from Series 2011-C to the Ability Reinsurance Trust, the March 24, 2017 transaction allegedly caused the Trust Account/Series 2011-C Repurchase Agreements to be even more underfunded. (Ability 56.1 St. ¶¶ 40-44, 48-51; Pl. SAMF ¶ 615.)

## III. Discussion

After years of litigation, the following claims remain in this case:

| Defendant | Claims |
|---|---|
| Graham | • Breach of Fiduciary Duty (Count One) |
| | • Fraud (Count Three) |
| | • Unjust Enrichment (Count Five) |
| | • Violation of Section 10(b) of the Securities Exchange Act of 1934 (Count Seven) |
| BAAM | • Breach of Fiduciary Duty (Count One) |
| | • Fraud (Count Three) |
| | • Unjust Enrichment (Count Five) |
| | • Violation of Section 10(b) of the Securities Exchange Act of 1934 (Count Seven) |

13 Of the total of $56 million in sale proceeds, $54.4 million went to the Ability Reinsurance Trust and $1.6 million went to Series 2011-C. (Pl. SAMF ¶ 615.)

| Defendant | Claims |
|---|---|
| | • Fraudulent Transfer in Violation of Delaware Uniform Fraudulent Transfer Act (Count Eight) |
| BCM | • Aiding and Abetting Breach of Fiduciary Duty (Count Two) |
| | • Fraud (Count Three) |
| | • Unjust Enrichment (Count Five) |
| | • Violation of Section 10(b) of the Securities Exchange Act of 1934 (Count Seven) |
| | • Fraudulent Transfer in Violation of Delaware Uniform Fraudulent Transfer Act (Count Eight) |
| BEF Ltd. | • Aiding and Abetting Breach of Fiduciary Duty (Count Two) |
| | • Unjust Enrichment (Count Five) |
| Blue II | • Aiding and Abetting Breach of Fiduciary Duty (Count Two) |
| | • Unjust Enrichment (Count Five) |
| Sancus | • Aiding and Abetting Breach of Fiduciary Duty (Count Two) |
| | • Unjust Enrichment (Count Five) |
| Series 2011-C[14] | • Aiding and Abetting Breach of Fiduciary Duty (Count Two) |
| | • Aiding and Abetting Fraud (Count Four) |
| | • Unjust Enrichment (Count Five) |
| Series 2013-A[15] | • Unjust Enrichment (Count Five) |
| | • Fraudulent Transfer in Violation of Delaware Uniform Fraudulent Transfer Act (Count Eight) |
| Ability | • Unjust Enrichment (Count Five) |
| | • Conversion (Count Six) |
| | • Fraudulent Transfer in Violation of Delaware Uniform Fraudulent Transfer Act (Count Eight) |
| | • Aiding and Abetting Breach of Fiduciary Duty (Count Nine) |
| ACH | • Unjust Enrichment (Count Five) |
| | • Fraudulent Transfer in Violation of Delaware Uniform Fraudulent Transfer Act (Count Eight) |
| | • Aiding and Abetting Breach of Fiduciary Duty (Count Nine) |

The Blue Defendants, Defendant Sancus, Defendant Ability, and Defendant ACH each move for summary judgment dismissing all of the claims asserted against them, except for Claims Seven, Eight, and Nine, which were added following the Court's January 6, 2026

14 The claims against Series 2011-C are stayed. (See docket entry no. 505, at 34.)

15 The claims against Series 2013-A are stayed. (See docket entry no. 505, at 34.)

decision on Plaintiff's motion to amend. Claims Seven, Eight, and Nine are subject to further discovery and dispositive motion practice that has not yet commenced. (See docket entry no. 511.) Furthermore, Plaintiff states that it is no longer bringing an unjust enrichment claim against either BEF Ltd or Sancus. (Pl. Opp. to Blue and Sancus at 46 n.13.)

Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is considered material if it "might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Caladora v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (citation omitted). The nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." Golden Pac. Bancorp. v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted). Nonetheless, in deciding a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," Overton v. N.Y. State Div. of Military & Naval Affairs, 373 F.3d 83, 89 (2d Cir. 2004), and the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003) (citation and quotation marks omitted).

For the reasons explained below, Ability's motion for summary judgment is granted in part and denied in part, ACH's motion for summary judgment is granted, the Blue Defendants' motions for summary judgment are granted in part and denied in part, and Sancus' motion for summary judgment is denied.

A. Claims Against Ability and ACH

Defendant Ability moves for summary judgment seeking dismissal of the conversion (Count Six) and unjust enrichment (Count Five) claims against it, and Defendant ACH moves for summary judgment seeking dismissal of the unjust enrichment claim (Count Five) against it. For the following reasons, Ability's motion is granted as to the conversion claim but denied as to the unjust enrichment claim, and ACH's motion is granted.

a. Conversion Claim Against Ability

To establish a conversion claim against Defendant Ability, Plaintiff must show "(1) plaintiff's possessory right or interest in the [relevant] property" and "(2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." House of Diamonds v. Borgioni, LLC, 737 F. Supp. 2d 162, 167 (S.D.N.Y. 2010) (quoting Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43 (2006)). To establish a possessory interest, "the plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing." Clark St. Wine & Spirits v. Emporos Sys. Corp., 754 F. Supp. 2d 474, 484 (E.D.N.Y. 2010) (quoting Eight In One Pet Products v. Janco Press, Inc., 828 N.Y.S.2d 899, 899 (App. Div., 2d Dep't 2007)). As to the second prong, conversion "requires that the defendant exclude the owner from exercising her rights over the goods." Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 404 (2d Cir. 2006) (citation omitted).

Plaintiff's papers trace a complicated series of transactions, but the only relevant transaction for the conversion claim against Ability is the March 24, 2017 transaction in which

Series 2011-C sold its shares in Sancus and BEF Ltd. and diverted the sale proceeds to Ability. That transaction is the only one in which Ability is alleged to have interfered with Plaintiff's funds. Ability was not involved in any of the transactions preceding the March 24, 2017 sale (i.e., the transfer from the old BNY Mellon trust account to the Trust Account; the Confirmations and the Master Repurchase Agreement between WSFS, as trustee, and Series 2011-C; and Series 2011-C's acquisition of the shares of Sancus and BEF Ltd.).

In support of its motion for summary judgment, Ability has tendered uncontroverted evidence that Series 2011-C, not the Trust Account, was the "registered owner" of the Sancus and BEF Ltd. shares, and that Series 2011-C was entitled to receive the proceeds of the sale those shares. (Ability 56.1 St. ¶¶ 43-51; docket entry no. 444-1 (BEF Ltd. shares purchase agreement); docket entry no. 444-2 (Sancus shares purchase agreement).) Accordingly, Plaintiff did not have any "possessory interest" in the March 24, 2017 transaction (i.e., in Series 2011-C's shares in Sancus and BEF Ltd. or in the sale proceeds thereof), and Plaintiff cannot sustain a conversion claim against Ability. See Greene v. Greene, 938 N.Y.S.2d 629, 631 (2012) (granting summary judgment for defendant because "plaintiff did not have any enforceable ownership interest in" the allegedly converted asset).

In its opposition to the motions, Plaintiff purports to trace its "possessory interest" through the complicated series of transactions. Plaintiff contends that it was the beneficial owner of the funds in the Trust Account; that WSFS used those funds in the Master Repurchase Agreement and Confirmation transactions with Series 2011-C; that Series 2011-C used those funds to purchase shares in Sancus and BEF Ltd.; that Series 2011-C eventually sold those shares; and that Ability converted the proceeds of that sale. (Pl. Opp. to Ability and ACH at 42-44.) Plaintiff also avers that the repurchases between WSFS and Series 2011-C never "settled,"

meaning that the Trust account never received the securities it paid for, and that the repurchases were "a cover to hide the diversion of the [Trust Account's] assets, including the $22 million that was misappropriated upfront." (Pl. Counterst. to Ability 56.1 St. ¶ 21.)

The complex and eyebrow-raising chain of events, even when Plaintiff's account is taken as true and all inferences drawn in its favor does not, however, demonstrate that Plaintiff had a "possessory interest" in Series 2011-C's shares of Sancus and BEF Ltd. or in the proceeds of the March 24, 2017 sale of those shares. Plaintiff's asserted interests in the shares and sale proceeds—whether based in contract, equity, or otherwise—cannot support a claim for conversion against Ability. It is well settled that "a conversion action cannot be predicated on an equitable interest or a mere breach of contractual obligation." Traffix, Inc. v. Herold, 269 F. Supp. 2d 223, 228 (S.D.N.Y. 2003); see also Selinger Enters., Inc. v. Cassuto, 860 N.Y.S.2d 533, 536 (App. Div., 2d Dep't 2008) (dismissing conversion claim premised on contractual agreement to pay broker's commission because "[t]he mere right to payment cannot be the basis for a cause of action alleging conversion"). Rather, a "possessory interest" must be based on "legal ownership or an immediate superior right of possession to a specific identifiable thing." Clark St., 754 F. Supp. 2d at 484 (quotation omitted). This Plaintiff has not shown. See Whitman Realty Grp., Inc. v. Galano, 838 N.Y.S.2d 585, 587 (App. Div., 2d Dep't 2007) (granting summary judgment against plaintiff on conversion claim "because, at best, [plaintiff] showed only a contractual right to payment where it never had ownership, possession, or control of the disputed monies").[16]

[16] The cases cited by Plaintiff in opposition to Ability's motion are inapposite because neither of those cases considered whether the plaintiff had established a possessory interest. (Pl. Opp. to Ability and ACH at 43-44).

Accordingly, Ability is entitled as a matter of law to summary judgment dismissing Plaintiff's conversion claim (Count Six) against it.

b. Unjust Enrichment Claims Against Ability and ACH

"To state a claim of unjust enrichment [] under New York law, a plaintiff must allege '(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'" Great W. Ins. Co. v. Graham, No. 18-CV-6249-VSB, 2020 WL 3415026, at *32 (S.D.N.Y. June 22, 2020) (quoting Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006)). Plaintiff's unjust enrichment claims against Defendants Ability and ACH trace to the March 24, 2017 transaction, in which Series 2011-C sold its investments in Sancus and BEF Ltd. for a total of $56 million and diverted most of those sale proceeds to the Ability Reinsurance Trust. Plaintiff claims that it was entitled to Series 2011-C's investments and the sale proceeds and that Ability and ACH wrongfully misappropriated those investments and sale proceeds.

Ability and ACH argue that Plaintiff "did not convey a benefit upon" them, and Plaintiff is thus unable to establish the second prong of the cause of action. (E.g., ACH Mem. at 19.) According to Ability and ACH, any benefit must have been conferred by Series 2011-C, rather than Plaintiff, because Series 2011-C "simply sold shares it owned." (Id.) While an unjust enrichment claim requires that the plaintiff have a "possessory interest" in the benefits that accrued to Ability and ACH (i.e., the investments held by Series 2011-C and the sale proceeds thereof), see Sobel v. Eggleston, No. 12-CV-2551-DAB, 2013 WL 1344712, at *5 (S.D.N.Y. Mar. 28, 2013); Caro Cap., LLC v. Koch, 653 F. Supp. 3d 108, 124 (S.D.N.Y. 2023), a "defendant may be liable for unjust enrichment even though the plaintiff technically did not have legal title to the misappropriated property," Dover Ltd. v. Morrow, 534 F. App'x 29, 32 (2d Cir. 2013). The Court previously rejected Defendants' arguments that the unjust enrichment claims

should be dismissed because "the source of the alleged improper payments is alleged to be either Plaintiff or Alpha, rather than simply Plaintiff" and "that the assets in Series 2011-C did not belong to Plaintiff," reasoning that, "[t]o the extent that Defendants drew from that pool of funds [in Series 2011-C], that either diminished the value of Series 2011-C or reduced the funds available to secure Alpha's payment obligation to Plaintiff, regardless of whether the specific dollar came directly from Plaintiff's account." Great W. Ins. Co., 2020 WL 3415026, at *33.[17] The Court thus has already determined that Plaintiff's interests in Series 2011-C and Series 2011-C's assets are sufficient to support an unjust enrichment claim. That conclusion is law of the case, and it holds here.[18]

Ability and ACH also argue that Plaintiff "can only pursue an unjust enrichment claim if it directly conveyed a benefit upon [them]." (ACH Mem. at 20 (emphasis added).) That argument is based on a flawed reading of the law. An unjust enrichment claim "does not require a 'direct relationship between plaintiff and defendant,' nor does it 'matter whether the benefit [was] directly or indirectly conveyed.'" Great W. Ins. Co., 2020 WL 3415026, at *32 (quoting Myun-Uk Choi v. Tower Rsch. Cap. LLC, 890 F.3d 60, 69 (2d Cir. 2018)). The only requirement is that "'there must exist [some] relationship or connection between the parties that is not 'too attenuated.'" Id. (quoting Georgia Malone & Co. v. Rieder, 19 N.Y.3d 511, 516 (2012)). Plaintiff proffers evidence that Ability and ACH were concerned that the Ability Reinsurance Trust was underfunded (Pl. SAMF ¶¶ 455-543); that they orchestrated the March

---

17 The cases cited by Ability and ACH are distinguishable because, in those cases, the plaintiff did not have the requisite interest in the benefit conferred upon the defendant. (See, e.g., ACH Mem. at 19-20.)

18 The possessory interest requirement for an unjust enrichment claim is less "exacting" than the possessory interest requirement for a conversion claim because unjust enrichment is "based on 'broad considerations of right, justice and morality.'" Dover Ltd., 534 F. App'x at 32 (internal citation omitted).

24, 2017 transaction to fund the Ability Reinsurance Trust (Pl. SAMF ¶¶ 544-651); and that, even though they knew that Plaintiff had an interest in the investments held by Series 2011-C, they proceeded with the March 24, 2017 transaction (Pl. SAMF ¶¶ 652-87). Taken together, these factual proffers establish a sufficient relationship to overcome Defendants' argument.[19]

Next, the Court addresses the first and third prongs of the unjust enrichment claims. As to Plaintiff's claim against Ability, Plaintiff proffers evidence that Ability benefited, because the proceeds of the March 24, 2017 transaction were diverted to the Ability Reinsurance Trust Account, which had been established to benefit Ability. Plaintiff also proffers evidence that this enrichment was unjust. Thus, Plaintiff's unjust enrichment claim against Ability survives.

Plaintiff's unjust claim against ACH, however, is situated differently. As to the first prong of the unjust enrichment claim, ACH argues that it did not receive any benefit from the March 24, 2017 transaction. In its opposition, Plaintiff contends that ACH benefited by:

> (1) the sale of ACH's wholly-owned subsidiary Ability for approximately $20 million, which could not have occurred without the [Ability Reinsurance Trust] receiving approximately $54.4 million purchase price from the sale of 2011-C's BEF [Ltd.] and Sancus shares; (2) being the 100% owner of the recipient [i.e., Ability] of the $54.4 million purchase price for the BEF [Ltd.] and Sancus shares; and (3) being the purchaser of the BEF [Ltd.] shares, and as the majority owner of the purchasers of the Sancus shares, as well as by being the party to whom these financial benefits ultimately accrued.

(Pl. Opp. to Ability and ACH Mem. at 28.)

19 Again, the cases cited by Ability and ACH are distinguishable because in those cases the relationship between the plaintiff and the defendant was simply "too attenuated." See Great W. Ins. Co., 2020 WL 3415026, at *32 ("[T]he relationship is 'too attenuated' if all that is alleged is that the defendant's 'mere knowledge' of the plaintiff, or if the parties 'simply had no dealings with each other.'" (citations omitted)).

The first of these benefits cannot sustain the unjust enrichment claim because ACH was not something that ever "belong[ed] to the plaintiff." Nat'l Westminster Bank PLC v. Grant Prideco, Inc., 261 F. Supp. 2d 265, 275 (S.D.N.Y. 2003) As to the second asserted benefit, Plaintiff "must demonstrate either that [Ability's] corporate veil should be pierced or that [ACH] received a benefit separate and apart from [its] roles as owner[] of [Ability]." See Residential Fences Corp. v. Rhino Blades, Inc., No. 24-897-CV, 2025 WL 583323, at *4 (2d Cir. Feb. 24, 2025) (citation modified). "Absent such circumstances, courts apply the 'accepted principles that a corporation exists independently of its owners, as a separate legal entity, [and] that the owners are normally not liable for the debts of the corporation.'" Id. (quoting Morris v. New York State Dep't of Tax'n & Fin., 82 N.Y.2d 135, 140 (1993)). Because Plaintiff's only allegation of enrichment is through ACH's ownership of Ability and because Plaintiff fails to make a showing sufficient to support veil piercing, the second asserted benefit cannot support an unjust enrichment claim. (See Pl. Opp. to Ability and ACH at 34 (stating "there is no need to pierce the corporate veil").) The third asserted benefit also fails to satisfy the standard. Even though ACH purchased the BEF Ltd. shares, ACH subsequently transferred those shares to its subsidiaries (Sentinel Security Life Insurance Corporation, Ability Life Insurance Company, and Atlantic Coast Life Insurance Company), and there is no evidence that ACH received any consideration for the transfer. Because "the [shares] passed through" ACH, it cannot be shown that ACH "benefitted from them." Avilon Auto. Grp. v. Leontiev, 149 N.Y.S.3d 30, 32 (App. Div., 1st Dep't 2021). Furthermore, without a showing of veil piercing, ACH was not unjustly enriched merely because its subsidiaries received benefits. See Residential Fences Corp, 2025 WL 583323, at *4.

Accordingly, ACH is entitled as a matter of law to summary judgment dismissing Plaintiff's unjust enrichment claim (Count Five) against it. Ability's motion for summary judgment dismissing Plaintiff's unjust enrichment claim (Count Five) against it is, however, denied.

## B. Claims Against the Blue Defendants

Defendants Graham and BAAM move for summary judgment dismissing Plaintiff's breach of fiduciary duty (Count One), fraud (Count Three), and unjust enrichment (Count Five) claims against them; Defendant BCM moves for summary judgment dismissing Plaintiff's aiding and abetting breach of fiduciary duty (Count Two), fraud (Count Three), and unjust enrichment (Count Five) claims against it; and Defendants BEF Ltd. and Blue II move for summary judgment dismissing Plaintiff's aiding and abetting breach of fiduciary duty (Count Two) and unjust enrichment (Count Five) claims against them. For the following reasons, all of these motions are denied, except as to the fraudulent inducement claim that is premised on the negotiations over the Novation Agreement and the Trust Agreement, the unjust enrichment claim against BCM that is premised on fees paid by BEF Ltd., and the unjust enrichment claim against BEF Ltd.

### a. Whether Plaintiff's Breach of Fiduciary Duty and Fraud Claims Are Duplicative of Plaintiff's Contract Claims

As a threshold issue, the Blue Defendants argue that Plaintiff's breach of fiduciary duty and fraud claims are duplicative of contract claims. "A simple breach of contract claim is not to be considered a tort unless a legal duty independent of the contract itself has been violated . . . , which legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract." Frontier Ins. Co. v. Merritt & McKenzie, Inc., 73 N.Y.S.3d 267, 270 (App. Div., 3d Dep't 2018).

First, the Court considers Plaintiff's breach of fiduciary duty claims against Defendants BAAM and Graham. The Court previously held that these claims were not duplicative "because [] [Plaintiff] asserts no breach of contract claim and [] BAAM and Graham are not even alleged to have been parties to any of the operative agreements" and because "the Trust Agreement implicitly created a relationship of trust and confidence between Graham and BAAM on the one hand and Plaintiff on the other, which was independent from any of the explicit contractual obligations created by the Trust Agreement." Great W. Ins. Co., 2020 WL 3415026, at *19. In the current motion practice, the Blue Defendants dispute the premise of the Court's prior decision, that Graham and BAAM owed fiduciary duties (Blue Defs. Reply at 13-14), but those arguments are meritless for the reasons discussed below in connection with Plaintiff's breach of fiduciary duty claim.

The Blue Defendants further argue that New York law "bar[s] the bringing of a fraud claim against a contractual party's agent when the agent acts in a representative capacity on behalf of the principal." (Blue Defs. Mem. at 13-14 (citing, inter alia, Exch. Listing, LLC v. Inspira Techs., Ltd., 661 F. Supp. 3d 134, 157 (S.D.N.Y. 2023)). The Blue Defendants, however, misread the law. The cases cited by the Blue Defendants hold that "where the alleged misrepresentation is simply a representation by a non-party that the party will in fact perform under the contract (i.e., a representation made on behalf of the contracting party), courts have found fraud claims to be duplicative, even as against the non-party." Exch. Listing, 661 F. Supp. 3d at 157-58. This principle, which is specifically limited to fraudulent inducement, has no application to Plaintiff's breach of fiduciary duty claims because Plaintiff's breach of fiduciary duty claims are not premised on representations about performing under a contract, but rather on

BAAM's and Graham's special roles in managing the Trust Account, as explained below.[20] Accordingly, those breach of fiduciary duty claims are not duplicative.

The Court now turns to Plaintiff's fraud claims against Defendants BAAM, BCM, and Graham. The Blue Defendants argue that those claims are duplicative because BAAM, BCM, and Graham acted as agents on behalf of Alpha. (Blue Defs. Mem. at 13-15.) Under Exchange Listing's narrow holding, however, the agency relationship is irrelevant without a showing that the agents made a "misrepresentation of future intent to perform under the contract" as opposed to a "misrepresentation of present fact." Exch. Listing, 661 F. Supp. 3d at 156 (citation omitted). A plaintiff's tort claims are not foreclosed merely because the defendant is the agent of plaintiff's contractual counterparty. Outside of the narrow context of the fraudulent inducement claim against Graham and BAAM that is premised on a failure to disclose information during the negotiation of the Trust Agreement and Novation Agreement, which the Court discusses below, the Blue Defendants make no effort to show that Plaintiff made a "misrepresentation of future intent to perform under the contract." Id. All of Plaintiff's other fraud claims concern misrepresentations of present fact, namely the concealment of material facts regarding the liquidity of the Trust Account, so they are not duplicative.

b. Breach of Fiduciary Duty

Next, the Court turns to the merits of Plaintiff's breach of fiduciary duty claims against Defendants BAAM and Graham. "To establish a claim for breach of fiduciary duty, a

---

20 One of the cases cited by the Blue Defendants applied Exchange Listing to a breach of fiduciary duty claim. See Doe v. Yeshiva Univ., 703 F. Supp. 3d 473, 499 (S.D.N.Y. 2023). That case, however, gave very cursory treatment to the issue and provided no rationale for extending Exchange Listing to a different context, possibly because the court also found that the plaintiff had failed to state a fiduciary duty claim against either defendant.

plaintiff must prove (1) the existence of a fiduciary relationship; (2) misconduct by defendant constituting a breach of its fiduciary duty to plaintiff; and (3) damages to plaintiff directly caused by defendant's misconduct." Soley v. Wasserman, 823 F. Supp. 2d 221, 232 (S.D.N.Y. 2011) (citation modified). The Blue Defendants argue that Plaintiff cannot establish the first and second prongs.

As to the first prong, a "fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Great W. Ins. Co., 2020 WL 3415026, at *19 (citation omitted). "Such a relationship exists where . . . one party 'reposes confidence in another and reasonably relies on the other's superior expertise or knowledge.'" Id. (citation omitted).

At the motion to dismiss stage, the Court held that Plaintiff plausibly alleged the existence of a fiduciary duty based on the Trust Agreement's designation of BAAM as the "Investment Manager" of the Trust Account and Graham's assurances that the Trust Account assets would be invested prudently and in the best interest of Plaintiff. Id. at *18-21. Now, Plaintiff proffers sufficient facts in opposition to Defendants' summary judgment motion to back up those allegations. Before the Novation Agreement was executed, Graham wrote to Plaintiff, touting his investment acumen. (Pl. SAMF ¶ 83.) Graham also repeatedly represented to Plaintiff that the Trust Account assets would be invested in safe and secure assets, such as U.S. Treasury securities, and that the Trust Account was sufficiently funded. (Id. ¶¶ 237, 333, 335, 341, 349, 362.) It is also undisputed that the Trust Agreement designated BAAM, which Graham controlled, as the "Investment Manager" of the Trust Account. (Trust Agreement § 4(b).)

The Blue Defendants contend that a fiduciary duty cannot arise solely from BAAM's designation as the "Investment Manager" under the Trust Agreement.[21] (Blue Defs. Mem. at 16-17 (citing, inter alia, Oddo Asset Mgmt. v. Barclays Bank PLC, 19 N.Y.3d 584, 594 (2012).) That argument, however, has already been considered and rejected by the Court. In denying the motion to dismiss, the Court distinguished Oddo because "BAAM and Graham were not the recipients of Plaintiff's investment or an arms-length contracting partner, but the managers of a trust created specifically for the benefit of Plaintiff" and because "Plaintiff alleges that it communicated directly and repeatedly with BAAM and Graham, who provided assurances about the state of the assets on which Plaintiff relied." Great W. Ins. Co., 2020 WL 3415026, at *20 n.18. Having completed discovery, Plaintiff now proffers evidence to support the allegations in its complaint. In the face of Plaintiff's evidentiary proffer, the Blue Defendants dispute whether Plaintiff's evidence permits finding a fiduciary duty and submit contradictory evidence (Blue Defs. Mem. at 17-21; Blue Defs. Reply at 9), but weighing the competing evidence is precisely the type of exercise reserved for the jury at trial.[22]

Next, the Court considers the second prong and whether Plaintiff has framed a triable issue of fact as to whether Defendants Graham and BAAM breached their fiduciary duties by engaging in misconduct. The Court previously held that Plaintiff had plausibly pleaded a breach based on, inter alia, allegations that Graham and BAAM "conceal[ed] the true ownership

---

21 The Blue Defendants also argue that BCM replaced BAAM as the Investment Manager of the Trust Account in 2013. (Blue Defs. Mem. at 21.) Not only is BAAM's title not dispositive, but there are genuine disputes of fact as to whether BCM actually replaced BAAM. (See Pl. SAMF ¶¶ 133-65, 615.)

22 The Blue Defendants also argue that, without alter ego liability, a fiduciary duty cannot be imposed on Graham. (Blue Defs. Mem. at 17.) This argument, which is not supported by any legal citation, is without merit because Plaintiff proffers evidence of a fiduciary relationship between itself and Graham. Moreover, Plaintiff proffers sufficient facts to establish that BAAM's veil should be pierced, as explained below.

structure of Alpha and their connections with [Series 2012-A, Series 2011-C,] and the Blue Defendants for their own benefit; invest[ed] trust assets to benefit themselves and other entities, rather than Plaintiff; allow[ed] Ability to withdraw money from Series 2011-C despite knowing it belonged to Plaintiff; improperly disburs[ed] payments to themselves; appl[ied] false valuations to the Trust Account and the Repurchase Agreement to suggest the Trust Account was fully funded when it was not and to enable the removal of funds from the account; and ma[de] assurances to Plaintiff that its assets were properly invested when they were not and generally conceal[ed] the state of the assets." Great W. Ins. Co., 2020 WL 3415026, at *20. Plaintiff has now proffered sufficient evidence to support these allegations. Plaintiff, for example, proffers evidence that Defendants Graham and BAAM invested the Trust Account assets in a highly volatile financial instrument despite representations that those assets would be in safe and secure investments, such as U.S. Treasury securities (Pl. SAMF ¶¶ 396-427); that they received millions in fees based on their roles as managers of the issuer of that financial instrument (id. ¶¶ 433-43); that they siphoned funds from Series 2011-C to other parties, including to Ability via the March 24, 2017 transaction (id. ¶¶ 442-43, 544-651); that they directed the Trust Account to invest in assets related to themselves (id. ¶¶ 433-41); and that they made false assurances regarding the Trust Account's investments and that they concealed the value and liquidity of those investments (id. ¶¶ 133, 136, 154-64, 185-88).

Thus, Plaintiff's breach of fiduciary duty claim (Count One) against Defendants Graham and BAAM survives Defendants' motion for summary judgment.

c. Fraud

To prevail on its fraud claim against Defendants Graham, BAAM, and BCM, Plaintiff must prove that "(1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant intended to deceive plaintiff; (4) plaintiff believed and

justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss." Amusement Indus., Inc. v. Stern, 693 F. Supp. 2d 327, 347 (S.D.N.Y. 2010) (citation omitted). Plaintiff points to six different alleged misstatements as fraudulent. The Court evaluates each misstatement against the Blue Defendants' challenges under the first and second prongs of a fraud claim and then addresses the Blue Defendants' argument under fourth prong. For the reasons discussed below, five of the six fraud claims are sustainable, and one does not survive this motion practice.

1. The Novation Agreement and the Trust Agreement Negotiations

Plaintiff contends that when Graham, as an owner of Alpha, negotiated the Novation Agreement and the Trust Agreement with Plaintiff, Graham failed to disclose that "his present intention was to divert assets from the Trust [Account]." (Pl. Opp. to Blue and Sancus at 25-26.) This claim is duplicative of a breach of contract claim.

As explained above, the distinction key to the viability of simultaneous breach of contract and fraudulent inducement claims is between misrepresentation regarding intended future conduct to perform under a contract (duplicative) and misrepresentation concerning historical facts or the present state of facts (not duplicative). Exch. Listing, 661 F. Supp. 3d at 156; see also PetEdge, Inc. v. Garg, 234 F. Supp. 3d 477, 491 (S.D.N.Y. 2017) (noting that "[t]his rule applies even where the plaintiff does not assert a claim for breach of contract"). Plaintiff's focus on "intention" makes clear that Plaintiff's fraudulent inducement claim boils down to a claim that Graham misled it into believing that Graham would perform the contract faithfully in the future. Plaintiff's claim is therefore duplicative of its breach of contract cause of action and must be dismissed.

2. The Repurchase Confirmations

Each time the Repurchase Agreement with Series 2011-C was renewed, Series 2011-C sent Plaintiff a Repurchase Confirmation. (Pl. SAMF ¶¶ 133, 136, 154-64.) These Repurchase Confirmations—which Graham either executed (as the owner of BCM/BAAM, which were the Collateral Managers of Series 2011-C) or directed someone else to execute on behalf of Series 2011-C—summarized the Repurchase Agreement transactions, including the collateral that backed the Repurchase Agreement. (Id. ¶¶ 133, 136, 154-64) Plaintiff proffers sufficient facts to demonstrate that each of these Repurchase Confirmations was materially false because each omitted some or all of the facts that: Graham had misappropriated $22 million from the Trust Account on August 1, 2012 (id. ¶ 142); Graham invested the funds that were transferred by the Trust Account into risky investments rather than U.S. Treasury securities (id. ¶¶ 185-88; 396-420); Series 2011-C lacked sufficient assets to meet the described collateral requirements (id. ¶¶ 182, 433-443); and Series 2011-C had diverted funds to other parties, decreasing the funds collateralizing the Repurchase Agreements (id. ¶¶ 442-43).

3. The August 1, 2012 and October 22, 2012 Assurances

On August 1, 2012, in response to an inquiry from Plaintiff, Graham stated that "I checked the account [i.e., the Trust Account] and everything seems in order Balance of 153mm." (Id. ¶¶ 236-38.) Similarly, on October 22, 2012, Graham stated that "The trust is properly funded and has been, and is able and has been able to make the required distribution." (Id. ¶ 266.) Plaintiff proffers evidence that these statements were false because, on August 1, 2012, Graham misappropriated $22 million from the Trust Account. (Id. ¶¶ 120-31.)

4. The September 20, 2012 Email

On September 20, 2012, Donald Solow, one of the owners of Alpha, sent Plaintiff a summary of the July 25, 2012 Repurchase Agreement between Series 2012-A and the Trust

Account, describing the collateral that backed the Repurchase Agreement. (Id. ¶¶ 240-58.) Graham was copied on this email. (Docket entry no. 475-25, at 83.) Plaintiff asserts that Solow prepared the summary "with Graham's assistance and input." (Pl. Opp. to Blue and Sancus at 27.) While the evidence to support that specific assertion is weak, a reasonable juror could nonetheless infer that Graham "authorized or caused" the misstatements in the email "to be made" based on his high-level positions in Alpha and in BAAM, which was the Investment Manager of the Trust Account. Cf. Worldwide Fun Ltd. v. Sanuk Enters., Inc., No. 17-CV-3418-VEC, 2017 WL 11616418, at *3 (S.D.N.Y. Oct. 30, 2017). Plaintiff also adduces evidence that the email was false because it omitted, for example, the fact that Graham had misappropriated $22 million from the Trust Account on August 1, 2012. (Pl. SAMF ¶¶ 120-31.)

5. The January 7, 2014 Letter

On January 7, 2014, Gregory Tolaram, the COO of Alpha, sent Plaintiff a letter describing the "collateral backing the repurchase agreements [with Series 2011-C] held in the" Trust Account. (Pl. SAMF ¶¶ 29, 275-76.) Plaintiff contends that Graham was involved in drafting the letter, based on Graham's receipt of a draft of the letter and his high-level positions in Alpha, BAAM (the Investment Manager of the Trust Account), and BCM (the Collateral Manager of Series 2011-C). (Pl. Opp. to Blue and Sancus at 28 & n.5.) While Plaintiff's evidence is weak, it is sufficient to create a genuine dispute of fact as to whether Graham "authorized or caused [the misstatements in the letter] to be made." Cf. Worldwide Fun, 2017 WL 11616418, at *3. Plaintiff also proffers sufficient evidence to create a genuine dispute of material fact as to whether the letter contains false statements. According to Plaintiff, the letter omitted the facts that funds had been diverted from the Trust Account, such as $22 million on August 1, 2012, and that the cash collateral that purported to back the Repurchase Agreements

was actually pledged to support another financial instrument instead. (Pl. SAMF ¶¶ 126, 277-81, 396-412.)

6. The October 27, 2016 and November 1, 2016 Phone Calls

During an October 27, 2016 call, Graham told Plaintiff that the collateral for the Repurchase Agreements consisted of cash, mortgage notes, hedge fund positions, and senior secured loans. (Id. ¶ 341.) Plaintiff proffers that Graham also assured Plaintiff that there was sufficient collateral backing the Repurchase Agreements: "I think that the quantum of assets that are available in the context of the repurchase are pretty close to the last statement you have, which I think is 140 million," and, "I think the repo value that you all are showing, I think, at 140 million-ish is, I think, in line with what we'll come up with. It'll be right around that number." (Id.) On a November 1, 2016 call, Alpha's outside counsel told Plaintiff that the collateral backing the Repurchase Agreements included cash, shares of Blue Elite Fund, shares of Y TREE, secured senior loans, mortgages, derivatives, and CLOs. (Id. ¶ 349.) Graham was present on the November 1 call and did not contradict the statements of Alpha's counsel. (Id.) Plaintiff proffers sufficient evidence to establish triable issues of fact as to whether Graham's statements and omissions were false and material because Series 2011-C's account statements showed at the time that Series 2011-C, which was the counterparty to the Trust Account on the Repurchase Agreements, only had about $79 million in assets as of October 2016. (Pl. SAMF ¶¶ 176, 189.)

7. Justifiable Reliance

Having addressed the first and second prongs, the Court turns to the Blue Defendants' argument that Plaintiff cannot establish the fourth prong, justifiable reliance. According to the Blue Defendants, Plaintiff had robust audit rights under the Coinsurance Agreement that it never exercised. (Blue Defs. Reply at 12-13.) The Blue Defendants aver that

these contractual rights preclude a fraud claim because reliance is not reasonable where "a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means." (Id. at 13 (quoting Arfa v. Zamir, 905 N.Y.S.2d 77, 79 (N.Y. App. Div., 1st Dep't 2010) (citation omitted), aff'd, 17 N.Y.3d 737 (2011))). Plaintiff, however, proffers evidence that it could not have discovered the true nature of the fraud because, for example, Graham made repeated, direct assurances to Plaintiff. (Pl. SAMF ¶¶ 237, 333, 335, 341, 349, 362.) At this stage, there is a genuine dispute of material fact as to whether Plaintiff's reliance was reasonable. See DDJ Mgmt., LLC v. Rhone Grp. L.L.C., 15 N.Y.3d 147, 155 (2010).

Accordingly, Defendant are not entitled as a matter of law to summary judgment dismissing Plaintiff's fraud claim (Count Three).

d. Aiding and Abetting Breach of Fiduciary Duty

Plaintiff brings claims of aiding and abetting breach of fiduciary duty (Count Two) against BCM, BEF Ltd., and Blue II, arguing that each aided and abetted Graham's and BAAM's primary breaches of fiduciary duty. To survive summary judgment, Plaintiff must establish "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 294 (2d Cir. 2006) (citation omitted). For the reasons discussed below, all of Plaintiff's aiding and abetting claims survive these summary judgment motions.

1. BCM

The Blue Defendants contend that BCM cannot be liable as an aider and abettor because BCM replaced BAAM as the Trust Account's Investment Manager in 2013. (Blue Defs. Mem. at 28.) According to the Blue Defendants, after 2013, any fiduciary duties would have

been owed by BCM, as Investment Manager, and BCM could not aid and abet itself. (Id.) Not only is the title of "Investment Management" not dispositive as to the existence of a fiduciary relationship, or a lack thereof, but there is also a genuine dispute of fact as to whether BCM actually replaced BAAM (see Pl. SAMF ¶¶ 133-65, 615). Therefore, this claim survives.

2. BEF Ltd.

Plaintiff contends that BEF Ltd. aided and abetted the March 24, 2017 transaction. (Pl. Opp. to Blue Defs. and Sancus at 42.) In 2016, Series 2011-C invested in BEF Ltd., and on March 24, 2017, Series 2011-C sold that investment and transferred the proceeds to the Ability Reinsurance Trust rather than to the Trust Account. (Pl. SAMF ¶¶ 544-651.) At the motion to dismiss stage, the Court sustained a similar aiding and abetting claim against another Graham-controlled entity, Blue Elite Fund LP ("BEF LP"). Great W. Ins. Co., 2020 WL 3415026, at *29. In sustaining the claim, the Court rejected BEF LP's argument that it was "merely [a] passive recipient[] of money" like a bank used by wrongdoers to perpetuate their misconduct. Id. Unlike in cases involving "large banks or other companies that served not just the individual accused of the underlying misconduct, but also other customers," Graham was alleged to have "actively directed and controlled the activities" of BEF LP to further his misconduct. Id.

Plaintiff's aiding and abetting claim against BEF Ltd. survives summary judgment because Plaintiff proffers evidence sufficient to support a finding that BEF Ltd. was more than "merely [a] passive recipient[] of money." Id. Plaintiff has demonstrated that BEF Ltd. was involved in and facilitated the March 24, 2017 transaction, tendering evidence that Series 2011-C used the Trust Account's funds to purchase shares from BEF Ltd. in 2016 (Pl. SAMF ¶¶ 415-18); that Series 2011-C sold those BEF Ltd. shares on March 24, 2017 and that the proceeds were diverted to the Ability Reinsurance Trust (id. ¶¶ 602-51); that the BEF Ltd.

shares were sold at a significantly lower price than that for which Series 2011-C had purchased them (id. ¶¶ 415, 615); that Graham executed the BEF Ltd. Purchase Agreement on behalf of BEF Ltd. (id. ¶ 615); that BEF Ltd.'s directors, including Graham, signed a resolution approving the March 24, 2017 sale (id. ¶ 615); and that Graham controlled BEF Ltd. (id. ¶¶ 24-28).

3. Blue II

Plaintiff proffers evidence that Blue II was involved in the August 1, 2012 misappropriation, in that Graham invested $42 million in Blue II to conceal the misappropriation of $22 million from the Trust Account. (Id. ¶¶ 128-31.) There is also evidence that Graham controlled and operated Blue II. (Id. ¶¶ 11, 23, 34.) Graham's knowledge may be imputed to Blue II, see Great W. Ins. Co., 2020 WL 3415026, at *34. Altogether, this evidence is sufficient to enable Plaintiff's claim to survive summary judgment.

e. Unjust Enrichment

As explained above, to establish a claim of unjust enrichment (Count Five) against each of Defendants Graham, BAAM, BCM, and Blue II, Plaintiff must prove "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." Id. at *32 (quotation omitted). Plaintiff contends that Graham, BAAM, and BCM were unjustly enriched through $17 million in fees paid by Series 2011-C to BAAM and BCM; that Graham and BCM were unjustly enriched through $537,500 in fees paid by BEF Ltd. to BCM; and that Graham and Blue II were unjustly enriched through $547,662 in fees paid by Series 2011-C to BCM. (Pl. Opp. to Blue Defs. and Sancus at 46-47.) The Court addresses Defendant's principal arguments and each of the claims in turn, finding that the first and third claims survive but that the second does not.

1. Whether Plaintiff's Unjust Enrichment Claims Are Duplicative of Contract Claims

As a threshold issue, the Blue Defendants contend that Plaintiff's unjust enrichment claims are precluded by the existence of contracts that "cover[] the subject matter of the dispute." (Blue Defs. Mem. at 30.) First, the Blue Defendants point to the Coinsurance Agreement, the Novation Agreement, and the Trust Agreement. (Id. at 30-31.) The Court has already considered, and rejected, the argument that claims based on those contracts are duplicative of the unjust enrichment claims asserted here. Great W. Ins. Co., 2020 WL 3415026, at *34.

Next, the Blue Defendants argue that Plaintiff's unjust enrichment claims, to the extent that they are based on the fees paid by Series 2011-C to the Collateral Manager BAAM/BCM, are foreclosed by the existence of a Collateral Management Agreement. (Blue Defs. Mem. at 31.) Plaintiff's claim is not, however, based on the fees that BAAM/BCM earned as Collateral Manager. Rather, Plaintiff contends that BAAM/BCM received fees from Series 2011-C as the "basket manager" for a highly volatile swap derivative in which Series 2011-C invested. (Pl. SAMF ¶¶ 185-88, 396-413, 433-36.) Accordingly, this claim is not foreclosed by the Collateral Management Agreement.

2. Series 2011-C's Payment of $17 million in Fees to BAAM/BCM

The Blue Defendants challenge the evidence that Plaintiff proffers to support its contention that BAAM and BCM received $17 million in fees. (Blue Defs. Reply at 15.) According to the Blue Defendants, the only evidence of such receipt is an expert report, which relies on an unaudited financial statement of Alpha. While Plaintiff's evidence is admittedly weak, Plaintiff has met its burden at this stage by proffering admissible evidence. The Blue Defendants complain that the expert report improperly relies on inadmissible hearsay (id.), but

the financial statement could satisfy the business records exception. Fed. R. Evid. 803(6)(B), and expert opinions are admissible even if they rely on otherwise inadmissible evidence, Fed. R. Evid. 703.[23] Lastly, the Blue Defendants argue that Plaintiff did not have a possessory interest in the conferred benefit. (Blue Defs. Mem. at 31-32.) The fees were paid by Series 2011-C and, as discussed above, Plaintiff's interests in Series 2011-C and Series 2011-C's assets are sufficient to support an unjust enrichment claim.

3. BEF Ltd.'s Payment of $537,500 in Fees to BCM

The Blue Defendants argue that there is no evidence that BCM received the $537,500 payment from Plaintiff. (Blue Defs. Reply at 15.) Plaintiff proffers evidence that this payment was structured as a consulting fee, that BCM received the payment from BEF Ltd. after ACH's principals took over BEF Ltd. following the March 24, 2017 transaction, and that this payment induced BCM to facilitate the March 24, 2017 transaction. (Pl. Opp. to Blue Defs. and Sancus at 46; Pl. SAMF ¶ 612, 615, 641.) None of the evidence, however, establishes that the payment to BCM came from Plaintiff. Thus, this claim fails. Sobel, 2013 WL 1344712, at *5 ("In the absence of any . . . 'possessory interest,' Plaintiff cannot maintain a cause of action for unjust enrichment." (citation omitted)).

4. Series 2011-C's Payment of $547,662 in Fees to Blue II

The Blue Defendants argue that Blue II did not receive any benefit that belonged to Plaintiff. Plaintiff, however, proffers evidence to demonstrate that Series 2011-C paid Blue II $547,662 in connection with one of the transactions that effectuated the August 1, 2012

---

23 Defendants also contend that the expert report, which was submitted as an unsworn expert report, is inadmissible hearsay and cannot be considered in connection with the instant summary judgment. That argument fails because the Court granted Plaintiff's motion to file declarations and deposition testimony from its experts. These additional documents cure the issue identified by Defendants.

misappropriation. (Pl. SAMF ¶ 404.) Because the payment came from Series 2011-C and was allegedly used to effectuate a misappropriation from the Trust Account, this claim survives.

5. Whether an Unjust Enrichment Claim May be Sustained Against Graham

Finally, the Blue Defendants argue that an unjust enrichment claim cannot be sustained against Graham because there is no evidence that Graham personally received any benefit. (Blue Defs. Mem. at 31.) Plaintiff cannot argue that Graham was enriched merely because he owned BCM, BAAM, and Blue II, which are the entities that received payments. Rather, Plaintiff "must demonstrate either that [BCM's, BAAM's, and Blue II's] corporate veil should be pierced or that [Graham] received a benefit separate and apart from [his] roles as owner[] of [BCM, BAAM, and Blue II]." Residential Fences Corp., 2025 WL 583323, at *4. To pierce the veil, Plaintiff must show that: "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 386 F. Supp. 2d 461, 464 (S.D.N.Y. 2005) (quoting Morris v. N.Y. Dep't of Taxation and Fin., 623 N.E.2d 1157, 1160-61 (N.Y. 1993)). While Plaintiff fails to address veil piercing, Plaintiff proffers sufficient facts to support its arguments that BCM's, BAAM's, and Blue II's veils should be pierced based on Graham's sole ownership of BCM and BAAM, his management of Blue II, and the fact that Graham used each entity to facilitate fraud, breaches of fiduciary duty, and other misconduct. (Pl. SAMF ¶ 11). Therefore, the claims against Graham survive.

C. Claim Against Sancus

Sancus moves for summary judgment dismissing Plaintiff' aiding and abetting breach of fiduciary duty claim (Count Two) against it. (Docket entry no. 448.) As explained

above, to survive summary judgment, Plaintiff must establish "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." Lerner, 459 F.3d at 294.

As in its aiding and abetting claim against BEF Ltd., Plaintiff alleges that Sancus aided and abetted the March 24, 2017 transaction. (Pl. Opp. to Blue and Sancus at 23, 42-44.) For similar reasons, Plaintiff's claim against Sancus survives. Plaintiff has sufficiently demonstrated that Sancus aided and abetted the transaction by proffering evidence that Series 2011-C used the Trust Account's funds to purchase shares from BEF Ltd. in 2016 (Pl. SAMF ¶¶ 414-18); that Series 2011-C sold those Sancus shares on March 24, 2017 and that the proceeds were diverted to the Ability Reinsurance Trust (id. ¶¶ 602-51); that Graham executed the Sancus Purchase Agreement on behalf of Sancus (id. ¶ 615); that Sancus' directors, which included Graham, signed a resolution approving the March 24, 2017 sale (id. ¶ 615); and that Graham, who was a director of Sancus, played a role in managing Sancus (id. ¶¶ 42-43, 603-05, 695-717).

In support of its motion, Sancus contends that it did not possess actual knowledge of any breaches of fiduciary duty because Graham's knowledge cannot be imputed to Sancus. (Sancus Mem. at 16-19.) "[I]t is well established that 'a director's knowledge may not properly be imputed to a corporation unless it is gained within the scope of his activity with respect to that corporation.'" Sandoval v. Uphold HQ Inc., No. 21-CV-7579-LTS-BCM, 2025 WL 1268291, at *8 (S.D.N.Y. May 1, 2025); see also DGI-BNSF Corp. v. TRT LeaseCo, LLC, No. 18-CV-3252-VEC, 2019 WL 5781973, at *5 (S.D.N.Y. Nov. 6, 2019) ("When the principal is a corporation, it is presumptively liable for its agent's actions, and the agent's knowledge is presumptively imputed to the corporation, unless the agent acts outside the scope of his or her authority.").

According to Sancus, Graham "had a limited role as a director of Sancus" and Graham's knowledge of a breach of fiduciary duty "was plainly acquired within the scope of [his] duties as managing member of BAAM." (Sancus Mem. at 19.) Plaintiff, however, proffers sufficient facts to create a genuine dispute of material fact as to the scope of Graham's role at Sancus and whether that role was broad enough that Graham's knowledge may be imputed to Sancus. For example, Plaintiff proffers evidence that Graham was involved in setting up Sancus (Pl. Counterst. to Sancus 56.1 St. ¶ 17), that Sancus was set up as a "fund of one" for Graham (i.e., Graham was initially the only investor in Sancus) (id. ¶¶ 17, 22), that Graham managed Sancus' investments (id. ¶¶ 17, 25-29; Pl. SAMF ¶ 696), that Sancus' other director, Olga Chernova, had limited insight into Sancus' investments (Pl. Counterst. to Sancus 56.1 St. ¶¶ 17, 25-29), and that Graham persuaded Chernova to approve the March 24, 2017 transaction and forgo her veto rights (Pl. SAMF ¶ 711). This evidence meets Plaintiff's burden at this stage. See Sjunde AP-Fonden v. Goldman Sachs Grp., Inc., 798 F. Supp. 3d 416, 436 (S.D.N.Y. 2025) (imputing the knowledge of the CEO and Chairman of a corporation to the corporation because "[t]he knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation" (citation omitted)).

Sancus also argues that it did not provide substantial assistance because it was a "passive recipient of an investment from Series 2011-C"—much like a bank used by wrongdoers to perpetuate their misconduct. (Sancus Mem. at 20.) The Court rejected this same argument at the motion to dismiss stage because, unlike in cases involving "large banks or other companies that served not just the individual accused of the underlying misconduct, but also other customers," Graham was alleged to have "actively directed and controlled the activities" of Sancus to further his misconduct. Great W. Ins. Co., 2020 WL 3415026, at *28. Just as there is

a genuine dispute of material fact as to whether Graham's knowledge may be imputed to Sancus, there is also a genuine dispute of material fact as to whether Graham directed and controlled the activities of Sancus to further his breaches of fiduciary duty.

Accordingly, the motion summary judgment is denied as to the aiding and abetting breach of fiduciary duty claim (Count Two) against Sancus.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motions to Strike are denied, but in the future, Plaintiff must comply with the Court's instructions outlined above; Plaintiff's motion for leave to file additional documents is granted; Plaintiff's motion to seal is denied; Defendant Ability's motion for summary judgment is granted as to the conversion claim but denied as to the unjust enrichment claim; Defendant ACH's motion for summary judgment is granted; all of the Blue Defendants' motions for summary judgment are denied, except as to Plaintiff's fraudulent inducement claim premised on the negotiations over the Novation Agreement and the Trust Agreement and the unjust enrichment claim against BCM that is premised on fees paid by BEF Ltd; and Sancus' motion for summary judgment is denied. Docket entry nos. 437, 441, 448, 454, 460, 475, 480, 482, 484, 487, 502 are resolved.

The parties are directed to contact Magistrate Judge Netburn's chambers promptly to request a settlement conference and to discuss any necessary further proceedings.

SO ORDERED.

Dated: New York, New York
September 14, 2026

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge